Sandford L. Frey (SBN 117058)
**CREIM MACIAS KOENIG & FREY LLP**
633 West Fifth Street, 48th Floor
Los Angeles, CA 90071
Telephone: (213) 614-1944
Facsimile:  (213) 614-1961
sfrey@cmkllp.com

[Proposed] Reorganization Attorneys for
315 Arden, LLC, Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### [LOS ANGELES DIVISION]

| | |
|---|---|
| In re | CASE NO.:  2:15-bk-26483-BR |
| **315 ARDEN, LLC,** | Chapter 11 |
| Debtor and Debtor in Possession. | **NOTICE OF MOTION AND MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER AUTHORIZING FINAL POST-PETITION FINANCING BY DEBTOR'S MAJORITY EQUITY HOLDER PURSUANT TO BANKRUPTCY CODE § 364(b), ON AN UNSECURED BASIS, ALLOWABLE UNDER BANKRUPTCY CODE § 503(b)(1) AS AN ADMINISTRATIVE EXPENSE;** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF** |
| | [11 U.S.C. §§ 364 and 105; FRBP 4001(c); LBR 4001-2, 9013-1 and 9013-1(o)(2)(E)] |
| | DATE:        December 15, 2015<br>TIME:        2:00 p.m.<br>CTRM:       1668 |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1

2

## TABLE OF CONTENTS

I.    INTRODUCTORY STATEMENT ...............................................................................4

    A.    Background ......................................................................................................5

    B.    The Chapter 11 Bankruptcy Case and Jurisdiction.............................................7

    C.    The Property...................................................................................................8

    D.    The Financing .................................................................................................8

II. DISCUSSION THE DEBTOR SHOULD BE AUTHORIZED TO ENTER INTO  ITS
    POST-PETITION FINANCING ARRANGEMENT....................................................10

    A.    The Terms of the Proposed Financing are Fair and Adequate and Reflect
         an Appropriate Exercise of the Debtor's Business Judgment...........................10

    B.    Authorizing the Post-Petition Financing under Section 364(b) of the
         Bankruptcy Code is Justified because of the Tangible Benefits that the
         Bankruptcy Estate will Reap from such Financing...........................................11

III. CONCLUSION ........................................................................................................12

DECLARATION OF TZEPAH FREEDLAND .................................................................13

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ..................................... 10

*Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ................... 10

**Statutes**

11 U.S.C. § 1107(a) ........................................................................................................................ 8

11 U.S.C. § 1108 ............................................................................................................................ 8

11 U.S.C. § 506(c) ........................................................................................................ 2, 10, 11, 14

28 U.S.C. § 1334(b) ....................................................................................................................... 8

28 U.S.C. § 157(b)(2)(A), (D), (K) and (M) .................................................................................. 8

**Rules**

Federal Rules of Bankruptcy Procedure 4001(c)(B)(i)-(xi) ...................................................... 2, 10

Local Bankruptcy Rule 5005-2(d) .................................................................................................. 3

Local Bankruptcy Rule 9004-1(a) .................................................................................................. 3

Local Bankruptcy Rule 9013-1 ...................................................................................................... 1

Local Bankruptcy Rule 9013-1(f) .................................................................................................. 3

Local Bankruptcy Rule 9013-1(h) .................................................................................................. 3

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, SECURED CREDITORS AND ALL OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that on December 15, 2015 at 2:00 p.m., or as soon thereafter as can be heard, before the Honorable Barry Russell in Courtroom "1668" of the United States Bankruptcy Court, located at 1668 of the United States Bankruptcy Court, located at 255 E. Temple Street, Los Angeles, California, 315 Arden, LLC, Debtor and Debtor-in-Possession ("Debtor") will and does hereby move ("DIP Motion") for entry of an order authorizing and approving final post-petition financing by the Debtor's majority equity holder, the Daniel & Judith Arnall Family Trust. ("DIP Lender" or "Trust") in the amount of up to $150,000.00 ("DIP Loan"), which may be used for, among other things, quarterly fees, operating expenses, adequate protection payments (to the extent required), costs of administration (including, but not limited to, professional fees and expenses) and any other costs or expenses necessary for, or related to, administration of the estate ("Permitted Uses"). The DIP Loan will be made pursuant to Title 11, United States Code ("Bankruptcy Code"), Section 364 (b), on an unsecured basis, allowable under Bankruptcy Code § 503(b)(1) as an administrative expense; and, granting such other and further relief as is just and appropriate.

**PLEASE TAKE FURTHER NOTICE** that the DIP Motion is based on this Notice of Motion, the DIP Motion, the Memorandum of Points and Authorities, the Declaration of Ms. Tzepah Freedland, the statements and representations of counsel appearing at the hearing on the DIP Motion, Bankruptcy Code §§ 364 and 105, Federal Rule of Bankruptcy Procedure ("FRBP") 4001(c), Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR") 4001-2, 9013-1 and 9013-1(o)(2)(E), and all other evidence properly before the Court at the hearing on the DIP Motion.

**PLEASE TAKE FURTHER NOTICE** that there is no separate agreement for the financing and the DIP Motion and order thereon shall contain all of the terms of the financing arrangement.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**PLEASE TAKE FURTHER NOTICE** that the DIP Loan shall not accrue any post-petition interest until confirmation of a Plan of Reorganization by the Debtor at which time the rate, if any, shall be set by the Plan.

**PLEASE TAKE FURTHER NOTICE** that there are no payments required to be made under the DIP Loan during the pendency of the Case. The maturity date of the DIP Loan shall be the earlier to occur of: (a) entry of a final order confirming a plan in this case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default (expressly set forth below).

**PLEASE TAKE FURTHER NOTICE** that the DIP Loan is <u>not</u> being made by the DIP Lender on a secured basis. Other than being allowable as an administrative expense pursuant to Bankruptcy Code § 503(b)(1), the DIP Loan shall not be granted any lien on property of the estate or granted any priority.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with FRBP 4001(c)(B)(i)-(xi), LBR 4001-2(b) and Official Form 4001-2, notice is hereby given that the terms of the financing do not contain any provision for any of the following: cross-collateralization; waiving any claims respecting the validity, perfection or amount of any pre-petition debt; waiving any rights under Bankruptcy Code §506(c); providing for any liens against any avoidance actions; deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt; providing for any professional fee carve-outs; providing for the priming of any secured lien; divesting the Debtor of any discretion under a Plan; releasing any claims against the DIP Lender; granting relief from stay; or waiving any procedural requirements.

**PLEASE TAKE FURTHER NOTICE** that an "<u>Event of Default</u>" under the DIP Loan is limited to the occurrence or existence of any one or more of the following events: (a) failure or reversal of the final order approving the DIP Loan; (b) change of control; (c) interim and/or final appointment of a responsible officer for the Debtor or of a trustee or an examiner with powers of a trustee; (d) conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (e) dismissal of this Chapter 11 case.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**PLEASE TAKE FURTHER NOTICE** that LBR 9013-1(f) requires that a formal written response to the DIP Motion be filed at least fourteen (14) days before the hearing on the DIP Motion and served upon (i) Creim Macias Koenig & Frey LLP, reorganization counsel for the Debtors, at 633 W. 5th Street; 48th Floor; Los Angeles, California 90071, Attn: Sandford L. Frey; fax: (213) 614-1961; and (ii) the Office of the United States Trustee.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with LBR 5005-2(d), a paper copy of any such opposition (which meets the requirements of LBR 9004-1(a) must be marked **"Judge's Copy"** and must be served on the chambers of the Honorable Barry Russell, in the United States Bankruptcy Court, located at 255 E. Temple Street, Los Angeles, California, and, if such opposition is filed electronically, the "Judge's Copy" must be accompanied by a copy of the NEF confirming the filing.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure of any party to timely object to the DIP Motion may be deemed to constitute consent to the relief sought therein.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

1.     Approving the requested financing on final basis;

2.     Providing that the DIP Loan shall be entitled to an administrative claim under Bankruptcy Code § 503(b)(1);

3.     Granting any other and further relief as may be just and proper.

Dated: November 18, 2015        CREIM MACIAS KOENIG & FREY LLP


By: /s/ Sandford L. Frey
      SANDFORD L. FREY
[Proposed] Reorganization Attorneys for 315 Arden
LLC, Debtor and Debtor-In-Possession

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### INTRODUCTORY STATEMENT

4

By this DIP Motion[1], the Debtor seeks approval from this Court for final post-petition

5

financing to be provided by the DIP Lender, which is the Debtor's majority equity holder, the

6

proceeds of which will be used for Permitted Uses, until the Debtor has a reasonable opportunity

7

to propose and confirm its Plan. In fact, there are few cases more deserving of an opportunity to

8

reorganize than this case.

9

The Debtor is a limited liability company, the membership interest of which is held 80%

10

by the Trust. The beneficiaries of the Trust consist of Judith Arnall, a widow of approximately

11

thirty-nine years of age, with advanced Multiple Sclerosis (who is now permanently confined to a

12

wheel chair), and her fourteen year old minor child. The balance of the equity interest is held by

13

Ms. Tzepah Freedland (*aka* Tzepah Zarmi) ("Freedland"), the managing member. Prior to the

14

filing of this Chapter 11 case, the Debtor was the victim of a fraudulent real estate scheme, in

15

which a group of unscrupulous real estate professionals (including, the sellers and real estate

16

agents) fraudulently induced the Debtor, through their misrepresentations and reprehensible

17

conduct, into immensely overpaying for commercial property, located at 7101 W. Lincoln Avenue,

18

Buena Park, CA ("Property"), to the detriment of the Debtor, its creditors, as well as to the

19

detriment of the infirm widow, her minor child and Ms. Freedland.

20

The Debtor wishes to propose a Plan to reorganize in order to avoid further and irreparable

21

harm by, and a further windfall to, these unscrupulous real estate professionals. The Plan will

22

afford the Debtor (for the benefit of its creditors, the infirm widow, her minor child and Ms.

23

Freedland), a reasonable opportunity to rehabilitate the Property; locate a suitable tenant; have the

24

secured claim determined and its pending claims adjudicated; and eventually accomplish an

25

orderly, non-distressed sale of the Property within a reasonable period of time. As will be

26

27

---

[1] Capitalized terms shall have the meaning ascribed to them in the Notice, unless otherwise defined in the DIP Motion.

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1   discussed at the appropriate time, on balance, the purported secured creditor will not be harmed

2   by the Plan as a result of, among other things, the value of the Property, and the financial

3   wherewithal of the DIP Lender and its commitment to provide "new value," if necessary, to fund

4   the Plan – a Plan which will preserve the value of the Property for the Estate and eventually pay

5   unsecured creditors in full.

6   **A.    Background**

7        In February of this year, the Debtor was induced to purchase the Property from W Linc BP

8   LLC, ("W Linc"), which is a single purpose limited liability company believed to be owned by

9   Red Mountain Group, Inc. ("RMG"), and/or Red Mountain Retail Group, Inc. ("RMRG" and

10  together with W. Linc and RMG, the "Seller Entities").    On the basis of the numerous

11  misrepresentations made respecting the Property, its value and the viability of its tenants, and the

12  net worth of the personal guarantor purportedly providing security for the tenants' obligations,

13  among other things, the Debtor was induced to purchase the Property for $6,200,000, of which

14  approximately $4,800,000 was paid in **cash**, with the balance of the purchase price of

15  approximately $1,500,000 being carried back by one of the Seller Entities in the form of a

16  promissory note, secured by a deed of trust against the Property ("Disputed Secured Claim").

17  Theoretically, this should result in over a 400% equity cushion for the Disputed Secured Claim,

18  but for the misrepresentations of the Seller Entities/secured claimant respecting the Property.

19       After close of escrow for the Property, the Debtor discovered that it had been misled into

20  massively overpaying for the Property, as the Property was actually worth approximately three

21  million less than the $6.5 million purchase price[2], to say nothing of the $7 plus million value

22  represented to the Debtor.    As a result, the Debtor initiated an action in the Superior Court of the

23  State of California for the County of Orange, by filing on August 21, 2015, a *Complaint for (1)*

24  *Breach of Contract (Lease); (2) Breach of Contract (Guaranty); (3) Fraud and Intentional;*

25  *Misrepresentation (against Agents and Does); (4) Fraud and Intentional; Misrepresentation*

26  *(against Sellers and Does); (5) Intentional Concealment; (6) Negligent Concealment; (7)*

27

28  _____

[2] Needless to say, the lower valuation still results in an approximately 200% equity cushion.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Negligent Misrepresentation; (8) Breach of Fiduciary Duty; (9) Negligence; (10) Constructive*

*Fraud; and (11) Rescission*, ("State Court Complaint"), entitled *315 Arden LLC, a California*

*Limited Liability Company, Plaintiff, vs. Red Mountain Group, Inc., a California Corporation;*

*Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited*

*Liability Company; Luviland Corporation, a California Corporation; Luviland LLC, a California*

*Limited Liability Company, John Huy Nguyen, an individual, Eric Wohl, an individual; Hanley*

*Investment Group, Inc., a California Corporation, and, Does 1 through 40, inclusive,* Case No.

3D-2015-00805904-CU-FR-CJC ("State Court Action").  A copy of the State Court Complaint is

attached as ***Exhibit 1***.

In the interest of brevity, the Debtor will not reiterate in this Motion all of the background

and factual allegations set forth in the State Court Complaint, and will only summarize some of

the background supporting the claims, which summary should not be construed as a substitute for

a thorough reading of the entirety of the State Court Complaint for a full and complete

understanding as to the nature of the claims being asserted by the Debtor and this Estate.

Suffice it to say, material representations made to the Debtor concerning the tenants and

their financial condition were fabricated.  Instead of the Property being leased by strong viable

tenants as represented to the Debtor, the Debtor discovered subsequent to closing that the

representations were completely false.  Prior to closing, it was represented to the Debtor that one

tenant was a purportedly successful "trading" business, being run by a "high net worth" doctor,

which leasehold allegedly generated sufficient income to satisfy the tenant's rental obligations.

Instead, the Debtor discovered after closing that the actual tenant was a completely uncreditworthy

operator, which was operating an illegal business from the Property.  Furthermore, within only a

few weeks after the close of escrow, the tenant promptly breached the lease and abandoned the

leased premises, leaving the Debtor without any rental income whatsoever.  In addition, the Seller

Entities were aware, but failed to disclose, that this allegedly viable tenant was likely to, and

ultimately did, abscond with funds provided to the tenant, which were intended to be used

exclusively for improvements the Property.

Importantly, the tenant's defaults were completely predictable to the Seller Entities as, unbeknownst to the Debtor, the Seller Entities were aware that the real operator was an uncreditworthy judgment debtor engaged in running an illegal business; had been denied a business license for that reason; and, was likely to default.  Moreover, the Debtor discovered only after the tenant's abandonment of the Property that the Seller Entities know, but failed to disclose that: (1) the thrift store business in operation at the time of escrow, violated city zoning ordinances, and had been denied a business license before the Property was even offered for sale (and thus had no business license as of the time of sale); (2) the doctor and lease guarantor who was supposedly using part of the Property in conjunction with another business was not the operator of *any* business at the Property, and his "trading" businesses was pure fiction; (3) the thrift store that did exist at the Property was actually being operated illegally by a person who had received a "leasing commission" from one of the Seller Entities -- but whose involvement was never disclosed to the Debtor prior to the close of escrow even though it was known to the Seller Entities; (4) the same doctor and lease guarantor that was touted as a "high net worth" individual providing security for the lease obligations is financially incapable of paying the damages caused by tenant's breach of the lease, and had an unpaid and undisclosed federal tax lien against him and is appearing in the civil action in *pro per*; and (5) the tenant improvements that were supposed to have been completed at the close of escrow have never been made.

Apparently discontent with having successfully defrauded the Debtor out of "only" approximately $3 million in cash by virtue of their misrepresentations, the Seller Entities now have the temerity to also pursue a non-judicial foreclosure of the remaining value, pursuant to the fraudulently obtained deed of trust, thereby completing their defilement of the Debtor, its creditors, a sick widow, her minor child and Ms. Freedland.

## B.    The Chapter 11 Bankruptcy Case and Jurisdiction

The Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 27, 2015 ("Petition Date").  The Debtor continues to operate and manage its affairs as a debtor-in-possession pursuant to Bankruptcy Code

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

§§ 1107(a) and 1108. An official committee of creditors holding unsecured claims has not yet been formed. The Court has core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (D), (K) and (M).

## C.    The Property

The Property consists of approximately 56,628 square feet of land, with a one-story commercial building consisting of approximately 22,680 square feet, with its fixtures and improvements ("Commercial Building"). The Commercial Building is currently unoccupied for the reasons set forth above, although the Debtor intends to actively market the Property for lease.

As of the Petition Date, RMG (affiliate or alter ego of the W Linc, the seller of the Property), asserts that it is the beneficiary of a promissory note from the Debtor in the approximate amount of $1.5 million, secured by the Property and the Commercial Building. The alleged secured claim is subject to a bona fide dispute in its entirety, and the Debtor asserts damages against the Seller Entities.

## D.    The Financing

By this DIP Motion, the Debtor seeks approval for the DIP Loan (which is essentially a credit line) of up to $150,000.00 provided by the DIP Lender, which may be used by the Debtor for the Permitted Uses in connection with this Chapter 11 case.

The proposed DIP Loan is being made, pursuant to Bankruptcy Code §364(b), on an unsecured basis, allowable under Bankruptcy Code §503(b)(1) as an administrative expense. The proposed DIP Loan is not being made by the DIP Lender on a secured basis.

Other than being allowable as an administrative expense pursuant to Bankruptcy Code §503(b)(1), the DIP Lender shall not be granted a lien on any property of the estate or granted any priority. The proposed DIP Loan shall not accrue any post-petition interest until after confirmation of a Plan of Reorganization by the Debtor at which time the rate, if any, shall be set by the Plan. No payments are required to be made by the Debtor under the terms of the DIP Loan until after confirmation of a Plan of Reorganization by the Debtor at which time the payment term shall be set by the Plan. The DIP Loan has no maturity date (other than on confirmation of a plan or in the

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

event of default), the provisions of which are discussed below.  Because the Commercial Building is not occupied at this time, the Real Property is not generating any income and therefore there are no cash collateral issues in this case.

There is no separate agreement for the financing.  Instead, this DIP Motion and order approving this DIP Motion shall contain the full and complete terms of the financing arrangement.

### 1. Total Amount of Financing

Up to $150,000.00 total as the Debtor determines is necessary to draw down upon from time to time.

### 2. Interest

None until Confirmation of the Plan.

### 3. Loan Maturity

Upon the earlier to occur of: (a) entry of a final order confirming a Plan in this case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default.

### 4. Security Interest and Priority Rights

The DIP Loan is not being made by the DIP Lender on a secured basis.  Other than being allowable as an administrative expense pursuant to Bankruptcy Code § 503(b)(1), the DIP Loan shall not be granted any lien on property of the estate or granted any priority.

### 5. Default

An "Event of Default" under the DIP Loan is limited to the occurrence or existence of any one or more of the following events: (a) failure or reversal of the final order approving the DIP Loan; (b) change of control; (c) interim and/or final appointment of a responsible officer for the Debtor or of a trustee or an examiner with powers of a trustee; (d) conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (e) dismissal of this Chapter 11 case.

Upon the occurrence of any of the Events of Default listed above, the DIP Lender's remedy is limited to:  (a) declaring the DIP Loan to be due and payable; and, (b) asserting its rights as an administrative claimant subject to the provisions of the Bankruptcy Code.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

6.    **Release of Claims**

None

7.    **FRBP 4001(c)(B)(i)-(xi) and LBR 4001-2(b) Disclosures**

The terms of the financing do not contain any provision for any of the following:

a)    Cross-collateralization;
b)    Waiving any claims respecting the validity,
c)    Perfection or amount of any pre-petition debt;
d)    Waiving any rights under Bankruptcy Code §506(c);
e)    Providing for any liens against any avoidance actions;
f)    Deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt;
g)    Providing for any professional fee carve-outs;
h)    Providing for the priming any secured lien;
i)    Divesting the Debtor of any discretion under a Plan;
j)    Releasing any claims against the DIP Lender; granting relief from stay; or
k)    Waiving any procedural requirements.

## II.

### DISCUSSION

### THE DEBTOR SHOULD BE AUTHORIZED TO ENTER INTO

### ITS POST-PETITION FINANCING ARRANGEMENT

A.    **The Terms of the Proposed Financing are Fair and Adequate and Reflect an Appropriate Exercise of the Debtor's Business Judgment.**

Bankruptcy Courts give broad deference to the business decisions of chapter 11 debtors, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As the court noted in *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990), a "court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the DIP financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest."

1  The extension of post-petition financing in the instant case reflects the exercise of sound

2  and prudent business judgment by the Debtor.  The DIP Loan is being made available by the

3  Debtor's majority equity holder.  The terms of this financing remain more favorable than any other

4  financing alternative available to the Debtor, particularly in terms of the flexible maturity date and

5  that it will not accrue interest during the pendency of the Chapter 11 case.

6  Furthermore, the DIP Lender has not sought to make the advance on a secured basis.  Other

7  than being allowable as an administrative expense pursuant to Bankruptcy Code §503(b)(1), the

8  DIP Lender is not being granted a lien on any property of the estate or granted priority.  The

9  proposed financing by the DIP Lender also does not seek priority over other administrative

10  expenses of the kind specified in Bankruptcy Code Section 503(b)(1).

11  In addition, the DIP Lender has not requested any of the protections typically requested by

12  secured lenders or financial institutions, such as cross-collateralization; waiving any claims

13  respecting the validity, perfection or amount of any pre-petition debt; waiving any rights under

14  Bankruptcy Code § 506(c); providing for any liens against any avoidance actions; deeming pre-

15  petition debt to be post-petition debt or providing for any security for any pre-petition debt;

16  providing for any professional fee carve-outs; providing for the priming of any secured lien;

17  divesting the Debtor of any discretion under a Plan; releasing any claims against the insiders;

18  granting relief from stay; or waiving any other procedural requirements.

19  It is clear that the Debtor is unable to obtain financing from other lenders on terms as

20  favorable as those under the financing by the DIP Lender at no interest, no fixed payment and with

21  a flexible maturity date.  The financing is not only the best financing alternative available, it is the

22  only financing available on this basis.

23  **B.    Authorizing the Post-Petition Financing under Section 364(b) of the Bankruptcy**

24        **Code is Justified because of the Tangible Benefits that the Bankruptcy Estate will**

25        **Reap from such Financing.**

26  Bankruptcy Code §364(b) authorizes the obtaining of credit allowable under Bankruptcy

27  Code §503(b)(1).  Here, the proposed financing provides the Debtor with the ability to cover its

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

operating expenses and adequate protection payments, if any, required to be made to the Lender during the pendency of the case. Because the Commercial Building is currently vacant, the Debtor does not have any source of income and therefore the proceeds from the DIP Loan is the only way the Debtor can meet its operating expenses and costs of administration until a new tenant is found.

The Debtor intends to file a Plan within 60 days of the Petition Date which will provide for a "new value" infusion from the DIP Lender. The Debtor believes that an appraisal will assist in ascertaining the current fair market value of the Real Property, thereby potentially impacting the amount of the "new value" infusion required, if any, for confirmation of a plan. The DIP Loan will be used in part for such purposes.

In addition, paying the administrative fees, retaining professionals and maintaining continuity of the Debtor's professionals will enhance and accelerate the reorganization process.

## III.

## CONCLUSION

For the foregoing reasons, it is appropriate to approve the DIP Loan. The Debtor respectfully requests that this Court enter an order authorizing it to incur the requested debt, and granting relief as requested in the Motion.

Dated: November 18, 2015

CREIM MACIAS KOENIG & FREY LLP

By:   /s/ Sandford L. Frey
       SANDFORD L. FREY
[Proposed] Reorganization Attorneys for 315 Arden LLC, Debtor and Debtor-In-Possession

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

## DECLARATION OF TZEPAH FREEDLAND

I, Tzepah Freedland, declare as follows:

1.      I am one of the trustees of the Trust[3]. I am also a 20% equity holder in the Debtor and the managing member of the Debtor. If called to testify, I could and would testify competently concerning the contents of this Declaration. My knowledge of the facts set forth herein is based on my personal knowledge of the Debtor's books and records as well as my observations of the Debtor's assets.

2.      I make this declaration in support of the DIP Motion.

3.      The Trust has authorized, and is prepared to advance a DIP Loan of up to the amount of $150,000.00 as may be requested by the Debtor from time to time, which the Debtor may in its discretion use for, among other things, operating expenses, including an appraisal report if necessary, and costs of administration, including, but not limited to, professional fees and expenses in connection with this Chapter 11 case.

4.      There is little doubt that the terms of this financing offered by the Trust are more favorable than any other financing alternative available to the Debtor, particularly in terms of the flexible maturity date and lack of interest accruing during the pendency of the case. The Trust is the 80% equity interest holder in the Debtor and I hold 20%. I am the trustee of the Trust and in that capacity I am authorized to enter into this agreement with the Debtor.

5.      The Trust agrees that the maturity of the DIP Loan will be upon the earlier to occur of: (a) entry of a final order confirming a Plan in this case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default.

6.      The Trust understands and agrees that the DIP Loan is not being made by the DIP Lender on a secured basis. Other than being allowable as an administrative expense pursuant to Bankruptcy Code §503(b)(1), the DIP Loan shall not be granted any lien on property of the estate or granted any priority. The proposed financing offered by the Trust also does not seek any priority over other administrative expenses of the kind specified in Bankruptcy Code sections 503(b)(1).

---

[3] Capitalized terms shall have the meaning ascribed to them in the Motion, unless defined otherwise herein.

7.    The Trust further agrees to the limited "Events of Default" under the DIP Loan as set forth in the DIP Motion.

8.    In addition, the Trust has not demanded as a condition of the DIP Loan any of the protections which I understand are customarily requested by typical DIP lenders, such as cross-collateralization; waiving any claims respecting the validity, perfection or amount of any pre-petition debt; waiving any rights under Bankruptcy Code § 506(c); providing for any liens against any avoidance actions; deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt; providing for any professional fee carve-outs; providing for the priming any secured lien; divesting the Debtor of any discretion under a Plan; releasing any claims against the DIP Lender; granting relief from stay; or waiving any other procedural requirements.

9.    The financing is not only the best financing alternative available, it is the only financing available on this basis.

10.    The Debtor intends to propose a Plan which will provide for, among other things, a "new value" infusion from the Trust.  An appraisal will assist in ascertaining the value of the Real Property, thereby potentially impacting the amount of the "new value" infusion required for confirmation of a plan.  It is my understanding that the DIP Loan will be used in part for such purposes.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on November 13, 2015 in Beverly Hills, California.

_____
Tzepah Freedland
Title: Trustee of the Daniel & Judith Arnall Family Trust

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

EXHIBIT A

## TENANT'S ESTOPPEL CERTIFICATE

The undersigned, Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company as the tenant ("**Tenant**") under that certain lease dated October 6, 2014 (the "**Lease**") with W LINC BP, LLC ("**Landlord**"), for certain premises ("**Premises**") located in the shopping center commonly known as 7101 W. Lincoln Avenue ("**Shopping Center**") in the City of Buena Park, the County of Orange, State of California. The undersigned understands that RED MOUNTAIN RETAIL GROUP, INC./OR ASSIGNS has offered or committed to enter into a transaction with Landlord and that RED MOUNTAIN RETAIL GROUP, INC./OR ASSIGNS has requested this certificate (this "**Certificate**") from the undersigned as a condition precedent to the consummation of such transaction and will therefore be relying upon the representations and warranties contained herein.

The undersigned hereby states, declares, represents, warrants and certifies as follows:

1. A copy of the Lease attached hereto as **Exhibit A** is a true and correct copy of the Lease and constitutes the only agreement between Landlord and Tenant with respect to the leased Premises.

2. The Lease (including all exhibits) is in full force and effect, has not been terminated, and is enforceable in accordance with its terms.

3. The Lease has not been modified, amended, supplemented or changed in any way, except as follows: *None*

4. The Lease constitutes the entire agreement between Landlord and Tenant for the Premises, and there are no other agreements, written or oral, between Landlord and Tenant relating to the Premises.

5. Tenant has accepted possession of the Premises under the Lease and all items required to be performed by Landlord under the terms of the Lease as follows: Tenant Improvement Allowance $ 113,400.00 and Tenant Allowance $288,660.00, have been completed by Landlord within the time periods set forth in the Lease, and all required contributions by Landlord to Tenant on account of Tenant's improvements to the Premises have been paid in full as of close of escrow.

6. The term ("**Term**") of the Lease commenced on November 20th, 2014. The Term shall expire on November 30th, 2026. There are 2 (5) Year options to extend the Term for periods of 60 months each.

7. Neither Tenant nor Landlord has begun any action, or given or received any notice for the purpose of termination of the Lease.

8. Tenant is currently paying monthly rent under the Lease in the amount of $37,422 per month ("**Base Rent**").

9. The Base Rent under the Lease is current as of February 24th, 2015. The next payment of Base Rent is due on May 20th, 2015.

10.    No Base Rent or other charges have been paid more than thirty (30) days in advance of its due date, except as follows: $30,000.

11.    Tenant is currently paying percentage rent (if any) under the Lease in the amount of -0- per month ("**Percentage Rent**").

12.    Tenant is currently paying additional rent under the Lease for Tenant's share of common area expenses, taxes and insurance in the amount of $  0   per month ("**Additional Rent**").Tenant pays all expenses and NNN costs.

13.    The amount of Tenant's security deposit held by Landlord under the Lease is ____$0____ ("**Security Deposit**").

14. No default or event that, with the giving of notice or the passage of time, or both, would constitute a default on the part of the undersigned exists under the Lease, nor is the undersigned (to the best of its knowledge) aware of any default or event that with the passing of time or the giving of notice, or both, would constitute a default on the part of Landlord under the Lease.

15. The undersigned has not received notice of any assignment, hypothecation, mortgage or pledge of Landlord's interest in the Lease or of any rents or other amounts due thereunder.

16. Any and all free rent, except as set forth in the Lease, will be paid at the close of escrow and Landlord has not given or conceded to Tenant any other concessions, abatements or compromises with respect to the rental obligations under the Lease.

17. All offsets or credits against or defenses to payment of any monetary obligations payable under the Lease will be handled as of close of escrow.

18. The Lease does not contain, and Tenant does not have, any options or rights, including, without limitation, expand the Premises, rights of first offer or refusal (or other rights) to purchase the Premises or any part thereof or all or any part of the real property of which the Premises are a part.

19. No actions, whether voluntary or otherwise, are pending against Tenant under the bankruptcy laws of the United States or any state thereof.

20. Tenant has not assigned, sublet or otherwise transferred Tenant's interest in the Lease or the Premises to any party.

21. To the best of Tenant's knowledge, the use, maintenance and operation of the Premises currently complies with all applicable federal, state, county or local statutes, laws, rules and regulations, including those relating to environmental, health or safety matters.

22. Tenant has not received notice of any alleged violation of any law governing the use or operation of the Premises and no outstanding writs, injunctions, decrees, orders or judgments are pending, or to the best of Tenant's knowledge, threatened, concerning the use, maintenance or operations of the Premises by Tenant, nor is the Tenant aware of the basis for any such proceeding.

23. The undersigned is authorized to execute this Certificate on behalf of Tenant.

24. This Certificate and the Lease are legal, valid, binding and enforceable obligations of Tenant.

Tenant executes this Certificate with the understanding that Lessor is contemplating selling the Premises, and Landlord, RED MOUNTAIN RETAIL GROUP, INC. and their respective successors and assigns (including any mortgagee or beneficiary under a deed of trust or mortgage) will rely on this Certificate.

Dated: 2/24/2005

TENANT:

By: _____

Print Name: JOHN NGUYEN

Print Title: PRESIDENT

EXHIBIT B

## LEASE AGREEMENT

LANDLORD:    Red Mountain Retail Group Inc. a California corporation or
"assignee"

TENANT:    Luviland Corporation, a California corporation and Luviland, LLC, a
California limited liability company

dba _____ TBD _____

ARTICLE I          GRANT AND TERM ...................................................... 1
    Section 1.01      Grant..................................................................... 1
    Section 1.02      Term and Commencement Notice ............................ 1
    Section 1.03      Extension Options .................................................. 1
    Section 1.04      Purchase and Sale of Demised Premises by
                      Landlord.................................................................. 1
    Section 1.05      Memorandum of Lease ........................................... 2

ARTICLE II         RENT ......................................................................... 2
    Section 2.01      Rent During Term................................................... 2
    Section 2.02      Payment of Rent ..................................................... 2
    Section 2.03      Security Deposit...................................................... 2
    Section 2.04      Percentage Rent..................................................... 2
    Section 2.05      Interest for Late Payments ..................................... 2
    Section 2.06      Late Charges .......................................................... 3
    Section 2.07      "NNN" Lease ........................................................... 3

ARTICLE III        USE OF PREMISES.................................................... 3
    Section 3.01      Use of Demised Premises....................................... 3
    Section 3.02      Continuous Occupancy .......................................... 3
    Section 3.03      Prohibition of Use................................................... 3
    Section 3.04      Hazardous Substances........................................... 4

ARTICLE IV         CONSTRUCTION, REPAIRS, ALTERATIONS AND
                   MAINTENANCE........................................................... 6
    Section 4.01      Construction of Improvements by Tenant ................ 6
    Section 4.02      Repairs by Tenant to Demised Premises................. 7
    Section 4.03      Alteration and Remodeling...................................... 7
    Section 4.04      Mechanic's Liens.................................................... 8
    Section 4.05      Compliance ............................................................. 9
    Section 4.06      No Services by Landlord .......................................... 9
    Section 4.07      Maintenance of the Demised Premises.................... 9

ARTICLE V          TAXES....................................................................... 9
    Section 5.01      Personal Property Taxes......................................... 9
    Section 5.02      Ad Valorem Taxes: Charges and Assessments:
                      and Utility Charges................................................... 9

ARTICLE VI         INSURANCE INDEMNITY ......................................... 11
    Section 6.01      Indemnity............................................................... 11
    Section 6.02      Insurance by Tenant. ............................................ 12
    Section 6.03      Increase in Insurance Rate.  ................................. 14
    Section 6.04      Waiver of Subrogation.  ........................................ 14

ARTICLE VII        SIGNS AND AWNINGS............................................. 15
    Section 7.01      Signs and Awnings................................................ 15

ARTICLE VIII       UTILITIES................................................................ 15
    Section 8.01      Tenant's Responsibility for Utilities Consumed ...... 15
    Section 8.02      Alternative Billing.................................................. 15

ARTICLE IX         ASSIGNMENT SUBLETTING AND MORTGAGING ...... 15
    Section 9.01      Assignment and Subletting. .................................. 15
    Section 9.02      Violation ................................................................ 17
    Section 9.03      Subordination........................................................ 17
    Section 9.04      Easements by Landlord ......................................... 17
    Section 9.05      Demised Premises Free from Liens ....................... 18
    Section 9.06      Bankruptcy Assignment ........................................ 18
    Section 9.07      Bankruptcy Assignment-Payment of Consideration
                      for Assignment...................................................... 18

ARTICLE X         CONDEMNATION ....................................................... 19
    Section 10.01      Whole Taking ................................................. 19
    Section 10.02      Partial Taking ............................................... 19
    Section 10.03      Condemnation Proceedings ...................................... 19
    Section 10.04      Waiver of Termination ........................................ 19

ARTICLE XI        DESTRUCTION OF DEMISED PREMISES ............................. 19
    Section 11.01      Destruction of Demised Premises. ............................. 19

ARTICLE XII       SURRENDER OF PREMISES ...................................... 20
    Section 12.01      Liability for Return of Demised Premises ..................... 20
    Section 12.02      Abandonment .................................................. 20

ARTICLE XIII      DEFAULT AND REMEDIES ....................................... 20
    Section 13.01      Default by Tenant ............................................ 20
    Section 13.02      Landlord's Remedies; Termination ............................. 21
    Section 13.03      Landlord's Remedies; Re-Entry Rights ......................... 22
    Section 13.04      Continuation of Lease ........................................ 22
    Section 13.05      Injunction ................................................... 22
    Section 13.06      No Waiver .................................................... 22
    Section 13.07      Indemnity .................................................... 22
    Section 13.08      Attorneys' Fees .............................................. 22
    Section 13.09      Default by Landlord .......................................... 22
    Section 13.10      Curing Tenant's Defaults ..................................... 23
    Section 13.11      Waiver of Breach ............................................. 23
    Section 13.12      Waiver of Redemption ......................................... 23

ARTICLE XIV       INSPECTION OF PREMISES ..................................... 23
    Section 14.01      Landlord's Right to Inspect .................................. 23

ARTICLE XV        QUIET ENJOYMENT ............................................ 23
    Section 15.01      Landlord's Covenant of Quiet Enjoyment ....................... 23

ARTICLE XVI       HOLDING OVER ............................................... 23
    Section 16.01      Rent for Holding Over Period ................................. 23

ARTICLE XVII      TITLE ...................................................... 24
    Section 17.01      Condition of Title and of Demised Premises ................... 24

ARTICLE XVIII     MISCELLANEOUS .............................................. 24
    Section 18.01      Notices; Rental Payments ..................................... 24
    Section 18.02      Partial Invalidity ........................................... 24
    Section 18.03      Entire Agreement ............................................. 24
    Section 18.04      Successors in Interest ....................................... 24
    Section 18.05      Headings ..................................................... 24
    Section 18.06      Applicable Law ............................................... 24
    Section 18.07      Definition of Landlord ....................................... 24
    Section 18.08      Tenant's Estoppel Certificate; Additional
                       Documents. ................................................... 25
    Section 18.09      Intentionally Omitted ........................................ 25
    Section 18.10      Intentionally Omitted ........................................ 25
    Section 18.11      Maintenance Bond ............................................. 25
    Section 18.12      No Partnership ............................................... 26
    Section 18.13      Effect of Statements Submitted by Landlord ................... 26
    Section 18.14      Arbitration .................................................. 26
    Section 18.15      Counterparts ................................................. 26
    Section 18.16      Default under Franchise Agreement by Tenant .................. 26
    Section 18.17      Brokers ...................................................... 26
    Section 18.18      Strict Construction .......................................... 26
    Section 18.19      Force Majeure ................................................ 26
    Section 18.20      Waiver of Jury Trial ......................................... 27
    Section 18.21      Tenant's Authority ........................................... 27

EXHIBITS

EXHIBIT "A"    SITE PLAN

EXHIBIT "B"    FORM OF LEASE GUARANTY AGREEMENT

EXHIBIT "C"    DELETED

EXHIBIT "D"    DELETED

## INDEX

Page(s)

ADA .............................................................................................................. 12
Affiliate ........................................................................................................ 20
Affiliated ...................................................................................................... 24
Alterations ................................................................................................... 11
Authorized Use ............................................................................................. 3
Claims.......................................................................................................... 15
Corrective Action........................................................................................... 7
Demised Premises.......................................................................................... 1
Effective Date................................................................................................ 1
Environmental Law ........................................................................................ 6
Environmental Laws ...................................................................................... 4
Environmental Permits................................................................................... 6
Excluded Claims .......................................................................................... 15
Guarantor....................................................................................................... 1
Guaranty ........................................................................................................ 1
Hazardous Substances .................................................................................. 6
Improvements .............................................................................................. 10
Landlord................................................................................................... 1, 28
Landlord Parties .......................................................................................... 15
Landlord's Broker ........................................................................................ 29
Late Charge .................................................................................................. 3
Lease ............................................................................................................. 1
Mortgage...................................................................................................... 21
Original Tenant .............................................................................................. 1
PCBs.............................................................................................................. 5
Purchase and Sale Agreement ...................................................................... 1
reasonableness.............................................................................................. 8
Recorded Agreements ................................................................................. 13
Release .......................................................................................................... 7
Rent ............................................................................................................... 2
Summary ........................................................................................................ i
Taxes ........................................................................................................... 13
Tenant............................................................................................................ 1
Tenant's Broker............................................................................................ 30
Tenant's Parties ........................................................................................... 15
Utilities ........................................................................................................ 18
worth at the time of award........................................................................... 25

## SUMMARY OF BASIC LEASE INFORMATION

This Summary of Basic Lease Information ("Summary") is hereby incorporated into and made a part of the attached Lease. Each reference in the Lease to any term of this Summary shall have the meaning as set forth in this Summary for such term. In the event of a conflict between the terms of this Summary and the Lease, the terms of the Lease shall prevail. Any capitalized terms used herein and not otherwise defined herein shall have the meaning as set forth in the Lease.

| TERMS OF LEASE (References are to the Lease) | | DESCRIPTION | |
|---|---|---|---|
| 1. | Date: | October 6 , 2014 | |
| 2. | Landlord: | Red Mountain Retail Group, Inc., a California corporation, or its assigns | |
| 3. | Address of Landlord: | 1234 E. 17 th Street Santa Ana, CA 92701 Attention:  Asset Manager | |
| 4. | Tenant: | Luviland Corporation, a California corporation and Luviland LLC, a California limited liability company, dba | |
| 5. | Business Address of Tenant: | Attention: _____ | |
| 6. | Term. | | |
| | 6.1    Lease Term: | Twelve (12) years. | |
| | 6.2    Commencement Date: | That date which is determined to be the Turnover Date | |
| | 6.3    Lease Expiration Date: | That date which is the last day of the month in which the twelfth (12th) anniversary of the Commencement Date | |
| | 6.4    Rent Commencement Date: | That date which is six (6) months following the Commencement Date | |
| 7. | Basic Rent: | | |
| Lease Year | Annual Basic Rent | Monthly Installment of Basic Rent | |
| Lease Years 1-5 | $449,064 | $37,422* *Months 1 – 6 shall be abated in full | |
| Lease Years 6-12 | $484,992 | $40,416 | |
| Options | See Lease | Rental during the Extension Options shall be increased at the commencement of each Extension Option to one hundred eight percent (108%) of the Basic Rent payable in the immediately preceding year | |
| 8. | Pre-Paid Rental: | $30,000 equal to two (2) months | |
| 9. | Broker(s): | None | |
| 10. | Tenant Improvement Allowance | $113,400.00 | |

## LEASE AGREEMENT

This Lease Agreement ("Lease") made and entered into this _____ day of September, 2014 (the "**Effective Date**") by and between Red Mountain Retail Group, Inc., a California corporation or its assigns ("**Landlord**") and Luviland Corporation, a California corporation and Luviland LLC, a California limited liability company dba _____ (hereinafter called "**Tenant**").

### W I T N E S S E T H:

### ARTICLE I
### GRANT AND TERM

**Section 1.01 Grant.**    Subject to the terms hereof, Landlord does by these presents lease and demise unto Tenant, and Tenant rents from Landlord that certain real property of that certain lot or parcel of land of approximately 56,628 square feet located at 7101 W. Lincoln Avenue, Buena Park, CA together with the first floor of the building located thereon consisting of approximately 22,698 square feet of floor area, and all building equipment, fixtures and other improvements thereon, as further depicted in Exhibit "A" attached hereto (collectively, the "**Demised Premises**"). Both land area and building area shall be subject to further verification via a boundary survey or ALTA upon which time this lease shall be amended and the correct land and building area shall be corrected.

**Section 1.02 Term.**    This Lease shall be effective upon the Effective Date (as defined above). The Term of this Lease shall commence upon the Commencement Date (as defined in the Summary of Basic Lease Information) and shall expire on the Lease Expiration Date (as defined in the Summary of Basic Lease Information), unless sooner terminated or extended as permitted herein, and if extended, the "Term" will include any applicable option periods.

**Section 1.03 Extension Options.**    Provided that Tenant is not in default under this Lease (after expiration of all applicable notice and cure periods) as of the date of exercise of any option granted by this Section 1.02 (and, at Landlord's option, as of the commencement of the applicable option period), Landlord hereby grants to Tenant two (2) option periods to extend the term of this Lease for five (5) years each upon the same terms and conditions as those set forth in this Lease. Tenant shall notify Landlord by written notice of Tenant's intention not to renew the Lease. Said notice must be mailed certified, return receipt mail or via a recognized overnight delivery service, signature required, and must be received by Landlord one hundred eighty (180) days prior to the expiration of the then current term, otherwise said option shall be deemed exercised as of the date that is one hundred eighty (180) days prior to the expiration of the then current term. If Tenant elects (in writing) not to exercise any option prior to the expiration of such one hundred eighty (180) day period, then such extension option (and any succeeding option, if any) shall forever terminate and be of no further force or effect. Any such extension option is personal to the original Tenant executing this Lease ("**Original Tenant**"), may not be exercised by any person or entity other than the Original Tenant and shall become null and void if the Original Tenant assigns its interest in this Lease or sublets all or any portion of the Demised Premises, unless such assignment or sublease is to an Affiliate that is an assignee of Original Tenant's entire interest in the Demised Premises pursuant to Section 9.01(c) of this Lease.

**Section 1.04 Purchase and Sale of Demised Premises by Landlord.**    Landlord and Tenant acknowledge that, as of the date of this Lease, Landlord does not own the Demised Premises. As of the date hereof, Landlord (as buyer) has entered into that certain Purchase Contract ("**Purchase Contract**") dated July 29, 2014 for Landlord's acquisition of the Demised Premises. In the event Landlord has not completed the acquisition of the Demised Premises on or before December 31, 2014, unless otherwise agreed in writing by Landlord and Tenant, this Lease shall automatically terminate and neither party shall have any further obligation to the other except Landlord shall promptly return to Tenant any prepaid rent and the Security Deposit.

-1-

Section 1.05 Memorandum of Lease. Neither Landlord nor Tenant shall record this Lease. In addition, Tenant shall not record a short form memorandum of this Lease without the prior written consent (and signature on the memorandum) of Landlord. Landlord, at its option, shall have the right to record a short form memorandum of this Lease. If such short form memorandum is recorded in accordance with this Section 1.05, the party requesting the recording shall pay for all costs of or related to such recording, including, but not limited to, recording charges and documentary transfer taxes.

## ARTICLE II
### RENT

Section 2.01 Rent During Term. The monthly Basic Rent payable by Tenant to Landlord during the Lease shall be as provided in Section 7 of the Summary of Basic Lease Information.

Section 2.02 Payment of Rent. The monthly Basic Rent plus all sums payable by Tenant under this Lease (collectively "Rent") shall be due on the first (1st) of each month for the period in which it relates and paid by Tenant to Landlord at the address shown in Section 3 of the Summary or at such other place as Landlord may in writing designate, without any right of notice, demand, deduction or set-off, except as expressly set forth herein.

Section 2.03 Security Deposit and Prepaid Rent. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be obligated to pay to Landlord a Security Deposit pursuant to the terms of this Lease; provided, however, concurrently with Tenant's execution and delivery of this Lease to Landlord, Tenant shall deposit with Landlord the Pre-Paid Rental designated in Section 8 of the Summary of Basic Lease Information (i.e., $30,000.00). The Pre-Paid Rental shall be applied Fifteen Thousand and 00/100 Dollars ($15,000.00) to the seventh (7th) and eighth (8th) monthly installments of Basic Rent due pursuant to the terms of this Lease.

Section 2.04 Tenant Allowance. Notwithstanding anything to the contrary contained in this Lease, Landlord shall pay to Tenant a tenant allowance in the sum of Two Hundred Eighty Eight Thousand Six Hundred Fifty Nine and 20/100 Dollars ($288,659.20), to be paid as an offset to the Basic Rent payable by Tenant for the first three (3) years of the Term of this Lease as set forth below. Notwithstanding the foregoing to the contrary, at any time during the Term of this Lease, Landlord may elect, at its sole election, to provide a lump sum payment to Tenant of any then remaining credit balance, in lieu of continuing such monthly credits as set forth below. In the event Landlord elects to provide said lump sum payment, Landlord shall so notify Tenant in writing and deliver such notice to Tenant together with any such lump sum payment. It is agreed and understood that following Landlord's payment of any such lump sum credit balance that the monthly offset, as set forth in this paragraph, shall thereafter be deemed null and void and Tenant shall thereafter be obligated to pay all Basic Rent in full pursuant to the schedule set forth in the Summary of Basic Lease Information.

| Months | Monthly Offset | Annual Offset | Total |
|--------|---------------|---------------|-------|
| 1-6 | $0 | $0 | |
| 7-12 | $22,422.00 | $134,533.20 | |
| 13-24 | $ 9,422.00 | $113,064.00 | |
| 25-36 | $ 3,422.00 | $ 41,062.00 | |
| | | | $288,659.20 |

Section 2.05 Percentage Rent. Notwithstanding anything to the contrary in this Lease, Tenant shall not be obligated to pay Landlord "percentage rent." Notwithstanding the foregoing, Tenant shall be responsible for reporting its gross sales to Landlord on a monthly basis.

Section 2.06 Interest for Late Payments. Notwithstanding any provision to the contrary set forth elsewhere in this Lease, and regardless of the provisions set forth in

Section 13.01 below with regard to cure periods, if Tenant shall fail timely to pay to Landlord any installment of Rent on the date on which such sum is due pursuant to the terms of this Lease, Tenant shall pay to Landlord interest on such late payment from the date which is ten (10) days following the due date thereof to the date of receipt of payment by Landlord at a rate per annum equal to twelve and one-half percent (12.5%) or the maximum rate permitted under applicable laws but in no event to exceed that permitted under applicable laws.

Section 2.07 Late Charges. Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult and costly to ascertain. Such costs include, but are not limited to processing, administrative and accounting charges. Accordingly, if any installment of Rent or any other sum due from Tenant is not received by Landlord as set out herein within five (5) days after such amount is due, Tenant shall pay to Landlord a late charge equal to five (5%) percent of such overdue amount ("**Late Charge**"). The parties hereby agree that such Late Charge represents a fair and reasonable estimate of the costs Landlord will incur as a consequence of late payment by Tenant. Acceptance of such Late Charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder, at law and/or in equity.

Section 2.08 "NNN" Lease. It is the intention of the parties that this Lease is a so called "NNN" Lease and that Landlord, except as otherwise expressly provided herein, will have no responsibility for and shall not pay for the construction, care, maintenance, operation, repair, replacement, alteration, addition, change, improvements, insurance and Taxes (defined below) for or to the Demised Premises and any building and improvement thereof; Tenant shall be responsible for and shall pay these items in addition to Rent.

**ARTICLE III**
**USE OF PREMISES**

Section 3.01 Use of Demised Premises. The Demised Premises shall be used for the operation of a store specializing in the sale of general merchandise at wholesale and/or close-out prices ("Authorized Use") and for no other purpose. In addition, the Demised Premises shall not be used in any manner, which is in violation of the requirements of any laws, ordinances, rules, regulations and requirements of any federal, state, municipal governments, or the provisions of recorded agreements.

Section 3.02 Continuous Occupancy. Tenant shall occupy the Demised Premises promptly upon the Commencement Date and thereafter throughout the Term; and upon completion of the Improvements (as defined in Article IV below) shall continuously, actively and diligently use the entire Demised Premises throughout the Term for the Authorized Use and for no other purpose in an efficient, businesslike and reputable manner, subject, however, to temporary interruption of business for a reasonable period of time approved by Landlord for authorized repairs, alterations and remodeling as permitted under this Lease. Further, Tenant shall at all times keep and maintain within and upon the Demised Premises adequate supplies and products and have sufficient personnel to service and supply the demands and requirements of its customers. Tenant shall have its exterior signs and exterior advertising displays (which have previously been approved by Landlord) adequately illuminated continuously during Tenant's hours of operation. If Tenant shall fail to continuously and uninterruptedly operate the business which it is required to operate under the terms of this Lease, Tenant acknowledges that monetary damages may be inadequate to compensate Landlord and that Landlord shall be entitled to injunctive relief ordering Tenant to resume such continuous operation and to pursue any and all other rights and remedies under this Lease, at law, or in equity, including termination as a result thereof.

Section 3.03 Prohibition of Use. Tenant shall have no claim against Landlord for damages and the validity of this Lease shall not be affected in any manner whatsoever, should the use and occupancy of the Demised Premises for the Authorized Use be prohibited or impaired by reason of any law, ordinance or regulation of federal, state,

county of municipal governments or by reason of any act of any legal or governmental or other public authority or by any Recorded Agreements (as defined in Section 5.02(b)(ii) below).

### Section 3.04  Hazardous Substances.

(a)    Compliance with Law.  Tenant shall conduct, and cause to be conducted, all operations and activity at the Demised Premises in compliance with, and shall in all other respects applicable to the Demised Premises comply with, all applicable federal, state and municipal statutes, ordinances, regulations, orders, directives or other requirements of law or common law orders, directives or other requirements of law or common law (collectively, **"Environmental Laws"**) concerning: (i) the generation, use, handling, treatment, storage, transportation, release, disposal, remediation or presence of any Hazardous Substances (as defined below) in, on, under, from or connected with operations and activities at the Demised Premises; and (ii) storage tanks and related facilities and connections (if any).  Tenant shall timely obtain and maintain all permits, licenses or approvals and shall timely prepare, make, maintain and/or submit all notifications, registrations, records, reports and other documents as required by Environmental Laws.  Tenant shall at all times comply with the terms and conditions of such permits, licenses, approvals, notifications and registrations.

(b)    Information Transfer.  Tenant shall provide to Landlord copies of the following, forthwith after each shall have been prepared, submitted or received by Tenant or any occupant of the Demised Premises: (i) all applications and associated material submitted to any governmental agency required under any Environmental Laws; (ii) all notifications, registrations, records, reports or other documents and supporting information prepared, maintained or submitted to any governmental agency required under any Environmental Laws; (iii) all permits, licenses and approvals, and amendments or modifications thereof, required under any Environmental Laws; and (iv) any correspondence, notice of violation, summons or order, administrative, civil or criminal complaint, notice of investigation, request for information or other document received by Tenant or any occupant of the Demised Premises relating to any Hazardous Substances pertaining to the Demised Premises.

(c)    Handling of Hazardous Substances.  Should Tenant be responsible for any release of Hazardous Substances at the Demised Premises, Tenant shall immediately take all measures necessary to contain, remove and dispose from the Demised Premises all materials released or contaminated by the release, and remedy and mitigate all threats to public health or the environment relating to such release. When conducting any such measures and when using and handling Hazardous Substances Tenant shall comply with all Environmental Statutes.  Further, Tenant, at Tenant's sole cost and expense, shall cooperate with any action plan, directive or order for clean-up or remediation of the Demised Premises by any federal, state or local authority which is regulating any release or violation of any environmental statute, rule, order or regulation.

(d)    Grease Traps.  Tenant shall obtain prior written approval from the Landlord for the installation of any replacement grease trap, whether above or underground, at the Demised Premises, and shall comply with all applicable laws and regulations concerning its installation, operation and closure.

(e)    Property Transfer.  If Tenant's use of any portion of the Demised Premises, for any purpose, results in the requirement to obtain an approval of any kind by any governmental agency administering Environmental Laws due to: (i) cessation of part or all of the operations on the Demised Premises for any reason, or (ii) a change in the operations on the Demised Premises to a use that requires such approval, Tenant shall, in compliance with all applicable requirements, and at Tenant's sole cost and expense, immediately apply for and obtain for Landlord the required approval and perform all remedial actions necessitated in whole or part by Tenant's activities at the Demised Premises.  Tenant and Landlord shall cooperate as necessary to prepare any such application and represent and warrant that any such application made pursuant to this subsection shall be true and complete to the best knowledge, information and belief

-4-

of each. If such a governmental approval requirement exists, but Tenant believes that it is not subject to such requirement, Tenant, at its sole cost and expense, shall obtain for Landlord a statement from the applicable governmental agency that the Demised Premises is not subject to such requirement.

(f)    Definitions.  For the purposes of this Section 3.04, the terms listed below shall be defined as they are defined in the provisions of law listed below and the regulations promulgated pursuant thereto as amended from time to time or in future federal legislation or in corresponding present or future provisions of law or regulation in the state where the Demised Premises are located.

(i)    air pollutant - 42 U.S.C. '7602 (g).

(ii)    discharge of pollutant - 33 U.S.C. '1362 (12)

(iii)    release - 42 U.S.C. '9601 (22).

(iv)    storage - 42 U.S.C. '6903 (33), without limitation as to the material involved.

(v)    disposal - 42 U.S.C. '6903 (3), without limitation as to the material involved.

(vi)    Solid Waste - 42 U.S.C. '6903 (27).

(vii)    Hazardous Substance shall mean and include any hazardous or toxic materials, substances or wastes as now or hereafter designated or regulated under any Environmental Law, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls ("PCBs"), and freon and other chlorofluorocarbons, except for ordinary and general office supplies, such as copier toner, liquid paper, glue, ink and common household cleaning materials as well as other materials used and stored by Tenant in the Demised Premises as part of Tenant's permitted use, all to the extent used and stored in compliance with all Environmental Laws (some or all of which may constitute "Hazardous Substances" as defined in this Lease).

(g)    Tenant's Environmental Indemnity.  To the fullest extent permitted by law, Tenant agrees to promptly indemnify, protect, defend and hold harmless Landlord and the Landlord Parties from and against any and all claims, damages, judgments, suits, causes of action, losses, liabilities, penalties, fines, expenses and costs (including, without limitation, clean-up, removal, remediation and restoration costs, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees and court costs) which arise or result from (i) the presence of Hazardous Substances on, in, under or about the Demised Premises during the Term of this Lease and/or (ii) the presence of Hazardous Substances on, in, under or about the Demised Premises which are caused or permitted by Tenant or any of Tenant's Parties, including arising from or caused in whole or in part, directly or indirectly, by (i) the presence in, on, under or about the Demised Premises, of any Hazardous Substances; (ii) Tenant's or other user's actual, proposed or threatened use, treatment, storage, transportation, holding, existence, disposition, manufacturing, control, management, abatement, removal, handling, transfer, generation or release (past, present or threatened) of Hazardous Substances to, in, on, under, about or from the Demised Premises; (iii) any past, present or threatened non-compliance or violations of any Environmental Laws in connection with Tenant and/or the Demised Premises, (iv) personal injury claims (v) the payment of any environmental liens, or the disposition, recording, or filing or threatened disposition, recording or filing of any environmental lien encumbering or otherwise affecting the Demised Premises, (vi) diminution in the value of the Demised Premises, (vii) damages for the loss or restriction of use of the Demised Premises, including prospective rent, lost profits and business opportunities, (viii) sums paid in settlement of claims, (ix) reasonable attorneys' fees, consulting fees and expert fees, (x) the cost of any investigation of site conditions, and (xi) the cost of any repair, clean-up or remediation ordered by any governmental or quasi-governmental agency or body or

otherwise deemed necessary in Landlord's reasonable judgment. Tenant's obligations hereunder shall include, without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, cleanup or detoxification or decontamination of the Demised Premises, or the preparation and implementation of any closure, remedial action or other required plans in connection therewith.  For purposes of the indemnity provisions in this Section 3.04, any acts or omissions of Tenant and/or Tenant's Parties or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to Tenant.  The provisions of this Section 3.04(g) will survive the expiration or earlier termination of this Lease.

(h)    General Compliance.  The provisions of this Section 3.04 shall not be construed as limiting in any respect the covenants and obligations of Tenant under Section 4.05 hereof.

**ARTICLE IV**
**CONSTRUCTION, REPAIRS, ALTERATIONS AND MAINTENANCE**

Section 4.01 Construction of Improvements by Tenant.  Landlord shall, at Landlord's sole cost and expense, and at its option either install new heating ventilation and air conditioner unit(s) ("HVAC") in the Demised Premises or perform all work necessary to deliver the existing HVAC in good working order on the Turnover Date (as defined herein).  It is agreed and understood that delivering the HVAC in good working order is the only work required by Landlord prior to the Turnover Date.  Tenant shall accept possession of the Demised Premises, together with all permanent building fixtures, easements, rights, permits and infrastructure, on the date that Landlord notifies Tenant that the Demised Premises is available for Tenant to perform, at Tenant's sole cost and expense, any and all improvements to the Demised Premises that Tenant desires or as is deemed necessary for Tenant to use the Demised Premises for Tenant's Authorized Use ("the Turnover Date").  All such improvements performed by Tenant in the Demised Premises shall be hereinafter collectively referred to as the "Improvements".  As material inducement to Landlord entering into this Lease and notwithstanding any provision to the contrary, Tenant represents and warrants:

(a)    Tenant will perform the Improvements to Tenant's specifications at its sole cost and expense, subject to the Tenant Improvement Allowance (as defined below),  and no representation or warranties have been made by Landlord to Tenant regarding the Demised Premises including but not limited to Tenant's proposed use or the development of the Demised Premises as contemplated herein.  As such, Tenant hereby agrees that the Demised Premises shall be taken "as is", "with all faults", "without any representations or warranties", except as expressly noted in the immediately preceding paragraph, and Tenant hereby agrees and warrants that it has investigated and inspected the condition of the Demised Premises and the suitability of same for Tenant's purposes, and Tenant does hereby waive and disclaim any objection to, cause of action based upon, or claim that its obligations hereunder should be reduced or limited because of the condition of the Demised Premises or the suitability of same for Tenant's purposes.  Tenant acknowledges that neither Landlord nor any agent nor any employee of Landlord has made any representations or warranty with respect to the Demised Premises or with respect to the suitability of either for the conduct of Tenant's business and Tenant expressly warrants and represents that Tenant has relied solely on its own investigation and inspection of the Demised Premises in its decision to enter into this Lease and let the Demised Premises in the above-described condition.

(b)    All costs required to develop the Improvements are the responsibility of the Tenant.  Tenant shall defend, indemnify, and hold Landlord harmless from and against any and all claims, demands, costs, obligations, liens, expenses (including attorney's fees and costs), and legal actions brought against Landlord which arise out of Tenant's development of the Improvements and from the actions, omissions, or negligence of Tenant, or any Tenant's Parties (as defined in Section 6.01(a)(i) below).

(c)      Tenant will construct the improvements pursuant to all applicable building codes, laws, ordinances and other regulations of governmental authority in a good, substantial and workmanlike manner.

(d)      Tenant will open for business with a Certificate of Occupancy and License to operate its business issued by the State of California or any other entity claiming authority to issue said license.  Tenant will obtain all other governmental approvals or permits necessary, if any, to operate its business upon the Demised Premises.

(e)      Tenant shall be solely responsible for all claims, defects, disputes, or causes of action of any manner arising from the construction of the improvements.

(f)      Tenant is unaware of any fact materially affecting the value or desirability of the Demised Premises whether or not said facts is/are readily observable. In the event Tenant shall become aware of any such fact or circumstance during the term of this Lease, Tenant shall immediately advise Landlord of such fact or circumstance.

(g)      Provided Tenant is not in default of this Lease beyond any applicable notice and cure period, Landlord shall pay to Tenant a tenant improvement allowance (the "Tenant Improvement Allowance") of One Hundred Thirteen Thousand Four Hundred Dollars ($113,400.00) within thirty (30) days following the later of (a) Tenant opening for business at the Demised Premises, (b) completion of the Improvements in the Demised Premises and inspection and approval by Landlord or Landlord's authorized agent or property manager of such Improvements, and (c) Landlord's receipt from Tenant of (i) a copy of the certificate of occupancy for the Demised Premises, (ii) copies of paid invoices for work and/or materials for permanent improvements made to the Demised Premises by or on behalf of Tenant (which shall equal at least the amount of the Tenant Improvement Allowance), (iii) final permits for Tenant's Work (if applicable), and (iv) unconditional final lien waivers from all contractors and/or material suppliers performing work or providing supplies for Tenant's improvements to the Demised Premises (which shall equal at least the amount of the Tenant Improvement Allowance). It is agreed and understood that Landlord may deduct from the Tenant Improvement Allowance any amounts due and owing to Landlord prior to disbursement of the Tenant Improvement Allowance to Tenant.   The Tenant Improvement Allowance shall not be used for furniture, fixtures or equipment, design or other fees, permits or signs, or other personal property.

Section 4.02  Repairs by Tenant to Demised Premises.  Tenant shall, throughout the Term of its Lease and at its sole cost and expense, take good care of the Demised Premises and its appurtenances and keep them in good order, condition and repair, normal wear and tear excepted, and in compliance with all of the terms and provisions of all laws, and all Recorded Agreements.  Tenant shall promptly make all repairs and replacements necessary to maintain such good order, condition, repair and compliance. Tenant shall keep and maintain all portions of, in and about the Demised Premises in a clean and orderly condition, and free of accumulations of dirt, rubbish, snow, ice and water.

Section 4.03  Alteration and Remodeling.  After completion of the Improvements, Tenant shall not, without on each occasion first obtaining Landlord's prior written consent, make or permit to. be made any alterations, improvements or additions (collectively, the "Alterations") to the Demised Premises of a value greater than Ten Thousand Dollars ($10,000.00) per Alteration.   Landlord's Consent shall not be unreasonably withheld.  Any Alterations made by Tenant including both those that do and do not require Landlord's prior written consent, shall not affect or impair the structure of the building nor reduce its value; and Tenant shall give to Landlord at least thirty (30) days prior written notice of any such Alteration. All plans for any Alterations shall be subject to Landlord's reasonable approval.  Landlord may impose, as a condition of its consent to all Alterations or repairs of the Demised Premises, such requirements as Landlord in its reasonable discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, materials, mechanics and materialmen approved by Landlord (such approval shall not

be unreasonably withheld, conditioned or delayed).    Tenant shall construct such Alterations and perform such repairs in conformance with any and all applicable rules and regulations of any federal, state, county or municipal code or ordinance and pursuant to a valid building permit, issued by the city in which the Demised Premises is located, and in conformance with Landlord's construction rules and regulations. Landlord's approval of the plans, specifications and working drawings for Tenant's Alterations shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities. All work performed by Tenant with respect to any of its Alterations must be done in a good and workmanlike manner and diligently prosecuted to the end that the Demised Premises shall at all times be a complete unit except during the period of work.    If Tenant makes any Alterations, Tenant agrees to carry (or have its contractor carry) "Builder's All Risk" insurance in an amount reasonably approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to this Lease immediately upon completion thereof.    In addition, Landlord may, in its discretion, require Tenant to obtain (at Tenant's sole cost and expense) a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee.  Promptly after completion of any Alterations, Tenant shall (i) cause a Notice of Completion to be recorded in the office of the Recorder of the county in which the Demised Premises is located in accordance with Section 3093 of the Civil Code of the State of California or any successor statute, (ii) deliver to Landlord a reproducible copy of the "as built" drawings of the Alterations, and (iii) deliver to Landlord evidence of payment, contractors' affidavits and full and final waivers of all liens for labor, services or materials used in the construction of the Alterations.  Except as otherwise provided herein, all Alterations and other property attached to the Demised Premises or any part thereof made or installed by Tenant shall immediately upon completion or installation thereof be and become part of the Demised Premises and the property of the Landlord without payment therefor by Landlord, and shall be surrendered to Landlord upon the expiration or earlier termination of the Term of this Lease.    Notwithstanding the foregoing, Tenant agrees that all removable trade fixtures and personal property installed by Tenant in the Demised Premises must be removed by Tenant at the termination of the Term of this Lease.  Tenant agrees that it will at its own cost and expense forthwith repair any and all damage done by the removal of any Alterations, fixtures, trade fixtures and personal property.

   Section 4.04  Mechanic's Liens.

       (a)    Prior to the making of any alterations or changes or the performance of any construction or work performed or authorized by Tenant which may give rise to a mechanic's lien, Tenant shall provide a statement in writing to Landlord assuring that payment for same will be made by Tenant and shall give Landlord reasonable opportunity to post a Notice of Non-responsibility.    Tenant hereby completely and fully indemnifies Landlord, and agrees to defend and hold Landlord harmless from and against, any mechanic's lien or other lien or claim in connection therewith.

       (b)    If any mechanic's, laborer's or materialman's lien shall at any time be filed against the Demised Premises or any part thereof by reason of work performed by or at the direction of the Tenant within thirty (30) days after notice of filing thereof, Tenant shall cause it to be discharged by payment or bonding. If Tenant shall fail to cause such lien to be discharged by payment or bonding within the period aforesaid, then in addition to any other right or remedy, the Landlord may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in such event, Landlord shall be entitled, if it so elects to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, cost and allowances. Any amount so paid by Landlord and all cost and expenses incurred by it in connection therewith, together with interest thereon at the rate of twelve percent (12%), from the respective dates of the making of the

payments and incurring of the costs and expenses, shall be immediately due and payable by the Tenant to Landlord.

(c)    Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific alteration, addition, improvement or repair to the Demised Premises or any part thereof.

Section 4.05 Compliance.  Tenant shall, throughout the Term of this Lease, at Tenant's sole cost and expense, promptly comply with all laws and ordinances, and all notices, orders, rules, regulations and requirements of federal, state and municipal governments and appropriate departments, commissions, boards, and officers thereof, or any other body now or hereafter constituted exercising similar functions, which are applicable to the condition, use, occupancy, improvement, and alteration or improvement (whether structural or non-structural, including unforeseen and/or extraordinary alterations or improvements, and regardless of the period of time remaining in the Term) of the Demised Premises, including, without limitation, the provisions of the Americans with Disabilities Act ("ADA") as it pertains to the condition, use, occupancy, improvement and alteration (whether structural or non-structural, including unforeseen and/or extraordinary alterations or improvements, and regardless of the period of time remaining in the Term) of the Demised Premises.  Tenant shall not use or allow the Demised Premises to be used (a) in violation of any Recorded Agreements affecting the Demised Premises or of any law or governmental rule or regulation, or of any certificate of occupancy issued for the Demised Premises, or (b) for any improper, immoral, unlawful or reasonably objectionable purpose.  Tenant shall not cause, maintain or permit any nuisance in, on or about the Demised Premises, nor commit or suffer to be committed any waste in, on or about the Demised Premises. Without limiting the generality of the foregoing, Tenant shall keep in force at all times all licenses, consents and permits necessary for the lawful use of the Demised Premises and Tenant shall pay all personal property taxes, income taxes, license fees, sales tax payable on rent, and other taxes and common area charges, if any, which are or may be assessed, levied or imposed upon the Demised Premises or Tenant in connection with Tenant's operation of its business upon the Demised Premises.

Section 4.06 No Services by Landlord.  Landlord is not and shall not be required to render any services of any kind to Tenant.

Section 4.07 Maintenance of the Demised Premises.  Tenant shall at his sole cost, keep and maintain said Demised Premises and appurtenances and every part thereof, including the building structure, roof, interior walls and utility lines, plumbing, sewer, electrical, heating and air conditioning, any store front, parking areas, sidewalks and landscaping and the interior and exterior of the premises in good sanitary order, condition, and repair.  Landlord shall have no repair or maintenance obligations whatsoever pertaining to the Demised Premises.

## ARTICLE V
## TAXES

Section 5.01 Personal Property Taxes.  Tenant shall pay all personal property taxes levied by any federal, state, municipal or other authority with respect to its property located on the Demised Premises and Tenant shall pay all sales taxes levied by any federal, state, municipal or other authority with respect to the Demised Premises, and reimburse Landlord for any tax assessed against Landlord on the Rent payable under this Lease, and shall hold the Landlord harmless with respect thereto.

Section 5.02 Ad Valorem Taxes: Charges and Assessments: and Utility Charges.

(a)    Tenant shall pay throughout the Term of this Lease, as additional rent, within twenty (20) days after receipt of a bill therefore from Landlord, or, as provided in Section 5.02(e) below, from the levying authority or within ten (10) days of its due date, whichever is later, all Taxes (as defined in Section 5.02(b)).  Tenant shall,

at its expense, and upon notice to Landlord, have the right to contest any and all such taxes in the name of, and on behalf of Landlord. Landlord shall, at Tenant's sole cost and expense, reasonably cooperate with Tenant in any such contest by Tenant. Tenant shall have the right to receive a copy of any notice that Landlord receives in connection in with any such contest.

    (b)    The term **"Taxes"** shall mean:

    (i)    all levies, taxes (including payments required to be made in lieu of taxes), assessments, liens, licenses and permit fees, charges for public utilities and commercial rental taxes imposed, assessed or charged on or with respect to Landlord's interest in the Demised Premises or this Lease, or the Demised Premises by any federal, state, municipal or other authority; or under any law, ordinance, or resolution of any federal, state municipal or other authority; and

    (ii)    any assessments, charges, levies or other Impositions imposed, assessed or charged on or with respect to Landlord's interest in the Demised Premises or this Lease, or the Demised Premises pursuant to the terms and provisions of an agreement, covenant, easement, restriction, declaration or other matter now of record or hereafter placed of record against the Demised Premises (all such terms and provisions referred to in this subsection (ii) being herein collectively called **"Recorded Agreements"**); and,

    (iii)    all other charges, imposts or burdens whatsoever of any kind and nature, whether or not particularized by name and whether general or special, ordinary or extraordinary, foreseen or unforeseen, which at any time during the Term of this Lease may be created, levied, assessed, confirmed, adjudged, imposed or charged upon or with respect to the Demised Premises, or any improvements made thereto, or on any part of the foregoing or any appurtenances thereto, or directly upon this Lease or the Rent payable hereunder, or amounts payable by any subtenant or other occupants of the Demised Premises or with respect to the leasing, operation, use or occupancy of the Demised Premises, or upon this transaction or against Landlord because of Landlord's estate or interest herein, by any federal, state, municipal or other authority, or under any law, ordinance or regulation of any federal, state, municipal or other authority, including among others, all special tax bills and general, special or other assessments and liens or charges made on local or general improvements or under any governmental or public power or authority whatsoever, and transit taxes, taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, and personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, furniture and other personal property used in connection with the Demised Premises. If any special assessments or special tax bills which relate directly to an improvement or improvements made by any governmental or public authority for the benefit of the Demised Premises, and further that said improvements have a useful life greater than the time remaining until the expiration of the Term, then Tenant shall only be required to pay that portion of the improvement or assessment which corresponds to Tenant's occupancy of the Demised Premises.

    (c)    Notwithstanding the provisions of the previous paragraph of this Article, the term Taxes, and the obligation of Tenant to pay Taxes, shall not include any net income or excess profits taxes assessed against Landlord, or any corporation capital stock and franchise taxes imposed upon Landlord; provided, however, that, if at any time prior to the expiration of the Term of this Lease, any net income tax, assessment, levy or charge shall be imposed upon Landlord on the Demised Premises in lieu of or in place of any  tax or other charge included in the definition of Taxes set forth above, and shall be measured by or based upon net income or profits derived from real estate (as distinguished from net income or profits generally), then such new tax, assessment, levy or charge shall be included in "Taxes" to the extent that such new tax, assessment, levy or charge would be payable if the Demised Premises were the only property of Landlord subject thereto and the income and profits received by Landlord from the Demised Premises were the only income and profits of Landlord.

(d)    All Taxes that become payable for the first and last tax years during the Term shall be apportioned between Landlord and the Tenant in such a manner that Tenant shall only be obligated to pay Taxes applicable to the Term.

(e)    Landlord shall have the right, in its discretion, to have all bills for Taxes be issued directly to Tenant and, in such event, Tenant shall (i) pay the Taxes indicated in such bills within ten (10) days of its due date and (ii) provide Landlord with reasonably particularized evidence of such payment concurrently with Tenant's payment of the same.  In such event, Tenant (and not Landlord) shall be responsible for the payment of Taxes and Tenant shall indemnify Landlord for any claims, costs, damages, fines and attorneys' fees resulting from or incurred by Landlord due to Tenant's failure to pay or timely pay such Taxes.

(f)    In the event Tenant is in default of any of its obligations under this Lease and Tenant fails to commence to cure any such default within thirty (30) days after notice of the occurrence from Landlord, Landlord may, at its sole option, elect to collect Taxes from Tenant for any calendar year in monthly installments, in the following manner: Landlord may at any time prior to or during a calendar year, submit to Tenant Landlord's reasonable estimates of Taxes for such calendar year (which estimate may include reasonably anticipated increases over Taxes incurred in calendar years prior to such calendar year). If Landlord shall submit to Tenant such estimate, Tenant shall pay to Landlord the amount of such estimate in equal monthly installments, in advance, on or before the first day of each calendar month during such calendar year (or during the remainder of such calendar year, in the event Landlord shall submit such estimates during a calendar year, or in the case of a partial calendar year) so that the full amount of such estimate shall have been paid: (i) upon the expiration of such calendar year, in the case of each calendar year except the calendar year in which the term hereof shall expire; and (ii) upon the expiration of the term hereof, in the case of a calendar year in which the term hereof shall expire.  If Landlord shall collect payments on-account of Taxes for any calendar year monthly, pursuant to this subsection, then, within ninety (90) days following the expiration of such calendar year, Landlord shall furnish to Tenant a written statement showing the actual amount of Taxes for such calendar year and the estimated payment theretofore made by Tenant.  If the estimated payments made by Tenant shall exceed the Taxes, Tenant shall be entitled to immediate credit for such excess against payments next thereafter due to Landlord under this Section 5.02 (or to a refund, if no such payments shall be due thereafter).  If the actual Taxes shall exceed the estimated payments made by Tenant, Tenant shall pay to Landlord the deficiency within ten (10) days after Landlord shall submit the aforesaid statement to Tenant.

## ARTICLE VI
## INSURANCE INDEMNITY

Section 6.01 Indemnity.

(a)    Indemnification.

(i)    Provided such indemnification by Tenant is not made necessary by Landlord's willful act or gross negligence, Tenant agrees to indemnify, defend and save harmless Landlord and its managing members, partners and subpartners, and their respective officers, agents, property managers, servants, employees, and independent contractors (collectively, "**Landlord Parties**"), from and against any and all claims, demands, expenses and liabilities (including, without limitation, reasonable attorneys' fees and costs) (collectively, "**Claims**"), arising from the occupancy, conduct, operation or management of the Demised Premises or from any work or thing whatsoever done on or about the Demised Premises, or arising from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or under the provisions of any law, ordinance or regulation or any federal, state, municipal or other authority, or arising from any act, neglect or negligence of Tenant, or any of its sublessees, assignees, licensees, agents, contractors, servants, employees or invitees or (collectively, "**Tenant's Parties**"), or arising from any accident,

injury or damage whatsoever caused to any person, firm or corporation, occurring during the term of this Lease, in or about the Demised Premises, and from and against all costs, expenses and liabilities incurred in connection with any such claim or action or proceeding brought thereon (including, without limitation, the reasonable fees of attorneys, investigators and experts); and in case any action or proceeding be brought against Landlord by reason of any such claim, Tenant upon notice from Landlord covenants at Tenant's cost and expense to resist or defend such action or proceeding or to cause it to be resisted or defended by an insurer. The provisions of this Section 6.01(a)(i) shall survive the expiration or sooner termination of the Lease.

(ii)     Notwithstanding anything in this Section 6.01 to the contrary, Tenant's indemnity shall not apply to any Claims to the extent resulting from the gross negligence or willful misconduct of Landlord or the Landlord Parties, and not insured (or required to be insured) by Tenant under this Lease (collectively, the "Excluded Claims"), and Landlord shall indemnify, protect, defend and hold harmless Tenant and Tenant's Parties from and against any such Excluded Claims, but only to the extent Landlord's liability is not waived and released by Tenant pursuant to the terms of Section 6.04 of this Lease (provided, however, that Landlord's indemnity shall, in no event, extend to loss of profits, loss of business or other consequential damages incurred by Tenant). Each party's agreement to indemnify the other pursuant to this Section 6.01 is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by the indemnifying party pursuant to the provisions of this Lease. The provisions of this Section 6.01(a)(ii) shall survive the expiration or sooner termination of this Lease.

(b)     Release.  Subject to Landlord's obligation to indemnify Tenant pursuant to the provisions of Section 6.01(a)(ii) above, Landlord, its principals, agents, employees and contractors, shall not be liable for, and Tenant hereby releases Landlord, its principals, agents, employees and contractors from, all claims for loss of life, personal injury or damage to property or business sustained by Tenant or any person claiming by, through or under Tenant resulting from any fire, accident, occurrence or condition in or upon the Demised Premises, or any part thereof including, but not limited to; any such claims for loss of life, personal injury in the Demised Premises, any defect in or any failure of any equipment, machinery, utilities, appliances, or apparatus in the Demised Premises, falling of fixtures or other items, leakage of water, snow or ice, broken glass or any other event, cause or circumstance.

Section 6.02 Insurance by Tenant.

(a)     Tenant shall keep in force, at Tenant's sole cost and expense, by responsible insurance companies reasonably acceptable to Landlord authorized to do business in the jurisdiction in which the Demised Premises are situated and throughout the Term of this Lease and during such other times as Tenant occupies the Demised Premises or any part thereof:

(i)     Insurance against claims for personal injury (including death) and property damage with broad-form contractual liability coverage, under a policy of comprehensive general liability insurance or (at Landlord's option) commercial general liability insurance, with limits not less than Five Million Dollars ($5,000,000) in respect of personal injury (including bodily injury and death) and One Million Dollars ($1,000,000) for property damage.

(ii)     If the nature of Tenant's operation is such as to place any or all of its employees under the coverage of local workmen's compensation laws or similar statutes, workmen's compensation or similar insurance affording statutory coverage and containing statutory limits.

(iii)     Fire insurance with extended coverage endorsements covering all of Tenant's stock in trade in the Demised Premises to the extent of at least one hundred percent (100%) of the replacement cost. The insurance specified in this Section 6.02(a) (iii) may include a deductible amount which

amount shall be the same as Tenant's other units nationwide and reasonably acceptable to Landlord, but in no event to exceed Ten Thousand Dollars ($10,000.00). Tenant is responsible for paying the deductible.

(iv)    Insurance against loss or damage to the building and all other improvements now or hereafter located on the Demised Premises by fire and such other casualties as may be included in the broadest form of all risk extended coverage insurance from time to time available (including, without in any manner limiting the generality of the foregoing, earthquake and flood insurance if the Demised Premises are located in an earthquake or flood hazard area (as applicable)), and that any additional coverage that a mortgage lender may reasonably require, in an amount equal to the full insurable replacement cost of such buildings and improvements; insurance against abatement or loss of rental by reason of the occurrences described in clause (a) above in an amount equal to minimum and additional rental for at least twelve (12) months following the occurrence of such casualty; and boiler insurance, plate glass insurance, and civil disturbance insurance.

(v)    Environmental Liability Insurance (in form and substance reasonably satisfactory to Landlord) with limits of coverage not less than Five Million Dollars ($5,000,000.00) combined per occurrence and in the aggregate insuring against any and all liability with respect to the Demised Premises and all areas appurtenant thereto arising out of any death or injury to any person, damage or destruction of any property, other loss, cost or expense resulting from any release, spill, leak or other contamination of the Demised Premises, or any other property surrounding the Demised Premises attributable to the presence of Hazardous Substances. Upon Landlord's request, Tenant shall also obtain (at Tenant's sole cost and expense) environmental impairment liability insurance and environmental remediation liability insurance (in form and substance (including limits) acceptable to Landlord). If, at anytime it reasonably appears to Landlord (based on Tenant's operations from the Demised Premises and/or based on claims made under any policies carried by Tenant whether or not such claims pertain to the Demised Premises) that Tenant is not maintaining sufficient insurance or other means of financial capacity to enable Tenant to fulfill its obligations to Landlord hereunder, whether or not then accrued, liquidated, conditional or contingent, Tenant shall procure and thereafter maintain in full force and effect such additional insurance and/or increased limits of insurance and/or other form of financial assurance, with or from companies or persons and in form and substance reasonably acceptable to Landlord, as Landlord may from time to time reasonably request. Without limiting the generality of the foregoing, all such environmental liability insurance shall specifically insure the performance by Tenant of the indemnity provisions set forth in this Lease.

(vi)    Any other form or forms of insurance as Tenant or Landlord or the mortgagees of Landlord may reasonably require from time to time, in form, amounts and for insurance risks against which a prudent tenant would protect itself, but only to the extent such risks and amounts are available in the insurance market at commercially reasonable costs.

(b)    Tenant shall deposit with Landlord certificates evidencing the issuance of the policies of insurance required under this Article, or copies thereof, prior to the Commencement Date of the Lease. Said policies of insurance shall name as additional insured parties the Landlord and the Holder of any mortgage on the Demised Premises (or estate thereof) and shall provide that they shall not be cancelable without thirty (30) days prior written notice to Landlord and the holder of such mortgage. The policies of insurance described in Section 6.02 (iv)(a) shall contain a standard mortgage endorsement in favor of the holder of any mortgage on the Demised Premises (or estate thereof), and shall name Landlord (and any other parties designated by Landlord) as an additional insured party or parties thereunder. At least thirty (30) days prior to the expiration of any such policy, Tenant shall deposit with Landlord a certificate evidencing the issuance of a renewal policy or copy thereof, together with satisfactory evidence of payment by Tenant of the premium or premiums required thereunder.

(c)     All policies of Insurance provided for herein shall be Issued by insurance companies with a general policy holder's rating of not less than "A-" as rated in the most current available "Best's" Insurance Reports, and qualified to do business in the state in which the Demised Premises are located.  All such policies shall have a deductible not exceeding Ten Thousand Dollars ($10,000.00).  All public liability and property damage policies shall contain a provision that Landlord, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Tenant.  As soon as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent.

(d)     Notwithstanding anything to the contrary contained within this Article VI, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that Landlord, and Landlord's mortgagee or beneficiary, shall all be named as an additional insured thereunder as their interests appear.  The coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance, and the requirements set forth herein are otherwise satisfied.

(e)     Except as otherwise provided herein or in any mortgage or deed of trust, all insurance proceeds payable with respect to any damage or destruction to the Demised Premises shall be payable to Landlord and will be held in an interest bearing account at a financial institution so named by Landlord.  In the event Tenant undertakes to repair said damages in accordance with this Lease, the proceeds shall be used to fund the reconstruction.  In all other events, the proceeds shall be the sole property of Landlord.   Tenant shall be entitled to compromise, adjust, or settle with Landlord's approval, any and all claims with respect to the Demised Premises.  Each party agrees to execute and deliver to the other party such releases, endorsements, and other instruments as the other party may reasonably require in order to compromise, adjust, or settle pursuant to this Section and to enable the other party or its designee to collect such insurance proceeds as are payable in respect of such claim.

(vii)     In the event that Tenant makes alterations to the Demised Premises pursuant to Section 4.03, Tenant or Tenant's contractor shall obtain a Builder's All Risk policy in form and content reasonably acceptable to Landlord, which policy shall be on an "all risk" basis on a completed value and covering the interest of Landlord in the Demised Premises.  Such policy shall name Landlord as additional insured and shall provide that it shall not be canceled without at least 30 days prior written notice to Landlord.   Prior to commencement of construction of the alterations, Tenant shall provide Landlord with a copy of the policy of insurance or certificate thereof.

(viii)     In the event that Tenant serves alcohol on the Demised Premises, so-called "dramshop" liquor liability insurance in an amount reasonably required by Landlord or otherwise consistent with industry standards.

Section 6.03  Increase in Insurance Rate.  Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Demised Premises which will violate the provisions of any policy of casualty insurance or liability insurance or which will prevent the procurement of casualty insurance and liability insurance in companies acceptable to Landlord.

Section 6.04  Waiver of Subrogation.  Tenant and Landlord each hereby release and relieve the other, and waive their entire right of recovery against the other, for direct or consequential loss of damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to the negligence of Landlord or Tenant or their agents, employees, contractors and/or invitees provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder.  If the release of either Landlord or Tenant, as set forth in this Section 6.04, shall contravene any law

with respect to exculpatory agreements, the liability of the party in question shall be deemed not released but shall be deemed secondary to the latter's insurance. If necessary, all property insurance policies required under this Lease shall be endorsed to so provide.

## ARTICLE VII
## SIGNS AND AWNINGS

Section 7.01 Signs and Awnings. Tenant may, subject to applicable laws and the Recorded Agreements and at its expense, construct all necessary signs in and upon the Demised Premises properly to conduct its marketing activities. Tenant shall be solely responsible for obtaining sign permits for ensuring that all signs conform with the requirements of all laws, ordinances or regulations of any federal, state, municipal governments or other authority and Recorded Agreements. Tenant shall, at Tenant's sole cost and expense, maintain all signs on the Demised Premises in good order, condition and repair throughout the Term of this Lease, and to remove the same upon the expiration or sooner termination of this Lease and to repair any damage caused by such removal.

## ARTICLE VIII
## UTILITIES

Section 8.01 Tenant's Responsibility for Utilities Consumed. Tenant shall make application for, and be solely responsible for, and shall promptly pay all charges for heat, cooling, sewer, water, electricity, and any other utilities used or consumed on the Demised Premises (collectively "Utilities"). Landlord shall not be liable in damages or otherwise for any interruption or impairment in the supply of such Utility service, nor shall any such interruption or impairment constitute a breach by Landlord of the terms and conditions of this Lease nor shall any such interruption constitute a ground for an abatement of any sums payable by Tenant hereunder. Tenant shall not at any time intentionally overburden or exceed the capacity of any Utility services which are supplied to, distributed in or serve the Demised Premises.

Section 8.02 Alternative Billing. If the authority or authorities supplying any Utilities servicing the Demised Premises shall require that the bills therefore be rendered to Landlord, then with proof of payment Tenant shall reimburse Landlord for the amount of each such bill upon request by Landlord.

## ARTICLE IX
## ASSIGNMENT SUBLETTING AND MORTGAGING

Section 9.01 Assignment and Subletting.

(a)    Tenant shall not assign or encumber this Lease nor sublet the Demised Premises, in whole or part, to any person, or entity or allow occupancy by any other person or entity, without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. Without any way limiting Landlord's right to reasonably refuse to give consent, Landlord may withhold its consent to any requested assignment or subletting if in Landlord's reasonable business judgment:

(1)    The quality of the merchandising operation of the proposed assignee, subtenant or transferee (each a "Transferee") is not equal to that of the Tenant;

(2)    The financial strength of the proposed Transferee, both in terms of net worth and in terms of reasonably anticipated cash flow over the Lease Term, is materially less than Tenant's financial strength at the time this Lease was signed or at the time of such assignment or sublease, whichever is greater, or is insufficient, based on generally accepted industry standards, to capitalize the business to be conducted in the Demised Premises;

(3)    The proposed Transferee does not, in Landlord's reasonable judgment, have sufficient business experience (including substantial experience in

-15-

comparable retail centers) to successfully operate a retail establishment in the Demised Premises in the manner contemplated in this Lease;

(4)     The proposed Transferee is a person with whom Landlord is, or recently has been, within the past three (3) months, negotiating to lease space in property owned by Landlord;

(5)     Tenant is default under the Lease, or has defaulted hereunder on more than three (3) occasions during the twelve (12) months preceding the request by Tenant; and/or

(6)     The proposed Transferee will operate under a trade name other than that stated in this Lease.

Notwithstanding any assignment or encumbrance of this Lease or subletting of all or any portion of the Demised Premises with or without the consent of Landlord, Tenant shall, nevertheless, remain liable to Landlord for the payment of all Rent hereunder and for the performance of all covenants and conditions of this Lease applicable to Tenant and any assignment, encumbrance, sublease or subletting made by Tenant shall be subject to the terms, conditions and provisions of this Lease. Tenant hereby waives all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all applicable laws, on behalf of the proposed Transferee. Tenant shall indemnify, defend and hold harmless Landlord from any and all liability, losses, claims, damages, costs, expenses, causes of action and proceedings involving any third party or parties (including without limitation Tenant's proposed subtenant or assignee) who claim they were damaged by Landlord's wrongful withholding or conditioning of Landlord's consent.

(b)     Tenant shall notify Landlord in writing (at least thirty (30) days prior thereto) if Tenant intends to sublease all or any portion of the Demised Premises or to assign or encumber this Lease, which notice shall include (i) the proposed effective date of the transfer, which shall not be less than twenty (20) days nor more than one hundred eighty (180) days after the date of delivery of the transfer notice, (ii) a description of the portion of the Demised Premises to be transferred, (iii) all of the terms of the proposed transfer and the consideration therefor in connection with such transfer, the name and address of the proposed Transferee, and a copy of all existing and/or proposed documentation pertaining to the proposed transfer, including all existing operative documents to be executed to evidence such transfer or the agreements incidental or related to such transfer and (iv) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof. Landlord shall make every effort to notify Tenant of its approval or disapproval of any proposed sublease, assignment or encumbrance within thirty (30) days after Tenant has submitted a request therefore to Landlord, including all information required to be delivered by Tenant to Landlord in connection with such proposed transfer. If Landlord does not deliver said notice then Landlord shall be deemed to have disapproved the proposed sublease, assignment or encumbrance. If Landlord does not consent to any proposed sublease, assignment or encumbrance by Tenant, Landlord shall provide Tenant with a written statement identifying its reasons for withholding such consent.

(c)     Except as otherwise provided below, for purposes of this Lease, the term "assignment" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of fifty percent (50%) or more of the partners, or transfer of twenty-five percent or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (i.e., whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant, (B) the sale or other transfer of more than an aggregate of fifty percent (50%) of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of more than an aggregate of fifty percent (50%) of the value of the unencumbered assets of Tenant within a twelve (12) month period. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to assign, sublease or transfer this Lease to

-16-

any corporation into which or with which Tenant merges or consolidates, and to any parent, subsidiary, or affiliated corporation, including any corporation which is under common control with Tenant or to a person who acquires substantially all of the assets of Tenant or to Tenant's going from a publicly-traded company to a privately-owned company (each, an "Affiliate"); provided that (1) any such Affiliate was not formed as a subterfuge to avoid the obligations of this Article IX; (2) Tenant gives Landlord prior written notice of any such assignment or sublease to an Affiliate; (3) any such Affiliate has, as of the effective date of any such assignment or sublease, a tangible net worth and net income, in the aggregate, computed in accordance with generally accepted accounting principles (but excluding goodwill as an asset), which is equal to or greater than Tenant as of the effective date of any such assignment or sublease and sufficient to meet the obligations of Tenant under this Lease; (4) any such assignment or sublease shall be subject to all of the terms and provisions of this Lease, and such assignee or sublessee shall assume, in a written document reasonably satisfactory to Landlord and delivered to Landlord upon or prior to the effective date of such assignment or sublease, all the obligations of Tenant under this Lease; and (5) Tenant and any Guarantor shall remain fully liable for all obligations to be performed by Tenant under this Lease.

Section 9.02 Violation. If this Lease is assigned, without any required prior written consent of Landlord, Landlord may and is hereby empowered to collect Rent from the assignee. If the Demised Premises or any part thereof be sublet or occupied by any person other than Tenant and in the event of Tenant's uncured default, Landlord may, and is hereby empowered to collect Rent from such subtenant or occupant. Landlord's collection of Rent pursuant to the provisions of this Section 9.02 shall not in any event be deemed to be a waiver of any default by Tenant in having assigned this Lease or sublet all or any portion of the Demised Premises without the prior written consent of Landlord.

Section 9.03 Subordination.

(a)  At Landlord's sole option, this Lease shall be subject and subordinate to any ground lease and the lien of any mortgages and/or other encumbrances now or hereafter placed upon the Demised Premises (including a lien on an estate thereof) without the necessity of any further instrument or act on the part of Tenant to effectuate such subordination. Tenant agrees, at the election of the holder of any such mortgage or other encumbrance, to attorn to such holder. Tenant further agrees to execute and deliver upon demand such reasonable instrument or instruments evidencing and confirming such subordination of this Lease to the lien of any such mortgage and/or encumbrance and such further instrument or instruments of attornment as shall be designated by Landlord. For the purpose of this Lease, the term "Mortgage" shall mean any mortgage, deed of trust, security deed or other similar document or instrument and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages or trust deeds, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto. A condition precedent to the subordination of this Lease to any future ground or underlying lease or to the lien of any future mortgage or deed of trust is that Landlord shall obtain for the benefit of Tenant a subordination, non-disturbance and attornment agreement from the lessor or lender of such future instrument. Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage, or if any ground or underlying lease is terminated, to attorn, without any deductions or set-offs whatsoever, to the purchaser upon any such foreclosure sale, or to the lessor of such ground or underlying lease, as the case may be, if so requested to do so by such purchaser or lessor. Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

Section 9.04 Easements by Landlord. Upon the written consent of the Tenant, Landlord shall have the right to grant easements over the Demised Premises and no joinder of Tenant shall be required in such grants of easements and the rights of Tenant

under this Lease shall be subject and subordinate thereto so long as Tenant's business operations are not impaired in any material respect and any easement conforms with the approved site plan and use to be issued by the city where the Property is located and provided Tenant receives at least thirty (30) days prior written notice of such proposed grant of easement(s).   In addition, Tenant agrees not to unreasonably withhold or delay its joinder in the grant of any easement.

Section 9.05 Demised Premises Free from Liens.   Tenant shall keep the Demised Premises and any Land in which the Demised Premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by or from Tenant. If a lien is filed against the Demised Premises and Tenant is disputing the validity of the lien, Tenant may bond over such lien until resolved. Notwithstanding anything to the contrary set forth in this Lease, if any such lien is not released and removed on or before the date notice of such lien is delivered by Landlord to Tenant, Landlord, at its sole option, may immediately take all action necessary to release and remove such lien, without any duty to investigate the validity thereof, and all sums, costs and expenses, including reasonable attorneys' fees and costs, incurred by Landlord in connection with such lien shall be deemed additional Rent under this Lease and shall immediately be due and payable by Tenant.

Section 9.06 Bankruptcy Assignment.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. 101 et seq., shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on or after the date of such assignment.  Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

Section 9.07 Bankruptcy Assignment-Payment of Consideration for Assignment. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. et seq., ninety percent (90%) of any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and promptly be paid or delivered to Landlord.

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Tenant under Chapter 7, 11 or 13 of the Bankruptcy Code, the Tenant, as debtor in possession, or the bankruptcy trustee, must elect to assume or reject this Lease within sixty (60) days after the date of the order for relief. If the Tenant, trustee or debtor in possession shall fail to elect or assume this Lease within sixty (60) days after the date of the order for relief, this Lease shall be deemed to be rejected. In the event the trustee or the debtor in possession requests additional time from the Bankruptcy Court in which to assume or reject this Lease, it shall be conclusively presumed that the trustee or debtor in possession has shown cause for such extension and the Landlord will be deemed to have consented to such additional time, up to an additional sixty (60) days. In the event of a rejection of this Lease, Landlord shall thereupon be immediately entitled to possession and this Lease shall be canceled, but Landlord's right to be compensated for damages in such proceeding shall survive.

If the estate of Tenant created hereby shall be taken in execution or by other process of law, or if Tenant shall be adjudicated insolvent pursuant to the provisions of any present or future insolvency law under state law, or if Tenant shall cease doing business as a going concern or generally not pay its debts as they become due, or if a receiver or trustee of the property of Tenant shall be appointed under state law by reason of Tenants' insolvency or inability to pay its debts as they become due or otherwise, or if any assignment shall be made of Tenant's property for the benefit of creditors under state law, then and in such event, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder declaring an Event of Default under Section 13.01.

-18-

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Landlord under Chapter 7, 11 or 13 of the Bankruptcy code, or, further, in the event the debtor in possession or trustee elects to reject this Lease, the Tenant shall have the right to either treat this Lease as terminated or, alternatively, to remain in possession for the balance of the Term of this Lease (including the initial term or any renewal term(s)), and the Tenant shall continue to have all rights provided under this Lease to extent the term of this Lease.

### ARTICLE X
### CONDEMNATION

Section 10.01  Whole Taking.  In the event the whole of the Demised Premises shall be taken by any public authority under the power of eminent domain, this Lease shall terminate as of the date of the taking.

Section 10.02  Partial Taking.  In the event a portion of the Demised Premises or a part of the building now located thereon shall be appropriated or taken under the power of eminent domain, or any similar power, by any public or quasi-public authority, the unearned portion of the rent theretofore paid with respect to such taken portion shall forthwith be returned to Tenant, and, if, in Tenant's reasonable judgment, the remaining portion of the Demised Premises or the building thereon can be used by Tenant in the operation of its business, Tenant shall so use said remaining portion and there shall be a prorata reduction of rent based upon the extent to which Tenant's use and occupancy of the Demised Premises is adversely impacted.  If, on the other hand, in Tenant's reasonable judgment, the remaining portion of the Demised Premises or the building thereon cannot be used by Tenant in the operation of its business or the use of such remaining portion would significantly and adversely affect Tenant's use of the Demised Premises, then this Lease shall terminate as of the date of such appropriation or taking, and the unearned portion of the rent theretofore paid shall forthwith be returned to Tenant.  If, however, the period of such partial appropriation or taking is less than six (6) months, this Lease shall continue in full force and effect, the rent in such case shall not abate and all awards for damages shall be paid to Tenant.  If the portion of the Demised Premises taken is solely for purposes of widening streets adjacent to the Demised Premises and such taking does not include any portion of the building on the Demised Premises and does not, in Landlord's reasonable judgment, substantially interfere with Tenant's use of the Demised Premises or parking available to the Demised Premises, then this Lease shall not terminate and there shall be no abatement in rent for the portion of the Demised Premises so taken.

Section 10.03  Condemnation Proceedings.  All compensation awarded for such taking of the fee shall belong to and be the property of the Landlord, provided, however that the Landlord shall not be entitled to any portion of the award attributable to the Demised Premises made to the Tenant for the cost of moving or removal of its stock and fixtures or made to Tenant for the loss of its business (if and only to the extent that such award for loss of business does not reduce or diminish the award payable to Landlord).

Section 10.04  Waiver of Termination.  Tenant and Landlord waive any right to terminate this Lease under Section 1265.130 of the California Code of Civil Procedure, or any similar statute or law now or hereafter in force.

### ARTICLE XI
### DESTRUCTION OF DEMISED PREMISES

Section 11.01  Destruction of Demised Premises.

(a)    If the Demised Premises or any portion thereof shall be damaged or destroyed by fire or other casualty, then Tenant shall promptly give notice thereof to Landlord; and, except as hereinafter otherwise provided, Tenant shall, within a reasonable time thereafter, repair or restore the Demised Premises with insurance proceeds from Landlord's account as provided for in Article 6.02, to substantially the same condition they were in prior to the casualty, and rent shall not abate.

(b)    Notwithstanding the foregoing provisions, Landlord shall not be obligated to reimburse Tenant for the repair and restoration of the Demised Premises in an amount in excess of insurance proceeds paid to Landlord for such damage or destruction pursuant to policies maintained by Tenant pursuant to the provisions of Section 6.02(iv)(a).  If during the last two (2) years of the Term of this Lease the Demised Premises shall be damaged or destroyed as aforesaid to the extent of twenty (20%) percent or more of its insurable value, Landlord, in its sole discretion, may terminate this Lease by notice to Tenant within thirty (30) days after such damage or destruction if Tenant does not agree to an increase in term of five (5) years under the same terms and conditions as those set forth in this Lease.  In the event of any termination of the Term of this Lease pursuant to the provisions of this Article, the termination shall become effective fifteen (15) days after the giving of the notice of termination and a just proportion of the minimum rent, according to the nature and extent of the injury to the Demised Premises shall be suspended or abated until the time of termination and minimum rent shall be apportioned as of the time of termination.

(c)    The agreements contained in this Article XI provide a material part of the consideration for this Lease and in bargaining for and obtaining its rights under this Article XI, Tenant waives any right to terminate this Lease under Section 1932 and/or 1933 of the Civil Code of California, or any similar statute or law now or hereafter in force.

## ARTICLE XII
## SURRENDER OF PREMISES

Section 12.01  Liability for Return of Demised Premises.  At the expiration of this Lease, Tenant shall surrender the Demised Premises broom clean and in the same condition as the Demised Premises were in upon delivery of possession to the Tenant under this Lease, loss by condemnation and insured casualty and by ordinary wear and tear excepted.

All alterations, additions, improvements and the Improvements which may have been made in, to or on the Demised Premises (except movable trade fixtures put in at the expense of Tenant) shall remain with Demised Premises except that Landlord shall notify Tenant within ninety (90) days before the end of the term of the lease whether Landlord desires to have the Demised Premises or any parts thereof restored to their condition when the Demised Premises were delivered to Tenant.

If Landlord shall so desire, the Tenant shall restore said Demised Premises or such part or parts thereof before the end of this Lease at Tenant's sole cost and expense.  In addition, Tenant shall repair any damage caused in connection with the removal of any trade fixtures.  Tenant on or before the end of the term or sooner termination of this Lease, shall remove Tenants personal property and trade fixtures from the Demised Premises and all property not so removed shall be deemed abandoned by Tenant.  If the Demised Premises are to be surrendered at the end of the term or sooner termination of this Lease, Tenant shall indemnify Landlord against loss or liability resulting from delay by Tenant in so surrendering the Demised Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay.

Section 12.02  Abandonment.  Tenant shall not vacate or abandon the Demised Premises at any time during the term of the Lease or any option period.  If Tenant shall abandon, vacate or surrender said premise, or be dispossessed by process of law, or otherwise any personal property belonging to Tenant and left on the premises shall be deemed abandoned, at the option of Landlord, except such property as may be mortgaged to Landlord.

## ARTICLE XIII
## DEFAULT AND REMEDIES

Section 13.01  Default by Tenant.  The following shall constitute material Events of Default by Tenant:

(a)    Tenant fails to pay any installment of Rent within ten (10) days after receiving notice from Landlord that payment has not been received; or

(b)    Tenant is in default of any of its other obligations under this Lease and Tenant fails to commence to cure any such default within thirty (30) days after notice of the occurrence thereof from Landlord and thereafter fails to complete the cure of such default with due diligence as soon as reasonably possible; and if such default is not completely cured by Tenant within sixty (60) days after notice of the occurrence thereof from Landlord, Tenant, if requested by Landlord, shall post with Landlord a surety bond (with corporate surety acceptable to Landlord) to assure its completion of such cure as promptly thereafter as is possible; or

(c)    Tenant is adjudicated a bankrupt; or

(d)    Tenant has a receiver in equity appointed for all or substantially all of its property and such appointment is not vacated within sixty (60) days; or

(e)    Tenant files a voluntary petition for reorganization or arrangement; or

(f)    Tenant has a trustee in reorganization appointed for its property; or

(g)    Tenant files a voluntary petition in bankruptcy; or

(h)    Tenant files an answer admitting bankruptcy or agreeing to reorganization or arrangement; or

(i)    Tenant makes an assignment for the benefit of creditors;

(j)    Tenant permits its leasehold interest hereunder to be sold pursuant to execution.

Any notice given under this Section 13.01 shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161.

Section 13.02  Landlord's Remedies; Termination.  In the event of any such Event of Default by Tenant, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall have the immediate option to terminate this Lease and all rights of Tenant hereunder. In the event that Landlord shall elect to so terminate this Lease, then Landlord may recover from Tenant:

(a)    the worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(b)    the worth at the time of the award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(c)    the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(d)    any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom including, but not limited to: unamortized tenant improvement costs; attorneys' fees; unamortized brokers' commissions; the costs of refurbishment, alterations, renovation and repair of the Demised Premises; and removal (including the repair of any damage caused by such removal) and storage (or disposal) of Tenant's personal property, equipment, fixtures, alterations and any other items which Tenant is required under this Lease to remove but does not remove.

As used in subsections (a) and (b) above, the **"worth at the time of award"** is computed by allowing interest at the interest rate set forth in Section 2.05 of the Lease. As used in subsection (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

Section 13.03 Landlord's Remedies; Re-Entry Rights. In the event of any such Event of Default by Tenant, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall also have the right as permitted by applicable law, with or without terminating this Lease, to re-enter the Demised Premises and remove all persons and property from the Demised Premises; such property may be removed, stored and/or disposed of pursuant to any procedures permitted by applicable law. No re-entry or taking possession of the Demised Premises by Landlord pursuant to this Section 13.03, and no acceptance of surrender of the Demised Premises or other action on Landlord's part, shall be construed as an election to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction.

Section 13.04 Continuation of Lease. Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

Section 13.05 Injunction. In the event of a breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity.

Section 13.06 No Waiver. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy herein or by law provided but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

Section 13.07 Indemnity. Tenant shall indemnify, defend, save and hold Landlord harmless of and from any and all loss, cost, expense or liability pursuant to any sublease. Until the occurrence of an event of default by Tenant under this Lease, Tenant may continue to collect the rent and other sums payable under the sublease(s) assigned hereby; but from and after the occurrence of an event of default all such rent and other sums shall be paid to Landlord and applied by Landlord on account of rent and other sums due by Tenant to Landlord pursuant to this Lease. A statement by Landlord to any subtenant that an event of default by Tenant has occurred under this Lease shall be conclusive evidence as between Landlord and sub-tenant only of such fact and shall be relied upon by the subtenant in making payment to Landlord. No subtenant shall be liable to Tenant for any payment made by the subtenant to Landlord pursuant to the paragraph. No sublease shall be valid or effective unless it shall expressly restate therein the provisions of this paragraph.

Section 13.08 Attorneys' Fees. In the event of litigation by Landlord against Tenant or by Tenant against Landlord by reason of a breach of any of the provisions of this Lease, the prevailing party shall be entitled to recover from the other party an amount equal to all reasonable attorney's fees and court costs (including costs of appeals) incurred by the prevailing party in enforcing its rights and remedies under this Lease.

Section 13.09 Default by Landlord. Landlord shall in no event be in default in the performance of any of its obligations in this Lease contained unless and until Landlord or the holder of any mortgage on the Demised Premises shall have failed to commence to perform such obligation within thirty (30) days (or such longer period of time as may be required by Landlord or the holder of any mortgage to effect such cure) after notice by Tenant to Landlord and to such mortgagee properly specifying wherein

Landlord has failed to perform any such obligation or shall have failed to proceed thereafter with reasonable diligence to complete such performance.

Section 13.10 Curing Tenant's Defaults. If Tenant shall be in default in the performance of any of its obligations under this Lease, Landlord may (but shall not be obligated to do so), in addition to any other rights it may have in law or equity or under this Lease, cure such default on behalf of Tenant after the appropriate notice as provided for elsewhere in this Lease, and Tenant shall reimburse Landlord upon demand for any reasonable sums paid or costs incurred by Landlord in curing such default, together with interest at twelve and 50/100 percent (12.5%) from the respective dates of Landlord's making of the payments and incurring of the costs, on all sums advanced by Landlord as aforesaid, which sums and costs together with interest thereon shall be deemed additional rent payable under this Lease.

Section 13.11 Waiver of Breach. The waiver by Landlord or Tenant of any breach of any term, covenant or conditions contained in this Lease, shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition contained in this Lease.

Section 13.12 Waiver of Redemption. Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future law to redeem any of the Demised Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future law which exempts property from liability for debt or for distress for rent.

## ARTICLE XIV
## INSPECTION OF PREMISES

Section 14.01 Landlord's Right to Inspect. Landlord and the holder of any mortgage on the Demised Premises, and each of their agents, shall have the right to enter the Demised Premises at all reasonable times during regular business hours upon forty eight (48) hours prior notice (except that during an emergency the right of entry shall be at any time) to examine same and to show them to prospective purchasers of the Demised Premises, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable. At any time within six (6) months immediately prior to the expiration of the Term of this Lease, Landlord shall have the right to display on the Demised Premises a customary "For Rent" sign and to show the property to prospective tenants.

## ARTICLE XV
## QUIET ENJOYMENT

Section 15.01 Landlord's Covenant of Quiet Enjoyment. Landlord's covenants that upon payment of the Rent by Tenant, and Tenant's complying with the terms, covenants and conditions of this Lease, Tenant may peaceably and quietly have, hold and enjoy the Demised Premises for the Term hereof without hindrance or interruption by Landlord or by any other person or persons claiming under Landlord.

## ARTICLE XVI
## HOLDING OVER

Section 16.01 Rent for Holding Over Period. In the event Tenant remains in possession of the Demised Premises with the consent of Landlord after the termination of the Term, the same shall be construed to be a tenancy from month to month at the same monthly rental as was being paid at the termination of the Lease, and upon the same other terms specified herein. The tenancy from month to month shall continue until either party shall notify the other in writing, at least thirty (30) days prior to the end of any calendar month, that the party giving such notice elects to terminate such tenancy at the end of such calendar month, in which event such tenancy shall so terminate.

## ARTICLE XVII
### TITLE

**Section 17.01** Condition of Title and of Demised Premises. Tenant represents that the title to the Demised Premises, the zoning of the Demised Premises and the permitted uses thereof have been examined by Tenant and Tenant accepts them in the condition or state in which they are as of the Commencement Date, and Tenant takes the Demised Premises subject to all Recorded Encumbrances; provided, however, that Tenant's obligation to comply with any Recorded Encumbrances recorded after the date hereof shall be conditioned on the same not materially restricting Tenant in Tenant's use of the Premises or materially increasing Tenant's obligations or adversely affecting Tenant's rights under this Lease.

## ARTICLE XVIII
### MISCELLANEOUS

**Section 18.01** Notices; Rental Payments. Any notice provided for in this Lease shall be given by written instrument, personally delivered or sent by United States certified or registered mail, return receipt requested or by Federal Express or otherwise nationally recognized over-night courier, each with postage and/or delivery charges prepaid, to the addresses designated in Sections 3 and 5 of the Summary (as applicable) or to such other addresses as the party to receive the notice may thereafter designate by written notice to the other. All notices shall be deemed to have been given when deposited in the United States mail or, if delivered via Federal Express (or other overnight carrier) when personally delivered, as aforesaid. Any notice may be given on behalf of any party by its counsel. Wherever in this Lease Tenant is required to provide a notice to the holder of any mortgage on the Demised Premises, Tenant shall not be obligated to deliver such notice unless and until Landlord has provided to Tenant written notice of the name and address of the holder of such mortgage.

**Section 18.02** Partial Invalidity. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant of condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

**Section 18.03** Entire Agreement. This Lease and any amendments and/or Exhibits thereto shall constitutes the entire agreement between the parties with respect to the subject matter hereof and all prior negotiations are merged into this Lease. Any amendment, change or addition to this Lease shall be made only in writing and signed by both parties.

**Section 18.04** Successors in Interest. The terms and conditions of this Lease shall be binding upon, and shall inure to the benefit of, the parties and their respective successors and assigns, subject however to the provisions of Section 9.01.

**Section 18.05** Headings. The Article and Section headings in this Lease are for convenience of reference only, and shall not be construed or held in any way to explain, modify, amplify or add to the interpretation, construction or meaning of this Lease. Any deletion of language from this Lease prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language.

**Section 18.06** Applicable Law. This Lease shall be governed by the laws of the state of California.

**Section 18.07** Definition of Landlord. The word "Landlord" is used herein to include the Landlord named above and any subsequent owner of the Demised Premises as well as their respective successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had, had it originally signed this Lease as Landlord; but any Landlord, whether or not named

herein, shall have no liability under this Lease after it ceases to hold title to the Demised Premises, except for obligations which may have theretofore accrued, provided that all subsequent obligations and liabilities under this Lease are assumed in writing by any successor, transferee, purchaser or assignee.  If Landlord is in breach or default with respect to Landlord's obligations or otherwise under this Lease, Tenant shall look solely to the interest of Landlord in the Demised Premises for satisfaction of Tenant's remedies.  Neither Landlord, nor any Landlord Parties, shall have any personal liability with respect to any of the provisions of this Lease.  It is expressly understood and agreed that Landlord's liability, and the liability of any Landlord Parties, under the terms, covenants, conditions, warranties, and obligations of this Lease shall in no event exceed the loss of Landlord's interest in the Demised Premises.

Section 18.08  Tenant's Estoppel Certificate; Additional Documents.

(a)    Landlord and Tenant agree at any time and from time to time, within ten (10) business days after a party's written notice, to execute, acknowledge and deliver to the other party a written instrument in recordable form certifying the commencement and ending dates of the Term of this Lease, that this Lease is unmodified and in full force and effect (or if there have been modifications, that it is in full force and effect as modified and stating the modifications) and the dates to which minimum rent, additional rent and other charges have been paid in advance, if any and stating whether or not Landlord or Tenant, to the best of its knowledge and belief without investigation, is in default in the performance of any covenant, agreement or condition contained in this Lease and if so, specifying each such default and such other information as Landlord or Tenant shall reasonably request; and agreeing that Tenant will give to the holder simultaneously with Landlord (or proposed holder) of any mortgage on the Demised Premises (or estate therein) a copy of any notice of default it sends to Landlord and will provide to such holder a reasonable time in which to effect a cure of same.  Tenant agrees that any such statement delivered pursuant to this section may be relied upon by any prospective purchaser of the fee or any mortgagee thereof or any assignee of Landlord's interest in this Lease or of any mortgage upon the fee of the Demised Premises, or any part thereof.

(b)    Within ten (10) business days after the date of a request by Landlord to Tenant, Tenant shall deliver to Landlord the following documents in connection with Tenant:

(i)    A full and complete annual financial statement for the fiscal annual period most recently ended prior to the date of the request, which financial statement shall:  be prepared and attested by a senior financial officer of Tenant as being complete, correct and fairly representing Tenant's financial condition;  in accordance with generally accepted accounting principles consistently applied; and contain a full and complete balance sheet of Tenant showing all assets and liabilities (both absolute and contingent) and a full and complete statement of Tenant's profits and loss, together with profit and loss statements for the Demised Premises.    Tenant is only obligated to provide Landlord said financial statements twice annually except in the event of a sale, finance or refinance of the Demised Premises by Landlord.

(ii)    If applicable, a Good Standing Certificate issued by the appropriate governmental authority confirming that Tenant is and remains a corporation or partnership (whichever, if either, are applicable) duly formed and in good standing under the laws of the State of its incorporation and/or formation.

Section 18.09  Intentionally Omitted.

Section 18.10  Intentionally Omitted.

Section 18.11  Maintenance Bond.    If a maintenance bond is required to be maintained by any governmental authority for the maintenance of the Demised Premises, Tenant agrees, at its sole cost and expense, to obtain and maintain such bond, and to cause it to name Tenant and Landlord as the bonded parties.

Section 18.12 No Partnership. Any intention to create a partnership or joint venture relationship between Landlord and Tenant is hereby expressly disclaimed; no relationship other than that of Landlord and Tenant is intended between the parties hereto.

Section 18.13 Effect of Statements Submitted by Landlord. Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of one hundred twenty (120) days after receipt thereof shall constitute Tenant's acquiescence and approval with respect thereto.

Section 18.14 Arbitration. Any controversy or claim between or among the parties, except for claims relating to Landlord's exercise of any unlawful detainer rights pursuant to California law or rights or remedies used by Landlord to gain possession of the Demised Premises or terminate Tenant's right of possession to the Demised Premises shall be determined by arbitration in San Diego, California, in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association.

Section 18.15 Counterparts. This Lease may be executed in one or more counterparts, all of which shall be deemed to be an original.

Section 18.16 Default under Franchise Agreement by Tenant. Tenant agrees to promptly deliver to Landlord, any notice of default provided to Tenant by Tenant's Franchisor (if any).

Section 18.17 Brokers. Landlord has entered into an agreement with the real estate brokers specified in Section 9 of the Summary of Basic Lease Information as representing Landlord (collectively, "Landlord's Broker"), and Landlord shall pay any commissions or fees that are payable to Landlord's Broker with respect to this Lease in accordance with the provisions of a separate commission contract. Landlord shall have no further or separate obligation for payment of commissions or fees to any other real estate broker, finder or intermediary. Tenant represents that it has not had any dealings with any real estate broker, finder or intermediary with respect to this Lease, other than Landlord's Broker and the broker (if any) specified in Section 9 of the Summary of Basic Lease Information as representing Tenant ("Tenant's Broker"). Any commissions or fees payable to Tenant's Broker with respect to this Lease shall be paid exclusively by Landlord's Broker. Each party represents and warrants to the other, that, to its knowledge, no other broker, agent or finder (a) negotiated or was instrumental in negotiating or consummating this Lease on its behalf, or (b) is or might be entitled to a commission or compensation in connection with this Lease. Tenant shall indemnify, protect, defend (by counsel reasonably approved in writing by Landlord) and hold Landlord harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including attorneys' fees and court costs) resulting from any breach by Tenant of the foregoing representation, including, without limitation, any claims that may be asserted against Landlord by any broker, agent or finder undisclosed by Tenant herein. Landlord shall indemnify, protect, defend (by counsel reasonably approved in writing by Tenant) and hold Tenant harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including attorneys' fees and court costs) resulting from any breach by Landlord of the foregoing representation, including, without limitation, any claims that may be asserted against Tenant by any broker, agent or finder undisclosed by Landlord herein. The foregoing indemnities shall survive the expiration or earlier termination of this Lease.

Section 18.18 Strict Construction. The rule of strict construction shall not apply to this Lease. This Lease has been prepared by Landlord and its professional advisors and reviewed and modified by Tenant and its professional advisors. Landlord, Tenant, and their separate advisors believe that this Lease is the product of all of their efforts, that it expresses their agreement, and that it should not be interpreted in favor of or against either Landlord or Tenant merely because of their efforts in preparing it.

Section 18.19 Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required

hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, governmental moratorium or other governmental action or inaction (including failure, refusal or delay in issuing permits, approvals and/or authorizations), injunction or court order, riots, insurrection, war, fire, earthquake, flood or other natural disaster or other reason of a like nature not the fault of the party delaying in performing work or doing acts required under the terms of this Lease (but excluding delays due to financial inability) (herein collectively, "**Force Majeure Delays**"), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 18.19 shall not apply to nor operate to excuse Tenant from the payment of monthly basic Rent, additional rent or any other payments strictly in accordance with the terms of this Lease.

Section 18.20 Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION SEEKING SPECIFIC PERFORMANCE OF ANY PROVISION OF THIS LEASE, FOR DAMAGES FOR ANY BREACH UNDER THIS LEASE, OR OTHERWISE FOR ENFORCEMENT OF ANY RIGHT OR REMEDY HEREUNDER.  Not sure if we want this as we should be able to go to trial.

Section 18.21 Tenant's Authority.  If Tenant executes this Lease as a limited liability company, partnership or corporation, then Tenant and the persons and/or entities executing this Lease on behalf of Tenant represent and warrant that: (a) Tenant is a duly organized and validly existing limited liability company, partnership or corporation, as the case may be, and is qualified to do business in the state in which the Premises are located; (b) such persons and/or entities executing this Lease are duly authorized to execute and deliver this Lease on Tenant's behalf in accordance with the Tenant's operating agreement (if Tenant is a limited liability company), Tenant's partnership agreement (if Tenant is a partnership), or a duly adopted resolution of Tenant's board of directors and Tenant's by-laws (if Tenant is a corporation); and (c) this Lease is binding upon Tenant in accordance with its terms.  Concurrently with Tenant's execution and delivery of this Lease to Landlord and/or at any time during the Lease Term within ten (10) days of Landlord's request, Tenant shall provide to Landlord a copy of any documents reasonably requested by Landlord evidencing Tenant's representations and warranties hereunder.

Section 18.22 Redevelopment of Property.  If Landlord re-develops the Property during the Term then Tenant shall have reasonable approvals over the re-development; provided, however Landlord shall make space available for Tenant to continue its business in such a manner that Tenant's business is not un reasonably harmed.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

LANDLORD:

Red Mountain Retail Group, Inc.,
a California corporation

By: _____

Its: _Michael H. Mugel, CEO_

TENANT:

Luviland Corporation,                          Luviland LLC,
a California corporation                        a California limited liability company

By: _____          By: _____

Its: _____          Its: ___CFO___

**EXHIBIT "A"**

**SITE PLAN**



## EXHIBIT "B"

## LEASE GUARANTY AGREEMENT

THIS LEASE GUARANTY ("Guaranty") is made by John Nguyen ("Guarantor") in favor of Red Mountain Retail Group Inc., a California Corporation or its assigns ("Landlord") in connection with that certain lease dated _____, 2014 (the "Lease") pursuant to which Landlord is to lease to Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company dba _____ _____ ("Tenant") those premises generally referred to as 7101 W. Lincoln Avenue, Buena Park, CA (the "Demised Premises").

A.      Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B.      Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.      The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.      Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant.  Guarantor's obligations under this Guaranty are continuing and unconditional.

3.      Guarantor hereby agrees that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed. Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.      Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5.      Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands

(including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.      Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.      Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.      Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.      Without limiting the generality of the waivers contained in this Guaranty, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2820, 2821, 2822, 2845, 2848, 2849 and 2850 of the Civil Code of the State of California, as recodified from time to time (except the right to require contribution from co-sureties as set forth in Section 2848 therein).

10.     Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for Guarantor for the two (2) years prior to the current financial statement year to the extent not previously delivered to Landlord. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if

such is the normal practice of Guarantor, audited by an independent certified public accountant. Guarantor represents and warrants that all such financial statements shall be true and correct statements of Guarantor's financial condition.

11.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

12.    This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law.

13.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.    Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.    The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise. The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

16.    If any or all Guarantors shall become bankrupt or insolvent, or any application shall be made to have any or all Guarantors declared bankrupt or insolvent, or any or all Guarantors shall make an assignment for the benefit of creditors, or any or all Guarantors shall enter into a proceeding for the dissolution of marriage, or in the event of death of any or all Guarantors, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or such Guarantor's fiduciary. This Guarantee shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

17.    Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.    If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action. Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.    Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor consents to the jurisdiction and venue of the State and Federal courts sitting in the judicial district(s) which include the Demised Premises and waives any claim that the same would be an inconvenient forum.    In addition, Guarantor hereby appoints _____ as agent for service of process in the State of California in connection with any actions that may be taken by Landlord under this Guaranty; provided, however, that in the event that _____ ceases to be Guarantor's agent for service of process in the State of California, then Guarantor shall appoint such other agent in the State of California as Guarantor's agent for service of process and such other agent shall provide Landlord with written confirmation of such other agent's capacity as agent for Guarantor.

20.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

21.    Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

22.    If more than one person signs this Guaranty, each such person shall be deemed a guarantor and the obligation of all such guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23.    If Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms. If Guarantor is a corporation, Landlord, at its option, may require Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed on this _____ day of September, 2014.

[If Guarantor Is a married individual, Guarantor's spouse must sign this Guaranty]

Address of Guarantor:

_____ ,

a _____

By: _____

Print Name:_____

Print Title:_____

_____

By: _____

_____

Print Name:_____

Print Title:_____

_____

**OR**

_____

_____

Print Name: _____

_____

Print Name: _____

(Spouse, if applicable)

(v)

EXHIBIT C

## LEASE GUARANTY AGREEMENT

THIS LEASE GUARANTY ("**Guaranty**") is made by John Nguyen  ("**Guarantor**") in favor of Red Mountain Retail Group Inc., a California Corporation or its assigns ("**Landlord**") in connection with that certain lease dated _October  6_____, 2014 (the "**Lease**") pursuant to which Landlord is to lease to Luviland Corporation, a California corporation and Luvlland, LLC, a California limited liability company dba _TBD_____ _____ ("**Tenant**") those premises generally referred to as 7101 W. Lincoln Avenue, Buena Park, CA (the "**Demised Premises**").

      A.    Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B.    Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

      In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

      1.    The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

      2.    Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant.  Guarantor's obligations under this Guaranty are continuing and unconditional.

      3.    Guarantor hereby agrees that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed.  Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

      4.    Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

      5.    Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change

in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.       Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.       Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.       Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.       Without limiting the generality of the waivers contained in this Guaranty, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2820, 2821, 2822, 2845, 2848, 2849 and 2850 of the Civil Code of the State of California, as recodified from time to time (except the right to require contribution from co-sureties as set forth in Section 2848 therein).

10.      Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for Guarantor for the two (2) years prior to the current financial statement year to the extent not previously delivered to Landlord. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Guarantor, audited by an independent certified public

accountant. Guarantor represents and warrants that all such financial statements shall be true and correct statements of Guarantor's financial condition.

11.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

12.    This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law.

13.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.    Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.    The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise.   The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

16.    If any or all Guarantors shall become bankrupt or insolvent, or any application shall be made to have any or all Guarantors declared bankrupt or insolvent, or any or all Guarantors shall make an assignment for the benefit of creditors, or any or all Guarantors shall enter into a proceeding for the dissolution of marriage, or in the event of death of any or all Guarantors, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or such Guarantor's fiduciary. This Guarantee shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

17.    Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.    If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to

have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action. Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.    Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor consents to the jurisdiction and venue of the State and Federal courts sitting in the judicial district(s) which include the Demised Premises and waives any claim that the same would be an inconvenient forum.    In addition, Guarantor hereby appoints _____ as agent for service of process in the State of California in connection with any actions that may be taken by Landlord under this Guaranty; provided, however, that in the event that _____ ceases to be Guarantor's agent for service of process in the State of California, then Guarantor shall appoint such other agent in the State of California as Guarantor's agent for service of process and such other agent shall provide Landlord with written confirmation of such other agent's capacity as agent for Guarantor.

20.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

21.    Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

22.    If more than one person signs this Guaranty, each such person shall be deemed a guarantor and the obligation of all such guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23.    If Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms. If Guarantor is a corporation, Landlord, at its option, may require Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed on this _6th_ day of ~~September~~ October, 2014.

[If Guarantor is a married individual, Guarantor's spouse must sign this Guaranty]

Address of Guarantor:

_____

_____

_____

_____

a _____

By: _____

Print Name: _John Nguyen_

Print Title: _President_

By: _____

Print Name: _____

Print Title: _____

**OR**

Print Name: _____

Print Name: _____
(Spouse, if applicable)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

633 W. Fifth Street, 48th Floor, Los Angeles, CA  90071

A true and correct copy of the foregoing document entitled (*specify*): ***NOTICE OF MOTION AND MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER AUTHORIZING FINAL POST-PETITION FINANCING BY DEBTOR'S MAJORITY EQUITY HOLDER PURSUANT TO BANKRUPTCY CODE § 364(b), ON AN UNSECURED BASIS, ALLOWABLE UNDER BANKRUPTCY CODE § 503(b)(1) AS AN ADMINISTRATIVE EXPENSE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 18, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Sandford L. Frey          sfrey@cmkllp.com; knielsen@cmkllp.com
Stuart I. Koenig          skoenig@cmkllp.com; knielsen@cmkllp.com
Ron Maroko                ron.maroko@usdoj.gov
U.S. Trustee (LA)         ustpregion16.la.ecf@usdoj.gov
Marta C. Wade             mwade@cmkllp.com; knielsen@cmkllp.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**  On (*date*) November 18, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Barry Russell
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA  90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct:

| November 18, 2015 | Kelli Nielsen |  |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## 2.    SERVICE LIST

315 Arden, LLC
8950 W Olympic Blvd # 650
Beverly Hills, CA 90211

Internal Revenue Service
PO Box 7346
Philadelphia, PA  19101-7346

Securities Exchange Commission
444 S Flower St, Ste 900
Los Angeles, CA  90071-2934

County of Orange
PO box 4515
Santa Ana, CA  92702-4515
Attn:  Bankruptcy Unit

Equity Real Estate Services
1702 S Robertson Blvd
Los Angeles, CA 90035-4316

Investment Property Exchange
4041 MacArthur Blvd No 400
Newport Beach, CA 92660-2554

Larry Langberg & Associates
PO Box 630485
Simi Valley, CA 93063-0009

Luviland LLC
9761 Calendula Ave
Westminster, CA 92683-6915

Red Mountain Group Inc
1234 E 17th Street
Santa Ana, CA 92701-2612

Seth I Weissman Esq
Jeffer Mangels Butler Mitchell LLP
1900 Ave of the Stars 7th Fl
Los Angeles, CA 90067-4308

Employment Development Dept.
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA  94280-0001

L.A. County Tax Collector
Bankruptcy Unit
PO Box 54110
Los Angeles, CA  90054-0110

Capital One Card Serv
PO Box 30285
Salt Lake City, UT 84130-0285

Daniel & Judith Arnall Family Trust
8950 W Olympic Blvd # 650
Beverly Hills, CA 90211-3561

Eugene G Cowan Esq
Bocarsly Emden LLP
633 W Fifth St 64th Fl
Los Angeles, CA 90071-2011

Internal Revenue Service
300 N. Los Angeles St, Stop 5022
Los Angeles, CA 90012-3478

Law Offices of Timothy D McGonigle
233 Wilshire Blvd Ste 700
Santa Monica, CA 90401-1207

Orange County Treasurer
11 Civic Center Plz
Santa Ana, CA 92701-4063

Red Mountain Retail Group Inc
1234 E 17th Street
Santa Ana, CA 92701-2612

Tzepah Freedland
8950 W Olympic Blvd # 650
Beverly Hills, CA  90211-3561

Franchise Tax Board
Bankruptcy Section MS A-340
PO Box 2952
Sacramento, CA  95812-2952

Los Angeles City Clerk
PO Box 53200
Los Angeles, CA  90053-0200

Christopher Morris CPA
Sobul Prime & Schenkel
12100 Wilshire Blvd Ste 1150
Los Angeles, CA 90025-7117

David and Tzepah Freedland
8950 W Olympic Blvd #650
Beverly Hills, CA 90211-3561

Infiniti of Beverly Hills
8825 Wilshire Blvd
Beverly Hills, CA 90211-2605

Judith Arnall
8950 W Olympic Blvd # 650
Beverly Hills, CA  90211-3561

Luviland Corporation
319 Collard Way
Placentia, CA 92870-8217

Plumbquest
5062 Lankersheim Blvd # 15
North Hollywood, CA 91601-4225

Rodriguez Hori Choi & Cafferata LLP
777 S Figueroa St Ste 2150
Los Angeles, CA 90017-5875

W Linc BP LLC
1234 E 17th Street
Santa Ana, CA 92701-2612

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.