1   Sandford L. Frey (SBN 117058)
**CREIM MACIAS KOENIG & FREY LLP**
2   633 West Fifth Street, 48th Floor
Los Angeles, CA 90071
3   Telephone: (213) 614-1944
Facsimile:  (213) 614-1961
4   sfrey@cmkllp.com

5   Reorganization Attorneys for 315 Arden, LLC,
Debtor and Debtor in Possession

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10                        **[LOS ANGELES DIVISION]**

11   In re                                    CASE NO.:  2:15-bk-26483-BR

12   **315 ARDEN, LLC,**                      Chapter 11

13          Debtor and Debtor in Possession.  **DISCLOSURE STATEMENT
DESCRIBING PLAN OF
14                                            REORGANIZATION PROPOSED BY
DEBTOR, 315 ARDEN, LLC**
15
**Preliminary Hearing (per Court Order
16   entered on October 28, 2015 *[Docket No.
4]*) Set for**:
17   Date:              January 12, 2016
Time:              10:00 a.m.
18   Ctrm:              Courtroom 1668

19

20

21

22

23

24

25

26

27

28

I:\slf\20252 (315 Arden LLC)\Disclosure Statement [Final Ver 12-28-15].docx

# TABLE OF CONTENTS

Page

I. DEFINITIONS AND RULES OF CONSTRUCTION ...........................................................1

    **A.**    **DEFINITIONS** ............................................................1

    **B.**    **RULES OF CONSTRUCTION.** ...........................................17

II. INTRODUCTION ...........................................................18

    **A.**    **PURPOSE OF THIS DOCUMENT** ...........................................18

    **B.**    **DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING; BALLOT TABULATION PROCEDURES** ...................20

        **1.**    *Time and Place of the Confirmation Hearing* ...........................20

        **2.**    *Deadline for Voting For or Against the Plan* ...........................21

        **3.**    *Deadline for Objecting to Confirmation/Parties Entitled to Vote or Object* ...........................21

        **4.**    *Identity of Persons to Contact for More Information regarding the Plan/Ballot Tabulation Procedures* ...........................21

    **C.**    **DISCLAIMER** ...........................................23

    **D.**    **SOURCE OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT** ...........................................24

    **E.**    **ACCOUNTING METHOD USED TO PRODUCE FINANCIAL INFORMATION/IDENTITY OF ACCOUNTANTS OR OTHERS RESPONSIBLE FOR SUCH INFORMATION** ...........................................24

    **F.**    **BAR DATE** ...........................................25

    **G.**    **EXHIBIT LIST** ...........................................25

III. BACKGROUND ...........................................................26

    **A.**    **DESCRIPTION AND HISTORY OF THE DEBTOR** ...........................26

    **B.**    **PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS** ...........................26

    **C.**    **MANAGEMENT OF THE DEBTOR BEFORE AND AFTER THE BANKRUPTCY, QUALIFICATIONS, COMPENSATION** ...........................27

    **D.**    **RELATIONSHIP OF THE DEBTOR WITH AFFILIATES, SUBSIDIARIES, MERGER OR ACQUISITION INTERESTS, PLAN PROPONENT** ...........................28

    **E.**    **EVENTS LEADING TO CHAPTER 11 FILING** ...........................28

    **F.**    **SIGNIFICANT EVENTS** ...........................................30

        **1.**    *Bankruptcy Proceedings* ...........................................30

        a.    Employment of Professionals ...........................................30

        b.    UST Requirements/341(a) Hearing ...........................................31

        c.    Cash Collateral Authorization ...........................................31

        *d.*    Dip Motion ...........................................32

        e.    Plan Deadline/Exclusivity ...........................................33

        **2.**    *Other Legal Proceedings* ...........................................33

*CREIM MACIAS KOENIG & FREY LLP*
*633 WEST FIFTH STREET, 48TH FLOOR*
*LOS ANGELES, CALIFORNIA 90071*
*(213) 614-1944*

3. *Description of the Available Assets and Their Value* ...........................40

IV. SUMMARY OF THE PLAN OF REORGANIZATION ................................................47

A. WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE UNDER THE PLAN; AND GENERAL STATEMENT ABOUT CLASSIFICATION UNDER THE PLAN. ........47

B. UNCLASSIFIED CLAIMS. ........47

1. *Administrative Expenses/Treatment under the Plan.* ...........................48

2. *Unclassified Priority Claims/Treatment under the Plan.* ...................51

C. CLASSIFIED CLAIMS AND INTERESTS ................................................54

D. MEANS OF EFFECTUATING THE PLAN ................................................75

1. *Funding for the Plan:* ................................................75

2. *Post Confirmation Management of the Reorganized Debtor.* ...............77

3. *Disbursing Agent.* ................................................77

4. *Distribution of Property under the Plan* ...........................79

E. RISK FACTORS ................................................81

F. OTHER PROVISIONS OF THE PLAN. ................................................83

1. *Executory Contracts and Unexpired Leases* ...........................83

2. *Retention of Jurisdiction* ................................................84

G. TAX CONSEQUENCES OF THE PLAN. ................................................85

1. *Tax Consequences to the Debtor.* ................................................87

a. Cancellation of Debt. ................................................87

b. Gain on Sales. ................................................88

c. Carryover Losses and Other Tax Attributes. ...................88

d. Limitation on Carry forwards. ................................................88

H. EXEMPTION FROM CERTAIN TRANSFER TAX ...........................89

I. REGULATORY APPROVAL NOT REQUIRED. ...........................89

V. CONFIRMATION REQUIRMENTS. ................................................89

A. WHO MAY VOTE OR OBJECT ................................................89

B. LIQUIDATION ANALYSIS ................................................94

C. FEASIBILITY ................................................96

1. *Cash on Effective Date* ................................................96

2. *Additional Financial Information* ...........................97

VI. EFFECT OF CONFIRMATION OF PLAN ................................................99

A. DISCHARGE. ................................................99

1. *Injunction.* ................................................100

B. VESTING OF PROPERTY IN THE REORGANIZED DEBTOR. ...........100

C. MODIFICATION OF THE PLAN. ................................................100

D. POST CONFIRMATION STATUS REPORT. ...........................101

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | |
|---|---|---|
| E. | QUARTERLY FEES. | 101 |
| F. | POST-CONFIRMATION CONVERSION/DISMISSAL. | 101 |
| G. | FINAL DECREE. | 101 |
| H. | EXCULPATION. | 101 |
| | 1. *Injunction Prohibiting Actions against the Exculpated Parties.* | 102 |
| | 2. *Indemnification of the Exculpated Parties.* | 102 |
| I. | POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS | 103 |
| J. | RECOURSE | 103 |
| K. | NO ADMISSIONS | 103 |
| L. | REVOCATION OF THE PLAN. | 103 |
| M. | SEVERABILITY OF PLAN PROVISIONS | 104 |
| N. | GOVERNING LAW | 104 |
| O. | SUCCESSORS AND ASSIGNS | 104 |
| P. | SATURDAY, SUNDAY, OR LEGAL HOLIDAY | 104 |
| Q. | HEADINGS | 105 |
| R. | OTHER ASSURANCES | 105 |
| S. | ROUNDING. | 105 |
| T. | CLAIMS ESTIMATION. | 105 |
| U. | SETOFF, RECOUPMENT AND OTHER RIGHTS. | 105 |
| VII. SUPPORTING DECLARATION | | 106 |
| A. | DECLARATION OF TZEPAH FREEDLAND. | 106 |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**I.**

**DEFINITIONS AND RULES OF CONSTRUCTION**

**A.    DEFINITIONS**

In addition to the definitions set forth elsewhere in the Disclosure Statement and in the Plan, the following definitions will apply with respect to the Disclosure Statement:

*Administrative Claim(s)* or *Administrative Expense(s)* means Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under Bankruptcy Code §§ 503 (b) and 507(a) (1).

*Administrative Claims Bar Date* shall have the meaning set forth in Section IV. A. 1(b) of the Plan.

*Administrative Claims Funding Amount* shall have the meaning set forth in Section IV.A.1 of the Plan.

*Administrative Claim Reserve(s)* means a Plan Reserve in an amount sufficient to satisfy Allowed Administrative Claims against the Debtor.

*Administrative Tax Claim* means a Claim that a governmental unit asserts or may assert against the Debtor either for taxes or for related interest, fees, costs or penalties for any tax period.

*Allowed* means, when used in respect of a Claim or an Interest or group of Claims or Interests, the following as applicable:

(a)    if no Proof of Claim or Interest has been timely filed, such amount of the Claim or Interest or group of Claims or Interests which has been scheduled by the Debtor as liquidated in amount and not disputed or contingent and as to which no party in interest has filed an objection within the time required under the Plan or otherwise fixed by the Court and which Claim or Interest is not disallowed under Bankruptcy Code § 502 (d) or (e); or

(b)    if a Proof of Claim or Interest has been filed by the applicable bar date or is deemed timely filed by the Court, such amount of the Claim or Interest or group Claims or Interests as to which any party in interest has not filed an objection within the time required under the Plan or otherwise fixed by the Court and which Claim or Interest is not disallowed under Bankruptcy Code § 502 (d) or (e); or

(c)    such amount of the Claim or Interest or group of Claims or Interests which is allowed by a Final Order of the Court.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Allowed Administrative Claim* means an Administrative Claim that is an Allowed Claim.

*Allowed Claim* or *Allowed Interest* means a Claim or Interest that is Allowed and not a Disputed Claim.

*Allowed General Unsecured Claim* means a General Unsecured Claim that is an Allowed Claim.

*Allowed Secured Claim* means a Secured Claim that is an Allowed Claim.

*Assets* means (i) any and all real or personal property of the Debtor of any nature, including, without limitation, the Commercial Property, Cash, licenses, goods, materials, supplies, furniture, fixtures, equipment, works in process, accounts or loans receivable, tax refunds, chattel paper, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Rights of Action, and any other general intangibles of any nature whatsoever; and (ii) proceeds, products, rents and profits of any and all of the foregoing.

*Assumed Contract Schedule* shall have the meaning set forth in Section VI. F of the Plan.

*Available Cash* means the positive cash flow generated from operation of the Commercial Property subsequent to the Effective Date (calculated in accordance with GAAP) less payment, or reserve for payment, of Operating Expenses and Operating Reserves (i.e. working capital, capital expenditures, debt service, etc.) and any and all Claims and creditor obligations under the Plan.

*Avoidance Action(s)* means all avoiding powers, rights to seek subordination and all rights and remedies under Bankruptcy Code §§ 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, or 553 or any fraudulent conveyance, fraudulent transfer, or preference laws under applicable state or other law.

*Ballot(s)* means the ballot to vote to accept or reject the Plan.

*Ballot Deadline* means the deadline established by the Bankruptcy Court for the delivery of executed Ballots to the Debtor.

*Bankruptcy Code* means the Bankruptcy Code, as codified in Title 11 of the United States Code, 11 U.S.C. Section 101 et seq., including all amendments thereto, to the extent such amendments are applicable to the Case.

*Bankruptcy Court* means the United States Bankruptcy Court for the Central District of California, Los Angeles Division, or any other court that exercises jurisdiction over the Case.

*Bar Date* means the bar date for POC(s) and POI(s) set in this Case.

*Bar Date Order* means the *Order Setting Bar Date for Filing Proofs of Claim in Chapter 11 Case and Approving Bar Date Notice*, entered by the Bankruptcy Court in this Case.

*Business Day* means any day other than a Saturday, Sunday or a legal holiday (as defined in the FRBP 9006(a)).

*Case* means the Chapter 11 proceeding commenced by the Debtor by voluntary petition and entitled *In re 315 Arden LLC*, Case No. 2:15-bk-26483-BR, pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

*Cash* means cash or cash equivalents, including, but not limited to, bank deposits, checks, or other similar items.

*Claim* means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Claim Objection Deadline* means the date, if any, set in the Confirmation Order as being the deadline for filing objections to Claims.

*Class* means a class of Claims or Interests described in the Plan.

*Classified Priority Claim(s)* means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(1), 507(a)(4), 507(a)(5), and/or 507(a)(7), excluding any such claims incurred after the Petition Date.

*CMKF* means Creim Macias Koenig & Frey LLP, reorganization attorneys to the Debtor.

*Commercial Building* means the one-story commercial building consisting of approximately 22,680 square feet located on the Commercial Property.

*Commercial Property* means the real property of approximately 56,628 square feet, located at 7101 W. Lincoln Avenue, Buena Park, CA, including the Commercial Building.

*Confirmation* means the entry of the Confirmation Order.

*Confirmation Date* means the date upon which the Court enters the Confirmation Order.

*Confirmation Hearing Date* means the date on which the Court held a hearing on Confirmation of the Plan.

*Confirmation Order* means the order of the Court confirming the Plan pursuant to Bankruptcy Code § 1129.

*Consummation* means the occurrence of the Effective Date.

*Contracts* means all agreements and contracts to which the Debtor is a party.

*Court* means the United States Bankruptcy Court for the Central District of California, Los Angeles Division, or any other court that exercises jurisdiction over the Case.

*Creditor* means the Holder of a Claim against the Debtor.

*Cure Obligations* means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an executory contract or unexpired lease) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults, if any, under any executory contract or unexpired lease that is to be assumed and assigned by the Debtor pursuant to Bankruptcy Code §§ 365 and 1123.

*D. Arnall* means Daniel Arnall, the deceased husband of J. Arnall.

*Debtor* means 315 Arden, LLC, the Debtor in this Case.

*Debtor's Accountants* means the accountants and financial advisors employed by the Debtor in the Case pursuant to Bankruptcy Code § 327(a).

*Debtor's Bankruptcy Counsel* means CMKF.

*DIP* means Debtor in Possession.

*Dip Loan* means the post-petition financing by the Trust approved by the Bankruptcy Court pursuant to the DIP Order.

*/ / /*

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Dip Motion* means the *Motion of Debtor and Debtor-in-Possession for Order Authorizing Final Post-Petition Financing by Debtor's Majority Equity Holder pursuant to Bankruptcy Code § 364(b), on an Unsecured Basis, Allowable Under Bankruptcy Code §503(b)(1) as an Administrative Expense*, filed on November 18, 2015. [Docket No. 14].

*Dip Order* means that certain *Order Approving Motion of Debtor and Debtor-in-Possession for Order Authorizing Final Post-Petition Financing by Debtor's Majority Equity Holder pursuant to Bankruptcy Code § 364(b), on an Unsecured Basis, Allowable Under Bankruptcy Code § 503(b)(1) as an Administrative Expense*, approving the Dip Motion.

*Disallowed Claim* means a Claim, or any portion thereof, that: (a) is not listed on the Debtor's Schedules, or is listed therein as contingent, unliquidated, disputed, in an unknown amount, or in an amount equal to zero, or is listed in an unknown amount, <u>and</u> whose Holder has failed to timely File a Proof of Claim; (b) is listed in the Debtor's Schedules, <u>but</u> is subject to a unresolved objection filed by the Debtor or other party in interest, or (c) the Court has disallowed pursuant to order of the Court.

*Disbursing Agent* means the Reorganized Debtor, which is responsible for making all Distributions to Claimants provided under the Plan.

*Disclosure Statement* means the *Disclosure Statement Describing Plan of Reorganization Proposed by Debtor, 315 Arden LLC*, and any and all amendments, modifications and exhibits thereto.

*Disclosure Statement Order* means the order of the Bankruptcy Court approving the Disclosure Statement accompanying the Plan.

*Disputed Claim* or *Disputed Interest* means a Claim or Interest as to which a Proof of Claim is filed or is deemed filed under FRBP 3003(b)(1) or a Proof of Interest was filed or deemed filed under FRBP 3003(b)(2); and

1.    An objection: (a) has been timely filed; and (b) has not been denied by a Final Order or withdrawn; or,

2.    The Claim or Interest is listed on the Debtor's Schedules as disputed, contingent or unliquidated; or is not listed on the Debtor's Schedules

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

as disputed, contingent or unliquidated, but an objection has nevertheless been filed and not denied by Final Order.

*Disputed Claim Reserve* means, for any Disputed Claim, the amount as estimated pursuant to (a) agreement among the Debtor (or the Reorganized Debtor, as applicable) and the Holder of the Disputed Claim; (b) determination made by the Debtor (or the Reorganized Debtor, as applicable) in its absolute and sole discretion; or (d) determination of the Bankruptcy Court.

*Disputed/Estimated Amount* shall have the meaning set forth in Section II, B, 4, b.1 (iii) of the Plan.

*Distribution* means any transfer under the Plan of Cash or other property to a Holder of an Allowed Administrative Claim, a Holder of an Allowed Claim, or a Holder of an Interest.

*EDD* means the Employment Development Department.

*Effective Date* means a date set by the Debtor, which date shall be within sixty (60) days after the Confirmation Order becomes a Final Order.

*Effective Date Notice* means a notice that may be served by the Reorganized Debtor upon the occurrence of the Effective Date.

*Enjoined Claim* shall have the meaning set forth in Section VIII. B of the Plan.

*Estate* means the estate in the Debtor's Case created pursuant to Bankruptcy Code § 541(a).

*Exculpated Parties* means, collectively, the Debtor, CMKF, the McGonigle Firm, the Lombardo Firm, the Trust, J. Arnall, and Freedland, and each of their respective predecessors, successors and assigns, beneficiaries, spouses, children, shareholders, partners, members, employees, affiliates and Insiders (determined as if such entity or individual were a debtor under the Bankruptcy Code), subsidiaries, principals, agents, officers, directors, trustees, members, partners, professionals, consultants, and advisors.

*Exculpation* shall have the meaning set forth in Section VIII. D of the Plan.

*Exhibit Filing Date* means the date that is at least 10 days prior to the date of the Confirmation Hearing.

*Final Order* or *Final Judgment* means an order or judgment of a court of competent jurisdiction entered on such court's official docket the operation or effect of which (a) has not been

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

reversed, rescinded, stayed, modified, or amended; (b) is in full force and effect; and (c) with respect to which: (i) the time to appeal or to seek review, remand, rehearing, or a *writ of certiorari* has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or *writ of certiorari* is pending, or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a *writ of certiorari* was sought.

*FRBP* means the Federal Rules of Bankruptcy Procedure as now in effect or hereafter amended and applicable to the Case.

*Freedland* means Tzepah Freedland.

*FTB* means the Franchise Tax Board.

*GAAP* means Generally Accepted Accounting Principles.

*General Unsecured Claimant* means the Holder of a General Unsecured Claim.

*General Unsecured Claimants* means collectively all Holders of the General Unsecured Claims.

*General Unsecured Claim* means a Claim that is not an Administrative Claim, a Priority Claim, an Administrative Tax Claim, a Secured Claim, a Secured Tax Claim, or a Convenience Claim.

*General Unsecured Claims* means collectively each and every General Unsecured Claim asserted against the Debtor.

*General Unsecured Creditor* has the same meaning as General Unsecured Claimant.

*General Unsecured Creditors* has the same meaning as General Unsecured Claimants.

*Glendale Building* means the commercial office building formerly owned by the Debtor, located at 315 Arden Avenue, Glendale, California

*Governmental Unit* means United States; State; Commonwealth; District; Territory; municipality; foreign state; or a department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state, or other foreign or domestic government.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Hanley* means Edward B. Hanley, an individual

*Herron* means Herron Companies.

*Herron Appraisal* means the appraisal prepared by Herron appraising the Commercial Property, a copy of which is attached as an exhibit to the Disclosure Statement.

*HIG* means Hanley Investment Group, Inc., a California Corporation.

*Holder* means the holder of a Claim against, or Interest in, the Debtor.

*Insider* means all Persons who are "insiders" as that term is defined in Bankruptcy Code § 101 (31).

*Interest* means any equity security Holder of the Debtor as defined in Bankruptcy Code § 101(16).

*IPRS* means Investment Property Exchange Services, Inc., a California corporation.

*IRC* means the United States Internal Revenue Code, as codified in Title 26 of the United States Code, including all amendments thereto, to the extent such amendments are applicable to the sale of the Glendale Building and Commercial Building.

*IRS* means the Internal Revenue Service.

*J. Arnall* means Judith Arnall, the widow of D. Arnall.

*LBR* means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, including all amendments thereto, to the extent such amendments are applicable to the Case.

*Lien* means any charge against or interest in property to secure payment or performance of a Claim, debt or obligation.

*Liquidation Analysis* means the Liquidation Analysis prepared by the Debtor attached to the Disclosure Statement.

*Liquidation Value* means the aggregate dollar amount found by the Court (calculated without consideration of Rights of Action), which is equal to the lowest dollar amount necessary to fund payment to a Class in the manner provided under the Plan so that each Holder of an Allowed Claim would receive or retain property with a value as of the Effective Date at least equal

to the amount such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

*Lombardo Firm* means Lombardo & Safford, the Debtor's special corporate and real estate attorneys.

*Lopez* means Carlos J. Lopez, an individual

*LTV Ratio* means the ratio of an Allowed Secured Claim to the value of the Commercial Property.

*LTV Reduction Contribution* means a further contribution or unsecured loan, if necessary, to be made after the Effective Date by, or on behalf of, the New Value Contributor in an amount necessary to make the W Linc LTV Reduction Payment.

*Luviland Corp* means Luviland Corporation, a California Corporation.

*Luviland Entities* means Luviland Corp and Luviland LLC.

*Luviland LLC* means Luviland LLC, a California Limited Liability Company.

*McGonigle Firm* means Timothy D. McGonigle Prof. Corp., the Debtor's special litigation attorneys.

*Net Sale Proceeds* means proceeds resulting from the sale of the Commercial Property remaining after payment of, or reserve for, any and all (a) usual and customary fees, costs and/or expenses of sale, including, but not limited to, escrow fees, title fees, title insurance fees, document preparation fees, insurance, and/or any other fees, costs or expenses of sale; (b) property taxes due and owing as of closing of such sale; (c) brokers' commissions; (d) repairs or improvements necessary to consummate the sale; and (e) other amounts, fees, costs, expenses, or other charges reasonable, necessary, or required in connection with the sale or close of escrow.

*New Value Contribution* means the contribution by the New Value Contributor.

*New Value Contributor* means the Trust.

*Nguyen* means John Huy Nguyen, an individual.

*Operating Agreement* means the *First Amended and Restated Operating Agreement of 315 Arden LLC,* entered into on December 9, 2014, as it existed as of the Petition Date.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Operating Expenses* means (a) operating expenses and ordinary course of business payments, including, but not limited to, goods, services, depreciation, interest, insurance, trash, utilities, supplies, repairs, security, improvements, equipment, furniture, fixtures, bank charges, taxes, wages, salaries, commissions (including vacation, severance and sick leave pay), withholding taxes, ordinary course payments to secured creditors and equipment lessors, and any other payments incurred, accrued or required to be paid in the ordinary course of business; and (b) Working Capital Reserves.

*Other Assets* means the Assets, excluding the Commercial Property.

*Person* means any individual or entity.

*Personal Property* means all property owned by the Debtor now or hereafter which under applicable law is not real property, and includes all tangible and intangible personal property.

*Petition Date* means October 27, 2015.

*Plan* means the *Plan of Reorganization Proposed by Debtor, 315 Arden LLC,* as it may be amended or modified from time to time, and all exhibits thereto.

*Plan Proponent* means the Debtor.

*Plan Reserve Account(s)* means the segregated accounts to be established by the Reorganized Debtor to hold each of the various Plan Reserves as the Reorganized Debtor reasonably deems appropriate, subject to the terms of the Plan.

*Plan Release(s)* means the general release of the Exculpated Parties set forth in the Plan.

*Plan Reserves* means all reserves to be established by the Reorganized Debtor on or after the Effective Date (or as soon as reasonably practicable thereafter), including, but not limited to, the Administrative Claim Reserve, and separate reserves for payment of Disputed Administrative Claims and Disputed General Unsecured Claims as of the date of any contemplated distribution. Each Plan Reserve shall be in an amount determined in the discretion of the Reorganized Debtor, and such amount(s) can be reduced, increased and/or replenished after the Effective Date by the Reorganized Debtor subject to the terms of the Plan.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

***Plan Supplement*** means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed before the Confirmation Hearing (to the extent such document is in existence as of the time thereof), as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the FRBP.

***POC*** means Proof of Claim filed in the Case.

***POC Amount*** shall have the meaning set forth in Section II, B, 4, b.1 (ii) of the Plan.

***POI*** means Proof of Interest filed in the Case.

***Post-Effective Date Litigation*** means all claims reserved under Section VII of the Plan, including, but not limited to: (a) the State Court Action; (b) Rights of Action; (b) any rights to object to, settle, compromise, or resolve Claims; and (c) any rights of equitable subordination or disallowance.

***Priority Claim(s)*** means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(1) through 507(a)(8), excluding any such claims incurred after the Petition Date.

***Priority Tax Claim(s)*** means certain unsecured tax claims based on income, employment, and other taxes described by Bankruptcy Code § 507(a)(8), excluding any such claims incurred after the Petition Date.

***Priority Tax Claims Funding Amount*** shall have the meaning set forth in Section IV of the Plan.

***Pro Rata*** means, with respect to a particular Class of Claims or Interests, the ratio that the amount of a particular Allowed Claim or Allowed Interest in the Class bears to the total amount of Allowed Claims or Allowed Interests in the Class.

***Professionals*** means the professionals (including, without limitation, attorneys, accountants, and other advisors and agents) employed by the Debtor.

***Professional Fee Claim*** means a claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred for which the Estate is liable for payment.

*Red Mountain Entities* means Red Mountain Group and Red Mountain Retail.

*Red Mountain Group* means Red Mountain Group, Inc., a California Corporation.

*Red Mountain Retail* means Red Mountain Retail Group, Inc., a California Corporation.

*Rejection Damage Claim* means a Claim for any obligations or damages arising under an unexpired real-property or personal-property lease or executory contract that the Debtor rejects or is deemed rejected pursuant to the terms of the Plan.

*Rejection Schedule* shall have the meaning set forth in Section VI of the Plan.

*Related Parties* means with respect to any person or entity, and, as the case may be, all of such person's or entity's direct or indirect, current or former, subsidiaries, partnerships, limited liability companies, management companies, affiliated companies, corporations, officers, directors staff, employees, shareholders, members, partners, legal representatives, attorneys, accountants, financial advisors, representatives, insurers, heirs, executors, administrators, guarantors, investors, trusts, trustees, beneficiaries, parents, spouses, children, grandchildren, siblings, predecessors, successors, assigns, managers, affiliates, contractors, consultants, agents, and any and all such persons or entities acting by, through or in concert with them, and each and all in their respective personal and corporate capacities and any insurers of any of the foregoing.

*Reorganized Debtor* means the Debtor on and after the Effective Date, after giving effect to the Plan and after the revesting of the Assets.

*Reorganized Debtor Operating Agreement* means the Operating Agreement, as may be modified, amended, or affected by the Plan as of the Effective Date, and as may be thereafter modified and/or amended by vote of the applicable members of the Reorganized Debtor.

*Rights of Action* means any and all claims, demands, rights, actions, causes of action and suits held by, or which could be asserted on behalf of, the Estate, of any kind, nature or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, including, but not limited to (1) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (2) the right to object to Claims or Interests, (3) claims pursuant

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

to Bankruptcy Code § 362, (4) such claims and defenses as fraud, mistake, duress, usury, and (5) Avoidance Actions, *excluding* the State Court Action and the Subordination Litigation.

*Sale Option* shall have the meaning set forth in Section VI of the Plan.

*Scheduled Amount* shall have the meaning set forth in Section II, B, 4, b.1 (i) of the Plan.

*Schedules* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statement of financial affairs filed by the Debtor pursuant to Bankruptcy Code § 521, as the same may have been amended, modified, or supplemented from time to time.

*Scheduling Order* means the *Order: (1) Setting Deadline for filing Chapter 11 Disclosure Statement and Plan of Reorganization; (2) Setting Preliminary Hearing on Adequacy of Disclosure Statement and Plan of Reorganization; and (3) Setting forth Mandatory Contents of Chapter 11 Disclosure Statement and Chapter 11 Plan of Reorganization*, entered by the Bankruptcy Court on October 28, 2015 [Docket No. 4].

*Secured Claim* means a Claim, including a Secured Tax Claim, which is secured by a lien on the Debtor's property. A claim is a Secured Claim only to the extent of the value of the claimholder's interest in the collateral or to the extent of the amount subject to setoff, whichever is applicable, and as determined under Bankruptcy Code §506(a).

*Secured Tax Claim* means a governmental unit's Secured Claim for unpaid taxes arising before the Petition Date.

*State Court Action* means the civil litigation action initially filed on August 21, 2015, pending in the Superior Court of the State of California for the County of Orange, pursuant to the State Court Complaint, entitled *315 Arden LLC, a California Limited Liability Company, Plaintiff, vs. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company; Luviland Corporation, a California Corporation; Luviland LLC, a California Limited Liability Company, John Huy Nguyen, an individual; Eric Wohl, an individual; Carlos J. Lopez, an individual;*

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Edward B. Hanley, an individual; Hanley Investment Group, Inc., a California Corporation, and, Does 1 through 40, inclusive*, Case No. 30-2015-00805904-CU-FR-CJC.

**State Court Complaint** means the first amended complaint filed by the Debtor in the State Court Action, entitled *First Amended Complaint for (1) Breach of Contract (Lease); (2) Breach of Contract (Guaranty); (3) Fraud and Intentional; Misrepresentation (against Agents and Does); (4) Fraud and Intentional Misrepresentation (against Sellers and Does); (5) Intentional Concealment; (6) Negligent Concealment; (7) Negligent Misrepresentation; (8) Breach of Fiduciary Duty; (9) Negligence; and (10) Constructive Fraud*, as currently filed or hereafter amended.

**State Court Defendants** means any and all defendants in the State Court Action, including, without limitation, the Red Mountain Entities, W Linc, the Luviland Entities, Nguyen, Wohl, Lopez, Hanley, HIG, and, Does 1 through 40, as now exists or may later be amended, modified, or supplemented.

**Stipulated Amount** shall have the meaning set forth in Section II, B, 4, b.1 (iv) of the Plan.

**Subordination Litigation** means an adversary action pursuant to Bankruptcy Code § 510(c) that may be initiated by the Debtor, in its discretion, in the Bankruptcy Court, seeking to equitably subordinate the W Linc Disputed Secured Claim.

**Takeout Financing** means, to the extent necessary, refinancing of the Commercial Property obtained by the Reorganized Debtor from a third party lender prior to the W Linc Note Extended Maturity Date, which shall be secured by a first deed of trust against the Commercial Property; the proceeds of which Takeout Financing will be used to, among other things, satisfy the unpaid balance due, if any, on account of the W Linc Allowed Secured Claim, if any, on or before the W Linc Note Extended Maturity Date.

**Trust** means the Daniel & Judith Arnall Family Trust.

**Trust Exit Financing** means financing or further contributions made available by the Trust to the Reorganized Debtor on and after the Effective Date, in such amounts as are periodically

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

required by the Reorganized Debtor from time to time for Operating Expenses or payments under the Plan.

***Unclassified Priority Claim(s)*** means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(2), 507(a)(3), and/or 507(a)(8), excluding any such claims incurred after the Petition Date.

***Updated Appraisal*** means the updated appraisal performed after the Effective Date, on the Update Appraisal Date, by Herron (or another appraiser selected by the Reorganized Debtor), in accordance with the treatment of Class 2 in Section V of the Plan.

***Updated Appraisal Date*** means the date upon which the Updated Appraisal must be completed in accordance with the treatment of Class 2 in Section V of the Plan, which date will be a Business Day, which is no more than twenty-four (24) months after the Effective Date.

***UST*** means the Office of the United States Trustee for the Central District of California.

***UST Fees*** means fees or charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

***Voting Deadline*** means the deadline established by the Debtor for receipt of Ballots voting to accept or reject the Plan and Plan Releases.

***W Linc*** means W Linc BP, LLC, a California Limited Liability Company.

***W Linc Allowed Secured Claim*** means the Secured Claim of W Linc, if any, as Allowed and determined (a) by Final Order entered in the Bankruptcy Court; (b) by Final Judgment in the State Court Action; (c) after applying any and all setoff and/or recoupment claims asserted by the Debtor; and, (d) by Final Judgment in the Subordination Litigation

***W Linc Deferred Payment(s)*** shall have the meaning set forth in the treatment of Class 2 under Section V.B of the Plan.

***W Linc Discount/Interest Rate*** shall have the meaning set forth in Section __ of the Plan.

***W Linc Disputed Claim Reserve*** means a reserve to be established by the New Value Contributor on behalf of the Reorganized Debtor on or after the Effective Date (or as soon as reasonably practicable thereafter) into which the W Linc Disputed Deferred Payments will be deposited pending determination of the W Linc Allowed Secured Claim.

**W Linc Disputed Claim Reserve Account** means a segregated account to be established by the Reorganized Debtor to hold the proceeds of the W Linc Disputed Claim Reserve, subject to the terms of the Plan.

**W Linc Disputed Deferred Payments** shall have the meaning set forth in the treatment of Class 2 under Section V.B of the Plan.

**W Linc Disputed Secured Claim** means any and all Secured Claims asserted by W Linc against the Debtor, including, without limitation, pursuant to W Linc Note.

**W Linc Final Payment** shall have the meaning set forth in Section V.B of the Plan.

**W Linc Final Payment Date** shall have the meaning set forth in Section V.B of the Plan.

**W Linc Interim Discount/Interest Rate** shall have the meaning set forth in Section V.B of the Plan.

**W Linc LTV Reduction Payment** shall have the meaning set forth in Section V.B of the Plan.

**W Linc NOD** shall have the meaning set forth in Section II.E of the Disclosure Statement.

**W Linc Note** means that certain *Promissory Note*, between the Debtor and IPRS, dated February 24, 2015, in the principal amount of $1,507,642.

**W Linc Note Extended Maturity Date** shall have the meaning set forth in Section V.B of the Plan.

**W Linc Secured Claim Allowance Date** means the first (1st) Business Day following ten (10) days after all of the following (i) entry of a Final Order Allowing the W Linc Disputed Secured Claim; (ii) entry of a Final Judgment in the State Court Action; and (iii) final determination of the W Linc Allowed Secured Claim.

**W Linc Trust Deed** means that certain *Deed of Trust and Assignment of Rents*, dated February 24, 2015, recorded on February 24, 2015, in the Official Records of recorder's office the Orange County office, as instrument number 2015000097859.

**Wohl** means Eric Wohl, an individual.

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Working Capital Reserves* means any and all anticipated, planner or actual cash needs for working capital, ascribed to such term under and pursuant to GAAP.

*1031 Exchange* means the exchange of the Glendale Building and Commercial Building, thereby resulting in the deferral of the recognition of capital gains and losses by the Debtor, pursuant to IRC § 1031.

## B. RULES OF CONSTRUCTION.

The rules of construction in Bankruptcy Code §102 and in the Plan apply to the Disclosure Statement and to the extent not inconsistent herewith.

FRBP 9006(a) applies when computing any time period under the Plan.

A term that is used in the Plan and that is not defined in the Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or the FRBP.

The Plan shall control over any conflicting provision, or in the event of any ambiguity, between the terms of the Disclosure Statement, on the one hand, and the Plan, on the other hand.

The Plan shall control over any conflicting provision, or in the event of any ambiguity, between the terms of any documents entered into or approved in connection with the Plan, on the one hand, and the Plan, on the other hand.

The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in singular or the plural, includes both the singular and the plural.

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms. No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially negatively affected.

Any reference to an existing document means the document as it may be, amended or supplemented.

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

Unless otherwise specified, all references to Sections are references to the Plan's sections.

Unless otherwise specified, all references to Exhibits are references to the Exhibits to the Plan.

The words "herein," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion hereof.

## II.

## INTRODUCTION

The Debtor[1] commenced its Case by filing in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date.

**THIS DOCUMENT IS THE DISCLOSURE STATEMENT DESCRIBING THE PLAN FILED BY THE DEBTOR.**

The Debtor believes that the Plan provides, under the circumstances, the best possible recoveries to creditors; that acceptance of the Plan is in the best interests of all parties in interest; and that any alternatives would result in unnecessary delay, uncertainty and expense to the Estate. The Debtor, therefore, recommends that all eligible creditors entitled to vote on the Plan cast their Ballot to accept the Plan.

**A.    PURPOSE OF THIS DOCUMENT**

This document is the Disclosure Statement filed by the Debtor.  The Disclosure Statement describes the Plan filed by the Debtor.   The Disclosure Statement also discusses certain information relating to the Plan and the process that the Bankruptcy Court follows in determining whether or not to confirm the Plan.  The Plan sets forth the manner in which the Claims against and Interests in the Debtor will be treated following the Debtor's emergence from Chapter 11.  The

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

---

[1]  Capitalized terms shall have the meaning ascribed to them in Section 1. A. of the Disclosure Statement, unless specifically defined elsewhere in the text of the Disclosure Statement.

Disclosure Statement further describes certain aspects of the Debtor's current and future business operations, and other related matters.

Chapter 11 allows a debtor, and under some circumstances creditors and others parties in interest, to propose a plan of reorganization. A plan may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Here, the Debtor is proposing the Plan, which provides for the continuing operation of the Debtor's business through reorganization.

The Plan proposed by the Debtor in this Case is included in the same envelope as the Disclosure Statement. By and through the Plan, the Debtor will resolve all Claims against the Estate. Plan Distributions shall be funded primarily from the Debtor's post-confirmation business operations as discussed in more detail later in this Disclosure Statement.

**READ THE DISCLOSURE STATEMENT AND PLAN CAREFULLY, AS THEY CONTAIN INFORMATION RESPECTING, AMONG OTHER THINGS:**

      **(1)**      **THE TERMS OF THE PLAN;**
      **(2)**      **PARTIES ENTITLED TO VOTE ON, AND/OR OBJECT TO, THE PLAN;**
      **(3)**      **THE TREATMENT OF CLAIMS (i.e., what Creditors will receive if the Plan is confirmed),**
      **(4)**      **HOW TREATMENT UNDER THE PLAN COMPARES TO LIQUIDATION;**
      **(5)**      **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**
      **(6)**      **REQUIREMENTS FOR CONFIRMATION OF THE PLAN;**
      **(7)**      **THE EFFECT OF CONFIRMATION; AND**
      **(8)**      **WHETHER THE PLAN IS FEASIBLE.**

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, READ THE DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS IN THEIR ENTIRETY.**

The Disclosure Statement does not explain all aspects of creditors' rights and claims. Parties in interest are urged to consider consulting their own lawyer to obtain more specific advice on how the Plan will affect the rights and claims of interested parties as well as the best course of action.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Among other things, the Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Bankruptcy Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Bankruptcy Court.

The provisions of the Plan govern in the event there are any inconsistencies between the language of the Disclosure Statement and the provisions of the Plan.  Please see, Section A.B (Rules of Construction) for additional "Rules of Construction."

The Bankruptcy Code requires that a Disclosure Statement contain "adequate information" concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party in interest can now solicit votes in favor of, or against, the Plan based on the information contained in the Disclosure Statement.

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THE DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, AND THE EFFECTIVE DATE OCCURS, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND OTHER PARTIES IN INTEREST IN THE CASE.**

**B.    DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING; BALLOT TABULATION PROCEDURES**

**1.    *Time and Place of the Confirmation Hearing***

The hearing at which the Bankruptcy Court will determine whether or not to confirm the Plan filed by the Debtor will take place on the date set forth in the Disclosure Statement Order, in **Courtroom 1668**, located at the **United States Bankruptcy Court,** located at the **Edward R. Roybal Federal Building and Courthouse**, **255 E. Temple Street, Los Angeles, California 90012**, before the **Honorable Barry Russell**, United States Bankruptcy Judge.

/ / /

/ / /

**2.**     _**Deadline for Voting For or Against the Plan**_

If a the Holder of an Allowed Claim is entitled to vote, it is in such Claimant's best interest

to timely vote on the enclosed Ballot and return the Ballot in the enclosed envelope to:

> **Kelli Nielsen**
> **Creim Macias Koenig & Frey LLP;**
> **633 W. Fifth Street, 48th Floor;**
> **Los Angeles, California 90071;**
> **Facsimile - (213) 614-1961;**
> **Email address - knielsen@cmkllp.com.**

**ALL BALLOTS MUST BE RECEIVED BY THE DATE AND TIME SET FORTH
IN THE DISCLOSURE STATEMENT ORDER IN ORDER TO BE COUNTED.**

**3.**     _**Deadline for Objecting to Confirmation/Parties Entitled to Vote or Object**_

    **a.**     Deadline for Objecting to Confirmation of the Plan.

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served

upon **Sandford L. Frey, Esq., Creim Macias Koenig & Frey LLP; 633 W. Fifth Street, 48th**

**Floor; Los Angeles, California 90071; Facsimile - (213) 614-1961; Email address:**

**sfrey@cmkllp.com by the date and time set forth in the Disclosure Statement Order**.

Any objection must be in writing; specify the name and address of the party objecting; set

forth the amount of the objecting party's Claim(s) and any other grounds giving the objector

standing to object; set forth grounds for the objection; and be accompanied by the objecting party's

evidentiary support for its objection, including declarations made under penalty of perjury and

other admissible documentary evidence.

**4.**     _**Identity of Persons to Contact for More Information regarding the Plan/Ballot**_

    _**Tabulation Procedures**_

    a.     Identity of Persons to Contact for More Information regarding the Plan.

Any interested party desiring further information about the Plan should contact Sandford

L. Frey, Esq., Stuart I. Koenig or Marta Wade of Creim Macias Koenig & Frey LLP; 633 W. Fifth

Street, 48th Floor, Los Angeles, California 90071; Telephone - (213) 614-1944; Facsimile - (213)

614-1961; Email address:  sfrey@cmkllp.com; skoenig@cmkllp.com; or mwade@cmkllp.com.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

b.      Ballot Tabulation Procedures.

The following procedures will apply with respect to balloting and the tabulation of Ballots with respect to the Plan:

b.1.    The amount of a Claim or Interest for purposes of Ballot tabulation will be:

     i.      For a Claim or Interest identified in the Schedules as not contingent, not unliquidated, and not disputed, and that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise, prior to the Balloting Deadline (as defined in the Disclosure Statement Order), and for which no POC has been timely filed, and for which no objection has been filed, the Claim or Interest amount, as identified in the Schedules (*"Scheduled Amount"*);

     ii.     For a timely POC or POI that is filed in a specified liquidated amount and that is not the subject of an objection filed before the Balloting Deadline, or that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise prior to the Balloting Deadline, the specified liquidated amount in such POC or POI (*"POC Amount"*);

     iii.    For a Claim or Interest (whether filed or scheduled) that is the subject of an objection, setoff, recoupment or litigation, in whole or in part, before the Confirmation Hearing, only the undisputed amount, if any, of such Claim or Interest, unless such Claim or Interest is temporarily Allowed under FRBP 3018(a) (*"Disputed/Estimated Amount"*);

     iv.     For a Claim that is offered an option under the Plan to have its Claim Allowed for voting purposes upon the timely election of certain options, and which claimant is in compliance with the procedures set forth in the Plan for such election, the stipulated amount specified in the Plan (*"Stipulated Amount"*);

b.2.    If an entity submits a Ballot for a Claim or Interest (i) for which there is no timely POC or POI filed and, for which there is no corresponding Scheduled Amount, or (ii) which is the subject of an unresolved objection filed prior to the Confirmation Hearing, such Ballot will not be counted, unless ordered by the Bankruptcy Court;

b.3.    Creditors that have Claims in more than one voting Class under the Plan must submit a separate Ballot for voting their Claims in each such Class; any creditor that requires additional copies of a Ballot may either photocopy the

original Ballot or obtain an additional Ballot pursuant to the instructions set forth in the Confirmation Hearing Notice and the proposed Ballot. **If a creditor uses the same Ballot to vote Claims in more than one class, such combined Ballot will NOT be counted unless the Court order's otherwise**;

b.4.    If an entity casts more than one eligible Ballot with respect to the same Claim or Interest before the Balloting Deadline, the last Ballot received prior such deadline shall supersede any prior Ballot(s) by such entity with respect to such Claim or Interest in the Class in which the Ballot is submitted; and,

b.5    Any Ballot that is incomplete or that is not received by the applicable deadline shall NOT be counted.

## C.    DISCLAIMER

The financial data relied upon in formulating the Plan is based on the information provided by the Debtor; the Debtor's books and records; the Schedules filed by the Debtor; and the opinion of the Debtor. The Debtor has represented that everything stated in the Disclosure Statement is true to the best of the Debtor's knowledge. The Debtor urges you to vote to accept the Plan.

The Bankruptcy Court has not yet determined whether the Plan is confirmable, and makes no recommendation as to whether Claimants entitled to vote should support or oppose the Plan.

The statements and information that concern the Debtor that are set forth in this document constitute the only statements and information that the Bankruptcy Court has approved for the purpose of soliciting votes to accept or reject the Plan. Therefore, no statements or information inconsistent with anything contained in the Disclosure Statement are authorized unless otherwise ordered by the Bankruptcy Court.

**You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan. Nothing contained in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any party or may be deemed to constitute evidence of the tax or other legal effects that the reorganization set forth in the Plan may have on entities holding Claims or Interests.**

Unless another time is expressly specified in the Disclosure Statement, all statements contained in this document are made as of the date set forth on the last page of the Disclosure Statement. Under no circumstances will the delivery of the Disclosure Statement or the exchange of any rights made in connection with the Plan create an implication or representation that there

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

has been no subsequent change in information included in this document.  The Debtor assumes no duty to update or supplement any of the information contained in this document, and it presently does not intend to undertake any such update or supplement.

**Any and all statements or projections contained in the Disclosure Statement regarding the amount or timeliness of Distributions to be made under the Plan to Creditors are only estimates based upon information reasonably available as of the date set forth on the last page of the Disclosure Statement, and are not a guaranty as the amount or timeliness of the projected Distributions.**

**The statements and information contained in the Plan and Disclosure Statement do not constitute financial or legal advice.  Parties in interest are strongly urged to consult with their own advisors, including respecting any questions about the impact of the Plan on any Claims or Interests.**

**D.    SOURCE OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT**

The Debtor's professionals have prepared the Plan and Disclosure Statement at the direction of, and with the review, input, and assistance of, the Debtor.  Valuation information is based upon the input of the Debtor and the Herron Appraisal.  The financial information contained in the Disclosure Statement is based on the Debtor's good faith estimate as to the operating income it believes can be achieved from leasing of the Commercial Property based upon its discussion with real estate brokers and other professionals.   The Debtor's professionals have not independently verified the information contained herein or used to formulate the Plan or prepare the Plan and/or Disclosure Statement.

**E.    ACCOUNTING METHOD USED TO PRODUCE FINANCIAL INFORMATION/IDENTITY OF ACCOUNTANTS OR OTHERS RESPONSIBLE FOR SUCH INFORMATION**

The financial information is derived from contained in the Debtor's QuickBooks accounting, which is maintained by Freedland, and from the tax information contained in the tax returns and financial reporting by the Debtor's Accountants.  The Cash Flow Projections and Debtor's Projected Profit & Loss Statements were prepared by the Debtor's Accountants with the assistance of the Debtor.  The Debtor's professionals have not independently verified the

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

information contained herein or used to formulate the Plan or prepare the Plan and/or Disclosure Statement.

## F.  BAR DATE

No Bar Date has been set in the Case as of the date of preparation of the Disclosure Statement.  However, contemporaneously with the drafting of the Disclosure Statement and Plan in this Case, the Debtor is also preparing a motion requesting that the Bankruptcy Court set a Bar Date in this Case.

**THE BAR DATE IN THE CASE FOR FILING POC's AND POI's IS _____, 2016**

Pursuant to the Plan, the Administrative Claim Bar Date shall be fixed as a date set forth in the Confirmation Order.  *See* further discussion below in Section II.

## G.  EXHIBIT LIST

The Exhibits listed in the following table are intended to be a part of the Disclosure Statement and Plan.  These Exhibits are deemed to be incorporated into the Disclosure Statement and Plan when filed.

| EXHIBIT NO. | | DESCRIPTION |
|---|---|---|
| A | | *List of Assets* |
| B | | *Cash Flow Projections/Debtor's Projected Profit & Loss Statements* |
| C | | *Administrative Expense Claims* |
| D | | *General Unsecured Claims* |
| E | | *Equity Interests* |
| F | | *Unexpired Leases And Executory Contracts* |
| G | | *Other Exhibits [1-4]* |
| | 1 | *State Court Complaint* |
| | 2 | *Herron Appraisal* |
| | 3 | *Liquidation Analysis* |
| | 4 | *Trust's Financial Information [to be filed under seal on or before the Exhibit Filing Date]* |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**III.**

**BACKGROUND**

**A.    DESCRIPTION AND HISTORY OF THE DEBTOR**

The Debtor is a limited liability company.  The Debtor was originally organized in 1999 as a single purpose entity, which held title to the Glendale Building.  In 2013, D. Arnall became the sole member of the Debtor.  The Glendale Building required maintenance and upgrades.  However, as a result of D. Arnall's declining health from cancer, along with the declining health of J. Arnall, his wheel-chair bound wife, the Debtor sold the Glendale Building in August of 2014 for approximately $6.925 million.  The proceeds of the sale were thereafter deposited into a 1031 exchange account; and, thereafter, utilized for the 1031 Exchange, thereby resulting in the Debtor acquiring title to the Commercial Building in February 2015.

As will be discussed in further detail later in the Disclosure Statement, the Debtor later discovered facts about the sale of the Commercial Property leading to its contention that it appears to have been the victim of a fraudulent real estate scheme, in which a group of unscrupulous real estate professionals (including, the sellers and real estate agents) fraudulently induced the Debtor, through their misrepresentations and reprehensible conduct, into immensely overpaying for Commercial Building, to the detriment of the Debtor, its creditors, as well as to the detriment of the infirm widow, her minor child and Freedland.

**B.    PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS**

As stated, the Debtor is a limited liability company that was originally organized in 1999 as a single purpose entity, which held title to the Glendale Building.  In 2013, D. Arnall became the sole member of the Debtor.

D. Arnall passed away on December 8, 2014 from complications from cancer, leaving behind his wife, J. Arnall, and their minor son.  J. Arnall suffers from Multiple Sclerosis, and has been confined to a wheel chair since her early twenties.  She has also been diagnosed with lupus, retinoid, and bursitis, and her health has been declining in recent months.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Following the death of D. Arnall, Freedland became one of the co-trustees of the Trust, and was named the Managing Member of the Debtor. Currently, as set forth in ***Exhibit E***, the membership interest of the Debtor is held 80% by the Trust, and the balance of 20% is held by Freedland, the managing member.

**C.    MANAGEMENT OF THE DEBTOR BEFORE AND AFTER THE BANKRUPTCY, QUALIFICATIONS, COMPENSATION**

    **a.**    Management of the Debtor and DIP prior to and after the Petition Date and prior to the Effective Date of the Plan.

D. Arnall was the sole manager of the Debtor until he sadly passed away in December 2014. Following the death of D. Arnall, Freedland became the Managing Member of the Debtor, and intends to continue in that capacity throughout the Case.

    **b.**    Management of the Reorganized Debtor on and after the Effective Date of the Plan.

The Reorganized Debtor shall manage its affairs after the Effective Date. Under the Plan, the interest holders in Class 5 shall retain their Interest in the Debtor provided that the Holders of the Claims in Classes 1 through 4 vote to accept the Plan. Otherwise, the Interest Holders shall be deemed not to receive any distribution under the Plan on account of their Interests in the Debtor, and their Interests and voting rights in the Reorganized Debtor shall be maintained based on the current percentages, by virtue of the New Value Contribution.

After the Effective Date, Freedland shall continue in the capacity of Managing Member of the Reorganized Debtor, and shall be responsible for the day to day management of the Reorganized Debtor.

D. Arnell was an experienced investor and managed the Glendale Building among other assets. Prior to the Petition Date, Freedland assisted D. Arnell in the management of these assets. Furthermore, Freedland was involved in the initial purchase of the Commercial Building and has a great deal of familiarity with such property.

**D.**    **RELATIONSHIP OF THE DEBTOR WITH AFFILIATES, SUBSIDIARIES, MERGER OR ACQUISITION INTERESTS, PLAN PROPONENT**

The Debtor is the Plan Proponent in this Case. Currently, the membership interest of the Debtor is held 80% by the Trust, and the balance of 20% is held by Freedland, the managing member. Freedland is also one of the co-trustees of the Trust.

The Debtor has no affiliates or subsidiaries,, and no merger or acquisition of the Interests in the Debtor is contemplated at this time.

**E.**    **EVENTS LEADING TO CHAPTER 11 FILING**

A brief summary of the circumstances that led to the filing of the Debtor's Case is set forth below. The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on the Petition Date. The facts giving rise to the Chapter 11 filing are relatively straightforward.

The Debtor was organized in 1999 to hold the Glendale Building, which was a commercial office building located at 315 Arden Avenue, Glendale, California. In 2013, D. Arnall became the sole member of the Debtor. The Glendale Building required maintenance and upgrades. Because of D. Arnall's declining health from cancer, along with the declining health of his wheel-chair bound wife, the Glendale Building was sold in August of 2014 for approximately $6.925 million.

Unfortunately, D. Arnall passed away on December 8, 2014, leaving behind his wife, J Arnall, and their minor son. J. Arnall suffers from Multiple Sclerosis, and has been in a wheel chair since her early twenties. She has also been diagnosed with lupus, retinoid, and bursitis, and her health has been declining in recent months. She is also left to care for their son who is their only child.

Immediately following the death of D Arnall, Freedland was appointed as co-trustee for the Trust, and was also named the managing member of the Debtor.

As the managing member of the Debtor, Freedland was required, among other things, to ensure that the 1031 Exchange was completed before the deadline, so that the Debtor could obtain the tax benefit from the sale. As a result, on or about February 24, 2015, the Debtor purchased the Commercial Property for approximately $6.5 million from WP Linc. The net income generated

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

from the Commercial Property was intended to pay creditors, provide a source of income for the Debtor, and spin off net income to the Interest Holders, including the Trust for the benefit of the family and for J. Arnall's desperately needed medical care.

The Debtor purchased the Commercial Property in February 2015, based upon representations made by, or on behalf of, WP Linc and its agents, resulting in WP Linc receiving approximately $5 million in cash, and the WP Linc Note, secured by the WP Linc Trust Deed.

The Debtor contends that it discovered after the close of escrow that WP Linc and its agents (which it was later discovered included the Debtor's own real estate agents), induced the Debtor into purchasing the Commercial Property through fraud, misrepresentations and other actionable conduct. The Debtor contends that, after the close of escrow, the Debtor learned that the Commercial Property was extremely unsuited for its investment objectives, and that WP Linc and its agents made false representations about the Commercial Property and its tenants. Among other things, within a few weeks after the close of escrow, the tenant promptly breached the lease and abandoned the leased premises, leaving the Debtor without any rental income whatsoever. The Debtor contends that the tenant also absconded with funds provided to the tenant, which were intended to be used for improvements to the Commercial Property.

Based upon the alleged fraudulent acts and omissions by WP Linc and its agents (and others), in connection with the purchase of the Commercial Property, the Debtor did not pay off the W Linc Note at maturity because, among other reasons, the Debtor's claims for damages and rights of setoff/recoupment.

In order to protect the Debtor's Assets, the Debtor commenced the State Court Action against the State Court Defendants, alleging, among other things, breach of contract (lease); breach of contract (guaranty); fraud and intentional misrepresentation; fraud and intentional misrepresentation; intentional concealment; negligent concealment; negligent misrepresentation; breach of fiduciary duty; negligence; and constructive fraud.

/ / /

/ / /

On or about August 18, 2015, W Linc served a Notice of Default ("**_W Linc NOD_**") threatening to foreclosure if the Debtor failed to pay the balance due on the W Linc Note in the amount of approximately $1,568,569.27.

Based upon the foregoing, the Debtor concluded that it was in the best interest of creditors, the Estate and Interest Holders to file for Chapter 11 protection and to propose a plan of reorganization that restructures its financial obligations, preserves its investment and the abundant equity in the Commercial Property, pays undisputed creditors, and permits the Debtor an opportunity to pursue its State Court Action and other Rights of Action.

## F.    SIGNIFICANT EVENTS

The Debtor filed its Case on the Petition Date (October 27, 2015).    Thereafter, on November 10, 2015, the Debtor filed its Schedules [Docket No. 12].[2]

### 1.    _Bankruptcy Proceedings_

#### a.    Employment of Professionals

The Debtor employed CMKF as reorganization counsel for the Debtor, pursuant to notice and application filed on November 25, 2015 [Docket Nos. 16 and 17], and order entered on December 18, 2015 [Docket No. 33].

The Debtor intends to employ as the Debtor's Accountants, the firm of SL Biggs, a Division of SingerLewak ("**_Biggs_**"), to act as its accountants and financial advisors.  Among other things, Biggs will be reviewing and modifying the Debtor's Cash Flow Projections, Debtor's Projected Profit & Loss Statements and Liquidation Analysis, as well as assisting with other financial matters.  In addition, Biggs will be assisting the Debtor to obtain reassessment of the property tax. The Debtor intends to file the application to employ shortly.

By application filed on November 25, 2015 [Docket No. 18], and order entered on December 18, 2015 [Docket No. 34], the Debtor employed Herron as its appraiser.

/ / /

---

[2]  The Debtor intends to file an amendment to the Schedules because it discovered that Schedule D was inadvertently omitted from the filed version of the Schedules.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

The Debtor is seeking to employ the McGonigle Firm as special litigation counsel for the Debtor, pursuant to notice and application filed on December 14, 2015 [Docket Nos. 29 and 30]. The order employing that the McGonigle Firm has not yet been entered as of the date of the Disclosure Statement.

The Debtor is seeking to employ the Lombardo Firm as special corporate and real estate counsel for the Debtor, pursuant to notice and application filed on December 3, 2015 [Docket Nos. 19 and 20]. The order employing that the Lombardo Firm has not yet been entered as of the date of the Disclosure Statement.

### b.    UST Requirements/341(a) Hearing

As required by the UST Guidelines, the Debtor submitted its "7-day" package to the UST prior to its initial debtor interview, and appeared at the initial debtor interview, which was conducted by the UST on November 18, 2015.

The Debtor appeared at its Statutory Meeting of Creditors held pursuant to Bankruptcy Code § 341(a) on November 30, 2015, which was concluded by the UST at that hearing.

### c.    Cash Collateral Authorization

W Linc asserts the W Linc Disputed Secured Claim against the Commercial Property in the asserted amount of approximately $1,500,000, pursuant to the W Linc Note and W Linc Trust Deed. In addition, the Debtor believes that W Linc may assert an interest in rents generated from the Commercial Property, pursuant to the assignment of rents provisions contained in the W Linc Trust Deed. Any and all Claims asserted by W Linc (including, without limitation, the W Linc Disputed Secured Claim), and the asserted interest of W Linc in rents, are disputed by the Debtor in their entirety.

Regardless, the Debtor has not yet sought authorization to use cash collateral because the Commercial Property is not currently generating any rents as of the date of this Disclosure Statement. At the appropriate time, once all or a portion of the Commercial Property is leased, the Debtor intends to seek consent or authorization to use cash collateral, despite that the Secured

1

2

Claim asserted by W Linc is disputed in its entirety, unless the W Linc Disputed Secured Claim has been disallowed by that time.

3

### d.    Dip Motion

4

The Debtor filed its Dip Motion on November 18, 2015 [Docket No. 14].  The hearing on the DIP Motion was held on December 15, 2015 at 2:00 p.m.  No opposition was filed to the DiP Motion.  The Bankruptcy Court approved the Dip Motion at the hearing, although the Dip Order has not yet been entered as of the date of the Disclosure Statement.

5

6

7

8

Pursuant to the Dip Motion, the Debtor was authorized to borrow from the Trust up to $150,000 from time to time as required by the Debtor for, among other things, quarterly fees, operating expenses, adequate protection payments (to the extent required), costs of administration (including, but not limited to, professional fees and expenses) and any other costs or expenses necessary for, or related to, administration of the estate.

9

10

11

12

13

The proposed Dip Loan is being made, pursuant to Bankruptcy Code § 364(b), on an unsecured basis, allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.  The DIP Loan is not made on a secured basis, but was allowed as an administrative expense pursuant to Bankruptcy Code § 503(b)(1).

14

15

16

17

The proposed Dip Loan does not accrue any post-petition interest during the Case until after confirmation of a plan at which time it was anticipated that the rate, if any, would be set by the plan.  No payments are required to be made by the Debtor under the terms of the Dip Loan until after confirmation of a plan of reorganization by the Debtor at which time the payment term were to be set by the Plan.

18

19

20

21

22

The maturity date of the DIP Loan shall be the earlier to occur of: (a) entry of a final order confirming a plan in this Case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default.  An "Event of Default" under the DIP Loan is limited to the occurrence or existence of any one or more of the following events: (a) failure or reversal of the final order approving the DIP Loan; (b) change of control; (c) interim and/or final appointment of a responsible officer for the Debtor or of a trustee or an examiner with

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

powers of a trustee; (d) conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (e) dismissal of this Chapter 11 case.

### e.    Plan Deadline/Exclusivity

The initial period within which only the Debtor has the exclusive right to file a plan is through February 24, 2015 pursuant to 11 U.S.C. §1121.  However, December 28, 2015 was set by the Bankruptcy Court as the deadline for filing the Plan pursuant to the Scheduling Order entered by the Bankruptcy Court.

By filing its Plan by December 28, 2015, the Debtor will have filed its Plan well within the initial exclusivity period in which only the Debtor may file a plan.  Upon filing of the Plan, for purposes of maintaining the exclusive right to file its Plan, the Debtor has the right to solicit acceptances of its Plan through April 25, 2015.

### 2.    *Other Legal Proceedings*

### a.    State Court Action

The Debtor initiated its State Court Action by filing a complaint in the Superior Court of the State of California for the County of Orange on August 21, 2015, which was thereafter amended.  The State Court Complaint is pending and the Debtor prior to Confirmation, and the Reorganized Debtor after Confirmation, intends to vigorously prosecute the State Court Action. A copy of the State Court Complaint is attached to the Disclosure Statement as ***Exhibit G.1***. Continued prosecution of the State Court Action, both before and after the Effective Date, will be funded by contributions to the Debtor and Reorganized Debtor by the Trust.

Although successful prosecution of the State Court Action in favor of the Debtor will undoubtedly have a material impact upon the value of the Estate, feasibility of the Plan in this Case, and the proposed distribution to the General Unsecured Creditors, is not contingent upon the Debtor's or Reorganized Debtor's success in the State Court Action.

The State Court Complaint filed by the Debtor in the State Court Action asserts ten causes of action against the State Court Defendants for breach of contract (lease); breach of contract (guaranty); fraud and intentional; misrepresentation; fraud and intentional misrepresentation; (5)

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1   intentional concealment; (6) negligent concealment; (7) negligent misrepresentation; (8) breach of

2   fiduciary duty; (9) negligence; and (10) constructive fraud.

3       Below is a brief summary of the background, underlying facts, and claims asserted, in

4   respect of the State Court Complaint.  Although the Debtor has used its best efforts to summarize

5   the allegations and claims being asserted by the Debtor in the State Court Complaint as accurately

6   as reasonably possible under the circumstances, the summary is not intended as a substitute for a

7   thorough reading of the State Court Complaint.  The statements made in the State Court Complaint

8   control over the summary contained in the Disclosure Statement.  In the event of a conflict,

9   mistake, or ambiguity, between the content of the State Court Complaint, on the one hand, and the

10  description contained in the Disclosure Statement, on the other hand, the State Court Complaint

11  shall control.  Therefore parties-in-interest are encouraged to read the State Court Complaint

12  thoroughly, and in it's entirely, for a full and complete understanding of the facts and claims being

13  asserted by the Debtor.

14      Furthermore, the reader should note that the summary set forth below represents

15  exclusively the Debtor's description of the underlying facts and claims, and the Debtor's

16  allegations in that regard, and should not be interpreted as admissions made by, or attributable to,

17  any of the State Court Defendants.

18      The State Court Action involves a fraudulent real estate scheme in which a group of real

19  estate professionals, including the seller, W Linc, as well as the Debtor's own real estate agents

20  (who are believed to have represented both sides of the transaction without disclosure to the

21  Debtor) convinced the Debtor to purchase and vastly overpay for the Commercial Property.  Prior

22  to the purchase of the Commercial Property, the Debtor's real estate agent touted the Commercial

23  Property as a "great deal" that could be closed almost immediately, with a purportedly "risk free"

24  tenant and two profitable businesses in place, and which could thereafter be promptly resold for

25  far more than the asking price.

26      In February 2015, the Debtor was induced to purchase the Commercial Property from W

27  Linc, which is a single purpose limited liability company believed to be owned by Red Mountain

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Group and/or Red Mountain Retail.  On the basis of the numerous misrepresentations made respecting the Commercial Property, its value and the viability of its tenants, and the net worth of the personal guarantor purportedly providing security for the tenants' obligations, among other things, the Debtor was induced to purchase the Commercial Property for $6,500,000, of which approximately $5,000,000 was paid in cash, with the balance of the purchase price of approximately $1,500,000 being carried back by one of the seller entities in the form of the W Linc Note, secured by the W Linc Trust Deed against the Commercial Property . Theoretically, this should result in over a 400% equity cushion for the W Linc Disputed Secured Claim, but for the misrepresentations of the seller entities/secured claimant respecting the Commercial Property.

After close of escrow for the Commercial Property, the Debtor discovered that it had been misled into massively overpaying for the Commercial Property, as the Commercial Property was actually worth approximately three million less than the $6.5 million purchase price, to say nothing of the $7 plus million value represented to the Debtor.

As a result, the Debtor initiated the State Court Action against the State Court Defendants. In the interest of brevity, the Debtor will not reiterate in the Disclosure Statement all of the background and factual allegations set forth in the State Court Complaint, and will only summarize some of the background supporting the claims, which summary should not be construed as a substitute for a thorough reading of the entirety of the State Court Complaint for a full and complete understanding as to the nature of the claims being asserted by the Debtor and this Estate.

Suffice it to say, material representations made to the Debtor concerning the tenants and their financial condition were fabricated.  On October 6, 2104, the Luviland Entities (defendants in the State Court Action) each executed a written lease for the Commercial Building with Red Mountain Retail, which is W Linc's predecessor and alter ego.  At some point after the lease was executed, W Linc apparently succeeded to the rights of Red Mountain Retail under the lease, and, in turn, at the close of escrow on or about February 24, 2105, the Debtor acquired the interest in the Commercial Property subject to the lease and succeeded to the rights of Red Mountain Retail/W Linc under the lease.

The Debtor is informed and believes that Billy N. Ha, a.k.a., Bill N. Ha became president of Luviland Corp during escrow (unbeknownst to the Debtor). As was known to the sellers, but not the Debtor, Billy N. Ha was actually operating the tenant's thrift store at the Commercial Property, albeit illegally, at the time of the close of escrow. Additionally, as the Debtor later discovered only when it received the final closing statement after the close of escrow, Bill N. Ha apparently received $75,000 as a "Leasing Consultant Fee."

The above-referenced lease was guaranteed by a written personal guaranty agreement dated October 6, 2014, and executed by Nguyen (another defendant in the State Court Action). At some point after the guaranty was executed, W Linc succeeded to the rights of Red Mountain Retail under the guaranty, and at the close of escrow on or about February 24, 2015, the Debtor succeeded to the rights of Red Mountain Retail/W Linc under that guaranty.

Instead of the Commercial Property being leased by strong viable tenants as represented to the Debtor, the Debtor discovered subsequent to closing that the representations were completely false. Prior to closing, it was represented to the Debtor that one tenant was a purportedly successful "trading" business, being run by a "high net worth" doctor, which leasehold allegedly generated sufficient income to satisfy the tenant's rental obligations. Instead, the Debtor discovered after closing that the actual tenant was a completely uncreditworthy operator, which was operating an illegal business from the Commercial Property. Furthermore, within only a few weeks after the close of escrow, the tenant promptly breached the lease and abandoned the leased premises, leaving the Debtor without any rental income whatsoever. In addition, the seller entities were aware, but failed to disclose, that this allegedly viable tenant was likely to, and ultimately did, abscond with funds provided to the tenant, which were intended to be used exclusively for improvements to the Commercial Property.

Importantly, the tenant's defaults were completely predictable to the seller entities as, unbeknownst to the Debtor, the seller entities were aware that the real operator was an uncreditworthy judgment debtor engaged in running an illegal business; had been denied a business license for that reason; and, was likely to default. Moreover, the Debtor discovered only

after the tenant's abandonment of the Commercial Property that the seller entities know, but failed to disclose that: (1) the thrift store business in operation at the time of escrow, violated city zoning ordinances, and had been denied a business license before the Commercial Property was even offered for sale (and thus had no business license as of the time of sale); (2) the doctor and lease guarantor who was supposedly using part of the Commercial Property in conjunction with another business was not the operator of *any* business at the Commercial Property, and his "trading" businesses was pure fiction; (3) the thrift store that did exist at the Property was actually being operated illegally by a person who had received a "leasing commission" from one of the seller entities -- but whose involvement was never disclosed to the Debtor prior to the close of escrow even though it was known to the seller entities; (4) the same doctor and lease guarantor that was touted as a "high net worth" individual providing security for the lease obligations is financially incapable of paying the damages caused by tenant's breach of the lease, and had an unpaid and undisclosed federal tax lien against him and is appearing in the civil action in *pro per*; and (5) the tenant improvements that were supposed to have been completed at the close of escrow have never been made.

Apparently discontent with having successfully defrauded the Debtor out of "only" approximately $3 million in cash by virtue of their misrepresentations, the seller entities also had the temerity to pursue a non-judicial foreclosure of the remaining value, pursuant to the fraudulently obtained W Linc Trust Deed, thereby completing their defilement of the Debtor, its creditors, a sick widow, her minor child and Freedland.

   **b.** Potential Subordination Litigation

In addition to the State Court Action, the Debtor is also investigating, researching, and considering, a possible adversary action in the Bankruptcy Court for equitable subordination of the W Linc Disputed Secured Claim on the basis of the factual allegations made in the State Court Action.

/ / /

/ / /

**c.** Potential Fraudulent Transfer Action

In addition to the State Court Action and Subordination Litigation, the Debtor intends, reserves its right, to file and serve a fraudulent conveyance action against W Linc (and other State Court Defendants) on the basis of the Debtor's failure to receive reasonably equivalent value in connection with the acquisition of the Commercial Property. Within one year of the Petition Date, the Debtor transferred $6.5 million (consisting of cash of approximately $5 million and the W Linc Trust Deed for $1.5 million) in exchange for the Commercial Property having a value of $3,310,000.

**d.** Additional Litigation Provisions

On the Effective Date, the Reorganized Debtor shall retain, and may exclusively enforce, the State Court Action, Subordination Litigation, any and all other claims, rights or Rights of Action, whether arising before or after the Effective Date, in any court or other tribunal. The Reorganized Debtor, in its absolute and sole discretion, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, the State Court Action, Subordination Litigation, and Rights of Action.

On and after the Effective Date, with respect to any matter affecting any Assets, the Reorganized Debtor may take such actions in the name of the Debtor.

Unless a claim, the State Court Action, Subordination Litigation, or any Right of Action against a person or entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order or Final Judgment, the Reorganized Debtor expressly reserves such claim or cause of action for later adjudication (including, without limitation, claims and Rights of Action which the Reorganized Debtor may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown at this time, or facts or circumstances which may change or be different from those now believed to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such

claims or Rights of Action upon, or after, the consent to, or consummation of, the Plan, except where such claims or Rights of Action have been released in the Plan or other Final Order.

On and after the Effective Date, the Reorganized Debtor will make the decision of whether or not to pursue any Right of Action, claims, or causes of action and/or to settle or not settle any Rights of Action, claims, or causes of action, and this decision will be based upon the Reorganized Debtor's review of the merits of the various Rights of Action as well as the costs required to prosecute such Rights of Action. The Reorganized Debtor may seek to retain counsel and/or other advisors to prosecute some or all of such Rights of Action on behalf of, and in the name of, the Reorganized Debtor, may seek to finance any costs relating to the prosecution of such litigation or may decide not to pursue such Rights of Action at all. The Reorganized Debtor, in its absolute and sole discretion, may settle such actions on behalf of the Reorganized Debtor following the Effective Date without further notice or hearing.

The Debtor and/or the Reorganized Debtor and their respective Related Parties shall not have any liability arising out of the good faith determinations of the Debtor and/or the Reorganized Debtor of whether or not to pursue prosecution of and/or settle the foregoing Rights of Action.

The Debtor and the Reorganized Debtor, in their absolute and sole discretion, reserve the right to supplement at any time before or after the Effective Date, the reserved litigation to include actions, causes of action, claims, avoidance actions, declaratory relief actions, and lawsuits of any kind or nature, whether in law or in equity, that the Debtor may have against any Claimant or any other person or entity by filing with the Bankruptcy Court ***Schedule I***. Upon such filing, Schedule I shall be deemed to be incorporated as part of the Disclosure Statement, Plan, and Confirmation Order as of the Effective Date without further order of the Bankruptcy Court, and none of the Disclosure Statement, Plan, and/or Confirmation Order shall act as bar against the filing and/or prosecution of any such actions, causes of action, claims, avoidance actions, declaratory relief actions, and lawsuits, and/or the enforcement of any judgment obtained with respect thereto.

/ / /

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**e.**    Litigation against the Debtor

The Debtor is not aware of any litigation pending against it that will have a material impact on the Plan or feasibility of the Plan.

**3.    *Description of the Available Assets and Their Value***

A List of the Debtor's Assets is attached as ***Exhibit A***. The Debtor's primary assets consists of real property and fixtures; the State Court Action and other Rights of Action; cash; office equipment, furnishing; supplies; and, an automobile.

**a.**    Real Property

The primary asset of the Estate is the Commercial Property and prospective rents to be derived therefrom. As stated earlier in the Disclosure Statement, the Debtor was induced to purchase the Commercial Property in February of 2015 for $6,500,000.

The Commercial Property consists of approximately 56,628 square feet of land, with the Commercial Building, which is a one-story commercial building consisting of approximately 22,680 square feet, with its fixtures and improvements. The Commercial Property is located at 7101 W. Lincoln Avenue, Buena Park, California, and is situated on the north side of Lincoln Avenue, east of Knott Avenue. The Commercial Property is developed on a rectangular-shaped, level site located along a major arterial street. Utilities are available at the site, and the Commercial Building is of adequate size to support continued use as a commercial building.

The Commercial Property is zoned "CS"--Community Shopping, which provides "primarily for shopping centers varying from neighborhood convenience centers to a major regional shopping center, and to provide within such centers for conveniently grouped stores with adequate parking.

Approximately 49% of the Commercial Building consists of the retail sales area, office space, and three restrooms, all with fluorescent lighting and vinyl or carpet floor coverings. The rear 51% of the building consists of warehouse storage area with sealed concrete floors, one roll-up truck door, two restrooms, and fluorescent lighting. There is also approximately 2,480 square feet of mezzanine space in the warehouse area of the Commercial Building that does not appear to

be included in the building size shown on the public records, and has not been calculated in the estimate of rentable space.

The improvements to the Commercial Property are generally attractive and well-designed, are of average- to good-quality construction (that is reasonably comparable to other retail buildings that were constructed around the same time), and are compatible with nearby commercial properties.  The Commercial Property has adequate ingress/egress and parking.

There are 56 marked parking spaces, consisting of 43 marked parking spaces within the front fenced parking lot and 13 marked parking spaces along the west side of the Commercial Building.  There is also ample space in the rear yard to stripe up to approximately 34 additional parking spaces.

Other than some oil stains on pavement, the Commercial Building shows no evidence of potential toxic or environmental hazards on the site or on the neighboring parcels surrounding the Commercial Property.  However, no environmental certification should be implied from the foregoing statement as it is outside the scope and purpose of the Disclosure Statement.

The Commercial Building is currently unoccupied for the reasons discussed earlier in the Disclosure Statement.  However, the Debtor intends to actively market the Commercial Property for lease, and intends to file shortly an application to employ a leasing broker.  The proposed leasing broker estimates that it will take five to six months to lease the Commercial Property.

There is some degree of deferred maintenance items that may need to be completed in order to make the Commercial Building ready for occupancy by a new tenant or buyer, consisting primarily of painting, repair to ceiling and wall fixtures, bulbs or possible repair to some of the interior light fixture, plumbing repair to one of the warehouse bathrooms, replacement of missing electric panel covers, and landscaping.

However, due to the layout and configuration of the Commercial Building, the most probable prospective tenant for the Commercial Building is a single user occupier.  Accordingly, tenant improvements may be required to be performed in order to adapt the building to the intended use of the prospective new tenant.  Therefore, the Debtor has deferred obtaining cost estimates for

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    such maintenance work until such time as the entire scope of the tenant improvement work that

2    may be required by the prospective tenant can be ascertained.  However, to the extent required, the

3    Trust will make advances to the Debtor as required to complete any expense that must be borne

4    by the Debtor in connection with the proposed lease.

5         Based upon information discovered subsequent to closing of the sale to the Debtor, the

6    Debtor's Schedule A estimated the fair market value of the Commercial Property to be $3,500,000.

7    In connection with the Case, the Debtor employed Herron as its appraiser.  The Herron Appraisal

8    is attached to the Disclosure Statement as ***Exhibit G.2***.

9         As set forth in the Herron appraisal, Herron has formed an opinion that the "as is" market

10   value of the fee simple interest in the Commercial Property, as of December 19, 2015, is

11   $3,310,000 (taking into account the assumptions set forth in the Herron Appraisal, including the

12   deferred maintenance assumptions).

13        At the time that the Debtor purchased the Commercial Property, it was represented to the

14   Debtor that the Commercial Property was leased to a tenant, Luviland Corp; and that Luviland

15   Corp was paying $37,422 per month (i.e. $1.64 per square foot per month).  Within a few weeks

16   of the close of escrow on February 24, 2015 (approximately April 2015), the tenant promptly

17   breached the lease and abandoned the Commercial Building.  Since closing of the sale to the

18   Debtor, and subsequent breach of the lease by the tenant, the Debtor learned that the purported

19   lease to the tenant may be as much as double the prevailing market rental rate for the Commercial

20   Property.

21        **b.**    State Court Action/Rights of Action

22        Another primary asset of the Estate is the State Court Action, discussed in detail in Section

23   II.F.2.a above.  The potential value of the State Court Action is difficult to ascertain at this stage.

24   However, the Debtor estimates that the potential recovery will exceed $3.5 million (excluding

25   punitive damages and attorney's fees).  In addition, the Debtor asserts rights in the Subordination

26   Litigation (discussed in Section II.F.2.b above) and the fraudulent conveyance action (discussed

27   in Section II.F.4 below).

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**c.**    Cash/Dip Loan

As of November 30, 2015, the Debtor has available cash of approximately $50 on deposit in its DIP accounts, and $150,000 of additional availability on the Dip Loan, which has not been drawn down.

**d.**    Office Equipment, Furnishing and Supplies

The Debtor has a computer, printer and scanner valued at approximately $500.

**e.**    Vehicles

The Debtor has a 2014 Infinity QX60 SUV, which is leased, and believed to have little or no realizable value at this time.  The payments for the vehicle are maintained by the Trust.

**4.**    ***Actual and Projected Recovery of Preferential or Fraudulent Transfer***

In addition to the State Court Action and Subordination Litigation, the Debtor is also investigating, researching, and considering, a possible of commencing a fraudulent conveyance action against the State Court Defendants based on the Debtor failure to get reasonably equivalent value in connection with the acquisition of the Commercial Property.

Apart from the contemplated fraudulent conveyance action discussed above, the Debtor is not currently aware of any other transfers that may give rise to any other Avoidance Actions. Therefore, apart from the State Court Action, Subordination Litigation and potential fraudulent transfer action against the State Court Defendants, the Debtor is not aware of any other Rights of Action that have significant value, although the Debtor intends to continue to evaluate and analyze such Rights of Action.  The Debtor intends to have the Debtor's Accountants undertake further analysis once such professional is employed by the Estate.

**5.**    ***Collectability of Accounts Receivable, Counter Claims***

The Debtor is not aware of the existence of any receivable.

**6.**    ***Procedures Implemented to Resolve Financial Problems***

As discussed earlier in the Disclosure Statement, the Debtor initiated its State Court Action which is pending in the Superior Court of the State of California for the County of Orange.  The

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Reorganized Debtor intends to vigorously prosecute the State Court Action, which will be funded by contributions to the Debtor and Reorganized Debtor by the Trust.

Although successful prosecution of the State Court Action in favor of the Debtor will undoubtedly have a material impact upon the value of the Estate and the timing of distribution, feasibility of the Plan in this Case, and the proposed distribution to the General Unsecured Creditors, is not contingent upon the Debtor's or Reorganized Debtor's success in the State Court Action. The Trust will make the New Value Contributions after the Effective Date in such amounts as are necessary to make the payments required under the Plan pursuant to the treatment of the General Unsecured Creditors in Class 3.

The Debtor intends to vigorously pursue locating a tenant for the Commercial Building. In the meantime, as discussed in more detail below, the Trust will similarly make the New Value Contributions after the Effective Date in such amounts as are necessary to make the payments required under the Plan pursuant to the treatment of W Linc in Class 2 pending the leasing of the Commercial Building.

In addition to the State Court Action and Subordination Litigation, the Debtor is also investigating, researching, and considering, a possible of commencing a fraudulent conveyance action against the State Court Defendants based on the Debtor failure to get reasonably equivalent value in connection with the acquisition of the Commercial Property.

Finally, the Debtor is amenable to participating in mediation with the State Court Defendants (including, without limitation, with W Linc) to resolve the State Court Action, the potential fraudulent conveyance action, the W Linc Disputed Secured Claim and the Debtor's setoff and recoupment claims in respect thereof.

**7.** ***Current and Historical Financial Conditions***

At the time that the Debtor purchased the Commercial Property, it was represented to the Debtor that the Commercial Property was leased to a tenant, Luviland Corp; and that Luviland Corp was paying $37,422 per month (i.e. $1.64 per square foot per month). Within a few weeks of the close of escrow on February 24, 2015 (approximately April 2015), the tenant promptly

breached the lease and abandoned the Commercial Building. Since closing of the sale to the Debtor, and subsequent breach of the lease by the tenant, the Debtor learned that the purported lease to the tenant may be as much as double the prevailing market rental rate for the Commercial Property.

In this Case, the Plan is to be funded from the proceeds of the Dip Loan, New Value Contributions from the Trust and future income generated from leasing of the Commercial Building. Based on its discussion with a number of experts, the Debtor estimates that the monthly rental income should not be less than $18,250 per month, and that it will take approximately five to six months to locate a suitable tenant. In addition, the Plan will be additionally funded from any recovery derived from the State Court Action and potential fraudulent conveyance action.

As of March 31, 2015, the Debtor has available cash of approximately $50 on deposit in its DIP accounts, and $150,000 of additional availability on the Dip Loan, which has not been drawn down. Therefore, the Debtor believes that it will have sufficient cash to fund all payments required to be made on the Effective Date. The Debtor projects that it will be required to have approximately $150,050 of available funds on the Effective Date to fund approximately $145,000 of Administrative Claims (see discussion below). In addition, the Trust will make available to the Reorganized Debtor New Value Contributions as are required for the Debtor to meet the payments necessary to fund the Plan on the Effective Date. Therefore, the Plan is feasible under the first part of the analysis.

The Debtor has included with this Disclosure Statement projected financial information to assist the reader in making an informed decision respecting the Plan. The financial information described above is based on the Debtor's good faith estimate as to the rental income it believes can be achieved from future operation of the Commercial Property and future New Value Contribution from the Trust. The projections demonstrate that the Debtor can meet its financial obligations under the Plan. The projections show that the Reorganized Debtor will be able to meet its obligations to Creditors under the Plan; and that the Plan is not likely to be followed by the need for further financial reorganization of the Liquidation Debtor. As a result, the Plan satisfies

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1  the feasibility requirement set forth in Bankruptcy Code § 1129.  Pursuant to the cash flow

2  projections, the Debtor projects that it will generate sufficient Available Cash to fund its Plan.

3      It is reasonable to expect that there may be some degree of variation from month to month

4  in cash flow.  The Debtor has attempted to project its income and expenses conservatively.

5  Therefore, the Available Cash may be higher than anticipated.  However, it is also possible that

6  the Available Cash may also be lower than projected based on unforeseen economic factors or

7  higher than anticipated Operating Expenses.

8      Based on the Herron Appraisal, Herron has formed an opinion that the "as is" market value

9  of the fee simple interest in the Commercial Property, as of December 19, 2015, is $3,310,000

10  (taking into account the assumptions set forth in the Herron Appraisal, including the deferred

11  maintenance assumptions).

12      Assuming *arguendo* the improbable, absolute worst case scenario for the Reorganized

13  Debtor that it is unsuccessful in the State Court Action, unsuccessful in the potential fraudulent

14  conveyance action, and unsuccessful in establishing any setoff or recoupment rights, it will result

15  in a W Linc Allowed Secured Claim in the approximate amount of $1,500,000, less reductions in

16  the principal amount occurring by virtue of the W Linc Disputed Deferred Payments, W Linc

17  Deferred Payments, W Linc LTV Reduction Payment, if required, under the Plan.  Applying the

18  foregoing Herron valuation to the facts of this Case, it results in a 45% LTV Ratio (without taking

19  into consideration the reduction in the principal amount of the W Linc Allowed Secured Claim

20  occurring by virtue of the W Linc Disputed Deferred Payments, W Linc Deferred Payments, W

21  Linc LTV Reduction Payment, if required).  Accordingly, the Reorganized Debtor does not

22  anticipate the need for a further W Linc LTV Reduction Payment, although it is provided for under

23  the Plan in the unlikely event it is needed to qualify for Takeout Financing.

24      The foregoing demonstrates that even in the event of a worst case scenario for the

25  Reorganized Debtor, regardless of the outcome of the State Court Action and other anticipated

26  actions, the W Linc Final Payment can be made at the W Linc Note Extended Maturity Date either

27  through a Cash payment by the Trust or by refinance of the Commercial Property.  If

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

required, the Debtor intends to demonstrate through expert testimony at the Confirmation Hearing the general availability of the Takeout Financing based on the LTV Ratio at the time of the W Linc Note Extended Maturity Date.

**8.** *__Anticipated Future of the Debtor__*

Based on the analysis set forth above, the Debtor's future looks extremely promising. The Debtor believes it has a high probability of prevailing in the State Court Action. Regardless, the Plan is, nevertheless, feasible as demonstrated above. The Debtor's real estate professionals believe that it may take between five to six months to find a suitable tenant for the Commercial Building. In the meantime, the Trust has committed to fund New Value Contributions in such amounts as are necessary to assist the Debtor to meet its payments under the Plan to Class 2 (W Linc Disputed Deferred Payments), Class 3 (General Unsecured Creditors), and for Operating Expenses for the Commercial Property, including real property taxes.

## IV.

## SUMMARY OF THE PLAN OF REORGANIZATION

**A.    WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE UNDER THE PLAN; AND GENERAL STATEMENT ABOUT CLASSIFICATION UNDER THE PLAN.**

The Plan provides for payment of all Allowed Claims in full over time through deferred payments funded by contributions made by the Trust, income derived from operation of the Commercial Property and recovery derived from the State Court Action and Rights of Action.

The Plan classifies Claims and Interests in various Classes according to their right to priority. The Plan states whether each Class of Claims or Interests is impaired or unimpaired. The Plan provides the treatment that each Class will receive. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description.

**B.    UNCLASSIFIED CLAIMS.**

Certain types of Claims are not placed into voting Classes; and instead they are referred to as "unclassified". Unclassified Claims are not considered impaired and are not entitled to vote on

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

the Plan because such Claims are automatically entitled to specific treatment provided in the Bankruptcy Code. As such, the Debtor has not placed the following Claims into a Class.

**1.** ***Administrative Expenses/Treatment under the Plan.***

Administrative Expenses are Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under Bankruptcy Code §§503(b) and 507(a)(1), including, without limitation, (i) the actual, necessary costs and expenses incurred after the commencement of the Debtor's Chapter 11 Case, including unpaid property tax and other tax Claims, and (ii) Professional Fee Claims, consisting of compensation for legal and other services and reimbursement of expenses awarded pursuant to Bankruptcy Code §§ 330(a), 331 or 1103.

The extent and amount of Administrative Claims listed below are a projection of amounts reasonably expected to be unpaid as of the Effective Date, and will be supplemented based upon fee applications filed by the professionals, and actual Tax Claims, if any. The chart below lists all of the Debtor's projected unpaid balances for the Bankruptcy Code §§ 503(b) and 507(a)(1) Administrative Claims and their treatment under the Plan:

| ***CLAIMANT*** | ***ESTIMATED BLANCE OF UNPAID FEES AND EXPENSES OWED AS OF CONFIRMATION (AFER APPLYING RETAINERS AND PAYMENTS OF INTERIN FEES)*** | ***TREATMENT*** |
|---|---|---|
| **CMKF**<br><br>**(Debtor's Counsel)**<br><br>**Professional fees** | $70,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **McGonigle Firm**<br><br>**(Special Litigation Counsel)**<br><br>**Professional fees** | $60,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| *CLAIMANT* | *ESTIMATED BLANCE OF UNPAID FEES AND EXPENSES OWED AS OF CONFIRMATION (AFER APPLYING RETAINERS AND PAYMENTS OF INTERIN FEES)* | *TREATMENT* |
|---|---|---|
| **Lombardo Firm**<br><br>**(Special Corporate and Real Estate Counsel)**<br><br>**Professional fees** | $5,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **Debtor's Proposed Accountants**<br><br>**Accountants and Financial Advisors** | $5,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **Projected Expert fees required for Confirmation** | $5,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **Clerk's Office Fees** | $0 | Any fees remaining unpaid as of the Effective Date shall be paid in full on the later of the Effective Date or as soon as practical after the Debtor is notified of any balance due. |
| **UST Fees** | $0 | Any fees remaining unpaid as of the Effective Date shall be paid in full on the later of the Effective Date or as soon as practical after the Debtor is notified of any balance due. |
| **TOTAL PROJECTED ADMINISTRATIVE EXPENSES** | **$145,000** | |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1      The aggregate amount of Cash required to pay in full all of the foregoing Administrative

2 Claims is referred to hereinafter collectively as the "***Administrative Claims Funding Amount***".

3 The aggregate amount of Cash required to pay in full the estimated Administrative Claims Funding

4 Amount is approximately $145,000.

5      The Professional Fees Claims account for the majority of the Administrative Expenses in

6 the Case.  The Professional Fees Claims set forth above are estimates of fees and expenses

7 remaining unpaid as of the Confirmation Date, and are based upon the best information available

8 at the time of the preparation of the Disclosure Statement.  Although reasonable efforts have been

9 made to estimate such Professional Fees Claims as accurately as reasonably possible under the

10 circumstances, the actual fees and expenses may vary from the projected amount, and actual results

11 may end up to be more than the amounts projected.

12      As of the date of this Disclosure Statement, there has been no requests made by the

13 Professionals employed by the Debtor for interim compensation in this Case.  It is anticipated that

14 the Administrative Claims Funding Amount (including any unpaid Professional Fees and

15 expenses) will be satisfied on the Effective Date from the proceeds of the Dip Loan and New Value

16 Contributions made by the Trust.

17           **a.**      Bankruptcy Court Approval of Fees Required.

18      The Bankruptcy Court must rule on all fees listed in the above chart before the fees will be

19 Allowed.  All requests for professional compensation for professionals employed pursuant to

20 Bankruptcy Code § 327 must be requested by applications for final allowance of compensation

21 and reimbursement of expenses.  Only the amount of fees approved by the Bankruptcy Court will

22 be Allowed and required to be paid under the Plan.  Any objection to Administrative Claims for

23 professional compensation for professionals employed pursuant to Bankruptcy Code § 327 shall

24 be filed on or before the date specified in the application for final compensation and reimbursement

25 of expenses.

26 / / /

27 / / /

28

Professional fees and expenses incurred after the Effective Date will not require Bankruptcy Court approval, and may be billed and paid at any time during the course of liquidation.

**b.** <u>Allowance of Other Administrative Claims.</u>

Pursuant to the Plan, the Administrative Claims Bar Date is a date set forth in the Confirmation Order.  All Administrative Claims (excluding professional compensation for professionals employed pursuant to Bankruptcy Code § 327) must have been asserted by the filing of a POC (i) designated as a request for payment of Administrative Expenses, (ii) asserting that such claim is allowable pursuant to Bankruptcy Code § 503(b), (iii) stating the amount of such claim, (iv) stating the basis of such claim, and (v) attaching documentation in support of such claim.

Any objection to any Administrative Claim (excluding those to professional compensation for professionals employed pursuant to Bankruptcy Code § 327) must be filed within one-hundred and twenty (120) days from the date such Administrative Claim is filed.

> HOLDERS OF ADMINISTRATIVE CLAIMS (INCLUDING, WITHOUT LIMITATION, PROFESSIONALS) REQUESTING COMPENSATION OR REIMBURSEMENT OF EXPENSES THAT DO NOT FILE SUCH REQUESTS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED FROM ASSERTING SUCH CLAIMS AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, REORGANIZED DEBTOR OR PROPERTY OF REORGANIZED DEBTOR OR ASSETS OR PROCEEDS HELD BY THE PLAN ADMINISTRATOR.

**2.**    ***Unclassified Priority Claims/Treatment under the Plan.***

Priority Claims are certain types of Claims entitled to priority under the Bankruptcy Code.  Certain types of Priority Claims are unclassified.  Unclassified Priority Claims are not entitled to vote because such claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.

Unclassified Priority Claims include Priority Tax Claims.  Priority Tax Claims are certain unsecured claims of governmental entities for taxes, based on income, employment and other taxes described by Bankruptcy Code § 507(a)(8).  The Bankruptcy Code requires that each Holder of

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

such a Section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred

Cash payments, over a period not exceeding five (5) years from the Petition Date.

The following chart lists <u>all</u> of the Debtor's Unclassified Priority Claims and their treatment

under the Plan.

| _**DESCRIPTION**_ | _**AMOUNT OWED**_<br>_**(Estimated)**_ | _**TREATMENT**_ |
| --- | --- | --- |
| **IRS**<br><br>*Type of Claim:*<br>**Priority Tax Claim.** | Scheduled Priority Claim is **$2,358**<br><br>[Unsecured portion of the Claim is $0]<br><br>[Penalty portion of the Claim is $0, and will be treated in Class 4] | Unless otherwise agreed to by the Debtor (or Reorganized Debtor) and the claimant, the Unclassified Priority Claim shall be treated as follows:<br><br>**Alternative 1:** The full amount thereof, without post-petition interest or penalty, (less any and all amounts paid after the Petition Date and prior to the Effective Date) in Cash, as soon as practicable after the later of (i) sixty (60) days after the Effective Date or (ii) ten (10) Business Days after the date on which such Priority Tax Claim Secured Tax Claim becomes an Allowed Priority Tax Claim, or<br><br>**Alternative 2:** A lesser amount as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtor prior to the Effective Date, or, after the Effective Date, by the Holder of an Allowed Priority Tax Claim, and the Reorganized Debtor, or<br><br>**Alternative 3:** At the election of the Debtor or Reorganized Debtor (as applicable), in accordance with Bankruptcy Code § 1129(a)(9)(C), equal quarterly installments paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date (and in such event, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at a rate to be agreed to by the Debtor or Reorganized Debtor (as applicable) and the appropriate Governmental Unit (or, if they are unable to agree, as determined by the Bankruptcy Court). |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| DESCRIPTION | AMOUNT OWED (Estimated) | TREATMENT |
|---|---|---|
| | | Any penalty portion of any Claim asserted by the Holder of a Priority Tax Claim shall be treated in Class 4.  Any unsecured portion will be treated in Class 3 |
| **FREELAND**<br><br>*Type of Claim:*<br>**Priority Wage Claim.** | Estimated Priority Claim is **$6,600**<br><br>[Unsecured portion of the Claim is $0] | Unless otherwise agreed to by the Debtor (or Reorganized Debtor) and the claimant, the Unclassified Priority Claim shall be treated as follows:<br><br>**Alternative 1:**  The full amount thereof, without post-petition interest or penalty, (less any and all amounts paid after the Petition Date and prior to the Effective Date) in Cash, as soon as practicable after the later of (i) sixty (60) days after the Effective Date or (ii) ten (10) Business Days after the date on which such Priority Tax Claim Secured Tax Claim becomes an Allowed Priority Tax Claim, or<br><br>**Alternative 2:**  A lesser amount as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtor prior to the Effective Date, or, after the Effective Date, by the Holder of an Allowed Priority Tax Claim, and the Reorganized Debtor, or<br><br>**Alternative 3:**  At the election of the Debtor or Reorganized Debtor (as applicable), in accordance with Bankruptcy Code § 1129(a)(9)(C), equal quarterly installments paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date (and in such event, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at a rate to be agreed to by the Debtor or Reorganized Debtor (as applicable) and the appropriate Governmental Unit (or, if they are unable to agree, as determined by the Bankruptcy Court). |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| *DESCRIPTION* | *AMOUNT OWED* *(Estimated)* | *TREATMENT* |
|---|---|---|
| | | Any penalty portion of any Claim asserted by the Holder of a Priority Tax Claim shall be treated in Class 4.  Any unsecured portion will be treated in Class 3 |

The IRS has not yet filed a Priority Tax Claim.  However, the Debtor has scheduled a Priority Tax Claim for the IRS in the approximate amount of $2,358.  The Debtor has also scheduled a Priority Wage Claim for the Freedland (the managing member) in the approximate amount of $6,600.  Although the Debtor scheduled the claim for the Orange County Treasurer for real property tax in the approximate amount of $94,750, the Debtor has provided for that claim in Class 1A below.

Although the Plan provides the Debtor with the option of paying such Claims in full after the Effective Date, the Debtor intends to elect <u>Alternative 3</u> treatment by paying such Allowed Priority Tax Claims in accordance with Bankruptcy Code § 1129(a)(9)(C), in equal quarterly installments, paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date.

**C.    CLASSIFIED CLAIMS AND INTERESTS**

**1.    *Classes of Secured Claims***

The following charts identify the Plan's treatment of the Classes containing all the Debtor's Secured Claims under the Plan:

| *CLASS NO.* | *DESCRIPTION* | *TREATMENT* |
|---|---|---|
| **Class 1** | Class 1 consists of Allowed Secured Tax Claims.  Each Holder of an Allowed Secured Tax Claim shall be deemed and treated as a separate sub-class of Class 1 (e.g. Class 1A, 1B, 1C etc).  Class 1 is <u>unimpaired</u> under the Plan, and *not* entitled to vote on the Plan. | |
| **1A** | *Secured Tax Claim of* **ORANGE COUNTY** | Each Holder of an Allowed Secured Tax Claim will be paid in respect of such Allowed Secured Tax Claim one of the following: |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | **TREASURER**<br><br>*Collateral description* = Commercial Property<br><br>Filed POC Claim Amount= $0<br><br>Scheduled Claim = $94,750<br><br>Debtor's Estimate of the Amount of the Claim = Unknown<br><br>General Unsecured Claim = $0<br><br>Subordinated Penalty Claim = $0 | **Alternative 1:** The full amount thereof, without post-petition interest or penalty, (less any and all amounts paid after the Petition Date and prior to the Effective Date) in Cash, as soon as practicable after the later of (i) sixty (60) days after the Effective Date or (ii) ten (10) Business Days after the date on which such Secured Tax Claim becomes an Allowed Secured Tax Claim, or<br><br>**Alternative 2:** A lesser amount as agreed to by the Holder of an Allowed Secured Tax Claim and the Debtor prior to the Effective Date, or, after the Effective Date, by the Holder of an Allowed Secured Tax Claim, and the Reorganized Debtor, or<br><br>**Alternative 3:** At the election of the Debtor or Reorganized Debtor (as applicable), in accordance with Bankruptcy Code § 1129(a)(9)(C), equal quarterly installments paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date (and in such event, interest shall be paid on the unpaid portion of such Allowed Secured Tax Claims at a rate to be agreed to by the Debtor or Reorganized Debtor (as applicable) and the appropriate Governmental Unit (or, if they are unable to agree, as determined by the Bankruptcy Court).<br><br>**Reservation of Defenses, Objections, Counterclaims and Other Rights**. Any defenses, objections, counterclaims, rights, rights of offset or recoupment of the Debtor or the Estate with respect to any Secured Tax Claim shall vest in and inure to the benefit of the Reorganized Debtor.<br><br>**Further Assurances**. The Holders of the Allowed Secured Tax Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate or requested by the Debtor and/or |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | Reorganized Debtor to effectuate the provisions of the Plan. |

Although the Plan provides the Debtor with the option of paying such Claims in full after the Effective Date, the Debtor intends to elect <u>Alternative 3</u> treatment by paying such Allowed Priority Tax Claims in accordance with Bankruptcy Code § 1129(a)(9)(C), in equal quarterly installments, paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date. In addition, the Debtor will be seeking a reassessment of the property tax claim based upon the actual valuation of the Commercial Property. Therefore, the Debtor anticipates that the Secured Tax Claim of the Orange County Treasurer may be substantially less than projected above.

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| **CLASS 2** | *Secured Claim of:*<br><br>**W LINC DISPUTED SECURED CLAIM**<br><br>*Amount of the W Linc Disputed Secured Claim asserted by W Linc under the W Linc Note*<br><br>*Collateral Description: Commercial Property and rents*<br><br>*Appraised Value of Collateral: $3,310,000*<br><br>*Scheduled Value of Collateral: $3,500,000*<br><br>*Debtor's Estimate of Secured Claim $0*<br><br>*General Unsecured Claim: $0* | Class 2 consists of the W Linc Disputed Secured Claim. Class 2 is impaired under the Plan.<br><br>**1.    Treatment of the W Linc Disputed Secured Claim.** On and after the Effective Date, the Holder of the W Linc Disputed Secured Claim will receive in respect of such W Linc Allowed Secured Claim the following treatment:<br><br>**Interim Retention of Disputed Lien Rights.** On the Effective Date, the Commercial Property shall be vested in the Reorganized Debtor, subject to the W Linc Disputed Secured Claim, and Disputed Lien rights, if any, until such time as there is a Final Order Allowing or disallowing such claim and a Final Judgment in the State Court Action. Pending entry of a (i) Final Order determining the W Linc Allowed Claim and (ii) a Final Judgment in the State Court Action, W Linc shall retain its disputed W Linc Trust Deed against the Commercial Property securing the W Linc Disputed Secured Claim, subject to the Reorganized Debtor's claims in the State Court Action and rights of setoff and/or recoupment |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | for damages as determined in the State Court Action. |
| | | **Interim Discount/Interest Rate.** On an after the Effective Date, the rate to be applied to the future payment stream on account of the W Linc Disputed Secured Claim shall be 4.25% per annum (or such other rate as determined by the Bankruptcy Court as the appropriate rate to be applied) ("***W Linc Interim Discount/Interest Rate***"), which shall accrue on the principal balance of the W Linc Disputed Secured Claim (or such estimated amount as may be determined by order of the Bankruptcy Court in connection with Confirmation), commencing on the Effective Date and continuing through the entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action. Interest shall be computed on a 365/360 basis; that is, by applying the ratio of the applicable rate over a year of 360 days, multiplied by the lesser of the (i) the principal balance of the W Linc Disputed Secured Claim, or (ii) such estimated amount as may be determined by order of the Bankruptcy Court in connection with Confirmation, then multiplied by the actual number of days that the principal balance of the W Linc Disputed Secured Claim (or estimated amount) is outstanding. |
| | | **W Linc Disputed Deferred Payment(s)**. A quarterly payment in an amount equal to the accrued W Linc Interim Discount/Interest Rate accruing, on the projected or estimated principal balance of the W Linc Disputed Secured Claim, during the applicable previous quarter, shall be deposited into the W Linc Disputed Claim Reserve, on a quarterly basis, on January 31, April 30, July 31, and October 31 (or the first Business Day thereafter), commencing on the first such date which is at least 90 days following the Effective Date and continuing until entry of (i) a Final Order |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | Allowing or disallowing W Linc Disputed Secured Claim, and (ii) a Final Judgment in the State Court Action (each a "*W Linc Disputed Deferred Payment*," and collectively the "*W Linc Disputed Deferred Payments*"). |

**Commercial Property Insurance.**  On and after the Effective Date, until entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action, the Reorganized Debtor shall maintain, or cause to be maintained, insurance covering the Commercial Property against loss, damage and liability, for such hazards, risks and loses, and in such amounts, as are usual, customary, and ordinary for similar property.

**Property Tax for Commercial Property.**  On an after the Effective Date, until entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action, the Reorganized Debtor shall pay, or cause to be paid, undisputed real property taxes incurred after the Effective Date, except to the extent such taxes are subject to a bona fide dispute as to the amount assessed.

**2.      Treatment of the W Linc Allowed Secured Claim**.  Commencing on the first date which is a January 31, April 30, July 31, or October 31 following the W Linc Secured Claim Allowance Date, the Holder of the W Linc Allowed Secured Claim will receive in respect of such W Linc Allowed Secured Claim the following treatment:

**Retention of Lien Rights.**  The lien to which the Holder of such W Linc Allowed Secured Claim under the W Linc Note is entitled pursuant to the W Linc Deed of Trust shall remain in place and unaltered by the Plan.

**Distribution of the W Linc Disputed Claim Reserve.**  Within ten (10) days following the W

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | Linc Secured Claim Allowance Date, the Holder of the W Linc Allowed Secured Claim shall receive on account of the W Linc Allowed Secured Claim, the proceeds of the W Linc Disputed Claim Reserve Account.

**W Linc Discount/Interest Rate**.  On an after the W Linc Secured Claim Allowance Date, the rate to be applied to the future payment stream on account of the W Linc Allowed Secured Claim shall be 4.25% per annum (or such other rate as determined by the Bankruptcy Court as the appropriate rate to be applied) ("***W Linc Discount/Interest Rate***"), which shall accrue on the principal balance of the W Linc Allowed Secured Claim, commencing on the W Linc Secured Claim Allowance Date and continuing through the date of the W Linc Final Payment. Interest shall be computed on a 365/360 basis; that is, by applying the ratio of the applicable rate over a year of 360 days, multiplied by the principal balance of the W Linc Allowed Secured Claim, and multiplied by the actual number of days that the principal balance of the W Linc Allowed Secured Claim is outstanding.

**W Linc Deferred Payment(s)**.  Commencing on and after the W Linc Secured Claim Allowance Date, and continuing each month thereafter until the W Linc Final Payment Date, the Holder of the W Linc Allowed Secured Claim shall receive on account of the W Linc Allowed Secured Claim, monthly installment payments, calculated based upon a thirty-five (35) year amortization of the W Linc Allowed Secured Claim, if any, (each a "***W Linc Deferred Payment***," and collectively the "***W Linc Deferred Payments***").  A fifteen (15) day grace period shall apply to each such W Linc Deferred Payment.  The W Linc Deferred Payments are determined based on the amount of the W Linc POC and the Discount/Interest Rate set forth in Class 2 of the Plan. |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | **Commercial Property Insurance.**  On an after the entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action through the W Linc Final Payment Date, the Reorganized Debtor shall maintain, or cause to be maintained, insurance covering the Commercial Property against loss, damage and liability, for such hazards, risks and loses, and in such amounts, as are usual, customary, and ordinary for similar property.

**Property Tax for Commercial Property.**  On an after the entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action through the W Linc Final Payment Date, the Reorganized Debtor shall pay, or cause to be paid, undisputed real property taxes incurred after the Effective Date, except to the extent such taxes are subject to a bona fide dispute as to the amount assessed.

**3.    Additional Plan Provisions applicable to the W Linc Disputed Secured Claim and W Linc Allowed Secured Claim.**  The following Additional Plan Provisions shall apply to the W Linc Disputed Secured Claim and W Linc Allowed Secured Claim, as applicable.

**W Linc LTV Reduction Payment**.  In the event that, as of the Updated Appraisal Date, the LTV Ratio, calculated based upon the principal (or estimated) balance of the W Linc Disputed Secured Claim or W Linc Allowed Secured Claim, as applicable, is not at least seventy-five percent (75%) of the value of the Commercial Property as determined by the Updated Appraisal, then a payment will be made from the LTV Reduction Contribution, on a date which is no later than twenty-five (25) months following the Effective Date, in such amount as is necessary to create a seventy-five percent (75%) LTV Ratio ("***W Linc LTV Reduction Payment***").  If the |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
|  |  | Updated Appraisal Date occurs *after* the W Linc Secured Claim Allowance Date, whereby there has resulted a W Linc Allowed Secured Claim, the W Linc LTV Reduction Payment, if required, will be made by the Reorganized Debtor directly to the Holder of the W Linc Allowed Secured Claim.  If, on the other hand, the Updated Appraisal Date occurs *before* the W Linc Secured Claim Allowance Date, such that the W Linc Allowed Secured Claim has not been determined by Final Order or Final Judgment as of the Updated Appraisal Date, the W Linc LTV Reduction Payment, if required, will be made by the Reorganized Debtor directly into the W Linc Disputed Claim Reserve, pending the W Linc Secured Claim Allowance Date and determination of the W Linc Allowed Secured Claim. |

**W Linc Final Payment**.  Notwithstanding the provisions of Subparagraphs 2 and 3 above, on or before a date which is the first Business Day after a full forty-eight (48) months following the Effective Date ("***W Linc Note Extended Maturity Date***"), one final payment will be made by the Reorganized Debtor in such amount as is necessary to ensure that the present value of the aggregate of the W Linc Deferred Payments, W Linc LTV Reduction Payment, if applicable, and the W Linc Final Payment are equal to the W Linc Allowed Secured Claim ("***W Linc Final Payment***").  If the W Linc Note Extended Maturity Date occurs *after* the W Linc Secured Claim Allowance Date, whereby there has resulted a W Linc Allowed Secured Claim, the W Linc Final Payment, if required, will be made by the Reorganized Debtor directly to the Holder of the W Linc Allowed Secured Claim.  If, on the other hand, the W Linc Note Extended Maturity Date occurs *before* the W Linc Secured Claim Allowance Date, such that the W Linc Allowed Secured Claim has not been determined by Final Order or Final Judgment as of the W Linc Note Extended Maturity Date,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
|  |  | the W Linc LTV Reduction Payment, if required, will be made by the Reorganized Debtor directly into the W Linc Disputed Claim Reserve, pending the W Linc Secured Claim Allowance Date and determination of the W Linc Allowed Secured Claim.<br><br>**W Linc Note Extended Maturity Date.** On the Effective Date, the maturity date under the W Linc Note shall be deemed extended to the W Linc Note Extended Maturity Date.<br><br>**Miscellaneous Plan Provisions.** On the Effective Date, (i) the W Linc Loan Documents shall be deemed modified and superseded by the provisions of the Plan; (ii) any and all non-monetary defaults or events of default under the W Linc Note shall be deemed cured and waived as of the Effective Date; and, (iii) any monetary defaults not cured on the Effective Date shall be deemed to be added to the principal balance of the Allowed W Linc Secured Claims in respect of the W Linc Note.<br><br>**Reservation of Claims, Defenses, Objections, Counterclaims and Other Rights.** The State Court Action and any defenses, objections, counterclaims, rights, rights of offset and/or recoupment of the Debtor or the Estate with respect to the Claim in this Class shall vest in and inure to the benefit of the Reorganized Debtor.<br><br>**Further Assurances.** The Holders of the Claim in this Class shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan, including, without limitation, as soon as practical after the Effective Date, any and all actions and documents required to rescind all notices of default and trustee's sale notices, and cancel and withdraw any trustee's sale. |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

As stated, the Debtor disputes in its entirety the Claim asserted by W Linc. Similarly, the Debtor disputes the validity of the W Linc Trust Deed.

As discussed earlier in the Disclosure Statement, the Debtor has filed the State Court Action and anticipates filing a fraudulent conveyance action and Subordination Litigation. The Debtor intends to file an objection to any POC filed by any of the State Court Defendants, including, without limitation, W Linc, based primarily on the allegation set forth in the State Court Complaint. In addition, the Debtor asserts that the W Linc Disputed Secured Claim should be disallowed pursuant to Bankruptcy Code § 502 (d), which generally disallows a Claim asserted by a transferee of an avoidable transfer until the transferee has returned such property or paid an amount equal to the value of such transferred property.

Furthermore, the Debtor disputes the W Linc Disputed Secured Claim on the basis of the Debtor's setoff/recoupment rights, which are preserved under the Plan. The right to setoff (also called offset) allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." See generally, *Citizens Bank of Maryland v. Strumpf* 516 U.S. 16, 18 (1995). In this case, the Debtor's setoff claim arises under California law, the governing law designated under the W Linc Note. See, *In re Communication Dynamics, Inc.*, 300 B.R. 220, 223 n.2 (Bankr. D. Del. 2003 (law governing parties' agreement determined the applicable setoff law). Under California law, the right of setoff is codified under California Code of Civil Procedure § 431.70, which permits setoff in an action between persons where "cross-demands for money have existed" between persons "at any point in time when neither demand is barred by the statute of limitations." *In re Prior*, 2014 WL 5573442 (Bankr. E.D. Cal. October 31, 2014), quoting Cal. Civ. Proc. Code § 431.70. This principle of setoff is not limited to judicial proceedings. The setoff applies between the parties to extinguish the debt even though no action is pending. *Murchison v. Murchison*, 33 Cal. Rptr. 285, 288 (Ct. App. 1963).

The doctrine of recoupment is an equitable remedy that permits the offset of mutual debts when the respective obligations originate from the same transaction or occurrence. *In re*

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    *Communication Dynamics, Inc.*, 300 B.R. at 225.  Recoupment is the setting up of a demand arising

2    from the same transaction, strictly for the purpose of abatement or reduction of such claim.  *In re*

3    *University Medical Center*, 973 F.2d 1065 (3d Cir. 1992).  Similarly, "under California law,

4    recoupment is a defensive claim which must arise out of the same transation . . ." *Zavecz v. Yield*

5    *Dynamics, Inc.*, 2004 WL 2009316, at *2 (E.D. Pa. Sept. 9, 2004).  Accordingly, the W Linc

6    Disputed Secured Claim should be disallowed in its entirety because, among other reasons, the

7    Debtor asserts recoupment claims against W Linc that far exceed the amount of the W Linc

8    Disputed Secured Claim.

9        For the foregoing reasons, among others, the Debtor asserts that there is no W Linc

10   Allowed Secured Claim.  Regardless of the dispute over the extent, nature, validity, and amount

11   of W Linc Disputed Secured Claim and W Linc Trust Deed, feasibility of the Plan is not dependent

12   upon the Debtor prevailing in its assertions.  The Plan provides for the treatment of the W Linc

13   Disputed Secured Claim and W Linc Trust Deed pending Allowance and after Allowance should

14   W Linc prevail in establishing a W Linc Allowed Secured Claim.

15       Assuming *arguendo* that W Linc prevails in establishing a W Linc Allowed Secured Claim,

16   based on the valuation contained in the Herron Appraisal (and subject to final determination by of

17   the Bankruptcy Court in connection with Confirmation), the lien securing any W Linc Allowed

18   Secured Claims appears to be over-secured within the meaning of Bankruptcy Code § 506(a)(1).

19   Accordingly, an election by W Linc pursuant to Bankruptcy Code § 1111(b)(1) and (2) to have its

20   entire claim, evidenced by the W Linc Note, be treated as Allowed, is unlikely to be made by W

21   Linc by the deadline for such election imposed by FRBP 3014, at the conclusion of the hearing on

22   the Disclosure Statement (unless such date is extended by the Bankruptcy Court).

23       Pursuant to its treatment in Classes 2, the Plan proposes to satisfy the W Linc Allowed

24   Secured Claim by distributing to W Linc under the Plan on account of such claim (i) Distribution

25   of the W Linc Disputed Claim Reserve, within ten (10) days following the W Linc Secured Claim

26   Allowance Date; (ii) W Linc Deferred Payments over a period of approximately forty-eight months

27   from the Effective Date; (iii) an W Linc LTV Reduction Payment, if necessary, no later than

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

twenty-five (25) months following the Effective Date, so as to ensure that the LTV Ration is at least 75%; and (iv) an W Linc Final Payment upon the W Linc Extended Maturity Date (approximately 48 months), which the Reorganized Debtor contemplates will be from Takeout Financing secured by the Commercial Property or a payment by the Trust.

Assuming *arguendo* that W Linc prevails in establishing a W Linc Allowed Secured Claim, the estimated W Linc Deferred Payment, based on a hypothetical $1,500,000 W Linc Allowed Secured Claim, is approximately $6,868 each month, or approximately $329,684 over the anticipated life of the Plan.  At Confirmation, the Debtor will establish the financial ability to satisfy those payment though the projected lease payments with the shortfall, if any, being satisfied by the New Value Contributions by the Trust, if required.

The W Linc Allowed Secured Claim will not have been satisfied in full as of the W Linc Extended Maturity Date.  However, the LTV Ratio at the time of the W Linc Extended Maturity Date will be such that upon maturity the feasibility of obtaining available Takeout Financing is probable.

If required, the Debtor is prepared to introduce expert testimony at Confirmation to support the likelihood, based on current market conditions and trends, of available Takeout Financing for this Commercial Property upon the W Linc Extended Maturity Date at the 75% LTV Ratio. Furthermore, the Debtor intends to introduce evidence at Confirmation respecting the financial ability and willingness of the New Value Contributor, the Trust, to make a further principal reduction should it be necessary to lower the LTV Ratio in order to secure Takeout Financing.

Assuming *arguendo* that Takeout Financing is not obtainable upon maturity, the Debtor contends that the Plan is nevertheless feasible because it can be sold and the proceeds used to satisfy the obligations under the Plan.

In order to provide the present value of the deferred payment stream, the Plan utilizes a 4.25% rate relevant to the payment stream applicable to W Linc.  However, the appropriate rate will be determined by the Bankruptcy Court at Confirmation taking a number of factors into consideration.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Set forth below is a brief discussion of the methods for determining the appropriate rate and the Debtor's argument in that regard.  The conclusions reached by the Debtor may be opposed by W Linc.  This section is included for discussion purposes only to assist the reader to evaluate the Plan.  The Debtor intends to introduce evidence at the Confirmation Hearing.  The evidence may establish a higher or lower rate.  Absent consensual resolution (which the Debtor hopes to achieve prior to Confirmation), the Bankruptcy Court will make the final determination with regard to the appropriate interest rate to be applied to the future payment stream.

Generally, the Ninth Circuit looks to a market rate for similar loans.  If a market is available for the type of loan at issue, the market rate will be applied.  In the absence of a market rate, the Ninth Circuit adopts a formula approach by adding an appropriate risk factor to a base rate for a "riskless" loan, such as U.S. government Treasury bond rates or the prime rate. See, *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503 (9th Cir. 1987); and *In re Fowler*, supra, 903 F.2d. 694 (9th Cir. 1990) (both cases decided prior to *Till*, see analysis below).  The Ninth Circuit Court of Appeals adopted a case by case approach.  As stated by the court in *Fowler*:

> Having heard testimony regarding both the market interest rates in the region and the risks associated with this debtor, the bankruptcy court used the formula approach, taking the prime rate on the date of plan confirmation, 8.75% and adding a .75% risk factor.  It did err in using this approach to determine the cramdown interest rate.

[Fowler at 697]

In utilizing the formula approach, the interest rate is adjusted for the term of the plan's repayment period by utilizing as the base rate the yield quoted for treasury bills or bonds on equivalent terms.  The risk inherent in the type of collateral involved can be accounted for by utilizing an adjustment factor derived from the market for loans secured by similar collateral.

In 2004, the Supreme Court addressed the crucial question of how to select an appropriate interest rate for cramdown in *Till v. SCS Credit Corporation* 541 U.S. 465, 124 S. Ct. 1951, 1958-59 (2004).  Although *Till* was a chapter 13 case, many Courts have applied it to chapter 11 cases as well.  *Till* holds that a formula approach based upon the prime rate of interest best carries out

the intention of Congress in order to determine a whether a stream of deferred payments constitutes present value of the allowed claim. 541 U.S. at 478-480, 124 S. Ct. at 1961-62. *Till* reversed a decision of the court of Appeals for the Seventh Circuit that held that the pre-bankruptcy contract rate should be the presumptive rate based on the theory that cramdown involved imposing a coerced loan on the secured creditor.  In rejecting that the contract rate was the appropriate rate, the Supreme Court preferred the formula approach, which starts with the prime rate, and then adjusts the applicable rate upward.

> [T]he resulting prime-plus rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor.  For these reasons, the prime-plus or formula rate best comports with the purposes of the Bankruptcy Code.

[*Till* at 541 U.S. at 477; 124 S. Ct. at 1960].

The Supreme Court in *Till* did not directly decide the proper scale for the risk adjustment factor, leaving it to a more flexible approach.  However, the Supreme Court in *Till* did offer some guidance.  The Supreme Court noted that adjustments of 1 to 3 percent seemed appropriate and suggested that large adjustments would not be appropriate because a plan cannot be confirmed unless the Bankruptcy Court finds the plan feasible.  The Supreme Court stated:

> If the court determines that the likelihood of default is so high as to necessitate an 'eye-popping' interest rate, . . . the plan probably should not be confirmed.

[*Till* 541 U.S. at 481; 124 S. Ct. at 1962].

Many courts have applied *Till* to Chapter 11 cases holding that a formula rate applies unless an efficient lending market exists for the proposed exit financing.  See, *In re American Homepatient, Inc.*, 420 F.3d 559 (6th Cir. 2005).

Although many factors may impact applicable commercial real estate loan rates, rates were generally significantly higher when Countrywide originally made the loan in 2007 than they are today.  The contract rate of 6.52% was within the range of typical commercial real estate loans

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

applicable in 2007; whereas, it would be considered high in the current market.  For example, commercial real estate loans in the market today are available at a rate in the range of 3.75%.

The current one year LIBOR rate as of May 2015 is 0.73%; whereas it was over 5% in 2007.  Similarly, the current Wall Street Journal Prime rate as of May 2015 is 3.25%; whereas, it was over 8% when the original loan was funded.

As stated, if necessary, the Debtor intends to introduce evidence at the Confirmation Hearing, including a <u>Till</u> analysis.  As further stated, if required, the Bankruptcy Court will make the final determination with regard to the appropriate rate to be applied to the future payment stream in connection with the Plan.

**2.**    ***Classes of Unsecured Claims***

The following charts identify the Plan's treatment of the Classes containing all the Debtor's Unsecured Claims under the Plan:

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| **CLASS 3** | **GENERAL UNSECURED CLAIMS (EXCLUDING ANY SUCH GENERAL UNSECURED CLAIMS THAT QUALIFY FOR TREATMENT IN CLASS 4).** <br><br> *Estimated General Unsecured Claims = 318,048* <br><br> *Estimated General Unsecured Claims, excluding General Unsecured Claim of the Trust treated in Class 4 = 180,788* | Class 3 consists of the Allowed Claims of the Holders of General Unsecured Claims (except any such General Unsecured Claims that qualify for treatment in Class 7).  The Holders of General Unsecured Claims in this Class are <u>impaired</u> under the Plan, and entitled to vote on the Plan. <br><br> After the Effective Date, the Holders of the General Unsecured Claims in Class 6 will receive the following on account of their Allowed General Unsecured Claims: <br><br> Class 3 Effective Date Plan Payment.  The Holders of the Allowed General Unsecured Claims qualifying for treatment in Class 3 shall receive on the Effective Date, or as soon as practicable thereafter, on account of such Allowed General Unsecured Claims, an aggregate payment of $10,000 from the New Value Contribution, to be distributed to each such Holder of an Allowed General Unsecured Claim on a Pro Rata basis, but not to exceed an amount equal to ten percent |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|-----------|-------------|-----------|
| | | (10%) of each such Holder's Allowed General Unsecured Claim. |

**Class 3 Deferred Plan Payments.** After payment in full of the Administrative Claims and Unclassified Priority Claims, the Reorganized Debtor shall distribute to the Holders of Allowed General Unsecured Claims in Class 3, payments of approximately $15,000 each quarter, on each January 31, April 30, July 31, and October 31 (or the first Business Day thereafter), commencing on a date that is a Business Day which is at least ninety (90) days after the Effective Date, and continuing until such time as all of the Allowed General Unsecured Claims in Class 3 receive the present value of 100% of their Allowed General Unsecured Claims. The Pro Rata distribution on account of the Disputed Claims, if any, in this Class shall be deposited into a Plan Reserve Account until entry of a Final Order resolving the Disputed Claim at which time the proceeds will be distributed to the Claimant to the extent such claim is Allowed, and/or to the Reorganized Debtor to the extent such claim is disallowed.

**Rights of Action.** In addition, to the foregoing, the Holders of the Allowed General Unsecured Claims qualifying for treatment in Class 3 shall also be entitled to receive after the Effective Date, a Pro Rata share of the net recovery or net settlement proceeds, if any, received by the Reorganized Debtor after the Effective Date, derived from any Rights of Action, which remain after payment of any and all attorney's fees and costs in connection with the prosecution of the same provided that: (i) payments due to Class 2 after the Effective Date are current for the applicable calendar year; (ii) any and all approved and unpaid Professional Fees in connection with the chapter 11, Plan or any action in respect thereof have been paid in

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | full; (iii) all property tax payments due after the Effective Date and/or pursuant to the Plan are paid when due and not in default; and (iv) all Plan payments are current and there are no Plan Defaults or event of default with respect to any obligations under the Plan.<br><br>**Voluntary Subordination of the General Unsecured Claim of the Trust.** In the event that Class 3 votes to accept the Plan (excluding the votes of Insiders), and that the Plan is confirmed, the Trust agrees to subordinate its General Unsecured Claim to the Allowed General Unsecured Claims held by the General Unsecured Creditors, who are not Insiders; and, the Trust consents to have its General Unsecured Claim treated in Class 4.<br><br>**Discount/Interest Rate from the Effective Date.** The applicable rate to be applied to the General Unsecured Claims in Class 3 shall be simple interest calculated at the Federal interest rate on civil judgments as set by the Federal Reserve on the Confirmation Hearing Date, commencing from and after the Effective Date on the Allowed General Unsecured Claims in Class 3 (or such other applicable rate as found by the Bankruptcy Court).<br><br>**Reservation of Defenses, Objections, Counterclaims and Other Rights**. Any defenses, objections, counterclaims, rights, rights of offset or recoupment of the Debtor or the Estate with respect to such Claims shall vest in and inure to the benefit of the Reorganized Debtor.<br><br>**Further Assurances.** The Holders of the Allowed Class 3 Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate, or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan. |

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | **Maximum Distribution**. In no event shall the aggregate Distributions to be made under the Plan to each Holder of a Class 3 Allowed General Unsecured Claim exceed the present value of such Holder's Allowed General Unsecured Claim. |

The Debtor estimates aggregate General Unsecured Claims of approximately $318,048, which includes a General Unsecured Claim asserted by the Trust in the amount of $137,260. Under the Plan, in the event that the Holders of the General Unsecured Claims in Class 3 vote to accept the Plan (excluding the votes of Insiders), and that the Plan is confirmed, the Trust agrees to subordinate its General Unsecured Claim to the Allowed General Unsecured Claims held by the General Unsecured Creditors who are not Insiders; and, the Trust consents to have its General Unsecured Claim treated in Class 4. Assuming the Holders of the General Unsecured Claims in Class 3 vote to accept the Plan (excluding the votes of Insiders), and that the Plan is confirmed, the Allowed General Unsecured Claims in Class 3 will be reduced to $180,788.

Accordingly, regardless of the outcome of the State Court Action, the Debtor projects that the present value of the Allowed General Unsecured Claims in Class 3 will paid in full within approximately 48 months following the Effective Date. However, there is a high probability that the Allowed General Unsecured Claims in Class 3 will be paid in full much sooner than the projected 48 months should the Reorganized Debtor prevail in the State Court Action or its Rights of Action against the State Court Defendants.

Until the W Linc Allowed Secured Claim, if any, is satisfied (either through litigation or payments under the Plan), the Reorganized Debtor shall distribute quarterly payments to the Holders of Allowed General Unsecured Claims in Class 3, which shall be distributed Pro Rata among the Holders of the Allowed General Unsecured Claims. However, the source of payment shall be from contributions made by the Trust and not from rents derived from the Commercial Property.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| **CLASS 4** | **ALLOWED PRIORITY CLAIM OF THE TRUST ON ACCOUNT OF THE DIP LOAN; GENERAL UNSECURED CLAIM OF THE TRUST; AND, ANY AND ALL OTHER SUBORDINATED ALLOWED CLAIMS.**<br><br>*Estimated Claims:= $287,260 (inclusive of the General Unsecured Claim asserted by the Trust in the amount of $137,260)* | Class 4 consists of the Allowed Priority Claim of the Trust for the unpaid balance of the Dip Loan. Class 4 also consists of the Allowed General Unsecured Claim of the Trust which it has agreed to voluntarily subordinate in the event that Class 3 votes to accept the Plan (excluding the votes of Insiders), and that the Plan is confirmed. Class 4 also consists of Allowed subordinated claims, if any, for penalties. Class 4 also consists of any other Allowed subordinated claims of any kind or nature. Class 4 is impaired under the Plan, and entitled to vote on the Plan.<br><br>Without limiting the generality of the foregoing, on the Effective Date, as part of its New Value Contribution, the Trust agrees to subordinate its Allowed Priority Claim for the unpaid balance of the Dip Loan and its General Unsecured Claim (on the conditions set forth above) to the payment of Administrative Claims, Unclassified Priority Claims and Allowed Claims in Class 3 of the Plan.<br><br>After the Effective Date, the Holders of the Allowed Claims in Class 4 will receive deferred payments equal to the present value of the full amount of their Allowed Claims, paid as follows:<br><br>**Class 4 Deferred Plan Payment(s).** After the Effective Date and payment in full of the Administrative Claims, Unclassified Priority Claims, and Allowed Claims in Classes 2 and 3, the Reorganized Debtor shall distribute each quarter to the Holders of Allowed General Unsecured Claims in Class 4, Available Cash, which shall be distributed Pro Rata among the Holders of the Allowed Claims (taking into consideration the Disputed Claims, if any, in Class 4), which shall continue until such time as all of the Allowed Claims in Class 4 receive the present value of 100% of their Allowed Claims. |

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | **Net Sale Proceeds**.  In addition, should the Commercial Property be sold after the Effective Date, the Reorganized Debtor shall also distribute to the Holders of Allowed General Unsecured Claims in Class 4, Net Sale Proceeds remaining after payment in full of the Administrative Claims, Unclassified Priority Claims, and Allowed Claims in Classes 2 and 3, up to an amount equal to the present value of One Hundred percent (100%) of the Allowed Claims in Class 4.<br><br>The Pro Rata distribution on account of the Disputed Claims, if any, in this Class shall be deposited into a Plan Reserve Account until entry of a Final Order resolving the Disputed Claim at which time the proceeds will be distributed to the Claimant to the extent such claim is Allowed, and/or to the Reorganized Debtor to the extent such claims is disallowed.<br><br>**Discount/Interest Rate from the Effective Date.** The applicable rate to be applied to the Allowed Claims in Class 4 shall be simple interest calculated at the Federal interest rate on civil judgments as set by the Federal Reserve on the Confirmation Hearing Date (or such other applicable rate as found by the Bankruptcy Court).<br><br>**Reservation of Defenses, Objections, Counterclaims and Other Rights**.  Any defenses, objections, counterclaims, rights, or rights of offset or recoupment of the Debtor or the Estate with respect to such Claims shall vest in and inure to the benefit of the Reorganized Debtor.<br><br>**Further Assurances**.  The Holders of the Allowed Class 4 Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate, or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan. |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|-----------|-------------|-----------|
|  |  | **Maximum Distribution**. In no event shall the aggregate Distributions to be made under the Plan to each Holder of a Class 4 Allowed Claim exceed the present value of such Holder's Allowed Class 7 Claim. |

The estimated Claims qualifying for treatment in Class 4 aggregate $287,260 of which $137,260 consists of the General Unsecured Claim asserted by the Trust which is voluntarily subordinated pursuant to Class 3 treatment, and $150,000 consists of the Allowed Priority Claim of the Trust for the unpaid balance of the Dip Loan anticipated to be drawn down on the Effective Date. As set forth in the Cash Flow Projections, it is projected that the Class 4 Allowed Claims will be paid in full. However, no distribution is projected to be made to the Holders of Allowed Claims in Class 4 until after payment in full of all Allowed Claims holding senior priority under the Bankruptcy Code, including, without limitation, all Administrative Claims, Unclassified Priority Claims, and Allowed Claims in Classes 1, 2 and 3.

    *3.*    <u>*Class of Interests*</u>

The following charts identify the Plan's treatment of the Class containing all the Debtor's Interests:

| CLASS NO. | DESCRIPTION | TREATMENT |
|-----------|-------------|-----------|
| **CLASS 5** | **ALLOWED EQUITY INTEREST** | Class 5 consists of the Interest in the Debtor. The Interests are <u>impaired</u> under the Plan, and entitled to vote on the Plan.<br><br>The Allowed Equity Interest in the Debtor shall retain their Interest in the Debtor if the Holders of the Claims in Classes 1 through 4 vote to accept the Plan. Otherwise, the Allowed Equity Interest in the Debtor shall be deemed not to receive any distribution under the Plan on account of their Interests in the Debtor, and their Interests and voting rights shall be |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

| CLASS NO. | DESCRIPTION | TREATMENT |
|-----------|-------------|-----------|
|  |  | maintained based on the current percentages, by virtue of the New Value Contribution. |

**D.   MEANS OF EFFECTUATING THE PLAN**

**1.   _Funding for the Plan:_**

The Plan will be funded by (i) the New Value Contribution; (ii) the Debtor's rental income; (iii) Trust Exit Financing (to the extent required); (iv) LTV Reduction Contribution (if necessary); and, on or before the W Linc Note Extended Maturity Date, (v) Takeout Financing, further contributions of the Trust or the Sale Option.

**a.**   New Value Contribution

The Plan will be funded in part by the New Value Contribution made by the New Value Contributors.  The anticipated source of the New Value Contribution is the Trust.

**b.**   Rental Income

The Plan will be funded from cash flow generated from continued operation of the retail center after the Effective Date.  The Reorganized Debtor shall receive and collect all revenue and pay all expenses.  Subject to the State Court Action, and the provisions of Bankruptcy Code § 552, until such time as the W Linc Disputed Secured Claim is disallowed or the W Linc Allowed Secured Claim is paid in full, proceeds, product, offspring, and/or profits of the Commercial Property, which are otherwise subject to the W Linc Disputed Secured Claim, shall be used solely for Operating Expenses for the Commercial Property and for W Linc Deferred Payments, and not to fund any other payments under the Plan.

**c.**   Trust Exit Financing or Further Contributions

The Plan will also be funded to the extent necessary from unsecured financing or further contributions made available by the Trust to the Reorganized Debtor on and after the Effective Date in such amounts as are periodically required by the Reorganized Debtor from time to time for Operating Expenses or payments under the Plan.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**d.**    LTV Reduction Contribution

The Plan will also be funded to the extent necessary from a further contribution or unsecured loan, if necessary, to be made after the Effective Date by the New Value Contributor in an amount necessary to make the W Linc LTV Reduction Payment, if required to be made.

**e.**    Takeout Financing, Payoff, or Sale Option

After the Effective Date, and prior to the W Linc Note Extended Maturity Date, the Reorganized Debtor may elect to payoff the W Linc Allowed Secured Claim at any time through additional contributions from the Trust or refinance the Commercial Property by obtaining a new loan from a third party lender prior to the W Linc Note Extended Maturity Date, which shall be secured by a new first deed of trust against the Commercial Property.  The proceeds of the contribution or Takeout Financing will be used to, among other things, satisfy the unpaid balance of the W Linc Allowed Secured Claim on or before the W Linc Note Extended Maturity Date.

After the Effective Date, the Reorganized Debtor may elect, in its sole and absolute discretion, to sell the Commercial Property ("*Sale Option*").  In the event that the Debtor exercises the Sale Option, the Net Sale Proceeds of such sale shall be distributed to pay the balances due in the following order (i) Allowed Secured Tax Claims in Class 1; (ii) W Linc Allowed Secured Claim in Class 2; (iii) Administrative Claims and Unclassified Priority Claims; (iv) General Unsecured Claims (Class 3), Pro Rata among such Holders; (v) Allowed Claims in Class 4, Pro Rata among such Holders; and (vi) Equity Interest Holders.

**f.**    Plan Reserves

The Reorganized Debtor shall maintain Plan Reserves, including (i) an Administrative Claims Plan Reserve (including, without limitation, reserves for Professional Fee Claims), (ii) separate reserves for payment of Disputed Administrative Claims, Disputed General Unsecured Claims, and (iii) Operating Reserves, which are reasonable reserves from cash flow generated from operations as determined by the Reorganized Debtor.

/ / /

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**2.**    *Post Confirmation Management of the Reorganized Debtor.*

The Reorganized Debtor shall manage its affairs after the Effective Date.  On the Effective Date, the Operating Agreement shall be deemed modified and amended pursuant to the terms of the Plan as of the Effective Date.  Freedland shall continue to act as managing member after the Effective Date.

**3.**    *Disbursing Agent.*

The Reorganized Debtor shall be the Disbursing Agent under the Plan.

**A.**    *The Reorganized Debtor.*

On the Effective Date, as set forth in Section VIII of the Plan, all of the Assets, property of the Estate and/or Debtor, including, without limitation, the Commercial Property and its operations, and Rights of Action are vested in the Reorganized Debtor free and clear of all Claims, Liens, interests and encumbrances, except the liens securing the W Linc Note Disputed Secured Claim or the W Linc Note Allowed Secured Claim, as applicable, pursuant to the provisions of Classes 2 of the Plan.

As of the Effective Date, the Reorganized Debtor shall manage the administration of the Plan, and in such capacity, may exercise rights, power and authority consistent with the Plan and applicable laws.

**B.**    *Powers and Authority of Reorganized Debtor.*

On or after the Effective Date, the powers and authority of the Reorganized Debtor shall include, but not be limited to, taking any action, filing or causing to be filed any proceeding, instituting and prosecuting any litigation, executing any document, entering into any compromise or settlement, or taking any such other actions, in connection with, consist with, or related to, (i) the Plan, (ii) the sale of the Commercial Property, the Other Assets and/or operations, (iii) determination, allowability, classification, or priority of any Claims, (iv) the extent, validity and priority of any lien, (v) construing, administering or enforcing the terms of the Plan, the Confirmation Order and any other order of the Court, (vi) implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred

to in the Plan and the Confirmation Order, (vii) the opening or closing of any account which the Reorganized Debtor determines is reasonable, necessary or required under the Plan, and making any withdrawals or deposits in connection therewith, (viii) reviewing, approving, or opposing any and all applications or requests for compensation and reimbursement of expenses of any Professionals which are submitted or brought after the Effective Date (regardless of the date of such services), (ix) filing, prosecuting, compromising or settling the State Court Actions, Rights of Action or other litigation reserved under the Plan, (x) any applications, motions, adversary proceedings, contested matters and any other litigated matters instituted before, on or after the Effective Date, including, without limitation, any and all claims, causes of action, setoffs, recoupments, and the determination of any other rights; (xi) modifying the Plan under Bankruptcy Code § 1127 in order to remedy any apparent defect or omission in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose, or implement any settlement reached (which shall be within the Reorganized Debtor's, sole and exclusive power, right and authority), (xii) seeking any injunctions, judgment, or orders or taking such other actions as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, (xiii) to aid in consummation of the Plan or the Confirmation Order, (xiv) the sale, collection, transfer, or disposition of the Commercial Property and/or any of the Assets and all related transactions, (xv) administration of the Case and the Plan, including, without limitation, retaining, hiring, terminating any employee or staff, (xvi) preparing, executing and filing of any tax return, and (xvii) closing of the Case, including, without limitation, obtaining a final decree.

On and after the Effective Date, and notwithstanding the restrictions of Bankruptcy Code § 363(b)(1), the Reorganized Debtor is authorized and empowered, without the necessity of further approval, consent or order of the Bankruptcy Court to execute, do, consummate, and perform, in the name and on behalf of the Reorganized Debtor, such acts, and to prepare, execute, acknowledge, verify, file, deliver any and all certificates, agreements, notices, reports, applications, declarations, instruments, notes, deeds, reconveyances, transfer documents, sale agreements, and any and all other documents of any kind or nature on behalf of, and in the name

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

of, the Reorganized Debtor, under the corporate seal of the Reorganized Debtor or otherwise, including, without limitation, those its deems, in its discretion, are reasonable, necessary, desirable, required, appropriate, or that are requested, in order to (i) carry into effect the decisions of the Reorganized Debtor, (ii) refinance, sell, operate, convey, transfer, hypothecate, assign, alienate, dispose of, take possession of, and/or abandon the Commercial Property, the operations and/or any of the Other Assets, (iii) collect or enforce the Reorganized Debtor's rights respecting, or in connection with, any accounts receivable, (iv) file, object to, prosecute, enforce or collect the State Court Action and any Claims and/or Rights of Action, (v) in connection with any of the matters set forth in the Plan, or to carry out the terms and intent of the Plan, and/or (vi) administer the Plan and the Case.  The Reorganized Debtor's performance of any such actions and execution and delivery of any such documents shall constitute conclusive evidence of such authority and determination.

**C.**    **_Records._**

After the Effective Date, the Reorganized Debtor shall maintain good and sufficient books and records relating to the Available Cash in connection with the distributions contemplated or effectuated under the Plan.  Upon final disposition of Available Residual Cash pursuant to the Plan, the Reorganized Debtor may destroy or otherwise dispose of all records maintained by it. Notwithstanding anything to the contrary, the Reorganized Debtor may destroy any documents that it reasonably believes are no longer required to effectuate the terms and conditions of the Plan.

**4.**    **_Distribution of Property under the Plan_**

**a.**    Manner of Cash Payments

Payments to domestic Holders of Allowed Claims will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Reorganized Debtor or, at the Reorganized Debtor's option, by wire transfer from a domestic bank.  Payments to foreign Holders of Allowed Claims, if any, may be paid, at the Reorganized Debtor's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction, but in accordance with all financial reporting,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

payment and tax withholding laws and regulations of Federal and State jurisdictions under which payments fall.

**b.**      Setoff and Recoupment

Notwithstanding anything to the contrary in the Plan, the Reorganized Debtor may setoff, recoup, or withhold against the Distributions to be made on account of any Allowed Claim (including, without limitation, respecting the W Linc Disputed Secured Claim or W Linc Allowed Secured Claim), any claims that the Debtor may have against the entity holding a Claim. The Reorganized Debtor will not waive or release any Claim against those entities by failing to effect such setoff or recoupment; by Allowing any Claim against the Debtor; or by making a Distribution on account of an Allowed Claim.

**c.**      No De Minimis Distributions

Notwithstanding anything to the contrary in the Plan, no Cash payment of less than $50 will be made to any Holder of an Allowed Claim. No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section. Allowed Claims that are entitled to a Pro Rata distribution of less than $50 shall continue to accrue until such time as the Pro Rata distribution on account of such Allowed Claim will be $50 or more.

**d.**      No Distributions With Respect to Disputed Claims

Notwithstanding any other Plan provision, Distributions will be made on account of a Disputed Claim only after, and only to the extent that, the Disputed Claim becomes an Allowed Claim or is deemed to be an Allowed Claim for Distribution purposes.

**e.**      Undeliverable, Unclaimed Non-Negotiated Distributions

Distributions to Holders of Allowed Claims will initially be made by mail to the address, if any, set forth on the books and records of the Debtor as amended by any written notice of address change received by the Reorganized Debtor no later than ten (10) Business Days prior to the date of any Distribution.

If no address is available through any of the foregoing means, the Distribution will be deemed to be undeliverable. If a Distribution is returned to the Reorganized Debtor as an

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

undeliverable Distribution or is deemed to be an undeliverable Distribution, the Reorganized Debtor shall make no further Distribution to the entity holding the Claim on which the Distribution is being made unless and until the Reorganized Debtor is timely notified in writing of that entity's current address.   Subject to the following paragraph, until they become deliverable, the Reorganized Debtor will create one or more Plan Reserves for undeliverable Distributions for the benefit of the entities entitled to the Distributions.   These entities will not be entitled to any interest on account of the undeliverable Distributions.

Any Holder of an Allowed Claim that is otherwise entitled to an undeliverable Distribution and that does not, within ninety (90) days after a Distribution is returned to the Reorganized Debtor as undeliverable, or is deemed to be an undeliverable Distribution, provide the Reorganized Debtor with a written notice asserting his, her or its claim to that undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Debtor, Reorganized Debtor and/or the Exculpated Parties.   Any undeliverable Distributions that are not claimed under this Section will become Available Cash. Nothing in the Plan requires the Reorganized Debtor to attempt to locate any entity holding an Allowed Claim and whose Distribution is undeliverable.

If an instrument delivered as a Distribution to a Holder of an Allowed Claim is not negotiated within one hundred and twenty (120) days after such instrument was sent to the Holder of the Allowed Claim, then the instrument shall be null and void, the Holder of an Allowed Claim shall be deemed to have waived such Distribution, and it shall become Available Cash.

**E.**     **RISK FACTORS**

The amount of distribution under the Plan is subject to various factors and contingencies, some of which are described below.   The following discussion summarizes only some of the material risks associated with the Plan and the Reorganized Debtor, and is not exhaustive. Moreover, this section should be read in connection with the other disclosures contained in the Plan and Disclosure Statement.   Each Holder of a Claim and Interest, in conjunction with its

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

advisors, should supplement the following discussion by analyzing and evaluating the Plan and Disclosure Statement as a whole.

**THE RISKS ASSOCIATED WITH THE PLAN AND THE REORGANIZED DEBTOR MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN.**

This discussion assumes that the Plan is confirmed and that the Effective Date occurs. The distribution to Creditors is subject to the following general risks:

- Adverse changes in general economic conditions.

- The Debtor fails to meet rental projections, including resulting from an unforeseen economic downturn.

- Higher than anticipated increase in vacancies in the Commercial Building.

- Higher than anticipated Operating Expenses.

- Unknown and unanticipated material deferred maintenance or unanticipated obsolesce of machinery and equipment.

- Unknown and unanticipated material default in, or unanticipated assessments of, taxes.

- Unanticipated material defaults by tenants of the Commercial Building.

- Unanticipated failure of the Trust to fund the Trust Exit Financing.

- Unanticipated inability to make the W Linc Final Payment as a result of an inability to obtain Takeout Financing or sell the Commercial Property upon W Linc Extended Maturity Date.

- Unanticipated litigation, or damages to the Commercial Building, not covered by insurance.

Another primary risk of the Plan is the Reorganized Debtor's ability to achieve rental income in adequate amounts to enable it to have sufficient Available Cash to meet the Plan payments.

The foregoing is a disclosure of general risks. However, the Debtor is not currently aware of any imminent event which falls into any of the foregoing categories, which would render the feasibility of the Plan highly suspect at this time.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**F.    OTHER PROVISIONS OF THE PLAN.**

**1.    *Executory Contracts and Unexpired Leases***

a.    <u>Assumption</u>.    The Debtor will assume certain executory contracts and unexpired leases.    A specific list of all executory contracts and/or unexpired leases to be assumed by the Debtor under the Plan ("***Assumed Contract Schedule***") will be filed with the Court and served on the other party to such contract or lease by the Exhibit Filing Date.

On the Effective Date, each of the unexpired leases and executory contracts listed on the Assumed Contract Schedule shall be assumed as obligations of the Reorganized Debtor.    The Confirmation Order shall constitute an order approving the assumption of each lease and contract to be identified on the Assumed Contract Schedule.    If a party to a lease or contract to be assumed objects to the assumption of his, her or its lease or contract, such party must file and serve his, her or its objection to the proposed assumption of his, her or its lease or contract within the deadline for objecting to the Confirmation of the Plan.

b.    <u>Rejection</u>.    The Debtor may reject certain pre-petition leases and executory contracts of the Debtor.    A specific list of the executory contracts and/or unexpired leases to be rejected by the Debtor under the Plan ("***Rejection Schedule***") will be filed with the Court and served on the other party to such contract or lease by the Exhibit Filing Date.

In addition, all executory contracts and unexpired leases that have not been specifically assumed will be deemed rejected on the Effective Date, despite not being included on the Rejection Schedule.    The Confirmation Order shall constitute an order approving the rejection of the lease or contracts not specifically assumed.

**THE BAR DATE FOR FILING ANY POC BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS THIRTY (30) DAYS AFTER THE ENTRY OF AN ORDER CONFIRMING THE PLAN.**

Any claim based on the rejection of a contract or lease will be barred if the POC is not timely filed, unless the Court later orders otherwise.

/ / /

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

2.    ___Retention of Jurisdiction___

After Confirmation of the Plan and after the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

a.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

b.    To determine the allowability, classification, or priority of Claims and Interests upon objection by the Debtor or Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

c.    To determine the extent, validity and priority of any lien asserted against the property of the Reorganized Debtor or property of the Debtor's Estate, including, without limitation, the lien rights, if any, asserted by the Holders of Claims;

d.    To (i) construe and take action to enforce the Plan, the Confirmation Order, and any other order of the Court, (ii) issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred to in the Plan and the Confirmation Order, and (iii) determine all matters that may

be pending before the Court in the Case on or before the Effective Date with respect to any Person or entity;

e.    To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period before, on and after the Effective Date;

f.    To determine any requests for payment of Administrative Expenses;

g.    To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan or the Confirmation Order;

/ / /

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

h.      To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any Claims resulting therefrom;

i.      To determine all applications, motions, adversary proceedings, contested matters and any other litigated matters instituted during the Case whether before, on or after the Effective Date, including, without limitation, any and all claims, causes of action, setoffs, recoupments and the determination of any other rights;

j.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

k.      To modify the Plan under Bankruptcy Code § 1127 in order to remedy any apparent defect or omission in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose, or implement any settlement reached;

l.      Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or to restrain the execution or implementation by any Person of the Plan or the Confirmation Order;

m.      To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy laws, with respect to any Person, to the fullest extent authorized by the Bankruptcy Code or FRBP;

n.      To enter any order approving, in connection with, or related to, the sale, collection, transfer or disposition of any of the Assets and all related transactions as may be requested by the Debtor or Reorganized Debtor; and,

o.      To enter a final decree closing this Case.

G.    TAX CONSEQUENCES OF THE PLAN.

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain Holders of Claims.  The following summary does not address the federal income tax consequences to Holders of Claims that are entitled to

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

reinstatement or payment in full in cash under the Plan, such as Holders of Allowed Administrative Claims.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt concerning any issue discussed herein. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through Entities).

This discussion assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form. There is no assurance, however, that the IRS will not take contrary positions to those described herein or upon which this summary is based.

**DISCLAIMER: The discussion set forth below is included for general information only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim or Interest. The Debtor and its counsel, tax advisors, and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan with respect to the Debtor, the Estate, entities holding Claims or Interests, the Reorganized Debtor, nor are they rendering any form of legal opinion or tax advice on such tax consequences. The tax laws applicable to debtor's in bankruptcy are extremely complex, and the following summary does not address all aspects of federal income taxation that may be relevant to the Debtor, the Estate, or entities holding Claims or Interests. Entities holding Claims or Interests are strongly urged to consult their**

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

tax advisors regarding the tax consequences of the Plan, including federal, foreign, state, and local tax consequences.

To ensure compliance with requirements imposed by the IRS, you are hereby inform that any tax information contained in the Disclosure Statement (including any attachments) (including to the extent that notwithstanding the preceding general disclaimer, any statement contained in the Disclosure Statement is deemed or construed to constitute tax advice) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Tax Code or (ii) promoting, marketing or recommending to another party any transaction(s), action(s) or tax-related matter(s) addressed herein.

1.    ___Tax Consequences to the Debtor.___

    a.    Cancellation of Debt.

Generally, cancellation of indebtedness is treated as income ("**COD income**") that is includable in a taxpayer's gross income.  However, Section 108(a) of the Tax Code provides that gross income does not include any COD income if the cancellation of indebtedness occurs in a bankruptcy case and the cancellation is granted by a court with proper jurisdiction under the Bankruptcy Code or pursuant to a plan approved by such a court.  The debtor in a bankruptcy case must reduce certain of its tax attributes—such as its current-year "net operating loss" ("**NOL**"), NOL carry forwards resulting from losses in prior years, tax credits and the tax basis in its assets (collectively, "**Tax Attributes**") — by the amount of any COD income that is excluded from gross income under Section 108(a) of the Tax Code.  The reduction of these tax attributes is made after the federal income tax liability for the year of the debt cancellation has been determined.

COD income realized by a debtor equals the amount by which the indebtedness discharged exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD realized (such as where the payment of the cancelled debt would have given rise to a tax deduction).  To the extent that the amount of COD income excluded from gross income pursuant to Section 108(a) of the Tax Code exceeds the tax attributes available for reduction, the excess COD income is simply excluded from gross income without any further tax consequences.

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

As a result of the Plan's treatment of the various claims of its creditors and the limited assets, the Reorganized Debtor is not expected to realize a significant amount of COD income. The extent of such COD income and the resulting Tax Attribute reduction will depend, in part, on the fair market value of the consideration paid by the Debtor in satisfaction of the creditors' Claims and Interests.

**b.**    Gain on Sales.

The Debtor does not anticipate selling the Commercial Property and would likely be able to avoid any gain from sales of its property under the Plan due to its loss carry forwards. However, the Debtor has yet not fully analyzed the tax consequences of a potential sale; therefore, the tax consequence to the Estate is unknown at this time, and has also not been factored into the Liquidation Analysis.

**c.**    Carryover Losses and Other Tax Attributes.

Following the Effective Date, the Debtor expects to have carryover losses. The amount of such carryover losses remains subject to adjustment by the IRS. As explained above, however, the Debtor's carryover losses and other tax attributes is subject to being reduced or eliminated as of the beginning of the taxable year following the year in which the Effective Date occurs as a result of the COD income on implementation of the Plan. Accordingly, there can be no assurance that the Reorganized Debtor will have carryover losses following the year in which the Plan is implemented. However, in this Case, the Debtor anticipates that there will be on COD and, therefore, it anticipates that its carryover losses will be available.

**d.**    Limitation on Carry forwards.

The utilization of part of the Debtor's carry forwards may be subject to limitation under Section 382 of the Tax Code and Treasury Regulations promulgated thereunder, which limitation, if applicable, would effectively prevent the Debtor from offsetting such carry forwards against taxable income in future years. Section 383 of the Tax Code imposes similar limitations on capital loss carry forwards and tax credits.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**H.    EXEMPTION FROM CERTAIN TRANSFER TAX.**

In accordance with Bankruptcy Code § 1146(c), the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, including the recording of any mortgage or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment.  The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instrument or other documents without payment of such tax or other governmental assessment.

**I.    REGULATORY APPROVAL NOT REQUIRED.**

The Debtor is not subject to governmental regulatory commission approval of its rates.

## V.

## CONFIRMATION REQUIRMENTS

**A.    WHO MAY VOTE OR OBJECT**

**_1.    Parties entitled to Object to Confirmation of the Plan_**

Any party in interest may object to the confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.

**_2.    Parties entitled to Vote to Accept/Reject the Plan_**

The Holder of an Allowed Claim has a right to vote for or against the Plan if such Claimant has a Claim which is <u>both</u> (1) Allowed or estimated for voting purposes and (2) classified in an impaired Class.

**a.    General description of an Allowed Claim/Interest**

As noted above, a Holder of Claim must have an Allowed Claim to have the right to vote. The definitions of "Allowed" and "Allowed Claim" are set forth in Section I, A (Definitions) located at the beginning of this document, which provisions supersede the general description below in the event of a conflict or ambiguity.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Without limiting the generality of the foregoing or of the definition of Allowed Claim, a proof of claim will generally be deemed Allowed, unless a party in interest files an objection to the Claim.  When an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or Allows the Claim for voting purposes.

A creditor may have an Allowed Claim even if a proof of claim or interest was not timely filed.  Generally, a Claim is deemed Allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the scheduled Claim.

**IF A CLAIM IS SCHEDULED AND IS NOT SCHEDULED AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, THE DEBTOR OR OTHER PARTY IN INTEREST MAY NEVERTHELESS OBJECT TO SUCH SCHEDULED CLAIM BEFORE OR AFTER CONFIRMATION OF THE PLAN.**

**b.**    General description of an Impaired Claim

As noted above, an Allowed Claim only has the right to vote if it is in a Class that is impaired under the Plan.  A Class is generally considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of their Allowed Claims.

In this Case, the Debtor believes that Classes **2, 3, 4** and **5** are **impaired** under the Plan and that Holders of Claims in each of these Classes in the Plan are, therefore, entitled to vote to accept or reject the Plan.  Class **1** is not impaired under the Plan, and are, therefore, not entitled to vote. Parties who dispute the Debtor's characterization of their Claim as being in a Class that is impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

**3.**    ***Parties Not Entitled to Vote***

Set forth below are the **Ballot Tabulation Procedures** which govern voting on the Plan, which provisions supersede the general description below in the event of a conflict or ambiguity.

Generally, the following types of Claims are <u>not</u> entitled to vote: (1) Claims (whether filed or scheduled) that are subject to a pending objection and that have not been estimated for voting purposes; (2) Claim that are Scheduled as disputed, contingent and/or unliquidated and for which no proof of claim has been timely filed; (3) Claim that have been disallowed or estimated at zero for voting or distribution; (4) Claims in unimpaired Classes; (5) Priority Claims; and (6) Claims in Classes that do not receive or retain any value under the Plan.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE DISCLOSURE STATEMENT OR PLAN, NO DISTRIBUTION WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM OR INTEREST THAT IS NOT AN ALLOWED CLAIM OR INTEREST.**

Claims in categories (1), (2) and (3) are not entitled to vote because such Claims are not Allowed or deemed Allowed.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Priority Claims are not entitled to vote because such claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan.

**EVEN IF THE HOLDER OF A CLAIM IS OF THE TYPE DESCRIBED ABOVE AND NOT ENTITLED TO VOTE ON THE PLAN, SUCH CLAIMANT MAY NEVERTHELESS STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.**

On and after the Effective Date, the Reorganized Debtor shall have the right to take actions to pursue any and all disputes respecting any and all Claims asserted against the Debtor with respect to which the liability is disputed in whole or in part.  All disputes may be litigated to Final Order; provided, however, that the Reorganized Debtor may compromise and settle any disputes respecting Claims.  At such time as a Disputed Claim is resolved by Final Order and/or is Allowed or is settled by the Reorganized Debtor, the Holder thereof will receive, as soon as practicable thereafter, the distributions to which such Holder is then entitled under the Plan.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**4.** *Parties entitled to Vote in More Than One Class*

The Holder of a Claim that has been Allowed in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one Ballot in the Class containing the Secured Claim and another Ballot in the Class containing the General Unsecured Claim, subject to the **Ballot Tabulation Procedures** below.

**5.** *Votes Necessary to Confirm the Plan*

If impaired Classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed below.

**6.** *Votes Necessary for a Class to Accept the Plan*

A Class of Claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims which actually voted and are entitled to vote, have voted in favor of the Plan. A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest-Holders of such Class which actually voted, voted to accept the Plan.

**7.** *Treatment of Non-Accepting Classes*

As noted above, even if all impaired Classes do not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting Classes are forced to be bound by the terms of the Plan is commonly referred to as *cramdown*. The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Interests if it meets all consensual requirements except the voting requirements of Bankruptcy Code § 1129(a)(8), and if the Plan does not *discriminate unfairly* and is *fair and equitable* toward each impaired Class that has not voted to accept the Plan as referred to in Bankruptcy Code § 1129(b) and applicable case law.

/ / /

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

These are complex statutory provisions and the explanations contained in the succeeding paragraphs do not purport to be exhaustive.  The Bankruptcy Code does not define discrimination, but it does provide a minimum definition of "fair and equitable."

If the Plan in this Case is contested, the Bankruptcy Court will make the ultimate determination at Confirmation as to whether the treatment of the Allowed Claims proposed under the Plan does not "discriminate unfairly" and is "fair and equitable," and whether the Plan in this Case meets the requisite standard to justify "cramdown" over any dissenting creditor.  The following information represents the Debtor's brief viewpoint, and is included only for purposes of disclosing adequate information.

The term "fair and equitable" can mean that secured claimants retain their liens and receive Cash payments whose present value equals the value of their security interest.  For example, if a creditor lends the hypothetical debtor $100,000 and obtains a security interest in property that is worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash payments whose present value equals $80,000 and not $100,000.

In this Case, the Debtor believes that the treatment of the Secured Claim in Class 2 does not "discriminate unfairly," is "fair and equitable," and consistent with the requirements of Bankruptcy Code §1129(b)(2)(A)(i) and (A)(iii) as the Plan proposes that such Claimants shall receive on account of their Allowed Secured Claims payments in such amounts as is necessary to ensure that the present value of the aggregate deferred payments and the present value of the final payments are equal to the Allowed Secured Claims.

In this Case, the Debtor believes the treatment of General Unsecured Claims also does not "discriminate unfairly," is "fair and equitable," and consistent with the requirements of Bankruptcy Code.  With respect to General Unsecured Claim, the term "fair and equitable" also means that no Claim or Interest that is junior to the General Unsecured Claimants will receive or retain anything under the Plan, unless the Plan provides for full satisfaction of such senior Class of General Unsecured Claims.  However, there are exceptions to this general rule.  Therefore, if a class of General Unsecured Claims votes against the Plan, the Plan cannot be confirmed where a Class of

Equity Interest Holders will receive or retain any property under the Plan, unless the Plan provides that the class of General Unsecured Claims shall be paid in full with interest or an exception to the general rule applies. ("Fair and equitable" also means that each Holder of an Interest must receive the value of such Interest or else no junior Interest is entitled to receive anything.)

In this Case, the Debtor believes that the treatment of the General Unsecured Claims (Class 3) and Subordinated Claims (Class 4) is consistent with the requirements of Bankruptcy Code §1129(b)(2)(B)(ii) as the Plan proposes to pay them in full. Furthermore, notwithstanding the foregoing, one of the exceptions to the "fair and equitable" general rule applicable to General Unsecured Creditors is where the plan contemplates an infusion of "new value" in which case General Unsecured Creditors need not be paid in full. The Plan in this Case propose a New Value Contribution. However, whether the New Value Contribution under the Plan in this Case is adequate and necessary to qualify it for the exception is a matter left for Confirmation. Nevertheless, the Debtor asserts that the Bankruptcy Court need not necessarily reach that issues as the Plan proposes payment in full to Classes 6 and 7.

**8.** *Request for Confirmation Despite Non-Acceptance by Impaired Classes*

In the event that all of the applicable requirements of Bankruptcy Code §1129 (a) are met other than paragraph (8), the Debtor requests Confirmation of the Plan notwithstanding the requirements of such paragraph under Bankruptcy Code §1129(b).

**B.    LIQUIDATION ANALYSIS**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the "Best Interest Test", if a Holder of a Claim or Interest is in an impaired Class and such Holder does not vote to accept the Plan, then that Holder of a Claim or Interest must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a hypothetical Chapter 7 case, the hypothetical debtor's assets are usually sold by a Chapter 7 trustee. Secured Creditors are generally paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims (both Chapter 7 and then Chapter

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

11) are paid next. Next, the General Unsecured Creditors are paid from any remaining sales proceeds, according to their rights to priority. General Unsecured Creditors with the same priority share in proportion to the amount of their Allowed Claim in relationship to the amount of total Allowed General Unsecured Claims. Finally, the Interest Holders receive the balance, if any, that remains after all creditors are paid.

The Debtor's Liquidation Analysis is attached to the Disclosure Statement as ***Exhibit G.3***. Under the Plan each Holder of an Allowed General Unsecured Claim in Class 6 should expect to receive a distribution of 100% of the amount of his, her or its Allowed General Unsecured Claim qualifying for treatment in Class 6.

Based on the Liquidation Analysis, the distribution to each Holder of an Allowed General Unsecured Claim in Class 6 in a chapter 7 liquidation would likely be zero. Although reasonable efforts have been made to project the amount of the anticipated distribution based on the best information available as of the date of the Disclosure Statement, it is not possible at this time to project with exactitude the percentage that each Holder of an Allowed Claim will receive because of there are a number of uncertainties impacting the liquidation. However, the Debtor maintains that the best interest requirement is met in this case. The financial projections attached to the Disclosure Statement projects a distribution of 100% to the amount of the Allowed General Unsecured Claims qualifying for treatment in Class 6. By comparison, the Liquidation Analysis projects an anticipated distribution of approximately 0% of the amount of the Allowed General Unsecured Claims, assuming the assets are liquidated in Chapter 7. There are a number of reasons for the projected disparity.

For example, in a hypothetical Chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy estate based on disbursements. The trustee's compensation is in an amount not to exceed 25% of the first $5,000 of all moneys disbursed, 10% on any amount over $5,000, but less than $50,000, 5% on any amount over $50,000 but not in excess of $1 million, and 3% on all amounts over $1 million. In a hypothetical Chapter 7 case, a trustee would be entitled to fees on projected distributions in Chapter 7. In addition to the added Administrative

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    Expense for the trustee, the Chapter 7 trustee will most certainly employ professional persons,

2    such as legal counsel, accountants and appraisers.  Thus, the projected Administrative Expense

3    claims will significantly increase.

4        As set forth in the Liquidation Analysis, the General Unsecured Creditors can expect to see

5    little, if anything, in Chapter 7.  The Debtor's Commercial Property and personal property would

6    be sold or foreclosed on by W Linc.  The New Value Contribution and Trust Exit Financing under

7    the Plan would not be made available by the Trust should the Case convert to chapter 7.  Similarly,

8    the Trust would not likely agree to subordinate its Priority Claim for the balance of the Dip Loan.

9        **The Debtor has estimated the liquidation values of its assets based upon the most**

10   **accurate information that is currently available.  Because those estimates are a prediction of**

11   **what could be obtained in the future if such assets were liquidated, there is no guarantee that**

12   **the estimates are entirely accurate.  It is possible that the actual liquidation of the assets**

13   **would generate either more or less than the estimated values set forth herein.**

14   **C.    FEASIBILITY**

15       The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy

16   Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the

17   liquidation or the need for further financial reorganization of the Debtor, unless such liquidation

18   is proposed in the Plan.  *See*, Bankruptcy Code § 1129(a)(11).  Here, the Plan is a reorganization

19   Plan.

20       In this Case, the Plan is to be funded from the proceeds of the Dip Loan, New Value

21   Contributions from the Trust and future income generated from leasing of the Commercial

22   Building.  In addition, the Plan will be additionally funded from any recovery derived from the

23   State Court Action and potential fraudulent conveyance action.

24   **1.    *Cash on Effective Date***

25       There are at least two important aspects of a feasibility analysis.  The first aspect considers

26   whether the Debtor will have enough Cash on hand on the Effective Date of the Plan to pay all the

27   claims and expenses which are entitled to be paid on such date.

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

As of March 31, 2015, the Debtor has available cash of approximately $50 on deposit in its DIP accounts, and $150,000 of additional availability on the Dip Loan, which has not been drawn down.

Therefore, the Debtor believes that it will have sufficient cash to fund all payments required to be made on the Effective Date.

The Debtor projects that it will be required to have approximately $150,050 of available funds on the Effective Date to fund approximately $145,000 of Administrative Claims (see discussion below). In addition, the Trust will make available to the Reorganized Debtor New Value Contributions as are required for the Debtor to meet the payments necessary to fund the Plan on the Effective Date. Therefore, the Plan is feasible under the first part of the analysis.

## 2.    *Additional Financial Information*

The Debtor has included with this Disclosure Statement projected financial information to assist the reader in making an informed decision respecting the Plan.

*Exhibit B* contains the Debtor's Projected Profit & Loss Statements.

*Exhibit B* contains the Debtor's Cash Flow Projections.

The financial information described above is based on the Debtor's good faith estimate as to the rental income it believes can be achieved from future operation of the Commercial Property and future New Value Contribution from the Trust. The projections demonstrate that the Debtor can meet its financial obligations under the Plan.

In order to protect the Trust's right to privacy, the Disclosure Statement does not include financial information demonstrating the Trust's financial ability to perform the required New Value Contributions required to fund (i) payments to Class 2 (W Linc Disputed Deferred Payments); (ii) payments to the General Unsecured Creditors in Class 3; and (iii) Operating Expenses for the Commercial Property. Suffice it to say, the Trust has sufficient assets for such purposes. Financial information demonstrating the Trust's financial ability to perform the required New Value Contributions will be filed with the Bankruptcy Court under seal as *Exhibit G.4* on or before the Exhibit Filing Date.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

The projections show that the Reorganized Debtor will be able to meet its obligations to Creditors under the Plan; and that the Plan is not likely to be followed by the need for further financial reorganization of the Liquidation Debtor.  As a result, the Plan satisfies the feasibility requirement set forth in Bankruptcy Code § 1129.  Pursuant to the cash flow projections, the Debtor projects that it will generate sufficient Available Cash to fund its Plan.

It is reasonable to expect that there may be some degree of variation from month to month in cash flow.  The Debtor has attempted to project its income and expenses conservatively. Therefore, the Available Cash may be higher than anticipated.  However, it is also possible that the Available Cash may also be lower than projected based on unforeseen economic factors or higher than anticipated Operating Expenses.

Based on the Herron Appraisal, Herron has formed an opinion that the "as is" market value of the fee simple interest in the Commercial Property, as of December 19, 2015, is $3,310,000 (taking into account the assumptions set forth in the Herron Appraisal, including the deferred maintenance assumptions).

Assuming *arguendo* the improbable, absolute worst case scenario for the Reorganized Debtor that it is unsuccessful in the State Court Action, unsuccessful in the potential fraudulent conveyance action, and unsuccessful in establishing any setoff or recoupment rights, it will result in a W Linc Allowed Secured Claim in the approximate amount of $1,500,000, less reductions in the principal amount occurring by virtue of the W Linc Disputed Deferred Payments, W Linc Deferred Payments, W Linc LTV Reduction Payment, if required, under the Plan.  Applying the foregoing Herron valuation to the facts of this Case, it results in a 45% LTV Ratio (without taking into consideration the reduction in the principal amount of the W Linc Allowed Secured Claim occurring by virtue of the W Linc Disputed Deferred Payments, W Linc Deferred Payments, W Linc LTV Reduction Payment, if required).  Accordingly, the Reorganized Debtor does not anticipate the need for a further W Linc LTV Reduction Payment, although it is provided for under the Plan in the unlikely event it is needed to qualify for Takeout Financing.

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1

2

3

The foregoing demonstrates that even in the event of a worst case scenario for the Reorganized Debtor, regardless of the outcome of the State Court Action and other anticipated actions, the W Linc Final Payment can be made at the W Linc Note Extended Maturity Date either through a Cash payment made by the Trust or by refinance of the Commercial Property.   If required, the Debtor intends to demonstrate through expert testimony at the Confirmation Hearing the general availability of the Takeout Financing based on the LTV Ratio at the time of the W Linc Note Extended Maturity Date.

## VI.

## EFFECT OF CONFIRMATION OF PLAN

**A.    DISCHARGE.**

Except as otherwise provided in the Plan or in the Confirmation Order, at the time provided in Bankruptcy Code § 1141(d), Confirmation of the Plan shall operate as a discharge pursuant to Bankruptcy Code § 1141(d)(1), effective as of the Effective Date, of any and all debts or Claims against the Debtor that arose at any time before issuance of the Confirmation Order, including, but not limited to, all principal and interest, whether accrued before, on or after the Petition Date.  As to every discharged debt and Claim, the Creditor that held such debt or Claim shall be precluded from asserting against the Debtor or against the Debtor's assets or the Reorganized Debtor or any assets of the Reorganized Debtor, any or further Claim based upon any document, instrument or act, omission, transaction, or any other activity of any kind or nature that occurred prior to the Confirmation Date, including, without limitation, Claims in the nature of successor liability.  Upon Confirmation of the Plan, the Debtor shall be discharged of liability for payment of debts incurred before Confirmation of the Plan, to the full extent specified in Bankruptcy Code § 1141.  However, any liability imposed by the Plan will not be discharged.  Furthermore, all Claims and debts against the Debtor which are so discharged may not be asserted against the Reorganized Debtor under any circumstances unless pursuant to the provisions of the Plan.

/ / /

/ / /

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1.    *Injunction.*

The Confirmation Order shall operate as an injunction against the commencement or continuation of any act relating to the collection or enforcement of any Claim ("***Enjoined Claim***") against the Debtor and the Reorganized Debtor.  The Confirmation Order shall provide, among other things, that except as otherwise provided in the Plan, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor are enjoined from and after the Effective Date in respect of the treatment of the Claims of Creditors under the Plan, from: (i) commencing or continuing in any manner any action or proceeding of any kind with respect to such Claim against the Debtor and/or the Reorganized Debtor, including, without limitation based upon any guaranty; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor and/or the Reorganized Debtor or the property of any such parties or property of their respective affiliates with respect to any such Claim; and (iii) creating, perfecting, or enforcing any encumbrances of any kind against the Debtor and/or the Reorganized Debtor or against the property of any such parties, with respect to any such Claim or Interest.

**B.    VESTING OF PROPERTY IN THE REORGANIZED DEBTOR.**

The Confirmation of the Plan vests all of the Assets, property of the Estate and/or Debtor, including, without limitation, the Commercial Property and its operations, and Rights of Action are vested in the Reorganized Debtor free and clear of all Claims, Liens, interests and encumbrances, except the liens securing the W Linc Note Disputed Secured Claim or the W Linc Note Allowed Secured Claim, as applicable, pursuant to the provisions of Classes 2 of the Plan.

As of the Effective Date, the Reorganized Debtor shall manage the administration of the Plan, and in such capacity, may exercise rights, power and authority consistent with the Plan and applicable laws.

**C.    MODIFICATION OF THE PLAN.**

The Debtor may modify, alter or amend the Plan at any time before the Effective Date. The Reorganized Debtor reserves the right to modify, alter, or amend the Plan at any time after the Effective Date to correct any ambiguity or mistake.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**D.      POST CONFIRMATION STATUS REPORT.**

In accordance with LBR 3020-1(b), within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report explaining what progress has been made toward consummation of the confirmed Plan.  The Reorganized Debtor shall serve such report on the UST, the 20 largest unsecured creditors, and those parties who have requested special notice.

**E.      QUARTERLY FEES.**

The Reorganized Debtor shall timely pay all UST Fees incurred after Confirmation until the entry of a final decree closing the Case.  The Reorganized Debtor shall be the Estate representative for purposes of complying with the Debtor's reporting requirements to the Court and the UST and for obtaining a final decree closing the Case.

**F.      POST-CONFIRMATION CONVERSION/DISMISSAL.**

In the event of a default under the Plan after the Effective Date, the Case may be dismissed. Conversion of the Case shall not effect the vesting of the Assets and/or Commercial Property in the Reorganized Debtor, and shall not have the effect of revesting such property to the Debtor.

**G.      FINAL DECREE.**

Once the Effective Date has occurred, the Reorganized Debtor or other party as the Court shall designate in the Confirmation Order, may file a motion with the Court to obtain a final decree to close the Case.  Upon entry of the final decree or applicable order of the Court, the obligation to pay UST Fees shall cease and terminate.

**H.      EXCULPATION.**

The Exculpated Parties shall neither have, nor incur, any liability to any entity or to any Holder of a Claim or Interest for any act taken or omitted to be taken on or after the Petition Date in connection with, related to, or arising out of the Case, the pursuit of confirmation of the Plan, the consummation or administration of the Plan, or property to be distributed under the Plan, including, without limitation, formulating, negotiating, soliciting, preparing, disseminating, implementing, entering, effecting, or consummating the Plan; the marketing, sale and/or liquidation of any Assets, personal property, and/or collection of any accounts receivable; any

contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; provided that the foregoing "*Exculpation*" shall not include and shall not apply to the liability of any of the Exculpated Parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud, breach of fiduciary duty or intentional misrepresentation; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

1.    *Injunction Prohibiting Actions against the Exculpated Parties.*

All Persons voting in favor of the Plan or receiving and accepting any distribution pursuant thereto are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against the Exculpated Parties, whether directly, derivatively, on account of or respecting any claim, debt, right, or cause of action based in whole or in part upon the conduct of the Exculpated Parties set forth and/or included in any of the Exculpation provisions set forth in this Plan.   In the event the Exculpated Parties and/or any of them are injured by any willful violation of the injunctions provided in the Plan, such aggrieved party shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

2.    *Indemnification of the Exculpated Parties.*

From and after the Effective Date, the Exculpated Parties shall be, and hereby are, indemnified by the Reorganized Debtor, to the fullest extent permissible by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability directly or indirectly relating to the conduct of the Exculpated Parties set forth and/or included in any of the Exculpation provisions set forth in the Plan.

Subject to the terms hereof, the Reorganized Debtor may advance or pay promptly out of Available Cash, on behalf of the Exculpated Parties reasonable attorneys' fees and other expenses and disbursements which they would be entitled to receive pursuant to the foregoing

1

2

3

4

indemnification obligation; provided, however, that any of the Exculpated Parties receiving any such advance shall execute a written undertaking to repay such advance amounts if a court of competent jurisdiction ultimately determines that such party is not entitled to indemnification hereunder due to the fraud, gross negligence, or willful misconduct of such party.

5

6

7

8

9

The Reorganized Debtor is authorized, but not required, to obtain and purchase (by using Available Cash) insurance coverage, to the extent available, with respect to the indemnification obligations hereunder.  Any person entitled to indemnification hereunder shall have the right to employ such person's own separate counsel reasonably acceptable to the Reorganized Debtor, in any such action, as a Plan Expense, subject to the terms and conditions of this Plan.

10

**I.**    **POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS**

11

12

Commencing on the Effective Date, instruments, notes, and other evidences of Claims will represent only the right to receive the Distributions contemplated under the Plan.

13

**J.**    **RECOURSE**

14

15

16

17

No Person entitled to receive a payment or Distribution under the Plan will have any recourse against the Debtor, the Reorganized Debtor, the Exculpated Parties, or their respective Related Parties other than the right to receive Distributions in accordance with the terms of the Plan**.**

18

**K.**    **NO ADMISSIONS**

19

20

21

22

23

24

Notwithstanding anything to the contrary in the Plan, if the Plan is not consented to, is revoked or otherwise the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan will: (1) be deemed to be an admission by the Debtor with respect to any matter discussed in the Plan, including liability on any Claim or the propriety of any Claim's classification; (2) constitute a waiver, acknowledgement, or release of any Claims; or (3) prejudice in any manner the rights of the Debtor or any other person in any further proceedings.

25

**L.**    **REVOCATION OF THE PLAN**

26

The Debtor reserves the right to withdraw the Plan before the Effective Date.

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**M.**    **SEVERABILITY OF PLAN PROVISIONS**

If, before the Effective Date, any court holds that any Plan term or provision is invalid, void, or unenforceable, the court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of the Debtor, in which case the Plan may be unilaterally withdrawn by it. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.

**N.**    **GOVERNING LAW**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and/or FRBP), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof, except as otherwise expressly stated therein.

**O.**    **SUCCESSORS AND ASSIGNS**

Unless otherwise specified in the Plan, the rights, benefits, and obligations of any entity referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of that entity.

**P.**    **SATURDAY, SUNDAY, OR LEGAL HOLIDAY**

If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**Q. HEADINGS**

The headings used in the Disclosure Statement and Plan are inserted for convenience only and do not constitute a portion of the Disclosure Statement or Plan or in any manner affect the provisions of the Disclosure Statement or Plan or their meaning.

**R. OTHER ASSURANCES**

The Creditors and Holders of Interests shall execute and deliver such documents and perform such other acts as may be reasonably requested by the Debtor and/or the Reorganized Debtor to implement and carry out the terms and/or intent of the Plan, and any notes or other documents issued pursuant hereto.

**S. ROUNDING.**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.

**T. CLAIMS ESTIMATION.**

Under the Plan, the Debtor has the right to file motions seeking to estimate Claims, including, without limitation, Secured Claims in accordance with Bankruptcy Code § 502(c)(1). Through such motions, the Debtor can seek a ruling from the Court estimating any Claim in a fixed amount for the purpose of voting, allowance and distributions under the Plan. Once Claims have been estimated and allowed for purposes of distribution at a fixed amount, Claims will be treated and distributions reserved based on such fixed amount, subject to any further order upon motion under Bankruptcy Code § 502(j) to reconsider the fixed amount allowed. Until Claims are finally Allowed: (a) such Claims shall not receive any Distributions; and (b) such Claims shall be reserved in the amount estimated.

**U. SETOFF, RECOUPMENT AND OTHER RIGHTS.**

Notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the Distributions to be made pursuant to the Plan on account of any claims that the Debtor, the Estate,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

or the Reorganized Debtor may have against the entity holding an Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment, nor the allowance of any Claim against the Debtor and/or the Reorganized Debtor, nor any partial or full payment during the Case or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by the Debtor, the Estate and/or the Reorganized Debtor of any claim that they may possess against such Holder.

**U.    CALCULATIONS.**

For purposes of calculating Distributions to be made under the Plan to Holders of Allowed Claims, the aggregate amounts of all Allowed Claims shall be computed as if all Disputed Claims and all unpaid Administrative Claims still outstanding on the date of any such calculations, and all anticipated Administrative Claims estimated pursuant to the procedures set forth below, were to be allowed in the full amount thereof.  The Reorganized Debtor shall calculate the Distributions due to Holder of such Allowed Claims on or before any distribution date, as applicable.  Although, for purposes of determining any Distributions, the Plan assumes that all Disputed Claims of the Class will be allowed, Distributions initially allocated to Holders of Disputed Claims will not be distributed on a distribution date, but will be held in the appropriate Plan Reserve Account until resolution of the Disputed Claim.

**VII.**

**SUPPORTING DECLARATION**

**A.    DECLARATION OF TZEPAH FREEDLAND.**

I, Tzepah Freedland, declare as follows:

1.    I am the manager of the Debtor.  I submit this declaration in support of an order seeking approval of the Disclosure Statement.  If called to testify, I could and would testify competently concerning the contents of this declaration.  My knowledge of the facts set forth herein is based on my personal knowledge, my review of the company's books and records and on information which I learned in the course of assisting the Debtor's outside counsel and appraiser in the preparation of the Disclosure Statement and Plan filed by the Debtor in this Case.

2.      I offer this Declaration in support of the Disclosure Statement propounded by the Debtor.

3.      The Debtor's counsel, the Debtor's Accountants and I are responsible for preparing the Disclosure Statement.

4.      The source of all financial data contained in the Disclosure Statement is the Debtor's books and records; valuation opinions of the Debtor and Herron; liquidation analysis and financial information prepared by the Debtor with the assistance of Debtor's Accountants and me. I have reviewed the information contained in the Disclosure Statement and believe it to be true and correct to the best of my knowledge and belief.

5.      All facts and representations in the Plan and Disclosure Statement are materially true to the best of my knowledge and belief.

6.      To the best of my knowledge and belief, no fact material to a claimant or interest holder voting to accept or reject the proposed Plan has been intentionally omitted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on December 28, 2015 in Los Angeles, California.

[Signature to be submitted.]
Tzepah Freedland

1   DATED:  December 28, 2015          **315 ARDEN, LLC**,
                                        Debtor

2

3                                          [signature to follow]
                                        By:  Tzepah Freedland
4                                       Its:  Managing Member

5

6

7   Respectfully submitted,

8   **CREIM MACIAS KOENIG & FREY LLP**

9

10  By:  /s/ Sandford L. Frey
        **Sandford L. Frey**
11  Reorganization Attorneys for 315 Arden, LLC
    Debtor and Debtor in Possession

12

In re 315 Arden, LLC, Debtor and Debtor in Possession
U.S. Bankruptcy Court for the Central District of California
Case No. 2:15-bk-26483-BR (Los Angeles Division)


## LIST OF ASSETS

| Assets | Estimated Value |
|---|---|
| 1. Commercial Real Property<br>(7101 W. Lincoln Ave., Buena Park, CA) | $3,310,000.00 |
| 2. State Court Action and Rights of Action<br>(Los Angeles County Superior Court,<br>Central District of California -<br>Case No. 30-2015-00805904-CU-FR-CJC) | Not less than $3,500,000.00<br>(excluding attorneys' fees and<br>punitive damages). |
| 3. Automobile Lease – 2014 Infiniti QX60 SUV | -0- |
| 4. Office Equipment / Furnishings / Supplies | $500.00 |


**EXHIBIT "A"**

**315 ARDEN, LLC**

CASH FLOW PROJECTIONS / DEBTOR'S PROFIT & LOSS STATEMENTS

(To be filed prior to hearing on the Disclosure Statement)

**EXHIBIT "B"**

In re 315 Arden, LLC, Debtor and Debtor in Possession
U.S. Bankruptcy Court for the Central District of California
Case No. 2:15-bk-26483-BR (Los Angeles Division)

## LIST OF ADMINISTRATIVE EXPENSES

**EXHIBIT "C"**

| CLAIMANT | ESTIMATED BLANCE OF UNPAID FEES AND EXPENSES OWED AS OF CONFIRMATION (AFER APPLYING RETAINERS AND PAYMENTS OF INTERIN FEES) | TREATMENT |
|---|---|---|
| **CMKF**<br><br>**(Debtor's Counsel)**<br><br>**Professional fees** | $70,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **McGonigle Firm**<br><br>**(Special Litigation Counsel)**<br><br>**Professional fees** | $60,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **Lombardo Firm**<br><br>**(Special Corporate and Real Estate Counsel)**<br><br>**Professional fees** | $5,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **Debtor's Proposed Accountants**<br><br>**Accountants and Financial Advisors** | $5,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |
| **Projected Expert fees required for Confirmation** | $5,000 | Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holder of the Allowed Administrative Expense Claim shall receive the full amount of its Allowed Claim in Cash on the Effective Date or as soon as such claim is Allowed. |

| CLAIMANT | ESTIMATED BLANCE OF UNPAID FEES AND EXPENSES OWED AS OF CONFIRMATION (AFER APPLYING RETAINERS AND PAYMENTS OF INTERIN FEES) | TREATMENT |
|---|---|---|
| Clerk's Office Fees | $0 | Any fees remaining unpaid as of the Effective Date shall be paid in full on the later of the Effective Date or as soon as practical after the Debtor is notified of any balance due. |
| UST Fees | $0 | Any fees remaining unpaid as of the Effective Date shall be paid in full on the later of the Effective Date or as soon as practical after the Debtor is notified of any balance due. |
| **TOTAL PROJECTED ADMINISTRATIVE EXPENSES** | $145,000 | |

In re 315 Arden, LLC, Debtor and Debtor in Possession
U.S. Bankruptcy Court for the Central District of California
Case No. 2:15-bk-26483-BR (Los Angeles Division)

## LIST OF UNSECURED CREDITORS

(Amended Schedule F)

**EXHIBIT "D"**

B6F (Official Form 6F) (12/07)

In re   **315 Arden, LLC**                                                     Case No.   **2:15-bk-26483-BR**
_____
                         Debtor

# AMENDED
## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. | | | Credit Card | | | | |
| **Capital One Card Services** PO Box 30285 Salt Lake City, UT 84130-0285 | - | | | | | | 34.87 |
| Account No. | | | Accounting Services | | | | |
| **Christopher Morris CPA** Sobul Prime & Schenkel 12100 Wilshire Blvd Ste 1150 Los Angeles, CA 90025 | - | | | | | | 6,000.00 |
| Account No. | | | Loan | | | | |
| **Daniel & Judith Arnall Family Trust** 8950 W Olympic Blvd # 650 Beverly Hills, CA 90211 | - | | | | | | 137,260.00 |
| Account No. | | | Loan | | | | |
| **David and Tzepah Freedland** 8950 W Olympic Blvd #650 Beverly Hills, CA 90211 | - | | | | | | 2,500.00 |
| **2**   continuation sheets attached | | | | Subtotal (Total of this page) | | | 145,794.87 |

B6F (Official Form 6F) (12/07) - Cont.

In re    **315 Arden, LLC**                                          Case No.   **2:15-bk-26483-BR**
_____
                              Debtor

## AMENDED
## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. | | | Contractor | | | | |
| Equity Real Estate Services 1702 S Robertson Blvd Los Angeles, CA 90035 | - | | | | | | 36,875.45 |
| Account No. | | | Professional Services | | | | |
| Eugene G Cowan Esq Bocarsly Emden LLP 633 W Fifth St 64th Fl Los Angeles, CA 90071 | - | | | | | X | 33,645.00 |
| Account No. | | | July 15, 2014 2014 Infiniti QX60 SUV | | | | |
| Infiniti of Beverly Hills 8825 Wilshire Blvd Beverly Hills, CA 90211 | - | | | X | X | | 11,518.00 |
| Account No. | | | Appraisal Fee (Herron & Associates) | | | | |
| Judith Arnall 8950 W Olympic Blvd # 650 Beverly Hills, CA 90211 | - | | | | | | 3,500.00 |
| Account No. | | | Professional Services | | | | |
| Larry Langberg & Associates PO Box 630485 Simi Valley, CA 93063 | - | | | | | | 2,255.20 |

Sheet no. __1__ of __2__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)                    87,793.65

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

B6F (Official Form 6F) (12/07) - Cont.

In re    315 Arden, LLC                                          Case No.   2:15-bk-26483-BR
_____
                        Debtor

## AMENDED
## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. | | | Professional Services | | | | |
| Law Offices of Timothy D McGonigle 1880 Century Park East Ste 516 Los Angeles, CA 90067 | - | | | | | | 25,000.00 |
| Account No. | | | Plumbing Services | | | | |
| Plumbquest 5062 Lankershelm Blvd # 15 North Hollywood, CA 91601 | - | | | | | | 27,675.00 |
| Account No. | | | Professional Services | | | | |
| Rodriguez Hori Choi & Cafferata LLP 777 S Figueroa St Ste 2150 Los Angeles, CA 90017 | - | | | | X | | 18,250.00 |
| Account No. | | | Professional Services | | | | |
| Seth I Weissman Esq Jeffer Mangels Butler Mitchell LLP 1900 Ave of the Stars 7th Fl Los Angeles, CA 90067 | - | | | X | X | | 13,534.00 |
| Account No. | | | | | | | |

Sheet no. __2__ of __2__ sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims

Subtotal (Total of this page)    84,459.00

Total (Report on Summary of Schedules)    318,047.52

Software Copyright (c) 1996-2014 - Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

In re 315 Arden, LLC, Debtor and Debtor in Possession
U.S. Bankruptcy Court for the Central District of California
Case No. 2:15-bk-26483-BR (Los Angeles Division)


## LIST OF EQUITY SECURITY HOLDERS

Daniel & Judith Arnall Family Trust – 80%

Tzepah Freedland – 20%


**EXHIBIT "E"**

In re 315 Arden, LLC, Debtor and Debtor in Possession
U.S. Bankruptcy Court for the Central District of California
Case No. 2:15-bk-26483-BR (Los Angeles Division)

## LIST OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Lease/Lessor | Type | Terms | Monthly Payment |
|---|---|---|---|
| Infiniti of Beverly Hills<br>8825 Wilshire Blvd.<br>Beverly Hills, CA 90211 | Automobile Lease:<br>2014 Infiniti<br>QX60 SUV | Lease Date:<br>8/14/14 for<br>39 Months | $460.72 |

**EXHIBIT "F"**

**<u>315 ARDEN, LLC</u>**


Other Exhibits [1-4]


**EXHIBIT "G"**

In re 315 Arden, LLC, Debtor and Debtor in Possession
U.S. Bankruptcy Court for the Central District of California
Case No. 2:15-bk-26483-BR (Los Angeles Division)


## FIRST AMENDED COMPLAINT

(State Court Litigation)


**EXHIBIT "1"**

1  Timothy D. McGonigle, Esq. [Bar No. 115979]
   TIMOTHY D. MCGONIGLE PROF. CORP.
2  1880 Century Park East, Suite 516
   Los Angeles, California 90067
3  Telephone: (310) 478-7110
   Facsimile: (310) 440-8749
4
   Attorney for Plaintiff
5  315 ARDEN LLC

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **FOR THE COUNTY OF ORANGE**

10

11

12  315 ARDEN LLC, a California Limited Liability      )   Case No. 30-2015-00805904-CU-FR-CJC
    Company,                                            )   [Assigned to Hon. Craig Griffin]
13                                                      )
                    Plaintiff,                          )   **FIRST AMENDED COMPLAINT FOR:**
14                                                      )
              vs.                                       )
15                                                      )   (1)   **Breach of Contract (Lease);**
    RED MOUNTAIN GROUP, INC., a California              )   (2)   **Breach of Contract (Guaranty);**
16  Corporation; RED MOUNTAIN RETAIL                    )   (3)   **Fraud and Intentional;**
    GROUP, INC., a California Corporation; W            )         **Misrepresentation (against**
17  LINC BP, LLC, a California Limited Liability        )         **Agents and Does);**
    Company;  LUVILAND CORPORATION, a                   )   (4)   **Fraud and Intentional**
18  California Corporation; LUVILAND LLC, a             )         **Misrepresentation (against**
    California Limited Liability Company; JOHN          )         **Sellers and Does);**
19  HUY NGUYEN, an individual; ERIC WOHL, an           )   (5)   **Intentional Concealment;**
    individual; CARLOS J. LOPEZ, an individual;         )   (6)   **Negligent Concealment;**
20  EDWARD B. HANLEY, an individual;                    )   (7)   **Negligent Misrepresentation;**
    HANLEY INVESTMENT GROUP, INC., a                    )   (8)   **Breach of Fiduciary Duty;**
21  California Corporation; and DOES 1 through 40,       )   (9)   **Negligence; and**
    inclusive,                                          )   (10)  **Constructive Fraud.**
22                                                      )
                    Defendants.                         )
23                                                      )   **JURY TRIAL DEMANDED**
                                                        )
24  _____             )

25

26

27

28
                                    -1-    FIRST AMENDED COMPLAINT

1   Plaintiff 315 Arden LLC ("ARDEN") alleges as follows:

2   **INTRODUCTION**

3       1.    This lawsuit involves a fraudulent real estate scheme in which a group of real estate

4   professionals (including the sellers as well as ARDEN's own real estate agents who are believed to

5   have represented both sides of the transaction without disclosure to ARDEN) convinced ARDEN

6   to purchase and vastly overpay for a commercial property located at 7101 W. Lincoln Ave., Buena

7   Park, CA (the "PROPERTY.") ARDEN's real estate agent touted the PROPERTY as a "great

8   deal" that could be closed almost immediately, with a purportedly "risk free" tenant and two

9   profitable businesses in place, and which could thereafter be promptly resold for far more than the

10  asking price. Knowing that ARDEN had only an extremely limited time in which to conduct due

11  diligence on the tenant, use, and current state of the PROPERTY, ARDEN's agents and the

12  PROPERTY's sellers took advantage of the short time frame and the knowledge that ARDEN

13  would rely on their representations to convince ARDEN to purchase the PROPERTY based on its

14  supposedly "impeccable financials" (i.e., with two businesses in place one of which was

15  purportedly operated by an experienced multi-location operator who was a "high net worth" doctor

16  and, also, the guarantor of the lease). Because ARDEN believed these (and other) representations,

17  it concluded that the PROPERTY was the least risky among its options in February 2015, just

18  before the lapse of the time period in which to complete a timely 1031 exchange. After escrow

19  closed, ARDEN learned that not only was the PROPERTY extremely unsuited for ARDEN's

20  investment objectives, but it had been falsely advertised in numerous respects, the only business

21  actually existing at the PROPERTY was an illegal business being operated, not by any "doctor,"

22  but by a completely uncreditworthy operator -- never previously disclosed to ARDEN -- and that

23  the highly successful "trading" business run by the "high net worth" doctor that was which was

24  supposed to generate enough income to satisfy the tenant's rent obligations simply did not exist.

25  Within a few weeks of the close of escrow, the tenant promptly breached the lease and abandoned

26  the premises, leaving ARDEN without any rental income whatsoever, while also absconding with

27  funds provided to the tenant which were intended to be used for improvements to the PROPERTY.

28  The tenant's defaults were completely predictable to the sellers which had had prior dealings with

-2-    FIRST AMENDED COMPLAINT

1  the real -- yet undisclosed -- operator, and knew or should have known that the real operator was an

2  uncreditworthy judgment debtor engaged in running an illegal business, had been denied a business

3  license for that reason, and was likely to default and abscond with the tenant improvement funds

4  without making the improvements. After close of escrow, ARDEN discovered that it had been

5  misled into massively overpaying for the PROPERTY, as the PROPERTY was actually worth

6  approximately three million less than the $6.5 million purchase price, to say nothing of the $7+

7  million that ARDEN's real estate agents claimed they could immediately resell the property for

8  after purchase. Moreover, ARDEN only discovered after the tenant's abandonment that: (1) with

9  the knowledge and approval of the sellers, but not ARDEN, the same real estate broker represented

10 both sides of the purchase/sale transaction in a gross breach of the broker's fiduciary duty to

11 ARDEN; (2) the thrift store business in operation at the PROPERTY at the time of escrow violated

12 city zoning ordinance and had been denied a business license before the property was even offered

13 for sale (and had no business license as of the time of sale); (3) the doctor and lease guarantor who

14 was supposedly using part of the PROPERTY in conjunction with another business was not the

15 operator of *any* business at the PROPERTY and his "trading" businesses was pure fiction; (4) the

16 thrift store that did exist at the PROPERTY was actually being operated illegally by a person who

17 had received a "leasing commission" from the seller -- but whose involvement was never disclosed

18 to ARDEN prior to the close of escrow even though it was known to the sellers and was a material

19 fact affecting the value of the PROPERTY; (5) the same doctor and lease guarantor defendants

20 expressly touted as a "high net worth" individual providing security for the lease obligations is, on

21 information and belief, not of high net worth, is incapable of paying the damages caused by

22 tenant's breach of the lease, has an unpaid and undisclosed federal tax lien against him, and

23 defendants never had any basis whatsoever for their claim that he had a "high" net worth; and (6)

24 the tenant improvements that were supposed to have been completed at the close of escrow had

25 never been made.

26      2.      As a consequence of defendants' fraudulent and/or negligent misstatements and

27 omissions of material facts either known to them or which should have been known, ARDEN's

28 purchase of the PROPERTY proved to be a financial calamity.

-3-    FIRST AMENDED COMPLAINT

**THE PARTIES AND VENUE**

**THE BUYER & THE PROPERTY**

2.      ARDEN is a limited liability company with its principal place of business in Los Angeles County.  ARDEN purchased the PROPERTY using an escrow which took place on or about February 23-24, 2015.  ARDEN acquired title to the PROPERTY by grant deed that was recorded on or about February 24, 2015.

**THE SELLERS**

3.      ARDEN purchased the PROPERTY from defendant W Linc BP LLC, ("W LINC"), which is, on information and belief, a single asset LLC owned by Red Mountain Group, Inc. ("RMG"), and/or Red Mountain Retail Group, Inc. ("RMRG").

4.      On information and belief, Defendant W LINC, is a California limited liability company which maintains its headquarters at 1234 E. 17th St., Santa Ana, CA.

5.      On information and belief, Defendant RMG is a California corporation which maintains its headquarters at 1234 E. 17th St., Santa Ana, CA.

6.      On information and belief, Defendant RMRG, is a California corporation which maintains its headquarters at 1234 E. 17th St., Santa Ana, CA.

7.      Collectively, W LINC, RMG, RMRG, and DOES 11-20 will be referenced as the "SELLERS."

8.      On information and belief, at all times mentioned herein and currently RMG, RMRG, and DOES 11–20, exclusively controlled W LINC as their "alter ego" such that there is such a unity of interests between RMG, RMRG, W LINC, and DOES 1-10 that inequitable results would occur by upholding the corporate entity, and allowing RMG, RMRG, and DOES 1-10 to escape liability for the debts of W LINC would sanction a fraud or promote an injustice.

**THE REAL ESTATE LICENSEES AND BROKER**

9.      ARDEN is informed and believes and based upon such information and belief alleges that Eric Wohl ("WOHL") is currently a licensed California real estate salesperson who resides in Orange County and maintains his principal place of business at 8001 Irvine Center Dr., Suite 100, Irvine, CA.

-4-      FIRST AMENDED COMPLAINT

10.    On information and belief, at the time of the purchase of the PROPERTY alleged herein, Defendant Hanley Investment Group, Inc. ("HIG") was a licensed California real estate corporation which employed WOHL and WOHL's supervising broker and maintained its principal place of business at 8001 Irvine Center Dr., Suite 100, Irvine, CA.

11.    On information and belief, at the time of the purchase of the PROPERTY alleged herein, Defendant Edward Brian Hanley ("HANLEY") was the broker-officer of HIG and the supervising broker of WOHL.

12.    HANLEY, HIG, and WOHL represented ARDEN in the purchase and attempted resale of the PROPERTY and owed ARDEN a fiduciary duty. Collectively HANLEY, HIG, WOHL, and DOES 1-10 will be referenced as "ARDEN'S AGENTS."

13.    ARDEN is informed and believes and based upon such information and belief alleges that Carlos J. Lopez ("LOPEZ") is currently a licensed California real estate salesperson who resides in Orange County, maintains his principal place of business at 8001 Irvine Center Dr., Suite 100, Irvine, CA, is the president of Hanley Investment Urban Retail Advisors and has personally closed at least $37 million in real estate transactions.

14.    On information and belief, at all times mentioned herein, Defendant HANLEY was supervising broker for LOPEZ, and defendants HANLEY, HIG, WOHL, and LOPEZ represented both ARDEN and SELLERS in the purchase and sale of the PROPERTY.

15.    ARDEN is informed and believes and based upon such information and belief alleges that neither LOPEZ, HANLEY, nor WOHL disclosed their dual agency to ARDEN (though that dual agency was known to SELLERS).

**THE TENANTS AND GUARANTOR**

16.    On information and belief, Defendant Luviland Corporation ("LUVILAND CORP") is a California Corporation with its principal place of business at 319 Collard Way, Placentia, CA.

17.    On information and belief, Defendant Luviland LLC ("LUVILAND LLC") is a California limited liability company with its principal place of business at 9761 Calendula Ave., Westminster, CA.

18.    On information and belief, Defendant John Huy Nguyen ("NGUYEN") was the

1  President of LUVILAND CORP when escrow began, maintains his address at 9761 Calendula

2  Ave., Westminster, CA, and is a licensed medical doctor.

3      19.    On information and belief, Billy N. Ha, a.k.a., Bill N. Ha ("HA") became president

4  of LUVILAND CORP during escrow (unbeknownst to ARDEN). (As was known to the

5  SELLERS but not ARDEN, HA was actually operating the TENANT's thrift store at the

6  PROPERTY, albeit illegally, at the time of the close of escrow. Additionally, as ARDEN

7  discovered only when it received the final closing statement after the close of escrow, HA received

8  $75,000 as a "Leasing Consultant Fee.")

9      20.    On or about October 6, 2014, Defendants LUVILAND CORP and LUVILAND

10  LLC each executed a written lease for the PROPERTY with RMRG, which was W LINC's

11  predecessor and alter ego. At some point after the lease was executed, W LINC succeeded to

12  RMRG's rights under the lease, and, in turn, at the close of escrow on or about February 24, 2015,

13  ARDEN took the property subject to the lease and succeeded to RMRG/W LINC's rights under

14  that lease.

15      21.    The above-referenced lease was guaranteed by a written personal guaranty

16  agreement dated October 6, 2014, and executed by Defendant NGUYEN. At some point after the

17  guaranty was executed, W LINC succeeded to RMRG's rights under the guaranty, and at the close

18  of escrow on or about February 24, 2015, ARDEN succeeded to RMRG/W LINC's rights under

19  that guaranty.

20      22.    On information and belief, at all times mentioned herein and currently NGUYEN

21  and DOES 21–30, exclusively controlled LUVILAND LLC and LUVILAND CORP as their "alter

22  ego(s)" such that there is such a unity of interests between NGUYEN, LUVILAND LLC,

23  LUVILAND CORP, and DOES 21–30 that inequitable results would occur by upholding the

24  corporate entity, and allowing NGUYEN and DOES 21-30 to escape liability for the debts of

25  LUVILAND LLC and LUVILAND CORP that would sanction a fraud or promote an injustice.

26      23.    Hereinafter, NGUYEN, LUVILAND LLC, LUVILAND CORP, and DOES 21-30

27  will be collectively referenced as the "TENANT."

28

**THE DOE DEFENDANTS**

24.    ARDEN is ignorant of the true names, identities, or capacities of the defendants designated as Does 1 through 40, inclusive, and has therefore sued said defendants by such fictitious names.  On information and belief, each of the fictitiously named defendants is an individual, corporation, partnership, joint venture, unincorporated association, or other form of legal entity that is liable and/or responsible in some manner for the acts, omissions, and damages alleged hereinafter.

25.    At all times alleged hereinafter, each of the defendants was the agent, partner, servant, employee, salesperson, supervising broker, or co-conspirator of each of the remaining defendants.  On further information and belief, at all times alleged hereinafter, each defendant acted within the course and scope of such agency, partnership, master-servant, employment, broker-salesperson, and/or conspiracy relationship, and/or with the ratification and/or approval of his or its principal, master, employer, supervising broker, or co-conspirator(s).  ARDEN will seek leave of court to amend this complaint to reflect the true names, identities, or capacities of the fictitiously named defendants when same have been ascertained.

**VENUE**

26.    Venue is proper pursuant to California Code of Civil Procedure § 392, as the PROPERTY is located in Orange County.

**SELLERS AND ARDEN'S AGENTS CONVINCE**

**ARDEN TO PURCHASE THE PROPERTY**

27.    As ARDEN was in the very last days in which it could conduct a 1031 exchange to defer taxes on the capital gains of a property it had previously sold, the SELLERS and ARDEN'S AGENTS knew that ARDEN was intent on closing on a property that posed little to no risk, was in good condition, and did not require much maintenance.

28.    On or about February 23, 2015 (with less than a day before expiration of the deadline for 1031 exchange), the SELLERS provided assurances by forwarding a written offering memorandum to ARDEN which stated that the PROPERTY boasted "impeccable financials" with a new 12-year lease by a tenant which was an "experienced operator" and that the lease was

1 | "personally guaranteed by a high net worth doctor." The SELLERS assured ARDEN that the

2 | TENANT was a "regional credit tenant" with "five locations." That offering memorandum also

3 | claimed that the PROPERTY was undergoing "over $500k in capital improvements," and

4 | identified two businesses existing at the PROPERTY, namely, "Via Trading" and "Hand to Hand."

5 | On or about February 24, 2015, the TENANT executed a written Tenant's Estoppel Certificate

6 | ("Estoppel Certificate"), which the SELLERS provided to ARDEN (a true and correct copy of

7 | which is attached hereto as Exhibit "A") and which contained the statement that the TENANT "is

8 | currently paying monthly rent under the Lease in the amount of $37,422 per month." The same

9 | Estoppel Certificate that the SELLERS provided to ARDEN with the intent that ARDEN would

10 | rely thereupon also stated that the use of the PROPERTY "complies with all applicable . . . laws,

11 | rules and regulations. . . ." The same Estoppel Certificate also states (in paragraph 5) that the

12 | "Tenant Improvement Allowance $113,400.00" and "Tenant Allowance $288,660.00" **have been**

13 | **completed by Landlord** within the time periods set forth in the Lease" (emphasis added) leading

14 | further corroboration to the SELLERS' claim that the PROPERTY was undergoing "$500K" in

15 | "capital improvements." Also, on or about February 23, 2015, Michelle Bell, RMG's Chief

16 | Financial Officer sent an email to ARDEN'S AGENTS and ARDEN's attorney confirming in

17 | writing that "Buyer [ARDEN] will be getting the full $449K" in annual rent with no offsets or

18 | credits, starting on February 24, 2015. All of these representations turned out to be materially false

19 | in some respect.

20 |        29.    ARDEN'S AGENTS accepted and passed along all of the above representations at

21 | face value and specifically represented on or about February 23, 2015, that the PROPERTY was a

22 | "great deal"; that the TENANT was operating both a store (Hand to Hand) and a very successful

23 | trading business (Via Trading) that was using part of the space at the PROPERTY for storage

24 | purposes, and that the TENANT's income from the Via Trading business would ensure that the

25 | TENANT would pay its monthly rent obligations under the lease irrespective of how Hand to Hand

26 | performed. ARDEN'S AGENTS also represented that the "operator" of the Via Trading

27 | businesses was NGUYEN and expressly directed ARDEN to the website located at

28 | www.viatrading.com for reassurance that Via Trading was a legitimate business with sufficient

1   operations to fund all of the TENANT's lease obligations.  Before close of escrow, in order to

2   assure itself that the TENANT was creditworthy and it could rely on the SELLERS' claim of

3   "impeccable financials," and "high net worth," ARDEN reviewed the www.viatrading.com website

4   that ARDEN'S AGENTS had directed ARDEN to review, which paints an impressive picture of a

5   successful enterprise.  ARDEN'S AGENTS further assured ARDEN that the PROPERTY was well

6   suited for ARDEN's investment goals, that it had recently been improved, and that the PROPERTY

7   could be quickly resold for well over $7 million.  ARDEN'S AGENTS at all times assured

8   ARDEN that they were experienced in the evaluation and due diligence required with respect to the

9   acquisition of similar commercial properties such that ARDEN could rely upon their advice and

10   estimation of value.  All of these representations turned out to be materially false in some respect.

11   ARDEN'S AGENTS convinced ARDEN to consummate the purchase of the PROPERTY so they

12   could earn a commission despite knowing that ARDEN lacked adequate time for due diligence to

13   determine the veracity of those representations, had not inspected the PROPERTY with the new

14   TENANT, and relied on ARDEN'S AGENTS both to accurately describe the condition of, and to

15   assess the value of, the PROPERTY.

16         30.      Based on these and other false representations, ARDEN purchased the property only

17   to discover within a short time after close of escrow that: (1) the TENANT claimed various offsets

18   and credits against the TENANT's liability for rent payments under the Lease, directly

19   contradicting the SELLERS' written statement of February 23, 2014, that ARDEN would be

20   receiving "the full $449K" in annual rent (i.e., $37,422 times 12 months) with no offsets or credits

21   starting on February 24, 2015; (2) no improvements were in process at the PROPERTY and there

22   was no evidence that the tenant improvement work that the SELLERS represented was to have

23   been performed at the PROPERTY had taken place; (3) the TENANT's thrift store business was a

24   non-conforming use and prohibited by local ordinance, which fact was never disclosed; (4) the

25   "Via Trading" business that both the SELLERS and ARDEN'S AGENTS represented was

26   operating in the remainder of the space simply did not exist (the website www.viatrading.com has,

27   on information and belief, no connection whatsoever to NGUYEN and/or the TENANT); (5) the

28   TENANT was unable or unwilling the pay the rent that was the basis of the purchase price and has

1   since abandoned the PROPERTY without paying any rent to ARDEN; (6) as was known to the

2   SELLERS, the TENANT had not made any substantial capital improvements, much less the

3   advertised "$500K" in capital improvements that the SELLERS had claimed the PROPERTY was

4   undergoing (in fact the TENANT received a "Tenant Improvement Allowance" of $113,400 and a

5   "Tenant Allowance" of $288,660 at the close of escrow but simply pocketed the majority of those

6   funds); (7) the TENANT was wrongly described as a "regional credit tenant" and an "operator"

7   with five locations, but at the time of purchase, on information and belief, there were, at most, only

8   two locations still in business conducting the type of business being conducted at the PROPERTY;

9   (8) the TENANT was associated with several closed locations, none of which were ever disclosed

10  to ARDEN prior to closing; (9) the "high net worth" doctor (NGUYEN) who was purportedly

11  providing security for the TENANT's obligations under the lease, was and is, on information and

12  belief, not of sufficient net worth to adequately secure the TENANT's obligations under the lease

13  and may well have a negative net worth; (10) SELLERS' misrepresentation that NGUYEN -- the

14  lease guarantor -- was of "high net worth" was made without any reasonable basis as the

15  SELLERS had never even reviewed a balance sheet for NGUYEN; (11) HA was the actual

16  operator of the only business located at the PROPERTY (despite the SELLERS' and ARDEN'S

17  AGENTS' false representations that NGUYEN was the "operator" of a business called "Via

18  Trading" using part of the premises at the PROPERTY which involvement would have given him a

19  financial incentive to execute the lease guarantee), and HA had previously filed for Chapter 7

20  bankruptcy and had a near-six figure judgment entered against him in 2013 which was, on

21  information and belief, not satisfied; (12) the TENANT had been denied a business license by the

22  City of Buena Park in or about December 2014; (13) NGUYEN has outstanding federal tax liens of

23  over $240,000 that were never disclosed to ARDEN; and (14) HANLEY had represented both

24  SELLERS and ARDEN in the transaction without disclosure of the dual agency to ARDEN.

25          **ARDEN DISCOVERS A PROBLEM WITH THE TENANT**

26          31.     On or about March 18, 2015, ARDEN inspected the PROPERTY only to see a

27  "going out of business" sign. ARDEN immediately tried to contact the TENANT, but was unable

28  to reach anybody at the telephone numbers the SELLERS had provided for LUVILAND CORP,

1  LUVILAND LLC, and NGUYEN (the signatories to the lease agreement ARDEN relied upon to

2  purchase the PROPERTY).  The SELLERS, through Michelle Bell, then informed ARDEN for the

3  first time that NGUYEN was not actually involved in the business being conducted by

4  LUVILAND CORP and/or LUVILAND LLC but that the real operator was HA, whom ARDEN

5  had never heard of, but whom the SELLERS indicated was NGUYEN's business "partner."

6       32.    ARDEN subsequently had several conversations with HA over a period of time in

7  which he eventually informed ARDEN that the TENANT could not afford, and had no intention of

8  paying, the rent called for under the lease. HA also informed ARDEN that he specialized in using

9  his businesses to help foreign investors obtain EB-5 foreign investment visas.

10      **EVEN AFTER THE SALE, ARDEN'S AGENTS CONTINUE TO FALSELY**

11      **REASSURE ARDEN THAT THE PROPERTY CAN BE "FLIPPED" AT A PROFIT**

12      33.    Even after learning of the problems with the TENANT, ARDEN'S AGENTS

13  continued to assure ARDEN that the PROPERTY was worth far in excess of its purchase price of

14  $6.5 million and that ARDEN'S AGENTS would have no problem reselling the PROPERTY for a

15  sum in excess of $7 million.  In further reliance upon these misrepresentations, ARDEN retained

16  ARDEN'S AGENTS to represent ARDEN to resell the PROPERTY after escrow closed on the

17  purchase from the SELLERS.

18      34.    After receiving the listing for reselling the PROPERTY from ARDEN, ARDEN'S

19  AGENTS proceeded to market the PROPERTY (ostensibly on ARDEN's behalf), by falsely

20  advertising it as having a tenant that was a "Top Distributor of Ashley Furniture Brands and

21  Products" with an "Above Market Cap Rate of 6.75%" having a "Regional Tenant With Multiple

22  Locations" and "Strong Financials and Personal Guaranty from High Net Worth Doctor" with

23  "Extensive Renovation and Retrofit in Progress." After being asked to take the misleading listing

24  down both by ARDEN's attorney and ARDEN, WOHL took down the listing, only to once again

25  misleadingly market the property on Auction.com. ARDEN'S AGENTS' subsequent listing on

26  Auction.com stated the PROPERTY "received improvements upon the acquisition by the

27  owner/user who plans to occupy the space on a 12 year absolute NNN lease with 8% increases

28  every five years"; "Extensive renovations with retrofit in progress"; and had a tenant who is a "Top

-11-    FIRST AMENDED COMPLAINT

1  distributor for Ashley Furniture and products and is a regional retailer"; a "Regional tenant with

2  multiple locations, strong financials and personal guaranty," despite knowing that (1) there was no

3  "owner/user" which had acquired the property (ARDEN was not an owner/user nor was the prior

4  owner); and (2) the TENANT did not have "strong financials," was not "a top distributor for

5  Ashley Furniture," and had but a single other location. Eventually, ARDEN decided WOHL was

6  acting in bad faith and discontinued dealings. However, ARDEN was barred by a listing

7  agreement from listing the property with any salesperson or broker other than WOHL through

8  September 2015. Further, WOHL would not agree to remove himself from the listing unless

9  ARDEN used WOHL's contact at Auction.com, on information and belief a 13-year veteran of

10  RMRG.

11  **ARDEN DISCOVERS THE SELLERS' PATTERN AND PRACTICE OF FALSE**

12  **STATEMENTS CONCERNING ANOTHER PROPERTY SELLERS HAVE LISTED FOR**

13  **SALE IN GARDEN GROVE OCCUPIED BY HA**

14        35.      After ARDEN began to suspect that it had been the victim of a series of fraudulent

15  and/or negligent misrepresentations, ARDEN investigated how the SELLERS marketed another

16  commercial retail property the SELLERS currently have listed for sale at 10201 Garden Grove

17  Blvd., Garden Grove, CA 92840 ("GARDEN GROVE"). ARDEN discovered that the SELLERS

18  had made misrepresentations with respect to both properties that were, in some cases, virtually

19  identical, and, in other cases, contradictory. In reality, HA operates a furniture dealership at

20  GARDEN GROVE named "Today's Design," the lease for which was guaranteed by both HA and

21  Thanh Huong Nguyen (who is elsewhere listed as the "President" of the Hand-to-Hand entity that

22  was running a thrift store at the PROPERTY and who is, on information and belief, related to

23  NGUYEN). Yet, the SELLERS originally marketed GARDEN GROVE, in a presentation

24  prepared by the Colliers International brokerage firm, as being guaranteed by a "high net worth

25  doctor" and represented that the guarantor was worth "20 million" despite the fact that neither

26  guarantors are either doctors or of "high net worth." And the SELLERS are currently marketing

27  GARDEN GROVE, in a presentation prepared by the Marcus & Millichap brokerage firm, as

28  backed by a "high net worth personal guarantee (see agent)," which is, on information and belief,

1  equally false.  Further, a video prepared by Marcus & Millichap persists in the false claim that

2  GARDEN GROVE is operated by the personal guarantor, a high net worth doctor with five other

3  locations -- while on information and belief, GARDEN GROVE was at all times being run by HA,

4  not NGUYEN -- the identical misrepresentation SELLERS made to ARDEN concerning the

5  PROPERTY.  Moreover, the SELLERS, with Colliers, originally marketed GARDEN GROVE as a

6  "Today's Furniture Design" location with the accompanying logo taken from a Pennsylvania

7  furniture chain with that name, but which, on information and belief, has nothing to do with HA's

8  local "Today's Design" dealership.  The SELLERS also continue to market the GARDEN GROVE

9  property as containing a store with the website "www.todaysfurnituredesign.com" which links to

10  the Pennsylvania chain of stores, not the "Today's Design" store operated by HA which actually

11  exists at the location.  Finally, in the original marketing materials for GARDEN GROVE, the

12  SELLERS linked HA's dealership to the Ashley Furniture manufacturer, together with information

13  about exclusive Ashley dealerships and a photograph of a sign on the building saying "by Ashley."

14  The SELLERS currently, with Marcus & Millichap, are falsely advertising GARDEN GROVE as

15  being a furniture store "by Ashley" and including statistics regarding nationwide retailer Ashley

16  Furniture (including headquarters in Wisconsin and in business 71 years) as if they related to the

17  GARDEN GROVE tenant, to bolster the property description section of their offering

18  memorandum, despite the fact that HA has removed the "by Ashley" portion of his signage from

19  the building and is not affiliated with Ashley Furniture.  Taken together, these misrepresentations

20  regarding GARDEN GROVE establish that the SELLERS knew or should have known that HA

21  was the real operator of the business located at the PROPERTY with NGUYEN serving merely as

22  a "front" for the business that was actually being operated by HA.  The SELLERS knew or should

23  have known that HA was the actual operator (as HA was paid a "fee" by the SELLERS out of

24  escrow on the PROPERTY, he was known to the SELLERS) and knew or should have known that

25  HA was a completely uncreditworthy judgment debtor with a long trail of closed locations in his

26  wake.  The SELLERS misrepresentations with respect to the guarantor of both properties were

27  made without any good faith basis upon which to make such a representation, as the SELLERS

28  admitted after the filing of this suit (through their real estate agent) that they had never seen a

1  balance sheet for NGUYEN despite falsely touting his "high net worth" of "20 million." Thus, the

2  SELLERS have established a business pattern of misrepresenting the truth concerning the operators

3  and guarantor(s) of both properties which was intentionally calculated, on information and belief,

4  to whitewash and conceal the identity of HA, and the true nature of the businesses being operated

5  by HA at GARDEN GROVE and, formerly, at the PROPERTY, as well as the net worth of the

6  lease guarantor(s), in order to artificially inflate the perceived value of both properties.  ARDEN

7  relied upon the SELLERS' concealment of HA's involvement in the PROPERTY, as well as the

8  other misrepresentations and concealments, to purchase the PROPERTY and would not have done

9  so had it known that HA was the actual operator of the business in place at the PROPERTY, and

10  that NGUYEN was not a "high net worth" personal guarantor as SELLERS claimed.

11  **FIRST CAUSE OF ACTION**

12  **Breach of Written Contract (Lease)**

13  (AGAINST NGUYEN, LUVILAND CORP, LUVILAND LLC, AND DOES 21-30)

14      36.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 35 of

15  this Complaint as though fully set forth herein.

16      37.    On or about October 6, 2014, tenants LUVILAND CORP and LUVILAND LLC

17  entered into a written lease agreement for the PROPERTY.  A true and correct copy of the lease is

18  attached hereto as Exhibit "B."

19      38.    Under the terms of the lease, tenants agreed to lease the PROPERTY for a term of

20  12 years.

21      39.    As new owner of the PROPERTY that was the subject of the lease, ARDEN

22  succeeded to the rights of the previous landlord under the lease agreement.

23      40.    On or about June, 1, 2015, LUVILAND CORP and LUVILAND LLC breached the

24  lease agreement in numerous respects, including, but not limited to, by failing to pay rent, by

25  abandoning the PROPERTY, by failing to provide financial information required under the lease,

26  by not obtaining required insurance, by not occupying the space, and by informing ARDEN that

27  they would not be performing under the lease.

28      41.    ARDEN has performed all obligations it owed to LUVILAND CORP and

1  LUVILAND LLC under the lease and has served all requisite statutory notices on LUVILAND

2  CORP and LUVILAND LLC.

3      42.    As of the present date, ARDEN has not secured a lease for the PROPERTY despite

4  attempts to mitigate ARDEN's damages caused by the TENANT's breach of the lease.

5      43.    As a direct and proximate result of the acts and omissions of the TENANT as

6  alleged herein, Plaintiff has already suffered damages as of the date hereof in an amount of at least

7  $40,000, plus interest, the exact amount to be proven at trial, together with costs and attorneys'

8  fees; and has suffered additional damages in an amount to be determined at trial insofar as the

9  TENANT's breach caused ARDEN to be unable to obtain new financing on the PROPERTY and

10  has put the PROPERTY at risk for foreclosure.

11      44.    Under Section 13.02 of the lease, ARDEN has the right to any future rent for the

12  entire rental term that ARDEN is not able to mitigate.  As a direct and proximate result of the acts

13  and omissions of the TENANT as alleged herein, Plaintiff will suffer future damages in an amount

14  to be proven at trial, together with costs and attorneys' fees.

15      45.    As a direct and proximate result of the acts and omissions of the TENANT as

16  alleged herein, Plaintiff has been required to retain the services of attorneys and other professionals

17  to prosecute its claim, and is entitled to an award of its attorneys' fees and costs, including

18  collection costs, incurred in connection herewith.

19      46.    As a direct and proximate result of the acts and omissions of the TENANT as

20  alleged herein, the TENANT has been unjustly enriched in an amount to be determined at trial, but

21  in no event less than $402,060.

22                    **SECOND CAUSE OF ACTION**

23                  **Breach of Written Contract (Guaranty)**

24                  (AGAINST NGUYEN AND DOES 21-30)

25      47.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 46 of

26  this Complaint as though fully set forth herein.

27      48.    On or about October 6, 2014, NGUYEN entered into a written guaranty agreement.

28  A true and correct copy of the guaranty is attached hereto as Exhibit "C."

                                    -15-    FIRST AMENDED COMPLAINT

49.    Under the terms of the guaranty, NGUYEN promised to perform all of the TENANT's obligations under the lease agreement. Upon the TENANT's default, NGUYEN became liable for all losses caused by the TENANT's default.

50.    As new owner of the PROPERTY, ARDEN succeeded to the rights of the previous landlord under the guaranty.

51.    ARDEN has performed all obligations it owed to NGUYEN under the guaranty and has served all requisite statutory notices on NGUYEN and demanded that NGUYEN perform the obligations of the defaulting TENANT.

52.    NGUYEN has failed to make good on the obligations of the TENANT under the lease and has therefore breached the Guaranty. As a direct and proximate result of the acts and omissions of NGUYEN as alleged herein, Plaintiff has suffered damages as of the date hereof in an amount of at least $40,000, plus interest, the exact amount to be proven at trial, together with costs and attorneys' fees, and future damages in an amount also to be proven at trial; and has suffered additional damages in an amount to be determined at trial insofar as the TENANT's breach caused ARDEN to be unable to obtain new financing on the PROPERTY and has put the PROPERTY at risk for foreclosure.

53.    As a direct and proximate result of the acts and omissions of NGUYEN as alleged herein, Plaintiff has been required to retain the services of attorneys and other professionals to prosecute its claim, and is entitled to an award of its attorneys' fees and costs, including collection costs, incurred in connection herewith.

54.    As a direct and proximate result of the acts and omissions of NGUYEN as alleged herein, NGUYEN has been unjustly enriched in an amount to be determined at trial, but in no event less than $402,060.

## THIRD CAUSE OF ACTION

### Fraud and Intentional Misrepresentation

(AGAINST ARDEN'S AGENTS AND DOES 1-40)

55.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 54 of this Complaint as though fully set forth herein.

-16-    FIRST AMENDED COMPLAINT

1    56.    ARDEN'S AGENTS, and each of them, either knew that their specific

2  representations regarding the PROPERTY were false, or recklessly made those statements without

3  good cause to believe that they were true. These representations included the statements that the

4  PROPERTY could easily be resold for over $7 million, was a suitable investment for ARDEN that

5  would meet ARDEN's investment objectives, was in the process of being improved, and was used

6  by two users, including a profitable business ("Via Trading") for storage; and that Via Trading was

7  operated by NGUYEN.

8    57.    These false misrepresentations were made with the intent of inducing reliance by

9  ARDEN.

10    58.    ARDEN justifiably relied upon ARDEN'S AGENTS misrepresentations by

11  purchasing the PROPERTY at ARDEN'S AGENTS' specific recommendation and then again by

12  retaining ARDEN'S AGENTS to attempt to resell the PROPERTY after purchase.

13    59.    ARDEN'S AGENTS knew or should have known that the PROPERTY was worth a

14  fraction of its purchase price, was not suitable for ARDEN's investment objectives, was not in the

15  process of being improved, and did not contain any business called "Via Trading" (and certainly

16  not any business affiliated with www.viatrading.com, the website to which ARDEN'S AGENTS

17  had directed ARDEN in order to convince ARDEN that the PROPERTY contained a creditworthy

18  tenant capable of paying its obligations under the lease); that the guarantor NGUYEN was not of

19  "high net worth," and that the business actually taking place at the PROPERTY was being operated

20  illegally, and by HA, not NGUYEN.

21    60.    As a direct and proximate result of ARDEN'S AGENTS' intentional

22  misrepresentations, ARDEN has suffered and will suffer damages in an amount to be determined at

23  trial, but in excess of $3,000,000.

24    61.    As a further proximate result of ARDEN's AGENTS' intentional

25  misrepresentations, ARDEN'S AGENTS have been unjustly enriched in an amount to be

26  determined at trial, but in no event less than $130,000.

27

28

1

2 **FOURTH CAUSE OF ACTION**

3 **Fraud and Intentional Misrepresentation**

4 (AGAINST THE SELLERS AND DOES 1-40)

5      62.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 61 of

6 this Complaint as though fully set forth herein.

7      63.    At the time of providing the Estoppel Certificate to ARDEN on or about February

8 23, 2015, the SELLERS knew or should have known that various representations in the Estoppel

9 Certificate SELLERS prepared, provided to ARDEN, and intended ARDEN to rely upon, were

10 materially false, or recklessly made those representations without good cause to believe that they

11 were true.  These false representations included but are not limited to the false representation that

12 the TENANT was operating lawfully at the location.  On information and belief, the SELLERS

13 either knew or should have known as of the date of the Estoppel Certificate that the TENANT had

14 been denied a business license and was operating a thrift store in violation of local zoning

15 ordinances, that a prior prospective thrift store tenant (Goodwill Industries) had refused to sign a

16 lease for the PROPERTY because of the restrictive zoning that prohibits thrift stores from

17 operating at the PROPERTY, and that Via Trading was not operating at the PROPERTY even for

18 storage (which would also been an unpermitted use had it actually commenced.)

19      64.    The SELLERS, and each of them, either knew that their other specific

20 representations regarding the PROPERTY were false, or recklessly made those statements without

21 good cause to believe that they were true.  These other representations included the statements that

22 the PROPERTY had "impeccable financials"; the PROPERTY was "undergoing substantial

23 renovation and remodel" with over $500,000 to be spent on capital improvements; "tenant is an

24 experienced operator with multiple locations"; "lease is personally guaranteed by a high net worth

25 doctor"; a business called "Via Trading" existed at the PROPERTY; and ARDEN would be

26 entitled to receive "the full $449K" in annual rent (i.e., $37,422 times 12 months) with no offsets or

27 credits, starting on February 24, 2015.

28      65.    These false misrepresentations and concealments were made with the intent of

-18-   FIRST AMENDED COMPLAINT

1  inducing reliance by ARDEN, and ARDEN justifiably relied upon the SELLERS'

2  misrepresentations by purchasing the PROPERTY.

3       66.    The SELLERS knew or should have known that the uncreditworthy HA, not

4  NGUYEN, was the real operator of the PROPERTY; there was no "Via Trading" business using

5  the PROPERTY at all; the PROPERTY had not recently undergone and was not undergoing any

6  significant "capital improvements," and certainly not $500,000 in such improvements as

7  advertised; and the PROPERTY's "financials" were not "impeccable" but were, in fact, extremely

8  risky as the TENANT was not paying rent, the TENANT's principal and real operator HA was not

9  remotely creditworthy, the lease guarantor (NGUYEN) lacked adequate net worth to fully secure

10  the lease, and the TENANT intended to use the PROPERTY solely for non-permitted uses, i.e., a

11  thrift shop and storage.

12       67.    As a direct and proximate result of the SELLERS' intentional misrepresentations,

13  ARDEN has suffered and will suffer damages in an amount to be determined at trial, but in excess

14  of $3,000,000.

15       68.    As a further proximate result of the SELLERS' intentional misrepresentations, the

16  SELLERS have been unjustly enriched in an amount in an amount to be determined at trial, but in

17  no event less than $3,000,000.

18       69.    Because the SELLERS' conduct as alleged herein was undertaken with malice,

19  fraud and/or oppression and/or with a conscious and deliberate disregard of ARDEN's rights and

20  interests, punitive damages should be assessed herein.

21                             **FIFTH CAUSE OF ACTION**

22                             **Intentional Concealment**

23            (AGAINST THE SELLERS, HANLEY, HIG, WOHL, AND LOPEZ,

24                          AND DOES 1-20)

25       70.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 69 of

26  this Complaint as though fully set forth herein.

27       71.    The SELLERS knew of the fact that the PROPERTY had not been improved by the

28  TENANT; the PROPERTY was not "undergoing" "500K" in "capital improvements"; the

1    PROPERTY could not be legally used for a thrift store (which was the sole business actually

2    operating at the PROPERTY); there was no "Via Trading" business using any portion of the

3    PROPERTY operated by NGUYEN or anyone else; HA was not creditworthy and was the person

4    actually operating the only business located at the PROPERTY; the PROPERTY's financials were

5    extremely risky insofar as the TENANT was not paying rent and was operating an illegal and

6    unlicensed business at the PROPERTY and the guarantor NGUYEN lacked sufficient assets to

7    fully secure the lease; the PROPERTY was not "undergoing substantial renovation and remodel";

8    and the TENANT was not "an experienced operator with multiple locations," and knew that they

9    had no basis whatsoever to make any representations concerning NGUYEN's net worth, but failed

10    to disclose this critical information to ARDEN in breach of their common law obligations.

11    ARDEN was unaware of this information prior to purchasing the PROPERTY, and this information

12    was plainly material, particularly as ARDEN relied on the SELLER's claim of NGUYEN's "high

13    net worth" to agree to purchase the PROPERTY.

14          72.    On information and belief, ARDEN'S AGENTS knew of the unsuitability of the

15    PROPERTY as an investment for ARDEN given ARDEN's investment objectives, knew that the

16    PROPERTY could not be resold for a price in excess of $7 million, knew that the PROPERTY was

17    not undergoing renovation, and knew that there was inadequate time for ARDEN to discover the

18    false representations made by the SELLERS.

19          73.    Additionally, the SELLERS, and each of them, intentionally failed to disclose the

20    material information they knew regarding the factual, legal, and financial background of HA, and

21    the fact that HA was the real operator of the TENANT's business, which, had that information been

22    disclosed to ARDEN, would have similarly resulted in ARDEN refusing to enter into the purchase

23    of the PROPERTY. The SELLERS further failed to disclose that their statements regarding the

24    supposedly "high net worth" of NGUYEN were made in a complete absence of any reasonable

25    basis to conclude that NGUYEN had a "high" or, indeed, any net worth, as SELLERS had never

26    reviewed a balance sheet for NGUYEN prior to making that misrepresentation.

27          74.    Additionally, HIG, HANLEY, WOHL, and LOPEZ intentionally failed to disclose

28    the fact that LOPEZ, HIG, and HANLEY had had prior business dealings with the SELLERS

1  and/or the expectation of future business dealings with the SELLERS and that HANLEY, HIG,

2  WOHL, and LOPEZ were concurrently representing both sides of the same transaction (SELLERS

3  and ARDEN), and therefore had a conflict of interest that, had it been disclosed to ARDEN, would

4  have caused ARDEN not to repose its trust and confidence in the representations of ARDEN'S

5  AGENTS.

6      75.    ARDEN justifiably relied upon the SELLERS' and HANLEY's, HIG's, WOHL's,

7  and LOPEZ's intentional misrepresentations and/or concealment and/or nondisclosures of material

8  facts to purchase the PROPERTY.

9      76.    As a direct and proximate result of the SELLERS' and HANLEY's, HIG's,

10  WOHL's, and LOPEZ's misrepresentations and nondisclosures of material fact, ARDEN has

11  suffered and will suffer damages in an amount to be determined at trial, but in excess of

12  $3,000,000.

13     77.    As a further proximate result of HANLEY's, HIG's, WOHL's, and LOPEZ's

14  misrepresentations and nondisclosures of material facts, HANLEY, WOHL, and LOPEZ have been

15  unjustly enriched in an amount in an amount to be determined at trial, but in no event less than

16  $130,000.

17     78.    As a further proximate result of the SELLERS misrepresentations and

18  nondisclosures of material facts, the SELLERS have been unjustly enriched in an amount in an

19  amount to be determined at trial, but in no event less than $3,000,000.

20     79.    Because the SELLERS' and HANLEY's, HIG's, WOHL's, and LOPEZ's conduct

21  as alleged herein was undertaken with malice, fraud and/or oppression and/or with a conscious and

22  deliberate disregard of ARDEN's rights and interests, punitive damages should be assessed herein.

23                          **SIXTH CAUSE OF ACTION**

24                          **Negligent Concealment**

25                  (AGAINST THE SELLERS, HANLEY, HIG, WOHL, LOPEZ,

26                          AND DOES 1-20)

27     80.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 79 of

28  this Complaint as though fully set forth herein.

-21-   FIRST AMENDED COMPLAINT

81.   The material facts alleged above, including but not limited to those alleged in paragraphs 70 through 78 were negligently concealed from ARDEN.

82.   ARDEN relied upon the SELLERS' nondisclosures of material fact relating to the PROPERTY to purchase the PROPERTY.

83.   ARDEN relied upon HANLEY's, HIG's, WOHL's, and LOPEZ's nondisclosures of material fact relating to the PROPERTY to (1) purchase the PROPERTY; and (2) allow ARDEN'S AGENTS to conduct due diligence and negotiations, and recommend purchase of the PROPERTY.

84.   As a direct and proximate result of defendants' nondisclosures of material fact, ARDEN has suffered and will suffer damages in an amount to be determined at trial, but in no event less than $3,000,000.

85.   As a further proximate result of ARDEN'S AGENTS' negligent concealment of material fact, ARDEN'S AGENTS' have been unjustly enriched in an amount in an amount to be determined at trial, but in no event less than $130,000.

86.   As a further proximate result of the SELLERS negligent concealment of material fact, the SELLERS have been unjustly enriched in an amount in an amount to be determined at trial, but in no event less than $3,000,000.

## SEVENTH CAUSE CAUSE OF ACTION

### Negligent Misrepresentation

(AGAINST THE SELLERS, ARDEN'S AGENTS, AND DOES 1-20)

87.   ARDEN incorporates by this reference the allegations in paragraphs 1 through 86 of this Complaint as though fully set forth herein.

88.   ARDEN is informed and believes, and on that basis alleges that the statements made by the SELLERS and ARDEN'S AGENTS (including but not limited to those alleged in paragraphs 1, 28 through 30, and 62 through 65 of this Complaint) were false, were made by the SELLERS and/or ARDEN'S AGENTS without reasonable grounds to believe the statements were true, and were made by the SELLERS and/or ARDEN'S AGENTS with the intent to induce ARDEN to act in reliance on those representations.

89.   Had the SELLERS and/or ARDEN'S AGENTS not negligently misrepresented

-22-   FIRST AMENDED COMPLAINT

1    material facts concerning the PROPERTY, ARDEN would have refused to enter into a purchase of

2    the PROPERTY.

3        90.    ARDEN was unaware that the SELLERS and/or ARDEN'S AGENTS

4    representations were false, and ARDEN reasonably acted in reliance on the truth of these

5    representations, as alleged herein.

6        91.    As a direct and proximate result of defendants' misrepresentations of material fact,

7    ARDEN has suffered and will suffer damages in an amount to be determined at trial, but in no

8    event less than $3,000,000.

9        92.    As a further proximate result of ARDEN'S AGENTS' misrepresentations of

10    material fact, ARDEN'S AGENTS' have been unjustly enriched in an amount in an amount to be

11    determined at trial, but in no event less than $130,000.

12        93.    As a further proximate result of the SELLERS' misrepresentations of material fact,

13    the SELLERS have been unjustly enriched in an amount in an amount to be determined at trial, but

14    in no event less than $3,000,000.

15                           **EIGHTH CAUSE OF ACTION**

16                                **Breach of Fiduciary Duty**

17            (AGAINST HANLEY, HIG, WOHL, LOPEZ, AND DOES 1-10)

18        94.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 93 of

19    this Complaint as though fully set forth herein.

20        95.    HANLEY, HIG, WOHL, and LOPEZ owed a fiduciary duty towards their principal,

21    ARDEN, to protect its interests, to avoid putting their own interests over those of their principal, to

22    fully disclose all material facts and risks, and to avoid making any reckless statements of fact or

23    opinion without regard for their truth.

24        96.    On information and belief, HANLEY, HIG, WOHL, and LOPEZ breached their

25    fiduciary duty to ARDEN by failing to disclose that they were representing both sides of the same

26    purchase/sale transaction between ARDEN and SELLERS, by failing to disclose their prior

27    relationship with SELLERS, and by failing to make the statutory disclosures of dual agency

28    required by Civil Code sections 2079.14, 2079.16, and 2079.17.

-23-    FIRST AMENDED COMPLAINT

1    97.    On information and belief, ARDEN'S AGENTS further breached their fiduciary

2  duty to ARDEN by (1) recommending purchase of the PROPERTY which was a very risky and

3  wholly unsuitable investment for ARDEN given its investment objectives which were known to

4  ARDEN'S AGENTS and which included preservation of capital; (2) by either negligently

5  performing or by entirely failing to perform the basic due diligence to establish whether the

6  PROPERTY was suitable for ARDEN'S investment objectives as they undertook to do; (3) by

7  concealing or failing to discover the illegal use of the PROPERTY by the TENANT; (4) by

8  concealing or failing to discover that the business "Via Trading" was not using the PROPERTY

9  (and directing ARDEN to a website for a company named "Via Trading" that was, on information

10  and belief, not affiliated with the TENANT with the knowledge and understanding that ARDEN

11  would rely upon the false information so provided regarding "Via Trading"); (5) by concealing or

12  failing to discover that NGUYEN was not operating any business at the PROPERTY; (6) by either

13  negligently or intentionally inducing ARDEN to believe that ARDEN'S AGENTS had accurate

14  knowledge of the condition, use, and value of the PROPERTY; (7) by either negligently or

15  intentionally making affirmative misrepresentations concerning the PROPERTY, including the

16  statement that the PROPERTY could be immediately resold for over $7 million and was in the

17  process of being improved, neither of which turned out to be the case; (8) by failing to disclose to

18  ARDEN all facts that materially affect the value or desirability of the PROPERTY; (9) by

19  concealing their business relationship with the SELLERS; (10) by recommending that ARDEN

20  purchase the PROPERTY in the absence of time necessary to conduct adequate due diligence that

21  could have disclosed the falsity of ARDEN'S AGENTS' and the SELLERS' representations; and

22  (11) by inducing reliance upon SELLERS' misrepresentation regarding NGUYEN's supposedly

23  "high" net worth without conducting any inquiry whatsoever into the truth or basis of that

24  representation or recommending that ARDEN do so.

25    98.    As a proximate result of HANLEY's, HIG's, WOHL's, and LOPEZ's breaches of

26  their fiduciary duty, ARDEN has suffered and will suffer damages in an amount to be determined

27  at trial, but in no event less than $3,000,000.

28    99.    As a proximate result of HANLEY's, HIG's, WOHL's, and LOPEZ's breaches of

-24-    FIRST AMENDED COMPLAINT

1  their fiduciary duty, HANLEY, WOHL, and LOPEZ have been unjustly enriched in an amount in

2  an amount to be determined at trial, but in no event less than $130,000.

### NINTH CAUSE OF ACTION

#### Negligence

(AGAINST ARDEN'S AGENTS AND DOES 1-10)

6       100.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 99 of

7  this Complaint as though fully set forth herein.

8       101.    ARDEN'S AGENTS negligently failed to conduct a reasonable investigation into

9  the suitability of the PROPERTY for the investment objectives of ARDEN; as any such

10  investigation would have determined that the PROPERTY was unsuited for ARDEN given the

11  short escrow period, lack of sufficient time to conduct due diligence, the lack of experience of

12  ARDEN's management, the lack of any basis for the claim of a "high net worth" personal

13  guarantor, ARDEN's need for preservation of capital; and the true value of the PROPERTY that in

14  fact was worth, on information and belief, millions less than what ARDEN'S AGENTS had

15  represented.

16       102.    Accordingly, even assuming arguendo that ARDEN'S AGENTS had no actual

17  knowledge of the true facts which contradicted their misrepresentations regarding the PROPERTY,

18  their failure to conduct a reasonable inquiry before making those representations was both reckless

19  and negligent.

20       103.    ARDEN relied upon the professional expertise, honesty, integrity and competence

21  of ARDEN'S AGENTS in purchasing the PROPERTY.  Their violation of the duty of due care

22  owed to ARDEN caused ARDEN damages in an amount to be proven at trial, but in no event less

23  than $3,000,000.

### TENTH CAUSE OF ACTION

#### Constructive Fraud

(AGAINST HANLEY, HIG, WOHL, LOPEZ, THE SELLERS, AND DOES 1-20)

27       104.    ARDEN incorporates by this reference the allegations in paragraphs 1 through 103

28  of this Complaint as though fully set forth herein.

105.     By making the affirmative misrepresentations and concealments and because of breaches of duty set forth in paragraphs 1 through 103, *ante*, HANLEY, WOHL, LOPEZ, and the SELLERS misled ARDEN to ARDEN's prejudice and in order to gain an advantage to themselves.

106.     On information and belief, SELLERS knew the true facts behind the affirmative misrepresentations and concealments and because of breaches of duty set forth in paragraphs 1 through 102, *ante*, and also knew of the undisclosed dual agency of HANLEY, HIG, WOHL, and LOPEZ, and substantially assisted HANLEY, HIG, WOHL, and LOPEZ in their breaches of fiduciary duty to ARDEN; and aided and abetted their breaches of fiduciary duty.

107.     Such conduct constitutes constructive fraud on the part of the HANLEY, WOHL, HIG, LOPEZ, and the SELLERS (even in the absence of fraudulent intent) in violation of Civil Code § 1573.

108.     ARDEN reasonably relied upon the misrepresentations and non-disclosures by HANLEY, WOHL, HIG, LOPEZ, and the SELLERS as alleged herein to its detriment.  If ARDEN had known the truth of these facts, ARDEN would not have entered into the purchase of the PROPERTY.

109.     As a direct and proximate result of HANLEY, WOHL, HIG, LOPEZ, and the SELLERS, ARDEN has suffered and will suffer damages in an amount to be determined at trial, but in no event less than $3,000,000.

### **REQUEST FOR RECISSION**

110.     ARDEN incorporates by this reference the allegations in paragraphs 1 through 109 of this Complaint as though fully set forth herein.

111.     ARDEN seeks rescission of the agreement to purchase the PROPERTY.  Here, SELLERS employed specific affirmative misrepresentations to induce ARDEN to purchase the PROPERTY. As a result of those misrepresentations ARDEN believed various facts that turned out not to be true, including but not limited to the facts alleged *supra*, including the purported facts that the lease guarantor NGUYEN had a "high net worth"; that the value of the PROPERTY was over $7 million; that ARDEN was being represented solely by HANLEY, HIG, and WOHL; and that neither HANLEY, HIG, nor WOHL were suffering from an undisclosed conflict of interest by

1  concurrently representing SELLERS in the same transaction.  Enforcement of the sale contract

2  would be unconscionable under the circumstances.

3      112.    With ARDEN's consent given under mistake or fraud, ARDEN is also entitled to

4  rescission as a remedy for the various causes of actions pleaded hereinabove.  ARDEN's consent to

5  purchase the PROPERTY was a result of mistake, fraud or undue influence by the SELLERS

6  and/or ARDEN'S AGENTS.  (Civ. Code, §§ 1565-1584 and 1689(b)(l).)  The SELLERS, together

7  with HANLEY, HIG, WOHL, and LOPEZ perpetrated a fraud upon ARDEN sufficient to support

8  ARDEN's right to unilateral rescission because of "actual fraud" and/or "constructive fraud."

9      113.    Additionally, even if the SELLERS' misrepresentations were innocently made (and

10  there is substantial evidence that they were not), ARDEN would still have the right to rescind on

11  the basis of mistake.

12      114.    ARDEN suffered multiple material mistakes of fact relating to the PROPERTY.

13  (Civ. Code, § 1577).  ARDEN was (i) ignorant of a past or present fact material to the contract,

14  and/or (ii) believed in the present existence of something material to the contract which does not

15  exist, or in the past existence of something which never existed.  ARDEN also suffered from a

16  mistake of law concerning the PROPERTY, namely that the tenant was operating a legal business

17  at the PROPERTY.  (Civ. Code, § 1578).  The effect of the mistakes is that enforceability of the

18  contract would be unconscionable.  Substantive unconscionability is clearly present from the

19  oppression and surprise that resulted.

20      115.    ARDEN's mistakes concerned multiple basic assumptions upon which the contract

21  was made; had a material effect on the agreed exchange of performances under the contract that is

22  adverse to ARDEN; and the effect of the mistakes is such that enforcement of the contract would

23  be unconscionable.

24      116.    ARDEN may also rescind the contract to purchase the PROPERTY because its

25  enforcement would be prejudicial to the public interest (Civ. Code, § 1689(b)(6)) on account of the

26  undisclosed and unlawful dual agency perpetrated by HANLEY, WOHL, and LOPEZ, with the

27  knowledge, cooperation, and assistance of SELLERS.

28      117.    Even in the unlikely event that SELLERS were unaware of the dual agency of

-27-   FIRST AMENDED COMPLAINT

1   HANLEY, HIG, WOHL, and LOPEZ, the undisclosed dual agency would still provide a right to

2   rescind the entire transaction. (*Gordon v. Beck* (1925) 196 Cal. 768, 776.)

3       118.    ARDEN seeks any and all relief that is necessary to adjust the equities between the

4   parties and ensure restoration to the pre-contract status quo. (Civ. Code, § 1692)

5       119.    Accordingly, as a remedy for the causes of actions pleaded hereinabove, ARDEN

6   seeks rescission both of the purchase of the PROPERTY and of payment of any commission to

7   HANLEY, HIG, WOHL, and LOPEZ. This First Amended Complaint shall serve as a notice of

8   rescission and offer to restore pursuant to Civil Code section 1691.

9

10                              **PRAYER**

11      WHEREFORE, ARDEN prays for judgment as follows:

12

13      ON THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT (LEASE):

14      (1)    For general and special damages according to proof;

15      (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

16             extent permitted by law;

17      (3)    For restitution;

18      (4)    For statutory interest as provided by law; and

19      (5)    For such other and further relief as the Court may deem just and proper.

20

21      ON THE SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT

22   (GUARANTY):

23      (1)    For general and special damages according to proof;

24      (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

25             extent permitted by law;

26      (3)    For restitution;

27      (4)    For statutory interest as provided by law; and

28      (5)    For such other and further relief as the Court may deem just and proper.

1

2   ON THE THIRD CAUSE OF ACTION FOR FRAUD AND INTENTIONAL

3   MISREPRESENTATION:

4    (1) For general and special damages according to proof;

5    (2) For costs of suit incurred in this matter including reasonable attorneys' fees to the

6      extent permitted by law;

7    (3) For rescission;

8    (4) For restitution;

9    (5) For punitive and exemplary damages in an amount sufficient to punish defendants;

10   (6) For statutory interest as provided by law; and

11   (7) For such other and further relief as the Court may deem just and proper.

12

13  ON THE FOURTH CAUSE OF ACTION FOR FRAUD AND INTENTIONAL

14  MISREPRESENTATION

15   (1) For general and special damages according to proof;

16   (2) For costs of suit incurred in this matter including reasonable attorneys' fees to the

17     extent permitted by law;

18   (3) For rescission;

19   (4) For restitution;

20   (5) For punitive and exemplary damages in an amount sufficient to punish defendants;

21   (6) For statutory interest as provided by law; and

22   (7) For such other and further relief as the Court may deem just and proper.

23

24  ON THE FIFTH CAUSE OF ACTION FOR INTENTIONAL CONCEALMENT:

25   (1) For general and special damages according to proof;

26   (2) For costs of suit incurred in this matter including reasonable attorneys' fees to the

27     extent permitted by law;

28   (3) For rescission;

1    (4)    For restitution;

2    (5)    For punitive and exemplary damages in an amount sufficient to punish defendants;

3    (6)    For statutory interest as provided by law; and

4    (7)    For such other and further relief as the Court may deem just and proper.

5

6    ON THE SIXTH CAUSE OF ACTION FOR NEGLIGENT CONCEALMENT:

7    (1)    For general and special damages according to proof;

8    (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

9         extent permitted by law;

10    (3)    For rescission;

11    (4)    For restitution;

12    (5)    For statutory interest as provided by law; and

13    (6)    For such other and further relief as the Court may deem just and proper.

14

15    ON THE SEVENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION:

16    (1)    For general and special damages according to proof;

17    (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

18         extent permitted by law;

19    (3)    For rescission;

20    (4)    For restitution;

21    (5)    For statutory interest as provided by law; and

22    (6)    For such other and further relief as the Court may deem just and proper.

23

24    ON THE EIGHTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY:

25    (1)    For general and special damages according to proof;

26    (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

27         extent permitted by law;

28    (3)    For punitive and exemplary damages in an amount sufficient to punish defendants;

1    (4)    For rescission;

2    (5)    For restitution;

3    (6)    For statutory interest as provided by law; and

4    (7)    For such other and further relief as the Court may deem just and proper.

5

6    ON THE NINTH CAUSE OF ACTION FOR NEGLIGENCE:

7    (1)    For general and special damages according to proof;

8    (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

9    extent permitted by law;

10    (3)    For rescission;

11    (4)    For restitution;

12    (5)    For statutory interest as provided by law; and

13    (6)    For such other and further relief as the Court may deem just and proper.

14

15    ON THE TENTH CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD:

16    (1)    For general and special damages according to proof;

17    (2)    For costs of suit incurred in this matter including reasonable attorneys' fees to the

18    extent permitted by law;

19    (3)    For rescission;

20    (4)    For restitution;

21    (5)    For statutory interest as provided by law; and

22    (6)    For such other and further relief as the Court may deem just and proper.

23

24                    **JURY DEMAND**

25    Plaintiff hereby demands trial by jury on all issues triable by a jury in the above-entitled action.

26

27

28

1

Dated:  December 11, 2015

Timothy D. McGonigle, Esq.
TIMOTHY D. McGONIGLE PROF. CORP

2

3

4

5

By:_____

6

Timothy D. McGonigle
Attorney for Plaintiff 315 ARDEN LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

## TENANT'S ESTOPPEL CERTIFICATE

The undersigned, Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company as the tenant ("Tenant") under that certain lease dated October 6, 2014 (the "Lease") with W LINC BP, LLC ("Landlord"), for certain premises ("Premises") located in the shopping center commonly known as 7101 W. Lincoln Avenue ("Shopping Center") in the City of Buena Park, the County of Orange, State of California. The undersigned understands that RED MOUNTAIN RETAIL GROUP, INC./OR ASSIGNS has offered or committed to enter into a transaction with Landlord and that RED MOUNTAIN RETAIL GROUP, INC./OR ASSIGNS has requested this certificate (this "Certificate") from the undersigned as a condition precedent to the consummation of such transaction and will therefore be relying upon the representations and warranties contained herein.

The undersigned hereby states, declares, represents, warrants and certifies as follows:

1. A copy of the Lease attached hereto as Exhibit A is a true and correct copy of the Lease and constitutes the only agreement between Landlord and Tenant with respect to the leased Premises.

2. The Lease (including all exhibits) is in full force and effect, has not been terminated, and is enforceable in accordance with its terms.

3. The Lease has not been modified, amended, supplemented or changed in any way, except as follows: _None_

4. The Lease constitutes the entire agreement between Landlord and Tenant for the Premises, and there are no other agreements, written or oral, between Landlord and Tenant relating to the Premises.

5. Tenant has accepted possession of the Premises under the Lease and all items required to be performed by Landlord under the terms of the Lease as follows: Tenant Improvement Allowance $ 113,400.00 and Tenant Allowance $288,660.00, have been completed by Landlord within the time periods set forth in the Lease, and all required contributions by Landlord to Tenant on account of Tenant's improvements to the Premises have been paid in full as of close of escrow.

6. The term ("Term") of the Lease commenced on November 20th, 2014. The Term shall expire on November 30th, 2026. There are 2 (5) Year options to extend the Term for periods of 60 months each.

7. Neither Tenant nor Landlord has begun any action, or given or received any notice for the purpose of termination of the Lease.

8. Tenant is currently paying monthly rent under the Lease in the amount of $37,422 per month ("Base Rent").

9. The Base Rent under the Lease is current as of February 24th, 2015. The next payment of Base Rent is due on May 20th, 2015.

10. No Base Rent or other charges have been paid more than thirty (30) days in advance of its due date, except as follows: $30,000.

11. Tenant is currently paying percentage rent (if any) under the Lease in the amount of -0- per month ("Percentage Rent").

12. Tenant is currently paying additional rent under the Lease for Tenant's share of common area expenses, taxes and insurance in the amount of $   0   per month ("Additional Rent").Tenant pays all expenses and NNN costs.

13. The amount of Tenant's security deposit held by Landlord under the Lease is ____$0____ ("Security Deposit").

14.    No default or event that, with the giving of notice or the passage of time, or both, would constitute a default on the part of the undersigned exists under the Lease, nor is the undersigned (to the best of its knowledge) aware of any default or event that with the passing of time or the giving of notice, or both, would constitute a default on the part of Landlord under the Lease.

15.    The undersigned has not received notice of any assignment, hypothecation, mortgage or pledge of Landlord's interest in the Lease or of any rents or other amounts due thereunder.

16.    Any and all free rent, except as set forth in the Lease, will be paid at the close of escrow and Landlord has not given or conceded to Tenant any other concessions, abatements or compromises with respect to the rental obligations under the Lease.

17.    All offsets or credits against or defenses to payment of any monetary obligations payable under the Lease will be handled as of close of escrow.

18.    The Lease does not contain, and Tenant does not have, any options or rights, including, without limitation, expand the Premises, rights of first offer or refusal (or other rights) to purchase the Premises or any part thereof or all or any part of the real property of which the Premises are a part.

19.    No actions, whether voluntary or otherwise, are pending against Tenant under the bankruptcy laws of the United States or any state thereof.

20.    Tenant has not assigned, sublet or otherwise transferred Tenant's interest in the Lease or the Premises to any party.

21.    To the best of Tenant's knowledge, the use, maintenance and operation of the Premises currently complies with all applicable federal, state, county or local statutes, laws, rules and regulations, including those relating to environmental, health or safety matters.

22.    Tenant has not received notice of any alleged violation of any law governing the use or operation of the Premises and no outstanding writs, injunctions, decrees, orders or judgments are pending, or to the best of Tenant's knowledge, threatened, concerning the use, maintenance or operations of the Premises by Tenant, nor is the Tenant aware of the basis for any such proceeding.

23.    The undersigned is authorized to execute this Certificate on behalf of Tenant.

24.    This Certificate and the Lease are legal, valid, binding and enforceable obligations of Tenant.

Tenant executes this Certificate with the understanding that Lessor is contemplating selling the Premises, and Landlord, RED MOUNTAIN RETAIL GROUP, INC. and their respective successors and assigns (including any mortgagee or beneficiary under a deed of trust or mortgage) will rely on this Certificate.

Dated:  _2/24/2015_

TENANT:

By: _____
Print Name: _JOHN NGUYEN_
Print Title: _PRESIDENT_

EXHIBIT B

## LEASE AGREEMENT

LANDLORD:      Red Mountain Retail Group Inc. a California corporation or "assignee"

TENANT:        Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company

dba _____ TBD _____

ARTICLE I     GRANT AND TERM ...................................................................... 1
    Section 1.01          Grant.................................................................................... 1
    Section 1.02          Term and Commencement Notice .................................... 1
    Section 1.03          Extension Options.............................................................. 1
    Section 1.04          Purchase and Sale of Demised Premises by
                          Landlord............................................................................. 1
    Section 1.05          Memorandum of Lease ..................................................... 2

ARTICLE II     RENT............................................................................................ 2
    Section 2.01          Rent During Term.............................................................. 2
    Section 2.02          Payment of Rent ............................................................... 2
    Section 2.03          Security Deposit................................................................ 2
    Section 2.04          Percentage Rent ............................................................... 2
    Section 2.05          Interest for Late Payments.............................................. 2
    Section 2.06          Late Charges .................................................................... 3
    Section 2.07          "NNN" Lease...................................................................... 3

ARTICLE III     USE OF PREMISES ................................................................. 3
    Section 3.01          Use of Demised Premises................................................ 3
    Section 3.02          Continuous Occupancy .................................................... 3
    Section 3.03          Prohibition of Use............................................................. 3
    Section 3.04          Hazardous Substances..................................................... 4

ARTICLE IV     CONSTRUCTION, REPAIRS, ALTERATIONS AND
                          MAINTENANCE................................................................. 6
    Section 4.01          Construction of Improvements by Tenant ..................... 6
    Section 4.02          Repairs by Tenant to Demised Premises...................... 7
    Section 4.03          Alteration and Remodeling............................................... 7
    Section 4.04          Mechanic's Liens............................................................... 8
    Section 4.05          Compliance ........................................................................ 9
    Section 4.06          No Services by Landlord ................................................. 9
    Section 4.07          Maintenance of the Demised Premises.......................... 9

ARTICLE V     TAXES ......................................................................................... 9
    Section 5.01          Personal Property Taxes................................................. 9
    Section 5.02          Ad Valorem Taxes: Charges and Assessments:
                          and Utility Charges.......................................................... 9

ARTICLE VI     INSURANCE INDEMNITY ......................................................... 11
    Section 6.01          Indemnity........................................................................... 11
    Section 6.02          Insurance by Tenant......................................................... 12
    Section 6.03          Increase in Insurance Rate.  ......................................... 14
    Section 6.04          Waiver of Subrogation. .................................................. 14

ARTICLE VII     SIGNS AND AWNINGS............................................................ 15
    Section 7.01          Signs and Awnings........................................................... 15

ARTICLE VIII     UTILITIES................................................................................. 15
    Section 8.01          Tenant's Responsibility for Utilities Consumed ............. 15
    Section 8.02          Alternative Billing............................................................. 15

ARTICLE IX     ASSIGNMENT SUBLETTING AND MORTGAGING ................ 15
    Section 9.01          Assignment and Subletting. ........................................... 15
    Section 9.02          Violation ............................................................................ 17
    Section 9.03          Subordination.................................................................... 17
    Section 9.04          Easements by Landlord ................................................. 17
    Section 9.05          Demised Premises Free from Liens ............................. 18
    Section 9.06          Bankruptcy Assignment ................................................. 18
    Section 9.07          Bankruptcy Assignment-Payment of Consideration
                          for Assignment ............................................................... 18

ARTICLE X       CONDEMNATION .................................................................. 19
    Section 10.01     Whole Taking .................................................. 19
    Section 10.02     Partial Taking .................................................. 19
    Section 10.03     Condemnation Proceedings ................................ 19
    Section 10.04     Waiver of Termination ...................................... 19

ARTICLE XI      DESTRUCTION OF DEMISED PREMISES ............................. 19
    Section 11.01     Destruction of Demised Premises ...................... 19

ARTICLE XII     SURRENDER OF PREMISES ........................................... 20
    Section 12.01     Liability for Return of Demised Premises ............ 20
    Section 12.02     Abandonment .................................................. 20

ARTICLE XIII    DEFAULT AND REMEDIES ............................................. 20
    Section 13.01     Default by Tenant ............................................ 20
    Section 13.02     Landlord's Remedies; Termination ..................... 21
    Section 13.03     Landlord's Remedies; Re-Entry Rights ............... 22
    Section 13.04     Continuation of Lease ...................................... 22
    Section 13.05     Injunction ...................................................... 22
    Section 13.06     No Waiver ...................................................... 22
    Section 13.07     Indemnity ...................................................... 22
    Section 13.08     Attorneys' Fees .............................................. 22
    Section 13.09     Default by Landlord ......................................... 22
    Section 13.10     Curing Tenant's Defaults ................................. 23
    Section 13.11     Waiver of Breach ............................................ 23
    Section 13.12     Waiver of Redemption ..................................... 23

ARTICLE XIV     INSPECTION OF PREMISES .......................................... 23
    Section 14.01     Landlord's Right to Inspect .............................. 23

ARTICLE XV      QUIET ENJOYMENT .................................................... 23
    Section 15.01     Landlord's Covenant of Quiet Enjoyment ........... 23

ARTICLE XVI     HOLDING OVER .......................................................... 23
    Section 16.01     Rent for Holding Over Period ............................ 23

ARTICLE XVII    TITLE ........................................................................ 24
    Section 17.01     Condition of Title and of Demised Premises ........ 24

ARTICLE XVIII   MISCELLANEOUS ........................................................ 24
    Section 18.01     Notices; Rental Payments ................................ 24
    Section 18.02     Partial Invalidity ............................................. 24
    Section 18.03     Entire Agreement ........................................... 24
    Section 18.04     Successors in Interest ..................................... 24
    Section 18.05     Headings ....................................................... 24
    Section 18.06     Applicable Law ............................................... 24
    Section 18.07     Definition of Landlord ..................................... 24
    Section 18.08     Tenant's Estoppel Certificate; Additional
                      Documents .................................................... 25
    Section 18.09     Intentionally Omitted ...................................... 25
    Section 18.10     Intentionally Omitted ...................................... 25
    Section 18.11     Maintenance Bond .......................................... 25
    Section 18.12     No Partnership ............................................... 26
    Section 18.13     Effect of Statements Submitted by Landlord ....... 26
    Section 18.14     Arbitration ..................................................... 26
    Section 18.15     Counterparts .................................................. 26
    Section 18.16     Default under Franchise Agreement by Tenant ..... 28
    Section 18.17     Brokers .......................................................... 26
    Section 18.18     Strict Construction .......................................... 26
    Section 18.19     Force Majeure ................................................ 28
    Section 18.20     Waiver of Jury Trial ......................................... 27
    Section 18.21     Tenant's Authority .......................................... 27

<u>**EXHIBITS**</u>

EXHIBIT "A"      SITE PLAN

EXHIBIT "B"      FORM OF LEASE GUARANTY AGREEMENT

EXHIBIT "C"      DELETED

EXHIBIT "D"      DELETED

<u>INDEX</u>

| | Page(s) |
|---|---|
| ADA | 12 |
| Affiliate | 20 |
| Affiliated | 24 |
| Alterations | 11 |
| Authorized Use | 3 |
| Claims | 15 |
| Corrective Action | 7 |
| Demised Premises | 7 |
| Effective Date | 1 |
| Environmental Law | 6 |
| Environmental Laws | 4 |
| Environmental Permits | 6 |
| Excluded Claims | 15 |
| Guarantor | 1 |
| Guaranty | 1 |
| Hazardous Substances | 6 |
| Improvements | 10 |
| Landlord | 1, 28 |
| Landlord Parties | 15 |
| Landlord's Broker | 29 |
| Late Charge | 3 |
| Lease | 1 |
| Mortgage | 21 |
| Original Tenant | 1 |
| PCBs | 5 |
| Purchase and Sale Agreement | 1 |
| reasonableness | 8 |
| Recorded Agreements | 13 |
| Release | 7 |
| Rent | 2 |
| Summary | i |
| Taxes | 13 |
| Tenant | 1 |
| Tenant's Broker | 30 |
| Tenant's Parties | 15 |
| Utilities | 18 |
| worth at the time of award | 25 |

## SUMMARY OF BASIC LEASE INFORMATION

This Summary of Basic Lease Information ("Summary") is hereby incorporated into and made a part of the attached Lease. Each reference in the Lease to any term of this Summary shall have the meaning as set forth in this Summary for such term. In the event of a conflict between the terms of this Summary and the Lease, the terms of the Lease shall prevail. Any capitalized terms used herein and not otherwise defined herein shall have the meaning as set forth in the Lease.

| TERMS OF LEASE (References are to the Lease) | DESCRIPTION |
|---|---|
| 1.  Date: | _October 6_ , 2014 |
| 2.  Landlord: | Red Mountain Retail Group, Inc., a California corporation, or its assigns |
| 3.  Address of Landlord: | 1234 E. 17 th Street<br>Santa Ana , CA 92701<br>Attention:  Asset Manager |
| 4.  Tenant: | Luviland Corporation, a California corporation and Luviland LLC, a California limited liability company, dba |
| 5.  Business Address of Tenant: | Attention: _____ |
| 6.  Term. | |
| 6.1   Lease Term: | Twelve (12) years. |
| 6.2   Commencement Date: | That date which is determined to be the Turnover Date |
| 6.3   Lease Expiration Date: | That date which is the last day of the month in which the twelfth (12th) anniversary of the Commencement Date |
| 6.4   Rent Commencement Date: | That date which is six (6) months following the Commencement Date |

7.  Basic Rent:

| Lease Year | Annual Basic Rent | Monthly Installment of Basic Rent |
|---|---|---|
| Lease Years 1-5 | $449,064 | $37,422*<br>*Months 1 – 6 shall be abated in full |
| Lease Years 6-12 | $484,992 | $40,416 |
| Options | See Lease | Rental during the Extension Options shall be increased at the commencement of each Extension Option to one hundred eight percent (108%) of the Basic Rent payable in the immediately preceding year |

| | |
|---|---|
| 8.   Pre-Paid Rental: | $30,000 equal to two (2) months |
| 9.   Broker(s): | None |
| 10.  Tenant Improvement Allowance | $113,400.00 |

## LEASE AGREEMENT

This Lease Agreement ("Lease") made and entered into this ____ day of September, 2014 (the "Effective Date") by and between Red Mountain Retail Group, Inc., a California corporation or its assigns ("Landlord") and Luviland Corporation, a California corporation and Luviland LLC, a California limited liability company dba _____ (hereinafter called "Tenant").


## W I T N E S S E T H:

### ARTICLE I
### GRANT AND TERM

**Section 1.01 Grant.**  Subject to the terms hereof, Landlord does by these presents lease and demise unto Tenant, and Tenant rents from Landlord that certain real property of that certain lot or parcel of land of approximately 56,626 square feet located at 7101 W. Lincoln Avenue, Buena Park, CA together with the first floor of the building located thereon consisting of approximately 22,698 square feet of floor area, and all building equipment, fixtures end other improvements thereon, as further depicted in Exhibit "A" attached hereto (collectively, the "Demised Premises").  Both land area and building area shall be subject to further verification via a boundary survey or ALTA upon which time this lease shall be amended and the correct land and building area shall be corrected.

**Section 1.02 Term.**  This Lease shall be effective upon the Effective Date (as defined above).  The Term of this Lease shall commence upon the Commencement Date (as defined in the Summary of Basic Lease Information) and shall expire on the Lease Expiration Date (as defined in the Summary of Basic Lease Information), unless sooner terminated or extended as permitted herein, and if extended, the "Term" will include any applicable option periods.

**Section 1.03 Extension Options.**  Provided that Tenant is not in default under this Lease (after expiration of all applicable notice and cure periods) as of the date of exercise of any option granted by this Section 1.02 (and, at Landlord's option, as of the commencement of the applicable option period), Landlord hereby grants to Tenant two (2) option periods to extend the term of this Lease for five (5) years each upon the same terms and conditions as those set forth in this Lease.  Tenant shall notify Landlord by written notice of Tenant's intention not to renew the Lease.  Said notice must be mailed certified, return receipt mail or via a recognized overnight delivery service, signature required, and must be received by Landlord one hundred eighty (180) days prior to the expiration of the then current term, otherwise said option shall be deemed exercised as of the date that is one hundred eighty (180) days prior to the expiration of the then current term.  If Tenant elects (in writing) not to exercise any option prior to the expiration of such one hundred eighty (180) day period, then such extension option (and any succeeding option, if any) shall forever terminate and be of no further force or effect.  Any such extension option is personal to the original Tenant executing this Lease ("Original Tenant"), may not be exercised by any person or entity other than the Original Tenant and shall become null and void if the Original Tenant assigns its interest in this Lease or sublets all or any portion of the Demised Premises, unless such assignment or sublease is to an Affiliate that is an assignee of Original Tenant's entire interest in the Demised Premises pursuant to Section 9.01(c) of this Lease.

**Section 1.04 Purchase and Sale of Demised Premises by Landlord.**  Landlord and Tenant acknowledge that, as of the date of this Lease, Landlord does not own the Demised Premises.  As of the date hereof, Landlord (as buyer) has entered into that certain Purchase Contract ("Purchase Contract") dated July 29, 2014 for Landlord's acquisition of the Demised Premises.  In the event Landlord has not completed the acquisition of the Demised Premises on or before December 31, 2014,  unless otherwise agreed in writing by Landlord and Tenant, this Lease shall automatically terminate and neither party shall have any further obligation to the other except Landlord shall promptly return to Tenant any prepaid rent and the Security Deposit.

-1-

Section 1.05 Memorandum of Lease. Neither Landlord nor Tenant shall record this Lease. In addition, Tenant shall not record a short form memorandum of this Lease without the prior written consent (and signature on the memorandum) of Landlord. Landlord, at its option, shall have the right to record a short form memorandum of this Lease. If such short form memorandum is recorded in accordance with this Section 1.05, the party requesting the recording shall pay for all costs of or related to such recording, including, but not limited to, recording charges and documentary transfer taxes.

## ARTICLE II
## RENT

Section 2.01 Rent During Term. The monthly Basic Rent payable by Tenant to Landlord during the Lease shall be as provided in Section 7 of the Summary of Basic Lease Information.

Section 2.02 Payment of Rent. The monthly Basic Rent plus all sums payable by Tenant under this Lease (collectively "Rent") shall be due on the first (1st) of each month for the period in which it relates and paid by Tenant to Landlord at the address shown in Section 3 of the Summary or at such other place as Landlord may in writing designate, without any right of notice, demand, deduction or set-off, except as expressly set forth herein.

Section 2.03 Security Deposit and Prepaid Rent. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be obligated to pay to Landlord a Security Deposit pursuant to the terms of this Lease; provided, however, concurrently with Tenant's execution and delivery of this Lease to Landlord, Tenant shall deposit with Landlord the Pre-Paid Rental designated in Section 8 of the Summary of Basic Lease Information (i.e., $30,000.00). The Pre-Paid Rental shall be applied Fifteen Thousand and 00/100 Dollars ($15,000.00) to the seventh (7th) and eighth (8th) monthly installments of Basic Rent due pursuant to the terms of this Lease.

Section 2.04 Tenant Allowance. Notwithstanding anything to the contrary contained in this Lease, Landlord shall pay to Tenant a tenant allowance in the sum of Two Hundred Eighty Eight Thousand Six Hundred Fifty Nine and 20/100 Dollars ($288,659.20), to be paid as an offset to the Basic Rent payable by Tenant for the first three (3) years of the Term of this Lease as set forth below. Notwithstanding the foregoing to the contrary, at any time during the Term of this Lease, Landlord may elect, at its sole election, to provide a lump sum payment to Tenant of any then remaining credit balance, in lieu of continuing such monthly credits as set forth below. In the event Landlord elects to provide said lump sum payment, Landlord shall so notify Tenant in writing and deliver such notice to Tenant together with any such lump sum payment. It is agreed and understood that following Landlord's payment of any such lump sum credit balance that the monthly offset, as set forth in this paragraph, shall thereafter be deemed null and void and Tenant shall thereafter be obligated to pay all Basic Rent in full pursuant to the schedule set forth in the Summary of Basic Lease Information.

| Months | Monthly Offset | Annual Offset | Total |
|---|---|---|---|
| 1-6 | $0 | $0 | |
| 7-12 | $22,422.00 | $134,533.20 | |
| 13-24 | $9,422.00 | $113,064.00 | |
| 25-36 | $3,422.00 | $41,062.00 | |
| | | | $288,659.20 |

Section 2.05 Percentage Rent. Notwithstanding anything to the contrary in this Lease, Tenant shall not be obligated to pay Landlord "percentage rent." Notwithstanding the foregoing, Tenant shall be responsible for reporting its gross sales to Landlord on a monthly basis.

Section 2.06 Interest for Late Payments. Notwithstanding any provision to the contrary set forth elsewhere in this Lease, and regardless of the provisions set forth in

-2-

Section 13.01 below with regard to cure periods, if Tenant shall fail timely to pay to Landlord any installment of Rent on the date on which such sum is due pursuant to the terms of this Lease, Tenant shall pay to Landlord interest on such late payment from the date which is ten (10) days following the due date thereof to the date of receipt of payment by Landlord at a rate per annum equal to twelve and one-half percent (12.5%) or the maximum rate permitted under applicable laws but in no event to exceed that permitted under applicable laws.

Section 2.07 Late Charges. Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult and costly to ascertain. Such costs include, but are not limited to processing, administrative and accounting charges. Accordingly, if any installment of Rent or any other sum due from Tenant is not received by Landlord as set out herein within five (5) days after such amount is due, Tenant shall pay to Landlord a late charge equal to five (5%) percent of such overdue amount ("Late Charge"). The parties hereby agree that such Late Charge represents a fair and reasonable estimate of the costs Landlord will incur as a consequence of late payment by Tenant. Acceptance of such Late Charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder, at law and/or in equity.

Section 2.08 "NNN" Lease. It is the intention of the parties that this Lease is a so called "NNN" Lease and that Landlord, except as otherwise expressly provided herein, will have no responsibility for and shall not pay for the construction, care, maintenance, operation, repair, replacement, alteration, addition, change, improvements, insurance and Taxes (defined below) for or to the Demised Premises and any building and improvement thereof; Tenant shall be responsible for and shall pay these items in addition to Rent.

## ARTICLE III
## USE OF PREMISES

Section 3.01 Use of Demised Premises. The Demised Premises shall be used for the operation of a store specializing in the sale of general merchandise at wholesale and/or close-out prices ("Authorized Use") and for no other purpose. In addition, the Demised Premises shall not be used in any manner, which is in violation of the requirements of any laws, ordinances, rules, regulations and requirements of any federal, state, municipal governments, or the provisions of recorded agreements.

Section 3.02 Continuous Occupancy. Tenant shall occupy the Demised Premises promptly upon the Commencement Date and thereafter throughout the Term; and upon completion of the Improvements (as defined in Article IV below) shall continuously, actively and diligently use the entire Demised Premises throughout the Term for the Authorized Use and for no other purpose in an efficient, businesslike and reputable manner, subject, however, to temporary interruption of business for a reasonable period of time approved by Landlord for authorized repairs, alterations and remodeling as permitted under this Lease. Further, Tenant shall at all times keep and maintain within and upon the Demised Premises adequate supplies and products and have sufficient personnel to service and supply the demands and requirements of its customers. Tenant shall have its exterior signs and exterior advertising displays (which have previously been approved by Landlord) adequately illuminated continuously during Tenant's hours of operation. If Tenant shall fail to continuously and uninterruptedly operate the business which it is required to operate under the terms of this Lease, Tenant acknowledges that monetary damages may be inadequate to compensate Landlord and that Landlord shall be entitled to injunctive relief ordering Tenant to resume such continuous operation and to pursue any and all other rights and remedies under this Lease, at law, or in equity, including termination as a result thereof.

Section 3.03 Prohibition of Use. Tenant shall have no claim against Landlord for damages and the validity of this Lease shall not be affected in any manner whatsoever, should the use and occupancy of the Demised Premises for the Authorized Use be prohibited or impaired by reason of any law, ordinance or regulation of federal, state,

county of municipal governments or by reason of any act of any legal or governmental or other public authority or by any Recorded Agreements (as defined in Section 5.02(b)(ii) below).

Section 3.04 Hazardous Substances.

(a)  Compliance with Law.  Tenant shall conduct, and cause to be conducted, all operations and activity at the Demised Premises in compliance with, and shall in all other respects applicable to the Demised Premises comply with, all applicable federal, state and municipal statutes, ordinances, regulations, orders, directives or other requirements of law or common law orders, directives or other requirements of law or common law (collectively, "Environmental Laws") concerning: (i) the generation, use, handling, treatment, storage, transportation, release, disposal, remediation or presence of any Hazardous Substances (as defined below) in, on, under, from or connected with operations and activities at the Demised Premises; and (ii) storage tanks and related facilities and connections (if any).  Tenant shall timely obtain and maintain all permits, licenses or approvals and shall timely prepare, make, maintain and/or submit all notifications, registrations, records, reports and other documents as required by Environmental Laws.  Tenant shall at all times comply with the terms and conditions of such permits, licenses, approvals, notifications and registrations.

(b)  Information Transfer.  Tenant shall provide to Landlord copies of the following, forthwith after each shall have been prepared, submitted or received by Tenant or any occupant of the Demised Premises: (i) all applications and associated material submitted to any governmental agency required under any Environmental Laws; (ii) all notifications, registrations, records, reports or other documents and supporting information prepared, maintained or submitted to any governmental agency required under any Environmental Laws; (iii) all permits, licenses and approvals, and amendments or modifications thereof, required under any Environmental Laws; and (iv) any correspondence, notice of violation, summons or order, administrative, civil or criminal complaint, notice of investigation, request for information or other document received by Tenant or any occupant of the Demised Premises relating to any Hazardous Substances pertaining to the Demised Premises.

(c)  Handling of Hazardous Substances.  Should Tenant be responsible for any release of Hazardous Substances at the Demised Premises, Tenant shall immediately take all measures necessary to contain, remove and dispose from the Demised Premises all materials released or contaminated by the release, and remedy and mitigate all threats to public health or the environment relating to such release. When conducting any such measures and when using and handling Hazardous Substances Tenant shall comply with all Environmental Statutes.  Further, Tenant, at Tenant's sole cost and expense, shall cooperate with any action plan, directive or order for clean-up or remediation of the Demised Premises by any federal, state or local authority which is regulating any release or violation of any environmental statute, rule, order or regulation.

(d)  Grease Traps.  Tenant shall obtain prior written approval from the Landlord for the installation of any replacement grease trap, whether above or underground, at the Demised Premises, and shall comply with all applicable laws and regulations concerning its installation, operation and closure.

(e)  Property Transfer.  If Tenant's use of any portion of the Demised Premises, for any purpose, results in the requirement to obtain an approval of any kind by any governmental agency administering Environmental Laws due to: (i) cessation of part or all of the operations on the Demised Premises for any reason, or (ii) a change in the operations on the Demised Premises to a use that requires such approval, Tenant shall, in compliance with all applicable requirements, and at Tenant's sole cost and expense, immediately apply for and obtain for Landlord the required approval and perform all remedial actions necessitated in whole or part by Tenant's activities at the Demised Premises.  Tenant and Landlord shall cooperate as necessary to prepare any such application and represent and warrant that any such application made pursuant to this subsection shall be true and complete to the best knowledge, information and belief

-4-

of each. If such a governmental approval requirement exists, but Tenant believes that it is not subject to such requirement, Tenant, at its sole cost and expense, shall obtain for Landlord a statement from the applicable governmental agency that the Demised Premises is not subject to such requirement.

(f)    Definitions. For the purposes of this Section 3.04, the terms listed below shall be defined as they are defined in the provisions of law listed below and the regulations promulgated pursuant thereto as amended from time to time or in future federal legislation or in corresponding present or future provisions of law or regulation in the state where the Demised Premises are located.

(i)    air pollutant - 42 U.S.C. '7602 (g).

(ii)    discharge of pollutant - 33 U.S.C. '1362 (12)

(iii)    release - 42 U.S.C. '9601 (22).

(iv)    storage - 42 U.S.C. '6903 (33), without limitation as to the material involved.

(v)    disposal - 42 U.S.C. '6903 (3), without limitation as to the material involved.

(vi)    Solid Waste - 42 U.S.C. '6903 (27).

(vii)    Hazardous Substance shall mean and include any hazardous or toxic materials, substances or wastes as now or hereafter designated or regulated under any Environmental Law, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls ("PCBs"), and freon and other chlorofluorocarbons, except for ordinary and general office supplies, such as copier toner, liquid paper, glue, ink and common household cleaning materials as well as other materials used and stored by Tenant in the Demised Premises as part of Tenant's permitted use, all to the extent used and stored in compliance with all Environmental Laws (some or all of which may constitute "Hazardous Substances" as defined in this Lease).

(g)    Tenant's Environmental Indemnity. To the fullest extent permitted by law, Tenant agrees to promptly indemnify, protect, defend and hold harmless Landlord and the Landlord Parties from and against any and all claims, damages, judgments, suits, causes of action, losses, liabilities, penalties, fines, expenses and costs (including, without limitation, clean-up, removal, remediation and restoration costs, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees and court costs) which arise or result from (i) the presence of Hazardous Substances on, in, under or about the Demised Premises during the Term of this Lease and/or (ii) the presence of Hazardous Substances on, in, under or about the Demised Premises which are caused or permitted by Tenant or any of Tenant's Parties, including arising from or caused in whole or in part, directly or indirectly, by (i) the presence in, on, under or about the Demised Premises, of any Hazardous Substances; (ii) Tenant's or other user's actual, proposed or threatened use, treatment, storage, transportation, holding, existence, disposition, manufacturing, control, management, abatement, removal, handling, transfer, generation or release (past, present or threatened) of Hazardous Substances to, in, on, under, about or from the Demised Premises; (iii) any past, present or threatened non-compliance or violations of any Environmental Laws in connection with Tenant and/or the Demised Premises, (iv) personal injury claims (v) the payment of any environmental liens, or the disposition, recording, or filing or threatened disposition, recording or filing of any environmental lien encumbering or otherwise affecting the Demised Premises, (vi) diminution in the value of the Demised Premises, (vii) damages for the loss or restriction of use of the Demised Premises, including prospective rent, lost profits and business opportunities, (viii) sums paid in settlement of claims, (ix) reasonable attorneys' fees, consulting fees and expert fees, (x) the cost of any investigation of site conditions, and (xi) the cost of any repair, clean-up or remediation ordered by any governmental or quasi-governmental agency or body or

otherwise deemed necessary in Landlord's reasonable judgment. Tenant's obligations hereunder shall include, without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, cleanup or detoxification or decontamination of the Demised Premises, or the preparation and implementation of any closure, remedial action or other required plans in connection therewith. For purposes of the indemnity provisions in this Section 3.04, any acts or omissions of Tenant and/or Tenant's Parties or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to Tenant. The provisions of this Section 3.04(g) will survive the expiration or earlier termination of this Lease.

(h)    General Compliance. The provisions of this Section 3.04 shall not be construed as limiting in any respect the covenants and obligations of Tenant under Section 4.05 hereof.

## ARTICLE IV
## CONSTRUCTION, REPAIRS, ALTERATIONS AND MAINTENANCE

Section 4.01 Construction of Improvements by Tenant. Landlord shall, at Landlord's sole cost and expense, and at its option either install new heating ventilation and air conditioner unit(s) ("HVAC") in the Demised Premises or perform all work necessary to deliver the existing HVAC in good working order on the Turnover Date (as defined herein). It is agreed and understood that delivering the HVAC in good working order is the only work required by Landlord prior to the Turnover Date. Tenant shall accept possession of the Demised Premises, together with all permanent building fixtures, easements, rights, permits and infrastructure, on the date that Landlord notifies Tenant that the Demised Premises is available for Tenant to perform, at Tenant's sole cost and expense, any and all improvements to the Demised Premises that Tenant desires or as is deemed necessary for Tenant to use the Demised Premises for Tenant's Authorized Use ("the "Turnover Date"). All such improvements performed by Tenant in the Demised Premises shall be hereinafter collectively referred to as the "Improvements". As material inducement to Landlord entering into this Lease and notwithstanding any provision to the contrary, Tenant represents and warrants:

(a)    Tenant will perform the improvements to Tenant's specifications at its sole cost and expense, subject to the Tenant Improvement Allowance (as defined below), and no representation or warranties have been made by Landlord to Tenant regarding the Demised Premises including but not limited to Tenant's proposed use or the development of the Demised Premises as contemplated herein. As such, Tenant hereby agrees that the Demised Premises shall be taken "as is", "with all faults", "without any representations or warranties", except as expressly noted in the immediately preceding paragraph, and Tenant hereby agrees and warrants that it has investigated and inspected the condition of the Demised Premises and the suitability of same for Tenant's purposes, and Tenant does hereby waive and disclaim any objection to, cause of action based upon, or claim that its obligations hereunder should be reduced or limited because of the condition of the Demised Premises or the suitability of same for Tenant's purposes. Tenant acknowledges that neither Landlord nor any agent nor any employee of Landlord has made any representations or warranty with respect to the Demised Premises or with respect to the suitability of either for the conduct of Tenant's business and Tenant expressly warrants and represents that Tenant has relied solely on its own investigation and inspection of the Demised Premises in its decision to enter into this Lease and let the Demised Premises in the above-described condition.

(b)    All costs required to develop the improvements are the responsibility of the Tenant. Tenant shall defend, indemnify, and hold Landlord harmless from and against any and all claims, demands, costs, obligations, liens, expenses (including attorney's fees and costs), and legal actions brought against Landlord which arise out of Tenant's development of the improvements and from the actions, omissions, or negligence of Tenant, or any Tenant's Parties (as defined in Section 6.01(a)(i) below).

(c)     Tenant will construct the Improvements pursuant to all applicable building codes, laws, ordinances and other regulations of governmental authority in a good, substantial and workmanlike manner.

(d)     Tenant will open for business with a Certificate of Occupancy and License to operate its business issued by the State of California or any other entity claiming authority to issue said license.  Tenant will obtain all other governmental approvals or permits necessary, if any, to operate its business upon the Demised Premises.

(e)     Tenant shall be solely responsible for all claims, defects, disputes, or causes of action of any manner arising from the construction of the Improvements.

(f)     Tenant is unaware of any fact materially affecting the value or desirability of the Demised Premises whether or not said facts is/are readily observable. In the event Tenant shall become aware of any such fact or circumstance during the term of this Lease, Tenant shall immediately advise Landlord of such fact or circumstance.

(g)     Provided Tenant is not in default of this Lease beyond any applicable notice and cure period, Landlord shall pay to Tenant a tenant improvement allowance (the "Tenant Improvement Allowance") of One Hundred Thirteen Thousand Four Hundred Dollars ($113,400.00) within thirty (30) days following the later of (a) Tenant opening for business at the Demised Premises, (b) completion of the Improvements in the Demised Premises and inspection and approval by Landlord or Landlord's authorized agent or property manager of such Improvements, and (c) Landlord's receipt from Tenant of (i) a copy of the certificate of occupancy for the Demised Premises, (ii) copies of paid invoices for work and/or materials for permanent improvements made to the Demised Premises by or on behalf of Tenant (which shall equal at least the amount of the Tenant Improvement Allowance), (iii) final permits for Tenant's Work (if applicable), and (iv) unconditional final lien waivers from all contractors and/or material suppliers performing work or providing supplies for Tenant's Improvements to the Demised Premises (which shall equal at least the amount of the Tenant Improvement Allowance).  It is agreed and understood that Landlord may deduct from the Tenant Improvement Allowance any amounts due and owing to Landlord prior to disbursement of the Tenant Improvement Allowance to Tenant.  The Tenant Improvement Allowance shall not be used for furniture, fixtures or equipment, design or other fees, permits or signs, or other personal property.

Section 4.02  Repairs by Tenant to Demised Premises.  Tenant shall, throughout the Term of its Lease and at its sole cost and expense, take good care of the Demised Premises and its appurtenances and keep them in good order, condition and repair, normal wear and tear excepted, and in compliance with all of the terms and provisions of all laws, and all Recorded Agreements.  Tenant shall promptly make all repairs and replacements necessary to maintain such good order, condition, repair and compliance. Tenant shall keep and maintain all portions of, in and about the Demised Premises in a clean and orderly condition, and free of accumulations of dirt, rubbish, snow, ice and water.

Section 4.03  Alteration and Remodeling.  After completion of the Improvements, Tenant shall not, without on each occasion first obtaining Landlord's prior written consent, make or permit to be made any alterations, improvements or additions (collectively, the "Alterations") to the Demised Premises of a value greater than Ten Thousand Dollars ($10,000.00) per Alteration.  Landlord's Consent shall not be unreasonably withheld.  Any Alterations made by Tenant including both those that do and do not require Landlord's prior written consent, shall not affect or impair the structure of the building nor reduce its value; and Tenant shall give to Landlord at least thirty (30) days prior written notice of any such Alteration.  All plans for any Alterations shall be subject to Landlord's reasonable approval.  Landlord may impose, as a condition of its consent to all Alterations or repairs of the Demised Premises, such requirements as Landlord in its reasonable discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, materials, mechanics and materialmen approved by Landlord (such approval shall not

be unreasonably withheld, conditioned or delayed).    Tenant shall construct such Alterations and perform such repairs in conformance with any and all applicable rules and regulations of any federal, state, county or municipal code or ordinance and pursuant to a valid building permit, issued by the city in which the Demised Premises is located, and in conformance with Landlord's construction rules and regulations. Landlord's approval of the plans, specifications and working drawings for Tenant's Alterations shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities. All work performed by Tenant with respect to any of its Alterations must be done in a good and workmanlike manner and diligently prosecuted to completion to the end that the Demised Premises shall at all times be a complete unit except during the period of work. If Tenant makes any Alterations, Tenant agrees to carry (or have its contractor carry) "Builder's All Risk" insurance in an amount reasonably approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to this Lease immediately upon completion thereof. In addition, Landlord may, in its discretion, require Tenant to obtain (at Tenant's sole cost and expense) a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee. Promptly after completion of any Alterations, Tenant shall (i) cause a Notice of Completion to be recorded in the office of the Recorder of the county in which the Demised Premises is located in accordance with Section 3093 of the Civil Code of the State of California or any successor statute, (ii) deliver to Landlord a reproducible copy of the "as built" drawings of the Alterations, and (iii) deliver to Landlord evidence of payment, contractors' affidavits and full and final waivers of all liens for labor, services or materials used in the construction of the Alterations. Except as otherwise provided herein, all Alterations and other property attached to the Demised Premises or any part thereof made or installed by Tenant shall immediately upon completion or installation thereof be and become part of the Demised Premises and the property of the Landlord without payment therefor by Landlord, and shall be surrendered to Landlord upon the expiration or earlier termination of the Term of this Lease. Notwithstanding the foregoing, Tenant agrees that all removable trade fixtures and personal property installed by Tenant in the Demised Premises must be removed by Tenant at the termination of the Term of this Lease. Tenant agrees that it will at its own cost and expense forthwith repair any and all damage done by the removal of any Alterations, fixtures, trade fixtures and personal property.

Section 4.04 Mechanic's Liens.

(a)    Prior to the making of any alterations or changes or the performance of any construction or work performed or authorized by Tenant which may give rise to a mechanic's lien, Tenant shall provide a statement in writing to Landlord assuring that payment for same will be made by Tenant and shall give Landlord reasonable opportunity to post a Notice of Non-responsibility.    Tenant hereby completely and fully indemnifies Landlord, and agrees to defend and hold Landlord harmless from and against, any mechanic's lien or other lien or claim in connection therewith.

(b)    If any mechanic's, laborer's or materialman's lien shall at any time be filed against the Demised Premises or any part thereof by reason of work performed by or at the direction of the Tenant within thirty (30) days after notice of filing thereof, Tenant shall cause it to be discharged by payment or bonding. If Tenant shall fail to cause such lien to be discharged by payment or bonding within the period aforesaid, then in addition to any other right or remedy, the Landlord may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in such event, Landlord shall be entitled, if it so elects to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, cost and allowances. Any amount so paid by Landlord and all cost and expenses incurred by it in connection therewith, together with interest thereon at the rate of twelve percent (12%), from the respective dates of the making of the

payments and incurring of the costs and expenses, shall be immediately due and payable by the Tenant to Landlord.

(c)     Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific alteration, addition, improvement or repair to the Demised Premises or any part thereof.

Section 4.05  Compliance.  Tenant shall, throughout the Term of this Lease, at Tenant's sole cost and expense, promptly comply with all laws and ordinances, and all notices, orders, rules, regulations and requirements of federal, state and municipal governments and appropriate departments, commissions, boards, and officers thereof, or any other body now or hereafter constituted exercising similar functions, which are applicable to the condition, use, occupancy, improvement, and alteration or improvement (whether structural or non-structural, including unforeseen and/or extraordinary alterations or improvements, and regardless of the period of time remaining in the Term) of the Demised Premises, including, without limitation, the provisions of the Americans with Disabilities Act ("ADA") as it pertains to the condition, use, occupancy, improvement and alteration (whether structural or non-structural, including unforeseen and/or extraordinary alterations or improvements, and regardless of the period of time remaining in the Term) of the Demised Premises. Tenant shall not use or allow the Demised Premises to be used (a) in violation of any Recorded Agreements affecting the Demised Premises or of any law or governmental rule or regulation, or of any certificate of occupancy issued for the Demised Premises, or (b) for any improper, immoral, unlawful or reasonably objectionable purpose. Tenant shall not cause, maintain or permit any nuisance in, on or about the Demised Premises, nor commit or suffer to be committed any waste in, on or about the Demised Premises. Without limiting the generality of the foregoing, Tenant shall keep in force at all times all licenses, consents and permits necessary for the lawful use of the Demised Premises and Tenant shall pay all personal property taxes, income taxes, license fees, sales tax payable on rent, and other taxes and common area charges, if any, which are or may be assessed, levied or imposed upon the Demised Premises or Tenant in connection with Tenant's operation of its business upon the Demised Premises.

Section 4.06  No Services by Landlord.  Landlord is not and shall not be required to render any services of any kind to Tenant.

Section 4.07  Maintenance of the Demised Premises.  Tenant shall at his sole cost, keep and maintain said Demised Premises and appurtenances and every part thereof, including the building structure, roof, interior walls and utility lines, plumbing, sewer, electrical, heating and air conditioning, any store front, parking areas, sidewalks and landscaping and the interior and exterior of the premises in good sanitary order, condition, and repair.  Landlord shall have no repair or maintenance obligations whatsoever pertaining to the Demised Premises.

ARTICLE V
TAXES

Section 5.01  Personal Property Taxes.  Tenant shall pay all personal property taxes levied by any federal, state, municipal or other authority with respect to its property located on the Demised Premises and Tenant shall pay all sales taxes levied by any federal, state, municipal or other authority with respect to the Demised Premises, and reimburse Landlord for any tax assessed against Landlord on the Rent payable under this Lease, and shall hold the Landlord harmless with respect thereto.

Section 5.02  Ad Valorem Taxes;  Charges and Assessments;  and Utility Charges.

(a)     Tenant shall pay throughout the Term of this Lease, as additional rent, within twenty (20) days after receipt of a bill therefore from Landlord, or, as provided in Section 5.02(e) below, from the levying authority or within ten (10) days of its due date, whichever is later, all Taxes (as defined in Section 5.02(b)). Tenant shall,

-9-

at its expense, and upon notice to Landlord, have the right to contest any and all such taxes in the name of, and on behalf of Landlord. Landlord shall, at Tenant's sole cost and expense, reasonably cooperate with Tenant in any such contest by Tenant. Tenant shall have the right to receive a copy of any notice that Landlord receives in connection in with any such contest.

   (b)  The term "Taxes" shall mean:

      (i)  all levies, taxes (including payments required to be made in lieu of taxes), assessments, liens, licenses and permit fees, charges for public utilities and commercial rental taxes imposed, assessed or charged on or with respect to Landlord's interest in the Demised Premises or this Lease, or the Demised Premises by any federal, state, municipal or other authority; or under any law, ordinance, or resolution of any federal, state municipal or other authority; and

      (ii)  any assessments, charges, levies or other impositions imposed, assessed or charged on or with respect to Landlord's interest in the Demised Premises or this Lease, or the Demised Premises pursuant to the terms and provisions of an agreement, covenant, easement, restriction, declaration or other matter now of record or hereafter placed of record against the Demised Premises (all such terms and provisions referred to in this subsection (ii) being herein collectively called "Recorded Agreements"); and,

      (iii)  all other charges, imposts or burdens whatsoever of any kind and nature, whether or not particularized by name and whether general or special, ordinary or extraordinary, foreseen or unforeseen, which at any time during the Term of this Lease may be created, levied, assessed, confirmed, adjudged, imposed or charged upon or with respect to the Demised Premises, or any improvements made thereto, or on any part of the foregoing or any appurtenances thereto, or directly upon this Lease or the Rent payable hereunder, or amounts payable by any subtenant or other occupants of the Demised Premises or with respect to the leasing, operation, use or occupancy of the Demised Premises, or upon this transaction or against Landlord because of Landlord's estate or interest herein, by any federal, state, municipal or other authority, or under any law, ordinance or regulation of any federal, state, municipal or other authority, including among others, all special tax bills and general, special or other assessments and liens or charges made on local or general improvements or under any governmental or public power or authority whatsoever, and transit taxes, taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, and personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, furniture and other personal property used in connection with the Demised Premises. If any special assessments or special tax bills which relate directly to an improvement or improvements made by any governmental or public authority for the benefit of the Demised Premises, and further that said improvements have a useful life greater than the time remaining until the expiration of the Term, then Tenant shall only be required to pay that portion of the improvement or assessment which corresponds to Tenant's occupancy of the Demised Premises.

   (c)  Notwithstanding the provisions of the previous paragraph of this Article, the term Taxes, and the obligation of Tenant to pay Taxes, shall not include any net income or excess profits taxes assessed against Landlord, or any corporation capital stock and franchise taxes imposed upon Landlord; provided, however, that, if at any time prior to the expiration of the Term of this Lease, any net income tax, assessment, levy or charge shall be imposed upon Landlord on the Demised Premises in lieu of or in place of any tax or other charge included in the definition of Taxes set forth above, and shall be measured by or based upon net income or profits derived from real estate (as distinguished from net income or profits generally), then such new tax, assessment, levy or charge shall be included in "Taxes" to the extent that such new tax, assessment, levy or charge would be payable if the Demised Premises were the only property of Landlord subject thereto and the income and profits received by Landlord from the Demised Premises were the only income and profits of Landlord.

(d)    All Taxes that become payable for the first and last tax years during the Term shall be apportioned between Landlord and the Tenant in such a manner that Tenant shall only be obligated to pay Taxes applicable to the Term.

(e)    Landlord shall have the right, in its discretion, to have all bills for Taxes be issued directly to Tenant and, in such event, Tenant shall (i) pay the Taxes indicated in such bills within ten (10) days of its due date and (ii) provide Landlord with reasonably particularized evidence of such payment concurrently with Tenant's payment of the same.  In such event, Tenant (and not Landlord) shall be responsible for the payment of Taxes and Tenant shall indemnify Landlord for any claims, costs, damages, fines and attorneys' fees resulting from or incurred by Landlord due to Tenant's failure to pay or timely pay such Taxes.

(f)    In the event Tenant is in default of any of its obligations under this Lease and Tenant fails to commence to cure any such default within thirty (30) days after notice of the occurrence from Landlord, Landlord may, at its sole option, elect to collect Taxes from Tenant for any calendar year in monthly installments, in the following manner: Landlord may at any time prior to or during a calendar year, submit to Tenant Landlord's reasonable estimates of Taxes for such calendar year (which estimate may include reasonably anticipated increases over Taxes incurred in calendar years prior to such calendar year). If Landlord shall submit to Tenant such estimate, Tenant shall pay to Landlord the amount of such estimate in equal monthly installments, in advance, on or before the first day of each calendar month during such calendar year (or during the remainder of such calendar year, in the event Landlord shall submit such estimates during a calendar year, or in the case of a partial calendar year) so that the full amount of such estimate shall have been paid: (i) upon the expiration of such calendar year, in the case of each calendar year except the calendar year in which the term hereof shall expire; and (ii) upon the expiration of the term hereof, in the case of a calendar year in which the term hereof shall expire.  If Landlord shall collect payments on-account of Taxes for any calendar year monthly, pursuant to this subsection, then, within ninety (90) days following the expiration of such calendar year, Landlord shall furnish to Tenant a written statement showing the actual amount of Taxes for such calendar year and the estimated payment theretofore made by Tenant.  If the estimated payments made by Tenant shall exceed the Taxes, Tenant shall be entitled to immediate credit for such excess against payments next thereafter due to Landlord under this Section 5.02 (or to a refund, if no such payments shall be due thereafter).  If the actual Taxes shall exceed the estimated payments made by Tenant, Tenant shall pay to Landlord the deficiency within ten (10) days after Landlord shall submit the aforesaid statement to Tenant.

## ARTICLE VI
## INSURANCE INDEMNITY

Section 6.01  Indemnity.

(a)    Indemnification.

(i)    Provided such indemnification by Tenant is not made necessary by Landlord's willful act or gross negligence, Tenant agrees to indemnify, defend and save harmless Landlord and its managing members, partners and subpartners, and their respective officers, agents, property managers, servants, employees, and independent contractors (collectively, "Landlord Parties"), from and against any and all claims, demands, expenses and liabilities (including, without limitation, reasonable attorneys' fees and costs) (collectively, "Claims"), arising from the occupancy, conduct, operation or management of the Demised Premises or from any work or thing whatsoever done on or about the Demised Premises, or arising from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or under the provisions of any law, ordinance or regulation or any federal, state, municipal or other authority, or arising from any act, neglect or negligence of Tenant, or any of its sublessees, assignees, licensees, agents, contractors, servants, employees or invitees or (collectively, "Tenant's Parties"), or arising from any accident,

injury or damage whatsoever caused to any person, firm or corporation, occurring during the term of this Lease, in or about the Demised Premises, and from and against all costs, expenses and liabilities incurred in connection with any such claim or action or proceeding brought thereon (including, without limitation, the reasonable fees of attorneys, investigators and experts); and in case any action or proceeding be brought against Landlord by reason of any such claim, Tenant upon notice from Landlord covenants at Tenant's cost and expense to resist or defend such action or proceeding or to cause it to be resisted or defended by an insurer. The provisions of this Section 6.01(a)(i) shall survive the expiration or sooner termination of the Lease.

(ii)    Notwithstanding anything in this Section 6.01 to the contrary, Tenant's indemnity shall not apply to any Claims to the extent resulting from the gross negligence or willful misconduct of Landlord or the Landlord Parties, and not insured (or required to be insured) by Tenant under this Lease (collectively, the "Excluded Claims"), and Landlord shall indemnify, protect, defend and hold harmless Tenant and Tenant's Parties from and against any such Excluded Claims, but only to the extent Landlord's liability is not waived and released by Tenant pursuant to the terms of Section 6.04 of this Lease (provided, however, that Landlord's indemnity shall, in no event, extend to loss of profits, loss of business or other consequential damages incurred by Tenant). Each party's agreement to indemnify the other pursuant to this Section 6.01(a) is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by the indemnifying party pursuant to the provisions of this Lease. The provisions of this Section 6.01(a)(ii) shall survive the expiration or sooner termination of this Lease.

(b)    Release.    Subject to Landlord's obligation to indemnify Tenant pursuant to the provisions of Section 6.01(a)(ii) above, Landlord, its principals, agents, employees and contractors, shall not be liable for, and Tenant hereby releases Landlord, its principals, agents, employees and contractors from, all claims for loss of life, personal injury or damage to property or business sustained by Tenant or any person claiming by, through or under Tenant resulting from any fire, accident, occurrence or condition in or upon the Demised Premises, or any part thereof including, but not limited to; any such claims for loss of life, personal injury in the Demised Premises, any defect in or any failure of any equipment, machinery, utilities, appliances, or apparatus in the Demised Premises, falling of fixtures or other items, leakage of water, snow or ice, broken glass or any other event, cause or circumstance.

Section 6.02 Insurance by Tenant.

(a)    Tenant shall keep in force, at Tenant's sole cost and expense, by responsible insurance companies reasonably acceptable to Landlord authorized to do business in the jurisdiction in which the Demised Premises are situated and throughout the Term of this Lease and during such other times as Tenant occupies the Demised Premises or any part thereof:

(i)    Insurance against claims for personal injury (including death) and property damage with broad-form contractual liability coverage, under a policy of comprehensive general liability insurance or (at Landlord's option) commercial general liability insurance, with limits not less than Five Million Dollars ($5,000,000) in respect of personal injury (including bodily injury and death) and One Million Dollars ($1,000,000) for property damage.

(ii)    If the nature of Tenant's operation is such as to place any or all of its employees under the coverage of local workmen's compensation laws or similar statutes, workmen's compensation or similar insurance affording statutory coverage and containing statutory limits.

(iii)    Fire insurance with extended coverage endorsements covering all of Tenant's stock in trade in the Demised Premises to the extent of at least one hundred percent (100%) of the replacement cost. The insurance specified in this Section 6.02(a) (iii) may include a deductible amount which

amount shall be the same as Tenant's other units nationwide and reasonably acceptable to Landlord, but in no event to exceed Ten Thousand Dollars ($10,000.00). Tenant is responsible for paying the deductible.

(iv)    Insurance against loss or damage to the building and all other improvements now or hereafter located on the Demised Premises by fire and such other casualties as may be included in the broadest form of all risk extended coverage insurance from time to time available (including, without in any manner limiting the generality of the foregoing, earthquake and flood insurance if the Demised Premises are located in an earthquake or flood hazard area (as applicable)), and that any additional coverage that a mortgage lender may reasonably require, in an amount equal to the full insurable replacement cost of such buildings and improvements; insurance against abatement or loss of rental by reason of the occurrences described in clause (a) above in an amount equal to minimum and additional rental for at least twelve (12) months following the occurrence of such casualty; and boiler insurance, plate glass insurance, and civil disturbance insurance.

(v)    Environmental Liability Insurance (in form and substance reasonably satisfactory to Landlord) with limits of coverage not less than Five Million Dollars ($5,000,000.00) combined per occurrence and in the aggregate insuring against any and all liability with respect to the Demised Premises and all areas appurtenant thereto arising out of any death or injury to any person, damage or destruction of any property, other loss, cost or expense resulting from any release, spill, leak or other contamination of the Demised Premises, or any other property surrounding the Demised Premises attributable to the presence of Hazardous Substances.  Upon Landlord's request, Tenant shall also obtain (at Tenant's sole cost and expense) environmental impairment liability insurance and environmental remediation liability insurance (in form and substance (including limits) acceptable to Landlord).  If, at anytime it reasonably appears to Landlord (based on Tenant's operations from the Demised Premises and/or based on claims made under any policies carried by Tenant whether or not such claims pertain to the Demised Premises) that Tenant is not maintaining sufficient insurance or other means of financial capacity to enable Tenant to fulfill its obligations to Landlord hereunder, whether or not then accrued, liquidated, conditional or contingent, Tenant shall procure and thereafter maintain in full force and effect such additional insurance and/or increased limits of insurance and/or other form of financial assurance, with or from companies or persons and in form and substance reasonably acceptable to Landlord, as Landlord may from time to time reasonably request.  Without limiting the generality of the foregoing, all such environmental liability insurance shall specifically insure the performance by Tenant of the indemnity provisions set forth in this Lease.

(vi)    Any other form or forms of insurance as Tenant or Landlord or the mortgagees of Landlord may reasonably require from time to time, in form, amounts and for insurance risks against which a prudent tenant would protect itself, but only to the extent such risks and amounts are available in the insurance market at commercially reasonable costs.

(b)    Tenant shall deposit with Landlord certificates evidencing the issuance of the policies of insurance required under this Article, or copies thereof, prior to the Commencement Date of the Lease.  Said policies of insurance shall name as additional insured parties the Landlord and the Holder of any mortgage on the Demised Premises (or estate thereof) and shall provide that they shall not be cancelable without thirty (30) days prior written notice to Landlord and the holder of such mortgage.  The policies of insurance described in Section 6.02 (iv)(a) shall contain a standard mortgage endorsement in favor of the holder of any mortgage on the Demised Premises (or estate thereof), and shall name Landlord (and any other parties designated by Landlord) as an additional insured party or parties thereunder.  At least thirty (30) days prior to the expiration of any such policy, Tenant shall deposit with Landlord a certificate evidencing the issuance of a renewal policy or copy thereof, together with satisfactory evidence of payment by Tenant of the premium or premiums required thereunder.

-13-

(c)   All policies of insurance provided for herein shall be issued by insurance companies with a general policy holder's rating of not less than "A-" as rated in the most current available "Best's" Insurance Reports, and qualified to do business in the state in which the Demised Premises are located.  All such policies shall have a deductible not exceeding Ten Thousand Dollars ($10,000.00).  All public liability and property damage policies shall contain a provision that Landlord, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Tenant.  As soon as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent.

(d)   Notwithstanding anything to the contrary contained within this Article VI, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that Landlord, and Landlord's mortgagee or beneficiary, shall all be named as an additional insured thereunder as their interests appear.  The coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance, and the requirements set forth herein are otherwise satisfied.

(e)   Except as otherwise provided herein or in any mortgage or deed of trust, all insurance proceeds payable with respect to any damage or destruction to the Demised Premises shall be payable to Landlord and will be held in an interest bearing account at a financial institution so named by Landlord.  In the event Tenant undertakes to repair said damages in accordance with this Lease, the proceeds shall be used to fund the reconstruction.  In all other events, the proceeds shall be the sole property of Landlord.  Tenant shall be entitled to compromise, adjust, or settle with Landlord's approval, any and all claims with respect to the Demised Premises.  Each party agrees to execute and deliver to the other party such releases, endorsements, and other instruments as the other party may reasonably require in order to compromise, adjust, or settle pursuant to this Section and to enable the other party or its designee to collect such insurance proceeds as are payable in respect of such claim.

(vii)   In the event that Tenant makes alterations to the Demised Premises pursuant to Section 4.03, Tenant or Tenant's contractor shall obtain a Builder's All Risk policy in form and content reasonably acceptable to Landlord, which policy shall be on an "all risk" basis on a completed value and covering the interest of Landlord in the Demised Premises.  Such policy shall name Landlord as additional insured and shall provide that it shall not be canceled without at least 30 days prior written notice to Landlord.  Prior to commencement of construction of the alterations, Tenant shall provide Landlord with a copy of the policy of insurance or certificate thereof.

(viii)   In the event that Tenant serves alcohol on the Demised Premises, so-called "dramshop" liquor liability insurance in an amount reasonably required by Landlord or otherwise consistent with industry standards.

Section 6.03  Increase in Insurance Rate.  Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Demised Premises which will violate the provisions of any policy of casualty insurance or liability insurance or which will prevent the procurement of casualty insurance and liability insurance in companies acceptable to Landlord.

Section 6.04  Waiver of Subrogation.  Tenant and Landlord each hereby release and relieve the other, and waive their entire right of recovery against the other, for direct or consequential loss of damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to the negligence of Landlord or Tenant or their agents, employees, contractors and/or invitees provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder.  If the release of either Landlord or Tenant, as set forth in this Section 6.04, shall contravene any law

with respect to exculpatory agreements, the liability of the party in question shall be deemed not released but shall be deemed secondary to the latter's insurance. If necessary, all property insurance policies required under this Lease shall be endorsed to so provide.

## ARTICLE VII
### SIGNS AND AWNINGS

Section 7.01 Signs and Awnings. Tenant may, subject to applicable laws and the Recorded Agreements and at its expense, construct all necessary signs in and upon the Demised Premises properly to conduct its marketing activities. Tenant shall be solely responsible for obtaining sign permits for ensuring that all signs conform with the requirements of all laws, ordinances or regulations of any federal, state, municipal governments or other authority and Recorded Agreements. Tenant shall, at Tenant's sole cost and expense, maintain all signs on the Demised Premises in good order, condition and repair throughout the Term of this Lease, and to remove the same upon the expiration or sooner termination of this Lease and to repair any damage caused by such removal.

## ARTICLE VIII
### UTILITIES

Section 8.01 Tenant's Responsibility for Utilities Consumed. Tenant shall make application for, and be solely responsible for, and shall promptly pay all charges for heat, cooling, sewer, water, electricity, and any other utilities used or consumed on the Demised Premises (collectively "Utilities"). Landlord shall not be liable in damages or otherwise for any interruption or impairment in the supply of such Utility service, nor shall any such interruption or impairment constitute a breach by Landlord of the terms and conditions of this Lease nor shall any such interruption constitute a ground for an abatement of any sums payable by Tenant hereunder. Tenant shall not at any time intentionally overburden or exceed the capacity of any Utility services which are supplied to, distributed in or serve the Demised Premises.

Section 8.02 Alternative Billing. If the authority or authorities supplying any Utilities servicing the Demised Premises shall require that the bills therefore be rendered to Landlord, then with proof of payment Tenant shall reimburse Landlord for the amount of each such bill upon request by Landlord.

## ARTICLE IX
### ASSIGNMENT SUBLETTING AND MORTGAGING

Section 9.01 Assignment and Subletting.

(a) Tenant shall not assign or encumber this Lease nor sublet the Demised Premises, in whole or part, to any person, or entity or allow occupancy by any other person or entity, without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. Without any way limiting Landlord's right to reasonably refuse to give consent, Landlord may withhold its consent to any requested assignment or subletting if in Landlord's reasonable business judgment:

(1) The quality of the merchandising operation of the proposed assignee, subtenant or transferee (each a "Transferee") is not equal to that of the Tenant;

(2) The financial strength of the proposed Transferee, both in terms of net worth and in terms of reasonably anticipated cash flow over the Lease Term, is materially less than Tenant's financial strength at the time this Lease was signed or at the time of such assignment or sublease, whichever is greater, or is insufficient, based on generally accepted industry standards, to capitalize the business to be conducted in the Demised Premises;

(3) The proposed Transferee does not, in Landlord's reasonable judgment, have sufficient business experience (including substantial experience in

comparable retail centers) to successfully operate a retail establishment in the Demised Premises in the manner contemplated in this Lease;

(4)     The proposed Transferee is a person with whom Landlord is, or recently has been, within the past three (3) months, negotiating to lease space in property owned by Landlord;

(5)     Tenant is default under the Lease, or has defaulted hereunder on more than three (3) occasions during the twelve (12) months preceding the request by Tenant; and/or

(6)     The proposed Transferee will operate under a trade name other than that stated in this Lease.

Notwithstanding any assignment or encumbrance of this Lease or subletting of all or any portion of the Demised Premises with or without the consent of Landlord, Tenant shall, nevertheless, remain liable to Landlord for the payment of all Rent hereunder and for the performance of all covenants and conditions of this Lease applicable to Tenant and any assignment, encumbrance, sublease or subletting made by Tenant shall be subject to the terms, conditions and provisions of this Lease. Tenant hereby waives all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all applicable laws, on behalf of the proposed Transferee. Tenant shall indemnify, defend and hold harmless Landlord from any and all liability, losses, claims, damages, costs, expenses, causes of action and proceedings involving any third party or parties (including without limitation Tenant's proposed subtenant or assignee) who claim they were damaged by Landlord's wrongful withholding or conditioning of Landlord's consent.

(b)     Tenant shall notify Landlord in writing (at least thirty (30) days prior thereto) if Tenant intends to sublease all or any portion of the Demised Premises or to assign or encumber this Lease, which notice shall include (i) the proposed effective date of the transfer, which shall not be less than twenty (20) days nor more than one hundred eighty (180) days after the date of delivery of the transfer notice, (ii) a description of the portion of the Demised Premises to be transferred, (iii) all of the terms of the proposed transfer and the consideration therefor in connection with such transfer, the name and address of the proposed Transferee, and a copy of all existing and/or proposed documentation pertaining to the proposed transfer, including all existing operative documents to be executed to evidence such transfer or the agreements incidental or related to such transfer and (iv) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof. Landlord shall make every effort to notify Tenant of its approval or disapproval of any proposed sublease, assignment or encumbrance within thirty (30) days after Tenant has submitted a request therefore to Landlord, including all information required to be delivered by Tenant to Landlord in connection with such proposed transfer. If Landlord does not deliver said notice then Landlord shall be deemed to have disapproved the proposed sublease, assignment or encumbrance. If Landlord does not consent to any proposed sublease, assignment or encumbrance by Tenant, Landlord shall provide Tenant with a written statement identifying its reasons for withholding such consent.

(c)     Except as otherwise provided below, for purposes of this Lease, the term "assignment" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of fifty percent (50%) or more of the partners, or transfer of twenty-five percent or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (i.e., whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant, (B) the sale or other transfer of more than an aggregate of fifty percent (50%) of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of more than an aggregate of fifty percent (50%) of the value of the unencumbered assets of Tenant within a twelve (12) month period. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to assign, sublease or transfer this Lease to

any corporation into which or with which Tenant merges or consolidates, and to any parent, subsidiary, or affiliated corporation, including any corporation which is under common control with Tenant or to a person who acquires substantially all of the assets of Tenant or to Tenant's going from a publicly-traded company to a privately-owned company (each, an "Affiliate"); provided that (1) any such Affiliate was not formed as a subterfuge to avoid the obligations of this Article IX; (2) Tenant gives Landlord prior written notice of any such assignment or sublease to an Affiliate; (3) any such Affiliate has, as of the effective date of any such assignment or sublease, a tangible net worth and net income, in the aggregate, computed in accordance with generally accepted accounting principles (but excluding goodwill as an asset), which is equal to or greater than Tenant as of the effective date of any such assignment or sublease and sufficient to meet the obligations of Tenant under this Lease; (4) any such assignment or sublease shall be subject to all of the terms and provisions of this Lease, and such assignee or sublessee shall assume, in a written document reasonably satisfactory to Landlord and delivered to Landlord upon or prior to the effective date of such assignment or sublease, all the obligations of Tenant under this Lease; and (5) Tenant and any Guarantor shall remain fully liable for all obligations to be performed by Tenant under this Lease.

Section 9.02 Violation. If this Lease is assigned, without any required prior written consent of Landlord, Landlord may and is hereby empowered to collect Rent from the assignee. If the Demised Premises or any part thereof be sublet or occupied by any person other than Tenant and in the event of Tenant's uncured default, Landlord may, and is hereby empowered to collect Rent from such subtenant or occupant. Landlord's collection of Rent pursuant to the provisions of this Section 9.02 shall not in any event be deemed to be a waiver of any default by Tenant in having assigned this Lease or sublet all or any portion of the Demised Premises without the prior written consent of Landlord.

Section 9.03 Subordination.

(a)    At Landlord's sole option, this Lease shall be subject and subordinate to any ground lease and the lien of any mortgages and/or other encumbrances now or hereafter placed upon the Demised Premises (including a lien on an estate thereof) without the necessity of any further instrument or act on the part of Tenant to effectuate such subordination. Tenant agrees, at the election of the holder of any such mortgage or other encumbrance, to attorn to such holder. Tenant further agrees to execute and deliver upon demand such further reasonable instrument or instruments evidencing and confirming such subordination of this Lease to the lien of any such mortgage and/or encumbrance and such further instrument or instruments of attornment as shall be designated by Landlord. For the purpose of this Lease, the term "Mortgage" shall mean any mortgage, deed of trust, security deed or other similar document or instrument and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages or trust deeds, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto. A condition precedent to the subordination of this Lease to any future ground or underlying lease or to the lien of any future mortgage or deed of trust is that Landlord shall obtain for the benefit of Tenant a subordination, non-disturbance and attornment agreement from the lessor or lender of such future instrument. Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage, or if any ground or underlying lease is terminated, to attorn, without any deductions or set-offs whatsoever, to the purchaser upon any such foreclosure sale, or to the lessor of such ground or underlying lease, as the case may be, if so requested to do so by such purchaser or lessor. Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

Section 9.04 Easements by Landlord. Upon the written consent of the Tenant, Landlord shall have the right to grant easements over the Demised Premises and no joinder of Tenant shall be required in such grants of easements and the rights of Tenant

under this Lease shall be subject and subordinate thereto so long as Tenant's business operations are not impaired in any material respect and any easement conforms with the approved site plan and use to be issued by the city where the Property is located and provided Tenant receives at least thirty (30) days prior written notice of such proposed grant of easement(s). In addition, Tenant agrees not to unreasonably withhold or delay its joinder in the grant of any easement.

Section 9.05  Demised Premises Free from Liens.  Tenant shall keep the Demised Premises and any Land in which the Demised Premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by or from Tenant. If a lien is filed against the Demised Premises and Tenant is disputing the validity of the lien, Tenant may bond over such lien until resolved. Notwithstanding anything to the contrary set forth in this Lease, if any such lien is not released and removed on or before the date notice of such lien is delivered by Landlord to Tenant, Landlord, at its sole option, may immediately take all action necessary to release and remove such lien, without any duty to investigate the validity thereof, and all sums, costs and expenses, including reasonable attorneys' fees and costs, incurred by Landlord in connection with such lien shall be deemed additional Rent under this Lease and shall immediately be due and payable by Tenant.

Section 9.06  Bankruptcy Assignment.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. 101 et seq., shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on or after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

Section 9.07  Bankruptcy Assignment-Payment of Consideration for Assignment. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. et seq., ninety percent (90%) of any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and promptly be paid or delivered to Landlord.

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Tenant under Chapter 7, 11 or 13 of the Bankruptcy Code, the Tenant, as debtor in possession, or the bankruptcy trustee, must elect to assume or reject this Lease within sixty (60) days after the date of the order for relief. If the Tenant, trustee or debtor in possession shall fail to elect or assume this Lease within sixty (60) days after the date of the order for relief, this Lease shall be deemed to be rejected. In the event the trustee or the debtor in possession requests additional time from the Bankruptcy Court in which to assume or reject this Lease, it shall be conclusively presumed that the trustee or debtor in possession has shown cause for such extension and the Landlord will be deemed to have consented to such additional time, up to an additional sixty (60) days. In the event of a rejection of this Lease, Landlord shall thereupon be immediately entitled to possession and this Lease shall be canceled, but Landlord's right to be compensated for damages in such proceeding shall survive.

If the estate of Tenant created hereby shall be taken in execution or by other process of law, or if Tenant shall be adjudicated insolvent pursuant to the provisions of any present or future insolvency law under state law, or if Tenant shall cease doing business as a going concern or generally not pay its debts as they become due, or if a receiver or trustee of the property of Tenant shall be appointed under state law by reason of Tenants' insolvency or inability to pay its debts as they become due or otherwise, or if any assignment shall be made of Tenant's property for the benefit of creditors under state law, then and in such event, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder declaring an Event of Default under Section 13.01.

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Landlord under Chapter 7, 11 or 13 of the Bankruptcy code, and, further, in the event the debtor in possession or trustee elects to reject this Lease, the Tenant shall have the right to either treat this Lease as terminated or, alternatively, to remain in possession for the balance of the Term of this Lease (including the initial term or any renewal term(s)), and the Tenant shall continue to have all rights provided under this Lease to extent the term of this Lease.

## ARTICLE X
## CONDEMNATION

**Section 10.01  Whole Taking.**  In the event the whole of the Demised Premises shall be taken by any public authority under the power of eminent domain, this Lease shall terminate as of the date of the taking.

**Section 10.02  Partial Taking.**  In the event a portion of the Demised Premises or a part of the building now located thereon shall be appropriated or taken under the power of eminent domain, or any similar power, by any public or quasi-public authority, the unearned portion of the rent theretofore paid with respect to such taken portion shall forthwith be returned to Tenant, and, if, in Tenant's reasonable judgment, the remaining portion of the Demised Premises or the building thereon can be used by Tenant in the operation of its business, Tenant shall so use said remaining portion and there shall be a prorata reduction of rent based upon the extent to which Tenant's use and occupancy of the Demised Premises is adversely impacted.  If, on the other hand, in Tenant's reasonable judgment, the remaining portion of the Demised Premises or the building thereon cannot be used by Tenant in the operation of its business or the use of such remaining portion would significantly and adversely affect Tenant's use of the Demised Premises, then this Lease shall terminate as of the date of such appropriation or taking, and the unearned portion of the rent theretofore paid shall forthwith be returned to Tenant.  If, however, the period of such partial appropriation or taking is less than six (6) months, this Lease shall continue in full force and effect, the rent in such case shall not abate and all awards for damages shall be paid to Tenant.  If the portion of the Demised Premises taken is solely for purposes of widening streets adjacent to the Demised Premises and such taking does not include any portion of the building on the Demised Premises and does not, in Landlord's reasonable judgment, substantially interfere with Tenant's use of the Demised Premises or parking available to the Demised Premises, then this Lease shall not terminate and there shall be no abatement in rent for the portion of the Demised Premises so taken.

**Section 10.03  Condemnation Proceedings.**  All compensation awarded for such taking of the fee shall belong to and be the property of the Landlord, provided, however that the Landlord shall not be entitled to any portion of the award attributable to the Demised Premises made to the Tenant for the cost of moving or removal of its stock and fixtures or made to Tenant for the loss of its business (if and only to the extent that such award for loss of business does not reduce or diminish the award payable to Landlord).

**Section 10.04  Waiver of Termination.**  Tenant and Landlord waive any right to terminate this Lease under Section 1265.130 of the California Code of Civil Procedure, or any similar statute or law now or hereafter in force.

## ARTICLE XI
## DESTRUCTION OF DEMISED PREMISES

**Section 11.01  Destruction of Demised Premises.**

(a)     If the Demised Premises or any portion thereof shall be damaged or destroyed by fire or other casualty, then Tenant shall promptly give notice thereof to Landlord; and, except as hereinafter otherwise provided, Tenant shall, within a reasonable time thereafter, repair or restore the Demised Premises with insurance proceeds from Landlord's account as provided for in Article 6.02, to substantially the same condition they were in prior to the casualty, and rent shall not abate.

(b)     Notwithstanding the foregoing provisions, Landlord shall not be obligated to reimburse Tenant for the repair and restoration of the Demised Premises in an amount in excess of insurance proceeds paid to Landlord for such damage or destruction pursuant to policies maintained by Tenant pursuant to the provisions of Section 6.02(iv)(a).  If during the last two (2) years of the Term of this Lease the Demised Premises shall be damaged or destroyed as aforesaid to the extent of twenty (20%) percent or more of its insurable value, Landlord, in its sole discretion, may terminate this Lease by notice to Tenant within thirty (30) days after such damage or destruction if Tenant does not agree to an increase in term of five (5) years under the same terms and conditions as those set forth in this Lease.  In the event of any termination of the Term of this Lease pursuant to the provisions of this Article, the termination shall become effective fifteen (15) days after the giving of the notice of termination and a just proportion of the minimum rent, according to the nature and extent of the injury to the Demised Premises shall be suspended or abated until the time of termination and minimum rent shall be apportioned as of the time of termination.

(c)     The agreements contained in this Article XI provide a material part of the consideration for this Lease and in bargaining for and obtaining its rights under this Article XI, Tenant waives any right to terminate this Lease under Section 1932 and/or 1933 of the Civil Code of California, or any similar statute or law now or hereafter in force.

## ARTICLE XII
## SURRENDER OF PREMISES

Section 12.01  Liability for Return of Demised Premises.  At the expiration of this Lease, Tenant shall surrender the Demised Premises broom clean and in the same condition as the Demised Premises were in upon delivery of possession to the Tenant under this Lease, loss by condemnation and insured casualty and by ordinary wear and tear excepted.

All alterations, additions, improvements and the improvements which may have been made in, to or on the Demised Premises (except movable trade fixtures put in at the expense of Tenant) shall remain with Demised Premises except that Landlord shall notify Tenant within ninety (90) days before the end of the term of the lease whether Landlord desires to have the Demised Premises or any parts thereof restored to their condition when the Demised Premises were delivered to Tenant.

If Landlord shall so desire, the Tenant shall restore said Demised Premises or such part or parts thereof before the end of this Lease at Tenant's sole cost and expense.  In addition, Tenant shall repair any damage caused in connection with the removal of any trade fixtures.  Tenant on or before the end of the term or sooner termination of this Lease, shall remove Tenants personal property and trade fixtures from the Demised Premises and all property not so removed shall be deemed abandoned by Tenant.  If the Demised Premises are to be surrendered at the end of the term or sooner termination of this Lease, Tenant shall indemnify Landlord against loss or liability resulting from delay by Tenant in so surrendering the Demised Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay.

Section 12.02  Abandonment.  Tenant shall not vacate or abandon the Demised Premises at any time during the term of the Lease or any option period.  If Tenant shall abandon, vacate or surrender said premise, or be dispossessed by process of law, or otherwise any personal property belonging to Tenant and left on the premises shall be deemed abandoned, at the option of Landlord, except such property as may be mortgaged to Landlord.

## ARTICLE XIII
## DEFAULT AND REMEDIES

Section 13.01  Default by Tenant.  The following shall constitute material Events of Default by Tenant:

(a)     Tenant fails to pay any installment of Rent within ten (10) days after receiving notice from Landlord that payment has not been received; or

(b)     Tenant is in default of any of its other obligations under this Lease and Tenant fails to commence to cure any such default within thirty (30) days after notice of the occurrence thereof from Landlord and thereafter fails to complete the cure of such default with due diligence as soon as reasonably possible; and if such default is not completely cured by Tenant within sixty (60) days after notice of the occurrence thereof from Landlord, Tenent, if requested by Landlord, shall post with Landlord a surety bond (with corporate surety acceptable to Landlord) to assure its completion of such cure as promptly thereafter as is possible; or

(c)     Tenant is adjudicated a bankrupt; or

(d)     Tenant has a receiver in equity appointed for all or substantially all of its property and such appointment is not vacated within sixty (60) days; or

(e)     Tenant files a voluntary petition for reorganization or arrangement; or

(f)     Tenant has a trustee in reorganization appointed for its property; or

(g)     Tenant files a voluntary petition in bankruptcy; or

(h)     Tenant files an answer admitting bankruptcy or agreeing to reorganization or arrangement; or

(i)     Tenant makes an assignment for the benefit of creditors;

(j)     Tenant permits its leasehold interest hereunder to be sold pursuant to execution.

Any notice given under this Section 13.01 shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161.

Section 13.02 Landlord's Remedies; Termination.  In the event of any such Event of Default by Tenant, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall have the immediate option to terminate this Lease and all rights of Tenant hereunder. In the event that Landlord shall elect to so terminate this Lease, then Landlord may recover from Tenant:

(a)     the worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(b)     the worth at the time of the award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(c)     the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(d)     any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom including, but not limited to: unamortized tenant improvement costs; attorneys' fees; unamortized brokers' commissions; the costs of refurbishment, alterations, renovation and repair of the Demised Premises; and removal (including the repair of any damage caused by such removal) and storage (or disposal) of Tenant's personal property, equipment, fixtures, alterations and any other items which Tenant is required under this Lease to remove but does not remove.

As used in subsections (a) and (b) above, the "worth at the time of award" is computed by allowing interest at the interest rate set forth in Section 2.05 of the Lease. As used in subsection (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

Section 13.03 Landlord's Remedies; Re-Entry Rights. In the event of any such Event of Default by Tenant, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall also have the right as permitted by applicable law, with or without terminating this Lease, to re-enter the Demised Premises and remove all persons and property from the Demised Premises; such property may be removed, stored and/or disposed of pursuant to any procedures permitted by applicable law. No re-entry or taking possession of the Demised Premises by Landlord pursuant to this Section 13.03, and no acceptance of surrender of the Demised Premises or other action on Landlord's part, shall be construed as an election to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction.

Section 13.04 Continuation of Lease. Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

Section 13.05 Injunction. In the event of a breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity.

Section 13.06 No Waiver. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy herein or by law provided but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

Section 13.07 Indemnity. Tenant shall indemnify, defend, save and hold Landlord harmless of and from any and all loss, cost, expense or liability pursuant to any sublease. Until the occurrence of an event of default by Tenant under this Lease, Tenant may continue to collect the rent and other sums payable under the sublease(s) assigned hereby; but from and after the occurrence of an event of default all such rent and other sums shall be paid to Landlord and applied by Landlord on account of rent and other sums due by Tenant to Landlord pursuant to this Lease. A statement by Landlord to any subtenant that an event of default by Tenant has occurred under this Lease shall be conclusive evidence as between Landlord and sub-tenant only of such fact and shall be relied upon by the subtenant in making payment to Landlord. No subtenant shall be liable to Tenant for any payment made by the subtenant to Landlord pursuant to the paragraph. No sublease shall be valid or effective unless it shall expressly restate therein the provisions of this paragraph.

Section 13.08 Attorneys' Fees. In the event of litigation by Landlord against Tenant or by Tenant against Landlord by reason of a breach of any of the provisions of this Lease, the prevailing party shall be entitled to recover from the other party an amount equal to all reasonable attorney's fees and court costs (including costs of appeals) incurred by the prevailing party in enforcing its rights and remedies under this Lease.

Section 13.09 Default by Landlord. Landlord shall in no event be in default in the performance of any of its obligations in this Lease contained unless and until Landlord or the holder of any mortgage on the Demised Premises shall have failed to commence to perform such obligation within thirty (30) days (or such longer period of time as may be required by Landlord or the holder of any mortgage to effect such cure) after notice by Tenant to Landlord and to such mortgagee properly specifying wherein

-22-

Landlord has failed to perform any such obligation or shall have failed to proceed thereafter with reasonable diligence to complete such performance.

Section 13.10 Curing Tenant's Defaults.  If Tenant shall be in default in the performance of any of its obligations under this Lease, Landlord may (but shall not be obligated to do so), in addition to any other rights it may have in law or equity or under this Lease, cure such default on behalf of Tenant after the appropriate notice as provided for elsewhere in this Lease, and Tenant shall reimburse Landlord upon demand for any reasonable sums paid or costs incurred by Landlord in curing such default, together with interest at twelve and 50/100 percent (12.5%) from the respective dates of Landlord's making of the payments and incurring of the costs, on all sums advanced by Landlord as aforesaid, which sums and costs together with interest thereon shall be deemed additional rent payable under this Lease.

Section 13.11 Waiver of Breach.  The waiver by Landlord or Tenant of any breach of any term, covenant or conditions contained in this Lease, shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition contained in this Lease.

Section 13.12 Waiver of Redemption.  Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future law to redeem any of the Demised Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future law which exempts property from liability for debt or for distress for rent.

## ARTICLE XIV
## INSPECTION OF PREMISES

Section 14.01 Landlord's Right to Inspect.  Landlord and the holder of any mortgage on the Demised Premises, and each of their agents, shall have the right to enter the Demised Premises at all reasonable times during regular business hours upon forty eight (48) hours prior notice (except that during an emergency the right of entry shall be at any time) to examine same and to show them to prospective purchasers of the Demised Premises, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable.  At any time within six (6) months immediately prior to the expiration of the Term of this Lease, Landlord shall have the right to display on the Demised Premises a customary "For Rent" sign and to show the property to prospective tenants.

## ARTICLE XV
## QUIET ENJOYMENT

Section 15.01 Landlord's Covenant of Quiet Enjoyment.  Landlord's covenants that upon payment of the Rent by Tenant, and Tenant's complying with the terms, covenants and conditions of this Lease, Tenant may peaceably and quietly have, hold and enjoy the Demised Premises for the Term hereof without hindrance or interruption by Landlord or by any other person or persons claiming under Landlord.

## ARTICLE XVI
## HOLDING OVER

Section 16.01 Rent for Holding Over Period.  In the event Tenant remains in possession of the Demised Premises with the consent of Landlord after the termination of the Term, the same shall be construed to be a tenancy from month to month at the same monthly rental as was being paid at the termination of the Lease, and upon the same other terms specified herein.  The tenancy from month to month shall continue until either party shall notify the other in writing, at least thirty (30) days prior to the end of any calendar month, that the party giving such notice elects to terminate such tenancy at the end of such calendar month, in which event such tenancy shall so terminate.

-23-

## ARTICLE XVII
## TITLE

Section 17.01 Condition of Title and of Demised Premises. Tenant represents that the title to the Demised Premises, the zoning of the Demised Premises and the permitted uses thereof have been examined by Tenant and Tenant accepts them in the condition or state in which they are as of the Commencement Date, and Tenant takes the Demised Premises subject to all Recorded Encumbrances; provided, however, that Tenant's obligation to comply with any Recorded Encumbrances recorded after the date hereof shall be conditioned on the same not materially restricting Tenant in Tenant's use of the Premises or materially increasing Tenant's obligations or adversely affecting Tenant's rights under this Lease.

## ARTICLE XVIII
## MISCELLANEOUS

Section 18.01 Notices; Rental Payments. Any notice provided for in this Lease shall be given by written instrument, personally delivered or sent by United States certified or registered mail, return receipt requested or by Federal Express or otherwise nationally recognized over-night courier, each with postage and/or delivery charges prepaid, to the addresses designated in Sections 3 and 5 of the Summary (as applicable) or to such other addresses as the party to receive the notice may thereafter designate by written notice to the other. All notices shall be deemed to have been given when deposited in the United States mail or, if delivered via Federal Express (or other overnight carrier) when personally delivered, as aforesaid. Any notice may be given on behalf of any party by its counsel. Wherever in this Lease Tenant is required to provide a notice to the holder of any mortgage on the Demised Premises, Tenant shall not be obligated to deliver such notice unless and until Landlord has provided to Tenant written notice of the name and address of the holder of such mortgage.

Section 18.02 Partial Invalidity. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant of condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

Section 18.03 Entire Agreement. This Lease and any amendments and/or Exhibits thereto shall constitutes the entire agreement between the parties with respect to the subject matter hereof and all prior negotiations are merged into this Lease. Any amendment, change or addition to this Lease shall be made only in writing and signed by both parties.

Section 18.04 Successors in Interest. The terms and conditions of this Lease shall be binding upon, and shall inure to the benefit of, the parties and their respective successors and assigns, subject however to the provisions of Section 9.01.

Section 18.05 Headings. The Article and Section headings in this Lease are for convenience of reference only, and shall not be construed or held in any way to explain, modify, amplify or add to the interpretation, construction or meaning of this Lease. Any deletion of language from this Lease prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language.

Section 18.06 Applicable Law. This Lease shall be governed by the laws of the state of California.

Section 18.07 Definition of Landlord. The word "Landlord" is used herein to include the Landlord named above and any subsequent owner of the Demised Premises as well as their respective successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had, had it originally signed this Lease as Landlord; but any Landlord, whether or not named

-24-

herein, shall have no liability under this Lease after it ceases to hold title to the Demised Premises, except for obligations which may have theretofore accrued, provided that all subsequent obligations and liabilities under this Lease are assumed in writing by any successor, transferee, purchaser or assignee. If Landlord is in breach or default with respect to Landlord's obligations or otherwise under this Lease, Tenant shall look solely to the interest of Landlord in the Demised Premises for satisfaction of Tenant's remedies. Neither Landlord, nor any Landlord Parties, shall have any personal liability with respect to any of the provisions of this Lease. It is expressly understood and agreed that Landlord's liability, and the liability of any Landlord Parties, under the terms, covenants, conditions, warranties, and obligations of this Lease shall in no event exceed the loss of Landlord's interest in the Demised Premises.

Section 18.08 Tenant's Estoppel Certificate; Additional Documents.

(a)     Landlord and Tenant agree at any time and from time to time, within ten (10) business days after a party's written notice, to execute, acknowledge and deliver to the other party a written instrument in recordable form certifying the commencement and ending dates of the Term of this Lease, that this Lease is unmodified and in full force and effect (or if there have been modifications, that it is in full force and effect as modified and stating the modifications) and the dates to which minimum rent, additional rent and other charges have been paid in advance, if any and stating whether or not Landlord or Tenant, to the best of its knowledge and belief without investigation, is in default in the performance of any covenant, agreement or condition contained in this Lease and if so, specifying each such default and such other information as Landlord or Tenant shall reasonably request; and agreeing that Tenant will give to the holder simultaneously with Landlord (or proposed holder) of any mortgage on the Demised Premises (or estate therein) a copy of any notice of default it sends to Landlord and will provide to such holder a reasonable time in which to effect a cure of same. Tenant agrees that any such statement delivered pursuant to this section may be relied upon by any prospective purchaser of the fee or any mortgagee thereof or any assignee of Landlord's interest in this Lease or of any mortgage upon the fee of the Demised Premises, or any part thereof.

(b)     Within ten (10) business days after the date of a request by Landlord to Tenant, Tenant shall deliver to Landlord the following documents in connection with Tenant:

(i)     A full and complete annual financial statement for the fiscal annual period most recently ended prior to the date of the request, which financial statement shall: be prepared and attested by a senior financial officer of Tenant as being complete, correct and fairly representing Tenant's financial condition; in accordance with generally accepted accounting principles consistently applied; and contain a full and complete balance sheet of Tenant showing all assets and liabilities (both absolute and contingent) and a full and complete statement of Tenant's profits and loss, together with profit and loss statements for the Demised Premises.    Tenant is only obligated to provide Landlord said financial statements twice annually except in the event of a sale, finance or refinance of the Demised Premises by Landlord.

(ii)     If applicable, a Good Standing Certificate issued by the appropriate governmental authority confirming that Tenant is and remains a corporation or partnership (whichever, if either, are applicable) duly formed and in good standing under the laws of the State of its incorporation and/or formation.

Section 18.09 Intentionally Omitted.

Section 18.10 Intentionally Omitted.

Section 18.11 Maintenance Bond. If a maintenance bond is required to be maintained by any governmental authority for the maintenance of the Demised Premises, Tenant agrees, at its sole cost and expense, to obtain and maintain such bond, and to cause it to name Tenant and Landlord as the bonded parties.

**Section 18.12** <u>No Partnership</u>.  Any intention to create a partnership or joint venture relationship between Landlord and Tenant is hereby expressly disclaimed; no relationship other than that of Landlord and Tenant is intended between the parties hereto.

**Section 18.13** <u>Effect of Statements Submitted by Landlord</u>.  Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of one hundred twenty (120) days after receipt thereof shall constitute Tenant's acquiescence and approval with respect thereto.

**Section 18.14** <u>Arbitration</u>.  Any controversy or claim between or among the parties, except for claims relating to Landlord's exercise of any unlawful detainer rights pursuant to California law or rights or remedies used by Landlord to gain possession of the Demised Premises or terminate Tenant's right of possession to the Demised Premises shall be determined by arbitration in San Diego, California, in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association.

**Section 18.15** <u>Counterparts</u>.  This Lease may be executed in one or more counterparts, all of which shall be deemed to be an original.

**Section 18.16** <u>Default under Franchise Agreement by Tenant</u>.  Tenant agrees to promptly deliver to Landlord, any notice of default provided to Tenant by Tenant's Franchisor (if any).

**Section 18.17** <u>Brokers</u>.  Landlord has entered into an agreement with the real estate brokers specified in Section 9 of the Summary of Basic Lease Information as representing Landlord (collectively, "Landlord's Broker"), and Landlord shall pay any commissions or fees that are payable to Landlord's Broker with respect to this Lease in accordance with the provisions of a separate commission contract.  Landlord shall have no further or separate obligation for payment of commissions or fees to any other real estate broker, finder or intermediary.  Tenant represents that it has not had any dealings with any real estate broker, finder or intermediary with respect to this Lease, other than Landlord's Broker and the broker (if any) specified in Section 9 of the Summary of Basic Lease Information as representing Tenant ("Tenant's Broker").  Any commissions or fees payable to Tenant's Broker with respect to this Lease shall be paid exclusively by Landlord's Broker.  Each party represents and warrants to the other, that, to its knowledge, no other broker, agent or finder (a) negotiated or was instrumental in negotiating or consummating this Lease on its behalf, or (b) is or might be entitled to a commission or compensation in connection with this Lease.  Tenant shall indemnify, protect, defend (by counsel reasonably approved in writing by Landlord) and hold Landlord harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including attorneys' fees and court costs) resulting from any breach by Tenant of the foregoing representation, including, without limitation, any claims that may be asserted against Landlord by any broker, agent or finder undisclosed by Tenant herein.  Landlord shall indemnify, protect, defend (by counsel reasonably approved in writing by Tenant) and hold Tenant harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including attorneys' fees and court costs) resulting from any breach by Landlord of the foregoing representation, including, without limitation, any claims that may be asserted against Tenant by any broker, agent or finder undisclosed by Landlord herein.  The foregoing indemnities shall survive the expiration or earlier termination of this Lease.

**Section 18.18** <u>Strict Construction</u>.  The rule of strict construction shall not apply to this Lease.  This Lease has been prepared by Landlord and its professional advisors and reviewed and modified by Tenant and its professional advisors.  Landlord, Tenant, and their separate advisors believe that this Lease is the product of all of their efforts, that it expresses their agreement, and that it should not be interpreted in favor of or against either Landlord or Tenant merely because of their efforts in preparing it.

**Section 18.19** <u>Force Majeure</u>.  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required

hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, governmental moratorium or other governmental action or inaction (including failure, refusal or delay in issuing permits, approvals and/or authorizations), injunction or court order, riots, insurrection, war, fire, earthquake, flood or other natural disaster or other reason of a like nature not the fault of the party delaying in performing work or doing acts required under the terms of this Lease (but excluding delays due to financial inability) (herein collectively, "Force Majeure Delays"), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 18.19 shall not apply to nor operate to excuse Tenant from the payment of monthly basic Rent, additional rent or any other payments strictly in accordance with the terms of this Lease.

        Section 18.20 Waiver of Jury Trial.   EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION SEEKING SPECIFIC PERFORMANCE OF ANY PROVISION OF THIS LEASE, FOR DAMAGES FOR ANY BREACH UNDER THIS LEASE, OR OTHERWISE FOR ENFORCEMENT OF ANY RIGHT OR REMEDY HEREUNDER.  Not sure if we want this as we should be able to go to trial.

        Section 18.21 Tenant's Authority.   If Tenant executes this Lease as a limited liability company, partnership or corporation, then Tenant and the persons and/or entities executing this Lease on behalf of Tenant represent and warrant that: (a) Tenant is a duly organized and validly existing limited liability company, partnership or corporation, as the case may be, and is qualified to do business in the state in which the Premises are located; (b) such persons and/or entities executing this Lease are duly authorized to execute and deliver this Lease on Tenant's behalf in accordance with the Tenant's operating agreement (if Tenant is a limited liability company), Tenant's partnership agreement (if Tenant is a partnership), or a duly adopted resolution of Tenant's board of directors and Tenant's by-laws (if Tenant is a corporation); and (c) this Lease is binding upon Tenant in accordance with its terms.  Concurrently with Tenant's execution and delivery of this Lease to Landlord and/or at any time during the Lease Term within ten (10) days of Landlord's request, Tenant shall provide to Landlord a copy of any documents reasonably requested by Landlord evidencing Tenant's representations and warranties hereunder.

        Section 18.22 Redevelopment of Property.   If Landlord re-develops the Property during the Term then Tenant shall have reasonable approvals over the re-development; provided, however Landlord shall make space available for Tenant to continue its business in such a manner that Tenant's business is not un reasonably harmed.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

LANDLORD:

Red Mountain Retail Group, Inc.,
a California corporation

By: _____

Its: _Michael H. Mugel, CEO_

TENANT:

Luviland Corporation,                          Luviland LLC,
a California corporation                       a California limited liability company

By: _____          By: _____

Its: _____          Its: _CFO_____

**EXHIBIT "A"**

**SITE PLAN**



<u>EXHIBIT "B"</u>

## LEASE GUARANTY AGREEMENT

THIS LEASE GUARANTY ("Guaranty") is made by John Nguyen ("Guarantor") in favor of Red Mountain Retail Group Inc., a California Corporation or its assigns ("Landlord") in connection with that certain lease dated _____, 2014 (the "Lease") pursuant to which Landlord is to lease to Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company dba _____ _____ ("Tenant") those premises generally referred to as 7101 W. Lincoln Avenue, Buena Park, CA (the "Demised Premises").

A.    Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B.    Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.    The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.    Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant.  Guarantor's obligations under this Guaranty are continuing and unconditional.

3.    Guarantor hereby agrees that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder:  (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed.  Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.    Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5.    Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands

(i)

(including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.    Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.    Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.    Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.    Without limiting the generality of the waivers contained in this Guaranty, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2820, 2821, 2822, 2845, 2848, 2849 and 2850 of the Civil Code of the State of California, as recodified from time to time (except the right to require contribution from co-sureties as set forth in Section 2848 therein).

10.    Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for Guarantor for the two (2) years prior to the current financial statement year to the extent not previously delivered to Landlord. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if

such is the normal practice of Guarantor, audited by an independent certified public accountant. Guarantor represents and warrants that all such financial statements shall be true and correct statements of Guarantor's financial condition.

11.     The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

12.     This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law.

13.     This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.     Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.     The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise.     The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

16.     If any or all Guarantors shall become bankrupt or insolvent, or any application shall be made to have any or all Guarantors declared bankrupt or insolvent, or any or all Guarantors shall make an assignment for the benefit of creditors, or any or all Guarantors shall enter into a proceeding for the dissolution of marriage, or in the event of death of any or all Guarantors, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or such Guarantor's fiduciary. This Guarantee shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

17.     Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.    If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action.  Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.    Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California.  Guarantor consents to the jurisdiction and venue of the State and Federal courts sitting in the judicial district(s) which include the Demised Premises and waives any claim that the same would be an inconvenient forum.    In addition, Guarantor hereby appoints _____ as agent for service of process in the State of California in connection with any actions that may be taken by Landlord under this Guaranty; provided, however, that in the event that _____ ceases to be Guarantor's agent for service of process in the State of California, then Guarantor shall appoint such other agent in the State of California as Guarantor's agent for service of process and such other agent shall provide Landlord with written confirmation of such other agent's capacity as agent for Guarantor.

20.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

21.    Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

22.    If more than one person signs this Guaranty, each such person shall be deemed a guarantor and the obligation of all such guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural.  The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23.    If Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms.  If Guarantor is a corporation, Landlord, at its option, may require Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed on this _____ day of September, 2014.

[If Guarantor is a married individual, Guarantor's spouse must sign this a Guaranty]

_____,

_____

Address of Guarantor:

By: _____

_____
_____

Print Name:_____

Print Title:_____

By: _____

_____

Print Name:_____

Print Title:_____

**OR**

Print Name: _____

Print Name: _____
(Spouse, if applicable)

(v)

EXHIBIT C

## LEASE GUARANTY AGREEMENT

THIS LEASE GUARANTY ("Guaranty") is made by John Nguyen ("Guarantor") in favor of Red Mountain Retail Group Inc., a California Corporation or its assigns ("Landlord") in connection with that certain lease dated _October 6_, 2014 (the "Lease") pursuant to which Landlord is to lease to Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company dba _TBD_ _____ ("Tenant") those premises generally referred to as 7101 W. Lincoln Avenue, Buena Park, CA (the "Demised Premises").

A.    Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B.    Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.    The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.    Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant.  Guarantor's obligations under this Guaranty are continuing and unconditional.

3.    Guarantor hereby agrees that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed.  Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.    Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5.    Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change

in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.      Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.      Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.      Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.      Without limiting the generality of the waivers contained in this Guaranty, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2820, 2821, 2822, 2845, 2848, 2849 and 2850 of the Civil Code of the State of California, as recodified from time to time (except the right to require contribution from co-suretiee as set forth in Section 2848 therein).

10.     Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for Guarantor for the two (2) years prior to the current financial statement year to the extent not previously delivered to Landlord. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Guarantor, audited by an independent certified public

accountant. Guarantor represents and warrants that all such financial statements shall be true and correct statements of Guarantor's financial condition.

11.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

12.    This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law.

13.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.    Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.    The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise.    The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

16.    If any or all Guarantors shall become bankrupt or insolvent, or any application shall be made to have any or all Guarantors declared bankrupt or insolvent, or any or all Guarantors shall make an assignment for the benefit of creditors, or any or all Guarantors shall enter into a proceeding for the dissolution of marriage, or in the event of death of any or all Guarantors, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or such Guarantor's fiduciary. This Guarantee shall extend to and be binding upon each Guarantor's successore and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

17.    Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purpose. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.    If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to

have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action. Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.    Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor consents to the jurisdiction and venue of the State and Federal courts sitting in the judicial district(s) which include the Demised Premises and waives any claim that the same would be an inconvenient forum.    In addition, Guarantor hereby appoints _____ as agent for service of process in the State of California in connection with any actions that may be taken by Landlord under this Guaranty; provided, however, that in the event that _____ ceases to be Guarantor's agent for service of process in the State of California, then Guarantor shall appoint such other agent in the State of California as Guarantor's agent for service of process and such other agent shall provide Landlord with written confirmation of such other agent's capacity as agent for Guarantor.

20.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

21.    Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

22.    If more than one person signs this Guaranty, each such person shall be deemed a guarantor and the obligation of all such guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23.    If Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms. If Guarantor is a corporation, Landlord, at its option, may require Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed on this ___6th___ day of September, 2014.

[If Guarantor is a married individual,
Guarantor's spouse must sign this a
Guaranty]

Address of Guarantor:

By: _____

Print Name: _John Nguyen_
Print Title: _President_

_____

By: _____

_____
Print Name: _____
Print Title: _____

_____

OR

Print Name: _____

Print Name: _____
(Spouse, if applicable)

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1880 Century Park East, Suite 516, Los Angeles, California 90067.

On December 14, 2015, I served the foregoing document described as:

FIRST AMENDED COMPLAINT AND SUMMONS ON FIRST AMENDED COMPLAINT

Said document was served on the interested party(ies) in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

see attached service list

_____ BY PERSONAL SERVICE: I, the undersigned, personally caused the above-referenced document to be personally delivered to the recipients listed on the following page on this date.

__X__ BY MAIL: I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at 1880 Century Park East, Los Angeles, California 90067 in the ordinary course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

__XX__ (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this December 14, 2015, at Santa Monica, California.

_____
Timothy McGonigle

**PROOF OF SERVICE**
-1-

<u>**SERVICE LIST**</u>

Rosamund Lockwood
Burkhalter Kessler Clement & George LLP
2020 Main Street, Suite 600
Irvine, CA 92614
(Counsel for Defendants Red Mountain Group, Inc., Red Mountain Retail Group, Inc. and W Linc
BP, LLC)

Dr. John Huy Nguyen
Luviland LLC
10201 Garden Grove Boulevard
Garden Grove, CA 92843

Robyn Frick, Esq.
Manoosh Shakib, Esq.
Newmeyer & Dillion LLP
895 Dove St 5th Fl.
Newport Beach, CA 92660
(counsel for Defendants Eric Wohl and Hanley Investment Group, Inc.)

315 ARDEN, LLC – APPRAISAL REPORT

(To be filed prior to hearing on Disclosure Statement)

**EXHIBIT "2"**

315 ARDEN, LLC – LIQUIDATION ANALYSIS

(To be filed prior to hearing on Disclosure Statement)

**EXHIBIT "3"**

315 ARDEN, LLC – TRUST'S FINANCIAL INFORMATION

(To be filed under seal on or before the Exhibit Filing Date)

**EXHIBIT "4"**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

633 W. Fifth Street, 48th Floor, Los Angeles, CA  90071

A true and correct copy of the foregoing document entitled (*specify*):  ***DISCLOSURE STATEMENT DESCRIBING PLAN OF REORGANIZATION PROPOSED BY DEBTOR, 315 ARDEN, LLC*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On December 28, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Sandford L. Frey            sfrey@cmkllp.com; knielsen@cmkllp.com
Daniel J. Kessler           aburkhalter@bkcglaw.com; ehardeman@bkcglaw.com; rlockwood@bkcglaw.com;
                            lsandoval@bkcglaw.com
Stuart I. Koenig            skoenig@cmkllp.com; knielsen@cmkllp.com
Ron Maroko                  ron.maroko@usdoj.gov
Byron Z. Moldo              bmoldo@ecjlaw.com; lpekrul@ecjlaw.com
U.S. Trustee (LA)           ustpregion16.la.ecf@usdoj.gov
Marta C. Wade               mwade@cmkllp.com; knielsen@cmkllp.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) December 28, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Barry Russell
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA  90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 28, 2015 | Kelli Nielsen | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                **F 9013-3.1.PROOF.SERVICE**

## 2.    SERVICE LIST

315 Arden, LLC
8950 W Olympic Blvd # 650
Beverly Hills, CA 90211

Internal Revenue Service
PO Box 7346
Philadelphia, PA  19101-7346

Securities Exchange Commission
444 S Flower St, Ste 900
Los Angeles, CA  90071-2934

County of Orange
PO box 4515
Santa Ana, CA  92702-4515
Attn:  Bankruptcy Unit

Equity Real Estate Services
1702 S Robertson Blvd
Los Angeles, CA 90035-4316

Investment Property Exchange
4041 MacArthur Blvd No 400
Newport Beach, CA 92660-2554

Larry Langberg & Associates
PO Box 630485
Simi Valley, CA 93063-0009

Luviland LLC
9761 Calendula Ave
Westminster, CA 92683-6915

Red Mountain Group Inc
c/o Byron Z. Moldo, Esq.
Ervin Cohen & Jessup LLP
9401 Wilshire Blvd, 9th Fl
Beverly Hills, CA  90212

Seth I Weissman Esq
Jeffer Mangels Butler Mitchell LLP
1900 Ave of the Stars 7th Fl
Los Angeles, CA 90067-4308

Employment Development Dept.
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA  94280-0001

L.A. County Tax Collector
Bankruptcy Unit
PO Box 54110
Los Angeles, CA  90054-0110

Capital One Card Serv
PO Box 30285
Salt Lake City, UT 84130-0285

Daniel & Judith Arnall Family Trust
8950 W Olympic Blvd # 650
Beverly Hills, CA 90211-3561

Eugene G Cowan Esq
Bocarsly Emden LLP
633 W Fifth St 64th Fl
Los Angeles, CA 90071-2011

Internal Revenue Service
300 N. Los Angeles St, Stop 5022
Los Angeles, CA 90012-3478

Law Offices of Timothy D. McGonigle
1880 Century Park East, Suite 516
Los Angeles, CA  90067

Orange County Treasurer
11 Civic Center Plz
Santa Ana, CA 92701-4063

Red Mountain Retail Group Inc
c/o Byron Z. Moldo, Esq.
Ervin Cohen & Jessup LLP
9401 Wilshire Blvd, 9th Fl
Beverly Hills, CA  90212

Tzepah Freedland
8950 W Olympic Blvd # 650
Beverly Hills, CA  90211-3561

Franchise Tax Board
Bankruptcy Section MS A-340
PO Box 2952
Sacramento, CA  95812-2952

Los Angeles City Clerk
PO Box 53200
Los Angeles, CA  90053-0200

Christopher Morris CPA
Sobul Prime & Schenkel
12100 Wilshire Blvd Ste 1150
Los Angeles, CA 90025-7117

David and Tzepah Freedland
8950 W Olympic Blvd #650
Beverly Hills, CA 90211-3561

Infiniti of Beverly Hills
8825 Wilshire Blvd
Beverly Hills, CA 90211-2605

Judith Arnall
8950 W Olympic Blvd # 650
Beverly Hills, CA  90211-3561

Luviland Corporation
319 Collard Way
Placentia, CA 92870-8217

Plumbquest
5062 Lankersheim Blvd # 15
North Hollywood, CA 91601-4225

Reynolds Cafferata, Esq.
Rodriguez Hori Choi & Cafferata LLP
777 S Figueroa St Ste 2150
Los Angeles, CA 90017-5875

Eric Wohl
W Linc BP LLC
1234 E 17th Street
Santa Ana, CA 92701-2612

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    F 9013-3.1.PROOF.SERVICE