1  BYRON Z. MOLDO (SBN 109652)
    bmoldo@ecjlaw.com
2  KENNETH MILLER (SBN 126083)
    kmiller@ecjlaw.com
3  HOWARD I. CAMHI (SBN 149194)
    hcamhi@ecjlaw.com
4  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
5  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
6  Facsimile  (310) 859-2325

7  Attorneys for Defendant
   W LINC BP, LLC, A
8  California limited liability company

9

10

11            **UNITED STATES BANKRUPTCY COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13               **LOS ANGELES DIVISION**

14  In re                              | Case No. 2:15-bk-26483-BR

15  315 ARDEN, LLC.,                   | Chapter 11

16            Debtor and Debtor in Possession.

17                                     | **DECLARATION OF KENNETH MILLER
                                        IN SUPPORT OF MOTION TO
18                                      CONVERT CHAPTER 11 CASE TO A
                                        CASE UNDER CHAPTER 7**

19
                                         Date:    May 16, 2017
20                                       Time:    2:00 p.m.
                                         Crtrm:   Courtroom 1668
21                                                Edward R. Roybal Courthouse
                                                  255 E. Temple Street
22                                                Los Angeles, CA  90012

23       I, Kenneth Miller, hereby declare and say:

24       1.      I am an attorney at law, duly licensed to practice before all of the Courts of the

25  State of California and before this Court.  I am a partner with the law firm of Ervin Cohen &

26  Jessup LLP, attorneys of record for W Linc BP, LLC, a California limited liability company ("W.

27  Linc") in the bankruptcy case of 315 Arden, LLC ("Debtor") as well as for W Linc and

28  Defendants Red Mountain Group, Inc. and Red Mountain Retail Group, Inc.(collectively,

13332.23:

ERVIN COHEN & JESSUP LLP

1   "Defendants") in the adversary action filed by the Debtor against the Defendants, adversary case

2   no. 2:16-ap-01076-BR (the "Adversary Action"). I have personal knowledge of the facts set forth

3   in this Declaration and if called upon as a witness to testify, I could and would testify competently

4   to the facts set forth below.

5   **The Debtor In Its Bankruptcy Schedules Represented That The Family Trust Is The**

6   **Majority Interest Equity Holder In The Debtor**.

7        2.      On November 10, 2015, Debtor filed with this Court its Action By Written Consent

8   of the Manager and Voting Membership Interests ("Written Consent") dated October 26, 2015.

9   The Debtor represented in the Written Consent that Tzepah Freedland ("Freedland") in her

10  personal capacity is the managing member of the Debtor and she, together with the Daniel &

11  Judith Arnall Family Trust (the "Family Trust") in which Freedland was the trustee, were the sole

12  unanimous voting members of the Debtor. (See Dkt. No. 12). There is no mention of Daniel

13  Arnall 2014 Trust (the "2014 Trust") in the Written Consent. A true and correct copy of the

14  Written Consent is attached hereto, marked Exhibit "1" and incorporated herein by this reference.

15       3.      The Debtor also filed its List of Equity Security Holders on November 10, 2015. In

16  its List of Equity Security Holders, Freedland, on behalf of the Debtor, testified under penalty of

17  perjury that the Debtor consisted of two members – Freedland, who held a twenty percent

18  membership interest in the Debtor and the Family Trust, which held an eighty percent membership

19  in the Debtor. (See Dkt. No. 12). The Family Trust is also listed in Schedule F as holding an

20  unsecured claim in the amount of $137,260.00 for a "Loan" as well as a second unsecured claim in

21  the amount of $2,500.00 for a different "Loan." There is no mention of the 2014 Trust in the List

22  of Equity Security Holders or in any of the Debtor's bankruptcy schedules. A true and correct

23  copy of the Debtor's List of Equity Security Holders is attached hereto, marked Exhibit "2" and

24  incorporated herein by this reference.

25  **The Debtor In Its Debtor In Possession Financing Motion Represented That The**

26  **Family Trust Is The Majority Equity Interest Holder In The Debtor**.

27       4.      The Debtor identified the Family Trust, not the 2014 Trust, as the majority equity

28  holder and lender in its motion for post-petition financing, specifically named, "Motion Of Debtor

*ERVIN COHEN & JESSUP LLP*

13332.23:                                          2
**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7**

1  And Debtor In Possession For Order Authorizing Final Post-Petition Financing By ***Debtor's***

2  ***Majority Equity Holder*** Pursuant To Bankruptcy Code §364 (B), On An Unsecured Basis,

3  Allowable Under Bankruptcy Code §503(B)(1) As An Administrative Expense (emphasis added)

4  [Dkt 14] (hereinafter the "Financing Motion").  A true and correct copy of the Financing Motion

5  is attached hereto, marked Exhibit "3" and incorporated herein by this reference.

6      5.      On page 11 of the Financing Motion, the Debtor attributes the fact that the

7  proposed financing was more favorable than the Debtor could otherwise obtain due to the fact that

8  the Debtor's insider, its Debtor's majority equity holder, is the source of the financing.  Further in

9  Paragraph 4 of her declaration accompanying the Financing Motion, Freedland testifies under

10  penalty of perjury that the Family Trust is the 80% equity interest holder in the Debtor and as

11  trustee of the Family Trust, Freedland was authorized to enter into the proposed financing.

12  **The Debtor In Its Disclosure Statement and Plan Represented That The Family Trust**

13  **Is The Majority Equity Interest Holder In The Debtor**.

14      6.      On Page 26 of its Disclosure Statement (Dkt 91), the Debtor states that the

15  membership interest of the Debtor is 80% held by the Trust and the balance of  20% is held by its

16  managing member, Freedland.  The Trust is defined on page 14 of the Disclosure Statement as the

17  Family Trust. True and correct copies of pages 14, and 26 of the Disclosure Statement are attached

18  hereto, collectively marked Exhibit "4" and incorporated herein by this reference.

19      7.      In is Disclosure Statement, the Debtor identifies the following five sources of

20  income for the success of its plan:

21      • The New Value Contribution which is defined in the disclosure statement as a

22        financial contribution by the Family Trust, the holder of the majority equity

23        interest in the Debtor;

24

25      • Exit financing from the Family Trust, the holder of the majority equity interest in

26        the Debtor;

27

28

ERVIN COHEN & JESSUP LLP

**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7**

ERVIN COHEN & JESSUP LLP

1    • Payment, if necessary, by a contribution an unsecured loan by the Family Trust,

2    the holder of the majority equity interest in the Debtor, after the Effective Date, so

3    that the loan to value ratio for the Property to be determined within 24 months after

4    the Effective Date is seventy five percent (75%) or less the LTV Reduction

5    Contribution) ;

6

7    • Rental income from the Property: and

8    • Any refinance, pay-off or sale of the Property.

9    True and correct copies of pages 9 and 74-76 of the Disclosure Statement are attached hereto,

10   collectively marked Exhibit "5" and incorporated herein by this reference.

11   8.    The Debtor also states on the very first sentence of the first page of its Plan of

12   Reorganization (Dkt 92) ("Plan") that the membership interest of the Debtor is 80% held by the

13   Trust and the balance of 20% is held by its managing member, Freedland.  The Trust is defined

14   on page 17 of the Plan as the Family Trust. True and correct copies of pages 1 and 17 of the Plan

15   are attached hereto, collectively marked Exhibit "6" and incorporated herein by this reference.

16   9.    Neither the order approving the Disclosure Statement or the order confirming the

17   Plan recognize that the Debtor's majority equity holder may actually have been the 2014 Trust, not

18   the Family Trust.  A true and correct copy of the order approving the Disclosure Statement entered

19   by this Court on April 8, 2017 is attached hereto,  marked Exhibit "7" and incorporated herein by

20   this reference.  A true and correct copy of the order confirming the Plan entered by this Court on

21   June 27, 2016 is attached hereto,  marked Exhibit "8" and incorporated herein by this reference.

22   **The Debtor Testified At Deposition That The Family Trust Is The Majority Equity**

23   **Interest Holder In The Debtor**.

24   10.    I personally took the deposition of Tzepah Freedland on August 18, 2016.  Ms.

25   Freedland testified that she and the Family Trust were the only members of the Debtor since

26   December 9, 2014.  She also testified that the 2014 trust was not a member of the Debtor as of

27   December 9, 2014 and never became a member of the Debtor. Ms. Freedland also testified that she

28   was served as managing member of the Debtor since December 9, 2014. True and correct copies

13332.23:                                                    4

ERVIN COHEN & JESSUP LLP

1  of pages 42 through 45 of the transcript from the deposition of Ms. Freedland containing this

2  testimony are attached hereto, collectively marked Exhibit "9" and incorporated herein by this

3  reference.

4        11.    Freedland testified at her deposition that the Debtor previously owned the real

5  property located at 315 Arden Avenue in Glendale, California (the "Glendale Property").  She also

6  testified that the Debtor sold the Glendale Property.  However, Freedland testified that her only

7  experience at the time of the closing of the Glendale Property was as an administrator and not a

8  decision maker.  She also testified that prior to the sale of the Glendale Property, she had no

9  involvement in the sale of commercial real property,   True and correct copies of pages 47- 48

10  177-178  and 181 - 182 of the transcript from the deposition  of Ms. Freedland containing this

11  testimony are attached hereto, collectively marked Exhibit "10" and incorporated herein by this

12  reference.

13        12.    Freedland also testified at her deposition that the Debtor purchased the real

14  property located at 7101 West Lincoln Avenue in Buena Park, California (the "Buena Park

15  Property" or the "Property") :in February 2015.  Freedland further testified that prior to the

16  purchase of the Property, she had no experience in purchasing commercial real property and that

17  her only experience in locating tenants that she could recall was putting up "For Lease" signs.

18  True and correct copies of pages 55- 56 and 74 and 119 of the transcript from the deposition  of

19  Ms. Freedland containing this testimony are attached hereto, collectively marked Exhibit "11" and

20  incorporated herein by this reference.

21                       **Deposition of Bill Ha**

22        13.    On page 36 of the Debtor's Disclosure Statement, the Debtor stated that the tenants

23  of the Property at the time that Plaintiff purchased the Property were Luviland LLC and Luviland

24  Corp and Bill Ha was the President of tenant Luviland Corp.  A true and correct copy of page 35

25  of the Disclosure Statement is attached hereto, marked Exhibit "12" and incorporated herein by

26  this reference.

27        14.    On January 10, 2017, I, on behalf of the Defendants, personally took the deposition

28  of Bill Ha.  At his deposition, Mr. Ha testified that he personally met with Tzepah Freedland

**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7**

ERVIN COHEN & JESSUP LLP

1  ("Freedland") in May 2015 with a check in the amount of $35,000.00 to pay the rent due for May

2  and June 2016. Freedland refused the $35,000.00 payment and told Mr. Ha that of the tenant

3  cleaned up the space the tenant would not be required to make any payments due under the Lease

4  because Freedland had a buyer for the Property   True and correct copies of pages 89-93 from the

5  deposition transcript of Mr. Ha containing this testimony is attached hereto, marked Exhibit "13"

6  and incorporated herein by this reference.

7                              **Deposition of Maurice Nieman**

8       15.    On January 27, 2017, I, on behalf of the Defendants, personally took the deposition

9  of Maurice Nieman.  At his deposition, Nieman  testified that he is a real estate broker and was

10  employed by CBRE, Inc. ("CBRE") in the capacity of Senior Vice President since July 2013..   He

11  further testified that prior to working for CBRE, he worked a s a broker for previous

12  approximately six and one half years as a real estate broker for Collier's International and Sperry

13  Van Ness.  True and correct copies of pages 10 - 13 from the deposition transcript of Mr. Nieman

14  containing this testimony is attached hereto, collectively marked Exhibit "14" and incorporated

15  herein by this reference.

16       16..    On April 18, 2016, the Debtor filed its application with this Court to employ CBRE

17  as listing broker to sell or lease the Property. (Dkt 100).  On May 18, 2016, this Court granted the

18  Debtor's application to employ CBRE  (Dkt 116).

19       17.    Mr. Nieman testified that although Debtor's application to employ CBRE as real

20  property brokers for the Debtor was granted on May 18, 2016, both he and CBRE stopped doing

21  work for the Debtor on May 24, 2016.  A true and correct copy of page 84 from the deposition

22  transcript of Mr. Nieman containing this testimony is attached hereto, marked Exhibit "15" and

23  incorporated herein by this reference.

24       18.    Mr. Nieman testified that he terminated CBRE's engagement with the Debtor

25  because Freedland was "out of control" based on the following:

26       • Not only did Freedland not know the customary procedures for obtaining tenants,

27         she demand that CBRE do the opposite.  In particular, although the normal

28

13332.23:                                    6
**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7**

procedure was that the landlord would make the initial offer to a prospective tenant, Freedland demand that the tenant make the initial offer;

- Freedland, though her attorneys, put a competing listing with the multiple listing service Loop Net for the same Property, circumventing the listing of Debtor's own broker;

- Freedland was erratic in marketing the Property and changed her mind about the marketing materials by approving and later disapproving the same materials and placing the Property on the multiple listing service and later taking the Property off the multiple listing service; and

- Freedland dealt with Nieman in a very unprofessional manner making personal attacks on CBRE, wrongfully accusing him of not doing his job despite the fact that Nieman had worked as a real estate broker for the previous ten years.

True and correct copies of pages 47 -48, 53-54, 86, 95-96 and 98 from the deposition transcript of Mr. Nieman containing this testimony is attached hereto, collectively marked Exhibit "16" and incorporated herein by this reference.

19.    Mr. Nieman also testified at deposition that Freedland had no expertise whatsoever in the real estate industry. A true and correct copy of page 59 from the deposition transcript of Mr. Nieman containing this testimony is attached hereto, marked Exhibit "17" and incorporated herein by this reference.

**The Debtor's Representation That The 2014 Trust Is Its Majority Equity Holder**

20.    Defendants have propounded the following outstanding written discovery on Debtor in the Adversary Action:

(a)    Defendant RMG's first set of interrogatories served on Plaintiff served on Debtor on October 31, 2016 (the "RMG Interrogatories").

**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7**

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1    (b)    Defendant RMRG's first set of interrogatories served on Debtor on October

2    31, 2016 (the "RMRG Interrogatories").

3    (c)    Defendant RMG's first set of requests for production of documents served

4    on Debtor on October 31, 2016 (the "RMG Production Request").

5    (d)    The request for production of documents found in the deposition subpoena

6    served on Ms. Freedland in her capacity as trustee of the Daniel and Judith Arnall Family Trust on

7    October 31, 2016. (the "Family Trust Subpoena" and together with the RMG Interrogatories, the

8    RMRG Interrogatories and the RMG Production Request, the "Outstanding Written Discovery").

9    

10   21.    On December 9, 2016, well after this Outstanding Written Discovery was

11   propounded on the Debtor and Freedland in the Adversary Action, the Debtor filed its Motion For

12   Continuance Of Pre-Trial Conference, Discovery Cut-Off Deadline, And Pending Discovery

13   Deadlines (Adv. Dkt No. 103) (the "Continuance Motion").  In the Continuance Motion, the

14   Debtor sought to extend the deadlines to respond to the Outstanding Discovery due to the fact that

15   Freedland got into a car accident and was in her eighth month of pregnancy (See Declaration of

16   Tzepah Freedland In Support of Motion For Continuance Of Pre-Trial Conference, Discovery Cut-

17   Off Deadline, And Pending Discovery Deadlines (Adv. Dkt No. 106).  This Court granted the

18   Continuance Motion, in part and, pursuant to the order on the Debtor's Continuance Motion (the

19   "Continuance Order"), ordered that the Debtor provide Defendants with responses to the

20   outstanding discovery, that the Debtor produce all documents responsive to the RMG Request For

21   Production, and that the Family Trust produce all documents responsive to the Subpoena by

22   January 20, 2017.  (Adv. Dkt No. 122).  Further, although this Court previously scheduled the

23   discovery cut-off date for January 10, 2017, the Continuance Order permitted  Defendants to take

24   certain depositions after January 10, 2017.

25   22.    The Debtor did not comply with the Continuance Order and failed to provide any

26   responses to the RMG Interrogatories and the RMRG Interrogatories.  The Debtor also failed to

27   produce any documents in response to the Family Trust Subpoena and refused to produce any

28   

13332.23:                                          8

**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7**

1    documents in response to  many of the requests for production found in the RMG Production

2    Request.

3        23.    On or about March 24, 2017 in connection with a meet and confer regarding the

4    Outstanding Discovery, Sandy Frey, counsel for the Debtor, first told me the Debtor's latest

5    contention that the 2014 Trust, and not the Family Trust, was the Debtor's majority equity interest

6    holder.  In the Stipulation of Plaintiff and Defendants Regarding Outstanding Discovery Pursuant

7    to Local Bankruptcy Rule 7026-1(c) (Adv.  Dkt No. 139) (the "Stipulation"), the Debtor does not

8    deny that Freedland previously testified under penalty that the Family Trust both in deposition

9    testimony and to this Court that the Family Trust, and not the 2014 Trust, was the Debtor's

10   majority equity holder.  Instead, the Debtor repeatedly asserted in the Stipulation that Freedland

11   was "confused, distracted and mistaken."  Pages 1 through 7 of the Stipulation containing the

12   Debtor's contention that Freedland misrepresentations to this Court were due to the fact that she

13   was "confused, distracted and mistaken", are attached hereto, marked Exhibit "18" and

14   incorporated herein by this reference.

15        **The Debtor Has Not Generated Any Income From The Property**

16        24.    I have reviewed the operating reports that the Debtor caused to be filed in its

17   bankruptcy case for the months of October 2015 through June 2016..  According to the operating

18   reports, the Debtor deposited the sum of $14.22 in the month of October, 2015, the sum of

19   $100.00 in November 2015 and the sum of $150,000.00 in the month of January 2016 (apparently

20   from the proceeds of the loan made in connection with the DIP Motion).   None of the Operating

21   Reports state that the Debtor received any income from accounts receivable, either pre or post-

22   petition, or from any sales.  In addition, there is no mention in either the Disclosure Statement or

23   the Plan that any leasing or sale of any portion of the Property by the Debtor has occurred.

24   Therefore, it would appear that the Debtor received no income during the course of its bankruptcy

25   case from any leasing or sale of the Property.  True and correct copies of the first page of each of

26   the operating reports filed in this bankruptcy case are attached  hereto, marked Exhibit "19" and

27   incorporated herein by this reference.

28

ERVIN COHEN & JESSUP LLP

13332.23:                                    9

**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE
TO A CASE UNDER CHAPTER 7**

ERVIN COHEN & JESSUP LLP

25.     I am not aware of whether the Debtor is current in its obligations owed under the Plan and have not received written confirmation that the payment due on January 31, 2017 under the Plan in connection with the Loan to W Linc was timely paid, and if so, the amount of this payment. This payment is required under the Plan to be paid quarterly commencing on January 31, 2017 to a segregated account maintained by the Debtor. I have requested from Debtor's counsel written confirmation that the January 31, 2017 payment was timely paid and the amount of the payment on numerous occasions. Although Mr. Frey stated at the April 4, 2017 status conference that the January 31, 2017 payment under the Plan was paid, he was unable to state the amount of the payment at the status conference. Although I have requested that counsel for the Debtor provide me with written confirmation that the payment due on January 31, 2017 under the Plan in connection with the Loan to W Linc was timely paid, and if so, the amount of this payment, to date, I have not received this information. True and correct copies of my e-mail dated February 17, 2017 to Steven Katzman and Anne Uyeda, Debtor's then counsel in the Adversary Action, requesting confirmation that the January 31, 2017 payment under the Plan was timely paid and the amount of the payment as well as my e-mail dated March 23, 2017 to Alan Kindred, one of the counsel for Debtor in the Adversary Action, in which I request the same information, are attached hereto, collectively marked Exhibit "20" and incorporated herein by this reference.

26.     I also asked Mr. Frey and Alan Kindred during our meet and confer in March 24, 2017 to not only to provide me with written confirmation that the January 31, 2017 payment was timely paid and the amount of the payment, but also to provide me with quarterly status reports consistent with the requirements set forth in Local Bankruptcy Rule 3020-1(b), such as schedules listing whether all other classes of claims under the plan, and all post-confirmation tax obligations, have been paid, when the payments were made and in what amounts. I have not received any of this information as of the date of this Declaration. A true and correct copy of my e-mail that I sent to Mr. Kindred on March 27, 2017 confirming this request is attached hereto, marked Exhibit "21" and incorporated herein by this reference.

27.     On April 4, 2017, I appeared on behalf of Defendants at the status conference in the Adversary Action. At the status conference, the Debtor requested additional time to respond to the

13332.23:

10

1  Outstanding Written Discovery, due to the fact that Freedland's infant child was ill. This Court

2  extended to April 18, 2016 the deadline for Plaintiff to respond to, and produce the documents

3  requested in, the remaining Outstanding Written Discovery on behalf of both the 2014 Trust and

4  the Family Trust.

5        28.    On April 8, 2017 at approximately 3:45 p.m., I visited the Property. The building

6  on the Property was entirely vacant with a large banner on the front of the building stating "For

7  Lease" and another banner on a sign at the front of the Property stating "Now Leasing." The front

8  and sides of the Property appeared not to be well maintained with weeds and litter found

9  throughout the Property. Copies of photographs of the Property that I took of the Property on

10  April 8, 2017 at approximately 3:45 p.m. are attached hereto, collectively marked Exhibit "22"

11  and incorporated herein by this reference. Based on my inspection of the Property, it appears that

12  the Debtor had not leased any portion of the Property on April 8, 2017.

13        29.    Debtor has produced in discovery its First Amend And Restated Operating

14  Agreement ("Operating Agreement") dated as of December 9, 2014. According to Section 3.3(D)

15  found on page 13 of the Operating Agreement, upon the consent of the members of the Debtor, the

16  majority equity interest holder is obligated to make loans to the Debtor "[i]f and to the extent that

17  [the Debtor] does not have funds to pay any of the costs, expenses or obligations of [the Debtor]",

18  upon the consent of the members of the Debtor. A true and correct copy of the Operating

19  Agreement is attached hereto, marked Exhibit "23" and incorporated herein by this reference.

20        I declare under penalty of perjury under the laws of the State of California and the United

21  States of America that the foregoing is true and correct.

22        Executed on the 14th day of April, 2017 at Beverly Hills, California.

23

24

25

26                                  Kenneth Miller

27

28

*(sidebar, left margin)* ERVIN COHEN & JESSUP LLP

13332.23:                      11

**DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7**

# EXHIBIT "1"

## 315 ARDEN, LLC

### ACTION BY WRITTEN CONSENT OF THE MANAGER AND VOTING MEMBERSHIP INTERESTS

#### October 26, 2015

#### AUTHORIZATION TO FILE CHAPTER 11 PETITION

The undersigned being the voting members and constituting the unanimous voting membership interests of 315 Arden, LLC ("Company"), do hereby approve, adopt and ratify the following:

WHEREAS, Tzepah Freedland (aka Tzepah Zarmi) is the managing member of the Company ("Managing Member").

WHEREAS, Tzepah Freedland (aka Tzepah Zarmi) is the Trustee ("Trustee") of the Daniel & Judith Arnall Family Trust ("Trust").

WHEREAS, the Managing Member and the Trust, as the unanimous voting members of the Company, have determined that the Company as currently organized requires a chapter 11 reorganization in order to preserve the value of the assets.

WHEREAS, the Managing Member and the Trust, as the unanimous voting members of the Company have determined that it is in the best interests of the Company to seek protection from its creditors under Chapter 11 of the Federal Bankruptcy Code in order to preserve the value of the assets.

IT IS THEREFORE RESOLVED that the Company is hereby authorized, directed and empowered to do any and all acts reasonably necessary for the filing and administration of a petition, pursuant to Chapter 11 of the Bankruptcy Code of the United States, including, without limitation, the retention of counsel and other professionals to assist the Company in the preparation

1

and filing of the necessary petition, schedules, and related documents, and to otherwise act on behalf of the Company in the proceedings commenced in connection therewith.

**RESOLVED FURTHER**, that the Managing Member is hereby authorized and directed, on behalf of the Company, to verify said petition, schedules and related documents, to represent the Company in all proceedings related thereto, to assist counsel and other professionals retained by the Company with the preparation and filing of the necessary petition, schedules and related documents, and to appear on behalf of the Company in the proceedings commenced in connection therewith.

**THEREFORE**, the Managing Member is hereby authorized, directed and empowered to execute, and to do and perform, in the name and on behalf of the Company, such acts and to prepare, execute, acknowledge, verify, file, deliver and cause to be published such certificates, agreements, notices, reports, applications, instruments and documents, under the corporate seal of the Company, or otherwise as she may deem necessary or desirable in her discretion to carry into effect the foregoing resolutions, the Managing Member's performance of any such actions to constitute conclusive evidence of such determination of necessity by her.

The execution of this consent shall constitute a written waiver of any notice required for 315 Arden, LLC Operating Agreement, and by applicable provisions of the California Corporations Code.

Signature by facsimile transmission will have the same force and effect as if this consent had been originally signed by the Managing Member of the Company.

This consent shall be filed in the minute book of the Company and shall become a part of the records of the Company.

**TZEPAH FREEDLAND (AKA TZEPAH ZARMI)**

In her capacity as Voting Member and Managing Member

**THE DANIEL & JUDITH ARNALL FAMILY TRUST**

By: Tzepah Freedland (aka Tzepah Zarmi),
It's:  Trustee

3

# EXHIBIT "2"

# United States Bankruptcy Court
### Central District of California

In re    315 Arden, LLC

Debtor

Case No.    2:15-bk-26483-BR

Chapter    11

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with Rule 1007(a)(3) for filing in this chapter 11 case.

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
| --- | --- | --- | --- |
| Daniel & Judith Arnell Family Trust<br>8950 W Olympic Blvd # 650<br>Beverly Hills, CA 90211 | | | 80% |
| Tzepah Freedland<br>8950 W Olympic Blvd # 650<br>Beverly Hills, CA 90211 | | | 20% |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

I, the Managing Member of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date    November 10, 2015

Signature    /s/ Tzepah Freedland
Tzepah Freedland
Managing Member

*Penalty for making a false statement or concealing property:*  Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C §§ 152 and 3571.

<u>0</u>   continuation sheets attached to List of Equity Security Holders

# EXHIBIT "3"

Sandford L. Frey (SBN 117058)
**CREIM MACIAS KOENIG & FREY LLP**
633 West Fifth Street, 48th Floor
Los Angeles, CA 90071
Telephone: (213) 614-1944
Facsimile:  (213) 614-1961
sfrey@cmkllp.com

[Proposed] Reorganization Attorneys for
315 Arden, LLC, Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### [LOS ANGELES DIVISION]

| | |
|---|---|
| In re | CASE NO.: 2:15-bk-26483-BR |
| **315 ARDEN, LLC,** | Chapter 11 |
| Debtor and Debtor in Possession. | **NOTICE OF MOTION AND MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER AUTHORIZING FINAL POST-PETITION FINANCING BY DEBTOR'S MAJORITY EQUITY HOLDER PURSUANT TO BANKRUPTCY CODE § 364(b), ON AN UNSECURED BASIS, ALLOWABLE UNDER BANKRUPTCY CODE § 503(b)(1) AS AN ADMINISTRATIVE EXPENSE;** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF** |
| | [11 U.S.C. §§ 364 and 105; FRBP 4001(c); LBR 4001-2, 9013-1 and 9013-1(o)(2)(E)] |
| | DATE:      December 15, 2015 |
| | TIME:       2:00 p.m. |
| | CTRM:     1668 |

CREIM MACias KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

# TABLE OF CONTENTS

I.    INTRODUCTORY STATEMENT ................................................4

    A.    Background ................................................................5

    B.    The Chapter 11 Bankruptcy Case and Jurisdiction..................7

    C.    The Property................................................................8

    D.    The Financing ...........................................................8

II. DISCUSSION THE DEBTOR SHOULD BE AUTHORIZED TO ENTER INTO ITS POST-PETITION FINANCING ARRANGEMENT................................................10

    A.    The Terms of the Proposed Financing are Fair and Adequate and Reflect an Appropriate Exercise of the Debtor's Business Judgment...........................10

    B.    Authorizing the Post-Petition Financing under Section 364(b) of the Bankruptcy Code is Justified because of the Tangible Benefits that the Bankruptcy Estate will Reap from such Financing................................11

III. CONCLUSION ................................................................12

DECLARATION OF TZEPAH FREEDLAND ....................................13

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I:\slf\20252 (315 Arden LLC)\Ntc Motion and Motion for DIP financing
(Final Ver_11-17-15).docx

i

## TABLE OF AUTHORITIES

**Cases**

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990)....................................10

*Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985)..................10

**Statutes**

11 U.S.C. § 1107(a) ............................................................................................................8

11 U.S.C. § 1108..................................................................................................................8

11 U.S.C. § 506(c) ................................................................................................2, 10, 11, 14

28 U.S.C. § 1334(b) ............................................................................................................8

28 U.S.C. § 157(b)(2)(A), (D), (K) and (M) ......................................................................8

**Rules**

Federal Rules of Bankruptcy Procedure 4001(c)(B)(i)-(xi)..........................................2, 10

Local Bankruptcy Rule 5005-2(d) ......................................................................................3

Local Bankruptcy Rule 9004-1(a) ......................................................................................3

Local Bankruptcy Rule 9013-1 ..........................................................................................1

Local Bankruptcy Rule 9013-1(f) ......................................................................................3

Local Bankruptcy Rule 9013-1(h) ......................................................................................3

CREIM MACIE̊S KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  **TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY**

2  **JUDGE, THE UNITED STATES TRUSTEE, SECURED CREDITORS AND ALL OTHER**

3  **INTERESTED PARTIES:**

4      **PLEASE TAKE NOTICE** that on December 15, 2015 at 2:00 p.m., or as soon thereafter

5  as can be heard, before the Honorable Barry Russell in Courtroom "1668" of the United States

6  Bankruptcy Court, located at 1668 of the United States Bankruptcy Court, located at 255 E. Temple

7  Street, Los Angeles, California, 315 Arden, LLC, Debtor and Debtor-in-Possession ("Debtor")

8  will and does hereby move ("DIP Motion") for entry of an order authorizing and approving final

9  post-petition financing by the Debtor's majority equity holder, the Daniel & Judith Arnall Family

10  Trust. ("DIP Lender" or "Trust") in the amount of up to $150,000.00 ("DIP Loan"), which may be

11  used for, among other things, quarterly fees, operating expenses, adequate protection payments (to

12  the extent required), costs of administration (including, but not limited to, professional fees and

13  expenses) and any other costs or expenses necessary for, or related to, administration of the estate

14  ("Permitted Uses").  The DIP Loan will be made pursuant to Title 11, United States Code

15  ("Bankruptcy Code"), Section 364 (b), on an unsecured basis, allowable under Bankruptcy Code

16  § 503(b)(1) as an administrative expense; and, granting such other and further relief as is just and

17  appropriate.

18      **PLEASE TAKE FURTHER NOTICE** that the DIP Motion is based on this Notice of

19  Motion, the DIP Motion, the Memorandum of Points and Authorities, the Declaration of Ms.

20  Tzepah Freedland, the statements and representations of counsel appearing at the hearing on the

21  DIP Motion, Bankruptcy Code §§ 364 and 105, Federal Rule of Bankruptcy Procedure ("FRBP")

22  4001(c), Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of

23  California ("LBR") 4001-2, 9013-1 and 9013-1(o)(2)(E), and all other evidence properly before

24  the Court at the hearing on the DIP Motion.

25      **PLEASE TAKE FURTHER NOTICE** that there is no separate agreement for the

26  financing and the DIP Motion and order thereon shall contain all of the terms of the financing

27  arrangement.

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**PLEASE TAKE FURTHER NOTICE** that the DIP Loan shall not accrue any post-petition interest until confirmation of a Plan of Reorganization by the Debtor at which time the rate, if any, shall be set by the Plan.

**PLEASE TAKE FURTHER NOTICE** that there are no payments required to be made under the DIP Loan during the pendency of the Case. The maturity date of the DIP Loan shall be the earlier to occur of: (a) entry of a final order confirming a plan in this case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default (expressly set forth below).

**PLEASE TAKE FURTHER NOTICE** that the DIP Loan is not being made by the DIP Lender on a secured basis. Other than being allowable as an administrative expense pursuant to Bankruptcy Code § 503(b)(1), the DIP Loan shall not be granted any lien on property of the estate or granted any priority.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with FRBP 4001(c)(B)(i)-(xi), LBR 4001-2(b) and Official Form 4001-2, notice is hereby given that the terms of the financing do not contain any provision for any of the following: cross-collateralization; waiving any claims respecting the validity, perfection or amount of any pre-petition debt; waiving any rights under Bankruptcy Code §506(c); providing for any liens against any avoidance actions; deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt; providing for any professional fee carve-outs; providing for the priming of any secured lien; divesting the Debtor of any discretion under a Plan; releasing any claims against the DIP Lender; granting relief from stay; or waiving any procedural requirements.

**PLEASE TAKE FURTHER NOTICE** that an "Event of Default" under the DIP Loan is limited to the occurrence or existence of any one or more of the following events: (a) failure or reversal of the final order approving the DIP Loan; (b) change of control; (c) interim and/or final appointment of a responsible officer for the Debtor or of a trustee or an examiner with powers of a trustee; (d) conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (e) dismissal of this Chapter 11 case.

**PLEASE TAKE FURTHER NOTICE** that LBR 9013-1(f) requires that a formal written response to the DIP Motion be filed at least fourteen (14) days before the hearing on the DIP Motion and served upon (i) Creim Macias Koenig & Frey LLP, reorganization counsel for the Debtors, at 633 W. 5th Street; 48th Floor; Los Angeles, California 90071, Attn: Sandford L. Frey; fax: (213) 614-1961; and (ii) the Office of the United States Trustee.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with LBR 5005-2(d), a paper copy of any such opposition (which meets the requirements of LBR 9004-1(a) must be marked "**Judge's Copy**" and must be served on the chambers of the Honorable Barry Russell, in the United States Bankruptcy Court, located at 255 E. Temple Street, Los Angeles, California, and, if such opposition is filed electronically, the "Judge's Copy" must be accompanied by a copy of the NEF confirming the filing.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure of any party to timely object to the DIP Motion may be deemed to constitute consent to the relief sought therein.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

1.  Approving the requested financing on final basis;

2.  Providing that the DIP Loan shall be entitled to an administrative claim under Bankruptcy Code § 503(b)(1);

3.  Granting any other and further relief as may be just and proper.

Dated: November 18, 2015        CREIM MACIAS KOENIG & FREY LLP


By: /s/ Sandford L. Frey
         SANDFORD L. FREY
[Proposed] Reorganization Attorneys for 315 Arden
LLC, Debtor and Debtor-In-Possession

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTORY STATEMENT

By this DIP Motion[1], the Debtor seeks approval from this Court for final post-petition financing to be provided by the DIP Lender, which is the Debtor's majority equity holder, the proceeds of which will be used for Permitted Uses, until the Debtor has a reasonable opportunity to propose and confirm its Plan. In fact, there are few cases more deserving of an opportunity to reorganize than this case.

The Debtor is a limited liability company, the membership interest of which is held 80% by the Trust. The beneficiaries of the Trust consist of Judith Arnall, a widow of approximately thirty-nine years of age, with advanced Multiple Sclerosis (who is now permanently confined to a wheel chair), and her fourteen year old minor child. The balance of the equity interest is held by Ms. Tzepah Freedland (*aka* Tzepah Zarmi) ("Freedland"), the managing member. Prior to the filing of this Chapter 11 case, the Debtor was the victim of a fraudulent real estate scheme, in which a group of unscrupulous real estate professionals (including, the sellers and real estate agents) fraudulently induced the Debtor, through their misrepresentations and reprehensible conduct, into immensely overpaying for commercial property, located at 7101 W. Lincoln Avenue, Buena Park, CA ("Property"), to the detriment of the Debtor, its creditors, as well as to the detriment of the infirm widow, her minor child and Ms. Freedland.

The Debtor wishes to propose a Plan to reorganize in order to avoid further and irreparable harm by, and a further windfall to, these unscrupulous real estate professionals. The Plan will afford the Debtor (for the benefit of its creditors, the infirm widow, her minor child and Ms. Freedland), a reasonable opportunity to rehabilitate the Property; locate a suitable tenant; have the secured claim determined and its pending claims adjudicated; and eventually accomplish an orderly, non-distressed sale of the Property within a reasonable period of time. As will be

---

[1] Capitalized terms shall have the meaning ascribed to them in the Notice, unless otherwise defined in the DIP Motion.

I:\slf\20252 (315 Arden LLC)\Nte Motion and Motion for DIP financing (Final Ver_11-17-15).docx

4

CREIM MACI+S KOENIG & FREY LLP
813 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    discussed at the appropriate time, on balance, the purported secured creditor will not be harmed

2    by the Plan as a result of, among other things, the value of the Property, and the financial

3    wherewithal of the DIP Lender and its commitment to provide "new value," if necessary, to fund

4    the Plan – a Plan which will preserve the value of the Property for the Estate and eventually pay

5    unsecured creditors in full.

6    **A.    Background**

7        In February of this year, the Debtor was induced to purchase the Property from W Linc BP

8    LLC, ("W Linc"), which is a single purpose limited liability company believed to be owned by

9    Red Mountain Group, Inc. ("RMG"), and/or Red Mountain Retail Group, Inc. ("RMRG" and

10   together with W. Linc and RMG, the "Seller Entities").    On the basis of the numerous

11   misrepresentations made respecting the Property, its value and the viability of its tenants, and the

12   net worth of the personal guarantor purportedly providing security for the tenants' obligations,

13   among other things, the Debtor was induced to purchase the Property for $6,200,000, of which

14   approximately $4,800,000 was paid in **cash**, with the balance of the purchase price of

15   approximately $1,500,000 being carried back by one of the Seller Entities in the form of a

16   promissory note, secured by a deed of trust against the Property ("Disputed Secured Claim").

17   Theoretically, this should result in over a 400% equity cushion for the Disputed Secured Claim,

18   but for the misrepresentations of the Seller Entities/secured claimant respecting the Property.

19       After close of escrow for the Property, the Debtor discovered that it had been misled into

20   massively overpaying for the Property, as the Property was actually worth approximately three

21   million less than the $6.5 million purchase price[2], to say nothing of the $7 plus million value

22   represented to the Debtor.    As a result, the Debtor initiated an action in the Superior Court of the

23   State of California for the County of Orange, by filing on August 21, 2015, a *Complaint for (1)*

24   *Breach of Contract (Lease); (2) Breach of Contract (Guaranty); (3) Fraud and Intentional;*

25   *Misrepresentation (against Agents and Does); (4) Fraud and Intentional; Misrepresentation*

26   *(against Sellers and Does); (5) Intentional Concealment; (6) Negligent Concealment; (7)*

27

28   [2]  Needless to say, the lower valuation still results in an approximately 200% equity cushion.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

*Negligent Misrepresentation; (8) Breach of Fiduciary Duty; (9) Negligence; (10) Constructive Fraud; and (11) Rescission*, ("State Court Complaint"), entitled *315 Arden LLC, a California Limited Liability Company, Plaintiff, vs. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company; Luviland Corporation, a California Corporation; Luviland LLC, a California Limited Liability Company, John Huy Nguyen, an individual, Eric Wohl, an individual; Hanley Investment Group, Inc., a California Corporation, and, Does 1 through 40, inclusive*, Case No. 3D-2015-00805904-CU-FR-CJC ("State Court Action"). A copy of the State Court Complaint is attached as ***Exhibit 1***.

In the interest of brevity, the Debtor will not reiterate in this Motion all of the background and factual allegations set forth in the State Court Complaint, and will only summarize some of the background supporting the claims, which summary should not be construed as a substitute for a thorough reading of the entirety of the State Court Complaint for a full and complete understanding as to the nature of the claims being asserted by the Debtor and this Estate.

Suffice it to say, material representations made to the Debtor concerning the tenants and their financial condition were fabricated. Instead of the Property being leased by strong viable tenants as represented to the Debtor, the Debtor discovered subsequent to closing that the representations were completely false. Prior to closing, it was represented to the Debtor that one tenant was a purportedly successful "trading" business, being run by a "high net worth" doctor, which leasehold allegedly generated sufficient income to satisfy the tenant's rental obligations. Instead, the Debtor discovered after closing that the actual tenant was a completely uncreditworthy operator, which was operating an illegal business from the Property. Furthermore, within only a few weeks after the close of escrow, the tenant promptly breached the lease and abandoned the leased premises, leaving the Debtor without any rental income whatsoever. In addition, the Seller Entities were aware, but failed to disclose, that this allegedly viable tenant was likely to, and ultimately did, abscond with funds provided to the tenant, which were intended to be used exclusively for improvements to the Property.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Importantly, the tenant's defaults were completely predictable to the Seller Entities as, unbeknownst to the Debtor, the Seller Entities were aware that the real operator was an uncreditworthy judgment debtor engaged in running an illegal business; had been denied a business license for that reason; and, was likely to default. Moreover, the Debtor discovered only after the tenant's abandonment of the Property that the Seller Entities know, but failed to disclose that: (1) the thrift store business in operation at the time of escrow, violated city zoning ordinances, and had been denied a business license before the Property was even offered for sale (and thus had no business license as of the time of sale); (2) the doctor and lease guarantor who was supposedly using part of the Property in conjunction with another business was not the operator of *any* business at the Property, and his "trading" businesses was pure fiction; (3) the thrift store that did exist at the Property was actually being operated illegally by a person who had received a "leasing commission" from one of the Seller Entities -- but whose involvement was never disclosed to the Debtor prior to the close of escrow even though it was known to the Seller Entities; (4) the same doctor and lease guarantor that was touted as a "high net worth" individual providing security for the lease obligations is financially incapable of paying the damages caused by tenant's breach of the lease, and had an unpaid and undisclosed federal tax lien against him and is appearing in the civil action in *pro per*; and (5) the tenant improvements that were supposed to have been completed at the close of escrow have never been made.

Apparently discontent with having successfully defrauded the Debtor out of "only" approximately $3 million in cash by virtue of their misrepresentations, the Seller Entities now have the temerity to also pursue a non-judicial foreclosure of the remaining value, pursuant to the fraudulently obtained deed of trust, thereby completing their defilement of the Debtor, its creditors, a sick widow, her minor child and Ms. Freedland.

**B.    The Chapter 11 Bankruptcy Case and Jurisdiction**

The Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 27, 2015 ("Petition Date"). The Debtor continues to operate and manage its affairs as a debtor-in-possession pursuant to Bankruptcy Code

§§ 1107(a) and 1108. An official committee of creditors holding unsecured claims has not yet been formed. The Court has core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (D), (K) and (M).

**C.     The Property**

The Property consists of approximately 56,628 square feet of land, with a one-story commercial building consisting of approximately 22,680 square feet, with its fixtures and improvements ("Commercial Building"). The Commercial Building is currently unoccupied for the reasons set forth above, although the Debtor intends to actively market the Property for lease.

As of the Petition Date, RMG (affiliate or alter ego of the W Linc, the seller of the Property), asserts that it is the beneficiary of a promissory note from the Debtor in the approximate amount of $1.5 million, secured by the Property and the Commercial Building. The alleged secured claim is subject to a bona fide dispute in its entirety, and the Debtor asserts damages against the Seller Entities.

**D.     The Financing**

By this DIP Motion, the Debtor seeks approval for the DIP Loan (which is essentially a credit line) of up to $150,000.00 provided by the DIP Lender, which may be used by the Debtor for the Permitted Uses in connection with this Chapter 11 case.

The proposed DIP Loan is being made, pursuant to Bankruptcy Code §364(b), on an unsecured basis, allowable under Bankruptcy Code §503(b)(1) as an administrative expense. The proposed DIP Loan is not being made by the DIP Lender on a secured basis.

Other than being allowable as an administrative expense pursuant to Bankruptcy Code §503(b)(1), the DIP Lender shall not be granted a lien on any property of the estate or granted any priority. The proposed DIP Loan shall not accrue any post-petition interest until after confirmation of a Plan of Reorganization by the Debtor at which time the rate, if any, shall be set by the Plan. No payments are required to be made by the Debtor under the terms of the DIP Loan until after confirmation of a Plan of Reorganization by the Debtor at which time the payment term shall be set by the Plan. The DIP Loan has no maturity date (other than on confirmation of a plan or in the

CREIM MACIAS KOENIG & FREY LLP
653 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

event of default), the provisions of which are discussed below. Because the Commercial Building is not occupied at this time, the Real Property is not generating any income and therefore there are no cash collateral issues in this case.

There is no separate agreement for the financing. Instead, this DIP Motion and order approving this DIP Motion shall contain the full and complete terms of the financing arrangement.

**1.**    **Total Amount of Financing**

Up to $150,000.00 total as the Debtor determines is necessary to draw down upon from time to time.

**2.**    **Interest**

None until Confirmation of the Plan.

**3.**    **Loan Maturity**

Upon the earlier to occur of: (a) entry of a final order confirming a Plan in this case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default.

**4.**    **Security Interest and Priority Rights**

The DIP Loan is not being made by the DIP Lender on a secured basis. Other than being allowable as an administrative expense pursuant to Bankruptcy Code § 503(b)(1), the DIP Loan shall not be granted any lien on property of the estate or granted any priority.

**5.**    **Default**

An "Event of Default" under the DIP Loan is limited to the occurrence or existence of any one or more of the following events: (a) failure or reversal of the final order approving the DIP Loan; (b) change of control; (c) interim and/or final appointment of a responsible officer for the Debtor or of a trustee or an examiner with powers of a trustee; (d) conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (e) dismissal of this Chapter 11 case.

Upon the occurrence of any of the Events of Default listed above, the DIP Lender's remedy is limited to: (a) declaring the DIP Loan to be due and payable; and, (b) asserting its rights as an administrative claimant subject to the provisions of the Bankruptcy Code.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

**6.   Release of Claims**

None

**7.   FRBP 4001(c)(B)(i)-(xi) and LBR 4001-2(b) Disclosures**

The terms of the financing do not contain any provision for any of the following:

a)   Cross-collateralization;
b)   Waiving any claims respecting the validity,
c)   Perfection or amount of any pre-petition debt;
d)   Waiving any rights under Bankruptcy Code §506(c);
e)   Providing for any liens against any avoidance actions;
f)   Deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt;
g)   Providing for any professional fee carve-outs;
h)   Providing for the priming any secured lien;
i)   Divesting the Debtor of any discretion under a Plan;
j)   Releasing any claims against the DIP Lender; granting relief from stay; or
k)   Waiving any procedural requirements.

## II.

## DISCUSSION

## THE DEBTOR SHOULD BE AUTHORIZED TO ENTER INTO

## ITS POST-PETITION FINANCING ARRANGEMENT

**A.   The Terms of the Proposed Financing are Fair and Adequate and Reflect an Appropriate Exercise of the Debtor's Business Judgment.**

Bankruptcy Courts give broad deference to the business decisions of chapter 11 debtors, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As the court noted in *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990), a "court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the DIP financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest."

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

The extension of post-petition financing in the instant case reflects the exercise of sound and prudent business judgment by the Debtor. ~~The DIP Loan is being made available by the Debtor's majority equity holders~~ The terms of this financing remain more favorable than any other financing alternative available to the Debtor, particularly in terms of the flexible maturity date and that it will not accrue interest during the pendency of the Chapter 11 case.

Furthermore, the DIP Lender has not sought to make the advance on a secured basis. Other than being allowable as an administrative expense pursuant to Bankruptcy Code §503(b)(1), the DIP Lender is not being granted a lien on any property of the estate or granted priority. The proposed financing by the DIP Lender also does not seek priority over other administrative expenses of the kind specified in Bankruptcy Code Section 503(b)(1).

In addition, the DIP Lender has not requested any of the protections typically requested by secured lenders or financial institutions, such as cross-collateralization; waiving any claims respecting the validity, perfection or amount of any pre-petition debt; waiving any rights under Bankruptcy Code § 506(c); providing for any liens against any avoidance actions; deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt; providing for any professional fee carve-outs; providing for the priming of any secured lien; divesting the Debtor of any discretion under a Plan; releasing any claims against the insiders; granting relief from stay; or waiving any other procedural requirements.

It is clear that the Debtor is unable to obtain financing from other lenders on terms as favorable as those under the financing by the DIP Lender at no interest, no fixed payment and with a flexible maturity date. The financing is not only the best financing alternative available, it is the only financing available on this basis.

**B.    Authorizing the Post-Petition Financing under Section 364(b) of the Bankruptcy Code is Justified because of the Tangible Benefits that the Bankruptcy Estate will Reap from such Financing.**

Bankruptcy Code §364(b) authorizes the obtaining of credit allowable under Bankruptcy Code §503(b)(1). Here, the proposed financing provides the Debtor with the ability to cover its

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

operating expenses and adequate protection payments, if any, required to be made to the Lender during the pendency of the case. Because the Commercial Building is currently vacant, the Debtor does not have any source of income and therefore the proceeds from the DIP Loan is the only way the Debtor can meet its operating expenses and costs of administration until a new tenant is found.

The Debtor intends to file a Plan within 60 days of the Petition Date which will provide for a "new value" infusion from the DIP Lender. The Debtor believes that an appraisal will assist in ascertaining the current fair market value of the Real Property, thereby potentially impacting the amount of the "new value" infusion required, if any, for confirmation of a plan. The DIP Loan will be used in part for such purposes.

In addition, paying the administrative fees, retaining professionals and maintaining continuity of the Debtor's professionals will enhance and accelerate the reorganization process.

## III.

## CONCLUSION

For the foregoing reasons, it is appropriate to approve the DIP Loan. The Debtor respectfully requests that this Court enter an order authorizing it to incur the requested debt, and granting relief as requested in the Motion.

Dated: November 18, 2015

CREIM MACIAS KOENIG & FREY LLP


By:    /s/ Sandford L. Frey
       SANDFORD L. FREY
[Proposed] Reorganization Attorneys for 315 Arden
LLC, Debtor and Debtor-In-Possession

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

### DECLARATION OF TZEPAH FREEDLAND

I, Tzepah Freedland, declare as follows:

1.     I am one of the trustees of the Trust[3]. I am also a 20% equity holder in the Debtor and the managing member of the Debtor. If called to testify, I could and would testify competently concerning the contents of this Declaration. My knowledge of the facts set forth herein is based on my personal knowledge of the Debtor's books and records as well as my observations of the Debtor's assets.

2.     I make this declaration in support of the DIP Motion.

3.     The Trust has authorized, and is prepared to advance a DIP Loan of up to the amount of $150,000.00 as may be requested by the Debtor from time to time, which the Debtor may in its discretion use for, among other things, operating expenses, including an appraisal report if necessary, and costs of administration, including, but not limited to, professional fees and expenses in connection with this Chapter 11 case.

4.     There is little doubt that the terms of this financing offered by the Trust are more favorable than any other financing alternative available to the Debtor, particularly in terms of the flexible maturity date and lack of interest accruing during the pendency of the case. ~~The Trust is the 80% equity interest holder in the Debtor and I hold 20%.~~ I am the trustee of the Trust and in that capacity I am authorized to enter into this agreement with the Debtor.

5.     The Trust agrees that the maturity of the DIP Loan will be upon the earlier to occur of: (a) entry of a final order confirming a Plan in this case; (b) entry of a final order approving the sale of substantially all of the Debtor's assets, or (c) occurrence of an Event of Default.

6.     The Trust understands and agrees that the DIP Loan is not being made by the DIP Lender on a secured basis. Other than being allowable as an administrative expense pursuant to Bankruptcy Code §503(b)(1), the DIP Loan shall not be granted any lien on property of the estate or granted any priority. The proposed financing offered by the Trust also does not seek any priority over other administrative expenses of the kind specified in Bankruptcy Code sections 503(b)(1).

---

[3] Capitalized terms shall have the meaning ascribed to them in the Motion, unless defined otherwise herein.

I:\slf20252 (315 Arden LLC)\Nte Motion and Motion for DIP financing (Final Ver_11-17-15).docx

13

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

7.    The Trust further agrees to the limited "Events of Default" under the DIP Loan as set forth in the DIP Motion.

8.    In addition, the Trust has not demanded as a condition of the DIP Loan any of the protections which I understand are customarily requested by typical DIP lenders, such as cross-collateralization; waiving any claims respecting the validity, perfection or amount of any pre-petition debt; waiving any rights under Bankruptcy Code § 506(c); providing for any liens against any avoidance actions; deeming pre-petition debt to be post-petition debt or providing for any security for any pre-petition debt; providing for any professional fee carve-outs; providing for the priming any secured lien; divesting the Debtor of any discretion under a Plan; releasing any claims against the DIP Lender; granting relief from stay; or waiving any other procedural requirements.

9.    The financing is not only the best financing alternative available, it is the only financing available on this basis.

10.    The Debtor intends to propose a Plan which will provide for, among other things, a "new value" infusion from the Trust. An appraisal will assist in ascertaining the value of the Real Property, thereby potentially impacting the amount of the "new value" infusion required for confirmation of a plan. It is my understanding that the DIP Loan will be used in part for such purposes.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on November *18*, 2015 in Beverly Hills, California.

_____
Tziepah Freedland
Title: Trustee of the Daniel & Judith Arnall Family Trust

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

EXHIBIT A

### TENANT'S ESTOPPEL CERTIFICATE

The undersigned, <u>Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company</u> as the tenant ("Tenant") under that certain lease dated <u>October 6, 2014</u> (the "**Lease**") with <u>W'LINC BP, LLC</u> ("**Landlord**"), for certain premises ("**Premises**") located in the shopping center commonly known as <u>7101 W. Lincoln Avenue</u> ("**Shopping Center**") in the City of <u>Buena Park</u>, the County of <u>Orange</u>, State of <u>California</u>. The undersigned understands that RED MOUNTAIN RETAIL GROUP, INC./OR ASSIGNS has offered or committed to enter into a transaction with Landlord and that RED MOUNTAIN RETAIL GROUP, INC./OR ASSIGNS has requested this certificate (this "**Certificate**") from the undersigned as a condition precedent to the consummation of such transaction and will therefore be relying upon the representations and warranties contained herein.

The undersigned hereby states, declares, represents, warrants and certifies as follows:

1. A copy of the Lease attached hereto as <u>Exhibit A</u> is a true and correct copy of the Lease and constitutes the only agreement between Landlord and Tenant with respect to the leased Premises.

2. The Lease (including all exhibits) is in full force and effect, has not been terminated, and is enforceable in accordance with its terms.

3. The Lease has not been modified, amended, supplemented or changed in any way, except as follows: <u>None</u>

4. The Lease constitutes the entire agreement between Landlord and Tenant for the Premises, and there are no other agreements, written or oral, between Landlord and Tenant relating to the Premises.

5. Tenant has accepted possession of the Premises under the Lease and all items required to be performed by Landlord under the terms of the Lease as follows: Tenant Improvement Allowance $ 113,400.00 and Tenant Allowance $288,660.00, have been completed by Landlord within the time periods set forth in the Lease, and all required contributions by Landlord to Tenant on account of Tenant's improvements to the Premises have been paid in full as of close of escrow.

6. The term ("Term") of the Lease commenced on <u>November 20th, 2014</u>. The Term shall expire on <u>November 30th, 2026</u>. There are <u>2 (5) Year</u> options to extend the Term for periods of <u>60</u> months each.

7. Neither Tenant nor Landlord has begun any action, or given or received any notice for the purpose of termination of the Lease.

8. Tenant is currently paying monthly rent under the Lease in the amount of <u>$37,422</u> per month ("Base Rent").

9. The Base Rent under the Lease is current as of <u>February 24th, 2015</u>. The next payment of Base Rent is due on <u>May 20th, 2015.</u>

10. No Base Rent or other charges have been paid more than thirty (30) days in advance of its due date, except as follows: $30,000.

11. Tenant is currently paying percentage rent (if any) under the Lease in the amount of -0- per month ("Percentage Rent").

12. Tenant is currently paying additional rent under the Lease for Tenant's share of common area expenses, taxes and insurance in the amount of $__0__ per month ("Additional Rent").Tenant pays all expenses and NNN costs.

13. The amount of Tenant's security deposit held by Landlord under the Lease is _____$0_____ ("Security Deposit").

14. No default or event that, with the giving of notice or the passage of time, or both, would constitute a default on the part of the undersigned exists under the Lease, nor is the undersigned (to the best of its knowledge) aware of any default or event that with the passing of time or the giving of notice, or both, would constitute a default on the part of Landlord under the Lease.

15. The undersigned has not received notice of any assignment, hypothecation, mortgage or pledge of Landlord's interest in the Lease or of any rents or other amounts due thereunder.

16. Any and all free rent, except as set forth in the Lease, will be paid at the close of escrow and Landlord has not given or conceded to Tenant any other concessions, abatements or compromises with respect to the rental obligations under the Lease.

17. All offsets or credits against or defenses to payment of any monetary obligations payable under the Lease will be handled as of close of escrow.

18. The Lease does not contain, and Tenant does not have, any options or rights, including, without limitation, expand the Premises, rights of first offer or refusal (or other rights) to purchase the Premises or any part thereof or all or any part of the real property of which the Premises are a part.

19. No actions, whether voluntary or otherwise, are pending against Tenant under the bankruptcy laws of the United States or any state thereof.

20. Tenant has not assigned, sublet or otherwise transferred Tenant's interest in the Lease or the Premises to any party.

21. To the best of Tenant's knowledge, the use, maintenance and operation of the Premises currently complies with all applicable federal, state, county or local statutes, laws, rules and regulations, including those relating to environmental, health or safety matters.

22. Tenant has not received notice of any alleged violation of any law governing the use or operation of the Premises and no outstanding writs, injunctions, decrees, orders or judgments are pending, or to the best of Tenant's knowledge, threatened, concerning the use, maintenance or operations of the Premises by Tenant, nor is the Tenant aware of the basis for any such proceeding.

23. The undersigned is authorized to execute this Certificate on behalf of Tenant.

24. This Certificate and the Lease are legal, valid, binding and enforceable obligations of Tenant.

Tenant executes this Certificate with the understanding that Lessor is contemplating selling the Premises, and Landlord, RED MOUNTAIN RETAIL GROUP, INC. and their respective successors and assigns (including any mortgagee or beneficiary under a deed of trust or mortgage) will rely on this Certificate.

Dated: __2/24/205__

TENANT:

By: _____

Print Name: __John Nguyen__

Print Title: __President__

# EXHIBIT B

# LEASE AGREEMENT

LANDLORD:    Red Mountain Retail Group Inc. a California corporation or "assignee"

TENANT:    Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company

dba _____TBD_____

ARTICLE I        GRANT AND TERM .................................................... 1
    Section 1.01        Grant .................................................................. 1
    Section 1.02        Term and Commencement Notice ........................ 1
    Section 1.03        Extension Options ............................................. 1
    Section 1.04        Purchase and Sale of Demised Premises by
                        Landlord ............................................................ 1
    Section 1.05        Memorandum of Lease ...................................... 2

ARTICLE II       RENT ................................................................... 2
    Section 2.01        Rent During Term ............................................. 2
    Section 2.02        Payment of Rent ............................................... 2
    Section 2.03        Security Deposit ................................................ 2
    Section 2.04        Percentage Rent ............................................... 2
    Section 2.05        Interest for Late Payments ................................. 2
    Section 2.06        Late Charges .................................................... 3
    Section 2.07        "NNN" Lease ..................................................... 3

ARTICLE III      USE OF PREMISES ............................................... 3
    Section 3.01        Use of Demised Premises .................................. 3
    Section 3.02        Continuous Occupancy ..................................... 3
    Section 3.03        Prohibition of Use ............................................. 3
    Section 3.04        Hazardous Substances ...................................... 4

ARTICLE IV       CONSTRUCTION, REPAIRS, ALTERATIONS AND
                 MAINTENANCE .................................................... 6
    Section 4.01        Construction of Improvements by Tenant ........... 6
    Section 4.02        Repairs by Tenant to Demised Premises ........... 7
    Section 4.03        Alteration and Remodeling ................................. 7
    Section 4.04        Mechanic's Liens .............................................. 8
    Section 4.05        Compliance ...................................................... 9
    Section 4.06        No Services by Landlord .................................... 9
    Section 4.07        Maintenance of the Demised Premises .............. 9

ARTICLE V        TAXES ................................................................. 9
    Section 5.01        Personal Property Taxes .................................... 9
    Section 5.02        Ad Valorem Taxes: Charges and Assessments:
                        and Utility Charges ........................................... 9

ARTICLE VI       INSURANCE INDEMNITY ..................................... 11
    Section 6.01        Indemnity. ...................................................... 11
    Section 6.02        Insurance by Tenant. ...................................... 12
    Section 6.03        Increase in Insurance Rate. ............................. 14
    Section 6.04        Waiver of Subrogation. .................................... 14

ARTICLE VII      SIGNS AND AWNINGS .......................................... 15
    Section 7.01        Signs and Awnings .......................................... 15

ARTICLE VIII     UTILITIES ........................................................... 15
    Section 8.01        Tenant's Responsibility for Utilities Consumed ... 15
    Section 8.02        Alternative Billing ............................................ 15

ARTICLE IX       ASSIGNMENT SUBLETTING AND MORTGAGING ...... 15
    Section 9.01        Assignment and Subletting. ............................. 15
    Section 9.02        Violation .......................................................... 17
    Section 9.03        Subordination. ................................................. 17
    Section 9.04        Easements by Landlord .................................... 17
    Section 9.05        Demised Premises Free from Liens .................... 18
    Section 9.06        Bankruptcy Assignment .................................... 18
    Section 9.07        Bankruptcy Assignment-Payment of Consideration
                        for Assignment ................................................ 18

(vi)

ARTICLE X         CONDEMNATION ........................................................................ 19
    Section 10.01      Whole Taking .......................................................... 19
    Section 10.02      Partial Taking .......................................................... 19
    Section 10.03      Condemnation Proceedings .................................. 19
    Section 10.04      Waiver of Termination ............................................ 19

ARTICLE XI        DESTRUCTION OF DEMISED PREMISES ............................... 19
    Section 11.01      Destruction of Demised Premises ........................ 19

ARTICLE XII       SURRENDER OF PREMISES ..................................................... 20
    Section 12.01      Liability for Return of Demised Premises ............ 20
    Section 12.02      Abandonment .......................................................... 20

ARTICLE XIII      DEFAULT AND REMEDIES ........................................................ 20
    Section 13.01      Default by Tenant .................................................. 20
    Section 13.02      Landlord's Remedies; Termination ...................... 21
    Section 13.03      Landlord's Remedies; Re-Entry Rights ............... 22
    Section 13.04      Continuation of Lease ........................................... 22
    Section 13.05      Injunction ................................................................ 22
    Section 13.06      No Waiver ................................................................ 22
    Section 13.07      Indemnity ................................................................ 22
    Section 13.08      Attorneys' Fees ..................................................... 22
    Section 13.09      Default by Landlord .............................................. 22
    Section 13.10      Curing Tenant's Defaults ...................................... 23
    Section 13.11      Waiver of Breach ................................................... 23
    Section 13.12      Waiver of Redemption .......................................... 23

ARTICLE XIV       INSPECTION OF PREMISES .................................................... 23
    Section 14.01      Landlord's Right to Inspect ................................... 23

ARTICLE XV        QUIET ENJOYMENT ................................................................. 23
    Section 15.01      Landlord's Covenant of Quiet Enjoyment ........... 23

ARTICLE XVI       HOLDING OVER ....................................................................... 23
    Section 16.01      Rent for Holding Over Period ............................... 23

ARTICLE XVII      TITLE ........................................................................................ 24
    Section 17.01      Condition of Title and of Demised Premises ...... 24

ARTICLE XVIII     MISCELLANEOUS ................................................................... 24
    Section 18.01      Notices; Rental Payments .................................... 24
    Section 18.02      Partial Invalidity .................................................... 24
    Section 18.03      Entire Agreement .................................................. 24
    Section 18.04      Successors in Interest .......................................... 24
    Section 18.05      Headings ................................................................. 24
    Section 18.06      Applicable Law ...................................................... 24
    Section 18.07      Definition of Landlord .......................................... 24
    Section 18.08      Tenant's Estoppel Certificate; Additional
                        Documents............................................................... 25
    Section 18.09      Intentionally Omitted ............................................. 25
    Section 18.10      Intentionally Omitted. ............................................ 25
    Section 18.11      Maintenance Bond ................................................ 25
    Section 18.12      No Partnership ....................................................... 26
    Section 18.13      Effect of Statements Submitted by Landlord ...... 26
    Section 18.14      Arbitration .............................................................. 26
    Section 18.15      Counterparts .......................................................... 26
    Section 18.16      Default under Franchise Agreement by Tenant ... 26
    Section 18.17      Brokers ................................................................... 26
    Section 18.18      Strict Construction................................................. 26
    Section 18.19      Force Majeure ....................................................... 26
    Section 18.20      Waiver of Jury Trial ............................................... 27
    Section 18.21      Tenant's Authority ................................................. 27

**EXHIBITS**

EXHIBIT "A"    SITE PLAN

EXHIBIT "B"    FORM OF LEASE GUARANTY AGREEMENT

EXHIBIT "C"    DELETED

EXHIBIT "D"    DELETED

## INDEX

| | Page(s) |
|---|---|
| ADA | 12 |
| Affiliate | 12 |
| Affiliated | 20 |
| Alterations | 24 |
| Authorized Use | 11 |
| Claims | 3 |
| Corrective Action | 15 |
| Demised Premises | 7 |
| Effective Date | 1 |
| Environmental Law | 1 |
| Environmental Laws | 6 |
| Environmental Permits | 4 |
| Excluded Claims | 6 |
| Guarantor | 15 |
| Guaranty | 1 |
| Hazardous Substances | 1 |
| Improvements | 6 |
| Landlord | 10 |
| Landlord Parties | 1, 28 |
| Landlord's Broker | 15 |
| Late Charge | 29 |
| Lease | 3 |
| Mortgage | 1 |
| Original Tenant | 21 |
| PCBs | 1 |
| Purchase and Sale Agreement | 5 |
| reasonableness | 1 |
| Recorded Agreements | 8 |
| Release | 13 |
| Rent | 7 |
| Summary | 2 |
| Taxes | i |
| Tenant | 13 |
| Tenant's Broker | 1 |
| Tenant's Parties | 30 |
| Utilities | 15 |
| worth at the time of award | 18 |
| | 25 |

Section 13.01 below with regard to cure periods, if Tenant shall fail timely to pay to Landlord any installment of Rent on the date on which such sum is due pursuant to the terms of this Lease, Tenant shall pay to Landlord interest on such late payment from the date which is ten (10) days following the due date thereof to the date of receipt of payment by Landlord at a rate per annum equal to twelve and one-half percent (12.5%) or the maximum rate permitted under applicable laws but in no event to exceed that permitted under applicable laws.

Section 2.07 Late Charges. Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult and costly to ascertain. Such costs include, but are not limited to processing, administrative and accounting charges. Accordingly, if any installment of Rent or any other sum due from Tenant is not received by Landlord as set out herein within five (5) days after such amount is due, Tenant shall pay to Landlord a late charge equal to five (5%) percent of such overdue amount ("Late Charge"). The parties hereby agree that such Late Charge represents a fair and reasonable estimate of the costs Landlord will incur as a consequence of late payment by Tenant. Acceptance of such Late Charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder, at law and/or in equity.

Section 2.08 "NNN" Lease. It is the intention of the parties that this Lease is a so called "NNN" Lease and that Landlord, except as otherwise expressly provided herein, will have no responsibility for and shall not pay for the construction, care, maintenance, operation, repair, replacement, alteration, addition, change, improvements, insurance and Taxes (defined below) for or to the Demised Premises and any building and improvement thereof; Tenant shall be responsible for and shall pay these items in addition to Rent.

## ARTICLE III
## USE OF PREMISES

Section 3.01 Use of Demised Premises. The Demised Premises shall be used for the operation of a store specializing in the sale of general merchandise at wholesale and/or close-out prices ("Authorized Use") and for no other purpose. In addition, the Demised Premises shall not be used in any manner, which is in violation of the requirements of any laws, ordinances, rules, regulations and requirements of any federal, state, municipal governments, or the provisions of recorded agreements.

Section 3.02 Continuous Occupancy. Tenant shall occupy the Demised Premises promptly upon the Commencement Date and thereafter throughout the Term; and upon completion of the Improvements (as defined in Article IV below) shall continuously, actively and diligently use the entire Demised Premises throughout the Term for the Authorized Use and for no other purpose in an efficient, businesslike and reputable manner, subject, however, to temporary interruption of business for a reasonable period of time approved by Landlord for authorized repairs, alterations and remodeling as permitted under this Lease. Further, Tenant shall at all times keep and maintain within and upon the Demised Premises adequate supplies and products and have sufficient personnel to service and supply the demands and requirements of its customers. Tenant shall have its exterior signs and exterior advertising displays (which have previously been approved by Landlord) adequately illuminated continuously during Tenant's hours of operation. If Tenant shall fail to continuously and uninterruptedly operate the business which it is required to operate under the terms of this Lease, Tenant acknowledges that monetary damages may be inadequate to compensate Landlord and that Landlord shall be entitled to injunctive relief ordering Tenant to resume such continuous operation and to pursue any and all other rights and remedies under this Lease, at law, or in equity, including termination as a result thereof.

Section 3.03 Prohibition of Use. Tenant shall have no claim against Landlord for damages and the validity of this Lease shall not be affected in any manner whatsoever, should the use and occupancy of the Demised Premises for the Authorized Use be prohibited or impaired by reason of any law, ordinance or regulation of federal, state,

county of municipal governments or by reason of any act of any legal or governmental or other public authority or by any Recorded Agreements (as defined in Section 5.02(b)(ii) below).

### Section 3.04 Hazardous Substances.

(a)    Compliance with Law.  Tenant shall conduct, and cause to be conducted, all operations and activity at the Demised Premises in compliance with, and shall in all other respects applicable to the Demised Premises comply with, all applicable federal, state and municipal statutes, ordinances, regulations, orders, directives or other requirements of law or common law orders, directives or other requirements of law or common law (collectively, "**Environmental Laws**") concerning: (i) the generation, use, handling, treatment, storage, transportation, release, disposal, remediation or presence of any Hazardous Substances (as defined below) in, on, under, from or connected with operations and activities at the Demised Premises; and (ii) storage tanks and related facilities and connections (if any).  Tenant shall timely obtain and maintain all permits, licenses or approvals and shall timely prepare, make, maintain and/or submit all notifications, registrations, records, reports and other documents as required by Environmental Laws.  Tenant shall at all times comply with the terms and conditions of such permits, licenses, approvals, notifications and registrations.

(b)    Information Transfer.  Tenant shall provide to Landlord copies of the following, forthwith after each shall have been prepared, submitted or received by Tenant or any occupant of the Demised Premises: (i) all applications and associated material submitted to any governmental agency required under any Environmental Laws; (ii) all notifications, registrations, records, reports or other documents and supporting information prepared, maintained or submitted to any governmental agency required under any Environmental Laws; (iii) all permits, licenses and approvals, and amendments or modifications thereof, required under any Environmental Laws; and (iv) any correspondence, notice of violation, summons or order, administrative, civil or criminal complaint, notice of investigation, request for information or other document received by Tenant or any occupant of the Demised Premises relating to any Hazardous Substances pertaining to the Demised Premises.

(c)    Handling of Hazardous Substances.  Should Tenant be responsible for any release of Hazardous Substances at the Demised Premises, Tenant shall immediately take all measures necessary to contain, remove and dispose from the Demised Premises all materials released or contaminated by the release, and remedy and mitigate all threats to public health or the environment relating to such release. When conducting any such measures and when using and handling Hazardous Substances Tenant shall comply with all Environmental Statutes. Further, Tenant, at Tenant's sole cost and expense, shall cooperate with any action plan, directive or order for clean-up or remediation of the Demised Premises by any federal, state or local authority which is regulating any release or violation of any environmental statute, rule, order or regulation.

(d)    Grease Traps.  Tenant shall obtain prior written approval from the Landlord for the installation of any replacement grease trap, whether above or underground, at the Demised Premises, and shall comply with all applicable laws and regulations concerning its installation, operation and closure.

(e)    Property Transfer.  If Tenant's use of any portion of the Demised Premises, for any purpose, results in the requirement to obtain an approval of any kind by any governmental agency administering Environmental Laws due to: (i) cessation of part or all of the operations on the Demised Premises for any reason, or (ii) a change in the operations on the Demised Premises to a use that requires such approval, Tenant shall, in compliance with all applicable requirements, and at Tenant's sole cost and expense, immediately apply for and obtain for Landlord the required approval and perform all remedial actions necessitated in whole or part by Tenant's activities at the Demised Premises. Tenant and Landlord shall cooperate as necessary to prepare any such application and represent and warrant that any such application made pursuant to this subsection shall be true and complete to the best knowledge, information and belief

-4-

of each. If such a governmental approval requirement exists, but Tenant believes that it is not subject to such requirement, Tenant, at its sole cost and expense, shall obtain for Landlord a statement from the applicable governmental agency that the Demised Premises is not subject to such requirement.

(f)    Definitions. For the purposes of this Section 3.04, the terms listed below shall be defined as they are defined in the provisions of law listed below and the regulations promulgated pursuant thereto as amended from time to time or in future federal legislation or in corresponding present or future provisions of law or regulation in the state where the Demised Premises are located.

(i)    air pollutant - 42 U.S.C. '7602 (g).

(ii)    discharge of pollutant - 33 U.S.C. '1362 (12)

(iii)    release - 42 U.S.C. '9601 (22).

(iv)    storage - 42 U.S.C. '6903 (33), without limitation as to the material involved.

(v)    disposal - 42 U.S.C. '6903 (3), without limitation as to the material involved.

(vi)    Solid Waste - 42 U.S.C. '6903 (27).

(vii)    Hazardous Substance shall mean and include any hazardous or toxic materials, substances or wastes as now or hereafter designated or regulated under any Environmental Law, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls ("PCBs"), and freon and other chlorofluorocarbons, except for ordinary and general office supplies, such as copier toner, liquid paper, glue, ink and common household cleaning materials as well as other materials used and stored by Tenant in the Demised Premises as part of Tenant's permitted use, all to the extent used and stored in compliance with all Environmental Laws (some or all of which may constitute "Hazardous Substances" as defined in this Lease).

(g)    Tenant's Environmental Indemnity. To the fullest extent permitted by law, Tenant agrees to promptly indemnify, protect, defend and hold harmless Landlord and the Landlord Parties from and against any and all claims, damages, judgments, suits, causes of action, losses, liabilities, penalties, fines, expenses and costs (including, without limitation, clean-up, removal, remediation and restoration costs, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees and court costs) which arise or result from (i) the presence of Hazardous Substances on, in, under or about the Demised Premises during the Term of this Lease and/or (ii) the presence of Hazardous Substances on, in, under or about the Demised Premises which are caused or permitted by Tenant or any of Tenant's Parties, including arising from or caused in whole or in part, directly or indirectly, by (i) the presence in, on, under or about the Demised Premises, of any Hazardous Substances; (ii) Tenant's or other user's actual, proposed or threatened use, treatment, storage, transportation, holding, existence, disposition, manufacturing, control, management, abatement, removal, handling, transfer, generation or release (past, present or threatened) of Hazardous Substances to, in, on, under, about or from the Demised Premises; (iii) any past, present or threatened non-compliance or violations of any Environmental Laws in connection with Tenant and/or the Demised Premises, (iv) personal injury claims (v) the payment of any environmental liens, or the disposition, recording, or filing or threatened disposition, recording or filing of any environmental lien encumbering or otherwise affecting the Demised Premises, (vi) diminution in the value of the Demised Premises, (vii) damages for the loss or restriction of use of the Demised Premises, including prospective rent, lost profits and business opportunities, (viii) sums paid in settlement of claims, (ix) reasonable attorneys' fees, consulting fees and expert fees, (x) the cost of any investigation of site conditions, and (xi) the cost of any repair, clean-up or remediation ordered by any governmental or quasi-governmental agency or body or

otherwise deemed necessary in Landlord's reasonable judgment. Tenant's obligations hereunder shall include, without limitation, and whether foreseeable or unforeseeable, all costs of any required or necessary repair, cleanup or detoxification or decontamination of the Demised Premises, or the preparation and implementation of any closure, remedial action or other required plans in connection therewith. For purposes of the indemnity provisions in this Section 3.04, any acts or omissions of Tenant and/or Tenant's Parties or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to Tenant. The provisions of this Section 3.04(g) will survive the expiration or earlier termination of this Lease.

(h)    General Compliance. The provisions of this Section 3.04 shall not be construed as limiting in any respect the covenants and obligations of Tenant under Section 4.05 hereof.

### ARTICLE IV
### CONSTRUCTION, REPAIRS, ALTERATIONS AND MAINTENANCE

Section 4.01 Construction of Improvements by Tenant.    Landlord shall, at Landlord's sole cost and expense, and at its option either install new heating ventilation and air conditioner unit(s) ("HVAC") in the Demised Premises or perform all work necessary to deliver the existing HVAC in good working order on the Turnover Date (as defined herein). It is agreed and understood that delivering the HVAC in good working order is the only work required by Landlord prior to the Turnover Date. Tenant shall accept possession of the Demised Premises, together with all permanent building fixtures, easements, rights, permits and infrastructure, on the date that Landlord notifies Tenant that the Demised Premises is available for Tenant to perform, at Tenant's sole cost and expense, any and all improvements to the Demised Premises that Tenant desires or as is deemed necessary for Tenant to use the Demised Premises for Tenant's Authorized Use ("the "Turnover Date"). All such improvements performed by Tenant in the Demised Premises shall be hereinafter collectively referred to as the "Improvements". As material inducement to Landlord entering into this Lease and notwithstanding any provision to the contrary, Tenant represents and warrants:

(a)    Tenant will perform the Improvements to Tenant's specifications at its sole cost and expense, subject to the Tenant Improvement Allowance (as defined below), and no representation or warranties have been made by Landlord to Tenant regarding the Demised Premises including but not limited to Tenant's proposed use or the development of the Demised Premises as contemplated herein. As such, Tenant hereby agrees that the Demised Premises shall be taken "as is", "with all faults", "without any representations or warranties", except as expressly noted in the immediately preceding paragraph, and Tenant hereby agrees and warrants that it has investigated and inspected the condition of the Demised Premises and the suitability of same for Tenant's purposes, and Tenant does hereby waive and disclaim any objection to, cause of action based upon, or claim that its obligations hereunder should be reduced or limited because of the condition of the Demised Premises or the suitability of same for Tenant's purposes. Tenant acknowledges that neither Landlord nor any agent nor any employee of Landlord has made any representations or warranty with respect to the Demised Premises or with respect to the suitability of either for the conduct of Tenant's business and Tenant expressly warrants and represents that Tenant has relied solely on its own investigation and inspection of the Demised Premises in its decision to enter into this Lease and let the Demised Premises in the above-described condition.

(b)    All costs required to develop the Improvements are the responsibility of the Tenant. Tenant shall defend, indemnify, and hold Landlord harmless from and against any and all claims, demands, costs, obligations, liens, expenses (including attorney's fees and costs), and legal actions brought against Landlord which arise out of Tenant's development of the Improvements and from the actions, omissions, or negligence of Tenant, or any Tenant's Parties (as defined in Section 6.01(a)(i) below).

(c)     Tenant will construct the Improvements pursuant to all applicable building codes, laws, ordinances and other regulations of governmental authority in a good, substantial and workmanlike manner.

(d)     Tenant will open for business with a Certificate of Occupancy and License to operate its business issued by the State of California or any other entity claiming authority to issue said license. Tenant will obtain all other governmental approvals or permits necessary, if any, to operate its business upon the Demised Premises.

(e)     Tenant shall be solely responsible for all claims, defects, disputes, or causes of action of any manner arising from the construction of the Improvements.

(f)     Tenant is unaware of any fact materially affecting the value or desirability of the Demised Premises whether or not said facts is/are readily observable. In the event Tenant shall become aware of any such fact or circumstance during the term of this Lease, Tenant shall immediately advise Landlord of such fact or circumstance.

(g)     Provided Tenant is not in default of this Lease beyond any applicable notice and cure period, Landlord shall pay to Tenant a tenant improvement allowance (the "Tenant Improvement Allowance") of One Hundred Thirteen Thousand Four Hundred Dollars ($113,400.00) within thirty (30) days following the later of (a) Tenant opening for business at the Demised Premises, (b) completion of the Improvements in the Demised Premises and inspection and approval by Landlord or Landlord's authorized agent or property manager of such Improvements, and (c) Landlord's receipt from Tenant of (i) a copy of the certificate of occupancy for the Demised Premises, (ii) copies of paid invoices for work and/or materials for permanent improvements made to the Demised Premises by or on behalf of Tenant (which shall equal at least the amount of the Tenant Improvement Allowance), (iii) final permits for Tenant's Work (if applicable), and (iv) unconditional final lien waivers from all contractors and/or material suppliers performing work or providing supplies for Tenant's Improvements to the Demised Premises (which shall equal at least the amount of the Tenant Improvement Allowance). It is agreed and understood that Landlord may deduct from the Tenant Improvement Allowance any amounts due and owing to Landlord prior to disbursement of the Tenant Improvement Allowance to Tenant. The Tenant Improvement Allowance shall not be used for furniture, fixtures or equipment, design or other fees, permits or signs, or other personal property.

Section 4.02  Repairs by Tenant to Demised Premises. Tenant shall, throughout the Term of its Lease and at its sole cost and expense, take good care of the Demised Premises and its appurtenances and keep them in good order, condition and repair, normal wear and tear excepted, and in compliance with all of the terms and provisions of all laws, and all Recorded Agreements. Tenant shall promptly make all repairs and replacements necessary to maintain such good order, condition, repair and compliance. Tenant shall keep and maintain all portions of, in and about the Demised Premises in a clean and orderly condition, and free of accumulations of dirt, rubbish, snow, ice and water.

Section 4.03  Alteration and Remodeling. After completion of the Improvements, Tenant shall not, without on each occasion first obtaining Landlord's prior written consent, make or permit to be made any alterations, improvements or additions (collectively, the "Alterations") to the Demised Premises of a value greater than Ten Thousand Dollars ($10,000.00) per Alteration. Landlord's Consent shall not be unreasonably withheld. Any Alterations made by Tenant including both those that do and do not require Landlord's prior written consent, shall not affect or impair the structure of the building nor reduce its value; and Tenant shall give to Landlord at least thirty (30) days prior written notice of any such Alteration. All plans for any Alterations shall be subject to Landlord's reasonable approval. Landlord may impose, as a condition of its consent to all Alterations or repairs of the Demised Premises, such requirements as Landlord in its reasonable discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, materials, mechanics and materialmen approved by Landlord (such approval shall not

be unreasonably withheld, conditioned or delayed).  Tenant shall construct such Alterations and perform such repairs in conformance with any and all applicable rules and regulations of any federal, state, county or municipal code or ordinance and pursuant to a valid building permit, issued by the city in which the Demised Premises is located, and in conformance with Landlord's construction rules and regulations. Landlord's approval of the plans, specifications and working drawings for Tenant's Alterations shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all laws, rules and regulations of governmental agencies or authorities. All work performed by Tenant with respect to any of its Alterations must be done in a good and workmanlike manner and diligently prosecuted to completion to the end that the Demised Premises shall at all times be a complete unit except during the period of work.  If Tenant makes any Alterations, Tenant agrees to carry (or have its contractor carry) "Builder's All Risk" insurance in an amount reasonably approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to this Lease immediately upon completion thereof.  In addition, Landlord may, in its discretion, require Tenant to obtain (at Tenant's sole cost and expense) a lien and completion bond or some alternate form of security satisfactory to Landlord in an amount sufficient to ensure the lien-free completion of such Alterations and naming Landlord as a co-obligee. Promptly after completion of any Alterations, Tenant shall (i) cause a Notice of Completion to be recorded in the office of the Recorder of the county in which the Demised Premises is located in accordance with Section 3093 of the Civil Code of the State of California or any successor statute, (ii) deliver to Landlord a reproducible copy of the "as built" drawings of the Alterations, and (iii) deliver to Landlord evidence of payment, contractors' affidavits and full and final waivers of all liens for labor, services or materials used in the construction of the Alterations. Except as otherwise provided herein, all Alterations and other property attached to the Demised Premises or any part thereof made or installed by Tenant shall immediately upon completion or installation thereof be and become part of the Demised Premises and the property of the Landlord without payment therefor by Landlord, and shall be surrendered to Landlord upon the expiration or earlier termination of the Term of this Lease.  Notwithstanding the foregoing, Tenant agrees that all removable trade fixtures and personal property installed by Tenant in the Demised Premises must be removed by Tenant at the termination of the Term of this Lease.  Tenant agrees that it will at its own cost and expense forthwith repair any and all damage done by the removal of any Alterations, fixtures, trade fixtures and personal property.

Section 4.04 Mechanic's Liens.

(a)    Prior to the making of any alterations or changes or the performance of any construction or work performed or authorized by Tenant which may give rise to a mechanic's lien, Tenant shall provide a statement in writing to Landlord assuring that payment for same will be made by Tenant and shall give Landlord reasonable opportunity to post a Notice of Non-responsibility.    Tenant hereby completely and fully indemnifies Landlord, and agrees to defend and hold Landlord harmless from and against, any mechanic's lien or other lien or claim in connection therewith.

(b)    If any mechanic's, laborer's or materialman's lien shall at any time be filed against the Demised Premises or any part thereof by reason of work performed by or at the direction of the Tenant within thirty (30) days after notice of filing thereof, Tenant shall cause it to be discharged by payment or bonding. If Tenant shall fail to cause such lien to be discharged by payment or bonding within the period aforesaid, then in addition to any other right or remedy, the Landlord may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in such event, Landlord shall be entitled, if it so elects to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, cost and allowances. Any amount so paid by Landlord and all cost and expenses incurred by it in connection therewith, together with interest thereon at the rate of twelve percent (12%), from the respective dates of the making of the

-8-

payments and incurring of the costs and expenses, shall be immediately due and payable by the Tenant to Landlord.

(c)    Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific alteration, addition, improvement or repair to the Demised Premises or any part thereof.

Section 4.05 Compliance. Tenant shall, throughout the Term of this Lease, at Tenant's sole cost and expense, promptly comply with all laws and ordinances, and all notices, orders, rules, regulations and requirements of federal, state and municipal governments and appropriate departments, commissions, boards, and officers thereof, or any other body now or hereafter constituted exercising similar functions, which are applicable to the condition, use, occupancy, improvement, and alteration or improvement (whether structural or non-structural, including unforeseen and/or extraordinary alterations or improvements, and regardless of the period of time remaining in the Term) of the Demised Premises, including, without limitation, the provisions of the Americans with Disabilities Act ("ADA") as it pertains to the condition, use, occupancy, improvement and alteration (whether structural or non-structural, including unforeseen and/or extraordinary alterations or improvements, and regardless of the period of time remaining in the Term) of the Demised Premises. Tenant shall not use or allow the Demised Premises to be used (a) in violation of any Recorded Agreements affecting the Demised Premises or of any law or governmental rule or regulation, or of any certificate of occupancy issued for the Demised Premises, or (b) for any improper, immoral, unlawful or reasonably objectionable purpose. Tenant shall not cause, maintain or permit any nuisance in, on or about the Demised Premises, nor commit or suffer to be committed any waste in, on or about the Demised Premises. Without limiting the generality of the foregoing, Tenant shall keep in force at all times all licenses, consents and permits necessary for the lawful use of the Demised Premises and Tenant shall pay all personal property taxes, income taxes, license fees, sales tax payable on rent, and other taxes and common area charges, if any, which are or may be assessed, levied or imposed upon the Demised Premises or Tenant in connection with Tenant's operation of its business upon the Demised Premises.

Section 4.06 No Services by Landlord. Landlord is not and shall not be required to render any services of any kind to Tenant.

Section 4.07 Maintenance of the Demised Premises. Tenant shall at his sole cost, keep and maintain said Demised Premises and appurtenances and every part thereof, including the building structure, roof, interior walls and utility lines, plumbing, sewer, electrical, heating and air conditioning, any store front, parking areas, sidewalks and landscaping and the interior and exterior of the premises in good sanitary order, condition, and repair. Landlord shall have no repair or maintenance obligations whatsoever pertaining to the Demised Premises.

## ARTICLE V
## TAXES

Section 5.01 Personal Property Taxes. Tenant shall pay all personal property taxes levied by any federal, state, municipal or other authority with respect to its property located on the Demised Premises and Tenant shall pay all sales taxes levied by any federal, state, municipal or other authority with respect to the Demised Premises, and reimburse Landlord for any tax assessed against Landlord on the Rent payable under this Lease, and shall hold the Landlord harmless with respect thereto.

Section 5.02 Ad Valorem Taxes: Charges and Assessments: and Utility Charges.

(a)    Tenant shall pay throughout the Term of this Lease, as additional rent, within twenty (20) days after receipt of a bill therefore from Landlord, or, as provided in Section 5.02(a) below, from the levying authority or within ten (10) days of its due date, whichever is later, all Taxes (as defined in Section 5.02(b)). Tenant shall,

at its expense, and upon notice to Landlord, have the right to contest any and all such taxes in the name of, and on behalf of Landlord.  Landlord shall, at Tenant's sole cost and expense, reasonably cooperate with Tenant in any such contest by Tenant.  Tenant shall have the right to receive a copy of any notice that Landlord receives in connection in with any such contest.

      (b)    The term "Taxes" shall mean:

      (i)    all levies, taxes (including payments required to be made in lieu of taxes), assessments, liens, licenses and permit fees, charges for public utilities and commercial rental taxes imposed, assessed or charged on or with respect to Landlord's interest in the Demised Premises or this Lease, or the Demised Premises by any federal, state, municipal or other authority; or under any law, ordinance, or resolution of any federal, state municipal or other authority; and

      (ii)    any assessments, charges, levies or other impositions imposed, assessed or charged on or with respect to Landlord's interest in the Demised Premises or this Lease, or the Demised Premises pursuant to the terms and provisions of an agreement, covenant, easement, restriction, declaration or other matter now of record or hereafter placed of record against the Demised Premises (all such terms and provisions referred to in this subsection (ii) being herein collectively called "Recorded Agreements"); and,

      (iii)    all other charges, imposts or burdens whatsoever of any kind and nature, whether or not particularized by name and whether general or special, ordinary or extraordinary, foreseen or unforeseen, which at any time during the Term of this Lease may be created, levied, assessed, confirmed, adjudged, imposed or charged upon or with respect to the Demised Premises, or any improvements made thereto, or on any part of the foregoing or any appurtenances thereto, or directly upon this Lease or the Rent payable hereunder, or amounts payable by any subtenant or other occupants of the Demised Premises or with respect to the leasing, operation, use or occupancy of the Demised Premises, or upon this transaction or against Landlord because of Landlord's estate or interest herein, by any federal, state, municipal or other authority, or under any law, ordinance or regulation of any federal, state, municipal or other authority, including among others, all special tax bills and general, special or other assessments and liens or charges made on local or general improvements or under any governmental or public power or authority whatsoever, and transit taxes, taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent,  and personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, furniture and other personal property used in connection with the Demised Premises.  If any special assessments or special tax bills which relate directly to an improvement or improvements made by any governmental or public authority for the benefit of the Demised Premises, and further that said improvements have a useful life greater than the time remaining until the expiration of the Term, then Tenant shall only be required to pay that portion of the improvement or assessment which corresponds to Tenant's occupancy of the Demised Premises.

      (c)    Notwithstanding the provisions of the previous paragraph of this Article, the term Taxes, and the obligation of Tenant to pay Taxes, shall not include any net income or excess profits taxes assessed against Landlord, or any corporation capital stock and franchise taxes imposed upon Landlord; provided, however, that, if at any time prior to the expiration of the Term of this Lease, any net income tax, assessment, levy or charge shall be imposed upon Landlord on the Demised Premises in lieu of or in place of any  tax or other charge included in the definition of Taxes set forth above, and shall be measured by or based upon net income or profits derived from real estate (as distinguished from net income or profits generally), then such new tax, assessment, levy or charge shall be included in "Taxes" to the extent that such new tax, assessment, levy or charge would be payable if the Demised Premises were the only property of Landlord subject thereto and the income and profits received by Landlord from the Demised Premises were the only income and profits of Landlord.

(d)    All Taxes that become payable for the first and last tax years during the Term shall be apportioned between Landlord and the Tenant in such manner that Tenant shall only be obligated to pay Taxes applicable to the Term.

(e)    Landlord shall have the right, in its discretion, to have all bills for Taxes be issued directly to Tenant and, in such event, Tenant shall (i) pay the Taxes indicated in such bills within ten (10) days of its due date and (ii) provide Landlord with reasonably particularized evidence of such payment concurrently with Tenant's payment of the same.  In such event, Tenant (and not Landlord) shall be responsible for the payment of Taxes and Tenant shall indemnify Landlord for any claims, costs, damages, fines and attorneys' fees resulting from or incurred by Landlord due to Tenant's failure to pay or timely pay such Taxes.

(f)    In the event Tenant is in default of any of its obligations under this Lease and Tenant fails to commence to cure any such default within thirty (30) days after notice of the occurrence from Landlord, Landlord may, at its sole option, elect to collect Taxes from Tenant for any calendar year in monthly installments, in the following manner:  Landlord may at any time prior to or during a calendar year, submit to Tenant Landlord's reasonable estimates of Taxes for such calendar year (which estimate may include reasonably anticipated increases over Taxes incurred in calendar years prior to such calendar year).  If Landlord shall submit to Tenant such estimate, Tenant shall pay to Landlord the amount of such estimate in equal monthly installments, in advance, on or before the first day of each calendar month during such calendar year (or during the remainder of such calendar year, in the event Landlord shall submit such estimates during a calendar year, or in the case of a partial calendar year) so that the full amount of such estimate shall have been paid: (i) upon the expiration of such calendar year, in the case of each calendar year except the calendar year in which the term hereof shall expire; and (ii) upon the expiration of the term hereof, in the case of a calendar year in which the term hereof shall expire.  If Landlord shall collect payments on-account of Taxes for any calendar year monthly, pursuant to this subsection, then, within ninety (90) days following the expiration of such calendar year, Landlord shall furnish to Tenant a written statement showing the actual amount of Taxes for such calendar year and the estimated payment theretofore made by Tenant.  If the estimated payments made by Tenant shall exceed the Taxes, Tenant shall be entitled to immediate credit for such excess against payments next thereafter due to Landlord under this Section 5.02 (or to a refund, if no such payments shall be due thereafter).  If the actual Taxes shall exceed the estimated payments made by Tenant, Tenant shall pay to Landlord the deficiency within ten (10) days after Landlord shall submit the aforesaid statement to Tenant.

## ARTICLE VI
## INSURANCE INDEMNITY

Section 6.01  Indemnity.

(a)    Indemnification.

(i)    Provided such indemnification by Tenant is not made necessary by Landlord's willful act or gross negligence, Tenant agrees to indemnify, defend and save harmless Landlord and its managing members, partners and subpartners, and their respective officers, agents, property managers, servants, employees, and independent contractors (collectively, "Landlord Parties"), from and against any and all claims, demands, expenses and liabilities (including, without limitation, reasonable attorneys' fees and costs) (collectively, "Claims"), arising from the occupancy, conduct, operation or management of the Demised Premises or from any work or thing whatsoever done on or about the Demised Premises, or arising from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or under the provisions of any law, ordinance or regulation or any federal, state, municipal or other authority, or arising from any act, neglect or negligence of Tenant, or any of its sublessees, assignees, licensees, agents, contractors, servants, employees or invitees or (collectively, "Tenant's Parties"), or arising from any accident,

injury or damage whatsoever caused to any person, firm or corporation, occurring during the term of this Lease, in or about the Demised Premises, and from and against all costs, expenses and liabilities incurred in connection with any such claim or action or proceeding brought thereon (including, without limitation, the reasonable fees of attorneys, investigators and experts); and in case any action or proceeding be brought against Landlord by reason of any such claim, Tenant upon notice from Landlord covenants at Tenant's cost and expense to resist or defend such action or proceeding or to cause it to be resisted or defended by an insurer. The provisions of this Section 6.01(a)(i) shall survive the expiration or sooner termination of the Lease.

(ii)    Notwithstanding anything in this Section 6.01 to the contrary, Tenant's indemnity shall not apply to any Claims to the extent resulting from the gross negligence or willful misconduct of Landlord or the Landlord Parties, and not insured (or required to be insured) by Tenant under this Lease (collectively, the "Excluded Claims"), and Landlord shall indemnify, protect, defend and hold harmless Tenant and Tenant's Parties from and against any such Excluded Claims, but only to the extent Landlord's liability is not waived and released by Tenant pursuant to the terms of Section 6.04 of this Lease (provided, however, that Landlord's indemnity shall, in no event, extend to loss of profits, loss of business or other consequential damages incurred by Tenant). Each party's agreement to indemnify the other pursuant to this Section 6.01(a) is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by the indemnifying party pursuant to the provisions of this Lease. The provisions of this Section 6.01(a)(ii) shall survive the expiration or sooner termination of this Lease.

(b)    Release.    Subject to Landlord's obligation to indemnify Tenant pursuant to the provisions of Section 6.01(a)(ii) above, Landlord, its principals, agents, employees and contractors, shall not be liable for, and Tenant hereby releases Landlord, its principals, agents, employees and contractors from, all claims for loss of life, personal injury or damage to property or business sustained by Tenant or any person claiming by, through or under Tenant resulting from any fire, accident, occurrence or condition in or upon the Demised Premises, or any part thereof including, but not limited to; any such claims for loss of life, personal injury in the Demised Premises, any defect in or any failure of any equipment, machinery, utilities, appliances, or apparatus in the Demised Premises, falling of fixtures or other items, leakage of water, snow or ice, broken glass or any other event, cause or circumstance.

Section 6.02  Insurance by Tenant.

(a)    Tenant shall keep in force, at Tenant's sole cost and expense, by responsible insurance companies reasonably acceptable to Landlord authorized to do business in the jurisdiction in which the Demised Premises are situated and throughout the Term of this Lease and during such other times as Tenant occupies the Demised Premises or any part thereof:

(i)    insurance against claims for personal injury (including death) and property damage with broad-form contractual liability coverage, under a policy of comprehensive general liability insurance or (at Landlord's option) commercial general liability insurance, with limits not less than Five Million Dollars ($5,000,000) in respect of personal injury (including bodily injury and death) and One Million Dollars ($1,000,000) for property damage.

(ii)    If the nature of Tenant's operation is such as to place any or all of its employees under the coverage of local workmen's compensation laws or similar statutes, workmen's compensation or similar insurance affording statutory coverage and containing statutory limits.

(iii)    Fire insurance with extended coverage endorsements covering all of Tenant's stock in trade in the Demised Premises to the extent of at least one hundred percent (100%) of the replacement cost. The insurance specified in this Section 6.02(a) (iii) may include a deductible amount which

amount shall be the same as Tenant's other units nationwide and reasonably acceptable to Landlord, but in no event to exceed Ten Thousand Dollars ($10,000.00). Tenant is responsible for paying the deductible.

(iv)    Insurance against loss or damage to the building and all other improvements now or hereafter located on the Demised Premises by fire and such other casualties as may be included in the broadest form of all risk extended coverage insurance from time to time available (including, without in any manner limiting the generality of the foregoing, earthquake and flood insurance if the Demised Premises are located in an earthquake or flood hazard area (as applicable)), and that any additional coverage that a mortgage lender may reasonably require, in an amount equal to the full insurable replacement cost of such buildings and improvements; insurance against abatement or loss of rental by reason of the occurrences described in clause (a) above in an amount equal to minimum and additional rental for at least twelve (12) months following the occurrence of such casualty; and boiler insurance, plate glass insurance, and civil disturbance insurance.

(v)    Environmental Liability Insurance (in form and substance reasonably satisfactory to Landlord) with limits of coverage not less than Five Million Dollars ($5,000,000.00) combined per occurrence and in the aggregate insuring against any and all liability with respect to the Demised Premises and all areas appurtenant thereto arising out of any death or injury to any person, damage or destruction of any property, other loss, cost or expense resulting from any release, spill, leak or other contamination of the Demised Premises, or any other property surrounding the Demised Premises attributable to the presence of Hazardous Substances. Upon Landlord's request, Tenant shall also obtain (at Tenant's sole cost and expense) environmental impairment liability insurance and environmental remediation liability insurance (in form and substance (including limits) acceptable to Landlord). If, at anytime it reasonably appears to Landlord (based on Tenant's operations from the Demised Premises and/or based on claims made under any policies carried by Tenant whether or not such claims pertain to the Demised Premises) that Tenant is not maintaining sufficient insurance or other means of financial capacity to enable Tenant to fulfill its obligations to Landlord hereunder, whether or not then accrued, liquidated, conditional or contingent, Tenant shall procure and thereafter maintain in full force and effect such additional insurance and/or increased limits of insurance and/or other form of financial assurance, with or from companies or persons and in form and substance reasonably acceptable to Landlord, as Landlord may from time to time reasonably request. Without limiting the generality of the foregoing, all such environmental liability insurance shall specifically insure the performance by Tenant of the indemnity provisions set forth in this Lease.

(vi)    Any other form or forms of insurance as Tenant or Landlord or the mortgagees of Landlord may reasonably require from time to time, in form, amounts and for insurance risks against which a prudent tenant would protect itself, but only to the extent such risks and amounts are available in the insurance market at commercially reasonable costs.

(b)    Tenant shall deposit with Landlord certificates evidencing the issuance of the policies of insurance required under this Article, or copies thereof, prior to the Commencement Date of the Lease. Said policies of insurance shall name as additional insured parties the Landlord and the Holder of any mortgage on the Demised Premises (or estate thereof) and shall provide that they shall not be cancelable without thirty (30) days prior written notice to Landlord and the holder of such mortgage. The policies of insurance described in Section 6.02 (iv)(a) shall contain a standard mortgage endorsement in favor of the holder of any mortgage on the Demised Premises (or estate thereof), and shall name Landlord (and any other parties designated by Landlord) as an additional insured party or parties thereunder. At least thirty (30) days prior to the expiration of any such policy, Tenant shall deposit with Landlord a certificate evidencing the issuance of a renewal policy or copy thereof, together with satisfactory evidence of payment by Tenant of the premium or premiums required thereunder.

(c)    All policies of insurance provided for herein shall be issued by insurance companies with a general policy holder's rating of not less than "A-" as rated in the most current available "Best's" Insurance Reports, and qualified to do business in the state in which the Demised Premises are located.  All such policies shall have a deductible not exceeding Ten Thousand Dollars ($10,000.00).  All public liability and property damage policies shall contain a provision that Landlord, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Tenant.  As soon as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent.

(d)    Notwithstanding anything to the contrary contained within this Article VI, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that Landlord, and Landlord's mortgagee or beneficiary, shall all be named as an additional insured thereunder as their interests appear.  The coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance, and the requirements set forth herein are otherwise satisfied.

(e)    Except as otherwise provided herein or in any mortgage or deed of trust, all insurance proceeds payable with respect to any damage or destruction to the Demised Premises shall be payable to Landlord and will be held in an interest bearing account at a financial institution so named by Landlord.  In the event Tenant undertakes to repair said damages in accordance with this Lease, the proceeds shall be used to fund the reconstruction.  In all other events, the proceeds shall be the sole property of Landlord.  Tenant shall be entitled to compromise, adjust, or settle with Landlord's approval, any and all claims with respect to the Demised Premises.  Each party agrees to execute and deliver to the other party such releases, endorsements, and other instruments as the other party may reasonably require in order to compromise, adjust, or settle pursuant to this Section and to enable the other party or its designee to collect such insurance proceeds as are payable in respect of such claim.

(vii)    In the event that Tenant makes alterations to the Demised Premises pursuant to Section 4.03, Tenant or Tenant's contractor shall obtain a Builder's All Risk policy in form and content reasonably acceptable to Landlord, which policy shall be on an "all risk" basis on a completed value and covering the interest of Landlord in the Demised Premises.  Such policy shall name Landlord as additional insured and shall provide that it shall not be canceled without at least 30 days prior written notice to Landlord.  Prior to commencement of construction of the alterations, Tenant shall provide Landlord with a copy of the policy of insurance or certificate thereof.

(viii)    In the event that Tenant serves alcohol on the Demised Premises, so-called "dramshop" liquor liability insurance in an amount reasonably required by Landlord or otherwise consistent with industry standards.

Section 6.03  Increase in Insurance Rate.  Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about the Demised Premises which will violate the provisions of any policy of casualty insurance or liability insurance or which will prevent the procurement of casualty insurance and liability insurance in companies acceptable to Landlord.

Section 6.04  Waiver of Subrogation.  Tenant and Landlord each hereby release and relieve the other, and waive their entire right of recovery against the other, for direct or consequential loss of damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to the negligence of Landlord or Tenant or their agents, employees, contractors and/or invitees provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder.  If the release of either Landlord or Tenant, as set forth in this Section 6.04, shall contravene any law

with respect to exculpatory agreements, the liability of the party in question shall be deemed not released but shall be deemed secondary to the latter's insurance. If necessary, all property insurance policies required under this Lease shall be endorsed to so provide.

## ARTICLE VII
## SIGNS AND AWNINGS

Section 7.01 Signs and Awnings. Tenant may, subject to applicable laws and the Recorded Agreements and at its expense, construct all necessary signs in and upon the Demised Premises properly to conduct its marketing activities. Tenant shall be solely responsible for obtaining sign permits for ensuring that all signs conform with the requirements of all laws, ordinances or regulations of any federal, state, municipal governments or other authority and Recorded Agreements. Tenant shall, at Tenant's sole cost and expense, maintain all signs on the Demised Premises in good order, condition and repair throughout the Term of this Lease, and to remove the same upon the expiration or sooner termination of this Lease and to repair any damage caused by such removal.

## ARTICLE VIII
## UTILITIES

Section 8.01 Tenant's Responsibility for Utilities Consumed. Tenant shall make application for, and be solely responsible for, and shall promptly pay all charges for heat, cooling, sewer, water, electricity, and any other utilities used or consumed on the Demised Premises (collectively "Utilities"). Landlord shall not be liable in damages or otherwise for any interruption or impairment in the supply of such Utility service, nor shall any such interruption or impairment constitute a breach by Landlord of the terms and conditions of this Lease nor shall any such interruption constitute a ground for an abatement of any sums payable by Tenant hereunder. Tenant shall not at any time intentionally overburden or exceed the capacity of any Utility services which are supplied to, distributed in or serve the Demised Premises.

Section 8.02 Alternative Billing. If the authority or authorities supplying any Utilities servicing the Demised Premises shall require that the bills therefore be rendered to Landlord, then with proof of payment Tenant shall reimburse Landlord for the amount of each such bill upon request by Landlord.

## ARTICLE IX
## ASSIGNMENT SUBLETTING AND MORTGAGING

Section 9.01 Assignment and Subletting.

(a)    Tenant shall not assign or encumber this Lease nor sublet the Demised Premises, in whole or part, to any person, or entity or allow occupancy by any other person or entity, without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. Without any way limiting Landlord's right to reasonably refuse to give consent, Landlord may withhold its consent to any requested assignment or subletting if in Landlord's reasonable business judgment:

(1)    The quality of the merchandising operation of the proposed assignee, subtenant or transferee (each a "Transferee") is not equal to that of the Tenant;

(2)    The financial strength of the proposed Transferee, both in terms of net worth and in terms of reasonably anticipated cash flow over the Lease Term, is materially less than Tenant's financial strength at the time this Lease was signed or at the time of such assignment or sublease, whichever is greater, or is insufficient, based on generally accepted industry standards, to capitalize the business to be conducted in the Demised Premises;

(3)    The proposed Transferee does not, in Landlord's reasonable judgment, have sufficient business experience (including substantial experience in

-15-

comparable retail centers) to successfully operate a retail establishment in the Demised Premises in the manner contemplated in this Lease;

(4)    The proposed Transferee is a person with whom Landlord is, or recently has been, within the past three (3) months, negotiating to lease space in property owned by Landlord;

(5)    Tenant is default under the Lease, or has defaulted hereunder on more than three (3) occasions during the twelve (12) months preceding the request by Tenant; and/or

(6)    The proposed Transferee will operate under a trade name other than that stated in this Lease.

Notwithstanding any assignment or encumbrance of this Lease or subletting of all or any portion of the Demised Premises with or without the consent of Landlord, Tenant shall, nevertheless, remain liable to Landlord for the payment of all Rent hereunder and for the performance of all covenants and conditions of this Lease applicable to Tenant and any assignment, encumbrance, sublease or subletting made by Tenant shall be subject to the terms, conditions and provisions of this Lease. Tenant hereby waives all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all applicable laws, on behalf of the proposed Transferee. Tenant shall indemnify, defend and hold harmless Landlord from any and all liability, losses, claims, damages, costs, expenses, causes of action and proceedings involving any third party or parties (including without limitation Tenant's proposed subtenant or assignee) who claim they were damaged by Landlord's wrongful withholding or conditioning of Landlord's consent.

(b)    Tenant shall notify Landlord in writing (at least thirty (30) days prior thereto) if Tenant intends to sublease all or any portion of the Demised Premises or to assign or encumber this Lease, which notice shall include (i) the proposed effective date of the transfer, which shall not be less than twenty (20) days nor more than one hundred eighty (180) days after the date of delivery of the transfer notice, (ii) a description of the portion of the Demised Premises to be transferred, (iii) all of the terms of the proposed transfer and the consideration therefor in connection with such transfer, the name and address of the proposed Transferee, and a copy of all existing and/or proposed documentation pertaining to the proposed transfer, including all existing operative documents to be executed to evidence such transfer or the agreements incidental or related to such transfer and (iv) current financial statements of the proposed Transferee certified by an officer, partner or owner thereof. Landlord shall make every effort to notify Tenant of its approval or disapproval of any proposed sublease, assignment or encumbrance within thirty (30) days after Tenant has submitted a request therefore to Landlord, including all information required to be delivered by Tenant to Landlord in connection with such proposed transfer. If Landlord does not deliver said notice then Landlord shall be deemed to have disapproved the proposed sublease, assignment or encumbrance. If Landlord does not consent to any proposed sublease, assignment or encumbrance by Tenant, Landlord shall provide Tenant with a written statement identifying its reasons for withholding such consent.

(c)    Except as otherwise provided below, for purposes of this Lease, the term "assignment" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of fifty percent (50%) or more of the partners, or transfer of twenty-five percent or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (i.e., whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant, (B) the sale or other transfer of more than an aggregate of fifty percent (50%) of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of more than an aggregate of fifty percent (50%) of the value of the unencumbered assets of Tenant within a twelve (12) month period. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to assign, sublease or transfer this Lease to

any corporation into which or with which Tenant merges or consolidates, and to any parent, subsidiary, or affiliated corporation, including any corporation which is under common control with Tenant or to a person who acquires substantially all of the assets of Tenant or to Tenant's going from a publicly-owned company to a privately-owned company (each, an "Affiliate"); provided that (1) any such Affiliate was not formed as a subterfuge to avoid the obligations of this Article IX; (2) Tenant gives Landlord prior written notice of any such assignment or sublease to an Affiliate; (3) any such Affiliate has, as of the effective date of any such assignment or sublease, a tangible net worth and net income, in the aggregate, computed in accordance with generally accepted accounting principles (but excluding goodwill as an asset), which is equal to or greater than Tenant as of the effective date of any such assignment or sublease and sufficient to meet the obligations of Tenant under this Lease; (4) any such assignment or sublease shall be subject to all of the terms and provisions of this Lease, and such assignee or sublessee shall assume, in a written document reasonably satisfactory to Landlord and delivered to Landlord upon or prior to the effective date of such assignment or sublease, all the obligations of Tenant under this Lease; and (5) Tenant and any Guarantor shall remain fully liable for all obligations to be performed by Tenant under this Lease.

Section 9.02 Violation.  If this Lease is assigned, without any required prior written consent of Landlord, Landlord may and is hereby empowered to collect Rent from the assignee.  If the Demised Premises or any part thereof be sublet or occupied by any person other than Tenant and in the event of Tenant's uncured default, Landlord may, and is hereby empowered to collect Rent from such subtenant or occupant. Landlord's collection of Rent pursuant to the provisions of this Section 9.02 shall not in any event be deemed to be a waiver of any default by Tenant in having assigned this Lease or sublet all or any portion of the Demised Premises without the prior written consent of Landlord.

Section 9.03 Subordination.

(a)    At Landlord's sole option, this Lease shall be subject and subordinate to any ground lease and the lien of any mortgages and/or other encumbrances now or hereafter placed upon the Demised Premises (including a lien on an estate thereof) without the necessity of any further instrument or act on the part of Tenant to effectuate such subordination. Tenant agrees, at the election of the holder of any such mortgage or other encumbrance, to attorn to such holder.  Tenant further agrees to execute and deliver upon demand such further reasonable instrument or instruments evidencing and confirming such subordination of this Lease to the lien of any such mortgage and/or encumbrance and such further instrument or instruments of attornment as shall be designated by Landlord.  For the purpose of this Lease, the term "Mortgage" shall mean any mortgage, deed of trust, security deed or other similar document or instrument and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages or trust deeds, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto.  A condition precedent to the subordination of this Lease to any future ground or underlying lease or to the lien of any future mortgage or deed of trust is that Landlord shall obtain for the benefit of Tenant a subordination, non-disturbance and attornment agreement from the lessor or lender of such future instrument.  Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage, or if any ground or underlying lease is terminated, to attorn, without any deductions or set-offs whatsoever, to the purchaser upon any such foreclosure sale, or to the lessor of such ground or underlying lease, as the case may be, if so requested to do so by such purchaser or lessor.  Tenant waives the provisions of any current or future statute, rule or law which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

Section 9.04 Easements by Landlord.  Upon the written consent of the Tenant, Landlord shall have the right to grant easements over the Demised Premises and no joinder of Tenant shall be required in such grants of easements and the rights of Tenant

under this Lease shall be subject and subordinate thereto so long as Tenant's business operations are not impaired in any material respect and any easement conforms with the approved site plan and use to be issued by the city where the Property is located and provided Tenant receives at least thirty (30) days prior written notice of such proposed grant of easement(s). In addition, Tenant agrees not to unreasonably withhold or delay its joinder in the grant of any easement.

Section 9.05 Demised Premises Free from Liens.   Tenant shall keep the Demised Premises and any Land in which the Demised Premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by or from Tenant. If a lien is filed against the Demised Premises and Tenant is disputing the validity of the lien, Tenant may bond over such lien until resolved. Notwithstanding anything to the contrary set forth in this Lease, if any such lien is not released and removed on or before the date notice of such lien is delivered by Landlord to Tenant, Landlord, at its sole option, may immediately take all action necessary to release and remove such lien, without any duty to investigate the validity thereof, and all sums, costs and expenses, including reasonable attorneys' fees and costs, incurred by Landlord in connection with such lien shall be deemed additional Rent under this Lease and shall immediately be due and payable by Tenant.

Section 9.06 Bankruptcy Assignment.   Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. 101 et seq., shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on or after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

Section 9.07 Bankruptcy Assignment-Payment of Consideration for Assignment. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. et seq., ninety percent (90%) of any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and promptly be paid or delivered to Landlord.

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Tenant under Chapter 7, 11 or 13 of the Bankruptcy Code, the Tenant, as debtor in possession, or the bankruptcy trustee, must elect to assume or reject this Lease within sixty (60) days after the date of the order for relief. If the Tenant, trustee or debtor in possession shall fail to elect or assume this Lease within sixty (60) days after the date of the order for relief, this Lease shall be deemed to be rejected. In the event the trustee or the debtor in possession requests additional time from the Bankruptcy Court in which to assume or reject this Lease, it shall be conclusively presumed that the trustee or debtor in possession has shown cause for such extension and the Landlord will be deemed to have consented to such additional time, up to an additional sixty (60) days. In the event of a rejection of this Lease, Landlord shall thereupon be immediately entitled to possession and this Lease shall be canceled, but Landlord's right to be compensated for damages in such proceeding shall survive.

If the estate of Tenant created hereby shall be taken in execution or by other process of law, or if Tenant shall be adjudicated insolvent pursuant to the provisions of any present or future insolvency law under state law, or if Tenant shall cease doing business as a going concern or generally not pay its debts as they become due, or if a receiver or trustee of the property of Tenant shall be appointed under state law by reason of Tenants' insolvency or inability to pay its debts as they become due or otherwise, or if any assignment shall be made of Tenant's property for the benefit of creditors under state law, then and in such event, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder declaring an Event of Default under Section 13.01.

In the event that either a voluntary petition or involuntary petition for reorganization or liquidation or adjustment of debts is filed either by or against Landlord under Chapter 7, 11 or 13 of the Bankruptcy code, and, further, in the event the debtor in possession or trustee elects to reject this Lease, the Tenant shall have the right to either treat this Lease as terminated or, alternatively, to remain in possession for the balance of the Term of this Lease (including the initial term or any renewal term(s)), and the Tenant shall continue to have all rights provided under this Lease to extent the term of this Lease.

## ARTICLE X
## CONDEMNATION

Section 10.01 Whole Taking. In the event the whole of the Demised Premises shall be taken by any public authority under the power of eminent domain, this Lease shall terminate as of the date of the taking.

Section 10.02 Partial Taking. In the event a portion of the Demised Premises or a part of the building now located thereon shall be appropriated or taken under the power of eminent domain, or any similar power, by any public or quasi-public authority, the unearned portion of the rent theretofore paid with respect to such taken portion shall forthwith be returned to Tenant, and, if, in Tenant's reasonable judgment, the remaining portion of the Demised Premises or the building thereon can be used by Tenant in the operation of its business, Tenant shall so use said remaining portion and there shall be a prorata reduction of rent based upon the extent to which Tenant's use and occupancy of the Demised Premises is adversely impacted. If, on the other hand, in Tenant's reasonable judgment, the remaining portion of the Demised Premises or the building thereon cannot be used by Tenant in the operation of its business or the use of such remaining portion would significantly and adversely affect Tenant's use of the Demised Premises, then this Lease shall terminate as of the date of such appropriation or taking, and the unearned portion of the rent theretofore paid shall forthwith be returned to Tenant. If, however, the period of such partial appropriation or taking is less than six (6) months, this Lease shall continue in full force and effect, the rent in such case shall not abate and all awards for damages shall be paid to Tenant. If the portion of the Demised Premises taken is solely for purposes of widening streets adjacent to the Demised Premises and such taking does not include any portion of the building on the Demised Premises and does not, in Landlord's reasonable judgment, substantially interfere with Tenant's use of the Demised Premises or parking available to the Demised Premises, then this Lease shall not terminate and there shall be no abatement in rent for the portion of the Demised Premises so taken.

Section 10.03 Condemnation Proceedings. All compensation awarded for such taking of the fee shall belong to and be the property of the Landlord, provided, however that the Landlord shall not be entitled to any portion of the award attributable to the Demised Premises made to the Tenant for the cost of moving or removal of its stock and fixtures or made to Tenant for the loss of its business (if and only to the extent that such award for loss of business does not reduce or diminish the award payable to Landlord).

Section 10.04 Waiver of Termination. Tenant and Landlord waive any right to terminate this Lease under Section 1265.130 of the California Code of Civil Procedure, or any similar statute or law now or hereafter in force.

## ARTICLE XI
## DESTRUCTION OF DEMISED PREMISES

Section 11.01 Destruction of Demised Premises.

(a)    If the Demised Premises or any portion thereof shall be damaged or destroyed by fire or other casualty, then Tenant shall promptly give notice thereof to Landlord; and, except as hereinafter otherwise provided, Tenant shall, within a reasonable time thereafter, repair or restore the Demised Premises with insurance proceeds from Landlord's account as provided for in Article 6.02, to substantially the same condition they were in prior to the casualty, and rent shall not abate.

(b)   Notwithstanding the foregoing provisions, Landlord shall not be obligated to reimburse Tenant for the repair and restoration of the Demised Premises in an amount in excess of insurance proceeds paid to Landlord for such damage or destruction pursuant to policies maintained by Tenant pursuant to the provisions of Section 6.02(iv)(a).  If during the last two (2) years of the Term of this Lease the Demised Premises shall be damaged or destroyed as aforesaid to the extent of twenty (20%) percent or more of its insurable value, Landlord, in its sole discretion, may terminate this Lease by notice to Tenant within thirty (30) days after such damage or destruction if Tenant does not agree to an increase in term of five (5) years under the same terms and conditions as those set forth in this Lease.  In the event of any termination of the Term of this Lease pursuant to the provisions of this Article, the termination shall become effective fifteen (15) days after the giving of the notice of termination and a just proportion of the minimum rent, according to the nature and extent of the injury to the Demised Premises shall be suspended or abated until the time of termination and minimum rent shall be apportioned as of the time of termination.

(c)   The agreements contained in this Article XI provide a material part of the consideration for this Lease and in bargaining for and obtaining its rights under this Article XI, Tenant waives any right to terminate this Lease under Section 1932 and/or 1933 of the Civil Code of California, or any similar statute or law now or hereafter in force.

## ARTICLE XII
## SURRENDER OF PREMISES

Section 12.01  Liability for Return of Demised Premises.  At the expiration of this Lease, Tenant shall surrender the Demised Premises broom clean and in the same condition as the Demised Premises were in upon delivery of possession to the Tenant under this Lease, loss by condemnation and insured casualty and by ordinary wear and tear excepted.

All alterations, additions, improvements and the improvements which may have been made in, to or on the Demised Premises (except movable trade fixtures put in at the expense of Tenant) shall remain with Demised Premises except that Landlord shall notify Tenant within ninety (90) days before the end of the term of the lease whether Landlord desires to have the Demised Premises or any parts thereof restored to their condition when the Demised Premises were delivered to Tenant.

If Landlord shall so desire, the Tenant shall restore said Demised Premises or such part or parts thereof before the end of this Lease at Tenant's sole cost and expense.  In addition, Tenant shall repair any damage caused in connection with the removal of any trade fixtures.  Tenant on or before the end of the term or sooner termination of this Lease, shall remove Tenants personal property and trade fixtures from the Demised Premises and all property not so removed shall be deemed abandoned by Tenant.  If the Demised Premises are to be surrendered at the end of the term or sooner termination of this Lease, Tenant shall indemnify Landlord against loss or liability resulting from delay by Tenant in so surrendering the Demised Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay.

Section 12.02  Abandonment.  Tenant shall not vacate or abandon the Demised Premises at any time during the term of the Lease or any option period.  If Tenant shall abandon, vacate or surrender said premise, or be dispossessed by process of law, or otherwise any personal property belonging to Tenant and left on the premises shall be deemed abandoned, at the option of Landlord, except such property as may be mortgaged to Landlord.

## ARTICLE XIII
## DEFAULT AND REMEDIES

Section 13.01  Default by Tenant.  The following shall constitute material Events of Default by Tenant:

(a)    Tenant fails to pay any installment of Rent within ten (10) days after receiving notice from Landlord that payment has not been received; or

(b)    Tenant is in default of any of its other obligations under this Lease and Tenant fails to commence to cure any such default within thirty (30) days after notice of the occurrence thereof from Landlord and thereafter fails to complete the cure of such default with due diligence as soon as reasonably possible; and if such default is not completely cured by Tenant within sixty (60) days after notice of the occurrence thereof from Landlord, Tenant, if requested by Landlord, shall post with Landlord a surety bond (with corporate surety acceptable to Landlord) to assure its completion of such cure as promptly thereafter as is possible; or

(c)    Tenant is adjudicated a bankrupt; or

(d)    Tenant has a receiver in equity appointed for all or substantially all of its property and such appointment is not vacated within sixty (60) days; or

(e)    Tenant files a voluntary petition for reorganization or arrangement; or

(f)    Tenant has a trustee in reorganization appointed for its property; or

(g)    Tenant files a voluntary petition in bankruptcy; or

(h)    Tenant files an answer admitting bankruptcy or agreeing to reorganization or arrangement; or

(i)    Tenant makes an assignment for the benefit of creditors;

(j)    Tenant permits its leasehold interest hereunder to be sold pursuant to execution.

Any notice given under this Section 13.01 shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161.

Section 13.02 Landlord's Remedies; Termination.    In the event of any such Event of Default by Tenant, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall have the immediate option to terminate this Lease and all rights of Tenant hereunder.  In the event that Landlord shall elect to so terminate this Lease, then Landlord may recover from Tenant:

(a)    the worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(b)    the worth at the time of the award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(c)    the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(d)    any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom including, but not limited to: unamortized tenant improvement costs; attorneys' fees; unamortized brokers' commissions; the costs of refurbishment, alterations, renovation and repair of the Demised Premises; and removal (including the repair of any damage caused by such removal) and storage (or disposal) of Tenant's personal property, equipment, fixtures, alterations and any other items which Tenant is required under this Lease to remove but does not remove.

-21-

As used in subsections (a) and (b) above, the "worth at the time of award" is computed by allowing interest at the interest rate set forth in Section 2.05 of the Lease. As used in subsection (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

Section 13.03 Landlord's Remedies; Re-Entry Rights. In the event of any such Event of Default by Tenant, in addition to any other remedies available to Landlord under this Lease, at law or in equity, Landlord shall also have the right as permitted by applicable law, with or without terminating this Lease, to re-enter the Demised Premises and remove all persons and property from the Demised Premises; such property may be removed, stored and/or disposed of pursuant to any procedures permitted by applicable law. No re-entry or taking possession of the Demised Premises by Landlord pursuant to this Section 13.03, and no acceptance of surrender of the Demised Premises or other action on Landlord's part, shall be construed as an election to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction.

Section 13.04 Continuation of Lease. Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

Section 13.05 Injunction. In the event of a breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity.

Section 13.06 No Waiver. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy herein or by law provided but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity or by statute.

Section 13.07 Indemnity. Tenant shall indemnify, defend, save and hold Landlord harmless of and from any and all loss, cost, expense or liability pursuant to any sublease. Until the occurrence of an event of default by Tenant under this Lease, Tenant may continue to collect the rent and other sums payable under the sublease(s) assigned hereby; but from and after the occurrence of an event of default all such rent and other sums shall be paid to Landlord and applied by Landlord on account of rent and other sums due by Tenant to Landlord pursuant to this Lease. A statement by Landlord to any subtenant that an event of default by Tenant has occurred under this Lease shall be conclusive evidence as between Landlord and sub-tenant only of such fact and shall be relied upon by the subtenant in making payment to Landlord. No subtenant shall be liable to Tenant for any payment made by the subtenant to Landlord pursuant to the paragraph. No sublease shall be valid or effective unless it shall expressly restate therein the provisions of this paragraph.

Section 13.08 Attorneys' Fees. In the event of litigation by Landlord against Tenant or by Tenant against Landlord by reason of a breach of any of the provisions of this Lease, the prevailing party shall be entitled to recover from the other party an amount equal to all reasonable attorney's fees and court costs (including costs of appeals) incurred by the prevailing party in enforcing its rights and remedies under this Lease.

Section 13.09 Default by Landlord. Landlord shall in no event be in default in the performance of any of its obligations in this Lease contained unless and until Landlord or the holder of any mortgage on the Demised Premises shall have failed to commence to perform such obligation within thirty (30) days (or such longer period of time as may be required by Landlord or the holder of any mortgage to effect such cure) after notice by Tenant to Landlord and to such mortgagee properly specifying wherein

-22-

Landlord has failed to perform any such obligation or shall have failed to proceed thereafter with reasonable diligence to complete such performance.

Section 13.10 Curing Tenant's Defaults.  If Tenant shall be in default in the performance of any of its obligations under this Lease, Landlord may (but shall not be obligated to do so), in addition to any other rights it may have in law or equity or under this Lease, cure such default on behalf of Tenant after the appropriate notice as provided for elsewhere in this Lease, and Tenant shall reimburse Landlord upon demand for any reasonable sums paid or costs incurred by Landlord in curing such default, together with interest at twelve and 50/100 percent (12.5%) from the respective dates of Landlord's making of the payments and incurring of the costs, on all sums advanced by Landlord as aforesaid, which sums and costs together with interest thereon shall be deemed additional rent payable under this Lease.

Section 13.11 Waiver of Breach.   The waiver by Landlord or Tenant of any breach of any term, covenant or conditions contained in this Lease, shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition contained in this Lease.

Section 13.12 Waiver of Redemption.  Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future law to redeem any of the Demised Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future law which exempts property from liability for debt or for distress for rent.

## ARTICLE XIV
## INSPECTION OF PREMISES

Section 14.01 Landlord's Right to Inspect.   Landlord and the holder of any mortgage on the Demised Premises, and each of their agents, shall have the right to enter the Demised Premises at all reasonable times during regular business hours upon forty eight (48) hours prior notice (except that during an emergency the right of entry shall be at any time) to examine same and to show them to prospective purchasers of the Demised Premises, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable.  At any time within six (6) months immediately prior to the expiration of the Term of this Lease, Landlord shall have the right to display on the Demised Premises a customary "For Rent" sign and to show the property to prospective tenants.

## ARTICLE XV
## QUIET ENJOYMENT

Section 15.01 Landlord's Covenant of Quiet Enjoyment.  Landlord's covenants that upon payment of the Rent by Tenant, and Tenant's complying with the terms, covenants and conditions of this Lease, Tenant may peaceably and quietly have, hold and enjoy the Demised Premises for the Term hereof without hindrance or interruption by Landlord or by any other person or persons claiming under Landlord.

## ARTICLE XVI
## HOLDING OVER

Section 16.01 Rent for Holding Over Period.  In the event Tenant remains in possession of the Demised Premises with the consent of Landlord after the termination of the Term, the same shall be construed to be a tenancy from month to month at the same monthly rental as was being paid at the termination of the Lease, and upon the same other terms specified herein.  The tenancy from month to month shall continue until either party shall notify the other in writing, at least thirty (30) days prior to the end of any calendar month, that the party giving such notice elects to terminate such tenancy at the end of such calendar month, in which event such tenancy shall so terminate.

## ARTICLE XVII
### TITLE

**Section 17.01** Condition of Title and of Demised Premises. Tenant represents that the title to the Demised Premises, the zoning of the Demised Premises and the permitted uses thereof have been examined by Tenant and Tenant accepts them in the condition or state in which they are as of the Commencement Date, and Tenant takes the Demised Premises subject to all Recorded Encumbrances; provided, however, that Tenant's obligation to comply with any Recorded Encumbrances recorded after the date hereof shall be conditioned on the same not materially restricting Tenant in Tenant's use of the Premises or materially increasing Tenant's obligations or adversely affecting Tenant's rights under this Lease.

## ARTICLE XVIII
### MISCELLANEOUS

**Section 18.01** Notices; Rental Payments. Any notice provided for in this Lease shall be given by written instrument, personally delivered or sent by United States certified or registered mail, return receipt requested or by Federal Express or otherwise nationally recognized over-night courier, each with postage and/or delivery charges prepaid, to the addresses designated in Sections 3 and 5 of the Summary (as applicable) or to such other addresses as the party to receive the notice may thereafter designate by written notice to the other. All notices shall be deemed to have been given when deposited in the United States mail or, if delivered via Federal Express (or other overnight carrier) when personally delivered, as aforesaid. Any notice may be given on behalf of any party by its counsel. Wherever in this Lease Tenant is required to provide a notice to the holder of any mortgage on the Demised Premises, Tenant shall not be obligated to deliver such notice unless and until Landlord has provided to Tenant written notice of the name and address of the holder of such mortgage.

**Section 18.02** Partial Invalidity. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

**Section 18.03** Entire Agreement. This Lease and any amendments and/or Exhibits thereto shall constitutes the entire agreement between the parties with respect to the subject matter hereof and all prior negotiations are merged into this Lease. Any amendment, change or addition to this Lease shall be made only in writing and signed by both parties.

**Section 18.04** Successors in Interest. The terms and conditions of this Lease shall be binding upon, and shall inure to the benefit of, the parties and their respective successors and assigns, subject however to the provisions of Section 9.01.

**Section 18.05** Headings. The Article and Section headings in this Lease are for convenience of reference only, and shall not be construed or held in any way to explain, modify, amplify or add to the interpretation, construction or meaning of this Lease. Any deletion of language from this Lease prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language.

**Section 18.06** Applicable Law. This Lease shall be governed by the laws of the state of California.

**Section 18.07** Definition of Landlord. The word "Landlord" is used herein to include the Landlord named above and any subsequent owner of the Demised Premises as well as their respective successors and assigns, each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had, had it originally signed this Lease as Landlord; but any Landlord, whether or not named

-24-

herein, shall have no liability under this Lease after it ceases to hold title to the Demised Premises, except for obligations which may have theretofore accrued, provided that all subsequent obligations and liabilities under this Lease are assumed in writing by any successor, transferee, purchaser or assignee.  If Landlord is in breach or default with respect to Landlord's obligations or otherwise under this Lease, Tenant shall look solely to the interest of Landlord in the Demised Premises for satisfaction of Tenant's remedies:  Neither Landlord, nor any Landlord Parties, shall have any personal liability with respect to any of the provisions of this Lease.  It is expressly understood and agreed that Landlord's liability, and the liability of any Landlord Parties, under the terms, covenants, conditions, warranties, and obligations of this Lease shall in no event exceed the loss of Landlord's interest in the Demised Premises.

### Section 18.08  Tenant's Estoppel Certificate; Additional Documents.

(a)    Landlord and Tenant agree at any time and from time to time, within ten (10) business days after a party's written notice, to execute, acknowledge and deliver to the other party a written instrument in recordable form certifying the commencement and ending dates of the Term of this Lease, that this Lease is unmodified and in full force and effect (or if there have been modifications, that it is in full force and effect as modified and stating the modifications) and the dates to which minimum rent, additional rent and other charges have been paid in advance, if any and stating whether or not Landlord or Tenant, to the best of its knowledge and belief without investigation,  is in default in the performance of any covenant, agreement or condition contained in this Lease and if so, specifying each such default and such other information as Landlord or Tenant shall reasonably request; and agreeing that Tenant will give to the holder simultaneously with Landlord (or proposed holder) of any mortgage on the Demised Premises (or estate therein) a copy of any notice of default it sends to Landlord and will provide to such holder a reasonable time in which to effect a cure of same.  Tenant agrees that any such statement delivered pursuant to this section may be relied upon by any prospective purchaser of the fee or any mortgagee thereof or any assignee of Landlord's interest in this Lease or of any mortgage upon the fee of the Demised Premises, or any part thereof.

(b)    Within ten (10) business days after the date of a request by Landlord to Tenant, Tenant shall deliver to Landlord the following documents in connection with Tenant:

(i)    A full and complete annual financial statement for the fiscal annual period most recently ended prior to the date of the request, which financial statement shall: be prepared and attested by a senior financial officer of Tenant as being complete, correct and fairly representing Tenant's financial condition; in accordance with generally accepted accounting principles consistently applied; and contain a full and complete balance sheet of Tenant showing all assets and liabilities (both absolute and contingent) and a full and complete statement of Tenant's profits and loss, together with profit and loss statements for the Demised Premises.    Tenant is only obligated to provide Landlord said financial statements twice annually except in the event of a sale, finance or refinance of the Demised Premises by Landlord.

(ii)    If applicable, a Good Standing Certificate issued by the appropriate governmental authority confirming that Tenant is and remains a corporation or partnership (whichever, if either, are applicable) duly formed and in good standing under the laws of the State of its incorporation and/or formation.

### Section 18.09  Intentionally Omitted.

### Section 18.10  Intentionally Omitted.

### Section 18.11  Maintenance Bond.  If a maintenance bond is required to be maintained by any governmental authority for the maintenance of the Demised Premises, Tenant agrees, at its sole cost and expense, to obtain and maintain such bond, and to cause it to name Tenant and Landlord as the bonded parties.

Section 18.12  No Partnership.  Any intention to create a partnership or joint venture relationship between Landlord and Tenant is hereby expressly disclaimed; no relationship other than that of Landlord and Tenant is intended between the parties hereto.

Section 18.13  Effect of Statements Submitted by Landlord.  Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of one hundred twenty (120) days after receipt thereof shall constitute Tenant's acquiescence and approval with respect thereto.

Section 18.14  Arbitration.  Any controversy or claim between or among the parties, except for claims relating to Landlord's exercise of any unlawful detainer rights pursuant to California law or rights or remedies used by Landlord to gain possession of the Demised Premises or terminate Tenant's right of possession to the Demised Premises shall be determined by arbitration in San Diego, California, in accordance with the then applicable Commercial Arbitration Rules of the American Arbitration Association.

Section 18.15  Counterparts.  This Lease may be executed in one or more counterparts, all of which shall be deemed to be an original.

Section 18.16  Default under Franchise Agreement by Tenant.  Tenant agrees to promptly deliver to Landlord, any notice of default provided to Tenant by Tenant's Franchisor (if any).

Section 18.17  Brokers.  Landlord has entered into an agreement with the real estate brokers specified in Section 9 of the Summary of Basic Lease Information as representing Landlord (collectively, "Landlord's Broker"), and Landlord shall pay any commissions or fees that are payable to Landlord's Broker with respect to this Lease in accordance with the provisions of a separate commission contract.  Landlord shall have no further or separate obligation for payment of commissions or fees to any other real estate broker, finder or intermediary.  Tenant represents that it has not had any dealings with any real estate broker, finder or intermediary with respect to this Lease, other than Landlord's Broker and the broker (if any) specified in Section 9 of the Summary of Basic Lease Information as representing Tenant ("Tenant's Broker").  Any commissions or fees payable to Tenant's Broker with respect to this Lease shall be paid exclusively by Landlord's Broker.  Each party represents and warrants to the other, that, to its knowledge, no other broker, agent or finder (a) negotiated or was instrumental in negotiating or consummating this Lease on its behalf, or (b) is or might be entitled to a commission or compensation in connection with this Lease.  Tenant shall indemnify, protect, defend (by counsel reasonably approved in writing by Landlord) and hold Landlord harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including attorneys' fees and court costs) resulting from any breach by Tenant of the foregoing representation, including, without limitation, any claims that may be asserted against Landlord by any broker, agent or finder undisclosed by Tenant herein.  Landlord shall indemnify, protect, defend (by counsel reasonably approved in writing by Tenant) and hold Tenant harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including attorneys' fees and court costs) resulting from any breach by Landlord of the foregoing representation, including, without limitation, any claims that may be asserted against Tenant by any broker, agent or finder undisclosed by Landlord herein.  The foregoing indemnities shall survive the expiration or earlier termination of this Lease.

Section 18.18  Strict Construction.  The rule of strict construction shall not apply to this Lease.  This Lease has been prepared by Landlord and its professional advisors and reviewed and modified by Tenant and its professional advisors.  Landlord, Tenant, and their separate advisors believe that this Lease is the product of all of their efforts, that it expresses their agreement, and that it should not be interpreted in favor of or against either Landlord or Tenant merely because of their efforts in preparing it.

Section 18.19  Force Majeure.  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required

hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, governmental moratorium or other governmental action or inaction (including failure, refusal or delay in issuing permits, approvals and/or authorizations), injunction or court order, riots, insurrection, war, fire, earthquake, flood or other natural disaster or other reason of a like nature not the fault of the party delaying in performing work or doing acts required under the terms of this Lease (but excluding delays due to financial inability) (herein collectively, "Force Majeure Delays"), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 18.19 shall not apply to nor operate to excuse Tenant from the payment of monthly basic Rent, additional rent or any other payments strictly in accordance with the terms of this Lease.

Section 18.20 Waiver of Jury Trial.   EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION SEEKING SPECIFIC PERFORMANCE OF ANY PROVISION OF THIS LEASE, FOR DAMAGES FOR ANY BREACH UNDER THIS LEASE, OR OTHERWISE FOR ENFORCEMENT OF ANY RIGHT OR REMEDY HEREUNDER. Not sure if we want this as we should be able to go to trial.

Section 18.21 Tenant's Authority.   If Tenant executes this Lease as a limited liability company, partnership or corporation, then Tenant and the persons and/or entities executing this Lease on behalf of Tenant represent and warrant that: (a) Tenant is a duly organized and validly existing limited liability company, partnership or corporation, as the case may be, and is qualified to do business in the state in which the Premises are located; (b) such persons and/or entities executing this Lease are duly authorized to execute and deliver this Lease on Tenant's behalf in accordance with the Tenant's operating agreement (if Tenant is a limited liability company), Tenant's partnership agreement (if Tenant is a partnership), or a duly adopted resolution of Tenant's board of directors and Tenant's by-laws (if Tenant is a corporation); and (c) this Lease is binding upon Tenant in accordance with its terms. Concurrently with Tenant's execution and delivery of this Lease to Landlord and/or at any time during the Lease Term within ten (10) days of Landlord's request, Tenant shall provide to Landlord a copy of any documents reasonably requested by Landlord evidencing Tenant's representations and warranties hereunder.

Section 18.22 Redevelopment of Property.   If Landlord re-develops the Property during the Term then Tenant shall have reasonable approvals over the re-development; provided, however Landlord shall make space available for Tenant to continue its business in such a manner that Tenant's business is not un reasonably harmed.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

LANDLORD:

Red Mountain Retail Group, Inc.,
a California corporation

By: _____

Its: _Michael H. Mugel, CEO_

TENANT:

Luviland Corporation,                                  Luviland LLC,
a California corporation                               a California limited liability company

By: _____              By: _____

Its: _____              Its: _CFO_

-27-

## EXHIBIT "A"

### SITE PLAN



## EXHIBIT "B"

## LEASE GUARANTY AGREEMENT

THIS LEASE GUARANTY ("Guaranty") is made by John Nguyen ("Guarantor") in favor of Red Mountain Retail Group Inc., a California Corporation or its assigns ("Landlord") in connection with that certain lease dated _____, 2014 (the "Lease") pursuant to which Landlord is to lease to Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company dba _____ _____ ("Tenant") those premises generally referred to as 7101 W. Lincoln Avenue, Buena Park, CA (the "Demised Premises").

A.    Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B.    Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.    The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.    Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant. Guarantor's obligations under this Guaranty are continuing and unconditional.

3.    Guarantor hereby agrees that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed. Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.    Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5.    Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands

(i)

(including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.     Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.     Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.     Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.     Without limiting the generality of the waivers contained in this Guaranty, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2820, 2821, 2822, 2845, 2848, 2849 and 2850 of the Civil Code of the State of California, as recodified from time to time (except the right to require contribution from co-sureties as set forth in Section 2848 therein).

10.     Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for Guarantor for the two (2) years prior to the current financial statement year to the extent not previously delivered to Landlord. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if

such is the normal practice of Guarantor, audited by an independent certified public accountant. Guarantor represents and warrants that all such financial statements shall be true and correct statements of Guarantor's financial condition.

11. The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

12. This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law.

13. This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14. Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15. The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise. The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

16. If any or all Guarantors shall become bankrupt or insolvent, or any application shall be made to have any or all Guarantors declared bankrupt or insolvent, or any or all Guarantors shall make an assignment for the benefit of creditors, or any or all Guarantors shall enter into a proceeding for the dissolution of marriage, or in the event of death of any or all Guarantors, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or such Guarantor's fiduciary. This Guarantee shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

17. Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.    If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action.  Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.    Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California.  Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California.  Guarantor consents to the jurisdiction and venue of the State and Federal courts sitting in the judicial district(s) which include the Demised Premises and waives any claim that the same would be an inconvenient forum.    In addition, Guarantor hereby appoints _____ as agent for service of process in the State of California in connection with any actions that may be taken by Landlord under this Guaranty; provided, however, that in the event that _____ ceases to be Guarantor's agent for service of process in the State of California, then Guarantor shall appoint such other agent in the State of California as Guarantor's agent for service of process and such other agent shall provide Landlord with written confirmation of such other agent's capacity as agent for Guarantor.

20.    Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

21.    Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

22.    If more than one person signs this Guaranty, each such person shall be deemed a guarantor and the obligation of all such guarantors shall be joint and several.  When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural.  The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23.    If Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms.  If Guarantor is a corporation, Landlord, at its option, may require Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed on this _____ day of September, 2014.

[If Guarantor is a married individual, Guarantor's spouse must sign this Guaranty]

Address of Guarantor:

_____

_____

_____

_____

_____ ,
_____

By: _____
Print Name: _____
Print Title: _____

By: _____
Print Name: _____
Print Title: _____

OR

Print Name: _____

Print Name: _____
(Spouse, if applicable)

(v)

# EXHIBIT C

## LEASE GUARANTY AGREEMENT

THIS LEASE GUARANTY ("Guaranty") is made by John Nguyen ("Guarantor") in favor of Red Mountain Retail Group Inc., a California Corporation or its assigns ("Landlord") in connection with that certain lease dated _October 6_, 2014 (the "Lease") pursuant to which Landlord is to lease to Luviland Corporation, a California corporation and Luviland, LLC, a California limited liability company dba _TBD_ _____ ("Tenant") those premises generally referred to as 7101 W. Lincoln Avenue, Buena Park, CA (the "Demised Premises").

A.    Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B.    Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1.    The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2.    Guarantor hereby unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant.    Guarantor's obligations under this Guaranty are continuing and unconditional.

3.    Guarantor hereby agrees that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Demised Premises beyond the Lease Term; and (f) all or any part of the Demised Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed. Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.    Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5.    Guarantor hereby waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change

in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease.

6.    Guarantor hereby waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.    Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.

8.    Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Demised Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.    Without limiting the generality of the waivers contained in this Guaranty, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2820, 2821, 2822, 2845, 2848, 2849 and 2850 of the Civil Code of the State of California, as recodified from time to time (except the right to require contribution from co-sureties as set forth in Section 2848 therein).

10.    Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) days prior written notice from Landlord, Guarantor agrees to provide Landlord with a current financial statement for Guarantor and financial statements for Guarantor for the two (2) years prior to the current financial statement year to the extent not previously delivered to Landlord. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Guarantor, audited by an independent certified public

accountant. Guarantor represents and warrants that all such financial statements shall be true and correct statements of Guarantor's financial condition.

11.    The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

12.    This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law.

13.    This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

14.    Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

15.    The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise.    The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

16.    If any or all Guarantors shall become bankrupt or insolvent, or any application shall be made to have any or all Guarantors declared bankrupt or insolvent, or any or all Guarantors shall make an assignment for the benefit of creditors, or any or all Guarantors shall enter into a proceeding for the dissolution of marriage, or in the event of death of any or all Guarantors, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or such Guarantor's fiduciary. This Guarantee shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

17.    Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.    If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to

have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action. Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.     Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and decided in accordance with, the laws of the State of California. Guarantor consents to the jurisdiction and venue of the State and Federal courts sitting in the judicial district(s) which include the Demised Premises and waives any claim that the same would be an inconvenient forum.     In addition, Guarantor hereby appoints _____ as agent for service of process in the State of California in connection with any actions that may be taken by Landlord under this Guaranty; provided, however, that in the event that _____ ceases to be Guarantor's agent for service of process in the State of California, then Guarantor shall appoint such other agent in the State of California as Guarantor's agent for service of process and such other agent shall provide Landlord with written confirmation of such other agent's capacity as agent for Guarantor.

20.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

21.     Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

22.     If more than one person signs this Guaranty, each such person shall be deemed a guarantor and the obligation of all such guarantors shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23.     If Guarantor is a corporation, each individual executing this Guaranty on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Guaranty on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, and that this Guaranty is binding upon said corporation in accordance with its terms. If Guarantor is a corporation, Landlord, at its option, may require Guarantor to concurrently, with the execution of this Guaranty, deliver to Landlord a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Guaranty.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed on this ___6th___ day of ~~September~~ October, 2014.

[If Guarantor is a married individual, Guarantor's spouse must sign this a Guaranty]

Address of Guarantor:

_____

_____

_____

_____

By: _____

Print Name: _Jon W Nguyen_

Print Title: _President_

By: _____

Print Name: _____

Print Title: _____

**OR**

Print Name: _____

Print Name: _____
(Spouse, if applicable)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

633 W. Fifth Street, 48th Floor, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled (specify): **NOTICE OF MOTION AND MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER AUTHORIZING FINAL POST-PETITION FINANCING BY DEBTOR'S MAJORITY EQUITY HOLDER PURSUANT TO BANKRUPTCY CODE § 364(b), ON AN UNSECURED BASIS, ALLOWABLE UNDER BANKRUPTCY CODE § 503(b)(1) AS AN ADMINISTRATIVE EXPENSE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 18, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Sandford L. Frey        sfrey@cmkllp.com; knielsen@cmkllp.com
Stuart I. Koenig        skoenig@cmkllp.com; knielsen@cmkllp.com
Ron Maroko            ron.maroko@usdoj.gov
U.S. Trustee (LA)        ustpregion16.la.ecf@usdoj.gov
Marta C. Wade          mwade@cmkllp.com; knielsen@cmkllp.com

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**: On (date) November 18, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Barry Russell
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 18, 2015 | Kelli Nielsen |  |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## 2.   SERVICE LIST

315 Arden, LLC
8950 W Olympic Blvd # 650
Beverly Hills, CA 90211

Internal Revenue Service
PO Box 7346
Philadelphia, PA  19101-7346

Securities Exchange Commission
444 S Flower St, Ste 900
Los Angeles, CA  90071-2934

County of Orange
PO box 4515
Santa Ana, CA  92702-4515
Attn:  Bankruptcy Unit

Equity Real Estate Services
1702 S Robertson Blvd
Los Angeles, CA 90035-4316

Investment Property Exchange
4041 MacArthur Blvd No 400
Newport Beach, CA 92660-2554

Larry Langberg & Associates
PO Box 630485
Simi Valley, CA 93063-0009

Luviland LLC
9761 Calendula Ave
Westminster, CA 92683-6915

Red Mountain Group Inc
1234 E 17th Street
Santa Ana, CA 92701-2612

Seth I Weissman Esq
Jeffer Mangels Butler Mitchell LLP
1900 Ave of the Stars 7th Fl
Los Angeles, CA 90067-4308

Employment Development Dept.
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA  94280-0001

L.A. County Tax Collector
Bankruptcy Unit
PO Box 54110
Los Angeles, CA  90054-0110

Capital One Card Serv
PO Box 30285
Salt Lake City, UT 84130-0285

Daniel & Judith Arnall Family Trust
8950 W Olympic Blvd # 650
Beverly Hills, CA 90211-3561

Eugene G Cowan Esq
Bocarsly Emden LLP
633 W Fifth St 64th Fl
Los Angeles, CA 90071-2011

Internal Revenue Service
300 N. Los Angeles St, Stop 5022
Los Angeles, CA 90012-3478

Law Offices of Timothy D McGonigle
233 Wilshire Blvd Ste 700
Santa Monica, CA 90401-1207

Orange County Treasurer
11 Civic Center Plz
Santa Ana, CA 92701-4063

Red Mountain Retail Group Inc
1234 E 17th Street
Santa Ana, CA 92701-2612

Tzepah Freedland
8950 W Olympic Blvd # 650
Beverly Hills, CA  90211-3561

Franchise Tax Board
Bankruptcy Section MS A-340
PO Box 2952
Sacramento, CA  95812-2952

Los Angeles City Clerk
PO Box 53200
Los Angeles, CA  90053-0200

Christopher Morris CPA
Sobul Prime & Schenkel
12100 Wilshire Blvd Ste 1150
Los Angeles, CA 90025-7117

David and Tzepah Freedland
8950 W Olympic Blvd #650
Beverly Hills, CA 90211-3561

Infiniti of Beverly Hills
8825 Wilshire Blvd
Beverly Hills, CA 90211-2605

Judith Arnall
8950 W Olympic Blvd # 650
Beverly Hills, CA  90211-3561

Luviland Corporation
319 Collard Way
Placentia, CA 92870-8217

Plumbquest
5062 Lankersheim Blvd # 15
North Hollywood, CA 91601-4225

Rodriguez Hori Choi & Cafferata LLP
777 S Figueroa St Ste 2150
Los Angeles, CA 90017-5875

W Linc BP LLC
1234 E 17th Street
Santa Ana, CA 92701-2612

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT "4"

1   Sandford L. Frey (SBN 117058)
    Stuart I. Koenig (SBN 102764)
2   **CREIM MACIAS KOENIG & FREY LLP**
    633 West Fifth Street, 48th Floor
3   Los Angeles, CA 90071
    Telephone: (213) 614-1944
4   Facsimile: (213) 614-1961
    sfrey@cmkllp.com
5   skoenig@cmkllp.com

6   Reorganization Attorneys for 315 Arden, LLC
    Debtor and Debtor-In-Possession

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                       **[LOS ANGELES DIVISION]**

11  In re                                   CASE NO.: 2:15-bk-26483-BR

12  **315 ARDEN, LLC,**                     Chapter 11

13          Debtor and Debtor-In-Possession.   **CLEAN AND REDLINE**
                                             **MODIFICATIONS IN RESPONSE TO**
14                                           **COMMENTS OF US TRUSTEE, AND**
                                             **FINAL EXHIBITS, TO DISCLOSURE**
15                                           **STATEMENT DESCRIBING PLAN OF**
                                             **REORGANIZATION PROPOSED BY**
16                                           **DEBTOR, 315 ARDEN, LLC**

17                                           DATE:        March 23, 2016
                                             TIME:        10:00 a.m.
18                                           CTRM:        1668

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1   *Contract (Guaranty); (3) Fraud and Intentional; Misrepresentation (against Agents and Does);*

2   *(4) Fraud and Intentional Misrepresentation (against Sellers and Does); (5) Intentional*

3   *Concealment; (6) Negligent Concealment; (7) Negligent Misrepresentation; (8) Breach of*

4   *Fiduciary Duty; (9) Negligence; and (10) Constructive Fraud,* as currently filed or hereafter

5   amended.

6      *State Court Defendants* means any and all defendants in the State Court Action, including,

7   without limitation, the Red Mountain Entities, W Linc, the Luviland Entities, Nguyen, Wohl,

8   Lopez, Hanley, HIG, and, Does 1 through 40, as now exists or may later be amended, modified,

9   or supplemented.

10      *Stipulated Amount* shall have the meaning set forth in Section II, B, 4, b.1 (iv) of the Plan.

11      *Subordination Claim* means the claim for relief pursuant to Bankruptcy Code § 510(c) that

12   has been initiated by the Debtor in the Bankruptcy Court, as part of the Fraudulent Transfer Action,

13   seeking to equitably subordinate the W Linc Disputed Secured Claim.

14      *Takeout Financing* means, to the extent necessary, refinancing of the Commercial

15   Property obtained by the Reorganized Debtor from a third party lender prior to the W Linc Note

16   Extended Maturity Date, which shall be secured by a first deed of trust against the Commercial

17   Property; the proceeds of which Takeout Financing will be used to, among other things, satisfy the

18   unpaid balance due, if any, on account of the W Linc Allowed Secured Claim, if any, on or before

19   the W Linc Note Extended Maturity Date.

20      *Trust* means the Daniel & Judith Arnall Family Trust.

21      *Trust Exit Financing* means financing or further contributions made available by the Trust

22   to the Reorganized Debtor on and after the Effective Date, in such amounts as are periodically

23   required by the Reorganized Debtor from time to time for Operating Expenses or payments under

24   the Plan.

25      *Unclassified Priority Claim(s)* means an Allowed Claim entitled to priority against the

26   Estate under Bankruptcy Code §§ 507(a)(2), 507(a)(3), and/or 507(a)(8), excluding any such

27   claims incurred after the Petition Date.

28

CREIM MACIAS KOENIG & FREY LLP
603 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

for approximately $6.925 million. The proceeds of the sale were thereafter deposited into a 1031 exchange account; and, thereafter, utilized for the 1031 Exchange, thereby resulting in the Debtor acquiring title to the Commercial Building in February 2015.

As will be discussed in further detail later in the Disclosure Statement, the Debtor later discovered facts about the sale of the Commercial Property leading to its contention that it appears to have been the victim of a fraudulent real estate scheme, in which a group of unscrupulous real estate professionals (including, the sellers and real estate agents) fraudulently induced the Debtor, through their misrepresentations and reprehensible conduct, into immensely overpaying for Commercial Building, to the detriment of the Debtor, its creditors, as well as to the detriment of the infirm widow, her minor child and Freedland.

**B.    PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS**

As stated, the Debtor is a limited liability company that was originally organized in 1999 as a single purpose entity, which held title to the Glendale Building. In 2013, D. Arnall became the sole member of the Debtor.

D. Arnall passed away on December 8, 2014 from complications from cancer, leaving behind his wife, J. Arnall, and their minor son. J. Arnall suffers from Multiple Sclerosis, and has been confined to a wheel chair since her early twenties. She has also been diagnosed with lupus, retinoid, and bursitis, and her health has been declining in recent months.

Following the death of D. Arnall, Freedland became one of the co-trustees of the Trust, and was named the Managing Member of the Debtor. Currently, as set forth in ***Exhibit E***, the membership interest of the Debtor is held 80% by the Trust, and the balance of 20% is held by Freedland, the managing member.

**C.    MANAGEMENT OF THE DEBTOR BEFORE AND AFTER THE BANKRUPTCY, QUALIFICATIONS, COMPENSATION**

    a.    Management of the Debtor and DIP prior to and after the Petition Date and prior to the Effective Date of the Plan.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

# EXHIBIT "5"

1    Sandford L. Frey (SBN 117058)
     Stuart I. Koenig (SBN 102764)
2    **CREIM MACIAS KOENIG & FREY LLP**
     633 West Fifth Street, 48th Floor
3    Los Angeles, CA 90071
     Telephone: (213) 614-1944
4    Facsimile: (213) 614-1961
     sfrey@cmkllp.com
5    skoenig@cmkllp.com

6    Reorganization Attorneys for 315 Arden, LLC
     Debtor and Debtor-In-Possession
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **[LOS ANGELES DIVISION]**

11   In re                              CASE NO.: 2:15-bk-26483-BR

12   **315 ARDEN, LLC,**                Chapter 11

13                                      **CLEAN AND REDLINE**
             Debtor and Debtor-In-Possession.    **MODIFICATIONS IN RESPONSE TO**
14                                      **COMMENTS OF US TRUSTEE, AND**
                                        **FINAL EXHIBITS, TO DISCLOSURE**
15                                      **STATEMENT DESCRIBING PLAN OF**
                                        **REORGANIZATION PROPOSED BY**
16                                      **DEBTOR, 315 ARDEN, LLC**

17                                      DATE:      March 23, 2016
                                        TIME:      10:00 a.m.
18                                      CTRM:      1668

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    *Liquidation Value* means the aggregate dollar amount found by the Court (calculated

2    without consideration of Rights of Action), which is equal to the lowest dollar amount necessary

3    to fund payment to a Class in the manner provided under the Plan so that each Holder of an

4    Allowed Claim would receive or retain property with a value as of the Effective Date at least equal

5    to the amount such Holder would receive if the Debtor were liquidated under chapter 7 of the

6    Bankruptcy Code on the Effective Date.

7        *Lombardo Firm* means Lombardo & Safford, the Debtor's special corporate and real estate

8    attorneys.

9        *Lopez* means Carlos J. Lopez, an individual

10       *LTV Ratio* means the ratio of an Allowed Secured Claim to the value of the Commercial

11   Property.

12       *LTV Reduction Contribution* means a further contribution or unsecured loan, if necessary,

13   to be made after the Effective Date by, or on behalf of, the New Value Contributor in an amount

14   necessary to make the W Linc LTV Reduction Payment.

15       *Luviland Corp* means Luviland Corporation, a California Corporation.

16       *Luviland Entities* means Luviland Corp and Luviland LLC.

17       *Luviland LLC* means Luviland LLC, a California Limited Liability Company.

18       *McGonigle Firm* means Timothy D. McGonigle Prof. Corp., the Debtor's special litigation

19   attorneys.

20       *Net Sale Proceeds* means proceeds resulting from the sale of the Commercial Property

21   remaining after payment of, or reserve for, any and all (a) usual and customary fees, costs and/or

22   expenses of sale, including, but not limited to, escrow fees, title fees, title insurance fees, document

23   preparation fees, insurance, and/or any other fees, costs or expenses of sale; (b) property taxes due

24   and owing as of closing of such sale; (c) brokers' commissions; (d) repairs or improvements

25   necessary to consummate the sale; and (e) other amounts, fees, costs, expenses, or other charges

26   reasonable, necessary, or required in connection with the sale or close of escrow.

27       *New Value Contribution* means the contribution by the New Value Contributor.

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

I:\slf\20252 (315 Arden LLC)\Disclosure Statement Modifications 3-10-16
[Clean Final Ver].docx

3.    *Class of Interests*

The following charts identify the Plan's treatment of the Class containing all the Debtor's Interests:

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| **CLASS 5** | **ALLOWED EQUITY INTEREST** | Class 5 consists of the Interest in the Debtor. The Interests are _impaired_ under the Plan, and entitled to vote on the Plan.<br><br>The Allowed Equity Interest in the Debtor shall retain their Interest in the Debtor if the Holders of the Claims in Classes 1 through 4 vote to accept the Plan. Otherwise, the Allowed Equity Interest in the Debtor shall be deemed not to receive any distribution under the Plan on account of their Interests in the Debtor, and their Interests and voting rights shall be maintained based on the current percentages, by virtue of the New Value Contribution. |

**D.    MEANS OF EFFECTUATING THE PLAN**

**1.    *Funding for the Plan:***

The Plan will be funded by (i) the New Value Contribution; (ii) the Debtor's rental income; (iii) Trust Exit Financing (to the extent required); (iv) LTV Reduction Contribution (if necessary); and, on or before the W Linc Note Extended Maturity Date, (v) Takeout Financing, further contributions of the Trust or the Sale Option.

    a.    New Value Contribution

The Plan will be funded in part by the New Value Contribution made by the New Value Contributors. The anticipated source of the New Value Contribution is the Trust.

    b.    Rental Income

The Plan will be funded from cash flow generated from continued operation of the retail center after the Effective Date. The Reorganized Debtor shall receive and collect all revenue and pay all expenses. Subject to the State Court Action, and the provisions of Bankruptcy Code § 552,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1  until such time as the W Linc Disputed Secured Claim is disallowed or the W Linc Allowed

2  Secured Claim is paid in full, proceeds, product, offspring, and/or profits of the Commercial

3  Property, which are otherwise subject to the W Linc Disputed Secured Claim, shall be used solely

4  for Operating Expenses for the Commercial Property and for W Linc Deferred Payments, and not

5  to fund any other payments under the Plan.

6          **c.**    Trust Exit Financing or Further Contributions

7          The Plan will also be funded to the extent necessary from unsecured financing or further

8  contributions made available by the Trust to the Reorganized Debtor on and after the Effective

9  Date in such amounts as are periodically required by the Reorganized Debtor from time to time

10  for Operating Expenses or payments under the Plan.

11          **d.**    LTV Reduction Contribution

12          ·The Plan will also be funded to the extent necessary from a further contribution or

13  unsecured loan, if necessary, to be made after the Effective Date by the New Value Contributor in

14  an amount necessary to make the W Linc LTV Reduction Payment, if required to be made.

15          **e.**    Takeout Financing, Payoff, or Sale Option

16          After the Effective Date, and prior to the W Linc Note Extended Maturity Date, the

17  Reorganized Debtor may elect to payoff the W Linc Allowed Secured Claim at any time through

18  additional contributions from the Trust or refinance the Commercial Property by obtaining a new

19  loan from a third party lender prior to the W Linc Note Extended Maturity Date, which shall be

20  secured by a new first deed of trust against the Commercial Property.    The proceeds of the

21  contribution or Takeout Financing will be used to, among other things, satisfy the unpaid balance

22  of the W Linc Allowed Secured Claim on or before the W Linc Note Extended Maturity Date.

23          After the Effective Date, the Reorganized Debtor may elect, in its sole and absolute

24  discretion, to sell the Commercial Property (*"Sale Option"*).    In the event that the Debtor exercises

25  the Sale Option, the Net Sale Proceeds of such sale shall be distributed to pay the balances due in

26  the following order (i) Allowed Secured Tax Claims in Class 1; (ii) W Linc Allowed Secured

27  Claim in Class 2; (iii) Administrative Claims and Unclassified Priority Claims; (iv) General

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1  Unsecured Claims (Class 3), Pro Rata among such Holders; (v) Allowed Claims in Class 4, Pro

2  Rata among such Holders; and (vi) Equity Interest Holders.

3          **f.**    Plan Reserves

4          The Reorganized Debtor shall maintain Plan Reserves, including (i) an Administrative

5  Claims Plan Reserve (including, without limitation, reserves for Professional Fee Claims), (ii)

6  separate reserves for payment of Disputed Administrative Claims, Disputed General Unsecured

7  Claims, and (iii) Operating Reserves, which are reasonable reserves from cash flow generated from

8  operations as determined by the Reorganized Debtor.

9  **2.    _Post Confirmation Management of the Reorganized Debtor._**

10          The Reorganized Debtor shall manage its affairs after the Effective Date.  On the Effective

11  Date, the Operating Agreement shall be deemed modified and amended pursuant to the terms of

12  the Plan as of the Effective Date.  Freedland shall continue to act as managing member after the

13  Effective Date.

14  **3.    _Disbursing Agent._**

15          The Reorganized Debtor shall be the Disbursing Agent under the Plan.

16          **a.    _The Reorganized Debtor._**

17          On the Effective Date, as set forth in Section VIII of the Plan, all of the Assets, property of

18  the Estate and/or Debtor, including, without limitation, the Commercial Property and its

19  operations, and Rights of Action are vested in the Reorganized Debtor free and clear of all Claims,

20  Liens, interests and encumbrances, except the liens securing the W Linc Note Disputed Secured

21  Claim or the W Linc Note Allowed Secured Claim, as applicable, pursuant to the provisions of

22  Classes 2 of the Plan.

23          As of the Effective Date, the Reorganized Debtor shall manage the administration of the

24  Plan, and in such capacity, may exercise rights, power and authority consistent with the Plan and

25  applicable laws.

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

# EXHIBIT "6"

Sandford L. Frey (SBN 117058)
Stuart I. Koenig (SBN 102764)
**CREIM MACIAS KOENIG & FREY LLP**
633 West Fifth Street, 48th Floor
Los Angeles, CA 90071
Telephone: (213) 614-1944
Facsimile: (213) 614-1961
sfrey@cmkllp.com
skoenig@cmkllp.com

Reorganization Attorneys for 315 Arden, LLC
Debtor and Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### [LOS ANGELES DIVISION]

| | |
|---|---|
| In re | CASE NO.: 2:15-bk-26483-BR |
| **315 ARDEN, LLC,** | Chapter 11 |
| Debtor and Debtor-In-Possession. | **CLEAN AND REDLINE MODIFICATIONS IN RESPONSE TO COMMENTS OF US TRUSTEE, TO PLAN OF REORGANIZATION PROPOSED BY DEBTOR, 315 ARDEN, LLC** |
| | **Plan Confirmation Hearing:** |
| | *[To be Set]* |

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

## I.

## __INTRODUCTION__

The Debtor[1] is a California limited liability company, the membership interest of which is held 80% by the Trust, and 20% by Freedland, the managing member. The Debtor commenced its Case by filing in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on Petition Date. The Debtor owns the Commercial Property, consisting of approximately 56,628 square feet of land, and the Commercial Building, consisting of a one-story commercial building of approximately 22,680 square feet. Prior to the Petition Date, in approximately February of 2015, the Debtor was induced to purchase the Commercial Property for approximately $6,200,000, of which approximately $4,800,000 was paid in cash, with the balance of the purchase price of approximately $1,500,000 being carried back in the form of the W Linc Note secured by the W Linc Trust Deed, which are disputed by the Debtor and the subject of the State Court Action.

In the State Court Action, the Debtor contends, among other things, that prior to the Petition Date, it was the victim of a fraudulent real estate scheme perpetrated by the State Court Defendants, whereby the Debtor was induced, through fraud, misrepresentations, and fraudulent concealment of material facts into immensely overpaying for the Commercial Property, to the detriment of the Debtor, its creditors, as well as to the detriment of the Trust (established for the benefit of J. Arnall, an infirm widow and her minor child), and Freedland. Apparently discontent with having successfully defrauded the Debtor out of "only" approximately $3 million in cash by virtue of their fraud, misrepresentations and concealment, the Debtor contends that the State Court Defendants, thereafter, also pursued a non-judicial foreclosure with the intent of depriving the Debtor of the remaining value, by means of the fraudulently obtained W Linc Trust Deed, thereby completing their defilement of the Debtor, its creditors, the Trust for a sick widow and her minor child, and Freedland.

/ / /

---

[1] Capitalized terms shall have the meaning set forth in Section II.A, unless otherwise defined herein.

L:\slf\20252 (315 Arden LLC)\Plan of Reorganization Modifications 3-9-16
[Clean Final Ver].docx

1

***Takeout Financing*** means, to the extent necessary, refinancing of the Commercial Property obtained by the Reorganized Debtor from a third party lender prior to the W Linc Note Extended Maturity Date, which shall be secured by a first deed of trust against the Commercial Property; the proceeds of which Takeout Financing will be used to, among other things, satisfy the unpaid balance due, if any, on account of the W Linc Allowed Secured Claim, if any, on or before the W Linc Note Extended Maturity Date.

***Trust*** means the Daniel & Judith Arnall Family Trust.

***Trust Exit Financing*** means financing or further contributions made available by the Trust to the Reorganized Debtor on and after the Effective Date, in such amounts as are periodically required by the Reorganized Debtor from time to time for Operating Expenses or payments under the Plan.

***Unclassified Priority Claim(s)*** means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(2), 507(a)(3), and/or 507(a)(8), excluding any such claims incurred after the Petition Date.

***Updated Appraisal*** means the updated appraisal performed after the Effective Date, on the Update Appraisal Date, by Herron (or another appraiser selected by the Reorganized Debtor), in accordance with the treatment of Class 2 in Section V of the Plan.

***Updated Appraisal Date*** means the date upon which the Updated Appraisal must be completed in accordance with the treatment of Class 2 in Section V of the Plan, which date will be a Business Day, which is no more than twenty-four (24) months after the Effective Date.

***UST*** means the Office of the United States Trustee for the Central District of California.

***UST Fees*** means fees or charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

***Voting Deadline*** means the deadline established by the Debtor for receipt of Ballots voting to accept or reject the Plan and Plan Releases.

***W Linc*** means W Linc BP, LLC, a California Limited Liability Company.

***W Linc Allowed Secured Claim*** means the Secured Claim of W Linc, if any, as Allowed and determined (a) by Final Order entered in the Bankruptcy Court; (b) by Final Judgment in the

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

# EXHIBIT "7"

1   Sandford L. Frey (SBN 117058)
    Stuart I. Koenig (SBN 102764)
2   **CREIM MACIAS KOENIG & FREY LLP**
    633 West Fifth Street, 48th Floor
3   Los Angeles, CA 90071
    Telephone: (213) 614-1944
4   Facsimile: (213) 614-1961
    sfrey@cmkllp.com
5   skoenig@cmkllp.com

6   Reorganization Attorneys for 315 Arden, LLC,
    Debtor and Debtor-in-Possession

7

8

FILED & ENTERED

APR 08 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fortier    DEPUTY CLERK

9        **UNITED STATES BANKRUPTCY COURT**

10        **CENTRAL DISTRICT OF CALIFORNIA**

11        **[LOS ANGELES DIVISION]**

12   In re                                CASE NO.: 2:15-bk-26483-BR

13   **315 ARDEN, LLC,**                  Chapter 11

14        Debtor and Debtor-in-Possession.   **ORDER APPROVING: (1) ADEQUACY
                                             OF THE DISCLOSURE STATEMENT
15                                           DESCRIBING PLAN OF
                                             REORGANIZATION PROPOSED BY
16                                           DEBTOR, 315 ARDEN LLC; (2) THE
                                             FORM, SCOPE, AND NATURE OF
17                                           SOLICITATION, BALLOTING,
                                             TABULATION, AND NOTICE WITH
18                                           RESPECT THERETO; AND (3)
                                             RELATED CONFIRMATION
19                                           PROCEDURES, DEADLINES AND
                                             NOTICES**

20
                                             **Disclosure Statement Hearing held on:**
21                                           DATE:    March 23, 2016
                                             TIME:    10:00 a.m.
22                                           CTRM:    1668

23                                           **Confirmation Hearing to be held on:**
                                             DATE:    June 7, 2016
24                                           TIME:    10:00 a.m.
                                             CTRM:    1668
25

26

27        A hearing was held on March 23, 2016, before the Honorable Barry Russell, United

28   States Bankruptcy Judge, in the above-captioned Courtroom to consider: (1) the adequacy of the

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1   *Disclosure Statement Describing Plan of Reorganization Proposed by Debtor, 315 Arden LLC,*

2   [Docket No. 41], as modified on March 18, 2016 (together with the original Disclosure

3   Statement, the "Disclosure Statement") [Docket No. 91], the final mailing version of which is

4   attached to the <u>Solicitation Package</u> (as defined below), which <u>Solicitation Package</u> is being filed

5   contemporaneously with this Order.

6       Sandford L. Frey and Stuart I. Koenig of Creim Macias Koenig & Frey LLP appeared on

7   behalf of the Debtor, 315 Arden LLC ("<u>Debtor</u>").   Byron Z. Maldo of  Ervin Cohen & Jessup

8   LLP, appeared on behalf of Red Mountain Group, Inc., Red Mountain Retail Group, Inc. and W.

9   Linc BP LLC.  Ron Maroko of the Office of the United States Trustee appeared on behalf of the

10  United States Trustee. No other appearances were made.

11      The Proposed Plan and Proposed Disclosure Statement were timely filed pursuant to the

12  *Order Setting (1) Deadlines Concerning Chapter 11 Plan and Disclosure Statement and (2)*

13  *Setting Preliminary Hearing on Adequacy of Disclosure Statement and Plan of Reorganization*

14  [Docket No. 4].  The hearing for approval of the Proposed Disclosure Statement and Disclosure

15  Statement Motion was originally set for January 12, 2016, and was continued by this Court to

16  March 23, 2016.  [Docket No. 56].

17      Thereafter, on March 18, 2016, the Debtor filed its (i) *Modifications [Clean and Redline*

18  *Versions] respecting Disclosure Statement Describing Plan of Reorganization Proposed by*

19  *Debtor, 315 Arden LLC* [Docket No. 91], and the (ii) *Modifications [Clean and Redline*

20  *Versions] respecting Plan of Reorganization Proposed by Debtor, 315 Arden LLC*[Docket No.

21  92].

22      Filed  contemporaneously  with  this  Order  is  a  pleading  entitled  "<u>Submission  of</u>

23  <u>Solicitation Package</u>" consisting of the <u>Solicitation Package</u> which the Debtor proposes to serve

24  on creditors.  The Solicitation Package consists of (1) a Solicitation Package Cover letter; (2) the

25  final form of Disclosure Statement and Exhibits thereto; (3) the final form of Plan; (4) a copy of

26  this Order; (5) Notice of the Confirmation Hearing; and, (6) the form of Ballot(s) (collectively

27  "<u>Solicitation Package</u>").

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

At the hearing on March 23, 2016, the Court approved the Disclosure Statement, subject to modification of the interest rate to be paid on the Note to the Secured Creditor, which modification is included in the Disclosure Statement and Plan of Reorganization attached to the Solicitation Package.

This Court has reviewed and considered, among other things: the Solicitation Package, the Disclosure Statement; all exhibits to the Disclosure Statement; the Ballot(s); all applicable pleadings, exhibits, documents and other evidence submitted in respect of the Disclosure Statement; the record in this case; and, having heard the arguments and representations of counsel.

Based upon that review and consideration, the Court determines, among other things, that:

A.    Notice of the hearing for approval of the Disclosure Statement constitutes adequate and appropriate notice under the circumstances and complies with the applicable provisions of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure ("FRBP") and Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR"), and no other or further notice for approval of the Disclosure Statement need be given.

B.    The Court has jurisdiction to grant the relief requested herein in accordance with 28 U.S.C. §§ 157 and 1334.

C.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.    The Disclosure Statement contains "adequate information" within the meaning of, and as prescribed by, Bankruptcy Code§ 1125(a)(1).

E.    The solicitation, balloting, tabulation and confirmation procedures, the form of notice attached to the Solicitation Package; and the deadlines and other relief requested by the Debtor in the Disclosure Statement Motion and/or set forth in this Order are fair, reasonable, and appropriate, authorized by the applicable provisions of the Bankruptcy Code, FRBP, and the LBR, and in the best interests of the Debtor's estate.

**BASED UPON THE FOREGOING AND GOOD CAUSE APPEARING THEREFORE, IT IS HEREBY**:

**ORDERED** that the Disclosure Statement contains "adequate information" within the meaning of, and as prescribed by, Bankruptcy Code§ 1125(a)(1), and that the Disclosure

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Statement is **APPROVED**; it is further,

     **ORDERED** that any and all objections to the Disclosure Statement, to the extent not previously withdrawn, resolved or waived, are hereby **OVERRULED**; it is further,

     **ORDERED** that the Debtor is authorized to solicit votes and elections with respect to the Plan; it is further,

     **ORDERED** that, in accordance with the procedures established by this Order, the Debtor is authorized to disseminate the following materials contained in the Solicitation Package, the form and content of which are hereby **APPROVED**:

1. Solicitation Package Cover letter;

2. The Disclosure Statement [attached to the Solicitation Package filed contemporaneously with this Order];

3. The Plan [attached to the Solicitation Package filed contemporaneously with this Order];

4. A copy of this Order approving the adequacy of the Disclosure Statement, which includes (i) the Scheduled hearing regarding confirmation of the Plan ("Confirmation Hearing"), and (ii) the deadline for voting, filing objections, and submitting evidence in connection therewith;

5. Notice of the Confirmation Hearing [substantially in the form of the proposed notice attached to the Solicitation Package ("Confirmation Hearing Notice")]; and,

6. With respect to those entities that are entitled to vote on the Plan, an appropriate ballot or ballots for the applicable Class [substantially the form of the proposed Ballots attached to the Solicitation Package]; and,

it is further,

     **ORDERED** that the Debtor shall serve (or cause to be served) a Solicitation Package on the following entities:

1. All known creditors, (a) that have filed a proof of claim in the Debtor's case (other than claims that have been disallowed, waived, or withdrawn by order of the Court, stipulation, or otherwise), or (b) if no such proof of claim has been filed, on whose behalf the Debtor scheduled as holding a claim in its Schedules of Assets and Liabilities ("Schedules") which is not listed as a contingent, unliquidated or disputed

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

claim;

2. All non-debtor parties to unexpired leases and executory contracts as of the Petition Date;

3. All parties to any pending pre-petition lawsuits;

4. All parties who have requested special notice in this case (collectively "Special Notice Parties");

5. The US Trustee;

6.  The governmental entities enumerated in FRBP 2002(j);

7. The Internal Revenue Service ("IRS") in accordance with LBR 2002-2(c) and FRBP 5003(e) and using the addresses set forth in the "Register of Federal and State Government Unit Addresses [FRBP 5003(e)] listed in the Court Manual under Appendix D; and,

8. Equity holder of the Debtor; and,

it is further,

**ORDERED** that the Debtor is authorized, in its discretion, to serve the Disclosure Statement and Plan by CD in lieu of paper copy, so long as it makes a paper copy available to any interested party upon request; it is further,

**ORDERED** that the Confirmation Hearing shall be held on **June 7, 2016 at 10:00 a.m.** (*Pacific Time*) before the United States Bankruptcy Court for the Central District of California, Los Angeles Division, the **Honorable Barry Russell**, presiding, in **Courtroom 1668, U.S. Bankruptcy Court, 255 E. Temple Street, Los Angeles, California**; it is further,

**ORDERED** that the deadline for the Debtor to mail the Solicitation Package is May 9, 2016; it is further,

**ORDERED** that the deadline by which the Debtor's memorandum and evidence in support of confirmation of the Plan must be filed and served is on or before **May 9, 2016**; such memorandum, evidence and/or reply shall be served only on the US Trustee, the Special Notice Parties; and the objecting parties, if any; it is further,

**ORDERED** that the deadline by which Ballots to accept or reject the Plan must be received by the Ballot Tabulator (designated in the Disclosure Statement and defined below)

shall be **May 23, 2016 at 5:00 p.m.** (*Pacific Time*) ("Balloting Deadline"). All Ballots must be returned to and actually received by the Ballot Tabulator on or before the Balloting Deadline in order to be counted; it is further,

   **ORDERED** that **May 23, 2016** ("Objection Deadline") shall be the deadline by which any party objecting to Confirmation of the Plan must file and serve its objection and evidence in support thereof. Any objection must be in writing; specify the name and address of the party objecting; set forth the amount of the objecting party's claim(s) and any other grounds giving the objector standing to object; set forth grounds for the objection; and be accompanied by the objecting party's evidentiary support for its objection, including declarations made under penalty of perjury and other admissible documentary evidence. The objection and evidence in support thereof shall be served on the Debtor, counsel for the Debtor, the US Trustee, and the Special Notice Parties; it is further,

   **ORDERED** that the Debtor's reply to any objections to the Plan, along with its Plan Ballot Summary shall be filed on or before **May 31, 2016**. The Plan Ballot Summary shall be served on the US Trustee, the Special Notice Parties, and any party that has filed an objection to the Plan; it is further,

   **ORDERED** that, consistent with the provisions of Section II.B.4 of the Disclosure Statement, the following procedures will apply to balloting and the tabulation of ballots with respect to the Plan unless subsequently ordered by the Court otherwise:

   1. The amount of a Claim or Interest for purposes of Ballot tabulation will be:

      A.   For a Claim or Interest identified in the Schedules as not contingent, not unliquidated, and not disputed, and that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise, prior to the Balloting Deadline (as defined in the Disclosure Statement Order), and for which no POC has been timely filed, the Claim or Interest amount, as identified in the Schedules ("Scheduled Amount");

      B.   For a timely POC or POI that is filed in a specified liquidated amount and that is not the subject of an objection filed before

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

the Balloting Deadline, or that has not been disallowed, waived, or withdrawn by order of the Bankruptcy Court, stipulation, or otherwise prior to the Balloting Deadline, the specified liquidated amount in such POC or POI ("POC Amount");

C.    For a Claim or Interest (whether filed or scheduled) that is the subject of an objection, in whole or in part, before the Confirmation Hearing, only the undisputed amount, if any, of such Claim or Interest, unless such Claim or Interest is temporarily Allowed under FRBP 3018(a) ("Disputed/Estimated Amount");

D.    For a Claim that is offered an option under the Plan to have its Claim Allowed for voting purposes upon the timely election of certain options, and which claimant is in compliance with the procedures set forth in the Plan for such election, the stipulated amount specified in the Plan ("Stipulated Amount");

2.    If an entity submits a Ballot for a Claim or Interest (i) for which there is no timely POC or POI filed and, for which there is no corresponding Scheduled Amount, or (ii) which is the subject of an unresolved objection filed prior to the Confirmation Hearing, such Ballot will not be counted, unless ordered by the Bankruptcy Court;

3.    Creditors that have Claims in more than one voting Class under the Plan must submit a separate Ballot for voting their Claims in each such Class; any creditor that requires additional copies of a Ballot may either photocopy the original Ballot or obtain an additional Ballot pursuant to the instructions set forth in the Confirmation Hearing Notice and the proposed Ballot. **If a creditor uses the same Ballot to vote Claims in more than one class, such combined Ballot will NOT be counted unless the Court order's otherwise;**

4.    If an entity casts more than one eligible Ballot with respect to the same Claim or Interest before the Balloting Deadline, the last Ballot received prior such deadline shall supersede any prior Ballot(s) by such entity with respect to such Claim or Interest in the Class in which the Ballot is submitted; and,

5.    Any Ballot that is incomplete or that is not received by the applicable deadline shall NOT be counted.

it is further,

**ORDERED** that **May 27, 2016** (at least 10 days prior to the Confirmation Hearing) shall be the deadline by which the Debtor must file and serve any exhibits to the Plan required to be

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    filed on the **_Exhibit Filing Date_** (as defined and set forth in the Plan); it is further,

2        **ORDERED** that <u>May 27, 2016</u> shall be the deadline by which the Debtor must file and

3    serve on the US Trustee, the Special Notice Parties and the non-debtor parties to its executory

4    contracts and leases (a) a schedule of executory contracts and leases to be assumed under the

5    Plan ("<u>Assumed Contract Schedule</u>"), and, (b) a schedule of executory contracts and leases to be

6    rejected under the Plan ("<u>Rejection Schedule</u>"); it is further,

7        **ORDERED** that <u>June 3, 2016</u> shall be the deadline by which the non-debtor parties on

8    the Assumed Contract Schedule must file and serve objections to assumption of the applicable

9    assumed agreement and/or confirmation of the Plan; it is further,

10        **ORDERED** that any objection not timely filed and served may be deemed to be waived

11    and to be consent to the Court's entry of an order confirming the Plan; and, it is further,

12        **ORDERED** that any evidence that is not timely filed and served may be stricken from

13    the record and may not be considered in determining any contested matter at the Confirmation

14    Hearing.

15                                                        # # #

16

17

18

19

20

21

22

23

24    Date: April 8, 2016

                                          _Barry Russell_

25                                              Barry Russell
                                          United States Bankruptcy Judge

26

27

28

# EXHIBIT "8"

1  Sandford L. Frey (SBN 117058)
   Stuart I. Koenig (SBN 102764)
2  **CREIM MACIAS KOENIG & FREY LLP**
   633 West Fifth Street, 48th Floor
3  Los Angeles, CA 90071
   Telephone: (213) 614-1944
4  Facsimile:  (213) 614-1961
   sfrey@cmkllp.com
5  skoenig@cmkllp.com

6  Reorganization Attorneys for 315 Arden LLC, Debtor
   and Debtor-in-Possession

7

8

9              **UNITED STATES BANKRUPTCY COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11                  **[LOS ANGELES DIVISION]**

12  In re                          CASE NO.: 2:15-bk-26483-BR

13  **315 ARDEN, LLC,**              Chapter 11

14      Debtor and Debtor-in-Possession.   **ORDER ON CONFIRMATION OF PLAN
                                        OF REORGANIZATION PROPOSED BY
15                                      DEBTOR, 315 ARDEN, LLC**

16                                      *Confirmation Hearing held on:*
                                        Date:      June 7, 2016
17                                      Time:      10:00 a.m.
                                        Ctrm:      1668

18

19

20

21

22

23

24

25

26

27

28

*Left margin vertical text:* CREIM MACIAS KOENIG & FREY LLP · 633 WEST FIFTH STREET, 48TH FLOOR · LOS ANGELES, CALIFORNIA 90071 · (213) 614-1944

**FILED & ENTERED**

**JUN 27 2016**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fortier    DEPUTY CLERK

On June 7, 2016, the Court held a hearing ("Confirmation Hearing") regarding confirmation of the *Plan of Reorganization Proposed by Debtor, 315 Arden, LLC*, a true and correct copy of which is filed as a part of the Findings of Fact and Conclusions of Law lodged contemporaneously with this Confirmation Order as ***Exhibit A*** ("Plan")[1].

Sandford L. Frey of Creim Macias Koenig & Frey LLP appeared on behalf of the Debtor, 315 Arden, LLC ("Debtor"). All other appearances were duly noted on the record.

The Court, having reviewed and considered:

- The *Disclosure Statement Describing Plan of Reorganization Proposed by Debtor, 315 Arden, LLC* and Exhibits ("Disclosure Statement"), attached as Exhibit C to *the Submission of Solicitation Package for Plan of Reorganization Proposed by Debtor, 315 Arden, LLC*, filed May 9, 2016, as Docket No. 108 ("Solicitation Package");

- The *Plan of Reorganization Proposed by Debtor, 315 Arden, LLC* ("Plan"), filed December 28, 2015, attached as Exhibit D to the Solicitation Package;

- The Exhibits accompanying the Disclosure Statement;

- The *Order Authorizing and Approving: (1) Adequacy of the Disclosure Statement Describing Plan of Reorganization Proposed by Debtor, 315 Arden, LLC; (2) The Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notice with respect thereto; and (3) Related Confirmation Procedures, Deadlines and Notices* ("Disclosure Statement Order") entered on April 8, 2016 [Docket No. 98];

- Solicitation Package and Exhibits [Docket No. 108];

- Ballots attached to the *Analysis of Ballots for Accepting or Rejecting Plan of Reorganization Proposed by Debtor, 315 Arden, LLC* and *Declaration of Kelli Nielsen in Support thereof*, filed on May 31, 2016 [Docket No. 120] ("Plan Ballot Summary");

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan. Capitalized terms defined herein shall have the meaning set forth herein. Unless otherwise noted, statutory references are to 11 U.S.C. §§ 101 et seq., the Bankruptcy Code.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

- Plan Ballot Summary filed on May 31, 2016 [Docket No. 120];

- The *Memorandum Filed in Support of Confirmation of Plan of Reorganization Proposed by Debtor, 315 Arden, LLC* filed on May 10, 2016 [Docket No. 109] ("Confirmation Memorandum");

- The *Supplemental Memorandum Filed in Support of Confirmation of Plan of Reorganization Proposed by 315 Arden, LLC* filed May 31, 2016 [Docket No. 121];

- Declaration of Samuel Biggs in support of confirmation of the Plan, filed with the Confirmation Memorandum on May 10, 2016 [as part of Docket No. 109];

- Declaration of Tzepah Freedland in support of confirmation of the Plan, filed on May 12, 2016 [Docket No. 112];

- The various declarations of service that relate to the Debtor's service of the Plan, the Disclosure Statement, and other Court-approved solicitation materials that the Debtor filed with the Court;

- All other pleadings and evidence that were submitted before or at the Confirmation Hearing;

- The record in this Case; and,

- The arguments and representations of counsel at the Confirmation Hearing;

The Court having made its Findings of Fact and Conclusions of Law ("Findings") and good cause appearing therefore:

**IT IS HEREBY ORDERED THAT:**

1.      The Plan is **APPROVED** and **CONFIRMED** under Bankruptcy Code §1129.

2.      Except as provided above, as of the Effective Date, pursuant to Section VI.F of the Plan, any and all other leases and executory contracts which were not assumed prior to the Effective Date are rejected. The deadlines, procedures and sanctions set forth in Section VI.F of the Plan regarding the assertion of Claims for damages arising from such rejection are approved and established. This Confirmation Order does not constitute a waiver of any defenses, claims,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

or counterclaims that the Debtor may have against any party to an assumed or rejected lease or contract.

3.    The terms and provisions of the Plan shall supersede and control any different or inconsistent term or provision in the Disclosure Statement. The Plan shall control over any conflicting provision, or in the event of any ambiguity, between the terms of the Disclosure Statement, on the one hand, and the Plan, on the other hand.  The Plan shall control over any conflicting provision, or in the event of any ambiguity, between the terms of any documents entered into or approved in connection with the Plan (as defined in the Plan), on the one hand, and the Plan, on the other hand.

4.    The provisions of the Plan and this Confirmation Order will bind (a) the Debtor, (b) the Reorganized Debtor, (c) all Holders of Administrative Claims, Priority Claims, Priority Tax Claims, Classified Priority Claims, Secured Claims, General Unsecured Creditors, and all other Creditors (as that term is defined in the Plan), (d) all Holders of Interests, and (e) all other interested parties, whether or not the Claims or interests of these entities are impaired under the Plan, whether or not these entities have voted to accept or reject the Plan, and whether or not these entities have filed Proofs of Claim or Proofs of Interest or are deemed to have filed Proofs of Claim or Proofs of Interest in the Debtor's case.

5.    On the Effective Date, Freedland shall continue in her role as the managing member of the Reorganized Debtor.  On the Effective Date, as set forth in Section VI.B of the Plan, all of the property of the Estate and/or Debtor, including, without limitation, the Assets, and Rights of Action, are vested in the Reorganized Debtor free and clear of all Claims, liens, interests and encumbrances.  As of the Effective Date, Freedland shall manage the affairs of the Reorganized Debtor and the administration of the Plan, and in such capacity, may exercise rights, power and authority consistent with the Plan and applicable laws.

6.    On and after the Effective Date, Freedland shall be authorized and empowered to execute, do and perform, in the name and on behalf of the Reorganized Debtor, such acts and to prepare, execute, acknowledge, verify, file, deliver and cause to be published such certificates,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

agreements, notices, reports, applications, declarations, instruments and documents, under the corporate seal of the Reorganized Debtor or otherwise, as Freedland may deem necessary, appropriate or desirable in her discretion, to carry into effect the decisions she makes in her capacity as the managing member of the Reorganized Debtor, the terms and provisions of the Plan, and/or in connection with any of the matters set forth above or in the Plan.    The Freedland's performance of any such actions and execution and delivery of any such documents shall constitute conclusive evidence of such authority and determination.

7.    On and after the Effective Date, Freedland is authorized and empowered to execute, do and perform, in the name and on behalf of the Reorganized Debtor, such acts and to prepare, execute, acknowledge, verify, file, deliver and cause to be published any and all certificates, agreements, notices, notice of default, reports, applications, declarations, instruments, notes, transfer documents, and any and all other documents of any kind or nature on behalf of, and in the name of, the Reorganized Debtor, including, without limitation, those reasonable, necessary, required, requested or appropriate in order to (i) sell, convey, transfer, hypothecate, assign, alienate, dispose of, take possession of, and/or abandon any of the Assets, (ii) collect or enforce the Reorganized Debtor's rights respecting, or in connection with, any accounts receivable, (iii) file, prosecute, enforce or collect any Claims and/or Rights of Action, (iv) carry-out the terms and intent of the Plan, and (v) administer the Plan and the Case. Freedland's performance of any such actions and execution and delivery of any such documents shall constitute conclusive evidence of such authority and determination.

8.    On and after the Effective Date, Freedland shall have the right and power to file and prosecute objections to, and take actions to pursue any and all disputes respecting, any and all Claims, including, without limitation, Administrative Claims, Priority Claims, Priority Tax Claims, Classified Priority Claims, Secured Claims, General Unsecured Creditors, Subordinated Claims, which are asserted against the Debtor with respect to which the liability is disputed in whole or in part.    All disputes may be litigated to Final Order; provided, however, that Freedland may compromise and settle any disputes respecting Claims.    At such time as a Disputed Claim is

resolved by Final Order and/or is Allowed or is settled by Freedland, the Holder thereof will receive, as soon as practicable thereafter, the distributions to which such Holder is then entitled under the Plan.

9.     Notwithstanding anything to the contrary in the Plan or any order, Freedland may setoff, recoup, or withhold against the Distributions to be made on account of any Allowed Claim, any Claims that the Debtor may have against the entity holding a Claim.  Freedland will not waive or release any Claim against those entities by failing to effect such setoff or recoupment; by Allowing any Claim against the Debtor; or by making a Distribution on account of an Allowed Claim.

10.     Notwithstanding any other Plan provision or other order, no Distributions will be made on account of any Claim until such Claim is an Allowed Claim.  Distributions will be made on account of a Disputed Claim only after, and only to the extent that, the Disputed Claim becomes an Allowed Claim.

11.     Freedland may pay all Administrative Expenses, Plan Expenses, Operating Expenses arising under, in connection with, related to, or necessary for implementation, execution, performance, and consummation of the Plan and this Confirmation Order, the transfer, disposition, distribution or administration of any Assets, and all matters referred to in the Plan and this Confirmation Order.

12.     After the Effective Date, professionals retained by the Reorganized Debtor may bill, invoice and be paid their fees and expenses for services rendered after the Effective Date in the ordinary course of business and without the necessity of Bankruptcy Court approval.

13.     Freedland may move to close the Case at any time after the Effective Date, even if any Assets remain to be liquidated, funds remain to be distributed or Plan Reserve(s) remain on deposit.

14.     On the Effective Date, Freedland shall retain, and may exclusively enforce, any and all such claims, rights or Rights of Action (as defined in the Plan), whether arising before or after the Effective Date, in any court or other tribunal.  Freedland shall have the exclusive right,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights and Rights of Action.

15.     Unless a claim or Right of Action against a person or entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Reorganized Debtor expressly reserves such claim or cause of action for later adjudication (including, without limitation, claims and Rights of Action which the Reorganized Debtor may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown at this time, or facts or circumstances which may change or be different from those now believed to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims or Rights of Action upon, or after, the consent to or consummation of the Plan, except where such claims or Rights of Action have been released in the Plan or other Final Order.

16.     Freedland and the Reorganized Debtor, in their absolute and sole discretion, have the right to supplement at any time before or after the Effective Date, the reserved litigation to include actions, causes of action, claims, avoidance actions, declaratory relief actions and lawsuits, of any kind or nature, whether in law or in equity, that the Debtor may have against any Claimant or any other person or entity by filing with the Bankruptcy Court *Schedule I*; upon such filing, Schedule I shall be deemed to be incorporated as part of the Disclosure Statement, Plan and this Confirmation Order as of the Effective Date without further order of this Court; and, none of the Disclosure Statement, Plan and/or this Confirmation Order shall act as bar against the filing and/or prosecution of any such actions, causes of action, claims, avoidance actions, declaratory relief actions and lawsuits, and/or the enforcement of any judgment obtained with respect thereto.

17.     On and after the Effective Date, with respect to any matter affecting any Assets, Freedland may take such actions in the name of the Debtor.

18.     All settlements, compromises, discharges, injunctions, exculpations and releases

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

provided for in the Plan are approved and established as if fully set forth herein, including, without limitation, those specifically provided for Section IX of the Plan.

19.     This Confirmation Order operates as an injunction against the commencement or continuation of any act relating to the collection or enforcement of any Claim ("Enjoined Claim") against the Debtor and the Reorganized Debtor.  Except as otherwise provided in the Plan, all Persons who have held, hold or may hold Claims against or Interests in the Debtor are enjoined from and after the Effective Date in respect of the treatment of the Claims of Creditors under the Plan, from: (i) commencing or continuing in any manner any action or proceeding of any kind with respect to such Claim against the Debtor and/or the Reorganized Debtor, including, without limitation based upon any guaranty; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor and/or the Reorganized Debtor or the property of any such parties or property of their respective affiliates with respect to any such Claim; and (iii) creating, perfecting or enforcing any encumbrances of any kind against the Debtor and/or the Reorganized Debtor or against the property of any such parties, with respect to any such Claim or Interest.

20.     The Exculpated Parties (as defined in the Plan) shall neither have, nor incur, any liability to any entity or to any Holder of a Claim or Interest for any act taken or omitted to be taken on or after the Petition Date in connection with,  related to, or arising out of the Case, the pursuit of confirmation of the Plan, the consummation or administration of the Plan, or property to be distributed under the Plan, including, without limitation, formulating, negotiating, soliciting, preparing, disseminating, implementing, entering, effecting or consummating the Plan; the marketing, sale and/or liquidation of any Assets, personal property and/or collection of any accounts receivable; any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan; provided that the foregoing "Exculpation" shall not include and shall not apply to the liability of any of the Exculpated Parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud, breach of fiduciary duty or intentional misrepresentation; provided,

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

21.     All Persons voting in favor of the Plan or receiving and accepting any distribution pursuant thereto are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against the Exculpated Parties, whether directly, derivatively, on account of or respecting any claim, debt, right, or cause of action based in whole or in part upon the conduct of the Exculpated Parties set forth and/or included in any of the Exculpation provisions set forth in this Plan.  In the event the Exculpated Parties and/or any of them are injured by any willful violation of the injunctions provided in the Plan, such aggrieved party shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

22.     The Court retains and reserves jurisdiction to enter appropriate order(s) in aid of the Plan or implementation of the Plan pursuant to Bankruptcy Code § 1142 and to matters set forth in Section VIII of the Plan.  The Court may properly retain jurisdiction over the matters set forth in Section VIII of the Plan.

23.     The Bar Date for filing a POC based on a claim arising from the rejection of a lease or contract is thirty (30) days after the entry of this Confirmation Order.

24.     All Administrative Claims (excluding professional compensation for professionals employed pursuant to Bankruptcy Code § 327) are barred unless asserted by the filing of a POC (i) designated as a request for payment of Administrative Expenses, (ii) asserting that such claim is allowable pursuant to Bankruptcy Code § 503(b), (iii) stating the amount of such claim, (iv) stating the basis of such claim, and (v) attaching documentation in support of such claim.

25.     Any objection to any Administrative Claim (excluding those to professional compensation for professionals employed pursuant to Bankruptcy Code § 327) must be filed within one-hundred and twenty (120) days from the date such Administrative Claim is filed.

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

Holders of Administrative Claims (including, without limitation, professionals) requesting compensation or reimbursement of expenses that do not file such requests by the Administrative Claims Bar Date shall be forever barred from asserting such claims against the Debtor, the Debtor's estate, the Liquidating Debtor or property of the Estate, Debtor or Liquidating Debtor or Assets or proceeds held by the Liquidating Debtor.

26.    Any party wishing to assert a Non-Ordinary Course Administrative Claim against the Estate (except Professional Fee Claims) must, on or before 90 days after the Effective Date, both file with the Court a final fee application or a motion requesting Allowance of the fees or claims and serve the application or motion on the Liquidating Debtor and the UST.

27.    Any and all objections to the Plan or confirmation of the Plan are waived and/or overruled.

28.    In accordance with Bankruptcy Code § 1146(c), the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, including the recording of any mortgage or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment. This Confirmation Order directs all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instrument or other documents without payment of such tax or other governmental assessment.

29.    Freedland may file and serve the Effective Date Notice fixing the Effective Date consistent with the Plan, on a date set by the Debtor, which date is within sixty (60) days after this Confirmation Order becomes a Final Order (as defined in the Plan), or such later date which is approved by the Court.

30.    In accordance with LBR 3020-1(b), on or before **October 7, 2016** (a date within 120 days of the entry of this Confirmation Order), Freedland shall file a status report explaining what progress has been made toward consummation of the confirmed Plan. Freedland shall

1  serve such report on the UST, the 20 largest unsecured creditors, and those parties who have

2  requested special notice.

3

4

5

6                                          # # #

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Date: June 27, 2016

25                                    Barry Russell
                                      United States Bankruptcy Judge
26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

# EXHIBIT "9"



1
2
3
4

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

In re:                              )
                                    )
5   315 ARDEN, LLC.,                )
                                    )
6       Debtor and Debtor in Possession )
                                    )
7   _____)
    315 ARDEN, LLC.,                )
                                    )
8               Plaintiff,          )
                                    )
9       vs.                         ) Case No.
                                    ) 2:15-bk-26483-BR
10                                  )
                                    )
11  RED MOUNTAIN GROUP, INC., a     )
    California Corporation; RED     )
12  MOUNTAIN RETAIL GROUP, INC., a  )
    California corporation, and W   )
13  LINC BP, LLC, a California      )
    Limited Liability Company,      )
                                    )
14              Defendants.         )
                                    )
15  _____)
                                    )
16  And Related Cross-Actions.      )
                                    )
17
18
19
20            DEPOSITION OF TZEPAH FREEDLAND
21            Thursday, August 18, 2016
22
23  Reported By:
    DEBORAH KINSELLA
24  CSR No. 13808
    Job No. 2349829
25  Pages 1 to 273

**CERTIFIED TRANSCRIPT**

**FILED**
SEP 2 0 2016
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

Page 1

1        A    It's my understanding that that's correct.

2        Q    Okay.  And that's you in your personal,

3    individual capacity; correct?

4        A    Can you clarify.

5        Q    Okay.  When I mentioned you were a member, I

6    mean you in your individual capacity were a member of

7    the debtor as of December 9, 2014, to your knowledge?

8        A    I believe that's correct.

9        Q    Okay.  As of December 9, 2014, were you and

10   your husband, in the capacity as trustee of the Daniel

11   Arnall 2014 trust, also a member of the debtor?

12       A    No.

13       Q    Okay.  Were you and David Zarmi, as trustees of

14   the Daniel Arnall 2014 trust, ever members of the

15   debtor?

16       A    I'm confused.

17       Q    Okay.  I'm trying to find out on December 9,

18   2014 who the members of the debtor were.  You mentioned

19   you in your individual capacity were a member.  Who else

20   was a member?

21       A    I believe the Daniel and Judith Arnall Family

22   Trust -- I'm literally reading this language now.

23   You're asking me to read the language.

24       Q    No, I'm asking what your knowledge is.

25       A    So the Daniel and Judith Arnall Family Trust

Page 42

1  and then again Judith -- I don't know how that works

2  out --

3      Q   Okay.

4      A   -- when you assign on a date.

5      Q   Okay.  So is it correct to state -- were there

6  any other members of the debtor as of December 9, 2014

7  besides the Daniel Arnall 2014 Trust and yourself in

8  your individual capacity?

9          MR. FREY:  Wait.  Can you read that back?  I

10  got confused.

11                      (Record was read.)

12          THE WITNESS:  I never said -- I guess -- I

13  never said the Daniel Arnall 2014 Trust.

14  BY MR. MILLER:

15      Q   Okay.  You did state that the Daniel

16  Arnall 2014 Trust at some point was a member of the

17  debtor; correct?

18          MR. FREY:  Objection.  Mischaracterizes her

19  testimony.

20          THE WITNESS:  Yeah.  Can you read it back

21  because I didn't say any of this.

22          Should she read it back or -- no.  No.

23  BY MR. MILLER:

24      Q   Okay.  So the Daniel Arnall 2014 Trust was

25  never a member of the debtor?

                                             Page 43

```
 1              MR. FREY:  Objection.  Asked and answered.

 2              MR. MILLER:  I'm just trying to find out who

 3    the members were?

 4              MR. FREY:  And it calls for speculation.  Can

 5    you be more specific as to time.

 6    BY MR. MILLER:

 7       Q    Okay.  As of December 9, 2014.

 8       A    I think they are not a member, no.

 9       Q    Were they -- they are not a member?

10       A    The Daniel Arnall 2014 Trust is not a member of

11    315 Arden as of December 9th according to my knowledge.

12       Q    Okay.  And did they ever become a member of the

13    trust -- of the debtor?

14       A    No.

15       Q    Okay.  Are there any other members of the

16    debtor at present besides you in your personal capacity?

17       A    Yes.

18       Q    And who are the other members?

19       A    The Daniel and Judith Arnall Family Trust.

20       Q    I see.  I see.  Is it fair then to say in the

21    first paragraph, the opening paragraph is incorrect to

22    the extent of listing you and David Zarmi as the

23    trustees of the Daniel Arnall 2014 Trust?  That's an

24    incorrect statement?

25       A    I don't believe so, that that's incorrect.
```

Page 44

```
 1        Q   Well, shouldn't it say the "Daniel and Judith

 2   Arnall Trust"?

 3            MR. FREY:  Objection.  Calls for speculation.

 4   Calls for a legal conclusion.

 5   BY MR. MILLER:

 6        Q   Can you answer the question?

 7            MR. FREY:  He doesn't want you to guess.

 8   BY MR. MILLER:

 9        Q   I don't want you to guess.  I just want to know

10   the correct name of the other member of the trust.

11        A   The Daniel and Judith Arnall Family Trust is

12   and I am -- are the members of -- since December 9th,

13   2014.

14        Q   Thank you.  Any other members of the debtor

15   besides yourself and the Daniel and Judith Arnall Family

16   Trust?

17        A   No.

18        Q   Okay.  Can I refer to the Daniel -- I will be

19   referring to the Daniel and Judith Arnall Family Trust

20   as "the trust," okay?

21        A   Sounds great.

22        Q   Okay.  On December 9, 2014 you were also the

23   managing member of the debtor; correct?

24        A   Correct.

25        Q   What were your job responsibilities as managing
```

                                               Page 45

# EXHIBIT "10"



UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

In re:                                    )
                                          )
315 ARDEN, LLC.,                          )
                                          )
    Debtor and Debtor in Possession )
                                          )
_____ )
315 ARDEN, LLC.,                          )
                                          )
            Plaintiff,                    )
                                          )
    vs.                                   ) Case No.
                                          ) 2:15-bk-26483-BR
                                          )
RED MOUNTAIN GROUP, INC., a               )
California Corporation; RED               )
MOUNTAIN RETAIL GROUP, INC., a            )
California corporation, and W             )
LINC BP, LLC, a California                )
Limited Liability Company,                )
                                          )
            Defendants.                   )
_____ )
                                          )
And Related Cross-Actions.                )
___                                       )


                DEPOSITION OF TZEPAH FREEDLAND
                   Thursday, August 18, 2016


Reported By:
DEBORAH KINSELLA
CSR No. 13808
Job No. 2349829
Pages 1 to 273


                                                    Page 1

**CERTIFIED
TRANSCRIPT**

**FILED**

SEP 20 2016

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

1        A    I don't believe so.

2        Q    Okay.  Can you elaborate on the work -- you

3    testified that your job responsibility as managing

4    member was to continue the work of Daniel Arnall.  What

5    was that work?

6        A    There the funds -- there was an exchange at the

7    time.

8        Q    Okay.  Is that a 1031 exchange?

9        A    Correct.

10       Q    Okay.

11       A    And it was handling that exchange.

12       Q    Can you elaborate.  When you're saying

13   "handling the exchange," what does that means?

14            MR. FREY:  Objection.  Vague and ambiguous and

15   calls for a narrative.

16   BY MR. MILLER:

17       Q    What does it mean?

18       A    Identifying a good income-producing property.

19       Q    Okay.  Anything else?

20       A    I don't recall at this time.

21       Q    Okay.  Now, at one time did the debtor own real

22   property at 315 Arden Avenue in Glendale, California?

23       A    To the best of my knowledge.

24       Q    Okay.  Do you know when that property was

25   acquired by the debtor?

                                           Page 47

1     A   No.

2     Q   Do you know if the debtor sold that property?

3     A   Yes.

4     Q   Do you know when that sale was?  You have to

5  give an audible response.  The court reporter can't take

6  down shakes of the head.

7     A   I can't recall specific dates.

8     Q   Can you give me an estimate?

9     A   Let's see, August of --

10    Q   How about 2014?

11    A   That sounds good.

12    Q   Okay.  Now, prior to becoming a member of the

13  debtor in or about December 9, 2014, did you have any

14  dealings with the debtor?

15         MR. FREY:  Objection.  Vague and ambiguous.

16         THE WITNESS:  Can you -- I'm sorry.  Can you

17  ask in a different way.

18  BY MR. MILLER:

19    Q   Elaborate?  Were you employed by the debtor

20  prior again to December 9, 2014?

21    A   I think so, yeah.

22    Q   What did you do?

23    A   I --

24         MR. FREY:  Objection.  Vague and ambiguous.

25         THE WITNESS:  I collected rent.  I -- what else

Veritext Legal Solutions
866 299-5127

1        A    That's up to my counsel what they would do.

2             MR. MILLER:  Will you produce a copy of the

3    previous operating agreement?

4             THE WITNESS:  Well, if it's relevant.

5    BY MR. MILLER:

6        Q    That would be up to your counsel.

7        A    Exactly.

8             MR. SOCHER:  I'd have to see the request to

9    know.

10            MR. MILLER:  I'm asking will you produce a

11   previous copy, an executed copy of the previous

12   operating agreement, "yes" or "no"?

13            THE WITNESS:  Aren't you having a meet and

14   confer anyway?

15            MR. SOCHER:  We can talk about it on a break.

16            MR. MILLER:  Okay.  All right.  I think we're

17   on Exhibit 22, which is a closing statement.

18            THE WITNESS:  Okay.  Hold on one second.  Let

19   me get back there, okay?

20   BY MR. MILLER:

21       Q    Before we get there, back with the --

22       A    Yes.

23       Q    -- at the time of the sale of the Glendale

24   property, is it correct to say that your functions with

25   the debtor were primarily of an administrative nature?

                                              Page 177

```
 1    Do you know what I mean by "administrative nature"?

 2         A    I don't think that's an accurate description.

 3         Q    Why not?

 4         A    I don't want to commit myself to that.

 5         Q    But you're saying it's not an accurate

 6    statement.  I'm entitled to know why it's not.

 7         A    For sure, and I'm saying the reason why I don't

 8    want to say that that was my role is because I did

 9    not -- I was not an exclusive -- it was not -- I don't

10    feel I was -- I mean I don't know what you mean by --

11    okay.  Let's back it up.  What do you mean by

12    "administrative"?

13         Q    In other words, you mentioned you provided

14    documents.  You did things that were nondecision making.

15    You were more of an administrator than a decision maker;

16    is that correct?

17         A    I would say so, yes.  I would say that's an

18    accurate statement.

19         Q    At the time of the sale of the Glendale

20    property, did you ever discuss with Mr. Arnall some

21    of -- why the Glendale property was sold?

22         A    Did I discuss with him why --

23         Q    Uh-huh.

24         A    -- he sold the property?  I don't recall.  I'm

25    sorry.  Again, I don't know why I said I'm sorry.
```

Page 178

1    In connection with the purchase -- oh.  With the

2    Glendale property, had you previously been involved in

3    the sale of commercial real property?

4        A    You asked --

5            MR. FREY:  With the purchase?

6            MR. MILLER:  With the sale of commercial real

7    property.

8            THE WITNESS:  You asked me at any time?

9            MR. MILLER:  Yeah.

10           MR. FREY:  Hold on.  Stop, stop, stop.

11   BY MR. MILLER:

12       Q    Prior to the sale of commercial real -- of the

13   Glendale property --

14       A    Hold on.

15           MR. FREY:  I need the question read back.

16                   (Record was read.)

17           MR. FREY:  I'm objecting to a few things.  In

18   connection with the purchase --

19           MR. MILLER:  No.  Let me re- -- strike it.

20           MR. FREY:  Yeah.

21   BY MR. MILLER:

22       Q    Okay.  Were you ever involved with the sale of

23   commercial property prior to the sale of the Glendale

24   property?

25       A    Prior to the sale of Glendale property, I

Page 181

```
 1   don't -- no, I don't think so.
 2        Q    Okay.  Let's go back then to Exhibit 21.  I'm
 3   looking now at the section --
 4             MR. ORTIZ:  You mean 22?
 5             MR. MILLER:  The Closing Statement.  22?
 6             MR. ORTIZ:  Yeah.
 7             MR. MILLER:  Thank you.  You're right.
 8             THE WITNESS:  Okay.
 9   BY MR. MILLER:
10        Q    Okay.
11        A    We're on 22?
12        Q    We're on 22, the Closing Statement.
13        A    Okay.  Got it.
14        Q    Do you see the section titled "Prorations and
15   Adjustments"?
16             MR. SOCHER:  Sorry.  I'm going to go.
17             (Mr. Socher leaves the deposition.)
18             THE WITNESS:  I'm sorry.  Can you repeat your
19   question.
20   BY MR. MILLER:
21        Q    Sure.  Do you see the section of the Closing
22   Statement, Exhibit 22, regarding prorations and
23   adjustments?
24        A    Prorations and adjustments, oh, gosh.  Yeah.
25        Q    Okay.  Do you see the free rent period from
```

Page 182

# EXHIBIT "11"

```
 1                UNITED STATES BANKRUPTCY COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                    LOS ANGELES DIVISION
 4
     In re:                          )      CERTIFIED
 5                                   )      TRANSCRIPT
     315 ARDEN, LLC.,            —   )
 6                                   )
        Debtor and Debtor in Possession )    FILED
 7    _____)
     315 ARDEN, LLC.,                )     SEP 2 0 2016
 8                                   )
                    Plaintiff,       )   CLERK U.S. BANKRUPTCY COURT
 9                                   )   CENTRAL DISTRICT OF CALIFORNIA
                                     )   BY:              Deputy Clerk
        vs.                          )  Case No.
10                                   )  2:15-bk-26483-BR
                                     )
11   RED MOUNTAIN GROUP, INC., a     )
     California Corporation; RED     )
12   MOUNTAIN RETAIL GROUP, INC., a  )
     California corporation, and W   )
13   LINC BP, LLC, a California      )
     Limited Liability Company,      )
14                                   )
                    Defendants.      )
15   _____)
                                     )
16   And Related Cross-Actions.      )
     ___                             )
17
18
19
20            DEPOSITION OF TZEPAH FREEDLAND
21             Thursday, August 18, 2016
22
23   Reported By:
     DEBORAH KINSELLA
24   CSR No. 13808
     Job No. 2349829
25   Pages 1 to 273


                                     Page 1
```

1              MR. FREY:  He doesn't want you to guess.

2              MR. MILLER:  Ever.

3              THE WITNESS:  I don't know.

4              MR. FREY:  He's entitled to an estimate.

5    BY MR. MILLER:

6         Q    Did you review the leases for Mr. Arnall?

7         A    No.  I mean he -- I think it's accurate to say

8    he has counsel -- he had -- sorry.  Had counsel.

9         Q    And do you know who that counsel was?

10        A    He had counsel.

11        Q    Who was the counsel?

12        A    I don't recall.

13        Q    Okay.  Did you do any analysis of the leases

14   for the Glendale property while Mr. Arnall was alive?

15        A    I don't believe so, no.

16        Q    Okay.  Did you help locate any tenants for the

17   Glendale property when Mr. Arnall was alive?

18        A    Yes.

19        Q    And what did you do?

20             MR. FREY:  Objection.  Calls for a narrative.

21             THE WITNESS:  Put a sign outside the building.

22   BY MR. MILLER:

23        Q    Okay.  Other than putting a sign, anything

24   else?

25        A    I don't know.  As I said, Daniel was involved

                                            Page 55

1    in the picture, so...

2         Q   In the -- I don't know what that means, "in the

3    picture."  What does that mean?

4         A   I did what Daniel told me to do.  So again, I

5    think I -- I think I was clear about that.  I don't

6    recall specifics --

7         Q   Okay.

8         A   -- of locating -- any of this stuff is just a

9    joint effort.  It's really hard at this point, years

10   later, to parse out.

11        Q   Okay.  Did you do anything else with respect to

12   locating tenants besides putting out signs?

13        A   I can't recall.

14        Q   Okay.  Did you do any work for the debtor prior

15   to Mr. Arnall's passing with respect to evicting any

16   tenant?

17        A   No, I don't believe so.  I don't recall.

18        Q   All right.  Besides Mr. Arnall, was there a

19   management company involved in terms of managing the

20   Glendale property before his passing?

21        A   Not -- you're asking -- sorry.  Can you be more

22   specific about what time period you're asking about.

23        Q   Before he passed away in 2014.

24        A   In 2014?  No.

25        Q   No?

                                              Page 56

```
 1        A    If I can correct the address.

 2        Q    Please.

 3        A    7101.

 4        Q    I thought that's what I said.  But if it's not,

 5   it's 7101 West Lincoln Avenue in Buena Park.

 6        A    Correct.

 7        Q    All right.  And the debtor purchased that

 8   property?

 9        A    I'm just trying to get things accurate.  Please

10   don't take it as anything else.

11        Q    I don't.  I don't take it at all --

12        A    Okay.

13        Q    -- I respect that you're trying to get it

14   accurate.

15        A    I'm trying to be honest --

16        Q    Great.  Let's go forward.

17        A    -- not trying.  Hopefully accomplishing.

18        Q    Okay.  Good.  Did the debtor buy the 7101 West

19   Lincoln Avenue --

20        A    Correct.

21        Q    Okay.  And that was in February 2015; correct?

22        A    Correct.

23        Q    Okay.  I'm going to refer to the 7101 West

24   Lincoln Avenue, Buena Park property as the "Buena Park

25   property," okay?
```

                                                    Page 74

```
 1        A    I mean --

 2        Q    Do you recall who did on behalf of the debtor?

 3        A    Don't recall.

 4        Q    Prior to the debtor's purchase of the Buena

 5   Park property, did you personally have any experience in

 6   the purchase of commercial real property?

 7        A    No.

 8        Q    Okay.  Were you relying on the advice of any

 9   party in connection with the purchase of the Buena Park

10   property?

11             MR. FREY:  Objection.  Asked and answered.

12             THE WITNESS:  Can you repeat the question.

13   BY MR. MILLER:

14        Q    Sure.  You testified that you had no experience

15   prior to the purchase of the Buena Park property in

16   purchasing commercial property; correct?

17        A    Correct.

18        Q    Were you relying on the experience of anyone

19   else in connection with the purchase of the property?

20             MR. FREY:  Objection.  Asked and answered.

21             THE WITNESS:  Yes.

22   BY MR. MILLER:

23        Q    Who?

24        A    I can't recall at this time.  Sorry.

25        Q    You don't recall?
```

Page 119

# EXHIBIT "12"

1  Sandford L. Frey (SBN 117058)
   Stuart I. Koenig (SBN 102764)
2  **CREIM MACIAS KOENIG & FREY LLP**
   633 West Fifth Street, 48th Floor
3  Los Angeles, CA 90071
   Telephone: (213) 614-1944
4  Facsimile: (213) 614-1961
   sfrey@cmkllp.com
5  skoenig@cmkllp.com

6  Reorganization Attorneys for 315 Arden, LLC
   Debtor and Debtor-In-Possession
7

8            UNITED STATES BANKRUPTCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                  [LOS ANGELES DIVISION]

11 In re                              CASE NO.: 2:15-bk-26483-BR

12 **315 ARDEN, LLC,**                Chapter 11

13                                    **CLEAN AND REDLINE**
          Debtor and Debtor-In-Possession.   **MODIFICATIONS IN RESPONSE TO**
14                                    **COMMENTS OF US TRUSTEE, AND**
                                      **FINAL EXHIBITS, TO DISCLOSURE**
15                                    **STATEMENT DESCRIBING PLAN OF**
                                      **REORGANIZATION PROPOSED BY**
16                                    **DEBTOR, 315 ARDEN, LLC**

17                                    DATE:      March 23, 2016
                                      TIME:      10:00 a.m.
18                                    CTRM:      1668

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1    approximately $1,500,000 being carried back by one of the seller entities in the form of the W

2    Linc Note, secured by the W Linc Trust Deed against the Commercial Property . Theoretically,

3    this should result in over a 400% equity cushion for the W Linc Disputed Secured Claim, but for

4    the misrepresentations of the seller entities/secured claimant respecting the Commercial Property.

5         After close of escrow for the Commercial Property, the Debtor discovered that it had been

6    misled into massively overpaying for the Commercial Property, as the Commercial Property was

7    actually worth approximately three million less than the $6.5 million purchase price, to say nothing

8    of the $7 plus million value represented to the Debtor.

9         As a result, the Debtor initiated the State Court Action against the State Court Defendants.

10   In the interest of brevity, the Debtor will not reiterate in the Disclosure Statement all of the

11   background and factual allegations set forth in the State Court Complaint, and will only summarize

12   some of the background supporting the claims, which summary should not be construed as a

13   substitute for a thorough reading of the entirety of the State Court Complaint for a full and

14   complete understanding as to the nature of the claims being asserted by the Debtor and this Estate.

15        Suffice it to say, material representations made to the Debtor concerning the tenants and

16   their financial condition were fabricated.  On October 6, 2104, the Luviland Entities (defendants

17   in the State Court Action) each executed a written lease for the Commercial Building with Red

18   Mountain Retail, which is W Linc's predecessor and alter ego.  At some point after the lease was

19   executed, W Linc apparently succeeded to the rights of Red Mountain Retail under the lease, and,

20   in turn, at the close of escrow on or about February 24, 2105, the Debtor acquired the interest in

21   the Commercial Property subject to the lease and succeeded to the rights of Red Mountain

22   Retail/W Linc under the lease.

23        The Debtor is informed and believes that Billy N. Ha, a.k.a., Bill N. Ha became president

24   of Luviland Corp during escrow (unbeknownst to the Debtor).  As was known to the sellers, but

25   not the Debtor, Billy N. Ha was actually operating the tenant's thrift store at the Commercial

26   Property, albeit illegally, at the time of the close of escrow.  Additionally, as the Debtor later

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1844

# EXHIBIT "13"

1      UNITED STATES BANKRUPTCY COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3           LOS ANGELES DIVISION

4                                    **CERTIFIED**

5    In re                        )  **TRANSCRIPT**

6    315 ARDEN, LLC,              )

                                  )  Case No.

7    Debtor and Debtor in Possession.  )  2:15-bk-26483-BR

     _____)

8    315 ARDEN, LLC,             )

9              Plaintiff,        )

              vs.                )

10   RED MOUNTAIN GROP, INC., A   )

11   California Corporation; RED MOUNTAIN)

12   RETAIL GROUP, INC., A California  )

13   corporation, and W LINC BP, LLC, A )

14   California Limited Liability   )

15   Company,                    )

16              Defendants.      )

     _____)

17           DEPOSITION OF BILLY HA

18         Beverly Hills, California

19         Tuesday, January 10, 2017

20   REPORTED BY:

21   Jimmy S. Rodriguez

22   CSR No. 13464

23   JOB No. 2496608

24

25   PAGES 1 - 204

                                    Page 1

1            But after I spoke to Tara, it's not so much

2    about paying the rent; it's about the use of the

3    space.  Because -- then I asked Tara why is the use of

4    the space more important than being able to pay you

5    rent and committing to the lease term.

6            She's saying because she wants to sell the

7    building.

8        Q    I see.

9        A    She wants to sell the building so she wants

10    it to look good to sell.

11            Then that makes me realize I'm having

12    Red Mountain that wants, you know, to get somebody in

13    there to lease and they want to sell the building and

14    now I have this lady wanting me to change to a

15    different look to wanting to be able to sell the

16    building.

17            So, we offer her to pay rent -- well, when

18    May 20th came, when the rent was due on May 20th,

19    according to the lease we prepaid the first month's

20    rent and the second month, so technically the rent

21    went up to 37,000.  So we already prepaid her 30,000,

22    if you look on the lease, the first page, there was a

23    prepaid.

24        Q    Let me see if I can help because I don't

25    want to interrupt you.  But I'm looking on -- the

Page 89

1    summary of basic lease information on Arden 02264?

2         A    Number 8.

3         Q    I'm looking at Item 8, $30,000 equal to two

4    months.  Prepaid rental?

5         A    Exactly.

6         Q    That was paid to?

7         A    That was after the free rent period end,

8    this is called prepaid, meaning you prepay the first

9    two months of rent which is May and June.

10        Q    Right.

11        A    So -- and then whatever the difference is,

12   Nancy was offering to pay her the difference.

13             That's why May and June was supposed to be

14   paid -- I mean, it's prepaid rent, it's on the

15   contract here.  So Nancy offer her to pay.  She

16   wouldn't accept it.  She asked me to meet her at her

17   attorney's office which is in -- his name was Eugene.

18   He's in Los Angeles here somewhere.  I forgot the

19   address because I went to his office.  I brought

20   Nancy's check to pay her the rent.

21        Q    How much amount was that?

22        A    It was like an extra month of rent, $37,000

23   to be paid.

24        Q    You brought a check in the amount of 37,000?

25        A    Yes, and at that time she was willing to

Page 90

1    take it, but I told her that this is all that Nancy --

2    because right now we cannot change the use, so if you

3    want this building back, then we'll move out so you

4    can do whatever you want or you can sell it.

5         She say she has a buyer -- when I met at the

6    office in Eugene's office in June, Tara said she have

7    a buyer for the building, that's why it's really

8    important to clean it up and make it look good,

9    presentable, so she have a buyer for the building.

10        So -- at that time, Nancy was having --

11   well, at that time, Nancy was having some financial

12   problem, too.  So the check that she give she wants

13   Tara to apply it towards the difference between the

14   June rent and July's rent.  And use the -- yeah, I'm

15   sorry -- it was $35,000 to be paid for June and July.

16        Q    What about now -- I'm confused.

17        A    May was prepaid, if you see the 30,000 that

18   we prepaid.

19        Q    30,000?

20        A    It was supposed to be applied for May's

21   rent, from May 20th to June 20th.  So we offered to

22   pay June 20th to July 20th.

23        Q    Okay.

24        A    But Tara, in front of her attorney, refused

25   to accept the payment because she say, If I take your

Page 91

1    money that means I'm accepting your use; if I don't

2    accept your money, then I'm going to go ahead and ask

3    you to move out because I'm going to sell the

4    building.

5        Q    So you came in with the June and July rent?

6        A    Exactly.

7        Q    And Tara said -- that was roughly in a check

8    in the amount of?

9        A    For $35,000.  And Tara -- she asked her

10   attorney, and attorney said, Yeah, you should take it.

11   And then they talk for a few minutes back and forth,

12   back and forth, and they ask me to step outside the

13   office so they can discuss it.  And when I came back

14   in, they said, No, we're not going to decide to accept

15   your rent, so we need you to move out.

16       Q    So they wanted the tenant to move out of the

17   property?

18       A    They wanted Nancy to move out, they don't

19   want her there anymore to use as Hand to Hand outlet.

20            And then I asked her why inside the attorney

21   office, I said, Why Nancy need to move out?

22            She said, Because I have a buyer for this

23   building, and if Nancy stays there, it's going

24   depreciate, or the value of the building, something

25   like that, if her buyer come and saw what is being

1    done or used for.

2        Q    Did she say during this negotiation that you

3    walk out and you don't have to pay any further rent?

4        A    Yeah, she say, Just clean up the space, if

5    you can move out for me, the sooner the better.

6             So I asked Nancy to move out immediately in

7    July.  But Nancy had a hard time moving out in July.

8    Nancy didn't move out until the end of August because

9    she needed a month to move all that stuff out.  And I

10   told Nancy, If you don't move out, you're going to

11   have an ongoing problem with this landlord because

12   they're not going to approve the use -- they want it

13   to be a furniture or mattress outlet.

14            So the last thing Nancy did before -- in May

15   and June, was she painted the whole exterior, that was

16   approved by Tara, Tara chose the painter and Tara

17   chose the color she wanted.

18       Q    Tara allowed her to stay without accepting

19   rent?

20       A    Exactly, but to move out, the sooner the

21   better.  She wanted her to move out immediately by the

22   end of July but Nancy couldn't move out in time so

23   Nancy stayed until the end of August.

24            But we give her notice and we hand her back

25   the key to Tara, had it delivered to her -- Nancy had

                                                Page 93

**EXHIBIT "14"**

```
 1              UNITED STATES BANKRUPTCY COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3                 LOS ANGELES DIVISION
 4
    In re                      )
 5  315 ARDEN LLC,             )          ---  ---   CERTIFIED
       Debtor in Possession,   )                    TRANSCRIPT
 6  315 ARDEN, LLC,            )
             Plaintiff,        )
 7                             )
             VS.               )  Case No.
 8                             )  2:15-bk-26483-BR
    RED MOUNTAIN GROUP, INC., ) Chapter 11
 9  a California corporation; )
    RED MOUNTAIN RETAIL GROUP )
10  INC., A California         )
    corporation, and W. LINC   )
11  BP,  LLC, a California     )
    Limited Liability Company )
12                             )
             Defendants.       )
13  _____)
    And related cross-action   )
14
15
16
17  DEPOSITION OF:
18              MAURICE NIEMAN
19              TAKEN ON FRIDAY, JANUARY 27, 2017
20              10:15 A.M.
21
22
23
24  Reported by:   GINA M. CLOUD
25                 CSR No. 6315
```

Page 1

```
 1              (The document referred to was marked

 2      by the reporter as Exhibit 2 for identification

 3      and is attached hereto).

 4      BY MR. MILLER:

 5          Q.    Please take an opportunity to review that

 6      and it's a copy of the bio, your bio that I pulled

 7      from the CBRE website?

 8          A.    Yes.

 9          Q.    Have you reviewed that document, Exhibit 2

10      before?

11          A.    Yes, I have.

12          Q.    To the best of your knowledge, is it true

13      and correct as of today?

14          A.    Yes, it is, true and correct as of today.

15          Q.    Is your present position with CBRE as very

16      Vice-President as described in the first sentence on

17      the bio?

18          A.    Yes, I am a senior Vice-President with CBRE.

19          Q.    Can you describe to me what your duties are

20      as senior Vice-President of CBRE?

21          A.    The title of senior Vice-President is based

22      upon how much production you've done, so that's how

23      those titles are done, but I'm a real estate broker

24      salesman licensed in the State of California and my

25      duties are to work with clients both on -- mainly on
```

Page 10

1    disposition of assets, which usually are investment

2    sales, and I also do an occasional -- I work in the

3    leasing area where I do lease negotiations,

4    modifications and sometimes working with people to do

5    representing tenants and landlords to lease

6    properties.

7         Q.   You mentioned that the title of senior

8    Vice-President is based on production.  Can you

9    better elaborate what that means, "production"?

10        A.   It's the way the company has titles.  It's

11   cumulative lifetime amount of production commissions

12   that are generated.  There is a scale and I have done

13   over a billion dollars in transactions.

14        Q.   Over what time period?

15        A.   In the last ten years.

16        Q.   Is that purchase and sales and leasing?

17        A.   Majority, 99.5% has been in the investment

18   sales area.

19        Q.   Is this sales in commercial real property?

20        A.   Commercial real property, yes.

21        Q.   Are you able to quantify how much you've

22   represented landlords and tenants in leasing

23   transactions, let's say, in the last five years?

24        A.   In the last five years I've represented one,

25   the plaintiff in this case in leasing, and I've had

                                        Page 11

1   leased a dozen other assignments where I have

2   represented landlords to renegotiate leases with the

3   tenants.

4       Q.   You mentioned plaintiff.  Are you referring

5   to 315 Arden LLC?

6       A.   I am.

7       Q.   And I'll try to refer to 315 Arden LLC as

8   either plaintiff or Arden for convenience.

9       A.   Okay.

10      Q.   And you mentioned also this transaction.

11  Are we talking about the real property located at

12  7101 west Lincoln Avenue in Buena Park, California.

13      A.   Yes.

14      Q.   I'll try to refer to that as either the

15  Buena Park property or the property.

16           How long have you been employed by CBRE?

17      A.   Since July of 2013.

18      Q.   Prior to that, who were you employed with?

19      A.   I was with Collier's International.

20      Q.   And what was your job responsibility with

21  Collier's?

22      A.   The same as it is with CBRE.  I was the

23  senior Vice-President, investment sales, net lease

24  properties.

25      Q.   What is net lease properties?

Page 12

1          A.    Usually one tenant or two tenant retail

2    properties were industrial.

3          Q.    Were you also involved in the leasing?

4          A.    Yes, in the same capacity mainly working

5    with landlords to renegotiate terms of leases with

6    the tenants.

7          Q.    Were you working with landlords to locate

8    tenants?

9          A.    No.  If I have done that, but that's not

10   something I do very often.

11         Q.    Can you estimate how often you've done it

12   in the last five years?

13         A.    Maybe locate new tenants for landlords,

14   probably six or seven times probably.

15         Q.    How long were you employed by Collier's?

16         A.    Five and a half years.

17         Q.    Before Collier's, who were you employed

18   with?

19         A.    Sperry Van Ness.

20         Q.    In what capacity were you employed by

21   Sperry Van Ness?

22         A.    I was an associate broker for about a year.

23         Q.    What did you do as an associate broker?

24         A.    My entry into the commercial real estate

25   industry.  I was developing my business.  That was

Page 13

# EXHIBIT "15"

```
 1              UNITED STATES BANKRUPTCY COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                  LOS ANGELES DIVISION
 4
    In re                    )
 5  315 ARDEN LLC,           )           CERTIFIED
       Debtor in Possession, )           TRANSCRIPT
 6  315 ARDEN, LLC,          )
              Plaintiff,     )
 7                           )
              VS.            )  Case No.
 8                           )  2:15-bk-26483-BR
    RED MOUNTAIN GROUP, INC., )  Chapter 11
 9  a California corporation; )
    RED MOUNTAIN RETAIL GROUP )
10  INC., A California       )
    corporation, and W. LINC )
11  BP,  LLC, a California    )
    Limited Liability Company )
12                           )
              Defendants.    )
13  _____)
    And related cross-action )
14
15
16
17  DEPOSITION OF:
18              MAURICE NIEMAN
19              TAKEN ON FRIDAY, JANUARY 27, 2017
20              10:15 A.M.
21
22
23
24  Reported by:   GINA M. CLOUD
25                 CSR No. 6315

                                          Page 1
```

 1    termination?

 2        A.    This is the confirmation that I wrote.

 3        Q.    I'm looking at the e-mail from you to Tara,

 4    among others.  Stewart Koenig, that's Skip?

 5        A.    That's correct.

 6        Q.    Sandy Fray.  He was also counsel?

 7        A.    Yes, he was partners.

 8        Q.    Why did the e-mail come from you and not

 9    Walter?

10        A.    Because I was the one who initiated the

11    relationship in the first place, and I was the senior

12    broker on the document, on the relationship.  It came

13    through me.  I brought Walter in and it was the buck

14    had to stop somewhere.

15        Q.    After May 24, did you do any work for

16    plaintiff in connection with the leasing of the

17    property?

18        A.    No, I didn't.

19        Q.    Do you know if anyone else at CBRE did any

20    work for plaintiff in connection with the leasing of

21    the property after May 24?

22        A.    Not as far as I know.

23        Q.    Did CBRE do any work for plaintiff after

24    May 24, to the best of your knowledge?

25        A.    No.  If there were inquiries about it, we

Page 84

# EXHIBIT "16"

1     UNITED STATES BANKRUPTCY COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3      LOS ANGELES DIVISION

4

In re      )

5 315 ARDEN LLC,   )    **CERTIFIED**

   Debtor in Possession, )  **TRANSCRIPT**

6 315 ARDEN, LLC,   )

     Plaintiff,   )

7      )

   VS.    ) Case No.

8      ) 2:15-bk-26483-BR

RED MOUNTAIN GROUP, INC., ) Chapter 11

9 a California corporation; )

RED MOUNTAIN RETAIL GROUP )

10 INC., A California  )

corporation, and W. LINC )

11 BP, LLC, a California )

Limited Liability Company )

12      )

   Defendants.  )

13 _____)

And related cross-action )

14

15

16

17 DEPOSITION OF:

18    MAURICE NIEMAN

19    TAKEN ON FRIDAY, JANUARY 27, 2017

20    10:15 A.M.

21

22

23

24 Reported by: GINA M. CLOUD

25    CSR No. 6315

           Page 1

```
 1   who we knew.
 2        Q.   Were they all rejected by plaintiff?
 3        A.   I remember she wanted to do something, which
 4   was a reversal of the way things would go.
 5        Q.   Let's stop here.  "She" being Tara?
 6        A.   Yes.  This was, I would say, quite a big
 7   bone of contention.  They were very fearful of making
 8   an offer to a tenant -- I have to think about this.
 9             She wanted the potential tenant to make an
10   offer on the suite.
11        Q.   "She" is Tara?
12        A.   Yes.
13        Q.   Always she --
14        A.   She is always Tara.
15        Q.   Was it reversed that the landlord typically
16   provides the first offer?
17        A.   Yes.  Whatever the normal way was, she
18   wanted to do the exact opposite.  It was very hard.
19   The normal thing is that the landlord would make a
20   proposal to the potential tenant to lease its
21   property, so landlord would go to Company A and say
22   do you want to lease 2,000 square feet, and do you
23   want to pay "X" amount of money rent?  But they
24   didn't want to do that.  They wanted it the other way
25   around.
```

Page 47

1        Q.   They wanted the tenant to initiate the

2   offer?

3        A.   Right.  And that's not how it's done.  The

4   landlord says here is my property.  I'm willing to do

5   this, this, and this for you and lease it to you for

6   this amount of money, and then the tenant comes back

7   and says okay, thank you for the offer, but we'll

8   counteroffer you this.  And the way they wanted to do

9   it was opposite.  It made it very difficult and then

10  the rental rates, I believe, in the advertising were

11  not defined clearly.

12       Q.   Because?

13       A.   Because they were afraid of creating some

14  misconceptions in marketplace.  I don't recall

15  exactly the amounts or -- I remember it was

16  problematic for us because it made the job very, very

17  difficult to do under those circumstances.  It was a

18  real issue for us.

19       Q.   Information during the course of the entire

20  representation?

21       A.   A lot of this happened in the beginning of

22  May.  I definitely remember that, so later in part of

23  the relationship -- and I just remember you couldn't

24  work under those conditions, and then there was

25  constant berating going on verbally and in e-mails

Page 48

1    were at that show and it's the biggest leasing event

2    in the real estate industry for tenants and

3    landlords.  And I remember getting an e-mail from her

4    accusing us for not showing her property at the show,

5    and that was patently not true, and I think I even

6    wrote that in a document, and she had heard rumors,

7    but that wasn't true.  And I actually took quite a

8    bit of offense from that, stating that and that was

9    really what it was.

10           But we were always working, and we also had

11   an issue because we have an exclusive list asking

12   about her attorneys at the time, took their own ad to

13   lease the property, and placed it in Loop Net, the

14   multiple listing service along side our own ad, so

15   there's two ads for the same property.  So they were

16   trying to circumvent us as well.  And for me, that

17   was the ultimate insult, and we couldn't deal with

18   having a client which was what I would call, out of

19   control.

20       Q.   When you're saying "out of control," again,

21   we've talked about the backwards procedure for

22   asking for rent, unrealistic amount of time being

23   requested, the fact that you were accused of not

24   representing the property at the ICSC conference and

25   you were, and the last bone of contention was the

                                                    Page 53

1    attorney putting a listing with, I think you

2    mentioned, Loop Net?

3        A.   I did.

4        Q.   Were there any other factors that led to

5    your conclusion that the plaintiff was out of

6    control?

7        A.   Yes, there was.  Another real issue for us

8    was her ability to pay for tenant improvements to

9    subdivide the property into two or three suites.  We

10   said it would cost half a million dollars or more.

11       Q.   For this demising wall?

12       A.   Yes.  And you cannot be offering a potential

13   tenant a suite which was smaller than the 22,000 that

14   the total space was, square feet, but not have any

15   ability to write a check out before the tenant moved

16   in to pay for those renovations, and -- I never got a

17   clear answer from them or their attorneys that they

18   could afford it.  They didn't have the money.  They

19   were in bankruptcy?

20       Q.   Why did you take the representation if you

21   wanted them to put a demising wall if they're in

22   bankruptcy and couldn't afford it?

23       A.   We originally took the leasing assignment as

24   a single-tenant leasing opportunity, but as we soon

25   found out there were more people that wanted a

                                              Page 54

1     A.   Yes, because a lot of what she thought

2  should be the way to conduct business wasn't the way

3  we conduct business.  We follow what we call best

4  practices, and we're looked upon and trained at CBRE

5  that we consult ourselves in a certain professional

6  manner with a certain amount of decorum, and we

7  filter a lot of that.  It got to a point where it

8  affected your general being because it was personal

9  attacks, things like that on us.  Telling us we're

10  not doing something when we certainly were doing it.

11     Q.   So the toxic and untenable pretty much

12  referred to the personal attacks against you?

13     A.   Typically with a relationship with a client

14  like this, you report to them usually on a weekly or

15  biweekly or monthly basis.  But this person wanted

16  hourly updates, and when we were at a show like this

17  or just normal business, we're busy with other

18  clients.  We have things going on.  We're in

19  meetings.  When you have a client continuously

20  pestering you, and it became pestering, that's not

21  the relationship we're looking for.

22     Q.   When you say a person, you're referring to

23  Tara?

24     A.   Yes.

25     Q.   E-mail above it, this is an e-mail from

Page 86

1      A.    Yes, I do.

2      Q.    And it says "This is a flyer that she

3  approved and now has rejected even though we were

4  making changes."  What does that mean?

5      A.    So we made the changes.  For example, on the

6  cover, we put your name here.

7      Q.    And you're looking at this sign?

8      A.    Yes, so she was happy --

9          MR. MILLER:  By the way, the witness is on

10  page 1179.

11          MS. UYEDA:  Thank you.

12          THE WITNESS:  So we took out the old names

13  and put that on there.  We left the car in and there

14  might have been some other changes I'm not aware of,

15  but we sent this version of it over to Tara.  She

16  did approve it.  We put it on our website so people

17  could download it, and then she came back sometime

18  later.  It was Saturday the 14th.  I wrote the

19  e-mail, and she disapproved it, so this is what I

20  was talking about, this relationship, how you get

21  something approved and then she changes her mind.

22  BY MR. MILLER:

23      Q.    So you used the word "erratic"?

24      A.    That's a good example of erratic behavior

25  because I do remember the car in there.  That was

Page 95

1    what she had later on when she finally approved it

2    and then disapproved it.  She disapproved it the

3    second time.  She didn't like the car in the picture

4    and that car had nothing -- didn't take away from the

5    picture whatsoever.

6        Q.   Would you say during the time that you

7    worked with Tara, that she was indecisive or was she

8    decisive, just erratic?  Do you see the difference?

9        A.   They're different.  She could make

10   decisions, but she could change her decisions.

11       Q.   Any other examples of Tara being erratic

12   besides anything you've testified to before come to

13   mind?

14       A.   Not unless you bring me a specific example

15   of.

16            MR. MILLER:  I'm going to hand you a

17   document I'll ask the court reporter to mark as

18   Exhibit 11, Bates CBRE 001229-001230.

19            (The document referred to was marked

20   by the reporter as Exhibit 11 for identification

21   and is attached hereto).

22            MR. MILLER:  I'm also going to hand you and

23   the court reporter, I'll ask her to mark as Exhibit

24   12, CBRE 1343.  They kind of relate to each other,

25   and that's why I'm going to hand you the Exhibits 11

Page 96

1        A.    But they're essentially the same.

2        Q.    Was there any decision on the part of

3   plaintiff regarding the Costar report or any

4   problems with respect that you recall?

5        A.    There was something.  I can't remember

6   exactly what it was, but we put it on Costar and then

7   she told us to take it off of Costar.  There was

8   something about it that she didn't like, and we took

9   the time and the expense and we put it on, and it was

10  something.  I can't remember what it was.  I remember

11  Shaina, she is a marketing assistant in our office,

12  admin.  She was very frustrated or she couldn't

13  believe that we did something we were told to do and

14  then told to take it down again.

15            MR. MILLER:  Maybe this will help.  I'm

16  going to hand you -- there is an e-mail point of --

17  I'm going to hand the court reporter an e-mail

18  chain.  It starts off CBRE 205, and goes onto 206,

19  and I'll ask her to mark it as Exhibit 13.

20            (The document referred to was marked

21  by the reporter as Exhibit 13 for identification

22  and is attached hereto).

23            MR. MILLER:  And I'm going to hand the

24  court reporter an e-mail chain and ask her to mark

25  it Exhibit 14, and it's Bates stamped CBRE 192-194.

                                          Page 98

# EXHIBIT "17"

1
2
3
4

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

5

In re                          )
315 ARDEN LLC,                 )
   Debtor in Possession,   )

6

315 ARDEN, LLC,                )
       Plaintiff,         )

7

                )
      VS.                      )  Case No.

8

                )  2:15-bk-26483-BR
RED MOUNTAIN GROUP, INC., )  Chapter 11

9

a California corporation; )
RED MOUNTAIN RETAIL GROUP )

10

INC., A California          )
corporation, and W. LINC    )

11

BP,  LLC, a California       )
Limited Liability Company )

12

                )
      Defendants.          )

13

_____)
And related cross-action )

14
15
16
17

DEPOSITION OF:

18
19
20

          MAURICE NIEMAN
          TAKEN ON FRIDAY, JANUARY 27, 2017
          10:15 A.M.

21
22
23
24
25

Reported by:   GINA M. CLOUD
              CSR No. 6315

**CERTIFIED TRANSCRIPT**

Page 1

1      Q.   Why so?

2      A.   It was just because it was very

3 unprofessional.  I would tell you her attitude and

4 expertise as a trustee, they were not typical of a

5 landlord.

6      Q.   Can you tell me so I understand?

7      A.   She had no expertise whatsoever in the real

8 estate industry.

9      Q.   How do you know that?

10     A.   Because I think from her background, she had

11 never, ever worked in the industry before.

12     Q.   How do you know that?

13     A.   Because I believe she told me that and

14 working with her was -- there is a procedure that you

15 do things.  There is an organization, like I

16 explained to you.  You run ads, talk to people,

17 canvas, put signs up.  But there is a process.

18 Sometimes it takes six months, sometimes a year,

19 sometimes two years to lease a property.  It's all

20 supply and demand, and I was told this property was

21 not a sought-after property.  It's not super

22 desirable.  It didn't have great curb appeal.  It

23 wasn't in the best location.  Properties, for

24 example, on corners are much more desirable for

25 retailers than properties that are mid-block, which

Page 59

# EXHIBIT "18"

1  BYRON Z. MOLDO (SBN 109652)
       bmoldo@ecjlaw.com
2  KENNETH MILLER (SBN 126083)
       kmiller@ecjlaw.com
3  HOWARD I. CAMHI (SBN 149194)
       hcamhi@ecjlaw.com
4  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
5  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
6  Facsimile  (310) 859-2325

7  Attorneys for Defendants
   RED MOUNTAIN GROUP, INC., a California
8  corporation; RED MOUNTAIN RETAIL GROUP, INC.,
   a California corporation and W LINC BP, LLC, A
9  California limited liability company

10

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                   **LOS ANGELES DIVISION**

14  In re                                  Case No. 2:15-bk-26483-BR

15  315 ARDEN, LLC.,                       Chapter 11

16        Debtor and Debtor in Possession.

17  _____       Adv. No. 2:16-ap-01076-BR

18  315 ARDEN, LLC,                        STIPULATION OF PLAINTIFF AND
                                           DEFENDANTS REGARDING
19        Plaintiff,                       OUTSTANDING DISCOVERY PURSUANT
                                           TO LOCAL BANKRUPTCY RULE 7026-
20        v.                               1(c)

21  RED MOUNTAIN GROUP, INC., A
    California Corporation; RED MOUNTAIN   Hon. Barry Russell
22  RETAIL GROUP, INC., A California
    corporation, and W LINC BP, LLC, A     DATE:    April 4, 2017
23  California Limited Liability Company,   TIME:    2:00 p.m.
                                           PLACE:   Courtroom 1668
24        Defendants.                               Edward R. Roybal Courthouse
    _____                255 E. Temple St.
25  RED MOUNTAIN GROUP, INC., A                     Los Angeles, CA 90212
    California Corporation; RED MOUNTAIN
26  RETAIL GROUP, INC., A California
    corporation, and W LINC BP, LLC, A
27  California Limited Liability Company,
          Third Party Plaintiffs,
28

ERVIN COHEN & JESSUP LLP

13332.23:2935361.1

1  | v.

2  | LUVILAND CORPORATION, a California
   | Corporation; LUVILAND LLC, a California
3  | Limited Liability Company; JOHN HUY
   | NGUYEN, an individual; ERIC WOHL, an
4  | individual; CARLOS J. LOPEZ, an individual;
   | EDWARD B. HANLEY, an individual;
5  | HANLEY INVESTMENT GROUP, INC. a
   | California Corporation,

6  |

7  |                  Third Party Defendants.

8  |

9  |        Plaintiff 315 Arden, LLC ("Plaintiff" or "Debtor") and Defendants Red Mountain Group,

10 | Inc., Red Mountain Retail Group, Inc., and W Linc BP, LLC (collectively, "Defendants") hereby

11 | submit their Stipulation Of Plaintiff And Defendants Regarding Outstanding Discovery Pursuant

12 | To Local Bankruptcy Rule 7026-1(c) in connection with the following discovery: (a) the First Set

13 | of Requests for Production of Documents propounded on Plaintiff by Defendant Red Mountain

14 | Group, Inc., (b) the document requests found in the Subpoena propounded by Defendants on the

15 | Tzepah Freedland in her capacity as trustee of the Daniel and Judith Arnall Family Trust, (c) the

16 | First Set of Interrogatories propounded by Red Mountain Group, Inc. on Plaintiff, (d) the First Set

17 | of Interrogatories propounded by Red Mountain Retail Group, Inc. on Plaintiff , and (e) the

18 | Deposition of Tzepah Freedland in her personal capacity, in her capacity as designated witness of

19 | Plaintiff and in her capacity as trustee of the Daniel and Judith Arnall Family Trust' as follows:

20 |                                  I.

21 |        **REQUESTS FOR PRODUCTION OF DOCUMENT PROPOUNDED**

22 |        **BY DEFENDANT RED MOUNTAIN GROUP, INC., ON PLAINTIFF**

23 | A.      **Item 26 of the Requests for Production**

24 |        Item 26 of the Requests for Production provides as follows:

25 | **REQUEST FOR PRODUCTION NO. 26:**

26 |        ALL COMMUNICATIONS between YOU and the TRUST RELATING to ANY debt

27 | owed by YOU to the TRUST as of February 24, 2015.

28 |

ERVIN COHEN & JESSUP LLP

13332.23:2935361.1                              2

1.     **Plaintiff's Objection to Item 26 of the Requests for Production**

Plaintiff objects to the definition of the term "Trust" found in the Requests for Production referring to the Daniel and Judith Arnall Family Trust and claims that this request should only refer to the Daniel Arnall 2014 Trust since the Daniel Arnall 2014 Trust, and not the Daniel and Judith Arnall Family Trust, holds the eighty percent membership interest in Plaintiff.

2.     **Defendants' Reply to Plaintiff's Objection to Item 26 of the Requests for Production**

Defendants contend that Plaintiff is judicially and equitably estopped from claiming that the Daniel Arnall 2014 Trust, and not the Daniel and Judith Arnall Family Trust, holds the eighty percent membership interest in Plaintiff since Plaintiff has identified the Daniel and Judith Arnall Family Trust, and not the Daniel Arnall 2014 Trust, as the holder of the eighty percent membership interest in Plaintiff throughout Plaintiff's entire main bankruptcy case, including in the following bankruptcy schedules and pleadings:

(a)     The Debtor's Authorization to File Chapter 11 Petition [Dkt 12];

(b)     The Debtor's List of Equity Holders, signed under penalty of perjury by managing member Tzepah Freedland [Dkt 12];

(c)     The Debtor's motion for post-petition financing, aptly named as the Motion Of Debtor And Debtor In Possession For Order Authorizing Final Post-Petition Financing By **Debtor's Majority Equity Holder** Pursuant To Bankruptcy Code §364 (B), On An Unsecured Basis, Allowable Under Bankruptcy Code §503(B)(1) As An Administrative Expense (emphasis added) [Dkt 14]. In particular, see Paragraph 4 of the Declaration of Tzepah Freedland attached to the motion in which Ms. Freedland testifies under penalty of perjury that the Daniel and Judith Arnall Family Trust is the holder of the eighty percent membership interest in Plaintiff ;

(d)     The Disclosure Statement Describing Plan of Reorganization proposed by Debtor, 315 Arden, LLC [Dkt 41] (See the definition of the term "Trust" on page 14 of the Disclosure Statement, page 27 of the Disclosure Statement and Exhibit "E" to the Disclosure Statement ).

Further, Plaintiff's position that the Daniel Arnall 2014 Trust, and not the Daniel and Judith Arnall Family Trust, holds the eighty percent membership interest in Plaintiff was not only not asserted in Plaintiff's responses to the Request for Production, but also it has not been

ERVIN COHEN & JESSUP LLP

1 | asserted in in any pleading in either the adversary action or in the main bankruptcy case.  In fact,

2 | at Ms. Freedland's deposition in the adversary action, Ms. Freedland testified under penalty of

3 | perjury that the Daniel and Judith Arnall Family Trust, and not the Daniel Arnall 2014 Trust, is the

4 | holder of the eighty percent membership interest in Plaintiff.  Attached as Exhibit "A" to this

5 | Stipulation are copies of pages 42 through 45 from the transcript of Ms. Freedland's deposition

6 | held on August 18, 2016 in which Ms. Freedland testified under penalty of perjury that the Daniel

7 | and Judith Arnall Family Trust, and not the Daniel Arnall 2014 Trust, is the holder of the eighty

8 | percent membership interest in Plaintiff.

9 | 3.    **Plaintiff Maintains Its Objections**

10 | Plaintiff's position is that the fact remains that the true holder of the eighty percent membership

11 | interest in Plaintiff is the Daniel Arnall 2014 Trust, that Plaintiff's Operating Agreement so states

12 | and that the Operating Agreement was produced by Plaintiff to Defendants some time ago.

13 | **Moreover, Ms. Freedland thought that the Daniel and Judith Arnall Family Trust was the**

14 | **other member (aside from herself) of Plaintiff, but she was confused, distracted and**

15 | **mistaken.**There are two separate and distinct trusts at issue in this dispute: The *Daniel Arnall*

16 | *2014 Trust* ("2014 Trust"), and the *Daniel & Judith Arnall Family Trust* ("Family Trust").  The

17 | 2014 Trust is the member of the Debtor LLC, and was the member of the Debtor LLC at the time

18 | of the fraudulent transfer.

19 | The Family Trust agreed to advance money to the Debtor after the Chapter 11 case was filed on

20 | October 27, 2015 ("Petition Date"), and under the Plan of Reorganization Proposed by Debtor,

21 | 315 Arden, LLC ("Plan"), which was confirmed in 2016.

22 | This adversary case concerns a fraudulent transfer that occurred prior to the Petition Date, in or

23 | about February 2015.  Among other issues involved in this adversary case is the issue of

24 | insolvency at the time of the transfer.  This particular discovery dispute centers around Red

25 | Mountain's request for discovery relating to the insolvency issue.  However, it is requesting

26 | financial information about the Family Trust (which is not the member of the LLC) instead of the

27 | 2014 Trust (which is the member of the LLC).

28 | This is clear under the *First Amended and Restated Operating Agreement of 315 Arden, LLC,*

ERVIN COHEN & JESSUP LLP

1  dated December 9, 2014 ("Operating Agt"), which provides as follows:

2     This First Amended and Restated Operating Agreement (the "Agreement") by and between

3     Tzepah Freedland ("Tzepah"), an individual, and Tzepah Freedland (Zarmi) and David

4     Zarmi, as Trustees of the **Daniel Arnall 2014 Trust** (the "Trust"), an irrevocable trust (and

5     together with Tzepah, the "Members"), is entered into as of December 9, 2014. [Emphasis

6     added]

7     *[Operating Agt, Page 1]*

8  Therefore, the trust that is the member of the Debtor LLC is unequivocally the 2014 Trust, not the

9  Family Trust.  Further clarity is found in the definition of the term "Percentage Interest" in the

10 Operating Agt, which is defined as follows:

11    Percentage Interest" of a Member means **80% for the Trust** *[defined as the 2014 Trust]*

12    and 20% for Tzepah.

13    [Emphasis added]

14    *[Operating Agt, Page 8]*

15 The Operating Agt further provides as follows:

16    If and to the extent that the Company does not have funds to pay any of the costs, expenses

17    or other obligations of the Company, including, without limitation, Company Costs and

18    Expenses, upon the Consent of the Members, **the Trust** *[defined as the 2014 Trust]* **shall**

19    **be obligated to make Support Loans** to the Company, the proceeds of which shall be

20    utilized to pay for such costs, expenses or other obligations. The decision to make Support

21    Loans to the Company shall be made by Consent of the Members and such Support Loans

22    shall be funded within ten (10) days of Members' Consent therefor.

23    [Emphasis added]

24    *[Operating Agt, Page 12-13, ¶3.3 (D)]*

25 Therefore, it is unequivocal that at the time of the transfer, the 2014 Trust was the member of the

26 Debtor LLC and it was the 2014 Trust which may be obligated to make support loans to the

27 Debtor LLC as of the date of the fraudulent transfer.

28 Instead, Red Mountain has erroneously requested information about the Family Trust, and

ERVIN COHEN & JESSUP LLP

13332.23:2935361.1                              5

ERVIN COHEN & JESSUP LLP

1   information about the Family Trust is not likely to lead to discoverable evidence regarding

2   solvency because the Family Trust is not the member of the LLC and there is absolutely no

3   obligation of the Family Trust to make advances or loans at the time of the fraudulent transfer.

4   Any obligation assumed by the Family Trust occurred only _after_ the Petition Date.

5   As an accommodation to Red Mountain, the Debtor has offered to not require Red Mountain to re-

6   notice its request; but rather to treat Red Mountain's discovery request as being applicable to the

7   2014 Trust; and to provide the documents from the 2014 Trust relevant to the request. Further, the

8   Debtor has offered a declaration to the effect that to the best of the Debtor's knowledge and belief,

9   it is aware of no document establishing that the Family Trust had an obligation to fund the Debtor

10  LLC at the time of transfer.

11  Red Mountain's attempt to bootstrap ambiguities in statements made after the Petition Date is

12  irrelevant to the issue of insolvency at the date of the fraudulent transfer. Further, it wrong

13  because even under the Plan the 2014 Trust remains the member of the Debtor. The Plan provides

14  in relevant part:

15      The Allowed Equity Interest in the Debtor **shall retain their Interest in the Debtor** if the

16      Holders of the Claims in Classes 1 through 4 vote to accept the Plan. Otherwise, the

17      Allowed Equity Interest in the Debtor shall be deemed not to receive any distribution

18      under the Plan on account of their Interests in the Debtor, **and their Interests and voting**

19      **rights shall be maintained based on the current percentages**, by virtue of the New

20      Value Contribution.

21      [Emphasis added]

22      _[Plan, Section V, E-Class 5]_

23  Furthermore, the Plan further unequivocally provides as follows:

24      The **Plan shall control** over any conflicting provision, or in the event of any ambiguity,

25      between the terms of the Disclosure Statement, on the one hand, and the Plan, on the other

26      hand.

27      [Emphasis added]

28      _[Plan, Section II, B]_

13332.23:2935361.1                          6

ERVIN COHEN & JESSUP LLP

1  Assuming *arguendo* that there are inconsistent statements inadvertently made in the Disclosure

2  Statement as contended by Red Mountain, the information it is requesting may be relevant to the

3  Disclosure Statement and Plan, but it is not remotely relevant to the facts that existed at the time of

4  transfer.  Moreover, the time to object to the inconsistencies was at the time of the hearing on the

5  Disclosure Statement, not now.  Red Mountain certainly should not be permitted to use the

6  Disclosure Statement as a basis for obtaining information that could not possibly lead to

7  discoverable evidence relevant to the date of the fraudulent transfer, particularly after having

8  failed to exercise its right to take discovery in connection with the contested matters for the

9  Disclosure Statement and Plan, or to exercise its right to object to the Disclosure Statement and

10  Plan at the time of approval.

11  **B.**     **Item 27 of the Requests for Production**

12          Item 27 of the Requests for Production provides as follows:

13  **REQUEST FOR PRODUCTION NO. 27:**

14          ALL DOCUMENTS, INCLUDING ALL promissory notes, loan agreements, checks,

15  money orders and bank statements RELATING to ANY debt owed by YOU to the TRUST as of

16  February 24, 2015.

17  1.     **Plaintiff's Objection to Item 27 of the Requests for Production**

18          Plaintiff objects to the definition of the term "Trust" found in the Requests for Production

19  referring to the Daniel and Judith Arnall Family Trust and claims that this request should only

20  refer to the Daniel Arnall 2014 Trust since the Daniel Arnall 2014 Trust, and not the Daniel and

21  Judith Arnall Family Trust, holds the eighty percent membership interest in Plaintiff.

22  2.     **Defendants' Reply to Plaintiff's Objection to Item 27 of the Requests for Production**

23          Defendants contend that Plaintiff is judicially and equitably estopped from claiming that

24  the Daniel Arnall 2014 Trust, and not the Daniel and Judith Arnall Family Trust, holds the eighty

25  percent membership interest in Plaintiff since Plaintiff has identified the Daniel and Judith Arnall

26  Family Trust, and not the Daniel Arnall 2014 Trust, as the holder of the eighty percent

27  membership interest in Plaintiff throughout Plaintiff's entire main bankruptcy case, including in

28  the following bankruptcy schedules and pleadings:

# EXHIBIT "19"

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re: 315 Arden LLC | CHAPTER 11 (BUSINESS) |
|---|---|
| Debtor(s). | Case Number: 2:15-bk-26483-BR<br>Operating Report Number: One (1)<br>For the Month Ending: 31-Oct-15 |

## I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

1. TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS          0.00

2. LESS: TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL ACCOUNT REPORTS          0.00

3. BEGINNING BALANCE:          14.22

4. RECEIPTS DURING CURRENT PERIOD:
   Accounts Receivable - Post-filing
   Accounts Receivable - Pre-filing
   General Sales
   Other (Specify)
   **Other (Specify)

   TOTAL RECEIPTS THIS PERIOD:          0.00

5. BALANCE:          14.22

6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
   Transfers to Other DIP Accounts (from page 2)
   Disbursements (from page 2)

   TOTAL DISBURSEMENTS THIS PERIOD:***          0.00

7. ENDING BALANCE:          14.22

8. General Account Number(s):          #xxxxxx7714 (Closed Pre-Petition Acct.)

   Depository Name & Location:          U.S. Bank, N.A.
   9420 Wilshire Blvd., #150
   Beverly Hills, CA  90211

* All receipts must be deposited into the general account.
** Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold, to whom, terms, and date of Court Order or Report of Sale.
***This amount should be the same as the total from page 2.

Case 2:15-bk-26483-BR    Doc 61    Filed 01/25/16    Entered 01/25/16 14:31:39    Desc
Main Document        Page 1 of 18

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br><br>Debtor(s). | CHAPTER 11 (BUSINESS)<br>**AMENDED** | |
|---|---|---|
| | Case Number: | 2:15-bk-26483-BR |
| | Operating Report Number: | Two (2) |
| | For the Month Ending: | 30-Nov-15 |

## I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

1.  TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS          0.00

2.  LESS:  TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL          0.00
ACCOUNT REPORTS

3.  BEGINNING BALANCE:          0.00

4.  RECEIPTS DURING CURRENT PERIOD:
Accounts Receivable - Post-filing
Accounts Receivable - Pre-filing
General Sales
Other (Specify)
**Other (Specify)

TOTAL RECEIPTS THIS PERIOD:          100.00

5.  BALANCE:          100.00

6.  LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
Transfers to Other DIP Accounts (from page 2)
Disbursements (from page 2)          24.00

TOTAL DISBURSEMENTS THIS PERIOD:***          24.00

7.  ENDING BALANCE:          76.00

8.  General Account Number(s):          #xxxxxx8360 (New DIP Account)

U.S. Bank, N.A.

Depository Name & Location:          9420 Wilshire Blvd., #150

Beverly Hills, CA  90211

---

\*    All receipts must be deposited into the general account.

\*\*  Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
to whom, terms, and date of Court Order or Report of Sale.

\*\*\*This amount should be the same as the total from page 2.

Case 2:15-bk-26483-BR    Doc 62    Filed 01/25/16    Entered 01/25/16 14:34:06    Desc
Main Document        Page 1 of 17

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br><br><br>Debtor(s). | CHAPTER 11 (BUSINESS)<br><br>Case Number:         2:15-bk-26483-BR<br>Operating Report Number: Three (3)<br>For the Month Ending:    31-Dec-15 |
|---|---|

## I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

1.  TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS      100.00

2.  LESS:  TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL      0.00
ACCOUNT REPORTS

3.  BEGINNING BALANCE:      76.00

4.  RECEIPTS DURING CURRENT PERIOD:
Accounts Receivable - Post-filing
Accounts Receivable - Pre-filing
General Sales
Other (Specify)
**Other (Specify)

TOTAL RECEIPTS THIS PERIOD:      0.00

5.  BALANCE:      76.00

6.  LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
Transfers to Other DIP Accounts (from page 2)
Disbursements (from page 2)

TOTAL DISBURSEMENTS THIS PERIOD:***      0.00

7.  ENDING BALANCE:      76.00

8.  General Account Number(s):      #xxxxxx8360
                       U.S. Bank, N.A.
Depository Name & Location:      9420 Wilshire Blvd., #150
                       Beverly Hills, CA  90211

*   All receipts must be deposited into the general account.
**  Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
    to whom, terms, and date of Court Order or Report of Sale.
***This amount should be the same as the total from page 2.

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re: | CHAPTER 11 (BUSINESS) | |
|---|---|---|
| 315 Arden LLC | | |
| 8950 W Olympic Blvd #650 | Case Number: | 2:15-bk-26483-BR |
| Beverly Hills, CA 90211 | Operating Report Number: | Four (4) |
| Debtor(s). | For the Month Ending: | 1/31/2016 |

## I. CASH RECEIPTS AND DISBURSEMENTS
## A. (GENERAL ACCOUNT*)

1. TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS _____ 76.00

2. LESS: TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL
ACCOUNT REPORTS _____

3. BEGINNING BALANCE: 76.00

4. RECEIPTS DURING CURRENT PERIOD:
   Accounts Receivable - Post-filing _____
   Accounts Receivable - Pre-filing _____
   General Sales
   Other (Specify)    Loan from Trust    150,000.00

   TOTAL RECEIPTS THIS PERIOD:    150,000.00

5. BALANCE:    150,076.00

6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
   Transfers to Other DIP Accounts (from page 2) _____
   Disbursements (from page 2)    338.00

   TOTAL DISBURSEMENTS THIS PERIOD:***    338.00

7. ENDING BALANCE:    149,738.00

8. General Account Number(s):    XXXX-8360

   Depository Name & Location:    U.S. Bank, N.A.
   9420 Wilshire Blvd, #150
   Beverly Hills, CA 90211

---

\*    All receipts must be deposited into the general account.

\*\*   Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
     to whom, terms, and date of Court Order or Report of Sale.

\*\*\*This amount should be the same as the total from page 2.

Case 2:15-bk-26483-BR    Doc 95    Filed 03/28/16    Entered 03/28/16 12:42:49    Desc
Main Document    Page 9 of 17

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br>8950 W Olympic Blvd #650<br>Beverly Hills, CA 90211<br><br>Debtor(s). | CHAPTER 11 (BUSINESS)<br><br>Case Number: 2:15-bk-26483-BR<br>Operating Report Number: Five (5)<br>For the Month Ending: 2/29/2016 |
|---|---|

## I. CASH RECEIPTS AND DISBURSEMENTS
## A. (GENERAL ACCOUNT*)

1.  TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS ................ 150,076.00

2.  LESS: TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL ACCOUNT REPORTS ................ 338.00

3.  BEGINNING BALANCE: ................ 149,738.00

4.  RECEIPTS DURING CURRENT PERIOD:
    Accounts Receivable - Post-filing _____
    Accounts Receivable - Pre-filing _____
    General Sales _____
    Other (Specify) _____ _____

    TOTAL RECEIPTS THIS PERIOD: ................ 0.00

5.  BALANCE: ................ 149,738.00

6.  LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
    Transfers to Other DIP Accounts (from page 2) ................ 0.00
    Disbursements (from page 2) ................ 10,493.97

    TOTAL DISBURSEMENTS THIS PERIOD:*** ................ 10,493.97

7.  ENDING BALANCE: ................ 139,244.03

8.  General Account Number(s): XXXX-8360

    Depository Name & Location: U.S. Bank, N.A.
    9420 Wilshire Blvd, #150
    Beverly Hills, CA 90211

---

\*   All receipts must be deposited into the general account.

\*\*  Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
    to whom, terms, and date of Court Order or Report of Sale.

\*\*\*This amount should be the same as the total from page 2.

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br>8950 W Olympic Blvd #650<br>Beverly Hills, CA 90211<br><br>Debtor(s). | CHAPTER 11 (BUSINESS)<br><br>Case Number: | 2:15-bk-26483-BR |
|---|---|---|
| | Operating Report Number: | Six (6) |
| | For the Month Ending: | 3/31/2016 |

## I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

| | |
|---|---|
| 1.  TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS | 150,076.00 |
| 2.  LESS: TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL ACCOUNT REPORTS | 10,831.97 |
| 3.  BEGINNING BALANCE: | 139,244.03 |

4.  RECEIPTS DURING CURRENT PERIOD:

| | |
|---|---|
| Accounts Receivable - Post-filing | |
| Accounts Receivable - Pre-filing | |
| General Sales | |
| Other (Specify) | |
| TOTAL RECEIPTS THIS PERIOD: | 0.00 |
| 5.  BALANCE: | 139,244.03 |

6.  LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD

| | |
|---|---|
| Transfers to Other DIP Accounts (from page 2) | 0.00 |
| Disbursements (from page 2) | 1,665.68 |
| TOTAL DISBURSEMENTS THIS PERIOD:*** | 1,665.68 |
| 7.  ENDING BALANCE: | 137,578.35 |

8.  General Account Number(s):       XXXX-8360

Depository Name & Location:       U.S. Bank, N.A.
                                  9420 Wilshire Blvd, #150
                                  Beverly Hills, CA 90211

*   All receipts must be deposited into the general account.
**  Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
    to whom, terms, and date of Court Order or Report of Sale.
*** This amount should be the same as the total from page 2.

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br>8950 W Olympic Blvd #650<br>Beverly Hills, CA 90211<br><br>Debtor(s). | CHAPTER 11 (BUSINESS) | |
|---|---|---|
| | Case Number: | 2:15-bk-26483-BR |
| | Operating Report Number: | Seven (7) |
| | For the Month Ending: | 4/30/2016 |

## I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

1.  TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS          150,076.00

2.  LESS:  TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL          12,497.65
ACCOUNT REPORTS

3.  BEGINNING BALANCE:          137,578.35

4.  RECEIPTS DURING CURRENT PERIOD:
Accounts Receivable - Post-filing          _____
Accounts Receivable - Pre-filing          _____
General Sales          _____
Other (Specify)          _____

TOTAL RECEIPTS THIS PERIOD:          0.00

5.  BALANCE:          137,578.35

6.  LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
Transfers to Other DIP Accounts (from page 2)          0.00
Disbursements (from page 2)          63,724.47

TOTAL DISBURSEMENTS THIS PERIOD:***          63,724.47

7.  ENDING BALANCE:          73,853.88

8.  General Account Number(s):          XXXX-8360

Depository Name & Location:          U.S. Bank, N.A.
9420 Wilshire Blvd, #150
Beverly Hills, CA 90211

* All receipts must be deposited into the general account.
** Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
to whom, terms, and date of Court Order or Report of Sale.
***This amount should be the same as the total from page 2.

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br>8950 W Olympic Blvd #650<br>Beverly Hills, CA 90211<br><div align="right">Debtor(s).</div> | CHAPTER 11 (BUSINESS)<br><br>Case Number:        2:15-bk-26483-BR<br>Operating Report Number:   Eight (8)<br>For the Month Ending:     5/31/2016 |
|---|---|

## I. CASH RECEIPTS AND DISBURSEMENTS
### A. (GENERAL ACCOUNT*)

1. TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS     150,076.00

2. LESS:  TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL ACCOUNT REPORTS     76,222.12

3. BEGINNING BALANCE:     73,853.88

4. RECEIPTS DURING CURRENT PERIOD:
   Accounts Receivable - Post-filing
   Accounts Receivable - Pre-filing
   General Sales
   Other (Specify)

   TOTAL RECEIPTS THIS PERIOD:     0.00

5. BALANCE:     73,853.88

6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
   Transfers to Other DIP Accounts (from page 2)     0.00
   Disbursements (from page 2)     6,136.00

   TOTAL DISBURSEMENTS THIS PERIOD:***     6,136.00

7. ENDING BALANCE:     67,717.88

8. General Account Number(s):     XXXX-8360

   Depository Name & Location:     U.S. Bank, N.A.
       9420 Wilshire Blvd, #150
       Beverly Hills, CA 90211

---

\*   All receipts must be deposited into the general account.

\*\*  Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
    to whom, terms, and date of Court Order or Report of Sale.

\*\*\*This amount should be the same as the total from page 2.

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
CENTRAL DISTRICT OF CALIFORNIA

| In Re:<br><br>315 Arden LLC<br>8950 W Olympic Blvd #650<br>Beverly Hills, CA 90211<br><br>Debtor(s). | CHAPTER 11 (BUSINESS)<br><br>Case Number:   2:15-bk-26483-BR<br>Operating Report Number:   Nine (9)<br>For the Month Ending:   6/30/2016 |
|---|---|

## I. CASH RECEIPTS AND DISBURSEMENTS
## A. (GENERAL ACCOUNT*)

1. TOTAL RECEIPTS PER ALL PRIOR GENERAL ACCOUNT REPORTS        150,076.00

2. LESS:  TOTAL DISBURSEMENTS PER ALL PRIOR GENERAL        82,358.12
ACCOUNT REPORTS

3. BEGINNING BALANCE:        67,717.88

4. RECEIPTS DURING CURRENT PERIOD:
   Accounts Receivable - Post-filing        _____
   Accounts Receivable - Pre-filing        _____
   General Sales        _____
   Other (Specify)   _____        _____

   TOTAL RECEIPTS THIS PERIOD:        0.00

5. BALANCE:        67,717.88

6. LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
   Transfers to Other DIP Accounts (from page 2)        0.00
   Disbursements (from page 2)        11,902.64

   TOTAL DISBURSEMENTS THIS PERIOD:***        11,902.64

7. ENDING BALANCE:        55,815.24

8. General Account Number(s):        XXXX-8360

   Depository Name & Location:        U.S. Bank, N.A.
                                      9420 Wilshire Blvd, #150
                                      Beverly Hills, CA 90211

---

*   All receipts must be deposited into the general account.

**  Include receipts from the sale of any real or personal property out of the ordinary course of business; attach an exhibit specifying what was sold,
    to whom, terms, and date of Court Order or Report of Sale.

*** This amount should be the same as the total from page 2.

# EXHIBIT "20"

## Kenneth Miller

| | |
|---|---|
| **From:** | Kenneth Miller <kmiller@ECJLAW.COM> |
| **Sent:** | Friday, February 17, 2017 2:52 PM |
| **To:** | Steven J. Katzman; Anne Uyeda (auyeda@bmkattorneys.com) |
| **Cc:** | Byron Moldo; Howard Camhi; dkessler@bkcglaw.com; 'Ros Lockwood' (rlockwood@bkcglaw.com) |
| **Subject:** | 315 Arden |
| **Attachments:** | Notice of Deposition of John Nguyen for March 13, 2017-.pdf |

Steve and Anne –

The Defendants reject the Plaintiff's latest counter-proposal and do not propose any further settlement offer at this time.

With respect to the adversary action, please respond to the following questions:

1. When will we be receiving Plaintiff's responses to the interrogatories propounded by Red Mountain Group and Red Mountain Retail Group?

2. In my e-mail sent to you on January 19, 2017, I stated Defendants' position regarding Ms. Freedland's deposition in order to satisfy the meet and confer requirement set forth in the order on Plaintiff's motion for a continuance entered on December 28, 2016.  Will Plaintiff make Ms. Freedland available for deposition, and if so, what constraints, if any, will Plaintiff be requesting on the duration of Ms. Freedland's deposition?

3. Has the debtor paid the W Linc Disputed Deferred Payment due on January 31, 2017 under its reorganization plan, and if so, when was the payment made and in what amount was the payment?

Lastly, John Nguyen has agreed to have his deposition taken March 13, 2017 at 10:00am at our office.  A copy of the notice for Dr. Nguyen's deposition is attached.

Ken

**Kenneth Miller, Esq.**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor | Beverly Hills, CA 90212-2974
(310) 281-6321 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | kmiller@ecjlaw.com | About me

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

## Kenneth Miller

| | |
|---|---|
| **From:** | Kenneth Miller <kmiller@ECJLAW.COM> |
| **Sent:** | Thursday, March 23, 2017 3:28 PM |
| **To:** | 'Alan Kindred' |
| **Cc:** | Sandford L. Frey (sfrey@leechtishman.com); Byron Moldo; Howard Camhi |
| **Subject:** | RE: 315 Arden v Red Mountain et al |
| **Attachments:** | ARDEN 03728-ARDEN 03832.pdf; Arden 3728-3735.pdf |

I am available to meet and confer about the outstanding discovery issues tomorrow at 2:30pm.  In addition, I still have not received any confirmation whether the debtor made the January 31, 2017 payment under the plan and the amount of the payment, despite several requests for this information.   Please provide me with this information by our call tomorrow as well as how our client can receive written confirmation the January 31 payment and of future payments under the plan.

Further, it appears that there has been a duplication of documents produced by Plaintiff with respect to documents bate stamped 3728-3735.  Please see attached.  I suggest that we bate stamp documents 3728-3735 above as 3728A – 3735A.  We can also discuss this tomorrow.

Ken

**Kenneth Miller, Esq.**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor | Beverly Hills, CA 90212-2974
(310) 281-6321 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | kmiller@ecjlaw.com | About me

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

**From:** Alan Kindred [mailto:AKindred@LeechTishman.com]
**Sent:** Thursday, March 23, 2017 2:59 PM
**To:** Kenneth Miller
**Cc:** Sandford L. Frey; John M. Steiner; Frances A. Scardino; Jason Straw
**Subject:** 315 Arden v Red Mountain et al

Ken

Are you available for a conference call with Sandy and me early tomorrow afternoon regarding the outstanding discovery issues, as well as the upcoming status report?

Can I suggest 2:30 pm?

Thanks.

Alan.

Alan Kindred | Partner
akindred@LeechTishman.com

**LEECH**TISHMAN
**T: 626.796.4000 | F: 626.795.6321 | Toll-free: 844.750.1600 | M: 818.636.5933 | D: 626.395.7338**
**100 Corson Street, Third Floor | Pasadena, CA 91103-3842**
leechtishman.com

**PITTSBURGH | CHICAGO | LOS ANGELES | NEW YORK | WILMINGTON**

*Committed to sustainable business practices - please consider the environment before printing this email.*

**Privileged and Confidential:** The information contained in this email is (1) subject to attorney-client privilege; (2) attorney work product; and/or (3) confidential. It is intended only for the individual(s) designated above. You are hereby notified that any use, copying, disclosure or distribution of the information contained in this transmission by anyone other than the recipient(s) named above is unauthorized and strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (412) 261-1600. Unauthorized interception of this e-mail is a violation of federal criminal law.

**Tax Advice Disclaimer:** In accordance with IRS Circular 230, any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties under the Internal Revenue Code nor may any such tax advice be used to promote, market or recommend to another party any transaction or matter addressed within this document. If you would like such advice, please contact us.

# EXHIBIT "21"

**Kenneth Miller**

| | |
|---|---|
| **From:** | Kenneth Miller <kmiller@ECJLAW.COM> |
| **Sent:** | Monday, March 27, 2017 6:29 PM |
| **To:** | 'akindred@leechtishman.com' (akindred@leechtishman.com) |
| **Cc:** | Sandford L. Frey (sfrey@leechtishman.com); Howard Camhi; Byron Moldo |
| **Subject:** | 315 Arden - Joint Status Report |
| **Attachments:** | .DRAFT STATUS REPORT 03.27.2017 v2.PDF; STIPULATION OF PLAINTIFF AND DEFENDANTS REGARDING OUTSTANDING DISCOVERY.DOCX; Exhibit A to Stipulation.PDF |

Alan –

Per our conversation, I am attaching a draft of the joint status report, the stipulation regarding outstanding discovery and Exhibit "A" to the stipulation. Please provide me with any comments to these documents at your earliest convenience as the joint status report and the stipulation are due to be filed tomorrow, March 28, 2017. Please make sure that any comments to any of the attachments are clearly redlined or highlighted.

I did not include any mention in the joint status report our discussion last Friday afternoon regarding the status of the debtor's payments under the plan. Our office has requested on numerous occasions that your office and previous counsel for plaintiff provide written confirmation that the debtor's January 31, 2017 payment under the plan regarding W Linc's loan was paid, and if so, when, to whom, and in what amount. We still have not received this information.

We also discussed last Friday that your office will be providing us with quarterly status reports showing not just whether future payments under the plan regarding W Linc's loan are paid and in what amount, but also containing all of the requirements set forth in Local Bankruptcy Rule 3020-1(b), such as schedules listing whether all other classes of claims under the plan, and all post-confirmation tax obligations, have been paid, when and in what amounts. Although this relates to the debtor's main bankruptcy case and not the adversary action, I will be raising this at the April 4, 2017 status conference.

Please call me with any questions .

Ken

---

**Kenneth Miller, Esq.**

Ervin Cohen & Jessup llp

9401 Wilshire Boulevard, 9th Floor | Beverly Hills, CA 90212-2974
(310) 281-6321 *(t)* | (310) 859-2325 *(f)*
www.ecjlaw.com | kmiller@ecjlaw.com | About me

---

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.

# EXHIBIT "22"



FOR LEASE
(714) 647-9100







# EXHIBIT "23"

## FIRST AMENDED AND RESTATED OPERATING AGREEMENT OF
## 315 Arden, LLC

### A California limited liability company

This First Amended and Restated Operating Agreement (the "Agreement") by and between Tzepah Freedland ("Tzepah"), an individual, and Tzepah Freedland (Zarmi) and David Zarmi, as Trustees of the Daniel Arnall 2014 Trust (the "Trust"), an irrevocable trust (and together with Tzepah, the "Members"), is entered into as of December 9, 2014.

### BACKGROUND

Daniel Mark Arnall ("Daniel") was the original sole and named member of, and held 100% of the membership interests in, 315 Arden, LLC (the "Company") from its inception.  Pursuant to that Partial Community Property and Transmutation Agreement dated September 10, 2008 between Judith Athalia Arnall ("Judith") and Daniel, 100% of the interests in  the Company became the community property of Judith and Daniel. Daniel assigned his 50% interest in the Company to the Trust effective December 4, 2014. Daniel passed away on December 8, 2014 and pursuant to the terms of the Trust, upon Daniel's death, a 20% interest in the Company was gifted to Tzepah by the Trust. Pursuant to an Assignment dated December 9, 2014, Judith assigned her 50% interest in the Company to the Trust effective December 9, 2014.

.The Members desire to continue the Company in accordance with the California Beverly Killea Limited Liability Company Act, as amended from time to time (the "Act"), by restating the understandings between the Members of the Company and appointing Tzepah as the managing member of the Company (the "Managing Member").

### STATEMENT OF AGREEMENT

In consideration of the covenants and agreements made herein, the Members, intending to be legally bound, hereby certify and agree, as follows:

### ARTICLE 1.

### DEFINED TERMS

Defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article 1.  Certain additional defined terms are set forth elsewhere in this Agreement.

"Accountants" means such firm of independent certified public accountants as may be engaged Tzepah.

1

501021723

ARDEN   03083

"Adjusted Capital Account" means an account maintained with respect to any Member, which will equal such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (i)    Crediting to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Regulations Sections 1.7042(g)(1) and 1.7042(i)(5); and

      (ii)    Debiting from such Capital Account the items described in paragraphs (4), (5) and (6) of Section 1.7041(b)(2)(ii)(d) of the Regulations.

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.7041(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Agreement" means this First Amended and Restated Operating Agreement, as originally adopted and as amended from time to time, as the context requires. Words such as "herein, " "hereinafter, " "hereof, " "hereto, " "hereby, " and "hereunder, " when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

"Bad Act Default" means any of the following: (a) a default by the Managing Member or the Non-Managing Member, as applicable, under Section 11.1(b) of this Agreement, or (b) a Transfer by the Managing Member or the Non-Managing Member, as applicable, in violation of this Agreement.

"Bankruptcy" means, with respect to any Person, such Person's making an assignment for the benefit of creditors, becoming a party to any liquidation or dissolution action or proceeding with respect to such Person, or any bankruptcy, reorganization, insolvency, or other proceeding for the relief of financially distressed debtors with respect to such Person, or the appointment of a receiver, liquidator, custodian, or trustee for such Person or a substantial part of such Person's assets and, if any of the same occurs involuntarily, the same is not dismissed, stayed, or discharged within ninety (90) days.

"Bankruptcy Code" has the meaning set forth in Section 11.1(d) hereinbelow.

"Capital Account" means, with respect to any Member, the account maintained by the Company for each such Member in accordance with the following provisions:

      (i)    To each Member's Capital Account there shall be credited such Member's Capital Contributions actually made to the Company, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 4.1(D) and 4.1(E) hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

2

501021723

ARDEN   03084

(ii)    From each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provisions of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.1(D) and 4.1(E) hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)    In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)    In determining the amount of any liability for purposes of subsections (i) and (ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Sections 1.7041(b) and 1.7042 of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.   In the event the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitations, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or Members) are computed in order to comply with such Regulations, the Managing Member may make such modifications, provided that it is not likely to have a material or adverse effect on the amount of Profits, Losses or tax credits allocable, or amounts distributable to any Member pursuant to Sections 4.2(A), 4.2(B) or 8.2(C) hereof upon the dissolution of the Company.   The Managing Member shall also, to the extent permitted by Regulations Section 1.7041(b)(2)(iv)(g)(i), make any adjustments that are necessary or appropriate to maintain equality between the Capital Account of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.7041(b).

"Capital Contribution" means, with respect to a Member, the total amount of money contributed or deemed contributed to the Company by a Member from time to time.

"Cash Flow" means for any period all cash receipts received by the Company (other than Capital Contributions, Support Loans, loan proceeds and Sale or Refinancing Proceeds) plus cash receipts from any other source (including any amounts previously added to any reserves no longer deemed necessary by the Managing Member), less all disbursements of cash by the Company (excluding distributions to

3

ARDEN   03085

Members), including payment of (i) operating expenses (including, without limitation, Company Costs and Expenses), amounts expended for replacement or preservation of Company assets and any other liabilities of the Company then due and owing to Persons other than Members, and (ii) principal and interest on Company debt. Expenses taken into account in computing Cash Flow shall not be reduced by any item paid from reserves.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision or provisions of succeeding law.

"Company" means the limited liability company continued by this Agreement.

"Company Costs and Expenses" has the meaning set forth in Section 5.1(C) hereinbelow.

"Consent" means the written approval or ratification of a Majority of the Members without a meeting.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

"Disability" means any disability, incompetency or legal incapacity of an individual if the individual (a) has been declared or adjudicated as being in such state by a court of competent jurisdiction, or by a guardian, conservator, or other personal representative of such individual's person or estate that has been appointed by a court of competent jurisdiction; (b) has been certified in writing as being in such state by at least two licensed physicians; or (c) has been deemed to be in such state under this subclause (c) because the individual has disappeared or has been absent for unexplained reasons or the individual has been detained under duress where the individual has been unable to effectively manage his or her property or financial affairs.

"Entity" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, cooperative, or association.

"Fiscal Year" means the tax year of the Company, which Fiscal Year ends December 31, or any portion of the Fiscal Year for which the Company is required to

4

501021723

ARDEN  03086

allocate Profits, Losses and tax credits and other Company items of income, gain, loss or deduction.  The last Fiscal Year of the Company shall end on the date of termination of the Company.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset as determined by the contributing Member and the Company;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.7041(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Managing Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)   The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.7041(b)(2)(iv)(m) and Section 4.1(D)(7) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (iv) to the extent the Managing Member determines that an adjustment pursuant to subsection (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (iv).

If the Gross Asset Value of any asset has been determined or adjusted pursuant to subsection (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

5

501021723

ARDEN   03087

"Interest" means the rights and interests of every kind in the Company of a Member, whether acquired pursuant to the purchase of an Interest or otherwise, including, without limitation, the Member's economic interest, any right to vote or participate in the management, any right to information concerning the business and affairs of the Company as provided by this Agreement or the Act, and such Member's entire interest arising under this Agreement; provided, however, in no event shall "Interest" mean or include a Member's right to make or revoke appointments to the Members.

"Investment Transactions" means transactions Consented to by the Members in which the Company acquires an interest in one or more Project Entit(y)(ies), who have acquired or will acquire one or more Project(s).  For purposes hereof, the following Projects (and any related Project Entities) have been approved by the Members and each shall constitute an "Investment Transaction" for all purposes hereunder: A tenants-in-common interest in certain real property located in the City of Los Angeles, County of Los Angeles, State of California, located at 421 E. Sixth Street Los Angeles, CA 90014.

"Losses" are defined under the term "Profits" herein hereinbelow.

"Major Decision" has the meaning set forth in Section 5.5(B) hereinbelow.

"Major Decision Impasse" means the submission by the Managing Member of a Major Decision to the Non-Managing Member for Consent and the Non-Managing Member's failure or refusal to give such Consent within the time designated therefor in this Agreement, or if no time is so designated, within 20 days of request for such Consent.

"Majority of the Members" means the Members in the aggregate that hold more than a 50% interest in the Company.

"Managing Member" means, subject to the terms of this Agreement, Tzepah, or such other party which succeeds to the Managing Member's Interest (or portion thereof) in accordance with the terms hereof and is admitted to the Company as a managing member of the Company with the approval of a Majority of the Members.

"Member" means the Trust or Tzepah, or such other party which succeeds to the Interest (or portion thereof) in accordance with the terms hereof and is admitted to the Company as a member of Company.  In the event that there is more than one Member at any time, the use of the singular term "Member" shall nevertheless be intended to mean all such parties which own Interests herein.

"Member Nonrecourse Debt" has the meaning set forth in Section 1.7042(b)(4) of the Regulations.

6

501021723

ARDEN   03088

"Member Nonrecourse Debt Minimum Gain" has the meaning set forth in Section 1.7042(i)(2) of the Regulations and shall be determined in accordance with Section 1.7042(i)(3) of the Regulations.

"Member Nonrecourse Deductions" has the meaning set forth in Section 1.7042(i)(2) of the Regulations. The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year equals the excess, if any, of the net increase, if any, in the amount of Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that Fiscal Year over the aggregate amount of any distributions during that Fiscal Year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt which are allocable to an increase in Member Nonrecourse Debt Minimum Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined according to the provisions of Section 1.7042(i)(2) of the Regulations.

"Modified Adjusted Capital Account" means, with respect to any Member for any Fiscal Year or other relevant period, an amount equal to such Member's Capital Account balance as of the beginning of such fiscal year or other relevant period, adjusted as provided in the definition of Capital Account for all contributions to the Company by, and all distributions by the Company to, such Member during such Fiscal Year or other relevant period, and by all special allocations pursuant to Section 4.1(D) with respect to such Fiscal Year or other relevant period but before giving effect to any allocations of Profits or Losses with respect to such Fiscal Year or other relevant period.

"Non-Managing Member" means, subject to the terms of this Agreement, the Trust, Judith or such other party which succeeds to the Non-Managing Member's Interest (or portion thereof) in accordance with the terms hereof and is admitted to the Company as a non-managing member of the Company with the approval of both Members.

"Nonrecourse Debt" has the meaning given to the term "nonrecourse liability" by Section 1.7042(b)(3) of the Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.7042(b)(1) of the Regulations.

"Notification" means a writing containing information required by this Agreement to be communicated to any Person which is personally delivered to such Person or sent to such Person (i) by certified mail, postage prepaid, (ii) nationally recognized courier service, or (iii) facsimile transmission, with proof of any such facsimile transmission sent by one of the other means of delivery permitted hereunder. The date of personal delivery or the date of actual receipt of the transmission thereof by the Person to whom Notification is addressed, as the case may be, shall be deemed the date of receipt of Notification.

7

501021723

ARDEN    03089

"Percentage Interest" of a Member means 80% for the Trust and 20% for Tzepah.

"Permitted Investments" means (i) readily marketable securities issued by states or municipalities within the United States of America or agencies or subdivisions thereof rated in the highest rating category by a nationally recognized statistical rating organization; (ii) direct obligations of, or obligations unconditionally guaranteed by, the United States of America or any agency thereof maturing in less than one (1) year from the date of purchase; (iii) commercial paper issued by any corporation organized and doing business under the laws of the United States of America or any state thereof rated in the highest category by a nationally recognized statistical rating organization; (iv) certificates of deposit, due within one (1) year from the date of purchase, issued by any commercial bank organized and doing business under the laws of the United States of America or any state thereof whose deposits are federally insured and which has a combined capital and surplus of not less than $100,000,000; (v) debt securities issued by corporations organized and doing business under the laws of the United States of America or any state thereof rated "A" or better by a nationally recognized rating agency and maturing in less than one (1) year from the date of purchase, provided that a dealer which is a member of the New York Stock Exchange maintains a regular market in such securities; and/or (vi) collateralized repurchase agreements with domestic banks whose deposits are federally insured and which have a combined capital and surplus of not less than $100,000,000, such repurchase agreements having a duration no longer than sixty (60) days (or any extension or renewal thereof for a period not exceeding the period of the initial agreement) with respect to or secured by any of the types of securities specified in clauses (i) through (iii) above.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such Person where the context so requires.

"Prime Rate" means the rate so designated as charged from time to time by Bank of America, N.A.

"Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) for such year or period, shall be taken into account in the determination of such taxable income or loss), with the following adjustments:

      (i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be taken into account in the determination of such taxable income or loss;

501021723

ARDEN  03090

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.7041(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, shall be taken into account in the determination of such taxable income or loss;

(iii)     Gain or loss resulting from any disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(iv)     In the event of a distribution of Company assets to a Member (whether in connection with a liquidation or otherwise), or in the event the Gross Asset Value of any Company asset is adjusted upon the acquisition of an additional interest in the Company, unrealized income, gain, loss and deduction inherent in such distributed or adjusted assets (not previously reflected in the Capital Accounts) shall be allocated pursuant to Section 4.1 hereof as if there had been a taxable disposition of such distributed or adjusted assets at fair market value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation herein; and

(vi)     Notwithstanding any other provision of this definition of Profits and Losses, any items that are allocated pursuant to Sections 4.1(D) and 4.1(E) hereof shall not be taken into account in computing Profits or Losses.

"Project" means any apartment complex or other type of real property acquired by a Project Entity with the Consent of the Members in the manner contemplated by this Agreement.

"Project Entity" has the meaning set forth in Section 2.4 hereinbelow.

"Project Plan and Budget" has the meaning set forth in Section 5.8(a) hereinbelow.

"Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Sale or Refinancing" means any Company sale or refinancing transaction and/or any Project Entity sale or refinancing transaction (including, without limitation, any sale or refinancing transaction undertaken by a Project Entity with respect to its Project) not

9

501021723

ARDEN   03091

in the ordinary course of its business, including, without limitation, sales, exchanges, or other dispositions of real or personal property of the Company and/or a Project Entity, condemnations, recoveries of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds), or any refinancings; provided, however, that (i) distributions of operating income which are deemed returns of capital solely for federal income tax purposes, or (ii) the payment of Capital Contributions by the Members, shall not be deemed a Sale or Refinancing.

"Securities Act" means the Securities Act of 1933, as amended.

"Service" means the Internal Revenue Service.

"Substituted Member" means any Person admitted to the Company as a Member pursuant to the provisions of Section 7.2(a)(v) hereof.

"Support Loan" means one or more loans made by the Trust to the Company in any such case with the Consent of the Members, the proceeds of which may be used to pay any amount which the Managing Member is authorized to pay pursuant to this Agreement. Supports Loans shall bear interest to be paid by the Company to the Members holding such loans at an annual rate equal to the greater of (a) the Prime Rate, plus two percent (2%), or (b) nine percent (9%); provided, however, in no event shall Support Loans bear interest at a rate greater than that permitted by applicable law. Any such Support Loans shall be repayable as set forth in Sections 4.2(A)(3) and 4.2(B)(4) of this Agreement, or as otherwise determined by the Members. The Members expressly acknowledge and agree that the Managing Member may determine that Support Loans made pursuant to this Agreement will be repaid, in whole or in part, by distributions made pursuant to this Agreement. In no event shall any Member be obligated to fund any Support Loans unless they are Consented to by the Members.

"Target Capital Account." means an amount (which may be either positive or negative), determined with respect to each Member for any Fiscal Year or other relevant period, equal to (a) the hypothetical distribution (if any) such Member would receive if each Company asset (including cash) were sold for an amount of cash equal to such asset's Gross Asset Value as of the end of such Fiscal Year or other relevant period, each liability of the Company were satisfied in cash in accordance with its terms (limited, with respect to each Nonrecourse Debt of the Company, to the gross fair market value of the asset or assets securing such Nonrecourse Debt), and all remaining cash of the Company (including the net proceeds of such hypothetical transactions and all cash otherwise available after the hypothetical satisfaction of all Company liabilities) were distributed in full on the last day of such Fiscal Year or other relevant period to the Members pursuant to Section 4.2(B) of the Agreement; minus (b) the sum of (i) such Member's share of Partnership Minimum Gain and Member Nonrecourse Debt Minimum Gain immediately prior to such deemed sale, plus (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company pursuant to the terms of the Agreement as of the last day of such Fiscal Year or other relevant period

10

501021723

ARDEN   03092

(but only to the extent such capital contribution obligation has not been taken into account in determining such Member's share of Member Nonrecourse Debt Minimum Gain).

"Tax Item" means each item of income, gain, loss, deduction, or tax credit of the Company.

"Tax Matters Partner" means the Member designated from time to time as the "Tax Matters Partner" of the Company pursuant to Section 9.6 hereof.  The Managing Member has been designated as the initial Tax Matters Partner.

"Transfer" means any sale, exchange, issuance, redemption, assignment, distribution, gift, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any direct or indirect interest in all or any portion of an Interest in the Company.  "Transfer" shall specifically include, without limiting any of the above, assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Voluntary Withdrawal" means, as to the Managing Member, a Withdrawal of any part of its Interest or the removal of the Managing Member pursuant to Section 11.3 hereof.

"Withdrawing" or "Withdrawal" means, as to the Managing Member, the withdrawal or retirement of the Managing Member (or deemed withdrawal or retirement of the Managing Member pursuant to Section 11.2(a)(vi) below) after an Event of Default by the Managing Member has been declared hereunder, and the Non-Managing Member has indicated its intent to remove the Managing Member pursuant to Section 11.3 below.

<div align="center">ARTICLE 2.</div>

<div align="center">ORGANIZATION; NAME; PLACE OF BUSINESS; PURPOSE; TERM</div>

2.1    Organization.  Pursuant to the provisions of the Act, the parties hereto hereby agree to continue the Company on the terms and conditions set forth herein as a limited liability company under the Act.  To the extent that the laws of other jurisdictions are applicable, the Company is intended to be qualified as a foreign limited liability company under such laws.  The certificate of formation of the Company has been previously filed with the California Secretary of State in accordance with the Act.

2.2    Name; Place of Business; Principal Office.  The Company shall continue to be conducted under the name of "315 Arden, LLC"  The Company may use such name with or without the words "a California limited liability company" as state law may require.  The place of business and principal office of the Company shall be c/o Tzepah Freedland, 344 South Arden Avenue, Beverly Hills, California 90211 or such other address as may from time to time be designated by the Managing Member.

<div align="center">11</div>

501021723

ARDEN   03093

2.3    Agent for Service of Process. Tzepah Freedland shall be the Company's agent for service of process on the Company. The Company's address for such purpose shall be 9018 David Avenue, Los Angeles, California 90034. The agent for service of process and/or its address may be changed from time to time by the Managing Member.

2.4    Purpose of the Company. The business and purpose of the Company shall be (a) to hold, operate, refinance and sell each Project or Project Entity in its portfolio, (b) do all things necessary, advisable, convenient or incidental to, or in furtherance of, such purposes; and (c) to engage in any other lawful business purpose and/or activity with the Consent of the Members. The business of the Company also includes the realization and distribution of the proceeds of a Sale or Refinancing.

2.5    Term. The term of the Company shall continue in full force and effect until December 31, 2075, unless terminated prior thereto pursuant to this Agreement or by law.

2.6    Governmental Filings. The Managing Member shall comply with the Act by making such filings required from time to time by applicable law, including such governmental filings as are necessary or appropriate to qualify the Company to do business in any jurisdiction or to otherwise carry out the purposes and intent of this Agreement.

ARTICLE 3.

MEMBERS AND CAPITAL

3.1    Gross Asset Value. The Members agree that, as of the date of this Agreement, the aggregate Gross Asset Value of the Projects (and/or Project Entities, as applicable) is $4,789,100 net of all debt secured by the Projects ("Net Value").

3.2    Members and Capital Contributions.    Upon execution of a counterpart of this Agreement, each of Tzepah and the Trust shall be deemed admitted to the Company as a Member of the Company. Each Member shall be credited with a Capital Contribution and Capital Account balance equal to the Net Value as of the date of this Agreement multiplied by that Member's Percentage Interest.

3.3    Company Capital and Support Loans.

(A)    No Member shall be paid interest on any Capital Contribution.

(B)    The Company shall not redeem or repurchase any Member Interest, and no Member shall have the right to withdraw, or receive any return of, its Capital Contribution, except as specifically provided herein. No Member shall have

12

ARDEN   03094

priority over any other Member either as to the return of its Capital Contribution or as to Profits, Losses, or distributions, except as otherwise specifically provided herein.

(C)      The Managing Member shall have no personal liability under this Agreement for the repayment of the Capital Contributions of any Member, nor any obligation to the Company to make additional Capital Contributions.

(D)      If and to the extent that the Company does not have funds to pay any of the costs, expenses or other obligations of the Company, including, without limitation, Company Costs and Expenses, upon the Consent of the Members, the Trust shall be obligated to make Support Loans to the Company, the proceeds of which shall be utilized to pay for such costs, expenses or other obligations. The decision to make Support Loans to the Company shall be made by Consent of the Members and such Support Loans shall be funded within ten (10) days of Members' Consent therefor.

3.4    Liability of Members.

(A)      The liability of the Members for the losses, debts, liabilities, and obligations of the Company shall, except as otherwise provided herein or by applicable law, be limited to their Capital Contributions and their share of any assets and undistributed profits of the Company. Except with respect to Support Loans approved by the Members, the Members shall not be required to lend any funds to the Company or, after its Capital Contributions have been paid in full, to make any further Capital Contributions to the Company. Nothing herein shall be deemed to limit or restrict the Members' obligations to make loans or contributions to other entities in which they may hold or own interests.

(B)      Notwithstanding the provisions of Section 3.4(A) above, in the event the Company is required, pursuant to applicable provisions of applicable law, to return to any third party any funds previously distributed by the Company to the Members hereunder, the Members shall be required to promptly return to the Company that portion of such Company distribution received by them (on a pro rata basis) as the Company requires to meet its obligation to return funds to such third party. Any such return of funds made by a Member shall be treated as a Capital Contribution for all purposes hereunder.

3.6    Representations and Warranties.

(A)      The Members each represent and warrant, as of the date hereof, to the Company and the other Members that:

(i)      each Member understands that neither the offering nor the sale of the Interests has been registered under the Securities Act or any applicable state securities law. The Members were not offered or sold their Interests, directly or indirectly, by means of any form of general solicitation or general advertising, including,

501021723

ARDEN    03095

without limitation, the following: (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio; or (ii) any seminar or meeting whose attendees had been invited by any general solicitation or general advertising.    The Members each understand that its Interest must be held indefinitely unless the sale or transfer thereof is subsequently registered under the Securities Act and any applicable state securities laws or an exemption from such registration is available.

(ii)    each Interest is being purchased or was previously purchased or acquired solely for that Member's own account for investment purposes only and not for the account of any other person and not for distribution, assignment or resale to others and no other person has a direct or indirect beneficial interest in its Interest.

## ARTICLE 4.

## ALLOCATIONS AND DISTRIBUTIONS

4.1    Allocations of Profits and Losses.

(A)    Profits and Losses.

After giving effect to the special allocations set forth in Section 4.1(D), the Profits and Losses of the Company for each Fiscal Year or other relevant period will be allocated to each Member in such manner as to cause the balance in such Member's Modified Adjusted Capital Account, immediately after making all of the allocations required for such Fiscal Year or other relevant period, to equal (as nearly as possible) such Member's Target Capital Account.

(B)    Reserved.

(C)    Reserved.

(D)    Special Allocations.    The following special allocations shall be made in the order of priority described in Section 4.1(H):

(1)    Partnership Minimum Gain Chargeback.    Except as otherwise provided in Regulations Section 1.7042(f) and notwithstanding any other provision of this Section 4.1, if there is a net decrease in Partnership Minimum Gain (as defined in Regulations Section 1.704-2(d)) during any Fiscal Year or other period, each Member shall be specially allocated items of Company income and gain for such Fiscal Year or other period (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Section 1.7042(g)(2).    Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the various Members pursuant thereto.    The items to be so allocated shall be

14

501021723

ARDEN  03096

determined in accordance with Regulations Sections 1.7042(f)(6) and 1.70420)(2). This Section 4.1(D)(1) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.7042(f) and shall be interpreted consistently therewith. To the extent permitted by such Section of the Regulations and for purposes of this Section 4.1(D)(1) only, each Member's negative Adjusted Capital Account shall be determined prior to any other allocations pursuant to this Section 4.1(D) with respect to such Fiscal Year or other period and without regard to any net decrease in Member Nonrecourse Debt Minimum Gain during such Fiscal Year or other period.

(2)    Member Nonrecourse Debt Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.7042(i)(4) and notwithstanding any other provision of this Section 4.1 except Section 4.1(D)(1), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year or other period, each Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year or other period (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the various Members pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(i)(4) and 1.70420)(2). This Section 4.1(D)(2) is intended to comply with the minimum gain chargeback requirement in Section 1.7042(i)(4) of the Regulations and shall be interpreted consistently therewith. Solely for purposes of this Section 4.1(B)(2), each Member's negative Adjusted Capital Account shall be determined prior to any other allocations pursuant to this Section 4.1(D) with respect to such Fiscal Year or other period, other than allocations pursuant to Section 4.1(D)(1) hereof.

(3)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations      Sections 1.7041(b)(2)(ii)(d)(4),      1.7041(b)(2)(ii)(d)(5),      or 1.7041(b)(2)(ii)(d)(6) for any Fiscal Year, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the negative Adjusted Capital Account of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.1(D)(3) shall be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(D)(3) were not in this Agreement.

(4)    Gross Income Allocation. In the event any Member has a negative Adjusted Capital Account (ignoring, for purposes of this Section 4.1(D)(4),

15

S0102172.3

ARDEN    03097

clause (ii) of the definition of "Adjusted Capital Account") at the end of any Company Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such negative Adjusted Capital Account as quickly as possible, provided that an allocation pursuant to this Section 4.1(D)(4) shall be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(D)(4) and Section 4.1(D)(3) were not in this Agreement.

(5)   Nonrecourse Deductions.   Nonrecourse Deductions shall be allocated to the Members in accordance with their Percentage Interests.

(6)   Member Nonrecourse Deductions.   Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be allocated, in accordance with Section 1.7042(i)(1), to the Member that bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.

(7)   Code Section 754 Adjustments.   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.7041(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(8)   Syndication Expenditures.   Any expenditures that constitute syndication expenditures under Section 709 of the Code and that are paid by the Company shall be allocated to the Interests with respect to which such syndication expenditures were paid.

(E)   Curative Allocations.   The allocations set forth in Sections 4.1(D)(1), (2), (3), (4), (5) and (6) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.1(E). Therefore, notwithstanding any other provisions of this Section 4.1 (other than the Regulatory Allocations), the Managing Member may make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not a part of this Agreement. In exercising its discretion under this Section 4.1(E), the Managing Member shall take

16

501021723

ARDEN   03098

into account any future Regulatory Allocations under Sections 4.1(D)(1) and 4.1(D)(2) hereof that, although not yet made, are likely to offset Regulatory Allocations made under Sections 4.1(D)(5) and 4.1(D)(6) hereof.

(F)    Other Allocation Rules.

(1)    For purposes of computing the Profits, Losses, tax credits or any other Tax Items allocable to any period, such Profits, Losses, tax credits and any other such Tax Items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Code Section 706 and the Regulations thereunder.

(2)    For purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interest in Company Profits shall be treated as that Member's Percentage Interest in the Company.

(3)    To the extent permitted by Regulations Sections 1.7042(h) and 1.7042(i)(6), the Managing Member shall endeavor to treat distributions of Cash Flow and Sale and Refinancing Proceeds as having been made from proceeds of Nonrecourse Debt or Member Nonrecourse Debt only to the extent that such distributions would have otherwise caused or increased a negative Adjusted Capital Account (ignoring, for purposes of this Section 4.1(F)(3), clause (ii) of the definition of "Adjusted Capital Account") for any Member.

(G)    Tax Allocations.

(1)    In General.  Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations shall be allocated among the Members for tax purposes in the same manner and the same proportions as they are allocated Profits or Losses or items thereof pursuant to Section 4.1 hereof for such year.  Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 4.1(G) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other Tax Items or distributions pursuant to any provision of this Agreement.

(2)    Code Section 704(c).    In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or owned by the Company upon the occurrence of any of the events described in Regulations Section 1.7041(b)(2)(iv)(f)(5) shall, solely for tax purposes (and not for purposes of determining Capital Accounts or allocating Profits, Losses or other Tax Items), be

501021723

17

ARDEN    03099

allocated among the Members so as to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.  Notwithstanding the foregoing, no allocation shall be made if an equivalent allocation has been made pursuant to Section 4.1(G)(1) hereof in connection with a transaction that would otherwise result in an allocation pursuant to this Section 4.1(G)(2).  The foregoing provision is intended to comply with Section 704(c) of the Code and with Regulations Section 1.7041(b) and shall be interpreted and applied in a manner consistent with such Regulations.  To the extent permitted by the Code and Regulations, any variation referred to in this Section 4.1(G)(2) shall be taken into account by allocations of gain from a disposition of the subject property and not through allocations of depreciation.

(3)     Recapture.  Gain from the disposition of Company assets which is allocated to a Member for tax purposes shall include, to the extent possible, ordinary income consisting directly or indirectly of recaptured deductions (for depreciation or otherwise) to the same extent and in the same proportion as such deductions were previously allocated to such Member or its predecessorininterest.

(4)     Section 751 Assets.  In the event that a Member (other than a Member who becomes a Member by purchasing the Interest in the Company of another Member) is admitted (an "Admission") to the Company after the date hereof or in the event that a Member's interest in Profits or Losses is increased (an "Increase") after the date hereof, the Member so admitted shall obtain no interest, or the Member so increased shall obtain no greater interest than prior to the Increase, in the Company's "unrealized receivables" (as defined in Section 751(c) of the Code), determined immediately prior to such Admission or Increase.   As the respective interests in such "unrealized receivables" of the Members who were Members prior to such Admission or such Increase are not reduced thereby, the Member so admitted or so increased shall, to the extent required, obtain a greater than proportionate interest in the Company's other assets (including the assets contributed by such Member), determined after giving effect to such Admission or Increase.

(H)     Order of Priority.  The allocation and distribution provisions of this Agreement will be applied in such order as may be determined by the Managing Member with the approval of the accountants for the Company, in a manner which will reflect the economic positions of the Members and which will comply with the Code and Regulations.

4.2     Distributions and Application of Cash Flow and Sale or Refinancing Proceeds.  Except as otherwise provided by this Agreement or required by law, distributions to the Members shall be made no less frequently than at the end of each calendar year as described below:

(A)     Cash Flow.  Cash Flow shall be distributed to the Members in the following order and priority:

501021723

ARDEN   03100

       (1)    First, to the Managing Member shall make such additions to reserves as it determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Company.

       (2)    The balance, if any, shall be distributed to the Members in accordance with their Percentage Interests.

    (B)    <u>Sale or Refinancing Proceeds</u>.  Sale or Refinancing Proceeds shall be distributed in the following order and priority:

       (1)    First, payment shall be made of the liabilities of the Company then due and owing to Persons other than the Members.

       (2)    Next, the Managing Member shall make such additions to reserves as it determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Company.

       (3)    Next, payment shall be made to the Members on a pro rata basis based on the ratio of each Member's unpaid balance plus accrued interest as compared to the aggregate unpaid balances plus accrued interest of all Members of any loans made by Members to the Company, in an amount equal to the unpaid balance, including accrued interest, of any loans made by them to the Company, including Support Loans.

       (4)    Next, pro rata to the Members in proportion to their respective unreimbursed Capital Contributions in reimbursement of their respective Capital Contributions until returned in full.

       (5)    The balance, if any, shall be distributed to the Members in accordance with their Percentage Interests.

Notwithstanding any other provision in this Agreement, distributions shall be made in accordance with the Act.

    4.3    <u>Allocation Rules</u>.  All allocations provided for herein to the Members and all distributions of Cash Flow and Sale and Refinancing Proceeds which are to be made to the Members shall be made to the Persons determined by the Managing Member to be the record holders of Interests entitled to such distributions (or to the legal representatives of any such Person or a named permitted assignee of any such Person) as of the date determined by the Managing Member to be the record date for purposes of such distributions, in proportion to the Interests owned by them.

<div align="center">ARTICLE 5.</div>

<div align="center"><u>RIGHTS, POWERS, AND DUTIES OF MANAGING MEMBER</u></div>

<div align="center">19</div>

501021723

ARDEN   03101

5.1    <u>Management and Control of the Company.</u>

(A)    Subject to the express limitations on the authority of the Managing Member set forth elsewhere herein, including, without limitation, the matters set forth herein expressly requiring the Consent of the Members, the Managing Member shall have the full, complete, and exclusive discretion and authority to manage and control the business, management, operations and affairs of the Company and to make all decisions with respect to the dayto-day business, management, operation and affairs of the Company. However, the Managing Member shall not be required nor expected to devote her full time or attention to the affairs of the Company.

(B)    Except as otherwise provided herein, the Trust and Judith shall not participate in or have any control over Company business nor have any authority or right to act for or bind the Company.

(C)    All of the Company's costs and expenses shall be billed directly to and paid by the Company. The Company shall pay all of its costs and expenses, including, without limitation, the following (collectively, the "Company Costs and Expenses"): (i) the costs of persons involved in the business of the Company; (ii) the principal and interest payments and costs paid to any lender for borrowed money; (iii) taxes and assessments applicable to the Company; (iv) legal, audit, accounting, tax consulting, environmental and market studies fees and costs, appraisal and engineering fees; (v) fees and expenses in connection with the sale, exchange, or other disposition or financing of Company assets, including, without limitation, brokerage fees; (vi) the cost of insurance in connection with the business of the Company; (vii) expenses of amending, converting, modifying, or terminating the Company; (viii) the costs and expenses incurred in qualifying the Company to do business in any jurisdiction, including fees and expenses of any resident agent appointed by the Company; (ix) the cost of preparing and disseminating to the Members any written communication and the cost of preparing and filing reports and tax returns with governmental agencies; (x) all reasonable travel, food and lodging expenses incurred by the Managing Member and her principals, employees, contractors and representatives in connection with the performance of the functions of the Managing Member hereunder and monitoring, supervising and attending to the business, operations and affairs of the Company, and/or the Project Entities; (xi) the costs incurred in connection with any litigation or regulatory proceedings in which the Company is involved; (xii) the annual management fee payable to Tzepah pursuant to Section 5.9 of this Agreement; and (xii) all other costs and expenses that are customarily incurred in the course of operating a real estate company engaged in the business of owning, operating and improving real estate projects of the type, kind and character owned, operated and improved by the Project Entities.

5.2    <u>Authority of Managing Member.</u>

20

ARDEN   03102

(A)     Subject to the terms and conditions of this Agreement and the approval of the Members where such approval is expressly required under this Agreement, including, without limitation, this Section 5.2 and Section 5.5 hereinbelow, the Managing Member for and on behalf of, the Company is hereby authorized, without limitation:

(1)     To give or withhold the consent of the Company in its capacity as the managing member of any Project Entity;

(2)     To form, hold, encumber, refinance, sell, dispose of and otherwise deal with and invest in a Project Entity on behalf of the Company, or to cause such Project Entity to acquire, hold, sell, improve, rehabilitate, finance and otherwise invest in any real estate project;

(3)     To borrow money and issue evidences of indebtedness, including from the Members in the form of Support Loans (which shall be unsecured) or other loans, and to secure such other loans by mortgage, deed of trust, pledge, or other lien on its interest in a Project Entity or other assets of the Company.

(4)     To employ agents, accountants, attorneys, consultants, and other Persons necessary or appropriate to carry out the business and operations of the Company, and to cause the Company to pay fees, expenses and other compensation to such Persons;

(5)     To cause the Company to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend, or compromise, upon such terms as the Members may mutually determine and upon such evidence as the Members may deem sufficient, any obligation, suit, liability, cause of action, or claim, including taxes, either in favor of or against the Company;

(6)     To cause the Company to make or revoke any of the elections under the Code which are made at the Company level, provided that such action does not have a material adverse effect on the Profits, Losses or items thereof allocated to or realized by the Members;

(7)     To establish and maintain reserves for such purposes and in such accounts and amounts as the Managing Member deems appropriate or necessary from time to time;

(8)     To amend this Agreement from time to time provided that the Managing Member first delivers written request for Consent to any such amendment to the Members, and the Non-Managing Members fail to grant or deny such Consent within twenty (20) days of request therefor, then, provided that each such request is made in a manner constituting a "Notification", ten (10) days following the expiration of such twenty (20) day period, the Non-Managing Member shall be deemed to have given

21

501021723

ARDEN   03103

its Consent, in addition to any amendment otherwise authorized herein to be made, to amend this Agreement from time to time to:

    (a)    Cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with law or with any other provision herein, or to add any other provision with respect to matters or questions arising under this Agreement which will not be inconsistent with law or with the provisions of this Agreement; and

    (b)    Reflect the addition or substitution of Members in accordance with this Agreement or the reduction of Capital Accounts upon the return of capital to Members.

    (9)    To deal with, or otherwise engage in business with, or provide services to and receive compensation from, any Person who has provided or may in the future provide any services to, lend money to, sell property to, or purchase property from, the Managing Member;

    (10)    To invest in Permitted Investments all funds not immediately needed in the operation of the business, including, but not limited to, (a) the proceeds from Capital Contributions, (b) reserves, and (c) Cash Flow and Sale and Refinancing Proceeds available for distribution to Members pending such distribution; and

    (11)    To engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with the accomplishment of the purposes of the Company.

    (B)    Subject to the Consent of the Members where expressly required by this Agreement, with respect to all of its obligations, powers, and responsibilities under this Agreement, the Managing Member is authorized to execute and deliver, for and on behalf of the Company, such notes and other evidences of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages, and other security instruments and agreements, all on such terms and conditions as the Managing Member may deem proper.

    (C)    Any Person dealing with the Company or the Managing Member may rely upon a certificate signed by the Managing Member as to:

    (1)    The identity of the Managing Member or any other Member;

    (2)    The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Managing Member or in any other manner germane to the affairs of the Company;

    (3)    The Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

<center>22</center>

501021723

ARDEN    03104

(4)    Any act or failure to act by the Company, or as to any other matter whatsoever involving the Company or any Member.

5.3    <u>Reimbursement of Members</u>.

To the extent not paid by the Company pursuant to Section 5.1(C), the Company shall reimburse each Member for all Company Costs and Expenses incurred by such Member in accordance with the terms of this Agreement, and in connection with the conduct of the Company's business, operations and affairs. Such reimbursement shall be in accordance with a budget duly adopted with the Consent of the Members. In addition, concurrently with the acquisition of any project, if and to the extent set forth on a settlement statement approved by the Members, the Company shall, or shall cause the applicable Project Entity to, reimburse the Members for one hundred percent (100%) of all escrow deposits made, and reasonable out-of-pocket costs incurred by the Members and in connection with due diligence, documentation, acquisition, financing, title, survey, brokerage (if any), third party reports, reasonable attorneys' fees and costs (excluding such attorneys' fees and costs incurred in connection with the preparation and negotiation of this Agreement and the operating agreements governing the Project Entity), closing and other costs associated with the acquisition of a project.

5.4    <u>Treatment of Payments</u>. Payments under Section 5.3, to the extent paid to a Member, are intended to be governed by Section 707(a) of the Code and made to that Member other than in such Member's capacity as a member of the Company.

5.5    <u>Restrictions on Authority of Managing Member</u>.

A.    The Managing Member shall not undertake any of the following on behalf of the Company or on behalf of a Project Entity:

(1)    Do any act in contravention of this Agreement or any applicable law or regulation;

(2)    Do any act that would make it impossible to carry on the ordinary business of the Company;

(3)    Change or expand the Company's purposes from those set forth in Section 2.4 hereof; or

(4)    Commingle the funds or assets of the Company with those of any other Person.

B.    The Managing Member shall not, without the Consent of the Members undertake any of the following (each, "Major Decision") on behalf of the Company, or on behalf of a Project Entity:

23

501021723

ARDEN    03105

(1)     Admit a Person as a Member, or permit any Person to withdraw as a Member, except with the Consent of all Members or as provided in this Agreement;

(2)     Receive any fee or payment, or pay any fee or payment, to itself, except as authorized herein;

(3)     Employ any Person as an employee of the Company;

(4)     Execute or deliver any assignment for the benefit of creditors of the Company;

(5)     Borrow from the Company and/or any Project Entity;

(6)     Consent to the merger or reorganization of the Company;

(7)     Enter into any transactions other than the Investment Transactions and/or acquire any Projects or any interests therein;

(8)     Borrow money, issue evidences of indebtedness or grant any mortgages or other encumbrances on or security interests in the assets of the Company, or any Project Entity, including any financing or refinancing of any Project owned by a Project Entity or any portion thereof, or modify, amend, extend, renew, change or prepay in whole or in part any borrowing, financing or refinancing, including, granting any approvals or consents, or make any commitments to borrow funds or give any consideration to obtain a commitment for the loan of funds;

(9)     Guaranty the payment of any money, or debt of another Person, or guaranty the performance of any other obligation of another Person;

(10)    Sell, convey, exchange, mortgage, subdivide or otherwise transfer or encumber (including the granting of any easement or license) all of or any interest in any Project or any real or personal, tangible or intangible property, other than non material transfers of personal, tangible or intangible property in the ordinary course of business;

(11)    Take any action that would violate an affirmative or negative covenant or other provision of any document evidencing or securing any financing, the regulatory agreements or other material agreement binding on the Company and/or any Project Entity or the Projects or materially modify or amend any such agreement;

(12)    Take any action that would cause the guarantor or guarantors under any obligation of the Company, and/or any Project Entity to incur any liability thereunder;

24

50102172.3

ARDEN   03106

(13)    Institute legal action or proceedings (including any tax abatement proceeding but excluding evictions of residential tenants) or otherwise bring or prosecute any claim available to the Company and/or any Project Entity, or settle any claim against the Company, and/or any Project Entity or any other matter, in each case outside of the ordinary course of business of the Company and having at issue more than twenty thousand dollars ($20,000) for any single action or proceeding and fifty thousand dollars ($50,000) in the aggregate for all such legal actions and proceedings in any twelve (12) calendar month period; or confess any claim against the Company, and/or any Project Entity; or settle any tax abatement or eminent domain taking.

(14)    Dissolve the Company, effect a merger, conversion, consolidation or other reorganization of the Company or modify or amend this Agreement;

(15)    File any voluntary petition under Title 11 of the United States Code, the Bankruptcy Act, or seek the protection of any other Federal or State bankruptcy or insolvency law or debtor relief statute, or consent to the institution or continuation of any involuntary bankruptcy proceeding, or fail to contest the any involuntary bankruptcy proceeding within fifteen (15) days of its institution, or the admission in writing of the inability to pay debts generally as they become due; or the making of a general assignment for the benefit of creditors;

(16)    Make any other decision or take any other action which by any provision of this Agreement is specifically required to be approved or as to which the Act specifically mandates that the vote or approval of the members is required (and such provision of the Act has not been superseded by this Agreement).

The Managing Member in proposing a Major Decision shall submit such Major Decision in writing for the Non-Managing Member's review and decision. Except as otherwise expressly set forth in this Agreement, the Non-Managing Member shall provide a decision in writing with respect to a Major Decision within five (5) business days' following the receipt of a complete submission with respect to such Major Decision request. In the event of a failure of the Non-Managing Member to respond to any such Major Decision request, the Managing Member shall resubmit the Major Decision request and all supporting documentation to such member. The failure of the Non-Managing Member to provide a decision in writing to the Managing Member within five (5) business days following such member's receipt of such resubmission shall be deemed approval of such Major Decision. If the Managing Member takes any action that is a Major Decision without first obtaining approval (or deemed approval) of the Members, the Non-Managing Member retains all rights and remedies hereunder and, in addition, all amounts spent by the Managing Member in taking such action shall not be costs permitted to be expended hereunder and the Managing Member shall receive no credit or reimbursement for any such amounts spent.

25

ARDEN  03107

C.    Additional Rights of the Non-Managing Member.

(a)    Additional Rights.  In addition to other rights reserved or granted to the Non-Managing Member, the Non-Managing Member and its agents and representatives shall have the right, at any time and from time to time, upon reasonable notice and during normal business hours to:

(i)    inspect any Project or other assets of the Company, and/or Project Entity in a manner which does not unduly interfere with the operation of thereof;

(ii)    review (i) the books and records required to be maintained under this Agreement, and (ii) any information and reports relating to the management, operations, policies or strategies of any Project or other assets of the Company, and/or any Project Entity;

(iii)    discuss, provide advice and consult with the Managing Member with respect to the business, financial and other operations of the Company, and/or any Project Entity and any other matters materially affecting the business and affairs of the Company, and/or any Project Entity and submit business proposals or suggestions to the Managing Member from time to time and one or more members of the management of Managing Member shall discuss such proposals or suggestions with Non-Managing Member within a reasonable period after such submission.  Such proposals and suggestions shall not be binding on the Managing Member unless approved by the Members.

D.    Managing Member Cure Rights for Failure to Obtain Consent.  If the Managing Member fails to obtain Consent under Sections 5.2 or 5.5 of this Agreement, the following shall apply:

(i)    The Members acknowledge and agree that such failure shall constitute a non-monetary default within the meaning of Section 11.1 of this Agreement allowing the Managing Member thirty (30) days within which to cure such failure (or such longer period of time as may be permitted pursuant to Section 11.1).

(ii)    Notwithstanding anything to the contrary in this Agreement, including, without limitation, Sections 11.2(a) and 11.3 below, if no material diminution has occurred with respect to the Non-Managing Member's Interests in the Company as a result of such failure to obtain Consent, (1) the Managing Member shall not be subject to removal as the managing member of the Company or, except as expressly set forth herein, any other remedy as a result of such failure to obtain Consent, (2) the sole remedy available to the Non-Managing Member shall be limited to damages, and (3) if such damages are equal to or less than $100,000, the Managing Member may cure her failure by either paying such amount to the Persons suffering such damages or setting off such damages, within ninety (90) days of the date of such failure to obtain Consent hereunder, against amounts otherwise payable to the Managing Member under this Agreement.

26

501021723

ARDEN   03108

5.6     Duties and Obligations of Managing Member.

(A)     The Managing Member shall devote to the affairs of the Company such time as may be necessary for the proper performance of her duties hereunder, but shall not be expected to devote her full time to the performance of such duties.

(B)     To the extent available from commercial insurance underwriters, the Managing Member shall cause the Company to obtain at the Company's expense a liability insurance policy (such as Managing Members' liability insurance, and director and officertype of errors and omissions insurance, including by participating in "blanket" or other combined insurance programs covering the Company and other entities that are not Affiliates of the Company), which would insure the Managing Member for liabilities they may incur with respect to claims made against her for certain wrongful or allegedly wrongful acts, including certain errors, misstatements, misleading statements, omissions, neglect, or breaches of duty.  Such insurance shall provide the types and amounts of coverage as are customarily obtained for managing members of real estate operating entities with assets of similar size, type and kind to those of the Company and the Project Entities.

(C)     The Managing Member shall cause the Accountants to prepare and shall file on or before the due date (or any extension thereof) any federal, state, or local tax returns required to be filed by the Company.  The Managing Member shall cause the Company to pay any taxes payable by the Company from available funds of the Company.

5.7     Other Business of Members.  Any Member may engage independently or with others in other business ventures of every nature and description, including, without limitation, the acquisition, rehabilitation, construction, operation and sale of market rate residential apartment complexes and the rendering of advice or services of any kind to investors and the making, sponsoring, or managing of investments, including, without limitation, investments in apartment complexes, other residential properties or any other projects that compete with Projects owned by a Project Entity.

5.8     Limitation on Liability of Managing Member; Indemnification.  Neither the Managing Member nor its Affiliates shall have any personal liability under this Agreement for the repayment of any Capital Contribution, and none of the foregoing Persons shall have any liability to the Company or the other Members under this Agreement with respect to any act or failure to act so long as such Person's conduct did not constitute fraud, bad faith, willful misconduct, a breach of the Managing Member's fiduciary duty to the other Member or as Tax Matters Partner, gross negligence, breach of this Agreement or the Act, or a violation of state or federal securities laws.  To the maximum extent permitted by law, the Company, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the Managing Member arising from any liability, loss, or damage incurred by her or by the Company by reason of any act performed or omitted to be performed by her in good faith on

27

S01021723

ARDEN   03109

behalf of the Company and while acting within the scope of her authority, including costs and reasonable attorneys' fees and any amount expended in the settlement of any claim of liability, loss, or damage; provided that such course of conduct did not constitute fraud, willful misconduct, a breach of the Managing Member's fiduciary duty to the other Member or as Tax Matters Partner, gross negligence, a breach of this Agreement or the Act, a violation of state or federal securities laws. Notwithstanding the foregoing, the Managing Member shall not be excused from bearing that portion of any indemnification payment by the Company as she would bear of any other obligation of the Company. Any such indemnification shall be recoverable only from the assets of the Company and not from the assets of the Members.

5.9    Annual Management Fee. For services rendered by Tzepah as the Managing Member of the Company, the Company shall pay Tzepah an annual management fee in the amount of $40,000 at such times as determined by Tzepah. If the Company has insufficient revenues to pay the annual management fee when requested by Tzepah, the Trust shall make a Support Loan to the Company in the amount of the fee due.

5.10    Managing Member Advances. The Managing Member may make advances to the Company to pay Company Costs and Expenses as the Managing Member determines such advances are needed by the Company. The Company shall repay Managing Member advances as promptly as practicable as determined by the Managing Member.

### ARTICLE 6.

### SUCCESSOR AND ADDITIONAL MANAGING MEMBER

6.1    Admission of Successor and Additional Managing Member.

(A)    Except with the prior written Consent of the Members and as provided in this Article 6 and in Section 8.1(A) hereof, the Managing Member shall not retire or voluntarily dissolve or withdraw voluntarily from the Company, or transfer, pledge or hypothecate all or any part of the Managing Member's Interest in the Company.

(B)    Upon timely Notification, and with the Consent of the Members which may be granted or withheld in such Members' sole discretion, the Managing Member may at any time designate one or more Persons to be successors to the Managing Member or to be an additional Managing Member, in each case with such participation in the Managing Member's Interest as the Managing Member and such successor or additional Managing Member may agree upon. Any such successor shall have the same rights as the Managing Member under this Subsection and shall be admitted as a Managing Member of the Company upon its execution of an agreement to be bound by the terms hereof.

28

501021723

ARDEN   03110

(C)    In any circumstance where an additional or successor Managing Member is admitted to the Company as provided in this Agreement, the additional or successor Managing Member, together with all the remaining Managing Members, shall continue the business of the Company without dissolution (and if a successor Managing Member is to be admitted at a time when the withdrawing Managing Member is the sole remaining Managing Member, such successor shall be admitted as a Managing Member immediately prior to the effective date of withdrawal of the withdrawing Managing Member, and such successor Managing Member shall continue the business of the Company without dissolution).

(D)    Notwithstanding the foregoing, if Tzepah is determined to have a Disability or is deceased, then Tzepah's interest as Managing Member shall be transferred to David Zarmi (if living and not considered to have a Disability) and David Zarmi shall serve as Managing Member.

6.2    Consent of Members to Admission of Successor or Additional Managing Member.  Except as provided Section 6.1(D), the Consent of the Members shall be required for the admission of any additional or successor Managing Member.  Such Consent may be granted or withheld by the Members in the exercise of their sole and absolute discretion.

6.3    Valuation and Sale of Interest of Former Managing Member.

(A)    If the business of the Company is continued after the Bankruptcy of the Managing Member, the Company shall purchase such Managing Member's Interest, as contemplated in Section 6.3(B) below, for a price equal to the present fair market value thereof.  Such present fair market value shall be determined by a qualified, independent appraiser selected by the Consent of the Members. The cost of the appraisal shall be borne by the Company.

(B)    The purchase price under 6.3(A) shall be paid in cash.

### ARTICLE 7.

### TRANSFERABILITY OF MEMBER INTERESTS

7.1    Restrictions of Transfers of Member Interests.

No Member may Transfer, nor permit an indirect Transfer, of all or any part of its Interest or otherwise withdraw from the Company, except as provided in this Article 7, or as set forth in Section 6.1(D), without the unanimous approval of the Members, which approval may be granted or withheld in the sole discretion of each such Member.  Except as expressly provided in this Agreement, upon the withdrawal of a Member from the Company, the withdrawing Member shall not have the right to require the Company to pay such withdrawing Member any amount (including, without limitation, the return of its Capital Contributions or the fair market value of its Interest (or

29

501021723

ARDEN    03111

any other compensation, for that matter)) whether or not such ability exists as a matter of statute or otherwise.  In the event of a Transfer hereunder permitted in accordance with the terms hereof, the non-transferring Member shall reasonably cooperate (at the transferring Member's cost and expense) with the transferring Member in connection therewith, and the Managing Member shall reasonably cooperate (at the transferring Member's sole cost and expense) in facilitating such Transfer (including, without limitation, providing estoppel certificates concerning the transferring Member's compliance or non-compliance with its obligations under this Agreement).  If the Managing Member is the transferring Member, then the Non-Managing Member shall deliver estoppel certificates of the Managing Member's compliance or non-compliance with her obligations hereunder.

  7.2    <u>Rules Applicable to All Transfers.</u>

  (a)  Every Transfer of an interest as a Member shall be subject to the following:

  (i)  No Transfer of any interest in the Company may be made if such Transfer would cause or result in a breach of any provision of any loan documents or any other material agreement binding upon the Company or any Project Entity, or of then applicable rules and regulations of any governmental or quasi-governmental authority having jurisdiction over such Transfer.  A non-transferring Member may require, as a condition of any Transfer, that the transferor furnish an opinion of counsel, reasonably satisfactory to such Member, both as to counsel and opinion, that the proposed Transfer complies with applicable law, including, without limitation, federal and state securities law.  The transferring Member shall be responsible for all costs and expenses of the Company and the non-transferring Members in connection with such Transfer, including, if the same are charged in connection with such Transfer, transfer taxes.

  (ii)  Except for permitted Transfers pursuant to Sections 7.3 and 7.4 hereof, no Interest shall be transferred if, solely by reason of such Transfer, the classification of the Company as a partnership other than a

30

501021723

ARDEN   03112

publicly traded partnership for federal income tax purposes would be adversely affected or jeopardized (unless same arises out of a change in law from and after the date of this Agreement), or if such Transfer would have any other substantial adverse effect on the Company for federal income tax purposes.

(iii)  In the event of any direct Transfer of Interests pursuant to the provisions of this Agreement, there shall be filed with the Company a duly executed and acknowledged counterpart of the instrument effecting such Transfer.    The transferee, if any, shall execute such additional instruments as shall be reasonably required by the non-transferring Member, and upon the execution thereof the transferee will become a Member of the Company.  If and for so long as such instruments are not so executed and filed, the Company need not recognize any such Transfer for any purpose, and the transferee shall be entitled only to the rights which are required under the Act to be afforded to a transferee who does not become a Member.

(iv)  Upon the admission or withdrawal of a Member, this Agreement shall be amended appropriately to reflect the then existing names of the Members and their respective Interests.

(v)  Any party admitted as a transferee of a Member hereunder shall thereafter be deemed to be a "Substituted Member" hereunder.

(b)  Subject to Section 11.2 below, a transferor of an interest as a Member shall, if the transferee is a Member hereunder or if the transferee becomes a Member pursuant to the provisions of this Agreement, be relieved of liability under this Agreement with respect to the transferred interest arising or

31

50102172.3

ARDEN   03113

accruing on or after the effective date of the Transfer.

(c)   Any Person who acquires in any manner whatsoever an interest (or any part thereof) in the Company, whether or not such Person has accepted and assumed in writing the terms and provisions of this Agreement or been admitted into the Company as a Member, shall be deemed, by acceptance of the acquisition thereof, to have agreed to be subject to and bound by all of the obligations of this Agreement with respect to such interest and shall be subject to the provisions of this Agreement with respect to any subsequent Transfer of such interest.

(d)   Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to transfer any interest in the Company, and shall not bind, or be recognized by, or on the books of, the Company, and any transferee or assignee in such transaction shall not be or be treated as or deemed to be a Member for any purpose. In the event any Member shall at any time Transfer an interest in the Company in contravention of any of the provisions of this Agreement, then each other Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach or threatened breach or the violation of the provisions concerning such transactions set forth in this Agreement.

7.3   <u>Permitted Transfers</u>.  Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, under Section 7.1 above, Permitted Transfers (as hereinafter defined) shall be permitted without the approval of the other Members, but such Transfers shall in any event be subject to the applicable provisions

32

50102172.3

ARDEN   03114

of Section 7.2 above.  For purposes hereof, "Permitted Transfers" shall mean and refer to the following:

(a)    Any Transfer by a Member of its Interests to a trust for estate planning purposes of which such transferor is the sole trustee and his or her grandparents, parents, siblings, children, and/or grandchildren (including children and grandchildren by legally valid adoption and stepchildren and step-grandchildren) are the sole beneficiaries, so long as such transferor at all times remains the trustee, and such immediate family members remain the sole beneficiaries, of such trust, and the Member which is the subject of such Transfer notifies the non-transferring Members in writing at least thirty (30) days in advance of such Transfer.

(c)    Any Member, or any holder of direct or indirect interests in such Member, may transfer its Interests in the Company to an entity in which the Transferor, immediately after the applicable Transfer, (a) maintains management control of the operations, management, and policy of the transferee, and (b) owns more than fifty percent (50%) of the outstanding beneficial ownership interests (directly or through trusts of which such Transferor is the sole trustee, and immediate family members are the sole beneficiaries) in the applicable transferee, and the Member which is the subject of such Transfer notifies the non-transferring Membes in writing at least thirty (30) days in advance of such Transfer.

## ARTICLE 8.

## DISSOLUTION AND LIQUIDATION OF THE COMPANY

8.1    Events Causing Dissolution.

(A)    The Company shall dissolve upon the occurrence of any of the following events: (i) the passage of 150 days after the sale or other disposition of all assets of the Company; (ii) the election by the Members to dissolve the Company; (iii) the expiration of the term of the Company specified in Section 2.5 hereof; (iv) at any time there are no remaining Members of the Company, or (v) upon a decree of judicial dissolution under the Act.

(B)    Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Certificate shall have been canceled and the assets of the Company shall have been distributed as provided in Section 8.2 hereof.  Notwithstanding the dissolution of the Company and prior to the termination of the Company, the business of the Company and the affairs of the Members shall continue to be governed by this Agreement.

8.2    Liquidation.

33

501021723

ARDEN  03115

(A)     Upon dissolution of the Company, the Managing Member shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Section 8.2. The Company's assets shall be sold in a manner that will maximize the proceeds available for distribution. If the Managing Member, in its reasonable discretion, determines that in connection with the dissolution of the Company any of its assets cannot be sold immediately in an orderly manner, the Managing Member may distribute those assets in kind to a liquidation trust or similar vehicle created for the purpose of the prompt and orderly liquidation of those assets for the benefit of the Members. In such event, those assets shall be valued at their fair market value and treated for all purposes under this Agreement as though the property had been sold for that amount.

(B)     After payment of liabilities owing to creditors of the Company, the Managing Member shall set aside as reserves such amounts as it deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. The reserves may be paid over by the Managing Member to a bank, trust company, or other financial institution to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Managing Member may deem advisable, the amount in such reserves shall be distributed in the manner set forth in Section 8.2(C) below.

(C)     Upon the occurrence of an event of dissolution, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Managing Member (or, in the event there is no remaining Managing Member, any Person elected by all Members), shall be responsible for overseeing the winding up of the Company and shall take full account of the Company's liabilities and property, and the Company property shall be liquidated as promptly as is consistent with obtaining the fair value thereof. The proceeds therefrom, together with assets distributed in kind to a liquidation trust, if any, to the extent sufficient therefor, shall be applied and distributed in the following order:

(1)     First, to the satisfaction (whether by payment or the establishment of reserves) of all of the Company's debts and liabilities to creditors and the expenses of liquidation, all in accordance with the Act; and

(2)     The balance, if any, shall be distributed to the Members in accordance with Section 4.2(B). No Managing Member shall receive any additional compensation for any services performed pursuant to this Section 8.2.

(D)     If the Managing Member shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Members, the Managing Member may, after having given Notification to the other Members and to the extent not then prohibited by any applicable law of any jurisdiction in which the

34

501021723

ARDEN   03116

Company is then formed or qualified, defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations.

(E)     The Members shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution thereto and its share of Cash Flow, Sale or Refinancing Proceeds, tax credits, and Profits and Losses, and, except as otherwise provided in this Agreement, shall have no recourse therefor, upon dissolution, or otherwise, against any Managing Member or any other Member. In furtherance of the foregoing, notwithstanding any provision to the contrary in this Agreement, regardless of whether a Member has a negative balance in its Capital Account upon liquidation of the Company (or upon liquidation of its interest in the Company), no Member shall be obligated to contribute the amount of such negative balance in cash to the Company for distribution to those Members with positive Capital Account balances and/or creditors of the Company.

(F)     The distribution and allocation provisions of Article 4 should result in distributions to each Member upon liquidation of the Company being in accordance with each such Member's positive Capital Accounts, as provided by the United States Treasury Regulations under Code Section 704(b). However, if upon liquidation of the Company, the Capital Accounts of the Members are in such ratios or balances that distributions under Section 4.2(B) would not be in accordance with the positive Capital Accounts of the Members as required by the Regulations under Code Section 704(b), such failure shall not affect or alter the distributions required under Section 4.2(B).

## ARTICLE 9.

## BOOKS AND RECORDS, ACCOUNTING; REPORTS; TAX ELECTIONS

9.1    Books and Records. The books and records of the Company shall be maintained, at the election of the Managing Member which shall be communicated in writing to the Non-Managing Member from time to time, at the principal office of the Company or each of the Project Entities, or in digital format on a website connected to the internet and maintained and updated by the Company or the applicable Project Entities, and shall be available for examination by any Member or its duly authorized representatives at any and all reasonable times. Each Member shall be entitled to a copy of the list of the names and addresses of the Members, including the Interest owned by each Member.

9.2    Accounting Basis and Fiscal Year. The books of the Company shall be kept on a cash basis and the Company shall use the Fiscal Year for both income tax and financial reporting purposes.

9.3    Bank Accounts. The bank accounts of the Company shall be maintained in such banking institutions as the Managing Member shall determine. All deposits and

35

501021723

ARDEN   03117

other funds not needed in the operation of the business may be invested in interim investments as determined by the Managing Member.

9.4    Reports.  Within 115 days after the end of each Fiscal Year, the Managing Member shall cause all information concerning the Company which is necessary for the preparation of the Members' federal and state income tax returns to be delivered to the Members.

9.5    Required Annual Reports.  Within 90 days of the end of each calendar year, the Managing Member shall, at the expense of a Project Entity for the Project owned by such Project Entity, deliver to the Non-Managing Member the following reports with respect to each Project, certified by the Managing Member for the calendar year then ended:

(a)    A financial statement of the Project Entity in the form as the Non-Managing Member may reasonably require including an accrual balance sheet, an income statement, a statement of cash flow and a statement of the balance of each Member's Capital Account, all unaudited but prepared according to generally accepted accounting principles consistently applied (to the extent applicable);

(b)    A leasing activity report together with a certified rent roll; and

(c)    Any other information with respect to each Project Entity and each Project, reasonably requested by the Non-Managing Member.

In addition, within 90 days of the end of each calendar year, the Managing Member shall, at the Partnership's expense, deliver to the Non-Managing Member, as support for calendar year distributions of Cash Flow as described in Section 4.2(A), a reconciliation of cash available for distribution.

9.6    Tax Matters Partner.  The Managing Member is designated as the Tax Matters Partner.  If the Tax Matters Partner resigns as Tax Matters Partner, or is otherwise disqualified by, e.g., Bankruptcy or insolvency, the Trust shall thereafter be and become the Tax Matters Partner.  The Tax Matters Partner shall promptly, after receipt thereof, provide to the other Members all notices and other communications received from or sent to the Service or any state or local taxing authority.  The Tax Matters Partner shall provide the other Member with reasonable notice of all meetings or conferences with the Service or any state or local taxing authority, and the other Member shall have the right to attend all such meetings or conferences and to participate directly in negotiations with the Service or such state or local taxing authority in an effort to resolve the dispute.  The other Member shall have the right to require the Tax Matters Partner, at the expense of the Company, to commence a judicial action with respect to a federal income tax matter and to appeal any adverse determination of a judicial tribunal.  Without the Consent of the Members, the Tax Matters Partner shall not (i) commence a judicial action (including filing a petition) as contemplated in

36

501021172.3

ARDEN   03118

Section 6226(a)(2) or 6228 of the Code with respect to a federal income tax matter or appeal any adverse determination of a judicial tribunal; (ii) enter into a settlement agreement with the Service which purports to bind the Members or any of them; (iii) intervene in any action as contemplated in Section 6226(b) of the Code; (iv) file any request contemplated in Section 6227 of the Code; (v) enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code; or (vi) take other action not expressly permitted by this Section 9.6 on behalf of the Members or the Company in connection with any administrative or judicial proceeding.

## ARTICLE 10.

### MEETINGS

At the request of any Member, the Members shall hold quarterly meetings to approve budgets, short, medium and long term goals of the Company and to approve advertising and other activities.  In addition, any Member may, from time to time and at any other time, call meetings of the Company for any other matters.  The Member calling the meeting shall give the other Members Notification of the meeting so called which shall be scheduled not less than fifteen (15) nor more than sixty (60) days from the date of Notification.  All meetings shall be held at the principal office of the Company; provided that Members may attend such meeting by means of teleconferencing systems wherein each participant can hear and be heard by each other participant.

## ARTICLE 11.

### DEFAULT

11.1   Events of Default.  There will be an "Event of Default" under this Agreement with respect to any Member if any event or circumstance shall transpire or exist with respect to such Member and such event or circumstance is expressly designated as an Event of Default under this Agreement or any one or more of the following events or circumstances shall transpire or exist with respect to that Member or an Affiliate of such Member, as applicable, and shall not be cured within any applicable period of notice and grace specified below:

(a)      Breach of Obligations.  If a Member is in breach of any obligation under this Agreement and such default or breach is not corrected within fifteen (15) days after written notice thereof if such default or breach is a monetary default or breach, or thirty (30) days after written notice thereof if such default or breach is a non-monetary default or breach, and in either case such written notice identifies the default with specificity; provided that if such default is non-monetary in nature and is not susceptible of cure within such thirty (30) day period, if the defaulting Member initiates such cure and diligently prosecutes such cure to completion, such grace period shall

37

50102172.3

ARDEN   03119

be extended for such time (not to exceed ninety (90) days) as is reasonably necessary to allow such defaulting Member to effect such cure; provided further that if such default or breach is willful, flagrant and material and not susceptible of cure, or if such default constitutes an act involving fraud, misappropriation of Company funds, willful misconduct, criminal conduct, material breach of fiduciary duty, material waste or gross negligence in connection with any of its obligations hereunder, then no notice or grace period shall be required and such breach or default shall immediately constitute an Event of Default.

(d)      Fraud, Negligence or Willful Misconduct.   If a Member or an Affiliate of such Member shall commit an act involving fraud, misappropriation of Company funds, willful misconduct, criminal conduct, material breach of fiduciary duty, material waste or gross negligence in connection with any of its obligations hereunder.

(e)      Prohibited Transfer.  Any Transfer by a Member or with respect to a Member in violation of the provisions of Article 7.

(f)      Bankruptcy.  If a Member shall (i) initiate proceedings of any nature under the federal Bankruptcy Code, or any amendment or successor thereto, (the "Bankruptcy Code") or any similar state or federal law for the relief of debtors, (ii) make a general assignment for the benefit of creditors, (iii) have initiated against it a proceeding under any section or chapter of the Bankruptcy Code, or any similar federal or state law for the relief of debtors, which proceeding is not dismissed or discharged within a period of ninety (90) days after the filing thereof, (iv) admit in writing its inability to pay its debts as they mature or to perform its obligations under this Agreement, (v) be the subject of an attachment or execution or other judicial seizure of all or any substantial part of said Member's assets or of its Interest or any part thereof, which remains undismissed or undischarged for a period of ninety (90) days after levy thereof, or (vi) consent to the appointment of a receiver or have a receiver appointed to manage it or any substantial part of its assets or of its Interest or any part thereof, which receivership remains in place for a period of at least ninety (90) days.

     11.2  Remedies.  Upon an Event of Default by any Member, the other Member shall have, in addition to any other rights set forth in this Agreement, all of their rights at law and in equity.

          (a)      Managing Member Event of Default.  Upon an Event of Default by Managing Member, in addition to all rights and remedies set forth in this Agreement or at law and equity, the following shall apply:

(i)      The Non-Managing Member shall have the rights set forth in Section 11.3 hereinbelow;

(ii)      In the event of any Event of Default by the Managing Member under this Agreement, the Non-Managing Member shall have the right to cause the Company to

38

ARDEN   03120

withhold and set-off the amount of damages relating to such default from the fees, distribution, and other amounts due the Managing Member under this Agreement, or withhold and set-off the amount of damages relating to such default from the amount otherwise due the Managing Member under this Agreement;

(iii)    While any Event of Default is in effect and continuing with respect to the Managing Member, the Non-Managing Member shall at any time from and after such Event of Default have the right to cause the Company to sell its assets to a third party on commercially reasonable terms deemed acceptable by the Non-Managing Member in its sole, good faith discretion without being required to first give the Managing Member the right to Consent;

(iv)    The Non-Managing Member, on behalf of the Company, shall have the right to terminate (or to cause Managing Member to terminate) upon three (3) business days notice any agreements between the then Managing Member and the Company or any Project Entity, excluding the operating agreements and/or partnership agreements, as applicable, of any such entities;

(v)    From and after the occurrence of an Event of Default, the Managing Member shall have no right to receive any future allocations of Profits and Losses of the Company, any distributions from the Company or any other funds or assets of the Company, nor shall it be entitled to receive or to be paid by the Company any further payments of fees (excluding fees earned through the date of the applicable Event of Default but are unpaid made by it to the Company).  From and after the occurrence of an Event of Default, the rights of such defaulting Managing Member to receive or to be paid such allocations, distributions, funds, assets, fees or repayments shall be reallocated to the other Member or, if required by the Non-Managing Member, to any new Member admitted to the Company to undertake the responsibilities of the Managing Member hereunder.  From and after the occurrence of an Event of Default by the Managing Member and application of the remedy set forth in this subsection (v) against the Managing Member, the Managing Member may Voluntarily Withdraw from the Company.  Notwithstanding such loss of any right to receive such allocations, distributions, funds, assets, fees and repayments, such defaulting Managing Member shall remain liable to the Company and the Non-Managing Member for (a) all obligations theretofore incurred by it under this Agreement, (b) all obligations that may arise prior to (i) a Voluntary Withdrawal of the Managing Member as provided above in this Section 11.2(a)(v), or (ii) if the Voluntary Withdrawal in the preceding clause (i) does not occur, following a Voluntary Withdrawal pursuant to subsection (vi) below, and (c) all obligations incurred following such Voluntary Withdrawal to the extent such obligations arise as a result of such defaulting Managing Member's breach of this Agreement.  Notwithstanding anything herein to the contrary, the Non-Managing Member shall have all rights and remedies against such defaulting Managing Member as provided by law or in equity; and

39

50102172.3

ARDEN   03121

(vi)    From and after the occurrence of any Bad Act Default by the Managing Member under this Agreement, (A) the Managing Member shall no longer be entitled to participate in any deliberations, decisions or Consent made by the Members, and (B) the Interest of the Managing Member in the Company  shall immediately and automatically terminate concurrent with the removal of the Managing Member as managing member of the Company in accordance with Section 11.3(a), and such Managing Member shall be deemed to have Voluntarily Withdrawn as a Member of the Company, and shall have no further right to participate in the management or operation of the Company, nor any further obligation under this Agreement arising from and after the date of the applicable Bad Act Default.

(g)    <u>Non-Managing Member Event of Default</u>.  Upon an Event of Default by the Non-Managing Member, in addition to all rights and remedies set forth in this Agreement or at law and equity, the following shall apply:

(i)    In the event of any Event of Default by the Non-Managing Member under this Agreement, in addition to its other rights, the Managing Member shall have the right to cause the Company to withhold and set-off the amount of damages relating to such default from the fees, distribution, and other amounts due the Non-Managing Member under this Agreement, or withhold and set-off the amount of damages relating to such default from the amount otherwise due the Non-Managing Member under this Agreement;

(ii)    While any Event of Default is in effect and continuing with respect to the Non-Managing Member, the Managing Member shall at any time from and after such Event of Default have the right to cause the Company to sell it assets to a third party on commercially reasonable terms deemed acceptable by Managing Member in its sole, good faith discretion without being required to first give the defaulting Non-Managing Member the right to acquire the assets of the Company;

(iii)    The Managing Member, on behalf of the Company, shall have the right to terminate (or to cause  the defaulting Non-Managing Member to terminate) upon three (3) business days' notice any agreements between the Non-Managing Member and the Company or any Project Entity, excluding the operating agreements and/or partnership agreements, as applicable, of any such entities;

(iv)    From and after the occurrence of a Bad Act Default by the Non-Managing Member under this Agreement, the Non-Managing Member shall have no right to receive any future allocations of Profits and Losses of the Company, any distributions from the Company, or any other funds or assets of the Company, nor shall it be entitled to receive or to be paid by the Company any further payments of fees (excluding fees which have been earned though the date of the applicable Event of Default but are unpaid) made by it to the Company.  From and after the occurrence of a Bad Act Default by the Non-Managing Member, the rights of such defaulting Non-Managing Member to receive or to be paid such allocations, distributions, funds, assets, fees or

40

50102172.3

ARDEN   03122

repayments shall be reallocated to the other Members or, if required by the Managing Member, any new Member admitted to the Company to undertake the responsibilities of the Non-Managing Member hereunder. Notwithstanding such loss of any right to receive such allocations, distributions, funds, assets, fees and repayments, such defaulting Non-Managing Member shall remain liable to the Company for all obligations theretofore incurred by it under this Agreement. Notwithstanding anything herein to the contrary, the Managing Member shall have all rights and remedies against such defaulting Non-Managing Member as provided by law or in equity

11.3  Change of Control.

(a)    Replacement of the Managing Member.  Notwithstanding anything in this Agreement to the contrary, if the Managing Member commits an Event of Default, (i) in addition to the other rights and remedies provided in this Agreement, the Non-Managing Member shall have the unilateral right, upon five (5) business days' prior written notice to defaulting Managing Member given at any time thereafter (such notice, the "Removal Notice"), to take over the responsibilities of the defaulting Managing Member under this Agreement, and (ii) the Managing Member can Voluntarily Withdraw from the Company. Once a Removal Notice has been issued or the Managing Member Voluntarily Withdraws from the Company, the new Managing Member (or new Managing Members) (hereinafter, the "Replacement Managing Member") shall have the unilateral decision-making authority to take all actions or authorize on behalf of and at the Company's expense permitted or required of a managing member of a California limited liability company, including all actions previously within the authority of defaulting Managing Member under this Agreement, without the necessity for obtaining any consent or approval of the defaulting Managing Member; provided, however, (A) if the defaulting Managing Member did not commit a Bad Act Default, then it may not be removed and, in circumstances where the Consent of the Members is required under this Agreement, including, without limitation, Consent for Major Decisions, the approval of the defaulting Managing Member shall continue to be required, and (B) if the defaulting Managing Member committed a Bad Act Default, neither the Consent of the defaulting Managing Member, nor the Consent of the Members, shall be required hereunder.  Upon the exercise of such right, or the Voluntary Withdrawal of the Managing Member from the Company, (i) the powers and authorities granted to defaulting Managing Member as a managing member under this Agreement shall terminate and be of no force or effect, (ii) subject to Section 11.2(a)(ii) above, the defaulting Managing Member's Interests shall convert to Interests of a Non-Managing Member with only those rights of a non-managing member set forth in the Act and, subject to subsections (A) and (B) of this Section 11.3(a), under this Agreement, (iii) subject to the terms of Section 11.2(a)(v), the defaulting Managing Member shall remain liable for all obligations and liabilities incurred prior to the exercise of such right, and (iv) the Replacement Managing Member shall have the power and authority to propose all actions requiring Consent, but such actions shall require the Consent of the Replacement Managing Member and, subject to subsections (A) and (B) of this Section 11.3(a), the defaulting Managing Member. The

41

501021723

ARDEN   03123

foregoing notwithstanding, subject to Section 11.2(a) above, the defaulting Managing Member shall continue to have all other rights and obligations of a Member hereunder and such replacement shall not relieve the defaulting Managing Member of any liability for any Event of Default hereunder or a default of any other agreement entered into by the defaulting Managing Member or any Affiliate thereof; provided, however, that notwithstanding the foregoing or any other provision to the contrary, upon the earlier to occur of the date (1) that the Managing Member commits an Event of Default and loses any rights under this Agreement as specified under Section 11.2(a)(v) above, or (2) on which it is removed, or Voluntarily Withdraws as the managing member of the Company in accordance with this Agreement.

(h)    Costs of Change of Administration.    The costs of implementing a change of administration under this Section 11.3 (including without limitation the legal fees of Non-Managing Member and any Replacement Managing Member) shall be borne by the Company.

(i)    Transition of Management.    If the defaulting Managing Member commits an Event of Default and is removed in accordance with this Section 11.3, then the defaulting Managing Member shall perform all obligations under this Agreement relating to the cessation and quitting of activities; entry upon any Projects; and turnover of all documents and other materials relating to the activities of the Company or any Project Entity. Without limiting the generality of the foregoing, upon any such termination, such defaulting Managing Member shall fully cooperate with the Non-Managing Member and any Replacement Managing Member in transitioning the management, renovation and operation of the Company and any Project Entity, which cooperation shall include, without limitation, delivering originals and copies of all files, materials, records, reports, studies, warranties, documents, maps, surveys plans, specifications, policies, agreements, escrows, instruments, accounts, contracts and computer files, and records pertaining or in any way relating to such activities in the possession or control of such defaulting Managing Member.

## ARTICLE 12.

## MISCELLANEOUS PROVISIONS

12.1    Signatures; Amendments.

(A)    The Members and any Substituted Member shall become a signatory hereto by signing this Agreement and such other instrument or instruments, and in such manner and at such time, as the Managing Member shall determine. By so signing, each Member and Substituted Member, as the case may be, shall have adopted, and shall have agreed to be bound by, all the provisions of this Agreement, as amended from time to time.

42

50102172.3

ARDEN   03124

(B)    In making any amendment, the Managing Member shall prepare and file for recording such documents and certificates as shall be required to be prepared and filed under the Act and under the laws of the other jurisdictions in which the Company is then formed or qualified.

12.2    Binding Provisions.    The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal representatives, successors, and assigns of the respective parties hereto.

12.3    Applicable Law.    This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of California.

12.4    Counterparts.    This Agreement may be executed in several counterparts, all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the same counterpart.    For all purposes of this agreement, facsimile signatures shall be binding upon the parties hereto.

12.5    Severability of Provisions.    Each provision of this Agreement shall be considered separable, and if, for any reason, any provision or provisions hereof are determined to be invalid, unenforceable, or contrary to any existing or future law, such invalidity, unenforceability, or illegality shall not impair the operation of, or the remaining provisions of, this Agreement which shall remain in full force and effect.

12.6    Captions.    Article and section titles and any table of contents are for convenience of reference only and shall not control or alter the meaning of this Agreement as set forth in this text.

12.7    Further Assurances.    Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things, reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

12.8    Disputes.    Any dispute between the Members, the Company or any Affiliate of any Member or the Company which is not resolved informally by negotiations between the relevant parties shall be resolved in an action or proceeding instituted in a state court located in Los Angeles County, California or a federal court for the Central District of the State of California, sitting in Los Angeles County.    Each Member, on behalf of itself and the Company, hereby irrevocably waives any objection which such Person may have or hereafter have to the venue of any such action or proceeding, and irrevocably submits to the jurisdiction of such court in such action or proceeding.

12.9    NonWaiver; Consents.    No waiver by any party hereto of any breach of this Agreement or any provision shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision.    Any consent of a Member which

43

50102172.3

ARDEN    03125

is required under this Agreement shall only be effective if given in writing by the Member.

       **12.10** <u>Notices</u>.  All Notifications provided for hereunder shall be in writing and shall be delivered to the parties in the manner set forth in the definition of "Notification" to the parties at the following addresses:

       If to the Trust: 8950 Olympic Blvd #650, Beverly Hills, CA 90211

       If to Tzepah: 9018 David Avenue, Los Angeles, CA 90034

or to such other address as shall be designated either party for receipt of notices so given.  All such notices shall be deemed served upon receipt thereof.

<div align="center">44</div>

50102172.3

<div align="right">ARDEN   03126</div>

IN WITNESS WHEREOF, the undersigned declare that they are the Persons who have executed this Agreement as of the date first above written, which execution is their act and deed.

Trust:

By: _____
Tzepah Freedland, Trustee of the Daniel Arnall 2014 Trust

By: _____
David Zarmi, Trustee of the Daniel Arnall 2014 Trust

Tzepah:

By: _____
Tzepah Freedland

S-45

501021723

ARDEN   03127

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9401 Wilshire Blvd. 9th Floor, Beverly Hills, CA 90212.

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF KENNETH MILLER IN SUPPORT OF MOTION TO CONVERT CHAPTER 1 CASE TO A CASE UNDER CHAPTER 7** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 14, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Sandford Frey    sfrey@leechtishman.com, fscardino@leechtishman.com
- Daniel J Kessler    lwell@bkcglaw.com;moberbeck@bkcglaw.com;cvasquez@bkcglaw.com;spettit@bkcglaw.com;litclerk1@bkcglaw.com
- Stuart I Koenig    Skoenig@leechtishman.com, fscardino@leechtishman.com
- Ron Maroko    ron.maroko@usdoj.gov
- Tomas A Ortiz    tortiz@garrett-tully.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Michael D Vanlochem    janguiano@vandc.net
- Marta C Wade    mwade@mcwadelaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **April 14, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 14 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***United States Bankruptcy Judge (by Overnight Mail)***
Hon. Barry Russell
U.S. Bankruptcy Court
255 E. Temple St., Ste. 1660
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 14, 2017 | Kimberly Anthony | /s/Kimberly Anthony |
|---|---|---|
| Date | Printed Name | Signature |

13332.23:2577816.1 This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                               **F 9013-3.1.PROOF.SERVICE**

**SERVICE LIST**

2. <u>**SERVED BY UNITED STATES MAIL**</u>:

DEBTOR:

315 Arden, LLC
8950 W. Olympic Blvd. #650
Beverly Hills, CA 902113561

20 LARGEST UNSECURED CREDITORS:

Luviland Corporation
319 Collard Way
Placentia, CA 92870

Luviland LLC
9761 Calendula Ave.
Westminster, CA 92683

Orange County Treasurer
Bankruptcy Unit
PO Box 4515
Santa Ana, CA 92702-4515

Plumbquest
5062 Landersheim Blvd. #15
North Hollywood, CA 91601

Rodriguez Hori Choi & Cafferata LLP
777 S. Figueroa St., #2150
Los Angeles, CA 90017

Seth I. Weissman, Esq.
Jeffer Mangels, Butler Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

13332.23:2577816.1 This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                 **F 9013-3.1.PROOF.SERVICE**