Sandford L. Frey (SBN 117058)
**LEECH TISHMAN FUSCALDO & LAMPL**
100 Corson Street, Third Floor
Pasadena, CA 91103
Telephone: (626) 796-4000
Facsimile: (626) 795-6321
sfrey@leechtishman.com

Reorganization Attorneys for 315 Arden, LLC, Reorganized Debtor

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**[LOS ANGELES DIVISION]**

| | |
|---|---|
| In re<br><br>**315 ARDEN, LLC,**<br><br>Reorganized Debtor. | CASE NO.: 2:15-bk-26483-BR<br><br>Chapter 11<br><br>**OPPOSITION FILED BY REORGANIZED DEBTOR TO MOTION TO CONVERT CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7; DECLARATONS IN SUPPPORT**<br><br>Date: May 16, 2017<br>Time: 2:00 p.m.<br>Ctrm: 1668<br><br>***[Relates to Motion at Docket No 163]*** |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; CREDITORS; AND INTERESTED PARTIES:**

The Reorganized Debtor, 315 Arden, LLC[1] ("Reorganized Debtor") hereby files its Opposition to the Motion to Convert Chapter 11 Case to a Case under Chapter 7 ("Conversion Motion" or "Motion") filed by W Linc BP, LLC ("W Linc" or "Movant").

[1] References to the "Debtor" (as opposed to the Reorganized Debtor) are to 315 Arden, LLC, in its capacity as debtor and debtor in possession prior to confirmation of the Plan.

# TABLE OF CONTENTS

Table of Authorities....................ii

I. INTRODUCTION....................2

**II. BACKGROUND....................6**

**III. DISCUSSION....................9**

A. The Purported Conversion Motion is Legally and Procedurally Improper....................9

B. There is No Proof that the Debtor Intended to Perpetrate a Fraud on the Court and No Proof that a Fraud on the Court Has Occurred....................13

C. There is No Cause to Convert the Case....................18

1. The Conversion Motion Does Not Meets its Burden of Establishing Both a Substantial or Continuing Loss to or Diminution of the Estate <u>and</u> the Absence of a Reasonable Likelihood of Rehabilitation as Required by 11 U.S.C. § 1112(b)(4)(A)....................20

2. The Motion Neither Meets its Burden of Establishing Gross Mismanagement nor Establishes that Gross Mismanagement <u>After</u> Confirmation is Grounds to Convert a Case under Bankruptcy Code § 1112(b)(4)(B)....................23

3. The Motion does not Meet its Burden of Establishing that a Material Default has Occurred under the Plan....................24

D. Unusual Circumstances Exist in the Case; and Neither Conversion nor the Appointment of a Trustee is in the Best Interests of Creditors....................27

**IV. CONCLUSION....................29**

**DECLARATION OF TZEPAH FREEDLAND....................30**

**DECLARATION OF JOSEPH S. SOCHER....................34**

**DECLARATION OF SANDFORD L. FREY....................35**

# TABLE OF AUTHORITIES

## Cases

*Anti-Lothian Bankr. Fraud Comm. v. Lothian Oil, Inc. (In re Lothian Oil)* 508 Fed. Appx. 352 (5th Cir. 2013) .......... 12, 13

*Dale C. Eckert Corp. v. Orange Tree Assocs., Ltd.,*,961 F2d 1445, 1447-48 (9th Cir. 1992) .......... 10, 11

*Grego v. U.S. Trustee (In re Grego)*, 2015 WL 3451559, *5 (9th Cir. May 29, 2015) .......... 25

*In re Austin Ocala Limited,* 150 B.R. 279, 281-282 (Bankr. M.D. Fla. 1993) .......... 29

*In re California Litfunding* 360 B.R. 310 (Bankr. C.D. Cal. 2007) .......... 10, 13

*In re Midstate Mortgage Investors, Inc.,* 105 Fed. Appx. 420, 423 (3d Cir. 2004) .......... 11

*In re Orbit Petroleum, Inc.,* 395 B.R. 145, 149 (Bankr. D. N.M.2008) .......... 30

*In re Products Int'l Co.*, 395 B.R. 101, 110 (Bankr. D. Ariz. 2008) .......... 24

*Rollex Corp. v. Associated Materials (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994) 29

*Lauren Assocs. v. Reed (In re California LIghting),* 360 B.R. 310 (Bankr. C.D. Cal. (2007) .....10, 11

*Matter of Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986) 21

*Official Committee of Unsecured Creditors v. H.B. Michelson (In re H.B. Michelson)* 141 B.R. 714, 725 (Bankr. E.D. Cal 1992) .......... 11, 12

*Taylor v. Freeland & Kronz,* 503 U.S. 638 (1992), .......... 13

## Statutes

11 U.S.C. § 1104(a) .......... 19

11 U.S.C. § 1112(a) .......... 3, 15

11 U.S.C. § 1112(b) .......... 20

11 U.S.C. § 1112(b)(4) .......... 21

11 U.S.C. § 1112(b)(4)(A) .......... 21, 22, 24

11 U.S.C. § 1112(b)(4)(B) .......... 21

11 U.S.C. § 1112(b)(4)(N) .......... 21, 26

11 U.S.C. § 1121(e) .......... 19

11 U.S.C. § 1129(e) .......... 19

11 U.S.C. § 1144 .......... 2, 10, 20, 31

Rules

Federal Rules of Bankruptcy Procedure 2004 .......... 20

Federal Rules of Bankruptcy Procedure 7001(5) .......... 3, 6, 10, 31

Federal Rules of Bankruptcy Procedure 9011 .......... 19

Federal Rules of Bankruptcy Procedure 9024 .......... 2, 31

Federal Rules of Civil Procedure 60 .......... 13

Federal Rules of Civil Procedure 60(b) .......... 4, 6, 31

Treatises

7 Collier on Bankruptcy ¶ 1112.05[2] (16th Ed. 2013) .......... 29

# I.

# INTRODUCTION

While styled a "motion to convert," a thorough reading of the so-called "Conversion Motion" reveals that it is in reality a request to revoke confirmation of a plan masquerading itself as a "Conversion Motion." The reason it is fashioned as a so-called "Conversion Motion" is because it is a brazen attempt to furtively circumvent substantive statutory and procedural bankruptcy law, enacted to prevent the very thing that W Linc is seeking to accomplish. Moreover, the so-called "Conversion Motion" is a subterfuge to achieve its hidden agenda of impairing the Reorganized Debtor's meritorious litigation claims against W Linc and the Red Mountain empire.

Approximately **ten months ago**, on June 27, 2016, this Court entered its *Order on Confirmation of Plan of Reorganization Proposed by Debtor, 315 Arden, LLC* [Docket No. 128] ("Confirmation Order"), thereby confirming the *Plan of Reorganization Proposed by Debtor, 315 Arden, LLC*, [Docket No. 108] ("Plan"). A true and correct copy of the Confirmation Order is attached to the accompanying *Declaration of Tzepah Freedland* (a/k/a Tara Freedland) ("Freedland Declaration") as ***Exhibit 1***.

As will be elucidated in greater detail below, a proceeding to revoke a confirmation order (even one procured by alleged fraud) **must** be brought ***before*** 180 days after the date of entry of the confirmation order, pursuant to Section 1144 of *Title 11* of the *United States Code* ("Bankruptcy Code) and Rule 9024 of the *Federal Rules of Bankruptcy Procedure* ("FRBP"). In this case, in order for such a request to be timely, W Linc would need to have filed such a proceeding before December 24, 2016.

Therefore, as of December 25, 2016, this Court's Confirmation Order is final, inviolable, and irreversible. The assets have been irretrievably vested in the Reorganized Debtor, and there is no longer a bankruptcy estate for a chapter 7 trustee to administer. The Plan governs the conduct and rights of, and remedies available to, all of the parties to the former Chapter 11 case, such parties are bound by the terms of the Plan, and default remedies are unenforceable under the Plan unless and until a material default occurs. There is no admissible evidence contained in the

Conversion Motion, or otherwise, of a material monetary or nonmonetary default under the Plan.

Moreover, even a timely action to revoke a confirmation order must be brought by way of an adversary proceeding pursuant to FRBP 7001(5), and not by way of motion, as is being attempted here. Additionally, the so-called "Conversion Motion" fails to provide for any provisions to protect entities that acquired rights in reliance on the Confirmation Order, as mandated under Bankruptcy Code § 1144(1).

Accordingly, the so-called "Conversion Motion" is legally and substantively without merit, brought in bad faith, and should be summarily denied (and the Movant and its counsel reprimanded for their conduct in bringing this motion in the first place).[2] In tacit recognition of its inability to satisfy the legal and procedural requirements for revoking the final and non-appealable Confirmation Order, the Movant has styled the proceeding as a "Conversion Motion" in the hope of obfuscating its legal and procedural deficiencies. However, in trying to fit the proverbial *round peg into the square hole* and conform its so-called Conversion Motion to the requirements of Section 1112 of the Bankruptcy Code, the Movant has reduced the so-called "Conversion Motion" into a confusing morass of inadmissible hyperbole, most of which bears little, if any, relevance to the burden of proof required under the law; and most of which is included for no apparent purpose other than to attempt to portray the Reorganized Debtor in a negative light in the hope of swaying the Court into a decision which overlooks the Motion's legal and procedural deficiencies.

The tortured effort of the Movant to fit the arguments within the parameters of Section 1112 has produced a motion which is the quintessential Swiss-army-knife of motions, a reading of which renders the reader bewildered as to the nature of relief actually being sought, as well as the basis for such relief. Reading the so-called "Conversion Motion" leaves the reader wondering whether it is actually requesting conversion, appointment of a trustee, or relief from the confirmation order under FRCP Rule 60(b). It fails miserably no matter how it is interpreted.

[2] Although the Motion is clearly in violation of FRBP 9011, the Reorganized Debtor has elected not to bring a separate proceeding for sanctions under such rule in order to avoid the additional expense associated with such proceeding, because legal expenses in this case are already spiraling out of control.

Assuming *arguendo* that the Court is inclined to hear this ruse of a "Conversion Motion" on the merits, despite its legal and procedural deficiencies, the "Conversion Motion" fails dismally in meeting its burden of proving the existence of "cause" for conversion, as well as its burden of establishing that conversion is in the best interest of creditors and interested parties. The "Conversion Motion" relies entirely upon inadmissible hyperbole, spurious facts, and meritless legal arguments. While some of the allegations may perhaps be germane to the issues in the underlying litigation, they are irrelevant to the grounds upon which the request for conversion is purportedly being made.

The "Conversion Motion" offers no proof of a material default, monetary or otherwise, under the Plan. As will be discussed in more detail below, there is in fact no monetary default under the terms of the confirmed Plan. The Reorganized Debtor has made the requisite deposits required by the confirmed Plan. Despite the Movant's denunciation, there is also no nonmonetary default under the Plan. As will be discussed below, the Reorganized Debtor has established, pursuant to the confirmed Plan, three reserve accounts pending resolution of disputed claims (and tax appeal) as follows: (a) for the benefit of W Linc, a reserve account having a current balance of $40,163.06 (consisting of the January 31 and April 30 quarterly payments); (b) for the benefit of the tax claims, a reserve account having a current balance of $141,000; and (c) for the benefit of unsecured claims, a reserve account having a current balance of $20,000.

Apart from its copious innuendo, conjecture, and censure of the Debtor, the "Conversion Motion" offers little in the way of actual proof that the Debtor intended to commit fraud respecting the identity of the majority member. The reason, as will be discussed below, is that the Debtor unequivocally did not intend to commit a fraud upon the Court, or upon any other interested party, including the Movant. If a mistake was made in the Schedules and Disclosure Statement concerning the identity of the majority member, it was an innocent one, and harmless error, as will be explained below.

Moreover, the identity of the majority member is ultimately irrelevant to the adversary action. The issue relating to the fraudulent transfer action (and recent ensuing discovery dispute)

did not concern the identity of the majority member, but rather, which trust had the obligation to fund "*Support Loans*" under the *First Amended and Restated Operating Agreement of 315 Arden, LLC*, dated December 9, 2014 ("Operating Agreement"), which may be relevant to the issue of insolvency at the time of the transfer. A true and correct copy of the Operating Agreement is attached to the accompanying Freedland Declaration as ***Exhibit 2***. It is crystal clear under the Operating Agreement that the 2014 Trust (as defined below) and not the Family Trust (as defined below) was the trust that had the obligations to make "Support Loans" to 315 Arden. Neither the Disclosure Statement nor the Plan contain any discussion whatsoever respecting the issue of the obligation to fund Support Loans. Additionally, as will also be discussed below, the particular trust that was identified as the member in the Disclosure Statement was actually in better financial condition at the time of the fraudulent transfer, so there would have been no benefit to the Debtor to have "fraudulently" identified the more solvent of the two trusts as the majority member, in order to allegedly influence the outcome of an adversary action where insolvency is an element of the claim. Therefore, the entirety of the Movant's argument regarding the alleged fraud is the *red-herring* of all *red-herrings*.

However, the Conversion Motion is procedurally meritless even construed as a proceeding to revoke a confirmation order based on fraud on the court as provided by Section 1144 and which in any event requires a complaint and adversary proceeding under FRBP 7001(5).[3]

The Movant's filing of the "Conversion Motion" is nothing more than a preemptive strike designed to circumvent the Reorganized Debtor's litigation claims against the Movant. It is not mere happenstance that the Motion is being brought as the adversary action comes closer to trial. For the foregoing reasons, as explained in more detail below, the so-called "Conversion Motion" should be denied.

[3] FRBP 9024 states in relevant part: Rule 60 60 F.R.Civ.P applies in cases under the Code except that . . . (3) a complaint to revoke an order confirming a plan may be filed only within the time allowed by § 1144 . . . *[emphasis added]*

**II.**

**BACKGROUND**

The Court is already familiar with much of the background of this highly contentious case and ensuing litigation. Therefore, in the interest of brevity, the Opposition will not delve into a lengthy foray into the background, and will provide only a brief summary of the salient facts.

The Debtor is a limited liability company formed in 1999. Daniel Arnall was the sole member of the Debtor. Daniel Arnall passed away on December 8, 2014 from complications from cancer, leaving behind his wife, Judith Arnall, and their minor son. Judith Arnall suffers from Multiple Sclerosis, and has been confined to a wheel chair since her early twenties. She has also been diagnosed with lupus, retinoid, and bursitis, and her health continues to be in decline. Following the death of Danial Arnall, Tzepah Freedland ("Freedland") became one of the managing members of the Debtor. *[See Freedland Declaration* at ¶ *2 and 7].*

As the Court is aware, the Debtor purchased real property and improvements, located at 7101 W. Lincoln Avenue, Buena Park, CA ("Commercial Property") in February 2015, for approximately $5 million in cash, and a note payable to the Movant, for approximately $1.5 million ("W Linc Note"), secured by the Commercial Property. *[See Freedland Declaration* at ¶ *4].*

Thereafter, the Debtor discovered facts about the sale of the Commercial Property leading to its contention that it appears to have been the victim of a fraudulent real estate scheme, in which a group of real estate professionals (including the sellers and the Debtor's real estate agents) fraudulently induced the Debtor into immensely overpaying for Commercial Property, to the detriment of the Debtor and its creditors, as well as to the detriment of the infirm widow, her minor child, and Freedland.

On or about August 18, 2015, the Movant served a Notice of Default ("W Linc NOD") threatening to foreclose if the Debtor failed to pay the balance due on the W Linc Note in the amount of approximately $1,568,569.27.

Thereafter, on August 21, 2015, the Debtor commenced a civil action in the Superior

Court of the State of California for the County of Orange by filing a Complaint captioned *315 Arden LLC, a California Limited Liability Company, Plaintiff, vs. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company; Luviland Corporation, a California Corporation; Luviland LLC, a California Limited Liability Company, John Huy Nguyen, an individual; Eric Wohl, an individual; Carlos J. Lopez, an individual; Edward B. Hanley, an individual; Hanley Investment Group, Inc., a California Corporation, and, Does 1 through 40, inclusive*, Case No. 30-2015-00805904-CU-FR-CJC ("State Court Action").

On October 27, 2015 ("Petition Date"), the Debtor initiated this Chapter 11 case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. On February 19, 2016, in an effort to reduce its litigation expenses (which turned out in retrospect only to have increased them), the Debtor commenced an adversary action in the Bankruptcy Court captioned *315 Arden, LLC, Plaintiff, v. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company, Defendants*, by filing a *Complaint for: (1) Avoidance and Recovery of Fraudulent Transfer [11 U.S.C. §§ 548, 550 and 551]; (2) Equitable Subordination [11 U.S.C. § 510]; (3) Disallowance of any Claims held by Defendants [11 U.S.C. § 502(d)]*, which was assigned adversary number 16-ap-01076-BR ("Fraudulent Transfer Action" and together with the State Court Action, the "Litigation").

Although the Debtor has sought mediation on numerous occasions, it has been unsuccessful in getting the defendants to the table (except as to the brokers in the State Court Action).

The Debtor filed its Disclosure Statement and Plan on December 28, 2015 [Docket Nos 41 and 42, respectively], over 1 year and 3 months prior to the Conversion Motion. No opposition was filed to the Disclosure Statement. The hearing on the Disclosure Statement was originally set for January 12, 2016 and was continued to March 23, 2016. No opposition was filed to the Disclosure Statement for the March 23rd hearing.

At a hearing on March 23, 2016, the Court held a hearing on approval of the Disclosure Statement. Byron Maldo of Ervin Cohen & Jessup, LLP appeared at the hearing on behalf of Red Mountain Group, Inc., Red Mountain Retail Group, Inc, and W Linc ("W Linc's Counsel"). No objections were raised at the Disclosure Statement hearing. At the March 23, 2016 hearing, the Court approved the Disclosure Statement, subject to modifications requested by W Linc's Counsel and agreed to by the Debtor, as to the interest rate to be accrued after the Effective Date on the W Linc Note.

On April 8, 2016, this Court entered its *Order Approving: (1) Adequacy of the Disclosure Statement Describing Plan of Reorganization Proposed by Debtor, 315 Arden LLC; (2) The Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notice with Respect Thereto; and (3) Related Confirmation Procedures, Deadlines and Notice* [Docket No 98], a true and correct copy of which is attached to the accompanying Freedland Declaration as ***Exhibit 3*** ("Disclosure Statement Order").

This Court scheduled a hearing to take place on June 7, 2016 at 10:00 a.m. to consider confirmation of the Plan ("Confirmation Hearing"). No opposition was filed to the Plan. No appearances were made at the hearing on confirmation.

On June 27, 2016, the Court entered its Order on Confirmation of Plan of Reorganization proposed by Debtor, 315 Arden, LLC [Docket No. 128] ("Confirmation Order") and separate Findings of Fact and Conclusions of Law Re Plan of Reorganization proposed by Debtor, 315 Arden, LLC [Docket No. 129] ("Findings"). No objections were filed to either the Confirmation Order or Findings.

With respect to W Linc, the Plan[4] provides in pertinent part as follows:

**W Linc Disputed Deferred Payment(s)**. A quarterly payment in an amount equal to the accrued W Linc Interim Discount/Interest Rate accruing, on the projected or estimated principal balance of the W Linc Disputed Secured Claim, during the applicable previous quarter, shall be deposited into the **W Linc Disputed Claim Reserve**, on a quarterly basis, on **January 31, April 30, July 31, and October 31** (or the first Business Day thereafter), commencing on the first such date which is at least 90 days following the Effective Date and continuing until entry of (i) a Final Order Allowing or disallowing W Linc Disputed Secured Claim, and (ii) a Final Judgment in the State Court Action (each a "W Linc Disputed Deferred Payment," and collectively the "W Linc Disputed Deferred Payments").

---

[4] The Court is requested to take judicial notice of the Plan.

*[Plan, Section V, ¶ B.2]. [Emphasis added].*

In accordance with the terms of the Plan, the first payment was due January 31, 2017. On January 25, 2017, the Reorganized Debtor caused to be deposited into a segregated account the sum of $20,081.53 ("January 2017 Deposit"), which sum remains on deposit. A true and correct copy of a Chase Deposit Account Balance Summary is attached to the accompanying Freedland Declaration as ***Exhibit 4*** ("Reserve Account"). The next quarterly payment is not due until the first business day following April 30, 2017. Pursuant to the Plan, the Reorganized Debtor deposited an additional $20,081.53 on May 1, 2017, bringing the Reserve Account balance to $40,163.06. *[See Freedland Declaration* at ¶ *19].*

In addition, the Reorganized Debtor has established, pursuant to the confirmed Plan, a reserve account for the priority taxes, having a balance of $141,000; and a reserve account for the benefit of unsecured claimants, having a balance of $20,000. *[See Freedland Declaration* at ¶ *19].*

**III.**

**DISCUSSION**

**A. The Purported Conversion Motion is Legally and Procedurally Improper.**

The so-called "Conversion Motion" is legally and substantively without merit and should be summarily denied. The so-called "Conversion Motion" is not a conversion motion, but, in reality, a disguised request to revoke confirmation of a plan. The reason it is fashioned as a so-called "Conversion Motion" is to circumvent Bankruptcy Code § 1144, FRBP 9024 and FRBP 7001(5).

Bankruptcy Code § 1144 provides as follows:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall –
>
> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
>
> (2) revoke the discharge of the debtor.

11 U.S.C. § 1144. *[Emphasis added]*

In order to promote the fundamental policy of finality in the Chapter 11 process, the general rule is that a final confirmation order is inviolable. Courts have consistently held that the absence of certainty that the transactions effectuated under a plan are valid and permanent would undermine Chapter 11's fundamental purpose as a vehicle for rehabilitating and providing debtors with a fresh start. *See, e.g., Dale C. Eckert Corp. v. Orange Tree Assocs., Ltd. (I re Orange Tree Assocs., Ltd.)*, 961 F.2d 1445, 1447-48 (9th Cir. 1992) ("There is a compelling reason for finality of reorganization plans. A Chapter 11 proceeding is 'focused towards rehabilitating a business, which if successful, is to the benefit of all persons who had dealings with the debtor. Such plans are not easily devised, and once accomplished a short time for challenging such plan is necessary to keep alive the potential life of that business. Uncertainty of continued operations, injected by a Sword of Damocles in the form of fraud allegations which can be filed at any time in the future, would render meaningless the whole purpose of a Chapter XI proceeding. As Judge Learned Hand said . . . unless a reorganized debtor can assure new creditors "as to the amount of his actual liabilities without a contingent addition of the old debts, he will start with a handicap in a race which he has already once lost".") [citations omitted].

The limited exception to the rule of finality of the confirmation of a chapter 11 plan can be found in Section 1144 of the Bankruptcy Code, which provides that, on the request of a party-in-interest made any time ***before 180 days*** after the entry of an order of confirmation, the bankruptcy court "***may*** revoke such order ***if and only if*** such order was procured by fraud." 11 U.S.C. § 1144 (emphasis added.)

Section 1144 is strictly construed; in order to promote the finality of bankruptcy confirmations, any challenge to the confirmation order brought after 180 days is untimely and therefore barred. *See Lauren Assocs. v. Reed (In re California Litfunding)*, 360 B.R. 310 (Bankr. C.D. Cal. 2007) ("The law in applying § 1144 is well-established. The Ninth Circuit has held that § 1144 is the only avenue for revoking confirmation of a plan of reorganization. The expiration of the limitation period bars a motion to set aside confirmation of a plan of