Case 2:15-bk-26483-BR   Doc 167-1   Filed 05/02/17   Entered 05/02/17 21:48:37   Desc
Volume(s) Opposition Part 2 of 3    Page 1 of 14

reorganization even if the fraud is not discovered until the period has passed. . . . [T]he Ninth Circuit explained that there is a compelling reason for the finality of reorganization plans and courts have uniformly held that strict compliance with § 1144 is a prerequisite to relief.") (*citing In re Orange Tree Assocs., supra*). *See also In re Midstate Mortgage Investors, Inc.*, 105 Fed. Appx. 420, 423 (3d Cir. 2004) ("Expiration of the limitations period bars a motion to set aside the confirmation of a reorganization plan even if the fraud is not discovered until the period has passed.").

Most courts construe "fraud" in Section 1144 to mean "fraud upon the court." *See, e.g., Official Committee of Unsecured Creditors v. H.B. Michelson (In re H.B. Michelson)*, 141 B.R. 714, 725 (Bankr. E.D. Cal 1992) (holding that "fraud upon the court is at the heart of 'procured by fraud' as that term is used in section 1144"). In addition, most courts require a showing of actual fraudulent intent. *Id.* at 724 ("Under the Bankruptcy Code, as was settled under the Bankruptcy Act, fraudulent intent is required before revocation is warranted."). The fraud must consist of material misstatements in the face of a duty to disclose information. *Id.* ("[T]he requisite intent, in the context of defective disclosure exists where there is an intentional omission of a material fact."). There is no such showing made in the "Conversion Motion" before this Court.

The importance of finality in this context was the subject of a ruling by the Fifth Circuit Court of Appeals in *Anti-Lothian Bankr. Fraud Comm. v. Lothian Oil, Inc. (In re Lothian Oil, Inc.)*, 508 Fed. Appx. 352 (5th Cir. 2013), where the court held that the 180-day limitation period in Section 1144 for seeking revocation of a confirmation order on the basis of fraud may not be tolled. 508 Fed. Appx. at 357. It is important to note that the Fifth Circuit Court of Appeals in *Lothian Oil* similarly rejected the movant's "dubious" assertion that the motion at issue in that case was a motion to "modify the plan" and not to "revoke confirmation" (not dissimilar to the dubious assertion of W Linc in this case that its motion is a conversion motion). *Id.* at 356.

The *Lothian Oil* decision demonstrates the critical importance of the finality of a confirmation order confirming a chapter 11 plan, as well as the exacting scrutiny that courts must bring to bear on any attempt to attack a confirmation order outside the normal appellate process,

11

regardless of how such a challenge is denominated. The requirements of Section 1144 of the Bankruptcy Code are strictly construed. The message is aptly summed up by the Fifth Circuit's citation to the U.S. Supreme Court's ruling in *Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992), for the proposition that "[d]eadlines may lead to unwelcome results, but they prompt parties to act and they produce finality." Id. at 357-58.

Assuming *arguendo* that W Linc timely filed its Motion within the 180-day limitation period (which it clearly did not) and alleged facts to support fraud (which it clearly did not), W Linc still could not prevail based on the facts of this case. In the case of *In re California Litfunding)*, *supra*, the movants argued that the fraud could "not have been raised preconfirmation as it was not discovered until after confirmation." 360 B.R. at 318. In rejecting the argument, the Court stated that "[t]he alleged fraudulent representations were available for investigation months before the hearing on confirmation and indeed, months after plan confirmation," the plaintiffs "could have (and should have) conducted their due diligence and investigated the accuracy (or inaccuracy) of the statements made in or omitted from the Disclosure Statement." Id. at 318-19.

FRCP 60 cannot remedy the deficiencies in the Movant's so-called Conversion Motion. FRBP 9024 (which makes FRCP 60 applicable to bankruptcy cases), provides as follows:

> Rule 60 F.R.Civ.P. applies in cases under the Code except that (1) a motion to reopen a case under the Code or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(c), (2) a complaint to revoke a discharge in a chapter 7 liquidation case may be filed only within the time allowed by §727(e) of the Code, and (3) **a complaint to revoke an order confirming a plan may be filed only within the time allowed by §1144**, §1230, or §1330 In some circumstances, Rule 8008 governs post-judgment motion practice after an appeal has been docketed and is pending.

[Emphasis added.]

Thus, "[t]he one-year limit on Rule 60(b) motions provided in Bankruptcy Rule 9024 is expressly subject to the §1144 limit." *In re Lothian Oil*, 508 Fed. Appx. at 356. Accordingly, the Reorganized Debtor submits that even if construed as a motion under FRCP 60 (b), the Motion is untimely and must be denied, regardless of whether the Confirmation Order was procured by intrinsic or extrinsic fraud or a fraud on the Court. In other words, once the 180

12

days passes (as it has here), the Confirmation Order is inviolable.

Furthermore, FRBP 7001 provides in pertinent part as follows:

> An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings:
>
> . . . .
>
> (5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan;
>
> . . . .

Therefore, the purported "Conversion Motion" is also procedurally improper pursuant to FRBP 7001(5).

As of December 25, 2016, this Court's Confirmation Order is final, inviolable, and irreversible. The assets have been irretrievably vested in the Reorganized Debtor, and there is no longer a bankruptcy estate for a chapter 7 trustee to administer. The Plan governs the conduct and rights of, and remedies available to, all of the parties to the former Chapter 11 case, such parties are bound by the terms of the Plan, and default remedies are unenforceable under the Plan, unless and until a material default occurs (and there is no admissible evidence contained in the "Conversion Motion" of a material monetary or nonmonetary default under the Plan).

This Court should not permit W Linc to cavalierly flout applicable law, and evade the important purpose behind such law, simply by disguising its "Conversion Motion" as something other than what it actually is, particularly where the so-called "Conversion Motion" is a subterfuge to achieve its hidden agenda of impairing the Reorganized Debtor's meritorious litigation claims against W Linc and the Red Mountain empire.

**B. There is No Proof that the Debtor Intended to Perpetrate a Fraud on the Court and No Proof that a Fraud on the Court Has Occurred**

Assuming *arguendo* that the Court is inclined to hear the merits of the Movant's motion as one under Section 1112, despite the untimeliness and deficiencies of the "Conversion Motion," the "Conversion Motion" fails dismally in meeting its burden of proving fraud and intent to defraud or other elements of Section 1112.

Prior to his untimely death, Daniel Arnall ran the financial affairs of the Debtor. Of the several trusts involving Danial and Judith Arnall, two are germane to the disputes respecting the Debtor – The ***Daniel Arnall 2014 Trust*** ("2014 Trust"), and the ***Daniel & Judith Arnall Family Trust*** ("Family Trust" and together with the 2014 Trust, the "Trusts"). Due to Daniel Arnall's death and Judith Arnall's illness, the background regarding the two Trusts is somewhat confusing, as explained below. *[See Freedland Declaration at ¶ 8].*

The alleged misidentification of the majority member of the Debtor was nothing more than an innocent mistake and harmless error. *[See Freedland Declaration at ¶ 9 and 10].* It is perplexing to imagine how a misidentification of a trust under the circumstances can rise to the level of fraud or deceit as alleged in the Motion, and it is clear that W Linc is merely trying to exploit the innocent mistake to its advantage in order to avoid the litigation against it.

The Plan was structured in such a way that the Family Trust would be the Plan funder. Whether or not it was the majority member of the Debtor is not relevant to its obligations to fund under the Plan. *[See Freedland Declaration at ¶ 5].*

The Operating Agreement is in fact mentioned and defined in the Plan. Thus, if the Debtor was trying to conceal material facts, mislead the Court, or commit a fraud, why would it reference and define the very document that contradicts its assertion that the Family Trust is the majority member? For the reason explained below, at the time, the Debtor thought there was a separate assignment to the Family Trust. *[See Freedland Declaration at ¶ 10].*

After Daniel Arnall passed away, it was discovered that he had transferred a fifty percent interest in 315 Arden LLC directly to Judith Arnall. Sometime thereafter, Judith Arnall assigned her interest to the 2014 Trust. However, as of the Petition Date, and through the date of confirmation, the Debtor had a good faith belief that Judith Arnall had subsequently assigned her entire interest (her fifty percent and the inherited thirty percent) to the "family trust," which the Debtor construed to mean <u>the</u> "Family Trust." *[See Freedland Declaration at ¶ 9].*

During the process of discovery in the Fraudulent Transfer Action, the Reorganized Debtor has successfully located the assignment document to the 2014 Trust, a true and correct copy of which is attached to the accompanying Freedland Declaration as ***Exhibit 5*** ("2014 Trust

14

Assignment"). However, the Reorganized Debtor has been unable to locate any document confirming any subsequent assignment to the Family Trust. *[See Freedland Declaration at ¶ 11]*.

Accordingly, based on the Operating Agreement, the 2014 Trust Assignment, and the inability to locate any document further assigning the membership interest, it appears that the Debtor may have identified the wrong trust as its majority member. If a mistake was made concerning the identity of the majority member, it was an innocent one, and harmless error. *[See Freedland Declaration at ¶ 11]*.

W Linc's erroneous speculation respecting the Debtor's purported motivation to allegedly commit fraud by identifying the wrong majority member is mere conjecture, and unsupported by any evidence, let alone admissible evidence. Moreover, W Linc's conclusions defy logic:

- First, the Debtor had no motivation for intentionally perpetrating the purported fraud, in the face of no objection to the Disclosure Statement, no objection to the Disclosure Statement Order, no objection to the Plan, no objection to confirmation, and no objection to the Confirmation Order, particularly where, at the time of the hearing on Plan confirmation, the Movant did not request or review any material disclosures respecting the financial condition of the members or the Trusts, so therefore could not possibly have relied upon them.

- Second, contrary to the inadmissible speculation of W Linc, the Family Trust was in better financial condition at the time of the fraudulent transfer than the 2014 Trust, so there would have been little benefit to fraudulently identifying the more solvent of the two trusts as the majority member in an action where insolvency is an element of the claim. A true and correct copy of a redacted bank statement for the Family Trust at the time of transfer (which has been produced in connection with the adversary action) is attached to the accompanying Freedland Declaration as ***Exhibit 6***. The 2014 Trust had no bank account at the time, to the best of the Debtor's knowledge and belief. *[See Freedland Declaration at ¶ 13]*.

- Third, the identity of the majority member is irrelevant to the Fraudulent Transfer Action. The issue relating to the Fraudulent Transfer Action (and the recent discovery dispute), did not concern the identity of the majority member, but rather, which trust had the obligation to fund "*Support Loans*" under the Operating Agreement, which may be relevant to the issue of insolvency at the time of the transfer. The Operating Agreement is crystal clear that it is the 2014 Trust that has such obligation. Neither the Disclosure Statement nor the Plan contain any discussion whatsoever respecting the issue of the obligation to fund Support Loans. *[See Freedland Declaration at ¶ 14]*.

- Fourth, the Plan is crystal clear that the Family Trust is the new value contributor and funder under the Plan. Therefore, the identity of the incorrect majority member is harmless and immaterial error with respect to the issues at confirmation. *[See Freedland*

15

*Declaration* at ¶ *15].*

- Fifth, with regard to the issues relevant to the Fraudulent Transfer Action, the Debtor has not asserted, and does not intend to assert, that W Linc is precluded by the approved Disclosure Statement, under principles of collateral estoppel and/or res judicata, from asserting in the Fraudulent Transfer Action the identity of the trust obligated to fund the Support Loans at the time of transfer (which is the 2014 Trust), or, for that matter, the identity of the correct majority member. Accordingly, despite its hyperbole, W Linc is not harmed in any material way by the innocent mistaken identity of the majority member in the Disclosure Statement.

Identifying the Operating Agreement in the Plan is not something that anyone would do if they were trying to "hide the ball." Any party in interest could have requested a copy of the Operating Agreement and read for itself the language identifying the 2014 Trust as the majority member and the entity obligated to make the "Support Loans".

Had W Linc timely objected to the Disclosure Statement, or taken discovery in connection with the Disclosure Statement and/or Plan, it, as well as the Debtor, may have discovered the error at that time, instead of in connection with the discovery sought in the Fraudulent Transfer Action. Instead, W Linc failed to file a timely objection to the Disclosure Statement, failed to conduct any discovery in connection with the Disclosure Statement, failed to file a timely objection to confirmation of the Plan, and failed to conduct any discovery in connection with the Plan. Having slept on its rights, how does it now have the temerity to infer that there is "newly discovered evidence that, with reasonable due diligence, could not have been discovered in time to move for a new trial under Rule 59(b)," particularly where the Plan disclosed the existence of a document which contradicted the statement made in the Disclosure Statement?

Furthermore, the Plan, which was confirmed in June 2016, does not expressly identify the managing member, and it specifically provides that the Plan *"shall control over any conflicting provision, or in the event of any ambiguity, between the terms of the Disclosure Statement . . ."* *[Plan, Section II, ¶ B].* Therefore, the Plan itself does not provide support for the Movant's contentions because the Plan simply does not discuss the identity of the member one way or the other.

Importantly, the Debtor had a good faith belief that the Family Trust was the majority

16

member at the time. Moreover, counsel for W Linc has had possession of the Operating Agreement since at least August 2016 (if not long before), which identified the 2014 Trust as the member and trust which is obligated to fund Support Loans; thus, it is certainly perplexing as to the reason counsel for W Linc did not make an inquiry or raise this argument eight months ago. [See Declaration of Joseph S. Socher ("Socher Declaration") and Freedland Declaration at ¶ 12].

Further, under the Plan, it is clear that the Family Trust is the new value contributor and potential source of exit financing. Under Section V, ¶ E. of the Plan, equity was going to retain its interests if voting went its way or in consideration of the new value contribution. Under Section VI, ¶ B. of the Plan, the Operating Agreement was deemed modified and amended to be consistent with the Plan.

Moreover, the identity of the managing member is not material because at the time of the hearing on Plan confirmation, the Movant did not request or review any material financial information respecting the financial condition of the members or the Trusts, so therefore could not possibly have relied upon them. Under these circumstances, how would any creditor's vote change if the Disclosure Statement identified the 2014 Trust as the majority member, when no financial disclosure about either trust was requested by anyone, and where the Family Trust is making the new value contribution?

The unsupported suggestion that it was done to hide the financial wherewithal of one of the two trusts in question is patently untrue, not supported by the facts, and not borne out by any admissible evidence. Furthermore, the inference in the "Conversion Motion" that counsel for the Debtor would participate in such a deception upon this Court or any court is entirely without factual basis, is unprofessional, and is unequivocally a violation of FRBP 9011.

Accordingly, the "Conversion Motion" fails dismally in establishing that it was anything other than an innocent mistake and harmless error. Apart from unsupported hyperbole, the "Conversion Motion" fails to contain a scintilla of evidence necessary to meet its burden of establishing that any purportedly incorrect statement about the member was made intentionally and for a fraudulent purpose, as opposed to a harmless error based upon a good faith belief as to

17

the identity of the member at the time it was made.

Assuming *arguendo* a mistake was made, there is no proof of fraud and/or reliance, and no legal authority has been cited that supports the extraordinary remedy being advocated in the "Conversion Motion" of effectively vacating a <u>final</u> and <u>non-appealable</u> Confirmation Order ten months after its entry or converting the case to chapter 7. Besides, what would have been the Debtor's nefarious motivation for intentionally perpetrating the purported lie, in the face of no objection to the Disclosure Statement, no objection to the Disclosure Statement Order, no objection to the Plan, no objection to confirmation, and no objection to the Confirmation Order, and particularly where no request for information about the Trusts or the Debtor's members was ever requested by any interested party, including the Movant, and so no interested party, including the Movant, could have relied upon it? The answer is simple: there is none.

**C. There is No Cause to Convert the Case.**

Conversion of a Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code is governed by Section 1112(b) of the Bankruptcy Code, which provides as follows:

> (1)    Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.
>
> (2)    The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>
> > (A)    there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
> >
> > (B)    the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
> >
> > > (i)    for which there exists a reasonable justification for the act or omission; and

18

          (ii)    that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b). For purposes of Section 1112(b), "cause" includes:

    (A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

    (B)    gross mismanagement of the estate;

    (C)    failure to maintain appropriate insurance that poses a risk to the estate or to the public;

    (D)    unauthorized use of cash collateral substantially harmful to 1 or more creditors;

    (E)    failure to comply with an order of the court;

    (F)    unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

    (G)    failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

    (H)    failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

    (I)    failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

    (J)    failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

    (K)    failure to pay any fees or charges required under chapter 123 of title 28;

    (L)    revocation of an order of confirmation under section 1144;

    (M)    inability to effectuate substantial consummation of a confirmed plan;

    (N)    material default by the debtor with respect to a confirmed plan;

    (O)    termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

    (P)    failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

Although courts have recognized that Section 1112(b)(4) does not provide an exclusive or exhaustive list, it is important to note that all of the examples of cause involve the *pre-confirmation* conduct of a debtor in possession, except for subsection "L" (revocation of an order of confirmation); "M" (inability to effectuate substantial consummation of a confirmed plan); "N" (material default by the debtor with respect to a confirmed plan); and "O" (termination of a confirmed plan by reason of the occurrence of a condition specified in the plan).

"Under this section, the Court is faced with a balancing of equities. Congress has determined that it is better to reorganize when possible, particularly when it is in the best interests of creditors. 'A Court should not precipitously sound the death knell for a debtor by prematurely determining that the debtor's prospects for economic revival are poor.' The Court, therefore, should resolve all doubts in favor of the debtor." *Matter of Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986) (citations omitted).

Based on the allegations set forth in the Conversion Motion, the Movant appears to allege that the Debtor's case should be converted on the basis of Section 1112(b)(4)(A), (B), or (N) of the Bankruptcy Code. However, for the reasons set forth in more detail below, the Motion fails to establish "cause" to convert the case pursuant to any of these subsections.

> 1. *The Conversion Motion Does Not Meets its Burden of Establishing Both a Substantial or Continuing Loss to or Diminution of the Estate <u>and</u> the Absence of a Reasonable Likelihood of Rehabilitation as Required by 11 U.S.C. § 1112(b)(4)(A)*

The Conversion Motion appears to assert that cause for conversion exists under Bankruptcy Code § 1112(b)(4)(A) due to a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." However, Movant fails to establish either of the two prongs necessary to obtain relief under this subsection.

First and foremost, the so-called "Conversion Motion" glosses over the fact that there is no longer an <u>estate</u> in this case and a plan of rehabilitation has already occurred!!!! Under the Plan, all former property of the estate, including the commercial real estate and litigation claims, are now indefeasibly vested in the Reorganized Debtor, and there is no provision in the Plan for

re-vesting such property in the estate upon conversion. Specifically, the Plan provides in relevant part:

> The Confirmation of the Plan **vests all of the property of the Estate** and/or Debtor, including, without limitation, the Commercial Property, the Other Assets, operations, the State Court Action, Fraudulent Transfer Action, the Subordination Claim, and Rights of Action **in the Reorganized Debtor free and clear of all Claims, Liens, interests, and encumbrances**, except the liens securing the W Linc Note Disputed Secured Claim or the W Linc Note Allowed Secured Claim, as applicable, pursuant to the provisions of Class 2 of the Plan.
>
> **On and after the Effective Date, the Reorganized Debtor may operate the business and use, sell, lease, assign, transfer, convey, hypothecate, pledge, alienate, dispose of, take possession of, or encumber any and all of the Commercial Property**, Other Assets, personal property, and any other property **without further Court order or approval, whether in the ordinary course of business or outside the ordinary course of business and free of any restrictions imposed by Bankruptcy Code § 363(b)**. . . .

*[See Plan, Section VIII, ¶ C] [Emphasis added].* Thus, following confirmation and revesting of the estate's assets in the Reorganized Debtor, there no longer is an estate, and so there cannot be loss to or diminution of such estate.

Even if one were to overlook this threshold defect, there is in fact no substantial or continuing loss to or diminution of the Reorganized Debtor's property. The so-called "Conversion Motion" is devoid of any admissible evidence of value in support of its contention that there is an alleged continuing loss or diminution, with the only evidence of value from W Linc contained in the record being its previous contention that the Commercial Property had a ridiculously high $5 million valuation (a disputed fact at issue in the very underlying litigation that W Linc seeks to preempt by the so-called "Conversion Motion"). Instead, W Linc asserts that the Commercial Property is not being maintained by the Reorganized Debtor. This allegation is false! Attached to the accompanying Freedland Declaration as ***Exhibit 7*** are photographs of both the interior and exterior of the Commercial Property during the period just after it was acquired from of W Linc and now. The photographs speak for themselves.

It is completely untrue that the Commercial Property is deteriorating. To the contrary, it is in far better physical condition today than it was when it was purchased. Since acquiring the Commercial Property the Debtor, and thereafter, Reorganized Debtor, has done the following,

among other things:

- Called the city to come out and repair damage from a water main break on the back portion of the property;
- Got rid of weeds in front of the property;
- Painted the exterior of the building;
- Painted the interior of the building;
- Fixed the building's air conditioner;
- Fixed the building's roof;
- Stripped a thick layer of dirt from the floors and waxed the floors;
- Fixed toilets in the building; and
- Fixed some of the electricity in the building.

*[See Freedland Declaration* at ¶ *16 and 17].* Indeed, as a result of the Debtor's efforts, both before and after Plan confirmation, the Commercial Property is in far, far better condition today than it was during the brief time that it was owned by W Linc.

Moreover, even assuming W Linc could establish loss or diminution (which is has not, and cannot), it must also establish the "absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1121(b)(4)(A); *In re Products Int'l Co.*, 395 B.R. 101, 110 (Bankr. D. Ariz. 2008) ("For a Chapter 11 case to be . . . converted predicted on this item, there must be both (1) continuing loss or diminution, and (2) the absence of reasonable likelihood of rehabilitation."). Here, the Movant cannot establish the absence of a reasonable likelihood of rehabilitation because the Debtor has already been rehabilitated and has confirmed a Plan. Accordingly, to the extent that the Conversion Motion is based on Section 1112(b)(4)(A), it must fail.

### 2. The Motion Neither Meets its Burden of Establishing Gross Mismanagement nor Establishes that Gross Mismanagement *After* Confirmation is Grounds to Convert a Case under Bankruptcy Code § 1112(b)(4)(B)

Alternatively, based on the allegations contained in the Motion, W Linc appears to be accusing the Reorganized Debtor's managing member of gross mismanagement for allegedly failing to lease or sell the Commercial Property within the meaning of Section 1112(b)(4)(B) of the Bankruptcy Code.

First and foremost, this contention in the Motion overlooks the threshold requirement for conversion under Bankruptcy Code § 1112(b)(4)(B) that movant must establish "gross mismanagement *of the estate*." The so-called "Conversion Motion" once again glosses over the fact *that there is no longer an estate*, and the debtor has, in fact, already been rehabilitated. Under the Plan, all former property of the estate, specifically including, without limitation, the commercial real estate and litigation claims, are indefeasibly vested in the Reorganized Debtor. *[See Plan Section VI, ¶ B.1 and Section VIII. ¶ C]*. There is no provision in the Plan for re-vesting such property in the estate upon conversion.

Even if one ignores this threshold defect, the Conversion Motion does not allege sufficient facts to establish gross mismanagement justifying conversion of the case at this late date. "The 1112(b)(4)(B) inquiry typically focuses on how the debtor or debtor's agents have managed the estate's assets or business during the pendency of the chapter 11 proceeding and how they have reported and handled, postpetition, income and expenses derived from the assets/business." *Grego v. U.S. Trustee (In re Grego)*, 2015 WL 3451559, *5 (9th Cir. BAP May 29, 2015). Notably, in this case, there is no provision under the Plan requiring the Reorganized Debtor to lease or sell the Commercial Property. To the contrary, the Plan expressly states in pertinent part as follows:

After the Effective Date, the Reorganized Debtor **may** elect, **in its sole and absolute discretion**, to sell the Commercial Property ("Sale Option").

[Plan, Section VI, ¶ A. e] *[emphasis added]*.

The Plan goes on to state:

> On and after the Effective Date, the Reorganized Debtor **may** operate the business and use, **sell, lease,** assign, transfer, convey, hypothecate, pledge, alienate, dispose of, take possession of, or encumber any and all of the Commercial Property, Other Assets, personal property, and any other property without further Court order or approval, whether in the ordinary course of business or outside the ordinary course of business and free of any restrictions imposed by Bankruptcy Code § 363(b). As provided under the Plan, the Reorganized Debtor is authorized and empowered without further Court Order to execute, do and perform, in the name and on behalf of the Reorganized Debtor, such acts and to prepare, execute, acknowledge, verify, file, deliver and cause to be published any and all certificates, agreements, notices, notice of default, trustees' sale notices, reports, applications, declarations, instruments, notes, deeds, reconveyances, transfer documents, sale agreements, and any and all other documents of any kind or nature to accomplish any of the foregoing.

*[Plan, Section VIII, ¶ C].*

In the absence of any obligation to lease or sell the Commercial Property, there is simply no basis for the Movant to allege, without more, that the Reorganized Debtor is mismanaging its property simply by exercising the discretion that it has expressly been granted. Accordingly, to the extent that the Conversion Motion is based upon Section 1112(b)(4)(B), it again must fail.

In addition, the statements in the "Conversion Motion" respecting leasing efforts are inaccurate. The Reorganized Debtor does have a broker and the Commercial Property is being marketed for lease with numerous services. Lee & Associates is marketing the Commercial Property, and a true and correct copy of one of the listing brochures is attached to the Freedland Declaration as **Exhibit 8**. *[See Freedland Declaration at ¶ 18].*

### 3. The Motion does not Meet its Burden of Establishing that a Material Default has Occurred under the Plan.

As conversion is no longer legally justified after confirmation under Bankruptcy Code § 1112(b)(4)(A) or (B), the reader is left wondering about the reason behind W Linc's diatribe

24