respecting the purported failure to sell or lease the Commercial Property. Logic concludes that the so-called "Conversion Motion" must be inferring that a material default has occurred under the Plan, thus invoking Section 1112(b)(4)(N). However, once again, the Motion must fail on the facts.

(a) There is no Nonmonetary Default under the Plan. As just discussed, there is absolutely no requirement under the Plan that the Commercial Property be leased or sold. To the contrary, the Plan expressly provides that the Reorganized Debtor "*may elect, in its sole and absolute discretion*, to sell the Commercial Property." *[Plan, Section VI, ¶ A. e]*. Moreover, the Plan goes on to state that "the Reorganized Debtor **may** operate the business and use, **sell, lease,** assign, transfer, convey, hypothecate, pledge, alienate, dispose of, take possession of, or encumber any and all of the Commercial Property, Other Assets, personal property, and any other property without further Court order or approval, whether in the ordinary course of business or outside the ordinary course of business and free of any restrictions imposed by Bankruptcy Code § 363(b)." *[Plan, Section VIII, ¶ C]*.

Accordingly, the Reorganized Debtor has been granted wide discretion to do with the Commercial Property what it wishes, and there can be no material default under the Plan for the Reorganized Debtor's alleged failure to lease or sell the Commercial Property in the absence of an express obligation to do so. Had W Linc desired to compel the Reorganized Debtor to lease or sell the Commercial Property and to provide a default remedy should the Reorganized Debtor fail to do so, the appropriate time and manner to have raised the issue would have been in the form of an objection to confirmation prior to, or at the time of, confirmation – **not nearly one year later!**

As a further ground for converting the case, W Linc contends that the Reorganized Debtor failed to underline confirm the deposit into the Reserve Account. Not only is its contention patently **false**, but once again the "Conversion Motion" points to no evidentiary support for its contention that such purported failure constitutes a material default under the confirmed Plan. The reason? Such default provision does not exist. The failure to provide confirmation of the deposits is not a default under the Plan, material or otherwise, as there is absolutely no obligation

whatsoever imposed under the Plan upon the Reorganized Debtor to provide such confirmation, let along provide proof of such deposits. Importantly, the Reorganized Debtor has made the required deposit.

Clearly, it would not have been inappropriate for W Linc to impose such a requirement under the Plan. Had W Linc desired such proof and a remedy for the Reorganized Debtor's failure to provide it, W Linc could have requested it (similar to requirements typically imposed by most secured creditors as a condition of confirmation), and the Debtor would likely have agreed. However, the truth is that such a provision was <u>not</u> requested, and the appropriate time to object and request it would have been at the time of confirmation – **not nearly one year later!**

Thus, assuming *arguendo* that the Reorganized Debtor had indeed refused to confirm the deposit (which is not the case), W Linc's bombastic feigning of harm therefrom is certainly hypocritical (particularly having failed to protect it rights in connection with confirmation in the first place). Such contention is even more disingenuous considering that the Movant now apparently contends that a material default exists under the confirmed Plan on the basis of the Reorganized Debtor's alleged failure to comply with a requirement that it was never asked to include in the Plan in the first place.

Additionally, the accusation is simply not true. Despite the exaggeration contained in the "Conversion Motion," this Court will hopefully recall that the Reorganized Debtor confirmed that the January 2017 deposit had been made as recently as April 4th, on the record at the status conference held before this Court. But, this was not the first and only time it was confirmed. In fact, the Reorganized Debtor has confirmed, through counsel, that the deposit has been made into the Reserve Account as required under the Plan on <u>at least</u> five separate occasion. *[See Declaration of Sandford L. Frey ("<u>Frey Declaration</u>")]*. Furthermore, the Reorganized Debtor intended to provide a copy of the bank statement, but this particular account does not have access to online banking. *[See Freedland Declaration at ¶ 19]*.

The contentions in the Motion are part of a troubling, systemic pattern on the part of counsel for W Linc, who consistently deluges counsel for the Reorganized Debtor with multiple requests, then feigns cooperation, and then suddenly raises the issue in pleadings and on the

equities to determine what will best serve the creditors and the estate." *In re Austin Ocala Ltd.,* 150 B.R. 279, 281-282 (Bankr. M.D. Fla. 1993) (*citing* H.R. Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787). When the Reorganized Debtor's Plan was confirmed, the Court found that "[t]he best interests of creditors" were met under the Plan. *See* Confirmation Order [Docket No. 128] and Findings [Docket No. 129]. The interests of ***all*** creditors must be considered if this Chapter 11 case is converted to a Chapter 7 case. *See Rollex Corp. v. Associated Materials, Inc.* (*In re Superior Siding & Window, Inc.*), 14 F.3d 240, 243 (4th Cir. 1994).

In this case, as discussed above, the primary "asset," the Commercial Property, is indefeasibly vested in the Reorganized Debtor. Specifically, the Plan vests all former property of the estate, including the commercial real estate and litigation claims, in the Reorganized Debtor, and there is no provision in the Plan for re-vesting such property in the estate upon conversion. *[See Plan, Section VIII, ¶ C].* Inasmuch as there no longer is an estate, the estate cannot suffer loss or diminution, and cannot be mismanaged. More importantly, however, there is simply nothing left in the estate to administer in Chapter 7. For this reason, among others, conversion will benefit no creditor or interested parties, other than W Linc, which continues to have a disputed security interest, whereas the other creditors do not.

The inability to readily liquidate the "assets," together with the disparity between the prospective recovery in Chapter 11 and the devastating effects of liquidation, provide a sound basis upon which this Court can base its finding that "unusual circumstances" exist in the case within the meaning of Section 1112(b). *See In re Orbit Petroleum, Inc.,* 395 B.R. 145, 149 (Bankr. D. N.M. 2008) (finding that the likelihood that unsecured creditors would be paid in full was "unusual circumstances" sufficient to show that conversion or dismissal was not in the best interests of creditors); 7 Collier on Bankruptcy ¶ 1112.05[2] (16th Ed. 2013) ("the word 'unusual' contemplates facts that are not common to chapter 11 cases generally").

record before this Court in an attempt to sandbag the Reorganized Debtor by feigning its alleged good faith and the Debtor's purported lack of cooperation.  It is an unfortunate and consistent pattern.  Consistent with its pattern, the "Conversion Motion" accuses the Reorganized Debtor of refusing to confirm the January 2017 deposit of its quarterly payment, which is not true. Importantly, as discussed above, the alleged failure to provide confirmation is not a default under the Plan in any event.

(b) <u>There is no Monetary Default under the Plan</u>.  In fact, there is <u>no</u> default under the Plan based on the facts contained in the "Conversion Motion".    Despite W Linc's grandiloquence, deposits have been timely made, and the Reorganized Debtor is performing under the Plan.

As discussed above, the Reorganized Debtor made the January 2017 Deposit into the Reserve Account in the amount of $20,081.53 (as confirmed in ***Exhibit 4***).  The next quarterly payment is not due until the first business day following April 30, 2017.  Pursuant to the Plan, the Reorganized Debtor deposited an additional $20,081.53 on May 1, 2017, bringing the Reserve Account balance to $40,163.06.  *[See Freedland Declaration at ¶ 19].*

In addition, the Reorganized Debtor has appealed the tax assessment, and such appeal is still pending.  *[See Freedland Declaration at ¶ 19].*  In the meantime, the Debtor has deposited the aggregate sum of $141,000 into a segregated Reserve Account pursuant to the Plan to cover the property taxes, pending resolution of the appeal.  Finally, the Debtor has deposited the sum of $20,000 for distribution to unsecured creditors once claims are reviewed for objections and are resolved.  *[See Freedland Declaration at ¶ 19].*

Because there have been no monetary or nonmonetary defaults under the clear terms of the Plan, conversion is not permissible pursuant to Section 1112(b)(4)(N).

**D. Unusual Circumstances Exist in the Case; and Neither Conversion nor the Appointment of a Trustee is in the Best Interests of Creditors.**

The Conversion Motion is devoid of any evidence that conversion of this case from Chapter 11 to a Chapter 7 is in the best interests of *all* creditors.  As the Court in *In re Austin Ocala Limited,* stated: "[u]nder this section, the Court has wide discretion and must balance the

## IV.

## CONCLUSION

There is little doubt that the "Conversion Motion" is brought for an improper purpose.[5] Initially, counsel for W Linc threatened on the record at the April 4, 2017 hearing that it was considering a motion to appoint a trustee based upon the allegedly mistaken statement in the Disclosure Statement as to the identity of the member. Subsequently, W Linc, in tacit realization (of that which the Reorganized Debtor knew at the hearing) that Bankruptcy Code § 1104 does not apply post confirmation, W Linc, thereafter, morphed the argument into purported grounds for conversion, which it then surreptitiously filed without prior discussion or effort to verify the true facts upon which it bases its motion. The "Conversion Motion" is nothing more than a ruse to obfuscate W Linc's failure to timely exercise its rights at the time of confirmation, and its inability to meet its burden to vacate the FINAL and NON-APPEALABLE, Confirmation Order under Section 1144 and FRBP 7001(5) and 9024, and FRCP 60(b). In summary, there are absolutely no meritorious grounds to convert this case, and conversion is unequivocally not in the best interest of creditors and interested parties.

Dated: May 2, 2017             LEECH TISHMAN FUSCALDO & LAMPL


                               By:  /s/ Sandford L. Frey
                                    SANDFORD L. FREY
                               Attorneys for 315 Arden, LLC, Reorganized Debtor

---

[5] The Reorganized Debtor believes that the Conversion Motion is sanctionable under FRBP 9011.

### DECLARATION OF TZEPAH FREEDLAND

I, Tzepah Freedland, declares as follows:

1. I have personal knowledge of the facts stated in this declaration, except as to those matters based upon information and belief; and if called as a witness, I could and would testify competently to them before this Court. I am the managing member of the Reorganized Debtor[6], and prior to confirmation was a managing member of the Debtor. I submit this declaration in support of the Opposition filed by the Reorganized Debtor to the Conversion Motion.

2. The Debtor is a limited liability company formed in 1999. A true and correct copy of the Operating Agreement is attached as ***Exhibit 2***.

3. At the time of formation, Daniel Arnall was the sole member of the Debtor.

4. The Debtor purchased the Commercial Property in February 2015, for approximately $5 million in cash, and the W Linc Note, payable to the Movant, for approximately $1.5 million, secured by the Commercial Property.

5. The Plan was structured in such a way that the Family Trust would be the Plan funder. Whether or not it was the majority member of the Debtor is not relevant to its obligations to fund under the Plan.

6. On June 27, 2016, the Bankruptcy Court entered its Confirmation Order, thereby confirming the Plan proposed by the Debtor [Docket No. 108]. A true and correct copy of the Confirmation Order is attached as ***Exhibit 1***.

7. Prior to the Petition Date, Daniel Arnall passed away on December 8, 2014 from complications from cancer, leaving behind his wife, Judith Arnall, and their minor son. Judith Arnall suffers from Multiple Sclerosis, and has been confined to a wheel chair since her early twenties. To the best of my knowledge and belief, she has also been diagnosed with lupus, retinoid, and bursitis, and her health continues to be in decline.

8. Prior to his untimely death, Daniel Arnall ran the financial affairs of the Debtor. Following the death of Danial Arnall, I became one of the managing members of the Debtor. Of the several trusts involving Danial and Judith Arnall, two are germane to the disputes respecting

---

[6] Capitalized terms shall have the meaning ascribed to them in the Opposition.

the Debtor – the 2014 Trust and the Family Trust.  Due to Daniel Arnall's death and Judith Arnall's illness, the background regarding the two Trusts is somewhat confusing.

9.     I assisted in the preparation of the Schedules, Statement of Financial Affairs, the Disclosure Statement and the Plan.  I had no intention whatsoever to mislead or defraud anyone in connection with the preparation of the foregoing.  After Daniel Arnall passed away, it was discovered that he had transferred a fifty percent interest in 315 Arden LLC directly to Judith Arnall.  Sometime thereafter, I understood that Judith Arnall assigned her interest to the 2014 Trust.  However, as of the Petition Date, and through the date of confirmation, I had a good faith belief that Judith Arnall had subsequently assigned her entire interest (her fifty percent and the inherited thirty percent) to the "family trust," which I construed to mean the "Family Trust."  Therefore, at the time of the preparation of those documents, I had a good faith belief that the Family Trust was the managing member and that the 2014 Trust had the obligation to make "Support Loans" under the Operating Agreement.

10.    The alleged misidentification of the majority member of the Debtor was nothing more than an innocent mistake and harmless error.  The Operating Agreement is in fact mentioned and defined in the Plan.  At the time, I thought there was a separate assignment to the Family Trust.

11.    During the process of discovery in the Fraudulent Transfer Action, I successfully located the assignment document to the 2014 Trust Assignment, a true and correct copy of which is attached as ***Exhibit 5***.  However, I have been unable to locate any document confirming any subsequent assignment to the Family Trust.

12.    Importantly, I had a good faith belief that the Family Trust was the majority member at the time of the preparation of the Disclosure Statement and Plan confirmation.

13.    The Family Trust was in better financial condition at the time of the fraudulent transfer than the 2014 Trust.  A true and correct copy of a redacted bank statement for the Family Trust at the time of transfer (which has been produced in connection with the adversary action) is attached as ***Exhibit 6***.  To the best of my knowledge and belief, the 2014 Trust had no bank account at the time.

31

14.     To the best of my knowledge and belief, neither the Disclosure Statement nor the Plan contain any discussion whatsoever respecting the issue of the obligation to fund Support Loans.

15.     The Plan provides that the Family Trust is the new value contributor and funder under the Plan.

16.     The Commercial Property is in better physical condition today than it was when it was purchased.    Attached as ***Exhibit 7*** are copies of photographs that I took at the time of purchase and after repairs made by the Debtor and Reorganized Debtor.    Since acquiring the Commercial Property the Debtor, and thereafter, Reorganized Debtor, has done the following, among other things:

- Called the city to come out and repair damage from a water main break on the back portion of the property;

- Got rid of weeds in front of the property;

- Painted the exterior of the building;

- Painted the interior of the building;

- Fixed the building's air conditioner;

- Fixed the building's roof;

- Stripped a thick layer of dirt from the floors and waxed the floors;

- Fixed toilets in the building; and

- Fixed some of the electricity in the building.

17.     In my opinion, the Commercial Property is in better condition today than it was during the brief time that it was owned by W Linc.

18.     Lee & Associates is marketing the Commercial Property for lease.    A true and correct copy of one of the listing brochures is attached to the Freedland Declaration as ***Exhibit 8***.

19.     As discussed above, the Reorganized Debtor made the January 2017 Deposit into the Reserve Account in the amount of $20,081.53 (as confirmed in ***Exhibit 4***).    I intended to provide a copy of the bank statement, but this particular account does not have access to online banking.    The next quarterly payment is not due until the first business day following April 30,

2017.  Pursuant to the Plan, the Reorganized Debtor deposited an additional $20,081.53 on May 1, 2017, bringing the Reserve Account balance to $40,163.06.  In addition, the Reorganized Debtor has appealed the tax assessment, and such appeal is still pending.  In the meantime, the Reorganized Debtor deposited the sum of $141,000 into a segregated Reserve Account pursuant to the Plan to cover the property taxes, pending resolution of the appeal.  Finally, the Debtor has deposited the sum of $20,000 for distribution to unsecured creditors once claims are reviewed for objections and are resolved.

I declare under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed in Culver City, California on May 2, 2017.

/s/*Tsepah Freedland*
Tzepah Freedland

### DECLARATION OF JOSEPH S. SOCHER

I, Joseph S. Socher, declares as follows:

1.     I am an attorney licensed to practice law in the State of California. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would testify competently to them before this Court. I submit this declaration in support of the Opposition[7] filed by the Reorganized Debtor to the Conversion Motion.

2.     I was retained by the Reorganized Debtor to assist counsel with respect to the litigation, and with the discovery in particular.

3.     In August 2016, I personally caused documents to be served upon counsel for W Linc in response to its discovery request. In addition, the Operating Agreement was included as an exhibit in Ms. Freedland's deposition held in August 2016.

4.     The production included a copy of the Operating Agreement, which identified the 2014 Trust as the member and trust which is obligated to fund Support Loans.

5.     I attended an inspection of the Commercial Property on August 9, 2016 conducted by W Linc for its appraisal. I noted that the Commercial Property was in much better condition that the pre-closing photographs that I personally viewed. In addition, W Linc's agents expressed no complaints about the condition of the property.

I declare under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on May 2, 2017.

/s/Joseph S. Socher
Joseph S. Socher

---

[7] Capitalized terms shall have the meaning ascribed to them in the Opposition.

34

# DECLARATION OF SANDFORD L. FREY

I, Sandford L. Frey, declares as follows:

     1.     I am an attorney licensed to practice law in the State of California and before this Court. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would testify competently to them before this Court. I submit this declaration in support of the Opposition[8] filed by the Reorganized Debtor to the Conversion Motion.

     2.     At the April 4th status conference held before this Court, I confirmed on the record that the Reorganized Debtor had made the January 2017 deposit. Counsel for W Linc made no further request of me.

     3.     This was not the first and only time I verbally confirmed that it had been made. In fact, I verbally confirmed that the deposit has been made into the Reserve Account as required under the Plan on no less than five separate occasion.

     I declare under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on May 2, 2017.

*/s/Sandford L. Frey*     
Sandford L. Frey

---

[8] Capitalized terms shall have the meaning ascribed to them in the Opposition.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
633 West 5th Street, 48th Floor, Los Angeles, CA  90071

A true and correct copy of the foregoing document entitled (*specify*): OPPOSITION FILED BY REORGANIZED DEBTOR
TO MOTION TO CONVERT CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7; DECLARATIONS IN SUPPORT
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
May 2, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- Sandford Frey    sfrey@leechtishman.com, fscardino@leechtishman.com
- Daniel J Kessler
  lwell@bkcglaw.com;moberbeck@bkcglaw.com;cvasquez@bkcglaw.com;spettit@bkcglaw.com;litclerk1@bkcglaw.com
- Stuart I Koenig    Skoenig@leechtishman.com, fscardino@leechtishman.com
- Ron Maroko    ron.maroko@usdoj.gov
- Kenneth Miller    kmiller@ecjlaw.com, kanthony@ecjlaw.com
- Byron Z Moldo    bmoldo@ecjlaw.com, lpekrul@ecjlaw.com
- Tomas A Ortiz    tortiz@garrett-tully.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Michael D Vanlochem    janguiano@vandc.net
- Marta C Wade    mwade@mcwadelaw.com

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) May 2, 2017, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours, Suite 1660 after the
document is filed.
Hon. Barry Russell
United States Bankruptcy Court
255 East Temple Street, , Suite 1660
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 5/2/17 | Janis Abrams | /s/Janis Abrams |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**