in the ordinary course of its business, including, without limitation, sales, exchanges, or other dispositions of real or personal property of the Company and/or a Project Entity, condemnations, recoveries of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds), or any refinancings; provided, however, that (i) distributions of operating income which are deemed returns of capital solely for federal income tax purposes, or (ii) the payment of Capital Contributions by the Members, shall not be deemed a Sale or Refinancing.

"Securities Act" means the Securities Act of 1933, as amended.

"Service" means the Internal Revenue Service.

"Substituted Member" means any Person admitted to the Company as a Member pursuant to the provisions of Section 7.2(a)(v) hereof.

"Support Loan" means one or more loans made by the Trust to the Company in any such case with the Consent of the Members, the proceeds of which may be used to pay any amount which the Managing Member is authorized to pay pursuant to this Agreement. Supports Loans shall bear interest to be paid by the Company to the Members holding such loans at an annual rate equal to the greater of (a) the Prime Rate, plus two percent (2%), or (b) nine percent (9%); provided, however, in no event shall Support Loans bear interest at a rate greater than that permitted by applicable law. Any such Support Loans shall be repayable as set forth in Sections 4.2(A)(3) and 4.2(B)(4) of this Agreement, or as otherwise determined by the Members. The Members expressly acknowledge and agree that the Managing Member may determine that Support Loans made pursuant to this Agreement will be repaid, in whole or in part, by distributions made pursuant to this Agreement. In no event shall any Member be obligated to fund any Support Loans unless they are Consented to by the Members.

"Target Capital Account." means an amount (which may be either positive or negative), determined with respect to each Member for any Fiscal Year or other relevant period, equal to (a) the hypothetical distribution (if any) such Member would receive if each Company asset (including cash) were sold for an amount of cash equal to such asset's Gross Asset Value as of the end of such Fiscal Year or other relevant period, each liability of the Company were satisfied in cash in accordance with its terms (limited, with respect to each Nonrecourse Debt of the Company, to the gross fair market value of the asset or assets securing such Nonrecourse Debt), and all remaining cash of the Company (including the net proceeds of such hypothetical transactions and all cash otherwise available after the hypothetical satisfaction of all Company liabilities) were distributed in full on the last day of such Fiscal Year or other relevant period to the Members pursuant to Section 4.2(B) of the Agreement; minus (b) the sum of (i) such Member's share of Partnership Minimum Gain and Member Nonrecourse Debt Minimum Gain immediately prior to such deemed sale, plus (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company pursuant to the terms of the Agreement as of the last day of such Fiscal Year or other relevant period

(but only to the extent such capital contribution obligation has not been taken into account in determining such Member's share of Member Nonrecourse Debt Minimum Gain).

"Tax Item" means each item of income, gain, loss, deduction, or tax credit of the Company.

"Tax Matters Partner" means the Member designated from time to time as the "Tax Matters Partner" of the Company pursuant to Section 9.6 hereof. The Managing Member has been designated as the initial Tax Matters Partner.

"Transfer" means any sale, exchange, issuance, redemption, assignment, distribution, gift, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any direct or indirect interest in all or any portion of an Interest in the Company. "Transfer" shall specifically include, without limiting any of the above, assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Voluntary Withdrawal" means, as to the Managing Member, a Withdrawal of any part of its Interest or the removal of the Managing Member pursuant to Section 11.3 hereof.

"Withdrawing" or "Withdrawal" means, as to the Managing Member, the withdrawal or retirement of the Managing Member (or deemed withdrawal or retirement of the Managing Member pursuant to Section 11.2(a)(vi) below) after an Event of Default by the Managing Member has been declared hereunder, and the Non-Managing Member has indicated its intent to remove the Managing Member pursuant to Section 11.3 below.

ARTICLE 2.

ORGANIZATION; NAME; PLACE OF BUSINESS; PURPOSE; TERM

2.1     Organization. Pursuant to the provisions of the Act, the parties hereto hereby agree to continue the Company on the terms and conditions set forth herein as a limited liability company under the Act. To the extent that the laws of other jurisdictions are applicable, the Company is intended to be qualified as a foreign limited liability company under such laws. The certificate of formation of the Company has been previously filed with the California Secretary of State in accordance with the Act.

2.2     Name; Place of Business; Principal Office. The Company shall continue to be conducted under the name of "315 Arden, LLC" The Company may use such name with or without the words "a California limited liability company" as state law may require. The place of business and principal office of the Company shall be c/o Tzepah Freedland, 344 South Arden Avenue, Beverly Hills, California 90211 or such other address as may from time to time be designated by the Managing Member.

50102172.3

2.3 <u>Agent for Service of Process</u>. Tzepah Freedland shall be the Company's agent for service of process on the Company. The Company's address for such purpose shall be 9018 David Avenue, Los Angeles, California 90034. The agent for service of process and/or its address may be changed from time to time by the Managing Member.

2.4 <u>Purpose of the Company</u>. The business and purpose of the Company shall be (a) to hold, operate, refinance and sell each Project or Project Entity in its portfolio, (b) do all things necessary, advisable, convenient or incidental to, or in furtherance of, such purposes; and (c) to engage in any other lawful business purpose and/or activity with the Consent of the Members. The business of the Company also includes the realization and distribution of the proceeds of a Sale or Refinancing.

2.5 <u>Term</u>. The term of the Company shall continue in full force and effect until December 31, 2075, unless terminated prior thereto pursuant to this Agreement or by law.

2.6 <u>Governmental Filings</u>. The Managing Member shall comply with the Act by making such filings required from time to time by applicable law, including such governmental filings as are necessary or appropriate to qualify the Company to do business in any jurisdiction or to otherwise carry out the purposes and intent of this Agreement.

ARTICLE 3.

MEMBERS AND CAPITAL

3.1 <u>Gross Asset Value</u>. The Members agree that, as of the date of this Agreement, the aggregate Gross Asset Value of the Projects (and/or Project Entities, as applicable) is $4,789,100 net of all debt secured by the Projects ("Net Value").

3.2 <u>Members and Capital Contributions</u>. Upon execution of a counterpart of this Agreement, each of Tzepah and the Trust shall be deemed admitted to the Company as a Member of the Company. Each Member shall be credited with a Capital Contribution and Capital Account balance equal to the Net Value as of the date of this Agreement multiplied by that Member's Percentage Interest.

3.3 <u>Company Capital and Support Loans</u>.

(A) No Member shall be paid interest on any Capital Contribution.

(B) The Company shall not redeem or repurchase any Member Interest, and no Member shall have the right to withdraw, or receive any return of, its Capital Contribution, except as specifically provided herein. No Member shall have

50102172.3

priority over any other Member either as to the return of its Capital Contribution or as to Profits, Losses, or distributions, except as otherwise specifically provided herein.

(C)  The Managing Member shall have no personal liability under this Agreement for the repayment of the Capital Contributions of any Member, nor any obligation to the Company to make additional Capital Contributions.

(D)  If and to the extent that the Company does not have funds to pay any of the costs, expenses or other obligations of the Company, including, without limitation, Company Costs and Expenses, upon the Consent of the Members, the Trust shall be obligated to make Support Loans to the Company, the proceeds of which shall be utilized to pay for such costs, expenses or other obligations. The decision to make Support Loans to the Company shall be made by Consent of the Members and such Support Loans shall be funded within ten (10) days of Members' Consent therefor.

3.4  Liability of Members.

(A)  The liability of the Members for the losses, debts, liabilities, and obligations of the Company shall, except as otherwise provided herein or by applicable law, be limited to their Capital Contributions and their share of any assets and undistributed profits of the Company. Except with respect to Support Loans approved by the Members, the Members shall not be required to lend any funds to the Company or, after its Capital Contributions have been paid in full, to make any further Capital Contributions to the Company. Nothing herein shall be deemed to limit or restrict the Members' obligations to make loans or contributions to other entities in which they may hold or own interests.

(B)  Notwithstanding the provisions of Section 3.4(A) above, in the event the Company is required, pursuant to applicable provisions of applicable law, to return to any third party any funds previously distributed by the Company to the Members hereunder, the Members shall be required to promptly return to the Company that portion of such Company distribution received by them (on a pro rata basis) as the Company requires to meet its obligation to return funds to such third party. Any such return of funds made by a Member shall be treated as a Capital Contribution for all purposes hereunder.

3.6  Representations and Warranties.

(A)  The Members each represent and warrant, as of the date hereof, to the Company and the other Members that:

(i)  each Member understands that neither the offering nor the sale of the Interests has been registered under the Securities Act or any applicable state securities law. The Members were not offered or sold their Interests, directly or indirectly, by means of any form of general solicitation or general advertising, including,

13

50102172.3

without limitation, the following: (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio; or (ii) any seminar or meeting whose attendees had been invited by any general solicitation or general advertising. The Members each understand that its Interest must be held indefinitely unless the sale or transfer thereof is subsequently registered under the Securities Act and any applicable state securities laws or an exemption from such registration is available.

(ii) each Interest is being purchased or was previously purchased or acquired solely for that Member's own account for investment purposes only and not for the account of any other person and not for distribution, assignment or resale to others and no other person has a direct or indirect beneficial interest in its Interest.

## ARTICLE 4.

## ALLOCATIONS AND DISTRIBUTIONS

4.1   Allocations of Profits and Losses.

(A)   Profits and Losses.

After giving effect to the special allocations set forth in Section 4.1(D), the Profits and Losses of the Company for each Fiscal Year or other relevant period will be allocated to each Member in such manner as to cause the balance in such Member's Modified Adjusted Capital Account, immediately after making all of the allocations required for such Fiscal Year or other relevant period, to equal (as nearly as possible) such Member's Target Capital Account.

(B)   Reserved.

(C)   Reserved.

(D)   Special Allocations. The following special allocations shall be made in the order of priority described in Section 4.1(H):

(1)   Partnership Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f) and notwithstanding any other provision of this Section 4.1, if there is a net decrease in Partnership Minimum Gain (as defined in Regulations Section 1.704-2(d)) during any Fiscal Year or other period, each Member shall be specially allocated items of Company income and gain for such Fiscal Year or other period (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the various Members pursuant thereto. The items to be so allocated shall

14

be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-20)(2). This Section 4.1(D)(1) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith. To the extent permitted by such Section of the Regulations and for purposes of this Section 4.1(D)(1) only, each Member's negative Adjusted Capital Account shall be determined prior to any other allocations pursuant to this Section 4.1(D) with respect to such Fiscal Year or other period and without regard to any net decrease in Member Nonrecourse Debt Minimum Gain during such Fiscal Year or other period.

(2)     <u>Member Nonrecourse Debt Minimum Gain Chargeback</u>. Except as otherwise provided in Regulations Section 1.704-2(i)(4) and notwithstanding any other provision of this Section 4.1 except Section 4.1(D)(1), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year or other period, each Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year or other period (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the various Members pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-20)(2). This Section 4.1(D)(2) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith. Solely for purposes of this Section 4.1(B)(2), each Member's negative Adjusted Capital Account shall be determined prior to any other allocations pursuant to this Section 4.1(D) with respect to such Fiscal Year or other period, other than allocations pursuant to Section 4.1(D)(1) hereof.

(3)     <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) for any Fiscal Year, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the negative Adjusted Capital Account of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.1(D)(3) shall be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(D)(3) were not in this Agreement.

(4)     <u>Gross Income Allocation</u>. In the event any Member has a negative Adjusted Capital Account (ignoring, for purposes of this Section 4.1(D)(4),

15

50102172.3

clause (ii) of the definition of "Adjusted Capital Account") at the end of any Company Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such negative Adjusted Capital Account as quickly as possible, provided that an allocation pursuant to this Section 4.1(D)(4) shall be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(D)(4) and Section 4.1(D)(3) were not in this Agreement.

(5) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions shall be allocated to the Members in accordance with their Percentage Interests.

(6) <u>Member Nonrecourse Deductions</u>. Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be allocated, in accordance with Section 1.704-2(i)(1), to the Member that bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.

(7) <u>Code Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(8) <u>Syndication Expenditures</u>. Any expenditures that constitute syndication expenditures under Section 709 of the Code and that are paid by the Company shall be allocated to the Interests with respect to which such syndication expenditures were paid.

(E) <u>Curative Allocations</u>. The allocations set forth in Sections 4.1(D)(1), (2), (3), (4), (5) and (6) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.1(E). Therefore, notwithstanding any other provisions of this Section 4.1 (other than the Regulatory Allocations), the Managing Member may make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not a part of this Agreement. In exercising its discretion under this Section 4.1(E), the Managing Member shall take

into account any future Regulatory Allocations under Sections 4.1(D)(1) and 4.1(D)(2) hereof that, although not yet made, are likely to offset Regulatory Allocations made under Sections 4.1(D)(5) and 4.1(D)(6) hereof.

    (F)    <u>Other Allocation Rules</u>.

        (1)    For purposes of computing the Profits, Losses, tax credits or any other Tax Items allocable to any period, such Profits, Losses, tax credits and any other such Tax Items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Code Section 706 and the Regulations thereunder.

        (2)    For purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interest in Company Profits shall be treated as that Member's Percentage Interest in the Company.

        (3)    To the extent permitted by Regulations Sections 1.704-2(h) and 1.704-2(i)(6), the Managing Member shall endeavor to treat distributions of Cash Flow and Sale and Refinancing Proceeds as having been made from proceeds of Nonrecourse Debt or Member Nonrecourse Debt only to the extent that such distributions would have otherwise caused or increased a negative Adjusted Capital Account (ignoring, for purposes of this Section 4.1(F)(3), clause (ii) of the definition of "Adjusted Capital Account") for any Member.

    (G)    <u>Tax Allocations</u>.

        (1)    <u>In General</u>. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations shall be allocated among the Members for tax purposes in the same manner and the same proportions as they are allocated Profits or Losses or items thereof pursuant to Section 4.1 hereof for such year. Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.1(G) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other Tax Items or distributions pursuant to any provision of this Agreement.

        (2)    <u>Code Section 704(c)</u>. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or owned by the Company upon the occurrence of any of the events described in Regulations Section 1.704-1(b)(2)(iv)(f)(5) shall, solely for tax purposes (and not for purposes of determining Capital Accounts or allocating Profits, Losses or other Tax Items), be

17

allocated among the Members so as to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. Notwithstanding the foregoing, no allocation shall be made if an equivalent allocation has been made pursuant to Section 4.1(G)(1) hereof in connection with a transaction that would otherwise result in an allocation pursuant to this Section 4.1(G)(2). The foregoing provision is intended to comply with Section 704(c) of the Code and with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. To the extent permitted by the Code and Regulations, any variation referred to in this Section 4.1(G)(2) shall be taken into account by allocations of gain from a disposition of the subject property and not through allocations of depreciation.

(3) <u>Recapture</u>. Gain from the disposition of Company assets which is allocated to a Member for tax purposes shall include, to the extent possible, ordinary income consisting directly or indirectly of recaptured deductions (for depreciation or otherwise) to the same extent and in the same proportion as such deductions were previously allocated to such Member or its predecessor-in-interest.

(4) <u>Section 751 Assets</u>. In the event that a Member (other than a Member who becomes a Member by purchasing the Interest in the Company of another Member) is admitted (an "Admission") to the Company after the date hereof or in the event that a Member's interest in Profits or Losses is increased (an "Increase") after the date hereof, the Member so admitted shall obtain no interest, or the Member so increased shall obtain no greater interest than prior to the Increase, in the Company's "unrealized receivables" (as defined in Section 751(c) of the Code), determined immediately prior to such Admission or Increase. As the respective interests in such "unrealized receivables" of the Members who were Members prior to such Admission or such Increase are not reduced thereby, the Member so admitted or so increased shall, to the extent required, obtain a greater than proportionate interest in the Company's other assets (including the assets contributed by such Member), determined after giving effect to such Admission or Increase.

(H) <u>Order of Priority</u>. The allocation and distribution provisions of this Agreement will be applied in such order as may be determined by the Managing Member with the approval of the accountants for the Company, in a manner which will reflect the economic positions of the Members and which will comply with the Code and Regulations.

4.2 <u>Distributions and Application of Cash Flow and Sale or Refinancing Proceeds</u>. Except as otherwise provided by this Agreement or required by law, distributions to the Members shall be made no less frequently than at the end of each calendar year as described below:

(A) <u>Cash Flow</u>. Cash Flow shall be distributed to the Members in the following order and priority:

18

50102172.3

(1) First, to the Managing Member shall make such additions to reserves as it determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Company.

(2) The balance, if any, shall be distributed to the Members in accordance with their Percentage Interests.

(B) <u>Sale or Refinancing Proceeds</u>. Sale or Refinancing Proceeds shall be distributed in the following order and priority:

(1) First, payment shall be made of the liabilities of the Company then due and owing to Persons other than the Members.

(2) Next, the Managing Member shall make such additions to reserves as it determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Company.

(3) Next, payment shall be made to the Members on a pro rata basis based on the ratio of each Member's unpaid balance plus accrued interest as compared to the aggregate unpaid balances plus accrued interest of all Members of any loans made by Members to the Company, in an amount equal to the unpaid balance, including accrued interest, of any loans made by them to the Company, including Support Loans.

(4) Next, pro rata to the Members in proportion to their respective unreimbursed Capital Contributions in reimbursement of their respective Capital Contributions until returned in full.

(5) The balance, if any, shall be distributed to the Members in accordance with their Percentage Interests.

Notwithstanding any other provision in this Agreement, distributions shall be made in accordance with the Act.

4.3 <u>Allocation Rules</u>. All allocations provided for herein to the Members and all distributions of Cash Flow and Sale and Refinancing Proceeds which are to be made to the Members shall be made to the Persons determined by the Managing Member to be the record holders of Interests entitled to such distributions (or to the legal representatives of any such Person or a named permitted assignee of any such Person) as of the date determined by the Managing Member to be the record date for purposes of such distributions, in proportion to the Interests owned by them.

19

ARTICLE 5.

RIGHTS, POWERS, AND DUTIES OF MANAGING MEMBER

5.1    Management and Control of the Company.

(A)    Subject to the express limitations on the authority of the Managing Member set forth elsewhere herein, including, without limitation, the matters set forth herein expressly requiring the Consent of the Members, the Managing Member shall have the full, complete, and exclusive discretion and authority to manage and control the business, management, operations and affairs of the Company and to make all decisions with respect to the day-to-day business, management, operation and affairs of the Company. However, the Managing Member shall not be required nor expected to devote her full time or attention to the affairs of the Company.

(B)    Except as otherwise provided herein, the Trust and Judith shall not participate in or have any control over Company business nor have any authority or right to act for or bind the Company.

(C)    All of the Company's costs and expenses shall be billed directly to and paid by the Company. The Company shall pay all of its costs and expenses, including, without limitation, the following (collectively, the "Company Costs and Expenses"): (i) the costs of persons involved in the business of the Company; (ii) the principal and interest payments and costs paid to any lender for borrowed money; (iii) taxes and assessments applicable to the Company; (iv) legal, audit, accounting, tax consulting, environmental and market studies fees and costs, appraisal and engineering fees; (v) fees and expenses in connection with the sale, exchange, or other disposition or financing of Company assets, including, without limitation, brokerage fees; (vi) the cost of insurance in connection with the business of the Company; (vii) expenses of amending, converting, modifying, or terminating the Company; (viii) the costs and expenses incurred in qualifying the Company to do business in any jurisdiction, including fees and expenses of any resident agent appointed by the Company; (ix) the cost of preparing and disseminating to the Members any written communication and the cost of preparing and filing reports and tax returns with governmental agencies; (x) all reasonable travel, food and lodging expenses incurred by the Managing Member and her principals, employees, contractors and representatives in connection with the performance of the functions of the Managing Member hereunder and monitoring, supervising and attending to the business, operations and affairs of the Company, and/or the Project Entities; (xi) the costs incurred in connection with any litigation or regulatory proceedings in which the Company is involved; (xii) the annual management fee payable to Tzepah pursuant to Section 5.9 of this Agreement; and (xii) all other costs and expenses that are customarily incurred in the course of operating a real estate company engaged in the business of owning, operating and improving real estate projects of the type, kind and character owned, operated and improved by the Project Entities.

20

50102172.3

5.2   <u>Authority of Managing Member</u>.

(A)   Subject to the terms and conditions of this Agreement and the approval of the Members where such approval is expressly required under this Agreement, including, without limitation, this Section 5.2 and Section 5.5 hereinbelow, the Managing Member for and on behalf of, the Company is hereby authorized, without limitation:

(1)   To give or withhold the consent of the Company in its capacity as the managing member of any Project Entity;

(2)   To form, hold, encumber, refinance, sell, dispose of and otherwise deal with and invest in a Project Entity on behalf of the Company, or to cause such Project Entity to acquire, hold, sell, improve, rehabilitate, finance and otherwise invest in any real estate project;

(3)   To borrow money and issue evidences of indebtedness, including from the Members in the form of Support Loans (which shall be unsecured) or other loans, and to secure such other loans by mortgage, deed of trust, pledge, or other lien on its interest in a Project Entity or other assets of the Company.

(4)   To employ agents, accountants, attorneys, consultants, and other Persons necessary or appropriate to carry out the business and operations of the Company, and to cause the Company to pay fees, expenses and other compensation to such Persons;

(5)   To cause the Company to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend, or compromise, upon such terms as the Members may mutually determine and upon such evidence as the Members may deem sufficient, any obligation, suit, liability, cause of action, or claim, including taxes, either in favor of or against the Company;

(6)   To cause the Company to make or revoke any of the elections under the Code which are made at the Company level, provided that such action does not have a material adverse effect on the Profits, Losses or items thereof allocated to or realized by the Members;

(7)   To establish and maintain reserves for such purposes and in such accounts and amounts as the Managing Member deems appropriate or necessary from time to time;

(8)   To amend this Agreement from time to time provided that the Managing Member first delivers written request for Consent to any such amendment to the Members, and the Non-Managing Members fail to grant or deny such Consent within twenty (20) days of request therefor, then, provided that each such request is made in a manner constituting a "Notification", ten (10) days following the expiration of

21

50102172.3

such twenty (20) day period, the Non-Managing Member shall be deemed to have given its Consent, in addition to any amendment otherwise authorized herein to be made, to amend this Agreement from time to time to:

(a) Cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with law or with any other provision herein, or to add any other provision with respect to matters or questions arising under this Agreement which will not be inconsistent with law or with the provisions of this Agreement; and

(b) Reflect the addition or substitution of Members in accordance with this Agreement or the reduction of Capital Accounts upon the return of capital to Members.

(9) To deal with, or otherwise engage in business with, or provide services to and receive compensation from, any Person who has provided or may in the future provide any services to, lend money to, sell property to, or purchase property from, the Managing Member;

(10) To invest in Permitted Investments all funds not immediately needed in the operation of the business, including, but not limited to, (a) the proceeds from Capital Contributions, (b) reserves, and (c) Cash Flow and Sale and Refinancing Proceeds available for distribution to Members pending such distribution; and

(11) To engage in any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with the accomplishment of the purposes of the Company.

(B) Subject to the Consent of the Members where expressly required by this Agreement, with respect to all of its obligations, powers, and responsibilities under this Agreement, the Managing Member is authorized to execute and deliver, for and on behalf of the Company, such notes and other evidences of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages, and other security instruments and agreements, all on such terms and conditions as the Managing Member may deem proper.

(C) Any Person dealing with the Company or the Managing Member may rely upon a certificate signed by the Managing Member as to:

(1) The identity of the Managing Member or any other Member;

(2) The existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managing Member or in any other manner germane to the affairs of the Company;

(3)    The Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(4)    Any act or failure to act by the Company, or as to any other matter whatsoever involving the Company or any Member.

5.3    Reimbursement of Members.

To the extent not paid by the Company pursuant to Section 5.1(C), the Company shall reimburse each Member for all Company Costs and Expenses incurred by such Member in accordance with the terms of this Agreement, and in connection with the conduct of the Company's business, operations and affairs. Such reimbursement shall be in accordance with a budget duly adopted with the Consent of the Members. In addition, concurrently with the acquisition of any project, if and to the extent set forth on a settlement statement approved by the Members, the Company shall, or shall cause the applicable Project Entity to, reimburse the Members for one hundred percent (100%) of all escrow deposits made, and reasonable out-of-pocket costs incurred by the Members and in connection with due diligence, documentation, acquisition, financing, title, survey, brokerage (if any), third party reports, reasonable attorneys' fees and costs (excluding such attorneys' fees and costs incurred in connection with the preparation and negotiation of this Agreement and the operating agreements governing the Project Entity), closing and other costs associated with the acquisition of a project.

5.4    Treatment of Payments. Payments under Section 5.3, to the extent paid to a Member, are intended to be governed by Section 707(a) of the Code and made to that Member other than in such Member's capacity as a member of the Company.

5.5    Restrictions on Authority of Managing Member.

A.    The Managing Member shall not undertake any of the following on behalf of the Company or on behalf of a Project Entity:

(1)    Do any act in contravention of this Agreement or any applicable law or regulation;

(2)    Do any act that would make it impossible to carry on the ordinary business of the Company;

(3)    Change or expand the Company's purposes from those set forth in Section 2.4 hereof; or

(4)    Commingle the funds or assets of the Company with those of any other Person.

23

50102172.3