1

Sandford L. Frey (SBN 117058)
**LEECH TISHMAN FUSCALDO & LAMPL INC**
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
Telephone: 626.796.4000; Facsimile: 626.795.6321
E-mail:sfrey@leechtishman.com

2

3

4

5

### UNITED STATES BANKRUPTCY COURT

6

### CENTRAL DISTRICT OF CALIFORNIA

7

### [LOS ANGELES DIVISION]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In re

**315 ARDEN, LLC,**

      Debtor and Debtor-in-Possession.

CASE NO.:  2:15-bk-26483-BR

Chapter 11

**MOTION OF COUNSEL OF RECORD, LEECH TISHMAN FUSCALDO & LAMPL LLP, TO AUTHORIZE BANKRUPTCY COUNSEL TO WITHDRAW FROM REPRESENTATION; DECLARATION IN SUPPORT**

*[Filed Contemporaneously with Application to Shorten Time - Hearing Date to be Set]*

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

By this Motion, Leech Tishman Fuscaldo & Lampl, LLP. ("Bankruptcy Counsel" or "Leech Tishman") will and does hereby move this Court for an order to authorize Bankruptcy Counsel to withdraw from representation as counsel of record for 315 Arden, LLC, Debtor and post-confirmation Reorganized Debtor ("Reorganized Debtor" or "Debtor") ("Motion").

## I.

## INTRODUCTION

This Motion is being brought because there is *bona fide* concern that funds resulting from the recent sale of the primary asset, commercial property located at 7101 W. Lincoln Avenue, Buena Park, CA ("Buena Park Property"), which are required to be used to fund the Plan will be transferred and/or dissipated to the detriment of Bankruptcy Counsel. Based on the attorney-client relationship, Bankruptcy Counsel cannot divulge all of the relevant facts surrounding the necessity for this Motion or the necessity of shortening time. Suffice it to say, Bankruptcy Counsel believes meritorious grounds exist for this Court to approve this Motion on an emergency basis for the reasons stated below, among others.

Leech Tishman is counsel of record in this Chapter 11 case and in the civil litigation action initially filed on August 21, 2015 pending in the Superior Court of the State of California for the County of Orange, entitled *315 Arden LLC, a California Limited Liability Company, Plaintiff, vs. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company; Luviland Corporation, a California Corporation; Luviland LLC, a California Limited Liability Company, John Huy Nguyen, an individual; Eric Wohl, an individual; Carlos J. Lopez, an individual; Edward B. Hanley, an individual; Hanley Investment Group, Inc., a California Corporation, and, Does 1 through 40, inclusive*, Case No. 30-2015-00805904-CU-FR-CJC. ("State Court Action").

The State Court Action constitutes reserved litigation pursuant to the *Plan of Reorganization Proposed by Debtor, 315 Arden LLC [Docket No.108]*, ("Confirmed Plan"), which was confirmed by the Bankruptcy Court pursuant the *Order on Confirmation of Plan of Reorganization Proposed by Debtor, 315 Arden LLC [Docket No.128]* ("Confirmation Order"). A true and correct copy of the Confirmed Plan is attached as ***Exhibit 1***. Recoveries from the State

1    Court Action or any settlement and the proceeds of the sale of the Buena Park Property are required

2    to be distributed in accordance with the terms of the Confirmed Plan.

3            In or about January 2018, the Reorganized Debtor and other parties to the State Court

4    Action reached a proposed settlement agreement.[1]    Since that time, Leech Tishman had been

5    documenting the settlement agreement pursuant to instructions from the managing member of the

6    Reorganized Debtor, Tzepah Zarmi ("Ms. Zarmi"), which agreement appeared to be in "final

7    form" in or around August 2018.  However, in or around late August 2018, the managing member

8    of the Reorganized Debtor, Ms. Zarmi, apparently retained new counsel, Aaron Swerdlow ("Mr.

9    Swerdlow"), to represent her in connection with the State Court Action (although the scope of Mr.

10   Swerdlow's retention and in what capacity has never been made entirely clear).  To that end, Mr.

11   Swerdlow sought certain changes to the settlement agreement from opposing counsel without the

12   direct participation of Leech Tishman.    Although Leech Tishman does not believe that the

13   confidentiality provisions of the settlement agreement preclude its disclosure of the exact

14   modifications under the circumstances, such changes are not disclosed in this Motion out of an

15   abundance of caution.  Suffice it to say, the changes concerned the distribution of the net proceeds

16   of the sale of the Buena Park Property.

17           Unbeknownst to Leech Tishman, it appears that sometime in late September to mid-

18   October 2018, the other parties executed and exchanged the final version of the settlement

19   agreement, which was not disclosed to Leech Tishman until its receipt of an email dated October

20   22, 2018 from Dan Kessler, counsel for certain defendants in the State Court Action, Red Mountain

21   Group, Inc., Red Mountain Retail Group, Inc., and W Linc BP, LLC.

22           Furthermore, Leech Tishman was unaware of any pending sale for the Buena Park Property

23   until receipt of Mr. Kessler's October 22 email.  Almost immediately thereafter, Leech Tishman

24   learned that Ms. Zarmi apparently closed escrow for sale of the Buena Park Property on or about

25   October 12, 2018, which it learned again from Mr. Kessler (not its client) upon receipt of an email

26   dated October 24, 2018.

27   _____

28   [1] Inasmuch as the Settlement Agreement contains a confidentiality provision, the material terms are not disclosed in
     this Motion at this point.

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

1    Subsequently, Leech Tishman was able to independently verify that the sale had closed

2    without its knowledge when it obtained a grant deed from the public records, which confirmed that

3    a sale had occurred on or about October 12, 2018.  A copy of the recorded grant deed is attached

4    as ***Exhibit 2***.  Although Leech Tishman is still counsel of record in the State Court Action and this

5    Chapter 11 case, Leech Tishman was not informed of the pending sale or any information pertinent

6    thereto and did not learn of such sale until after the close of escrow when it received an email from

7    Mr. Kessler dated October 24, 2018.

8    Bankruptcy Counsel has no knowledge as to the disposition of the proceeds of the sale,

9    except that pursuant to demand Ms. Zarmi apparently paid the delinquent administrative claim of

10   SL Biggs.[2]  As will be discussed below, such payments have potentially resulted in a default under

11   the Confirmed Plan because the terms of the Confirmed Plan mandate that the fees and expenses

12   of Leech Tishman, which are secured pursuant to the terms of the Confirmed Plan and its

13   Attorney's Lien, are required to be paid ahead of all other claims.  Moreover, the remaining

14   proceeds of sale are unaccounted for as of the current time, and such proceeds are required to be

15   used to fund the Confirmed Plan as discussed below.

16   At the current time, Leech Tishman's outstanding unpaid fees and expenses in connection

17   with the Chapter 11 administration and related matters, State Court Action and settlement

18   agreement (which are secured by its Attorney's Lien) are $606,261.58, less $200,000 received

19   pursuant to payment made by one of the defendants and in accordance with the settlement

20   agreement, for a total outstanding of $406,261.58.

21   It is noteworthy that Leech Tishman has fulfilled its duties and concluded its obligations

22   as counsel in the State Court Action and is merely awaiting the entered order of dismissal from the

23   State Court.  Similarly, Leech Tishman had no intention of withdrawing as Bankruptcy Counsel

24   until learning of Ms. Zarmi's undisclosed actions, and that 315 Arden had no intention of paying

25   _____

26   [2] Ms. Zarmi also claimed to have sent a payment for the delinquent administrative claim of Creim Macias Koenig &
Frey LLP, pursuant to demand of its receivable collector, the Accomodator Group, Inc. ("AGI").  However, such

27   payment was never received as of the date of this Motion.  Moreover, AGI was subsequently notified that Ms. Zarmi
stopped payment on the checks to Mr. Biggs and the purported check to CMKF.  Thereafter, on November 2, 2018,
Ms. Zarmi delivered a payment to AGI which was less than the amount of the approved fees, and which was

28   delivered pursuant to a number of conditions not authorized under the Confirmed Plan or applicable orders.

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

1    Leech Tishman despite the language under the Confirmed Plan.

2    **II.**

3    **BACKGROUND**

4    On December 18, 2015, this Court entered an Order *[Docket No. 33]* approving the

5    employment of Criem Macias Koenig & Frey LLP ("CMKF") as reorganization counsel for the

6    Debtor and Debtor in Possession.  On June 27, 2016, this Court entered the Confirmation Order

7    *[Docket No. 128]* confirming the Debtor's plan of reorganization.  The Effective Date of the Plan

8    occurred on September 9, 2016.

9    Effective October 1, 2016, Sandford L. Frey left CMKF and joined Leech Tishman.

10    Thereafter, on October 31, 2016, a substitution of attorney *[Docket No. 156]* was filed with this

11    Court substituting Leech Tishman as counsel for the Reorganized Debtor in place and instead of

12    CMKF.

13    Due to a breakdown in the attorney client relationship, Leech Tishman sought to be relieved

14    as counsel, and on November 17, 2016, the firm of Bienert, Miller, And Katzman, PLC ("BMK

15    Firm") substituted in as counsel in place of Leech Tishman in adversary proceeding 2:16-ap-

16    01076-BR ("Bankruptcy Avoidance Action") *[Adv. Docket No. 96]*.  On November 18, 2016, the

17    BMK Firm substituted in as counsel in the State Court Action in place of the Debtor's former firm,

18    Timothy D. McGonigle Professional Corporation.

19    Within three months on February 28, 2017 *[Adversary Docket No. 129]*, the BMK Firm

20    filed a motion seeking to withdraw, which stated as its grounds that, the BMK Firm had "*certain*

21    *irreconcilable differences have arisen between the [BMK] Firm and Plaintiff, which the [BMK]*

22    *Firm has attempted to repeatedly and earnestly address. . . . The irreconcilable differences are*

23    *related to the [BMK] Firm's employment and render the [BMK] Firm's ability to carry out its*

24    *representation of Plaintiff effectively unreasonably difficult. . . .*"  The BMK Firm also sought to

25    be relieved in the State Court Action.

26    On February 3, 2017, Leech Tishman filed a motion to withdraw as bankruptcy counsel in

27    the main bankruptcy case citing a breakdown in the attorney-client relationship *[Docket No. 159]*,

28    which was subsequently withdrawn at the request of the Reorganized Debtor *[Docket No. 160]*.

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

1    On March 14, 2017 at the request of the Reorganized Debtor, Leech Tishman entered into

2    a new engagement agreement and substituted back into the adversary action *[Adv. Docket No. 96]*,

3    and into the State Court Action in place of the BMK Firm.

4    **III.**

5    **LEECH TISHMAN REQUESTS AUTHORITY TO IMMEDIATELY WITHDRAW AS**

6    **COUNSEL**

7    Leech Tishman previously had no intention of withdrawing as Bankruptcy Counsel and

8    had intended to remain as counsel through the final decree.  However, Leech Tishman must now

9    seek an order of this Court allowing it to withdraw as counsel to the Reorganized Debtor in the

10    underlying Bankruptcy case.

11    There has been a breakdown in communications and in the attorney-client relationship.

12    Although Leech Tishman attempted to amicably resolve its differences with the Ms. Zarmi and

13    thought it had done so until recent events, some of which are the subject of this Motion.  Based on

14    the attorney-client privilege, Leech Tishman cannot provide all of the specific facts surrounding

15    the breakdown between Ms. Zarmi and the firm.  Suffice it to say, Leech Tishman believes grounds

16    exist for this Court to approve this Motion and allow Leech Tishman to withdraw pursuant to its

17    engagement agreement and the permissive withdrawal provisions of the *California Rules of*

18    *Professional Conduct*, Rule 3-700 (C).  Leech Tishman believes under the Rules of Professional

19    Conduct, specifically Rule 3-700 (C)(1)(d), Leech Tishman cannot continue its representation of

20    the Reorganized Debtor.  Thus, LTFL has unfortunately been compelled to file this Motion.

21    Inasmuch as Ms. Zarmi has had attorney, Aaron Swerdlow, acting on behalf of the

22    Reorganized Debtor, it does not appear that the Reorganized Debtor will be prejudiced by the

23    withdrawal.    Regardless, recent events have necessitated that Leech Tishman withdraw

24    immediately because there is now an actual conflict of interest.

25    On the one hand, Ms. Zarmi has been informing parties in interest that Leech Tishman is

26    not her counsel, and on the other hand she was instructing Leech Tishman to take actions on behalf

27    of the Reorganized Debtor.  This situation in unworkable, coupled with the

28

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

1    fact that there is an actual conflict of interest.  Therefore, Leech Tishman requests an immediate

2    order relieving it as counsel.

3                                                    IV.

4    **AN ACTUAL CONFLICT EXISTS BECAUSE LEECH TISHMAN 'S COLLATERAL**

5    **WAS WRONGFULLY CONVERTED PURSUANT TO ITS ATTORNEY'S LIEN**

6           The engagement agreement[3] between Leech Tishman and the Reorganized Debtor provides

7    as follows:

8

9           Attorney and Client have agreed to, and Client hereby grants Attorney, a lien on
             any and all claims or causes of action that are the subject of Attorney's
10           representation under this Agreement.  The Attorney's lien will be paid for any sums
             owing to Attorney for unpaid costs, or attorneys' fees, at the conclusion of
11           Attorney's services.  The lien will attach to any recovery Client may obtain,
             whether by judgment, arbitration award, settlement or other disposition.

12           "An attorney's lien is created and takes effect at the time the fee agreement is executed."

13    *Carroll v. Interstate Brands Corp.*, 99 Cal.App.4th 1168, 1175 (Ct. App. 2002).  Notice is not

14    required—however, an attorney may "choose to file a notice of lien in the underlying action, and

15    the common practice of doing so has been held permissible and even advisable." Id. at 1172.

16

17           To that end, the Confirmed Plan unequivocally provides that creditors are entitled to

18    recovery from Rights of Action, which have been reserved under the Plan, "*which remain after*

19    *payment of any and all attorney's fees and costs in connection with the prosecution of the same*".

      *[See, Confirmed Plan, Section V. C].*

20           Inasmuch as the settlement proceeds and the sale of the Buena Park Property were derived

21    and accomplished pursuant to the terms of the settlement agreement, the Confirmed Plan

22    unequivocally provides that Bankruptcy Counsel is to be paid, and then the balance distributed in

23    accordance with the terms of the Confirmed Plan.  Had Bankruptcy Counsel been made aware of

24    the pending sale of the Buena Park Property, Bankruptcy Counsel could and would have asserted

25    its Attorneys' Lien in escrow as well as made demand on behalf of creditors under the Confirmed

26    Plan.  Regardless, Mr. Swerdlow and Ms. Zarmi were keenly aware of the terms and the Confirmed

27

28    _____
      [3]  The engagement agreement is not attached, but will be made available for review at the hearing.

                                                    7
      MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

1  Plan and the Attorney's Lien under the engagement agreement and failed to protect those rights

2  and/or provide Bankruptcy Counsel a reasonable opportunity to do so.

3                                    **V.**

4                              **CONCLUSION**

5          Leech Tishman respectfully requests that the Court enter an order permitting Leech

6  Tishman to be immediately relieved as counsel of record.

7

8  Dated:  November 5, 2018          LEECH TISHMAN FUSCALDO & LAMPL INC

9

10                                   By:   */s/ Sandford L. Frey*_____
                                          SANDFORD L. FREY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

### DECLARATION OF SANDFORD L. FREY

I, Sandford L. Frey, declare as follows:

1.      I am an attorney at law duly licensed to practice in all courts of the State of California, and I am admitted to practice in the Central District of California. I am member of Leech Tishman.[4] I submit this declaration in support of the Motion. I have personal knowledge of the facts stated below and, if called upon as a witness, I could and would competently testify thereto.

2.      On December 18, 2015, this Court entered an Order *[Docket No. 33]* approving the employment of Creim Macias Koenig & Frey LLP ("CMKF") as reorganization counsel for the Debtor and Debtor in Possession.

3.      On June 27, 2016, this Court entered the Confirmation Order *[Docket No. 128]*, confirming the Debtor's plan of reorganization. A true and correct copy of the Confirmed Plan is attached as ***Exhibit 1***. The Effective Date of the Confirmed Plan occurred on September 9, 2016.

4.      Effective October 2016, I left CMKF and joined Leech Tishman. Thereafter, on October 31, 2016, a substitution of attorney *[Docket No. 156]* was filed with this Court substituting Leech Tishman as counsel for the Reorganized Debtor in place and instead of CMKF.

5.      The BMK Firm substituted in as counsel in place of Leech Tishman in the Bankruptcy Avoidance Action *[Adv. Docket No. 96]*. On November 18, 2016, the BMK Firm substituted in as counsel in the State Court Action in place of the Debtor's former firm, Timothy D. McGonigle Professional Corporation.

6.      Within three months on February 28, 2017 *[Adversary Docket No. 129]*, the BMK Firm filed a motion seeking to withdraw.

7.      On February 3, 2017, Leech Tishman filed a motion to withdraw as bankruptcy counsel in the main bankruptcy case citing a breakdown in the attorney-client relationship *[Docket No. 159]*, which was subsequently withdrawn at the request of the Reorganized Debtor *[Docket No. 160]*.

---

[4] Capitalized terms shall have the meaning ascribed to them in the Motion.

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

8.      On March 14, 2017 at the request of the Reorganized Debtor, Leech Tishman entered into a new engagement agreement and substituted back into the adversary action *[Adv. Docket No. 96]* and into the State Court Action in place of the BMK Firm.  The engagement agreement states in pertinent part that "Attorney and Client have agreed to, and Client hereby grants Attorney, a lien on any and all claims or causes of action that are the subject of Attorney's representation under this Agreement.  The Attorney's lien will be paid for any sums owing to Attorney for unpaid costs, or attorneys' fees, at the conclusion of Attorney's services.  The lien will attach to any recovery Client may obtain, whether by judgment, arbitration award, settlement or other disposition."

9.      In or about January 2018, the Reorganized Debtor and other parties to the State Court Action reached a proposed settlement agreement.  Since that time, Leech Tishman had been documenting the settlement agreement pursuant to instructions from the managing member of the Reorganized Debtor, Tzepah Zarmi, which agreement appeared to be in "final form" in or around August 2018.

10.     However in or around late August 2018, I received communications indicating that the managing member of the Reorganized Debtor, Tzepah Zarmi, apparently retained new counsel, Aaron Swerdlow, to represent her in connection with the State Court Action (although the scope of his retention and in what capacity has never been made entirely clear to me).

11.     I am informed and believe that Mr. Swerdlow sought certain changes to the settlement agreement from opposing counsel, the exact changes are not disclosed out of an abundance of caution.  Suffice it to say, the changes concerned the distribution of the net proceeds of the sale of the Buena Park Property.

12.     Unbeknownst to me, it appears that sometime in late September to mid-October 2018, the other parties executed and exchanged the final version of the settlement agreement, which, to the best of my knowledge and belief, was not disclosed to Leech Tishman until its receipt of an email dated October 22, 2018 from Dan Kessler, counsel for certain defendants in the State Court Action, Red Mountain Group, Inc., Red Mountain Retail Group, Inc., and W Linc BP, LLC.

13.     Furthermore, at the time it received the October 22 email, Leech Tishman was, to

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

1  the best of my knowledge and belief, unaware of any pending sale for the Buena Park Property.

2  Almost immediately thereafter, Leech Tishman learned that Ms. Zarmi apparently closed escrow

3  for sale of the Buena Park Property on or about October 12, 2018, which it learned again from Mr.

4  Kessler upon receipt of an email dated October 24, 2018.

5        14.    Subsequently, Leech Tishman was able to independently verify that the sale had

6  closed without its knowledge when it obtained a grant deed from the public records, which

7  confirmed that a sale had been concluded on or about October12, 2018.  A true and correct copy

8  of the recorded grant deed is attached as ***Exhibit 2***.

9        15.    At the current time, I am advised by our accounting department that Leech

10  Tishman's outstanding unpaid fees and expenses in connection with the Chapter 11 administration

11  and related matters, State Court Action and settlement agreement are $606,261.58, less $200,000

12  received pursuant to payment made by one of the defendants and in accordance with the settlement

13  agreement, for a total outstanding of $406,261.58.

14        I declare under penalty of perjury under the laws of the United States of America, that the

15  foregoing is true and correct, and that this Declaration was executed on November 5, 2018, in

16  Pasadena, California.

17

18            */s/ Sandford L. Frey*
          SANDFORD L. FREY

19

20

21

22

23

24

25

26

27

28

MOTION OF COUNSEL OF RECORD TO WITHDRAW AS COUNSEL FOR REORGANIZED DEBTOR

Sandford L. Frey (SBN 117058)
**LEECH TISHMAN FUSCALDO & LAMPL INC**
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
Telephone: 626.796.4000; Facsimile: 626.795.6321
E-mail:sfrey@leechtishman.com

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## [LOS ANGELES DIVISION]

| | |
|---|---|
| In re | CASE NO.: 2:15-bk-26483-BR |
| **315 ARDEN, LLC,** | Chapter 11 |
| Debtor and Debtor-in-Possession. | **EXHIBIT 1 TO MOTION OF COUNSEL OF RECORD, LEECH TISHMAN FUSCALDO & LAMPL LLP, TO AUTHORIZE BANKRUPTCY COUNSEL TO WITHDRAW FROM REPRESENTATION** |

LAW OFFICES OF

# CREIM MACIAS KOENIG & FREY LLP

633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CA 90071   TEL (213) 614-1944   FAX (213) 614-1961

In re

**315 ARDEN, LLC,**

Debtor and Debtor in Possession.

CASE NO.:  2:15-bk-26483-BR

Chapter 11

**PLAN OF REORGANIZATION PROPOSED BY DEBTOR, 315 ARDEN, LLC**

<u>**Plan Confirmation Hearing**</u>:
DATE:      June 7, 2016
TIME:      10:00 a.m.
CTRM:      1668

*PRESENTED BY:*

**Creim Macias Koenig & Frey LLP**

*By:  Sandford L. Frey*
*Chapter 11 Attorneys for Debtor and Debtor in Possession*

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. DEFINITIONS AND RULES OF CONSTRUCTION ................................................. 2

    A.   Definitions .................................................................................. 2

    B.   Rules of Construction. ............................................................... 13

III. GENERAL STATEMENT ABOUT CLASSIFICATION AND TREATMENT OF NON-CONSENTING CLASSES ............................................................................. 14

    A.   General Statement about Classification under the Plan ................... 14

    B.   Holders of Claims Entitled to Vote .............................................. 14

    C.   General Statement Respecting the Treatment of Non-Consenting Classes ................................................................... 14

IV. CLASSIFICATION AND TREATMENT OF UNCLASSIFIED CLAIMS ........................ 14

    A.   Unclassified Claims .................................................................. 14

        1.   *Administrative Expenses/Treatment under the Plan* .................. 14

        2.   *Unclassified Priority Claims/Treatment under the Plan* ............. 15

V. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...................................... 16

    A.   CLASS 1 – Classification and Treatment of Secured Tax Claims. ................................................................................... 16

    B.   CLASS 2 – Classification and Treatment of the W Linc Disputed Secured Claim. ....................................................................... 17

    C.   CLASS 3 - Classification and Treatment of Allowed Claims of the Holders of General Unsecured Claims (Excluding Any Such General Unsecured Claims That Qualify for Treatment in Class 4). ................................................................................. 20

    D.   CLASS 4 - Classification and Treatment of the (I) Allowed Priority Claim of the Trust on Account of the DIP Loan; (II) General Unsecured Claim of the Trust; (III) Allowed Subordinated Claims for Penalties; and (IV) Any and all other Subordinated Allowed Claims. ...................................................... 22

    E.   CLASS 5 - Classification and Treatment of the Holder of Allowed Equity Interest ............................................................ 23

VI. MEANS OF EFFECTUATING THE PLAN ........................................................... 23

    A.   Sources of Distribution .............................................................. 23

        *The source of all Distributions and payments under the Plan will be as follows:* ...................................................**Error! Bookmark not defined.**

| B. | MANAGEMENT OF THE REORGANIZED DEBTOR | 25 |
| | 1. | The Reorganized Debtor | 25 |
| | 2. | Powers and Authority of the Reorganized Debtor | 25 |
| C. | CLOSING OF THE CASE | 26 |
| D. | TREATMENT OF DISPUTED CLAIMS | Error! Bookmark not defined. |
| E. | DISTRIBUTION OF PROPERTY UNDER THE PLAN | 26 |
| | 1. | *Manner of Cash Payments* | 26 |
| | 2. | *Setoff and Recoupment* | 27 |
| | 3. | *No De Minimis Distributions* | 27 |
| | 4. | *No Distributions with Respect to Disputed Claims* | 27 |
| | 5. | *Undeliverable, Unclaimed Non-Negotiated Distributions* | 27 |
| F. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 28 |
| G. | REGULATORY APPROVAL NOT REQUIRED. | 28 |

VII. LITIGATION .......................................................................................................... 28

VIII. EFFECT OF CONFIRMATION OF THE PLAN AND RELATED
PROVISIONS ........................................................................................................ 29

| A. | DISCHARGE | 29 |
| B. | INJUNCTION. | 30 |
| C. | VESTING OF PROPERTY IN THE REORGANIZED DEBTOR. | 30 |

IX. OTHER PLAN PROVISIONS .................................................................................. 31

| A. | POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS | 31 |
| B. | RECOURSE | 31 |
| C. | NO ADMISSIONS | 31 |
| D. | REVOCATION OF THE PLAN | 31 |
| E. | SEVERABILITY OF PLAN PROVISIONS | 31 |
| F. | CONFIRMATION REQUEST | 31 |
| G. | GOVERNING LAW | 31 |
| H. | SUCCESSORS AND ASSIGNS | 32 |
| I. | SATURDAY, SUNDAY, OR LEGAL HOLIDAY | 32 |
| J. | HEADINGS | 32 |
| K. | OTHER ASSURANCES | 32 |
| L. | MODIFICATION OF PLAN | 32 |
| M. | ROUNDING. | 32 |

| N. | CLAIMS ESTIMATION. | 32 |
| O. | SETOFF, RECOUPMENT AND OTHER RIGHTS. | 32 |
| P. | RETENTION OF JURISDICTION | 33 |
| Q. | POST CONFIRMATION UST FEES AND IDENTITY OF THE ESTATE REPRESENTATIVE. | 34 |
| R. | EXEMPTION FROM CERTAIN TRANSFER TAX. | 34 |
| S. | APPLICABILITY OF LBR 3020(B) | 34 |
| T. | FINAL DECREE. | 34 |
| U. | Calculations. | 34 |
| V. | Estimation of Distributions. | 35 |

## I.    INTRODUCTION

The Debtor is a California limited liability company, the membership interest of which is held 80% by the Trust, and 20% by Freedland, the managing member. The Debtor commenced its Case by filing in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on Petition Date. The Debtor owns the Commercial Property, consisting of approximately 56,628 square feet of land, and the Commercial Building, consisting of a one-story commercial building of approximately 22,680 square feet. Prior to the Petition Date, in approximately February of 2015, the Debtor was induced to purchase the Commercial Property for approximately $6,200,000, of which approximately $4,800,000 was paid in cash, with the balance of the purchase price of approximately $1,500,000 being carried back in the form of the W Linc Note secured by the W Linc Trust Deed, which are disputed by the Debtor and the subject of the State Court Action.

In the State Court Action, the Debtor contends, among other things, that prior to the Petition Date, it was the victim of a fraudulent real estate scheme perpetrated by the State Court Defendants, whereby the Debtor was induced, through fraud, misrepresentations, and fraudulent concealment of material facts into immensely overpaying for the Commercial Property, to the detriment of the Debtor, its creditors, as well as to the detriment of the Trust (established for the benefit of J. Arnall, an infirm widow and her minor child), and Freedland. Apparently discontent with having successfully defrauded the Debtor out of "only" approximately $3 million in cash by virtue of their fraud, misrepresentations and concealment, the Debtor contends that the State Court Defendants, thereafter, also pursued a non-judicial foreclosure with the intent of depriving the Debtor of the remaining value, by means of the fraudulently obtained W Linc Trust Deed, thereby completing their defilement of the Debtor, its creditors, the Trust for a sick widow and her minor child, and Freedland.

The Bankruptcy Code allows a debtor, and under some circumstances, creditors and other parties-in-interest, to propose a plan of reorganization in Chapter 11. This document is the Plan proposed and filed by the Debtor.

The Plan proposed by the Debtor in this Case, provides for, among other things, reorganization of the Estate, by continuing its ownership, operation, and leasing of the Commercial Property, and by continuing its vigorous pursuit of its claims against the State Court Defendants in the State Court Action before, on, and after the Effective Date. The Debtor believes strongly that the State Court Action will result in, among other things, cancellation of the W Linc Note and W Linc Trust Deed and/or damages far in excess of the W Linc Disputed Secured Claim.

Although the Plan proposed by the Debtor preserves after Confirmation any and all claims asserted by the Debtor against the State Court Defendants in the State Court Action, and provides for the continued vigorous prosecution of such claims, the treatment of Creditors under the Plan is not contingent upon prosecution of, or success in, the State Court Action, except with respect to the actual distribution on account of any Disputed Claim, including, without limitation, the W Linc Disputed Secured Claim.

Pending determination of the W Linc Allowed Secured Claim, the Plan proposes a restructuring of the W Linc Note for the benefit of the Debtor, its General Unsecured Creditors, the Trust (for the benefit of the infirm widow and her minor child), and Freedland, providing a reasonable opportunity to rehabilitate the Commercial Property; locate a suitable tenant; have the W Linc Allowed Secured Claim determined; have the Debtor's pending claims in the State Court

Action adjudicated; and eventually accomplish an orderly, non-distressed sale of the Commercial Property within a reasonable period of time. With respect to distribution on account W Linc Disputed Secured Claim, the Plan (consistent with the treatment of any Disputed Claim) provides for treatment of such Disputed Claim, but establishes the W Linc Disputed Claim Reserve pending Final Order, Allowing such claim, into which the W Linc Disputed Deferred Payments shall be deposited pending Allowance.

Contained in the same envelope as the Plan is the Disclosure Statement which has been approved by the Bankruptcy Court and which is provided to help you understand the Plan. All Creditors and Holders of Interests are encouraged to read thoroughly the Plan and the Disclosure Statement before voting to accept or reject the Plan. No solicitation materials, other than the Disclosure Statement and related materials being transmitted with the Plan have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

***All Holders of Claims and interests are encouraged to read thoroughly the Plan and the related materials in their entirety before deciding to consent to the Plan.***

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTION WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM OR INTEREST THAT IS NOT AN ALLOWED CLAIM OR INTEREST.**

## II.    DEFINITIONS AND RULES OF CONSTRUCTION

### A.    DEFINITIONS

In addition to any definitions set forth in the Plan, the following definitions will apply with respect to the Plan.

***Administrative Claim(s)*** or ***Administrative Expense(s)*** means Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under Bankruptcy Code §§ 503 (b) and 507(a) (1).

***Administrative Claims Bar Date*** shall have the meaning set forth in Section IV. A. 1(b) of the Plan.

***Administrative Claims Funding Amount*** shall have the meaning set forth in Section IV.A.1 of the Plan.

***Administrative Claim Reserve(s)*** means a Plan Reserve in an amount sufficient to satisfy Allowed Administrative Claims against the Debtor.

***Administrative Tax Claim*** means a Claim that a governmental unit asserts or may assert against the Debtor either for taxes or for related interest, fees, costs or penalties for any tax period.

***Allowed*** means, when used in respect of a Claim or an Interest or group of Claims or Interests, the following as applicable:

(a)    if no Proof of Claim or Interest has been timely filed, such amount of the Claim or Interest or group of Claims or Interests which has been scheduled by the Debtor as liquidated in amount and not disputed or contingent and as to which no party in interest has filed an objection within the time required under the Plan or otherwise fixed by the Court and which Claim or Interest is not disallowed under Bankruptcy Code § 502 (d) or (e); or

(b)    if a Proof of Claim or Interest has been filed by the applicable bar date or is deemed timely filed by the Court, such amount of the Claim or Interest or group Claims or Interests as to which any party in interest has not filed an objection within the time required under the Plan or otherwise fixed by the Court and which Claim or Interest is not disallowed under Bankruptcy Code § 502 (d) or (e); or

(c)    such amount of the Claim or Interest or group of Claims or Interests which is allowed by a Final Order of the Court.

*Allowed Administrative Claim* means an Administrative Claim that is an Allowed Claim.

*Allowed Claim* or *Allowed Interest* means a Claim or Interest that is Allowed and not a Disputed Claim.

*Allowed General Unsecured Claim* means a General Unsecured Claim that is an Allowed Claim.

*Allowed Secured Claim* means a Secured Claim that is an Allowed Claim.

*Assets* means (i) any and all real or personal property of the Debtor of any nature, including, without limitation, the Commercial Property, Cash, licenses, goods, materials, supplies, furniture, fixtures, equipment, works in process, accounts or loans receivable, tax refunds, chattel paper, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Rights of Action, and any other general intangibles of any nature whatsoever; and (ii) proceeds, products, rents and profits of any and all of the foregoing.

*Assumed Contract Schedule* shall have the meaning set forth in Section VI. F of the Plan.

*Available Cash* means the positive cash flow generated from operation of the Commercial Property subsequent to the Effective Date (calculated in accordance with GAAP) less payment, or reserve for payment, of Operating Expenses and Operating Reserves (i.e. working capital, capital expenditures, debt service, etc.) and any and all Claims and creditor obligations under the Plan.

*Avoidance Action(s)* means all avoiding powers, rights to seek subordination and all rights and remedies under Bankruptcy Code §§ 502(d), 506, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, or 553 or any fraudulent conveyance, fraudulent transfer, or preference laws under applicable state or other law.

*Ballot(s)* means the ballot to vote to accept or reject the Plan.

*Ballot Deadline* means the deadline established by the Bankruptcy Court for the delivery of executed Ballots to the Debtor.

*Bankruptcy Code* means the Bankruptcy Code, as codified in Title 11 of the United States Code, 11 U.S.C. Section 101 et seq., including all amendments thereto, to the extent such amendments are applicable to the Case.

*Bankruptcy Court* means the United States Bankruptcy Court for the Central District of California, Los Angeles Division, or any other court that exercises jurisdiction over the Case.

*Bar Date* means the bar date for POC(s) and POI(s) set in this Case.

*Bar Date Order* means the Order Setting Bar Date for Filing Proofs of Claim in Chapter 11 Case and Approving Bar Date Notice, entered by the Bankruptcy Court in this Case.

*Biggs* means Samuel R. Biggs of SL Biggs.

3

Sandford L. Frey (SBN 117058)
Stuart I. Koenig (SBN 102764)
**CREIM MACIAS KOENIG & FREY LLP**
633 West Fifth Street, 48th Floor
Los Angeles, CA 90071
Telephone: (213) 614-1944
Facsimile: (213) 614-1961
sfrey@cmkllp.com
skoenig@cmkllp.com

Chapter 11 Attorneys for 315 Arden, LLC,
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### [LOS ANGELES DIVISION]

| | |
|---|---|
| In re | CASE NO.: 2:15-bk-26483-BR |
| **315 ARDEN, LLC,** | Chapter 11 |
| Debtor and Debtor in Possession. | **PLAN OF REORGANIZATION PROPOSED BY DEBTOR, 315 ARDEN, LLC** |

_**Plan Confirmation Hearing**_:
DATE:       June 7, 2016
TIME:       10:00 a.m.
CTRM:       1668

***Business Day*** means any day other than a Saturday, Sunday or a legal holiday (as defined in the FRBP 9006(a)).

***Case*** means the Chapter 11 proceeding commenced by the Debtor by voluntary petition and entitled In re 315 Arden LLC, Case No. 2:15-bk-26483-BR, pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

***Cash*** means cash or cash equivalents, including, but not limited to, bank deposits, checks, or other similar items.

***Claim*** means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

***Claim Objection Deadline*** means the date, if any, set in the Confirmation Order as being the deadline for filing objections to Claims.

***Class*** means a class of Claims or Interests described in the Plan.

***Classified Priority Claim(s)*** means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(1), 507(a)(4), 507(a)(5), and/or 507(a)(7), excluding any such claims incurred after the Petition Date.

***CMKF*** means Creim Macias Koenig & Frey LLP, reorganization attorneys to the Debtor.

***Commercial Building*** means the one-story commercial building consisting of approximately 22,680 square feet located on the Commercial Property.

***Commercial Property*** means the real property of approximately 56,628 square feet, located at 7101 W. Lincoln Avenue, Buena Park, CA, including the Commercial Building.

***Confirmation*** means the entry of the Confirmation Order.

***Confirmation Date*** means the date upon which the Court enters the Confirmation Order.

***Confirmation Hearing Date*** means the date on which the Court held a hearing on Confirmation of the Plan.

***Confirmation Order*** means the order of the Court confirming the Plan pursuant to Bankruptcy Code § 1129.

***Consummation*** means the occurrence of the Effective Date.

***Contracts*** means all agreements and contracts to which the Debtor is a party.

***Court*** means the United States Bankruptcy Court for the Central District of California, Los Angeles Division, or any other court that exercises jurisdiction over the Case.

***Creditor*** means the Holder of a Claim against the Debtor.

***Cure Obligations*** means all (a) amounts (or such lesser amount as may be agreed upon by the parties under an executory contract or unexpired lease) required to cure any monetary defaults and (b) other obligations required to cure any non-monetary defaults, if any, under any executory

contract or unexpired lease that is to be assumed and assigned by the Debtor pursuant to Bankruptcy Code §§ 365 and 1123.

*D. Arnall* means Daniel Arnall, the deceased husband of J. Arnall.

*Debtor* means 315 Arden, LLC, the Debtor in this Case.

*Debtor's Accountants* means the accountants and financial advisors employed by the Debtor in the Case pursuant to Bankruptcy Code § 327(a).

*Debtor's Bankruptcy Counsel* means CMKF.

*DIP* means Debtor in Possession.

*Dip Loan* means the post-petition financing by the Trust approved by the Bankruptcy Court pursuant to the DIP Order.

*Dip Motion* means the Motion of Debtor and Debtor-in-Possession for Order Authorizing Final Post-Petition Financing by Debtor's Majority Equity Holder pursuant to Bankruptcy Code § 364(b), on an Unsecured Basis, Allowable Under Bankruptcy Code §503(b)(1) as an Administrative Expense, filed on November 18, 2015. [Docket No. 14].

*Dip Order* means that certain Order Approving Motion of Debtor and Debtor-in-Possession for Order Authorizing Final Post-Petition Financing by Debtor's Majority Equity Holder pursuant to Bankruptcy Code § 364(b), on an Unsecured Basis, Allowable Under Bankruptcy Code § 503(b)(1) as an Administrative Expense, approving the Dip Motion.

*Disallowed Claim* means a Claim, or any portion thereof, that: (a) is not listed on the Debtor's Schedules, or is listed therein as contingent, unliquidated, disputed, in an unknown amount, or in an amount equal to zero, or is listed in an unknown amount, and whose Holder has failed to timely File a Proof of Claim; (b) is listed in the Debtor's Schedules, but is subject to a unresolved objection filed by the Debtor or other party in interest, or (c) the Court has disallowed pursuant to order of the Court.

*Disbursing Agent* means the Reorganized Debtor, which is responsible for making all Distributions to Claimants provided under the Plan.

*Disclosure Statement* means the Disclosure Statement Describing Plan of Reorganization Proposed by Debtor, 315 Arden LLC, and any and all amendments, modifications and exhibits thereto.

*Disclosure Statement Order* means the order of the Bankruptcy Court approving the Disclosure Statement accompanying the Plan.

*Disputed Claim* or *Disputed Interest* means a Claim or Interest as to which a Proof of Claim is filed or is deemed filed under FRBP 3003(b)(1) or a Proof of Interest was filed or deemed filed under FRBP 3003(b)(2); and

1. An objection: (a) has been timely filed; and (b) has not been denied by a Final Order or withdrawn; or,

2. The Claim or Interest is listed on the Debtor's Schedules as disputed, contingent or unliquidated; or is not listed on the Debtor's Schedules as disputed, contingent or unliquidated, but an objection has nevertheless been filed and not denied by Final Order.

*Disputed Claim Reserve* means, for any Disputed Claim, the amount as estimated pursuant to (a) agreement among the Debtor (or the Reorganized Debtor, as applicable) and the Holder of the Disputed Claim; (b) determination made by the Debtor (or the Reorganized Debtor, as applicable) in its absolute and sole discretion; or (d) determination of the Bankruptcy Court.

*Disputed/Estimated Amount* shall have the meaning set forth in Section II, B, 4, b.1 (iii) of the Plan.

*Distribution* means any transfer under the Plan of Cash or other property to a Holder of an Allowed Administrative Claim, a Holder of an Allowed Claim, or a Holder of an Interest.

*EDD* means the Employment Development Department.

*Effective Date* means a date set by the Debtor, which date shall be within sixty (60) days after the Confirmation Order becomes a Final Order.

*Effective Date Notice* means a notice that may be served by the Reorganized Debtor upon the occurrence of the Effective Date.

*Enjoined Claim* shall have the meaning set forth in Section VIII. B of the Plan.

*Estate* means the estate in the Debtor's Case created pursuant to Bankruptcy Code § 541(a).

*Exhibit Filing Date* means the date that is at least 10 days prior to the date of the Confirmation Hearing.

*Final Order* or *Final Judgment* means an order or judgment of a court of competent jurisdiction entered on such court's official docket the operation or effect of which (a) has not been reversed, rescinded, stayed, modified, or amended; (b) is in full force and effect; and (c) with respect to which: (i) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

*Fraudulent Transfer Action* means that certain adversary action filed in the Bankruptcy Court on February 19, 2016, entitled 315 Arden, LLC, plaintiff, v. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company, defendants, initiated by the filing of a Complaint for: (1) Avoidance and Recovery of Fraudulent Transfer [11 U.S.C. §§ 548, 550 and 551]; (2) Equitable Subordination [11 U.S.C. § 510]; (3) Disallowance of any Claims held by Defendants [11 U.S.C. § 502(d)], and assigned adversary number 16-ap-01076-BR.

*FRBP* means the Federal Rules of Bankruptcy Procedure as now in effect or hereafter amended and applicable to the Case.

*Freedland* means Tzepah Freedland.

*FTB* means the Franchise Tax Board.

*GAAP* means Generally Accepted Accounting Principles.

*General Unsecured Claimant* means the Holder of a General Unsecured Claim.

*General Unsecured Claimants* means collectively all Holders of the General Unsecured Claims.

*General Unsecured Claim* means a Claim that is not an Administrative Claim, a Priority Claim, an Administrative Tax Claim, a Secured Claim, a Secured Tax Claim, or a Convenience Claim.

*General Unsecured Claims* means collectively each and every General Unsecured Claim asserted against the Debtor.

*General Unsecured Creditor* has the same meaning as General Unsecured Claimant.

*General Unsecured Creditors* has the same meaning as General Unsecured Claimants.

*Glendale Building* means the commercial office building formerly owned by the Debtor, located at 315 Arden Avenue, Glendale, California

*Governmental Unit* means United States; State; Commonwealth; District; Territory; municipality; foreign state; or a department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state, or other foreign or domestic government.

*Hanley* means Edward B. Hanley, an individual

*Herron* means Herron Companies.

*Herron Appraisal* means the appraisal dated March 10, 2016 prepared by Herron appraising the Commercial Property, a copy of which is attached as an exhibit to the Disclosure Statement.

*HIG* means Hanley Investment Group, Inc., a California Corporation.

*Holder* means the holder of a Claim against, or Interest in, the Debtor.

*Insider* means all Persons who are "insiders" as that term is defined in Bankruptcy Code § 101 (31).

*Interest* means any equity security Holder of the Debtor as defined in Bankruptcy Code § 101(16).

*IPRS* means Investment Property Exchange Services, Inc., a California corporation.

*IRC* means the United States Internal Revenue Code, as codified in Title 26 of the United States Code, including all amendments thereto, to the extent such amendments are applicable to the sale of the Glendale Building and Commercial Building.

*IRS* means the Internal Revenue Service.

*J. Arnall* means Judith Arnall, the widow of D. Arnall.

*LBR* means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, including all amendments thereto, to the extent such amendments are applicable to the Case.

*Lien* means any charge against or interest in property to secure payment or performance of a Claim, debt or obligation.

*Liquidation Analysis* means the Liquidation Analysis prepared by the Debtor attached to the Disclosure Statement.

*Liquidation Value* means the aggregate dollar amount found by the Court (calculated without consideration of Rights of Action), which is equal to the lowest dollar amount necessary to fund payment to a Class in the manner provided under the Plan so that each Holder of an Allowed Claim would receive or retain property with a value as of the Effective Date at least equal to the amount such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

*Lombardo Firm* means Lombardo & Safford, the Debtor's special corporate and real estate attorneys.

*Lopez* means Carlos J. Lopez, an individual.

*LTV Ratio* means the ratio of an Allowed Secured Claim to the value of the Commercial Property.

*LTV Reduction Contribution* means a further contribution or unsecured loan, if necessary, to be made after the Effective Date by, or on behalf of, the New Value Contributor in an amount necessary to make the W Linc LTV Reduction Payment.

*Luviland Corp* means Luviland Corporation, a California Corporation.

*Luviland Entities* means Luviland Corp and Luviland LLC.

*Luviland LLC* means Luviland LLC, a California Limited Liability Company.

*McGonigle Firm* means Timothy D. McGonigle Prof. Corp., the Debtor's special litigation attorneys.

*Net Sale Proceeds* means proceeds resulting from the sale of the Commercial Property remaining after payment of, or reserve for, any and all (a) usual and customary fees, costs and/or expenses of sale, including, but not limited to, escrow fees, title fees, title insurance fees, document preparation fees, insurance, and/or any other fees, costs or expenses of sale; (b) property taxes due and owing as of closing of such sale; (c) brokers' commissions; (d) repairs or improvements necessary to consummate the sale; and (e) other amounts, fees, costs, expenses, or other charges reasonable, necessary, or required in connection with the sale or close of escrow.

*New Value Contribution* means the contribution by the New Value Contributor.

*New Value Contributor* means the Trust.

*Nguyen* means John Huy Nguyen, an individual.

*Operating Agreement* means the First Amended and Restated Operating Agreement of 315 Arden LLC, entered into on December 9, 2014, as it existed as of the Petition Date.

*Operating Expenses* means (a) operating expenses and ordinary course of business payments, including, but not limited to, goods, services, depreciation, interest, insurance, trash, utilities, supplies, repairs, security, improvements, equipment, furniture, fixtures, bank charges, taxes, wages, salaries, commissions (including vacation, severance and sick leave pay), withholding taxes, ordinary course payments to secured creditors and equipment lessors, and any other payments incurred, accrued or required to be paid in the ordinary course of business; and (b) Working Capital Reserves.

*Other Assets* means the Assets, excluding the Commercial Property.

*Person* means any individual or entity.

8

*Personal Property* means all property owned by the Debtor now or hereafter which under applicable law is not real property, and includes all tangible and intangible personal property.

*Petition Date* means October 27, 2015.

*Plan* means the Plan of Reorganization Proposed by Debtor, 315 Arden LLC, as it may be amended or modified from time to time, and all exhibits thereto.

*Plan Proponent* means the Debtor.

*Plan Reserve Account(s)* means the segregated accounts to be established by the Reorganized Debtor to hold each of the various Plan Reserves as the Reorganized Debtor reasonably deems appropriate, subject to the terms of the Plan.

*Plan Reserves* means all reserves to be established by the Reorganized Debtor on or after the Effective Date (or as soon as reasonably practicable thereafter), including, but not limited to, the Administrative Claim Reserve, and separate reserves for payment of Disputed Administrative Claims and Disputed General Unsecured Claims as of the date of any contemplated distribution. Each Plan Reserve shall be in an amount determined in the discretion of the Reorganized Debtor, and such amount(s) can be reduced, increased and/or replenished after the Effective Date by the Reorganized Debtor subject to the terms of the Plan.

*Plan Supplement* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed before the Confirmation Hearing (to the extent such document is in existence as of the time thereof), as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the FRBP.

*POC* means Proof of Claim filed in the Case.

*POC Amount* shall have the meaning set forth in Section II, B, 4, b.1 (ii) of the Plan.

*POI* means Proof of Interest filed in the Case.

*Post-Effective Date Litigation* means all claims reserved under Section VII of the Plan, including, but not limited to: (a) the State Court Action; (b) Rights of Action; (b) any rights to object to, settle, compromise, or resolve Claims; and (c) any rights of equitable subordination or disallowance.

*Priority Claim(s)* means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(1) through 507(a)(8), excluding any such claims incurred after the Petition Date.

*Priority Tax Claim(s)* means certain unsecured tax claims based on income, employment, and other taxes described by Bankruptcy Code § 507(a)(8), excluding any such claims incurred after the Petition Date.

*Priority Tax Claims Funding Amount* shall have the meaning set forth in Section IV of the Plan.

*Pro Rata* means, with respect to a particular Class of Claims or Interests, the ratio that the amount of a particular Allowed Claim or Allowed Interest in the Class bears to the total amount of Allowed Claims or Allowed Interests in the Class.

*Professionals* means the professionals (including, without limitation, attorneys, accountants, and other advisors and agents) employed by the Debtor.

9

*Professional Fee Claim* means a claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred for which the Estate is liable for payment.

*Red Mountain Entities* means Red Mountain Group and Red Mountain Retail.

*Red Mountain Group* means Red Mountain Group, Inc., a California Corporation.

*Red Mountain Retail* means Red Mountain Retail Group, Inc., a California Corporation.

*Rejection Damage Claim* means a Claim for any obligations or damages arising under an unexpired real-property or personal-property lease or executory contract that the Debtor rejects or is deemed rejected pursuant to the terms of the Plan.

*Rejection Schedule* shall have the meaning set forth in Section VI of the Plan.

*Reorganized Debtor* means the Debtor on and after the Effective Date, after giving effect to the Plan and after the revesting of the Assets.

*Reorganized Debtor Operating Agreement* means the Operating Agreement, as may be modified, amended, or affected by the Plan as of the Effective Date, and as may be thereafter modified and/or amended by vote of the applicable members of the Reorganized Debtor.

*Rights of Action* means any and all claims, demands, rights, actions, causes of action and suits held by, or which could be asserted on behalf of, the Estate, of any kind, nature or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, including, but not limited to (1) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (2) the right to object to Claims or Interests, (3) claims pursuant to Bankruptcy Code § 362, (4) such claims and defenses as fraud, breach of fiduciary duty, mistake, duress, usury, and (5) Avoidance Actions, excluding the State Court Action, the Fraudulent Transfer Action and the Subordination Claim.

*Sale Option* shall have the meaning set forth in Section VI of the Plan.

*Scheduled Amount* shall have the meaning set forth in Section II, B, 4, b.1 (i) of the Plan.

*Schedules* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statement of financial affairs filed by the Debtor pursuant to Bankruptcy Code § 521, as the same may have been amended, modified, or supplemented from time to time.

*Scheduling Order* means the Order: (1) Setting Deadline for filing Chapter 11 Disclosure Statement and Plan of Reorganization; (2) Setting Preliminary Hearing on Adequacy of Disclosure Statement and Plan of Reorganization; and (3) Setting forth Mandatory Contents of Chapter 11 Disclosure Statement and Chapter 11 Plan of Reorganization, entered by the Bankruptcy Court on October 28, 2015 [Docket No. 4].

*Secured Claim* means a Claim, including a Secured Tax Claim, which is secured by a lien on the Debtor's property. A claim is a Secured Claim only to the extent of the value of the claimholder's interest in the collateral or to the extent of the amount subject to setoff, whichever is applicable, and as determined under Bankruptcy Code §506(a).

*Secured Tax Claim* means a governmental unit's Secured Claim for unpaid taxes arising before the Petition Date.

*SL Biggs* means SL Biggs, a division of SingerLewak.

*State Court Action* means the civil litigation action initially filed on August 21, 2015, pending in the Superior Court of the State of California for the County of Orange, pursuant to the State Court Complaint, entitled 315 Arden LLC, a California Limited Liability Company, Plaintiff, vs. Red Mountain Group, Inc., a California Corporation; Red Mountain Retail Group, Inc., a California Corporation; W Linc BP, LLC, a California Limited Liability Company; Luviland Corporation, a California Corporation; Luviland LLC, a California Limited Liability Company, John Huy Nguyen, an individual; Eric Wohl, an individual; Carlos J. Lopez, an individual; Edward B. Hanley, an individual; Hanley Investment Group, Inc., a California Corporation, and, Does 1 through 40, inclusive, Case No. 30-2015-00805904-CU-FR-CJC.

*State Court Complaint* means the first amended complaint filed by the Debtor in the State Court Action, entitled First Amended Complaint for (1) Breach of Contract (Lease); (2) Breach of Contract (Guaranty); (3) Fraud and Intentional; Misrepresentation (against Agents and Does); (4) Fraud and Intentional Misrepresentation (against Sellers and Does); (5) Intentional Concealment; (6) Negligent Concealment; (7) Negligent Misrepresentation; (8) Breach of Fiduciary Duty; (9) Negligence; and (10) Constructive Fraud, as currently filed or hereafter amended.

*State Court Defendants* means any and all defendants in the State Court Action, including, without limitation, the Red Mountain Entities, W Linc, the Luviland Entities, Nguyen, Wohl, Lopez, Hanley, HIG, and, Does 1 through 40, as now exists or may later be amended, modified, or supplemented.

*Stipulated Amount* shall have the meaning set forth in Section II, B, 4, b.1 (iv) of the Plan.

*Subordination Claim* means the claim for relief pursuant to Bankruptcy Code § 510(c) that has been initiated by the Debtor in the Bankruptcy Court, as part of the Fraudulent Transfer Action, seeking to equitably subordinate the W Linc Disputed Secured Claim.

*Takeout Financing* means, to the extent necessary, refinancing of the Commercial Property obtained by the Reorganized Debtor from a third party lender prior to the W Linc Note Extended Maturity Date, which shall be secured by a first deed of trust against the Commercial Property; the proceeds of which Takeout Financing will be used to, among other things, satisfy the unpaid balance due, if any, on account of the W Linc Allowed Secured Claim, if any, on or before the W Linc Note Extended Maturity Date.

*Trust* means the Daniel & Judith Arnall Family Trust.

*Trust Exit Financing* means financing or further contributions made available by the Trust to the Reorganized Debtor on and after the Effective Date, in such amounts as are periodically required by the Reorganized Debtor from time to time for Operating Expenses or payments under the Plan.

*Unclassified Priority Claim(s)* means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(2), 507(a)(3), and/or 507(a)(8), excluding any such claims incurred after the Petition Date.

*Updated Appraisal* means the updated appraisal performed after the Effective Date, on the Update Appraisal Date, by Herron (or another appraiser selected by the Reorganized Debtor), in accordance with the treatment of Class 2 in Section V of the Plan.

*Updated Appraisal Date* means the date upon which the Updated Appraisal must be completed in accordance with the treatment of Class 2 in Section V of the Plan, which date will be a Business Day, which is no more than twenty-four (24) months after the Effective Date.

*UST* means the Office of the United States Trustee for the Central District of California.

*UST Fees* means fees or charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

*Voting Deadline* means the deadline established by the Debtor for receipt of Ballots voting to accept or reject the Plan and Plan Releases.

*W Linc* means W Linc BP, LLC, a California Limited Liability Company.

*W Linc Allowed Secured Claim* means the Secured Claim of W Linc, if any, as Allowed and determined (a) by Final Order entered in the Bankruptcy Court; (b) by Final Judgment in the State Court Action; (c) after applying any and all setoff and/or recoupment claims asserted by the Debtor; and, (d) by Final Judgment in the Fraudulent Transfer Action.

*W Linc Deferred Payment(s)* shall have the meaning set forth in the treatment of Class 2 under Section V.B of the Plan.

*W Linc Discount/Interest Rate* shall have the meaning set forth in Section __ of the Plan.

*W Linc Disputed Claim Reserve* means a reserve to be established by the New Value Contributor on behalf of the Reorganized Debtor on or after the Effective Date (or as soon as reasonably practicable thereafter) into which the W Linc Disputed Deferred Payments will be deposited pending determination of the W Linc Allowed Secured Claim.

*W Linc Disputed Claim Reserve Account* means a segregated account to be established by the Reorganized Debtor to hold the proceeds of the W Linc Disputed Claim Reserve, subject to the terms of the Plan.

*W Linc Disputed Deferred Payments* shall have the meaning set forth in the treatment of Class 2 under Section V.B of the Plan.

*W Linc Disputed Secured Claim* means any and all Secured Claims asserted by W Linc against the Debtor, including, without limitation, pursuant to W Linc Note.

*W Linc Final Payment* shall have the meaning set forth in Section V.B of the Plan.

*W Linc Final Payment Date* shall have the meaning set forth in Section V.B of the Plan.

*W Linc Interim Discount/Interest Rate* shall have the meaning set forth in Section V.B of the Plan.

*W Linc LTV Reduction Payment* shall have the meaning set forth in Section V.B of the Plan.

*W Linc NOD* shall have the meaning set forth in Section II.E of the Disclosure Statement.

*W Linc Note* means that certain Promissory Note, between the Debtor and IPRS, dated February 24, 2015, in the principal amount of $1,507,642.

*W Linc Note Extended Maturity Date* shall have the meaning set forth in Section V.B of the Plan.

*W Linc Secured Claim Allowance Date* means the first (1st) Business Day following ten (10) days after all of the following (i) entry of a Final Order Allowing the W Linc Disputed Secured Claim; (ii) entry of a Final Judgment in the State Court Action; and (iii) final determination of the W Linc Allowed Secured Claim.

*W Linc Trust Deed* means that certain Deed of Trust and Assignment of Rents, dated February 24, 2015, recorded on February 24, 2015, in the Official Records of recorder's office the Orange County office, as instrument number 2015000097859.

*Wohl* means Eric Wohl, an individual.

*Working Capital Reserves* means any and all anticipated, planner or actual cash needs for working capital, ascribed to such term under and pursuant to GAAP.

*1031 Exchange* means the exchange of the Glendale Building and Commercial Building, thereby resulting in the deferral of the recognition of capital gains and losses by the Debtor, pursuant to IRC § 1031.

B.    RULES OF CONSTRUCTION.

The rules of construction in Bankruptcy Code § 102 apply to the Plan to the extent not inconsistent herewith.

FRBP 9006(a) applies when computing any time period under the Plan.

A term that is used in the Plan and that is not defined in the Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or the FRBP.

The Plan shall control over any conflicting provision, or in the event of any ambiguity, between the terms of the Disclosure Statement, on the one hand, and the Plan, on the other hand.

The Plan shall control over any conflicting provision, or in the event of any ambiguity, between the terms of any documents entered into or approved in connection with the Plan, on the one hand, and the Plan, on the other hand.

The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in singular or the plural, includes both the singular and the plural.

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.  No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially negatively affected.

Any reference to an existing document means the document as it may be, amended or supplemented.

Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

Unless otherwise specified, all references to Sections are references to the Plan's sections.

13

Unless otherwise specified, all references to Exhibits are references to the Exhibits to the Plan.

The words "herein," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion hereof.

## III.   GENERAL STATEMENT ABOUT CLASSIFICATION AND TREATMENT OF NON-CONSENTING CLASSES

### A.   GENERAL STATEMENT ABOUT CLASSIFICATION UNDER THE PLAN

The Plan classifies Claims and Interests in various Classes according to their right to priority. The Plan states whether each Class of Claims or Interests is impaired or unimpaired. The Plan provides the treatment that each Class will receive. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description.

### B.   HOLDERS OF CLAIMS ENTITLED TO VOTE

Each Holder of an Allowed Claim that is impaired under the Plan is entitled to vote separately to accept or reject the Plan.

### C.   GENERAL STATEMENT RESPECTING THE TREATMENT OF NON-CONSENTING CLASSES

Even if all Classes do not consent to the proposed treatment of their Claims under the Plan, the Plan may nonetheless be confirmed if the dissenting Classes are treated in a manner prescribed by the Bankruptcy Code. The process by which dissenting Classes are forced to abide by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows dissenting Classes to be crammed down if the Plan does not "discriminate unfairly" and is "fair and equitable."

## IV.   CLASSIFICATION AND TREATMENT OF UNCLASSIFIED CLAIMS

### A.   UNCLASSIFIED CLAIMS

Certain types of Claims are not placed into voting Classes; and instead they are referred to as "unclassified." Unclassified Claims are not considered impaired and are not entitled to vote on the Plan because such Claims are automatically entitled to specific treatment provided in the Bankruptcy Code. As such, the Debtor has not placed the following Claims into a Class.

#### 1.   *Administrative Expenses/Treatment under the Plan*

Administrative Expenses are Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under Bankruptcy Code §§ 503(b) and 507(a)(1), including, without limitation, (i) the actual, necessary costs and expenses incurred after the commencement of the Debtor's Chapter 11 Case, including unpaid property tax and other tax Claims, and (ii) Professional Fee Claims, consisting of compensation for legal and other services and reimbursement of expenses awarded pursuant to Bankruptcy Code §§ 330(a), 331 or 1103.

The extent and amount of Administrative Claims are set forth in the Disclosure Statement, and are a projection of amounts reasonably expected to be unpaid as of the Effective Date, which will be supplemented based upon fee applications filed by the professionals, and actual Tax Claims, if any.

The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The aggregate amount of

Cash required to satisfy in full all Administrative Claims is referred to hereinafter collectively as the "**Administrative Claims Funding Amount**."

Unless otherwise agreed by the Debtor or Reorganized Debtor and the claimant, the Holders of the Allowed Administrative Expenses Claims shall receive the full amount of their Allowed Claims in Cash on the Effective Date or as soon as such claims are Allowed.

a.    Court Approval of Fees Required

The Court must rule on Professional Fee Claims before such fees and expenses will be Allowed. All requests for professional compensation for professionals employed pursuant to Bankruptcy Code § 327 must be requested by applications for final allowance of compensation and reimbursement of expenses. Only the amount of fees and expenses approved by the Court will be Allowed and required to be paid under the Plan. Any objection to Administrative Claims for professional compensation for professionals employed pursuant to Bankruptcy Code § 327 shall be filed on or before the date specified in the application for final compensation and reimbursement of expenses.

Professional fees and expenses incurred after the Effective Date will not require Court approval, and may be billed and paid by the Reorganized Debtor at any time after the Effective Date.

b.    Allowance of Other Administrative Claims

Pursuant to the Plan, the Administrative Claims Bar Date is a date set forth in the Confirmation Order ("***Administrative Claims Bar Date***"). All Administrative Claims (excluding professional compensation for professionals employed pursuant to Bankruptcy Code § 327) must have been asserted by the filing of a POC (i) designated as a request for payment of Administrative Expenses, (ii) asserting that such claim is allowable pursuant to Bankruptcy Code § 503(b), (iii) stating the amount of such claim, (iv) stating the basis of such claim, and (v) attaching documentation in support of such claim.

Any objection to any Administrative Claim (excluding those to professional compensation for professionals employed pursuant to Bankruptcy Code § 327) must be filed within one-hundred and twenty (120) days from the date such Administrative Claim is filed.

HOLDERS OF ADMINISTRATIVE CLAIMS (INCLUDING, WITHOUT LIMITATION, PROFESSIONALS) REQUESTING COMPENSATION OR REIMBURSEMENT OF EXPENSES THAT DO NOT FILE SUCH REQUESTS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED FROM ASSERTING SUCH CLAIMS AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR OR PROPERTY OF ESTATE, DEBTOR OR REORGANIZED DEBTOR OR ASSETS OR PROCEEDS HELD BY THE REORGANIZED DEBTOR.

2.    *Unclassified Priority Claims/Treatment under the Plan*

Priority Claims are certain types of Claims entitled to priority under the Bankruptcy Code. Certain types of Priority Claims are unclassified. Unclassified Priority Claims are not entitled to vote because such claims are not placed in Classes and they are required to receive certain

treatment specified by the Bankruptcy Code. Unclassified Priority Claims treated below are those set forth in Bankruptcy Code §§ 507(a)(2), (3), and (8)

Unclassified Priority Claims include Priority Tax Claims. Priority Tax Claims are certain unsecured claims of governmental entities for taxes, based on income, employment and other taxes described by Bankruptcy Code § 507(a)(8). The Bankruptcy Code requires that each Holder of such a Section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred Cash payments, over a period not exceeding five (5) years from the Petition Date.

A list of all of the Debtor's known Unclassified Priority Claims is set forth in the Disclosure Statement. Unclassified Priority Claims shall be treated as follows:

**Alternative 1**: The full amount thereof, without post-petition interest or penalty, (less any and all amounts paid after the Petition Date and prior to the Effective Date) in Cash, as soon as practicable after the later of (i) sixty (60) days after the Effective Date or (ii) ten (10) Business Days after the date on which such Priority Tax Claim Secured Tax Claim becomes an Allowed Priority Tax Claim, or

**Alternative 2**: A lesser amount as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtor prior to the Effective Date, or, after the Effective Date, by the Holder of an Allowed Priority Tax Claim, and the Reorganized Debtor, or

**Alternative 3**: At the election of the Debtor or Reorganized Debtor (as applicable), in accordance with Bankruptcy Code § 1129(a)(9)(C), equal quarterly installments paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date (and in such event, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at a rate to be agreed to by the Debtor or Reorganized Debtor (as applicable) and the appropriate Governmental Unit (or, if they are unable to agree, as determined by the Bankruptcy Court).

Any penalty portion of any Claim asserted by the Holder of a Priority Tax Claim shall be treated in Class 4.

## V.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The treatment in the Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of an Allowed Claim or Interest may have in or against the Debtor. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor and the Assets. All Distributions under the Plan will be tendered to the entity holding the Allowed Claim.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTION WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

A.    CLASS 1 – CLASSIFICATION AND TREATMENT OF SECURED TAX CLAIMS.

Class 1 consists of Allowed Secured Tax Claims. Each Holder of an Allowed Secured Tax Claim shall be deemed and treated as a separate sub-class of Class 1 (e.g. Class 1A, 1B, 1C etc). Class 1 is underlined under the Plan, and not entitled to vote on the Plan. Each Holder of an Allowed Secured Tax Claim will be paid in respect of such Allowed Secured Tax Claim one of the following:

16

**Alternative 1**: The full amount thereof, without post-petition interest or penalty, (less any and all amounts paid after the Petition Date and prior to the Effective Date) in Cash, as soon as practicable after the later of (i) sixty (60) days after the Effective Date or (ii) ten (10) Business Days after the date on which such Secured Tax Claim becomes an Allowed Secured Tax Claim, or

**Alternative 2**: A lesser amount as agreed to by the Holder of an Allowed Secured Tax Claim and the Debtor prior to the Effective Date, or, after the Effective Date, by the Holder of an Allowed Secured Tax Claim, and the Reorganized Debtor, or

**Alternative 3**: At the election of the Debtor or Reorganized Debtor (as applicable), in accordance with Bankruptcy Code § 1129(a)(9)(C), equal quarterly installments paid over a period ending no later than the fifth (5th) year anniversary of the Petition Date (and in such event, interest shall be paid on the unpaid portion of such Allowed Secured Tax Claims at a rate to be agreed to by the Debtor or Reorganized Debtor (as applicable) and the appropriate Governmental Unit (or, if they are unable to agree, as determined by the Bankruptcy Court).

**Reservation of Defenses, Objections, Counterclaims and Other Rights**. Any defenses, objections, counterclaims, rights, or rights of offset or recoupment of the Debtor or the Estate with respect to any Secured Tax Claim shall vest in and inure to the benefit of the Reorganized Debtor.

**Further Assurances**. The Holders of the Allowed Secured Tax Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan.

B.      CLASS 2 – CLASSIFICATION AND TREATMENT OF THE W LINC DISPUTED SECURED CLAIM.

Class 2 consists of the W Linc Disputed Secured Claim.  Class 2 is impaired under the Plan.

*1.*      *Treatment of the W Linc Disputed Secured Claim.*  On and after the Effective Date, the Holder of the W Linc Disputed Secured Claim will receive in respect of such W Linc Allowed Secured Claim the following treatment:

**Interim Retention of Disputed Lien Rights**. On the Effective Date, the Commercial Property shall be vested in the Reorganized Debtor, subject to the W Linc Disputed Secured Claim, and Disputed Lien rights, if any, until such time as there is a Final Order Allowing or disallowing such claim and a Final Judgment in the State Court Action. Pending entry of a (i) Final Order determining the W Linc Allowed Claim and (ii) a Final Judgment in the State Court Action, W Linc shall retain its disputed W Linc Trust Deed against the Commercial Property securing the W Linc Disputed Secured Claim, subject to the Reorganized Debtor's claims in the State Court Action and rights of setoff and/or recoupment for damages as determined in the State Court Action.

**Interim Discount/Interest Rate**. On an after the Effective Date, the rate to be applied to the future payment stream on account of the W Linc Disputed Secured Claim shall be 5% per annum (or such other rate as determined by the Bankruptcy Court as the appropriate rate to be applied) ("***W Linc Interim Discount/Interest Rate***"), which shall accrue on the principal balance of the W Linc Disputed Secured Claim (or such estimated amount as may

be determined by order of the Bankruptcy Court in connection with Confirmation),
commencing on the Effective Date and continuing through the entry of a Final Order
Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State
Court Action. Interest shall be computed on a 365/360 basis; that is, by applying the ratio
of the applicable rate over a year of 360 days, multiplied by the lesser of the (i) the principal
balance of the W Linc Disputed Secured Claim, or (ii) such estimated amount as may be
determined by order of the Bankruptcy Court in connection with Confirmation, then
multiplied by the actual number of days that the principal balance of the W Linc Disputed
Secured Claim (or estimated amount) is outstanding.

**W Linc Disputed Deferred Payment(s)**. A quarterly payment in an amount equal to the
accrued W Linc Interim Discount/Interest Rate accruing, on the projected or estimated
principal balance of the W Linc Disputed Secured Claim, during the applicable previous
quarter, shall be deposited into the W Linc Disputed Claim Reserve, on a quarterly basis,
on January 31, April 30, July 31, and October 31 (or the first Business Day thereafter),
commencing on the first such date which is at least 90 days following the Effective Date
and continuing until entry of (i) a Final Order Allowing or disallowing W Linc Disputed
Secured Claim, and (ii) a Final Judgment in the State Court Action (each a "W Linc
Disputed Deferred Payment," and collectively the "W Linc Disputed Deferred Payments").

**Commercial Property Insurance**. On and after the Effective Date, until entry of a Final
Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in
the State Court Action, the Reorganized Debtor shall maintain, or cause to be maintained,
insurance covering the Commercial Property against loss, damage and liability, for such
hazards, risks and loses, and in such amounts, as are usual, customary, and ordinary for
similar property.

**Property Tax for Commercial Property**. On an after the Effective Date, until entry of a
Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment
in the State Court Action, the Reorganized Debtor shall pay, or cause to be paid, undisputed
real property taxes incurred after the Effective Date, except to the extent such taxes are
subject to a bona fide dispute as to the amount assessed.

   2.    *Treatment of the W Linc Allowed Secured Claim*.  Commencing on the first date
which is a January 31, April 30, July 31, or October 31 following the W Linc Secured Claim
Allowance Date, the Holder of the W Linc Allowed Secured Claim will receive in respect of such
W Linc Allowed Secured Claim the following treatment:

**Retention of Lien Rights**. The lien to which the Holder of such W Linc Allowed Secured
Claim under the W Linc Note is entitled pursuant to the W Linc Deed of Trust shall remain
in place and unaltered by the Plan.

**Distribution of the W Linc Disputed Claim Reserve**. Within ten (10) days following
the W Linc Secured Claim Allowance Date, the Holder of the W Linc Allowed Secured
Claim shall receive on account of the W Linc Allowed Secured Claim, the proceeds of the
W Linc Disputed Claim Reserve Account.

**W Linc Discount/Interest Rate**. On an after the W Linc Secured Claim Allowance Date,
the rate to be applied to the future payment stream on account of the W Linc Allowed
Secured Claim shall be 5% per annum (or such other rate as determined by the Bankruptcy

Court as the appropriate rate to be applied) ("W Linc Discount/Interest Rate"), which shall accrue on the principal balance of the W Linc Allowed Secured Claim, commencing on the W Linc Secured Claim Allowance Date and continuing through the date of the W Linc Final Payment. Interest shall be computed on a 365/360 basis; that is, by applying the ratio of the applicable rate over a year of 360 days, multiplied by the principal balance of the W Linc Allowed Secured Claim, and multiplied by the actual number of days that the principal balance of the W Linc Allowed Secured Claim is outstanding.

**W Linc Deferred Payment(s)**. Commencing on and after the W Linc Secured Claim Allowance Date, and continuing each month thereafter until the W Linc Final Payment Date, the Holder of the W Linc Allowed Secured Claim shall receive on account of the W Linc Allowed Secured Claim, monthly installment payments, calculated based upon a thirty-five (35) year amortization of the W Linc Allowed Secured Claim, if any, (each a "W Linc Deferred Payment," and collectively the "W Linc Deferred Payments"). A fifteen (15) day grace period shall apply to each such W Linc Deferred Payment. The W Linc Deferred Payments are determined based on the amount of the W Linc POC and the Discount/Interest Rate set forth in Class 2 of the Plan.

**Commercial Property Insurance**. On an after the entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action through the W Linc Final Payment Date, the Reorganized Debtor shall maintain, or cause to be maintained, insurance covering the Commercial Property against loss, damage and liability, for such hazards, risks and loses, and in such amounts, as are usual, customary, and ordinary for similar property.

**Property Tax for Commercial Property**. On an after the entry of a Final Order Allowing or disallowing W Linc Disputed Secured Claim and a Final Judgment in the State Court Action through the W Linc Final Payment Date, the Reorganized Debtor shall pay, or cause to be paid, undisputed real property taxes incurred after the Effective Date, except to the extent such taxes are subject to a bona fide dispute as to the amount assessed.

3. *Additional Plan Provisions applicable to the W Linc Disputed Secured Claim and W Linc Allowed Secured Claim.* The following Additional Plan Provisions shall apply to the W Linc Disputed Secured Claim and W Linc Allowed Secured Claim, as applicable.

**W Linc LTV Reduction Payment**. In the event that, as of the Updated Appraisal Date, the LTV Ratio, calculated based upon the principal (or estimated) balance of the W Linc Disputed Secured Claim or W Linc Allowed Secured Claim, as applicable, is not at least seventy-five percent (75%) of the value of the Commercial Property as determined by the Updated Appraisal, then a payment will be made from the LTV Reduction Contribution, on a date which is no later than twenty-five (25) months following the Effective Date, in such as amount as is necessary to create a seventy-five percent (75%) LTV Ratio ("*W Linc LTV Reduction Payment*"). If the Updated Appraisal Date occurs after the W Linc Secured Claim Allowance Date, whereby there has resulted a W Linc Allowed Secured Claim, the W Linc LTV Reduction Payment, if required, will be made by the Reorganized Debtor directly to the Holder of the W Linc Allowed Secured Claim. If, on the other hand, the Updated Appraisal Date occurs before the W Linc Secured Claim Allowance Date, such that the W Linc Allowed Secured Claim has not been determined by Final Order or Final Judgment as of the Updated Appraisal Date, the W Linc LTV Reduction Payment, if

required, will be made by the Reorganized Debtor directly into the W Linc Disputed Claim Reserve, pending the W Linc Secured Claim Allowance Date and determination of the W Linc Allowed Secured Claim.

**W Linc Final Payment**. Notwithstanding the provisions of Subparagraphs 2 and 3 above, on or before a date which is the first Business Day after a full forty-eight (48) months following the Effective Date ("*W Linc Note Extended Maturity Date*"), one final payment will be made by the Reorganized Debtor in such amount as is necessary to ensure that the present value of the aggregate of the W Linc Deferred Payments, W Linc LTV Reduction Payment, if applicable, and the W Linc Final Payment are equal to the W Linc Allowed Secured Claim ("*W Linc Final Payment*"). If the W Linc Note Extended Maturity Date occurs after the W Linc Secured Claim Allowance Date, whereby there has resulted a W Linc Allowed Secured Claim, the W Linc Final Payment, if required, will be made by the Reorganized Debtor directly to the Holder of the W Linc Allowed Secured Claim. If, on the other hand, the W Linc Note Extended Maturity Date occurs before the W Linc Secured Claim Allowance Date, such that the W Linc Allowed Secured Claim has not been determined by Final Order or Final Judgment as of the W Linc Note Extended Maturity Date, the W Linc LTV Reduction Payment, if required, will be made by the Reorganized Debtor directly into the W Linc Disputed Claim Reserve, pending the W Linc Secured Claim Allowance Date and determination of the W Linc Allowed Secured Claim.

**W Linc Note Extended Maturity Date**. On the Effective Date, the maturity date under the W Linc Note shall be deemed extended to the W Linc Note Extended Maturity Date.

**Miscellaneous Plan Provisions**. On the Effective Date, (i) the W Linc Loan Documents shall be deemed modified and superseded by the provisions of the Plan; (ii) any and all non-monetary defaults or events of default under the W Linc Note shall be deemed cured and waived as of the Effective Date; and, (iii) any monetary defaults not cured on the Effective Date shall be deemed to be added to the principal balance of the Allowed W Linc Secured Claims in respect of the W Linc Note.

**Reservation of Claims, Defenses, Objections, Counterclaims and Other Rights**. The State Court Action and any defenses, objections, counterclaims, rights, rights of offset and/or recoupment of the Debtor or the Estate with respect to the Claim in this Class shall vest in and inure to the benefit of the Reorganized Debtor.

**Further Assurances**. The Holders of the Claim in this Class shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan, including, without limitation, as soon as practical after the Effective Date, any and all actions and documents required to rescind all notices of default and trustee's sale notices, and cancel and withdraw any trustee's sale.

C.     CLASS 3 - CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS OF THE HOLDERS OF GENERAL UNSECURED CLAIMS (EXCLUDING ANY SUCH GENERAL UNSECURED CLAIMS THAT QUALIFY FOR TREATMENT IN CLASS 4).

Class 3 consists of the Allowed Claims of the Holders of General Unsecured Claims (except any such General Unsecured Claims that qualify for treatment in Class 7). The Holders of

General Unsecured Claims in this Class are impaired under the Plan, and entitled to vote on the Plan.

After the Effective Date, the Holders of the General Unsecured Claims in Class 6 will receive the following on account of their Allowed General Unsecured Claims:

**Class 3 Effective Date Plan Payment.** The Holders of the Allowed General Unsecured Claims qualifying for treatment in Class 3 shall receive on the Effective Date, or as soon as practicable thereafter, on account of such Allowed General Unsecured Claims, an aggregate payment of $10,000 from the New Value Contribution, to be distributed to each such Holder of an Allowed General Unsecured Claim on a Pro Rata basis, but not to exceed an amount equal to ten percent (10%) of each such Holder's Allowed General Unsecured Claim.

**Class 3 Deferred Plan Payments.** After payment in full of the Administrative Claims and Unclassified Priority Claims, the Reorganized Debtor shall distribute to the Holders of Allowed General Unsecured Claims in Class 3, payments of approximately $15,000 each quarter, on each January 31, April 30, July 31, and October 31 (or the first Business Day thereafter), commencing on a date that is a Business Day which is at least ninety (90) days after the Effective Date, and continuing until such time as all of the Allowed General Unsecured Claims in Class 3 receive the present value of 100% of their Allowed General Unsecured Claims. The Pro Rata distribution on account of the Disputed Claims, if any, in this Class shall be deposited into a Plan Reserve Account until entry of a Final Order resolving the Disputed Claim at which time the proceeds will be distributed to the Claimant to the extent such claim is Allowed, and/or to the Reorganized Debtor to the extent such claim is disallowed.

**Rights of Action.** In addition, to the foregoing, the Holders of the Allowed General Unsecured Claims qualifying for treatment in Class 3 shall also be entitled to receive after the Effective Date, a Pro Rata share of the net recovery or net settlement proceeds, if any, received by the Reorganized Debtor after the Effective Date, derived from any Rights of Action, which remain after payment of any and all attorney's fees and costs in connection with the prosecution of the same provided that: (i) payments due to Class 2 after the Effective Date are current for the applicable calendar year; (ii) any and all approved and unpaid Professional Fees in connection with the chapter 11, Plan or any action in respect thereof have been paid in full; (iii) all property tax payments due after the Effective Date and/or pursuant to the Plan are paid when due and not in default; and (iv) all Plan payments are current and there are no Plan Defaults or event of default with respect to any obligations under the Plan.

**Voluntary Subordination of the General Unsecured Claim of the Trust.** In the event that Class 3 votes to accept the Plan (excluding the votes of Insiders), and that the Plan is confirmed, the Trust agrees to subordinate its General Unsecured Claim to the Allowed General Unsecured Claims held by the General Unsecured Creditors, who are not Insiders; and, the Trust consents to have its General Unsecured Claim treated in Class 4.

**Discount/Interest Rate from the Effective Date.** The applicable rate to be applied to the General Unsecured Claims in Class 3 shall be simple interest calculated at the Federal interest rate on civil judgments as set by the Federal Reserve on the Confirmation Hearing Date, commencing

from and after the Effective Date on the Allowed General Unsecured Claims in Class 3 (or such other applicable rate as found by the Bankruptcy Court).

**Reservation of Defenses, Objections, Counterclaims and Other Rights**. Any defenses, objections, counterclaims, rights, rights of offset or recoupment of the Debtor or the Estate with respect to such Claims shall vest in and inure to the benefit of the Reorganized Debtor.

**Further Assurances**. The Holders of the Allowed Class 3 Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate, or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan.

**Maximum Distribution**. In no event shall the aggregate Distributions to be made under the Plan to each Holder of a Class 3 Allowed General Unsecured Claim exceed the present value of such Holder's Allowed General Unsecured Claim.

D.  CLASS 4 - CLASSIFICATION AND TREATMENT OF THE (I) ALLOWED PRIORITY CLAIM OF THE TRUST ON ACCOUNT OF THE DIP LOAN; (II) GENERAL UNSECURED CLAIM OF THE TRUST; (III) ALLOWED SUBORDINATED CLAIMS FOR PENALTIES; AND (IV) ANY AND ALL OTHER SUBORDINATED ALLOWED CLAIMS

Class 4 consists of the Allowed Priority Claim of the Trust for the unpaid balance of the Dip Loan. Class 4 also consists of the Allowed General Unsecured Claim of the Trust which it has agreed to voluntarily subordinate in the event that Class 3 votes to accept the Plan (excluding the votes of Insiders), and that the Plan is confirmed. Class 4 also consists of Allowed subordinated claims, if any, for penalties. Class 4 also consists of any other Allowed subordinated claims of any kind or nature. Class 4 is impaired under the Plan, and entitled to vote on the Plan.

Without limiting the generality of the foregoing, on the Effective Date, as part of its New Value Contribution, the Trust agrees to subordinate its Allowed Priority Claim for the unpaid balance of the Dip Loan and its General Unsecured Claim (on the conditions set forth above) to the payment of Administrative Claims, Unclassified Priority Claims and Allowed Claims in Class 3 of the Plan.

After the Effective Date, the Holders of the Allowed Claims in Class 4 will receive deferred payments equal to the present value of the full amount of their Allowed Claims, paid as follows:

**Class 4 Deferred Plan Payment(s)**. After the Effective Date and payment in full of the Administrative Claims, Unclassified Priority Claims, and Allowed Claims in Classes 2 and 3, the Reorganized Debtor shall distribute each quarter to the Holders of Allowed General Unsecured Claims in Class 4, Available Cash, which shall be distributed Pro Rata among the Holders of the Allowed Claims (taking into consideration the Disputed Claims, if any, in Class 4), which shall continue until such time as all of the Allowed Claims in Class 4 receive the present value of 100% of their Allowed Claims.

**Net Sale Proceeds**. In addition, should the Commercial Property be sold after the Effective Date, the Reorganized Debtor shall also distribute to the Holders of Allowed General Unsecured Claims in Class 4, Net Sale Proceeds remaining after payment in full of the Administrative Claims, Unclassified Priority Claims, and Allowed Claims in Classes 2 and 3, up to an amount equal to the present value of One Hundred percent (100%) of the Allowed Claims in Class 4.

The Pro Rata distribution on account of the Disputed Claims, if any, in this Class shall be deposited into a Plan Reserve Account until entry of a Final Order resolving the Disputed Claim at which time the proceeds will be distributed to the Claimant to the extent such claim is Allowed, and/or to the Reorganized Debtor to the extent such claims is disallowed.

**Discount/Interest Rate from the Effective Date**. The applicable rate to be applied to the Allowed Claims in Class 4 shall be simple interest calculated at the Federal interest rate on civil judgments as set by the Federal Reserve on the Confirmation Hearing Date (or such other applicable rate as found by the Bankruptcy Court).

**Reservation of Defenses, Objections, Counterclaims and Other Rights**. Any defenses, objections, counterclaims, rights, or rights of offset or recoupment of the Debtor or the Estate with respect to such Claims shall vest in and inure to the benefit of the Reorganized Debtor.

**Further Assurances**. The Holders of the Allowed Class 4 Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate, or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan.

**Maximum Distribution**. In no event shall the aggregate Distributions to be made under the Plan to each Holder of a Class 4 Allowed Claim exceed the present value of such Holder's Allowed Class 7 Claim.

E.    CLASS 5 - CLASSIFICATION AND TREATMENT OF THE HOLDER OF ALLOWED EQUITY INTEREST

Class 5 consists of the Interest in the Debtor. The Interests are impaired under the Plan, and entitled to vote on the Plan.

The Allowed Equity Interest in the Debtor shall retain their Interest in the Debtor if the Holders of the Claims in Classes 1 through 4 vote to accept the Plan. Otherwise, the Allowed Equity Interest in the Debtor shall be deemed not to receive any distribution under the Plan on account of their Interests in the Debtor, and their Interests and voting rights shall be maintained based on the current percentages, by virtue of the New Value Contribution.

## VI.    MEANS OF EFFECTUATING THE PLAN

A.    SOURCES OF DISTRIBUTION

*The source of all Distributions and payments under the Plan will be as follows:*

The Plan will be funded by (i) the New Value Contribution; (ii) the Debtor's rental income; (iii) Trust Exit Financing (to the extent required); (iv) LTV Reduction Contribution (if necessary); and, on or before the W Linc Note Extended Maturity Date, (v) Takeout Financing, further contributions of the Trust or the Sale Option.

a.    New Value Contribution.

The Plan will be funded in part by the New Value Contribution made by the New Value Contributors. The anticipated source of the New Value Contribution is the Trust.

b.    Rental Income.

The Plan will be funded from cash flow generated from continued operation of the retail center after the Effective Date. The Reorganized Debtor shall receive and collect all revenue and pay all expenses. Subject to the State Court Action, and the provisions of Bankruptcy Code § 552, until such time as the W Linc Disputed Secured Claim is disallowed or the W Linc Allowed Secured Claim is paid in full, proceeds, product, offspring, and/or profits of the Commercial Property, which are otherwise subject to the W Linc Disputed Secured Claim, shall be used solely for Operating Expenses for the Commercial Property and for W Linc Deferred Payments, and not to fund any other payments under the Plan.

c.    Trust Exit Financing or Further Contributions.

The Plan will also be funded to the extent necessary from unsecured financing or further contributions made available by the Trust to the Reorganized Debtor on and after the Effective Date in such amounts as are periodically required by the Reorganized Debtor from time to time for Operating Expenses or payments under the Plan.

d.    LTV Reduction Contribution.

The Plan will also be funded to the extent necessary from a further contribution or unsecured loan, if necessary, to be made after the Effective Date by the New Value Contributor in an amount necessary to make the W Linc LTV Reduction Payment, if required to be made.

e.    Takeout Financing, Payoff, or Sale Option.

After the Effective Date, and prior to the W Linc Note Extended Maturity Date, the Reorganized Debtor may elect to payoff the W Linc Allowed Secured Claim at any time through additional contributions from the Trust or refinance the Commercial Property by obtaining a new loan from a third party lender prior to the W Linc Note Extended Maturity Date, which shall be secured by a new first deed of trust against the Commercial Property. The proceeds of the contribution or Takeout Financing will be used to, among other things, satisfy the unpaid balance of the W Linc Allowed Secured Claim on or before the W Linc Note Extended Maturity Date.

After the Effective Date, the Reorganized Debtor may elect, in its sole and absolute discretion, to sell the Commercial Property ("**Sale Option**"). In the event that the Debtor exercises the Sale Option, the Net Sale Proceeds of such sale shall be distributed to pay the balances due in the following order (i) Allowed Secured Tax Claims in Class 1; (ii) W Linc Allowed Secured Claim in Class 2; (iii) Administrative Claims and Unclassified Priority Claims; (iv) General Unsecured Claims (Class 3), Pro Rata among such Holders; (v) Allowed Claims in Class 4, Pro Rata among such Holders; and (vi) Equity Interest Holders.

f.    Plan Reserves

The Reorganized Debtor shall maintain Plan Reserves, including (i) an Administrative Claims Plan Reserve (including, without limitation, reserves for Professional Fee Claims), (ii) separate reserves for payment of Disputed Administrative Claims, Disputed General Unsecured Claims, and (iii) Operating Reserves, which are reasonable reserves from cash flow generated from operations as determined by the Reorganized Debtor.

B.    MANAGEMENT OF THE REORGANIZED DEBTOR

The Reorganized Debtor shall manage its affairs after the Effective Date.  On the Effective Date, the Operating Agreement shall be deemed modified and amended pursuant to the terms of the Plan as of the Effective Date.  Freedland shall continue to act as managing member after the Effective Date, at the discretion of the Trust and subject to the provisions of the Operating Agreement.

*1.    The Reorganized Debtor*

On the Effective Date, as set forth in Section VIII of the Plan, all of the Assets, property of the Estate and/or Debtor, including, without limitation, the Commercial Property and its operations, and Rights of Action are vested in the Reorganized Debtor free and clear of all Claims, Liens, interests and encumbrances, except the liens securing the W Linc Note Disputed Secured Claim or the W Linc Note Allowed Secured Claim, as applicable, pursuant to the provisions of Classes 2 of the Plan.

As of the Effective Date, the Reorganized Debtor shall manage the administration of the Plan, and in such capacity, may exercise rights, power and authority consistent with the Plan and applicable laws.

*2.    Powers and Authority of the Reorganized Debtor*

On or after the Effective Date, the powers and authority of the Reorganized Debtor shall include, but not be limited to, taking any action, filing or causing to be filed any proceeding, instituting and prosecuting any litigation, executing any document, entering into any compromise or settlement, or taking any such other actions, in connection with, consist with, or related to, (i) the Plan, (ii) the sale of the Commercial Property, the Other Assets and/or operations, (iii) determination, allowability, classification, or priority of any Claims, (iv) the extent, validity and priority of any lien, (v) construing, administering or enforcing the terms of the Plan, the Confirmation Order and any other order of the Court, (vi) implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred to in the Plan and the Confirmation Order, (vii) the opening or closing of any account which the Reorganized Debtor determines is reasonable, necessary or required under the Plan, and making any withdrawals or deposits in connection therewith, (viii) reviewing, approving, or opposing any and all applications or requests for compensation and reimbursement of expenses of any Professionals which are submitted or brought after the Effective Date (regardless of the date of such services), (ix) filing, prosecuting, compromising or settling the State Court Actions, Rights of Action or other litigation reserved under the Plan, (x) any applications, motions, adversary proceedings, contested matters and any other litigated matters instituted before, on or after the Effective Date, including, without limitation, any and all claims, causes of action, setoffs, recoupments, and the determination of any other rights; (xi) modifying the Plan under Bankruptcy Code § 1127 in order to remedy any apparent defect or omission in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose, or implement any settlement reached (which shall be within the Reorganized Debtor's, sole and exclusive power, right and authority), (xii) seeking any injunctions, judgment, or orders or taking such other actions as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, (xiii) to aid in consummation of the Plan or the Confirmation Order, (xiv) the sale, collection, transfer, or disposition of the Commercial Property and/or any of the Assets and all related transactions, (xv) administration of the Case and the Plan, including, without limitation, retaining, hiring,

terminating any employee or staff, (xvi) preparing, executing and filing of any tax return, and (xvii) closing of the Case, including, without limitation, obtaining a final decree.

On and after the Effective Date, and notwithstanding the restrictions of Bankruptcy Code § 363(b)(1), the Reorganized Debtor is authorized and empowered, without the necessity of further approval, consent or order of the Bankruptcy Court to execute, do, consummate, and perform, in the name and on behalf of the Reorganized Debtor, such acts, and to prepare, execute, acknowledge, verify, file, deliver any and all certificates, agreements, notices, reports, applications, declarations, instruments, notes, deeds, reconveyances, transfer documents, sale agreements, and any and all other documents of any kind or nature on behalf of, and in the name of, the Reorganized Debtor, under the corporate seal of the Reorganized Debtor or otherwise, including, without limitation, those its deems, in its discretion, are reasonable, necessary, desirable, required, appropriate, or that are requested, in order to (i) carry into effect the decisions of the Reorganized Debtor, (ii) refinance, sell, operate, convey, transfer, hypothecate, assign, alienate, dispose of, take possession of, and/or abandon the Commercial Property, the operations and/or any of the Other Assets, (iii) collect or enforce the Reorganized Debtor's rights respecting, or in connection with, any accounts receivable, (iv) file, object to, prosecute, enforce or collect the State Court Action and any Claims and/or Rights of Action, (v) in connection with any of the matters set forth in the Plan, or to carry out the terms and intent of the Plan, and/or (vi) administer the Plan and the Case. The Reorganized Debtor's performance of any such actions and execution and delivery of any such documents shall constitute conclusive evidence of such authority and determination.

C.    CLOSING OF THE CASE

Notwithstanding any other provision herein, the Reorganized Debtor may move to close the Case at any time after the Effective Date, even if any Assets remain to be liquidated, funds remain to be distributed or Plan Reserve(s) remain on deposit.

D.    TREATMENT OF DISPUTED CLAIMS

On and after the Effective Date, the Reorganized Debtor shall have the right to take actions to pursue any and all disputes respecting any and all Claims asserted against the Debtor with respect to which the liability is disputed in whole or in part. All disputes may be litigated to Final Order; provided, however, that the Reorganized Debtor may compromise and settle any disputes respecting Claims. At such time as a Disputed Claim is resolved by Final Order and/or is Allowed or is settled by the Reorganized Debtor, the Holder thereof will receive, as soon as practicable thereafter, the distributions to which such Holder is then entitled under the Plan.

E.    DISTRIBUTION OF PROPERTY UNDER THE PLAN

1.    *Manner of Cash Payments*

Payments to domestic Holders of Allowed Claims will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Reorganized Debtor or, at the Reorganized Debtor's option, by wire transfer from a domestic bank. Payments to foreign Holders of Allowed Claims, if any, may be paid, at the Reorganized Debtor's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction, but in accordance with all financial reporting, payment and tax withholding laws and regulations of Federal and State jurisdictions under which payments fall.

2.    *Setoff and Recoupment*

Notwithstanding anything to the contrary in the Plan, the Reorganized Debtor may setoff, recoup, or withhold against the Distributions to be made on account of any Allowed Claim (including, without limitation, respecting the W Linc Disputed Secured Claim or W Linc Allowed Secured Claim), any claims that the Debtor may have against the entity holding a Claim. The Reorganized Debtor will not waive or release any Claim against those entities by failing to effect such setoff or recoupment; by Allowing any Claim against the Debtor; or by making a Distribution on account of an Allowed Claim.

3.    *No De Minimis Distributions*

Notwithstanding anything to the contrary in the Plan, no Cash payment of less than $50 will be made to any Holder of an Allowed Claim. No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section. Allowed Claims that are entitled to a Pro Rata distribution of less than $50 shall continue to accrue until such time as the Pro Rata distribution on account of such Allowed Claim will be $50 or more.

4.    *No Distributions with Respect to Disputed Claims*

Notwithstanding any other Plan provision, Distributions will be made on account of a Disputed Claim only after, and only to the extent that, the Disputed Claim becomes an Allowed Claim or is deemed to be an Allowed Claim for Distribution purposes.

5.    *Undeliverable, Unclaimed Non-Negotiated Distributions*

Distributions to Holders of Allowed Claims will initially be made by mail to the address, if any, set forth on the books and records of the Debtor as amended by any written notice of address change received by the Reorganized Debtor no later than ten (10) Business Days prior to the date of any Distribution.

If no address is available through any of the foregoing means, the Distribution will be deemed to be undeliverable. If a Distribution is returned to the Reorganized Debtor as an undeliverable Distribution or is deemed to be an undeliverable Distribution, the Reorganized Debtor shall make no further Distribution to the entity holding the Claim on which the Distribution is being made unless and until the Reorganized Debtor is timely notified in writing of that entity's current address. Subject to the following paragraph, until they become deliverable, the Reorganized Debtor will create one or more Plan Reserves for undeliverable Distributions for the benefit of the entities entitled to the Distributions. These entities will not be entitled to any interest on account of the undeliverable Distributions.

Any Holder of an Allowed Claim that is otherwise entitled to an undeliverable Distribution and that does not, within ninety (90) days after a Distribution is returned to the Reorganized Debtor as undeliverable, or is deemed to be an undeliverable Distribution, provide the Reorganized Debtor with a written notice asserting his, her or its claim to that undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Debtor, and/or the Reorganized Debtor. Any undeliverable Distributions that are not claimed under this Section will become Available Cash. Nothing in the Plan requires the Reorganized Debtor to attempt to locate any entity holding an Allowed Claim and whose Distribution is undeliverable.

If an instrument delivered as a Distribution to a Holder of an Allowed Claim is not negotiated within one hundred and twenty (120) days after such instrument was sent to the Holder of the Allowed Claim, then the instrument shall be null and void, the Holder of an Allowed Claim shall be deemed to have waived such Distribution, and it shall become Available Cash.

F.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

The Debtor will assume certain executory contracts and unexpired leases. A specific list of all executory contracts and/or unexpired leases to be assumed by the Debtor under the Plan ("**Assumed Contract Schedule**") will be filed with the Court and served on the other party to such contract or lease by the Exhibit Filing Date.

On the Effective Date, each of the unexpired leases and executory contracts listed on the Assumed Contract Schedule shall be assumed as obligations of the Reorganized Debtor. The Confirmation Order shall constitute an order approving the assumption of each lease and contract to be identified on the Assumed Contract Schedule. If a party to a lease or contract to be assumed objects to the assumption of his, her or its lease or contract, such party must file and serve his, her or its objection to the proposed assumption of his, her or its lease or contract within the deadline for objecting to the Confirmation of the Plan.

The Debtor may reject certain pre-petition leases and executory contracts of the Debtor. A specific list of the executory contracts and/or unexpired leases to be rejected by the Debtor under the Plan ("**Rejection Schedule**") will be filed with the Court and served on the other party to such contract or lease by the Exhibit Filing Date.

In addition, all executory contracts and unexpired leases that have not been specifically assumed will be deemed rejected on the Effective Date, despite not being included on the Rejection Schedule. The Confirmation Order shall constitute an order approving the rejection of the lease or contracts not specifically assumed.

**THE BAR DATE FOR FILING ANY POC BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS THIRTY (30) DAYS AFTER THE ENTRY OF AN ORDER CONFIRMING THE PLAN.**

Any claim based on the rejection of a contract or lease will be barred if the POC is not timely filed, unless the Court later orders otherwise.

G.    REGULATORY APPROVAL NOT REQUIRED.

The Debtor is not subject to governmental regulatory commission approval of its rates.

## VII.    **LITIGATION**

On the Effective Date, the Reorganized Debtor shall retain, and may exclusively enforce, the State Court Action, the Fraudulent Transfer Action and the Subordination Claim, any and all other claims, rights or Rights of Action, whether arising before or after the Effective Date, in any court or other tribunal. The Reorganized Debtor, in its absolute and sole discretion, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, the State Court Action, Fraudulent Transfer Action, Subordination Claim, and Rights of Action.

On and after the Effective Date, with respect to any matter affecting any Assets, the Reorganized Debtor may take such actions in the name of the Debtor.

Unless a claim, the State Court Action, Fraudulent Transfer Action, Subordination Claim, or any Right of Action against a person or entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order or Final Judgment, the Reorganized Debtor expressly reserves such claim or cause of action for later adjudication (including, without limitation, claims and Rights of Action which the Reorganized Debtor may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown at this time, or facts or circumstances which may change or be different from those now believed to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims or Rights of Action upon, or after, the consent to, or consummation of, the Plan, except where such claims or Rights of Action have been released in the Plan or other Final Order.

On and after the Effective Date, the Reorganized Debtor will make the decision of whether or not to pursue any Right of Action, claims, or causes of action and/or to settle or not settle any Rights of Action, claims, or causes of action, and this decision will be based upon the Reorganized Debtor's review of the merits of the various Rights of Action as well as the costs required to prosecute such Rights of Action. The Reorganized Debtor may seek to retain counsel and/or other advisors to prosecute some or all of such Rights of Action on behalf of, and in the name of, the Reorganized Debtor, may seek to finance any costs relating to the prosecution of such litigation or may decide not to pursue such Rights of Action at all. The Reorganized Debtor, in its absolute and sole discretion, may settle such actions on behalf of the Reorganized Debtor following the Effective Date without further notice or hearing.

The Debtor and/or the Reorganized Debtor shall not have any liability arising out of the good faith determinations of the Debtor and/or the Reorganized Debtor of whether or not to pursue prosecution of and/or settle the foregoing Rights of Action.

The Debtor and the Reorganized Debtor, in their absolute and sole discretion, reserve the right to supplement at any time before or after the Effective Date, the reserved litigation to include actions, causes of action, claims, avoidance actions, declaratory relief actions, and lawsuits of any kind or nature, whether in law or in equity, that the Debtor may have against any Claimant or any other person or entity by filing with the Bankruptcy Court ***Schedule I***. Upon such filing, Schedule I shall be deemed to be incorporated as part of the Disclosure Statement, Plan, and Confirmation Order as of the Effective Date without further order of the Bankruptcy Court, and none of the Disclosure Statement, Plan, and/or Confirmation Order shall act as bar against the filing and/or prosecution of any such actions, causes of action, claims, avoidance actions, declaratory relief actions, and lawsuits, and/or the enforcement of any judgment obtained with respect thereto.

## VIII.    EFFECT OF CONFIRMATION OF THE PLAN AND RELATED PROVISIONS

### A.    DISCHARGE

Except as otherwise provided in the Plan or in the Confirmation Order, at the time provided in Bankruptcy Code § 1141(d), Confirmation of the Plan shall operate as a discharge pursuant to Bankruptcy Code § 1141(d)(1), effective as of the Effective Date, of any and all debts or Claims against the Debtor that arose at any time before issuance of the Confirmation Order, including, but not limited to, all principal and interest, whether accrued before, on or after the Petition Date. As to every discharged debt and Claim, the Creditor that held such debt or Claim shall be precluded from asserting against the Debtor or against the Debtor's assets or the Reorganized Debtor or any

assets of the Reorganized Debtor, any or further Claim based upon any document, instrument or act, omission, transaction, or any other activity of any kind or nature that occurred prior to the Confirmation Date, including, without limitation, Claims in the nature of successor liability. Upon Confirmation of the Plan, the Debtor shall be discharged of liability for payment of debts incurred before Confirmation of the Plan, to the full extent specified in Bankruptcy Code § 1141. However, any liability imposed by the Plan will not be discharged. Furthermore, all Claims and debts against the Debtor which are so discharged may not be asserted against the Reorganized Debtor under any circumstances unless pursuant to the provisions of the Plan.

    B.    INJUNCTION.

The Confirmation Order shall operate as an injunction against the commencement or continuation of any act relating to the collection or enforcement of any Claim ("*Enjoined Claim*") against the Debtor and the Reorganized Debtor. The Confirmation Order shall provide, among other things, that except as otherwise provided in the Plan, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor are enjoined from and after the Effective Date in respect of the treatment of the Claims of Creditors under the Plan, from: (i) commencing or continuing in any manner any action or proceeding of any kind with respect to such Claim against the Debtor and/or the Reorganized Debtor, including, without limitation based upon any guaranty; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor and/or the Reorganized Debtor or the property of any such parties or property of their respective affiliates with respect to any such Claim; and (iii) creating, perfecting, or enforcing any encumbrances of any kind against the Debtor and/or the Reorganized Debtor or against the property of any such parties, with respect to any such Claim or Interest.

    C.    VESTING OF PROPERTY IN THE REORGANIZED DEBTOR.

The Confirmation of the Plan vests all of the property of the Estate and/or Debtor, including, without limitation, the Commercial Property, the Other Assets, operations, the State Court Action, Fraudulent Transfer Action, the Subordination Claim, and Rights of Action in the Reorganized Debtor free and clear of all Claims, Liens, interests, and encumbrances, except the liens securing the W Linc Note Disputed Secured Claim or the W Linc Note Allowed Secured Claim, as applicable, pursuant to the provisions of Class 2 of the Plan.

On and after the Effective Date, the Reorganized Debtor may operate the business and use, sell, lease, assign, transfer, convey, hypothecate, pledge, alienate, dispose of, take possession of, or encumber any and all of the Commercial Property, Other Assets, personal property, and any other property without further Court order or approval, whether in the ordinary course of business or outside the ordinary course of business and free of any restrictions imposed by Bankruptcy Code § 363(b). As provided under the Plan, the Reorganized Debtor is authorized and empowered without further Court Order to execute, do and perform, in the name and on behalf of the Reorganized Debtor, such acts and to prepare, execute, acknowledge, verify, file, deliver and cause to be published any and all certificates, agreements, notices, notice of default, trustees' sale notices, reports, applications, declarations, instruments, notes, deeds, reconveyances, transfer documents, sale agreements, and any and all other documents of any kind or nature to accomplish any of the foregoing.

## IX.   OTHER PLAN PROVISIONS

A.   POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS

Commencing on the Effective Date, instruments, notes, and other evidences of Claims will represent only the right to receive the Distributions contemplated under the Plan.

B.   RECOURSE

No Person entitled to receive a payment or Distribution under the Plan will have any recourse against the Debtor or the Reorganized Debtor other than the right to receive Distributions in accordance with the terms of the Plan.

C.   NO ADMISSIONS

Notwithstanding anything to the contrary in the Plan, if the Plan is not consented to, is revoked or otherwise the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan will: (1) be deemed to be an admission by the Debtor with respect to any matter discussed in the Plan, including liability on any Claim or the propriety of any Claim's classification; (2) constitute a waiver, acknowledgement, or release of any Claims; or (3) prejudice in any manner the rights of the Debtor or any other person in any further proceedings.

D.   REVOCATION OF THE PLAN

The Debtor reserves the right to withdraw the Plan before the Effective Date.

E.   SEVERABILITY OF PLAN PROVISIONS

If, before the Effective Date, any court holds that any Plan term or provision is invalid, void, or unenforceable, the court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of the Debtor, in which case the Plan may be unilaterally withdrawn by it. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.

F.   CONFIRMATION REQUEST.

In the event that all of the applicable requirements of Bankruptcy Code § 1129 (a) are met other than paragraph (8), the Debtor requests Confirmation of the Plan notwithstanding the requirements of such paragraph under Bankruptcy Code § 1129(b).

G.   GOVERNING LAW

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and/or FRBP), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof, except as otherwise expressly stated therein.

H.    SUCCESSORS AND ASSIGNS

Unless otherwise specified in the Plan, the rights, benefits, and obligations of any entity referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of that entity.

I.    SATURDAY, SUNDAY, OR LEGAL HOLIDAY

If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

J.    HEADINGS

The headings used in the Plan are inserted for convenience only and do not constitute a portion of the Plan or in any manner affect the provisions of the Plan or their meaning.

K.    OTHER ASSURANCES

The Creditors and Holders of Interests shall execute and deliver such documents and perform such other acts as may be reasonably requested by the Debtor and/or the Reorganized Debtor to implement and carry out the terms and/or intent of the Plan, and any notes or other documents issued pursuant hereto.

L.    MODIFICATION OF PLAN

The Debtor may modify, alter or amend the Plan at any time before the Effective Date. The Reorganized Debtor reserves the right to modify, alter, or amend the Plan at any time after the Effective Date to correct any ambiguity or mistake.

M.    ROUNDING.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.

N.    CLAIMS ESTIMATION.

Under the Plan, the Debtor has the right to file motions seeking to estimate Claims, including, without limitation, Secured Claims in accordance with Bankruptcy Code § 502(c)(1). Through such motions, the Debtor can seek a ruling from the Court estimating any Claim in a fixed amount for the purpose of voting, allowance, and distributions under the Plan. Once Claims have been estimated and allowed for purposes of distribution at a fixed amount, Claims will be treated and distributions reserved based on such fixed amount, subject to any further order upon motion under Bankruptcy Code § 502(j) to reconsider the fixed amount allowed. Until Claims are finally Allowed: (a) such Claims shall not receive any Distributions; and (b) such Claims shall be reserved in the amount estimated.

O.    SETOFF, RECOUPMENT AND OTHER RIGHTS.

Notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the Distributions to be made pursuant to the Plan on account of any claims that the Debtor, the Estate, or the Reorganized Debtor may have against the entity holding an Allowed Claim; provided,

however, that neither the failure to effect such a setoff or recoupment, nor the allowance of any Claim against the Debtor and/or the Reorganized Debtor, nor any partial or full payment during the Case or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by the Debtor, the Estate and/or the Reorganized Debtor of any claim that they may possess against such Holder.

P.    RETENTION OF JURISDICTION

After Confirmation of the Plan and after the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

a.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

b.    To determine the allowability, classification, or priority of Claims and Interests upon objection by the Debtor or Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

c.    To determine the extent, validity and priority of any lien asserted against the property of the Reorganized Debtor or property of the Debtor's Estate, including, without limitation, the lien rights, if any, asserted by the Holders of Claims;

d.    To (i) construe and take action to enforce the Plan, the Confirmation Order, and any other order of the Court, (ii) issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred to in the Plan and the Confirmation Order, and (iii) determine all matters that may be pending before the Court in the Case on or before the Effective Date with respect to any Person or entity;

e.    To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period before, on and after the Effective Date;

f.    To determine any requests for payment of Administrative Expenses;

g.    To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan or the Confirmation Order;

h.    To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any Claims resulting therefrom;

i.    To determine all applications, motions, adversary proceedings, contested matters and any other litigated matters instituted during the Case whether before, on or after the Effective Date, including, without limitation, any and all claims, causes of action, setoffs, recoupments and the determination of any other rights;

j.    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

k.    To modify the Plan under Bankruptcy Code § 1127 in order to remedy any apparent defect or omission in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose, or implement any settlement reached;

l.     Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or to restrain the execution or implementation by any Person of the Plan or the Confirmation Order;

m.     To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy laws, with respect to any Person, to the fullest extent authorized by the Bankruptcy Code or FRBP;

n.     To enter any order approving, in connection with, or related to, the sale, collection, transfer or disposition of any of the Assets and all related transactions as may be requested by the Debtor or Reorganized Debtor; and,

o.     To enter a final decree closing this Case.

Q.     POST CONFIRMATION UST FEES AND IDENTITY OF THE ESTATE REPRESENTATIVE.

The Reorganized Debtor shall timely pay all UST Fees incurred after Confirmation until the entry of a final decree closing the Case. The Reorganized Debtor shall be the Estate representative for purposes of complying with the Debtor's reporting requirements to the Court and the UST and for obtaining a final decree closing the Case.

R.     EXEMPTION FROM CERTAIN TRANSFER TAX.

In accordance with Bankruptcy Code § 1146(c), the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, including the recording of any mortgage or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment. The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instrument or other documents without payment of such tax or other governmental assessment.

S.     APPLICABILITY OF LBR 3020(b)

In accordance with LBR 3020-1(b), within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report explaining what progress has been made toward consummation of the confirmed Plan. The Reorganized Debtor shall serve such report on the UST, the twenty (20) largest unsecured creditors, and those parties who have requested special notice.

T.     FINAL DECREE

Once the Effective Date has occurred, the Reorganized Debtor or other party as the Court shall designate in the Confirmation Order, may file a motion with the Court to obtain a final decree to close the Case. Upon entry of the final decree or applicable order of the Court, the obligation to pay UST Fees shall cease and terminate.

U.     CALCULATIONS

For purposes of calculating Distributions to be made under the Plan to Holders of Allowed Claims, the aggregate amounts of all Allowed Claims shall be computed as if all Disputed Claims and all unpaid Administrative Claims still outstanding on the date of any such calculations, and all anticipated Administrative Claims estimated pursuant to the procedures set forth below, were to

be allowed in the full amount thereof. The Reorganized Debtor shall calculate the Distributions due to Holder of such Allowed Claims on or before any distribution date, as applicable. Although, for purposes of determining any Distributions, the Plan assumes that all Disputed Claims of the Class will be allowed, Distributions initially allocated to Holders of Disputed Claims will not be distributed on a distribution date, but will be held in the appropriate Plan Reserve Account until resolution of the Disputed Claim.

   V.    ESTIMATION OF DISTRIBUTIONS.

   The amount of each Distribution under the Plan shall be determined in light of the Available Cash, Available Residual Cash, and taking into consideration an estimate by the Reorganized Debtor as to the amount required for a Plan Reserve or Operating Reserves.

DATED: May 9, 2016              **315 ARDEN, LLC**
                               Debtor


                               _____[signature to follow]_____
                               By:  Tzepah Freedland
                               Its:  Managing Member


Respectfully submitted,

**CREIM MACIAS KOENIG & FREY LLP**


By: */s/ Sandford L. Frey*
     SANDFORD L. FREY
Reorganization Attorneys for 315 Arden, LLC
Debtor and Debtor-In-Possession

35

Sandford L. Frey (SBN 117058)
**LEECH TISHMAN FUSCALDO & LAMPL INC**
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
Telephone: 626.796.4000; Facsimile: 626.795.6321
E-mail:sfrey@leechtishman.com

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## [LOS ANGELES DIVISION]

| | |
|---|---|
| In re | CASE NO.: 2:15-bk-26483-BR |
| **315 ARDEN, LLC,** | Chapter 11 |
| Debtor and Debtor-in-Possession. | **EXHIBIT 2 TO MOTION OF COUNSEL OF RECORD, LEECH TISHMAN FUSCALDO & LAMPL LLP, TO AUTHORIZE BANKRUPTCY COUNSEL TO WITHDRAW FROM REPRESENTATION** |

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

NO FEE

*$R001040707825$*

2018000372386 2:31 pm 10/12/18

9 406 G02 A04   5

0.00 0.00 0.00 0.00 12.00 0.00 0.000.000.00 0.00

RECORDING REQUESTED BY
FIRST AMERICAN TITLE INSURANCE CO.
NATIONAL COMMERCIAL SERVICES

NCS·917481·SA1

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

City of Buena Park
6650 Beach Boulevard
Buena Park, CA 90622
Attn: Economic Development Department

APN: 135-192-50

DTT = 0.00 *
City of Buena Park

[SPACE ABOVE FOR RECORDER'S USE ONLY]

## GRANT DEED

THE UNDERSIGNED GRANTOR DECLARES AS FOLLOWS:

*      The undersigned declares that this Grant Deed is exempt from Recording Fees pursuant
to California Government Code Section 27383, and that this Grant Deed is exempt from
documentary transfer taxes as a conveyance to a public entity.

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, 315
ARDEN, LLC, a California limited liability company ("**Grantor**"), hereby grants to the CITY
OF BUENA PARK, a municipal corporation ("**Grantee**") the land located in the County of
Orange, State of California, more particularly described on **Exhibit A** attached hereto and
incorporated herein by reference and all improvements and fixtures thereon (collectively, the
"**Property**").

IN WITNESS WHEREOF, Grantor has executed this Grant Deed as of the date set forth
below.

Dated: 9/3 , 2018

315 ARDEN, LLC

By: _____
Tzepah Freedland

Mail Tax Statements To: Same as Above

11224-0001\2204147v3.doc

# ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate is
> attached, and not the truthfulness, accuracy, or
> validity of that document.

State of California
County of _____ Los Angeles _____ )

On _09 / 03_ / 2018 before me, _Dale Marc Effren, Notary Public_
_____
(insert name and title of the officer)

personally appeared _Tzepah Freedland_ _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

DALE MARC EFFREN
Notary Public - California
Los Angeles County
Commission # 2162775
My Comm. Expires Sep 13, 2020

## CERTIFICATE OF ACCEPTANCE
(California Government Code Section 27281)

This is to certify that the interest in real property conveyed by that certain Grant Deed dated September 3, 2018 from 315 Arden, LLC, to the City of Buena Park, which is a political corporation, is hereby accepted by the undersigned officer on behalf of the City of Buena Park pursuant to the authority conferred by action of the City Council of the City of Buena Park on July 24, 2018, and the grantee consents to recordation thereof by its duly authorized officer.

Dated: _____ **SEP 19**, 2018 _____

Jim Vanderpool
City Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

On _September 19, 2018_ before me, _Lana Ardaiz_ , a Notary Public

personally appeared _Jim Vanduepool_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature(s) on the instrument the person(s), or the entity(ies) upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature of Notary Public

LANA ARDAIZ
Notary Public – California
Orange County
Commission # 2194218
My Comm. Expires May 25, 2021

Place Notary Seal Above

# OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) claimed by Signer(s)

Signer's Name: _____

☐ Individual
☐ Corporate Officer – Title(s): _____
☐ Partner –    ☐ Limited    ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer is Representing: _____

RIGHT THUMBPRINT
OF SIGNER

Top of thumb here

11224-0001\2204147v3.doc

Exhibit A
to Grant Deed

LEGAL DESCRIPTION

Real property in the City of Buena Park, County of Orange, State of California, described as follows:

THE EAST 172.35 FEET OF THE WEST 802.35 FEET OF THE NORTH 340.00 FEET OF THE SOUTH 380.00 FEET OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 11 WEST, IN THE RANCHO LOS COYOTES, IN THE CITY OF BUENA PARK, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 51, PAGE 11 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

APN: 135-192-50

11224-0001\2204147v3.doc

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 200 South Los Robles Avenue, Suite 210, Pasadena, California 91101.

A true and correct copy of the foregoing document entitled (*specify*): MOTION OF COUNSEL OF RECORD, LEECH TISHMAN FUSCALDO & LAMPL LLP, TO WITHDRAW AS BANKRUPTCY COUNSEL FOR REORGANIZED DEBTOR, 315 ARDEN LLC; DECLARATION OF SANDFORD L. FREY IN SUPPORT will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On September 27, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| Name: | On behalf of: | E-mail address: |
|---|---|---|
| Byron Z Moldo | W Linc BP, LLC<br>Red Mountain Group Inc.<br>Red Mountain Retail Group Inc. | bmoldo@ecjlaw.com;<br>lpekrul@ecjlaw.com |
| Daniel J. Kessler | W Linc BP, LLC | dkessler@bkcglaw.com;<br>lwell@bkcglaw.com;<br>moberbeck@bkcglaw.com;<br>cvasquez@bkcglaw.com;<br>spettit@bkcglaw.com;<br>litclerk1@bkcglaw.com |
| Howard Camhi | W Linc BP, LLC<br>Red Mountain Group Inc.<br>Red Mountain Retail Group Inc. | hcamhi@ecjlaw.com |
| Marta C. Wade | Debtor | mwade@mcwadelaw.com |
| Michael D. Vanlochem | NISSAN-INFINITI LT. | janguiano@vandc.net |
| Ron Moroko | United States Trustee | ron.maroko@usdoj.gov |
| Sandford Frey | Debtor | sfrey@leechtishman.com |
| Tomas A Ortiz | Hanley Investment Group | tortiz@garrett-tully.com |
| Kenneth Miller | W Linc BP, LLC | kmiller@pmcos.com |

**2.  SERVED BY UNITED STATES MAIL**:  On (*date*) November 5, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| | |
|---|---|
| Hon. Barry Russell<br>United States Bankruptcy Court<br>255 E. Temple Street, Suite 1660<br>Los Angeles, CA 90012 | 315 Arden, LLC<br>8950 W. Olympic Blvd., Suite 650<br>Beverly Hills, CA 90211 |
| Tzepah Zarmi<br>344 S. Almont Drive<br>Beverly Hills, CA 90211-3548 | Aaron B. Swerdlow<br>Glaser Weil<br>425 California Street<br>Suite 800<br>San Francisco, CA 94104 |
| Ron Maroko<br>915 Wilshire Blvd., Ste 1850<br>Los Angeles, CA 90017 | |

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
(state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date)
____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those
who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing
the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be
completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 5, 2018 | Sandford L. Frey | /s/ Sandford L. Frey |
|---|---|---|
| Date | Printed Name | Signature |